FILED
2023 Feb-21  AM 10:40
U.S. DISTRICT COURT
N.D. OF ALABAMA



Deposition of:

# 30(b)(6) Shawn Watson

*December 16, 2021*

In the Matter of:

# Kornegay, Matthew Vs. High Point Birmingham, LLC, et al.

Veritext Legal Solutions

877.373.3660 | calendar-al@veritext.com | 800.808.4958

EXHIBIT 1 - 000001

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DIVISION OF ALABAMA
3                  SOUTHERN DIVISION
4
5     KINSLEY KORNEGAY, a
      minor, by and through her
6     parent and guardian,
      MATTHEW KORNEGAY
7
          PLAINTIFF,
8
                              CASE NO.
9     vs.
                         2:21-cv-00505-NAD
10
      HIGH POINT BIRMINGHAM,
11    LLC, and HIGH POINT
      CLIMBING, LLC,
12
          DEFENDANTS.
13
14          DEPOSITION OF SHAWN WATSON
15           TAKEN DECEMBER 16, 2021
16          * * * * * * * * * * *
17          Taken pursuant to stipulation and
18     agreement before Joseph Jones, CCR,
19     Commissioner for the State of Alabama at
20     Large, at Regus Chattanooga, 200 West Martin
21     Luther King Boulevard, Suite 1000, commencing
22     at approximately 8:57 a.m. (EST).
23          * * * * * * * * * * *

EXHIBIT 1 - 000002

Page 2

1       APPEARANCES
2  FOR THE PLAINTIFF:
3    Mr. Austin B. Whitten
     PITTMAN, DUTTON, HELLUMS,
4    BRADLEY & MANN, PC
     Attorneys at Law
5    2001 Park Place North
     Suite 1100
6    Birmingham, Alabama  35203
7  FOR THE DEFENDANT:
8    Mr. Jeremy S. Hazelton
     MOORE, YOUNG, FOSTER & HAZELTON, LLP
9    Attorneys at Law
     1400 Urban Center Drive
10   Suite 200
     Birmingham, Alabama  35242
11
12       * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

Page 4

1       STIPULATIONS
2       It is hereby stipulated and agreed by
3  and between counsel representing the parties
4  that the deposition of SHAWN WATSON is taken
5  pursuant to the Federal Rules of Civil
6  Procedure and that said deposition may be
7  taken before Joseph Jones, Court Reporter and
8  Commissioner for the State of Alabama at
9  Large, without the formality of a commission;
10  that objections to questions other than
11  objections as to the form of the questions
12  need not be made at this time but may be
13  reserved for a ruling at such time as the
14  deposition may be offered in evidence or used
15  for any other purpose as provided for by the
16  Federal Rules of Civil Procedure.
17       It is further stipulated and agreed by
18  and between counsel representing the parties
19  in this case that said deposition may be
20  introduced at the trial of this case or used
21  in any manner by either party hereto provided
22  for by the Federal Rules of Civil Procedure.
23       * * * * * * * * * * * * * *

Page 3

1       EXAMINATION INDEX
2  SHAWN WATSON
3  BY MR. WHITTEN                    5
4       EXHIBIT INDEX
5  PLAINTIFF'S EXHIBIT NUMBER
6  Exhibit 1  Notices of Deposition          7
7  Exhibit 2  Orientation Form              17
8  Exhibit 3  Video Footage                 41
9  Exhibit 4  Incident Report               52
10  Exhibit 5  Training Checklist           58
11  Exhibit 6  Orientation Evaluation Form  63
12  Exhibit 7  Operator's Manual            68
13  Exhibit 8  Industry Practices, Third Edition 91
14  Exhibit 9  Photographs                  97
15  Exhibit 10 Answers to Interrogatories   103
16
17       * * * * * * * * * * * *
18
19
20
21
22
23

Page 5

1            SHAWN WATSON
2       The witness, having first been
3  duly sworn or affirmed to speak the truth, the
4  whole truth, and nothing but the truth,
5  testified as follows:
6            EXAMINATION
7  BY MR. WHITTEN:
8       Q.   Good morning.  My name is Austin
9  Whitten.  I'm one of the attorneys
10  representing the plaintiffs in this matter.
11       Can you state your name for the
12  record?
13       A.   Shawn Watson.
14       Q.   And have you ever given a
15  deposition before?
16       A.   No.
17       Q.   Well, I'll go over a few ground
18  rules to make sure things go smoothly for us
19  and the court reporter.  I'll ask you
20  questions.  You have to answer them
21  truthfully.  This is a formal legal proceeding
22  like testifying in Court, and you're under the
23  same legal obligation to tell the truth.

Veritext Legal Solutions
877-373-3660                                    800.808.4958

EXHIBIT 1 - 000003

Page 6

1       Do you understand that?
2       A.   Yes.
3       Q.   And it's important that only one
4  of us speak at a time so that the court
5  reporter can write down everything that we're
6  saying.  He can only write down words, so
7  please don't shrug or, you know, nod your
8  head.  Make sure everything is a verbal
9  response.  It's important that only one of us
10  speak at a time so that he can write down
11  everything clearly.  So I'll just ask that you
12  let me finish my question before you respond,
13  and I'll try to let you finish your response.
14       If you don't hear or understand a
15  question that I'm asking, please ask me to
16  repeat it or rephrase it.  If you don't, I'll
17  have to assume that you understood the
18  question.  Is that fair?
19       A.   Yes.
20       Q.   And this is not a marathon.  If
21  you need a break, please just ask for one.
22  The only caveat is if there's a question
23  pending, I'll ask that you answer that

Page 7

1  question before we take a break.  Okay?
2       A.   Yes.
3       Q.   Are you taking any medication this
4  morning that could affect your memory or
5  impair your ability to truthfully answer my
6  questions?
7       A.   No.
8       Q.   I'm going to hand you a document.
9  I'll mark it Plaintiff's Exhibit 1, and it's
10  actually two documents in one there.  So if
11  you'll just flip through it and familiarize
12  yourself with it for a second.
13       (Plaintiff's Exhibit Number 1 was
14       marked for identification.)
15       Q.   Have you seen these documents
16  before this morning?
17       A.   Yes.
18       Q.   And can you confirm that you are
19  here to testify today as to all of the topics
20  listed in these two deposition notices on
21  behalf of both High Point Climbing and High
22  Point Birmingham?
23       A.   Yes.

Page 8

1       Q.   What did you do to prepare for
2  today's deposition?
3       A.   I took a look at this, the
4  submittals that were made, the
5  interrogatories, and I saw Hannah's
6  deposition.
7       Q.   Okay.  Did you read the transcript
8  of Hannah's deposition?
9       A.   Yes.
10       Q.   What documents did you look at
11  other than the specific ones you just
12  mentioned?
13       A.   Can you be more specific?  I mean,
14  like -- so I looked at this.
15       Q.   You said the submissions?
16       A.   The interrogatories.  Sorry -- or
17  the submissions we made to you.
18       Q.   So the documents that High Point
19  turned over?
20       A.   Submitted.  Exactly, yeah.
21       Q.   Okay.  Have you looked at any of
22  the documents that my plaintiff, Kinsley
23  Kornegay, sent to you guys?

Page 9

1       A.   No, I haven't seen any of that.
2       Q.   All right.  Did you speak with
3  anyone at High Point to prepare for this
4  deposition?
5       A.   No.
6       Q.   Okay.  Mr. Watson, what is your
7  date of birth?
8       A.   6/8/72.
9       Q.   And what is your educational
10  background?
11       A.   I have a degree in business from
12  Illinois State University.
13       Q.   And where are you employed now?
14       A.   High Point Climbing & Fitness.
15       Q.   What is your job title there?
16       A.   Technically, chief operating
17  officer.
18       Q.   And how long have you been in that
19  role?
20       A.   In that specific role?
21       Q.   Yeah.
22       A.   It's kind of arbitrary.  Let's say
23  2015, I guess.

3 (Pages 6 - 9)

EXHIBIT 1 - 000004

Page 10

1   Q.   Roughly six years?
2   A.   Yeah.
3   Q.   Okay.  Did you work for High Point
4 before that?
5   A.   Yeah.  I started with the company
6 in 2013.
7   Q.   What was your job title when you
8 started with the company?
9   A.   I guess -- assistant general
10 manager, I guess.
11   Q.   Okay.  Had you worked in the
12 climbing industry before this?
13   A.   Yes.
14   Q.   What was your background in the
15 climbing industry?
16   A.   I started in '95 with another
17 start-up and was with them until I moved here
18 in 2013 to help this company start up.
19   Q.   And with that previous company,
20 did you do much actual on-the-floor work with
21 them, or was it more executive?
22   MR. HAZELTON:  Object to form.
23   A.   It was all on the floor.  I was a

Page 11

1 general manager, so I was directly involved in
2 everything happening.
3   Q.   (By Mr. Whitten) What was the name
4 of that company?
5   A.   Upper Limits, I think.
6   Q.   Where is it based out of?
7   A.   Central Illinois.
8   Q.   And you worked in Illinois?
9   A.   Uh-huh, yes.
10   Q.   All right.  As COO of High Point,
11 what are your principal job responsibilities
12 now?
13   A.   It's a wide range of
14 responsibilities from risk management to
15 training standards to processes, policies,
16 day-to-day operations, maintenance, new
17 construction.  There's -- anything that
18 happens in a business pretty much falls under
19 my purview.
20   Q.   How many facilities does High
21 Point Climbing own?
22   A.   Currently, we have six.
23   Q.   Six.

Page 12

1   MR. HAZELTON:  Object to the form.
2 Sorry.  I don't know that High Point Climbing
3 owns any of these facilities, but just for the
4 record.
5   THE WITNESS:  Oh, I'm sorry.
6   A.   It depends on which entity you're
7 talking about, I guess.
8   Q.   (By Mr. Whitten) Yeah.  High Point
9 Climbing, my understanding -- and please
10 correct me if I'm wrong -- is that High Point
11 Climbing leases the properties from -- or
12 leases the Birmingham facility from High Point
13 Birmingham; is that correct?
14   A.   Correct.  High Point Climbing,
15 LLC, is the operator of the business.
16   Q.   And is that the same for all of
17 its six locations?
18   A.   High Point Climbing, LLC, operates
19 the -- the operations, the business part of
20 it.  There are various leases and property
21 owners.  So, yes, we lease all of our spaces.
22   Q.   So does High Point Climbing own
23 any property itself?

Page 13

1   A.   No, it doesn't.
2   Q.   Okay.  And who do you report to in
3 your role?
4   A.   The president.
5   Q.   Who is that?
6   A.   John Wiygul.
7   Q.   Has he been the president since
8 you started?
9   A.   Yes.
10   Q.   Do you know who the members of the
11 LLC are?
12   A.   Yes.
13   Q.   Who are they?
14   MR. HAZELTON:  Of which one?
15   THE WITNESS:  Yeah.
16   A.   Which one?
17   Q.   (By Mr. Whitten) Of High Point
18 Climbing.  I'm sorry.
19   A.   High Point Climbing, LLC, is --
20 you want the specific names or the number of
21 people?
22   Q.   Is it more than two?
23   A.   Yes.

4 (Pages 10 - 13)

Page 14

1    Q.   Okay.  If you know the names, that
2  would be great.
3    A.   John Wiygul, John O'Brien, and
4  then Patrick O'Brien and Conner O'Brien.
5    Q.   Just four total?
6    A.   Four total, yes.
7    Q.   Do you understand that we're here
8  to talk about a fall involving my client at
9  High Point's Birmingham facility that occurred
10  on August 2nd, 2019?
11    A.   Yes.
12    Q.   And are you familiar with
13  everything that happened surrounding that
14  fall?
15    A.   Only in so far as the incident
16  report and the video and then just speaking
17  with them immediately after the event.
18    Q.   So you were not present at --
19    A.   No.
20    Q.   -- the facility when that
21  occurred?
22    A.   No.
23    Q.   How often do you yourself go down

Page 15

1  to the Birmingham facility?
2    A.   I'm in the facilities at least
3  once a month.
4    Q.   Okay.  So does any other corporate
5  representative go down to the Birmingham
6  facility regularly?
7    A.   Yes.  The owners are in there
8  about once a month as well.
9    Q.   So I'd like to walk through what
10  happened when Kinsley Kornegay's group arrived
11  at High Point.
12         What would have been the first
13  step for them when they got there?
14    A.   When someone comes in the gym, the
15  first step is to find out if they've been
16  there before.  If they have, we'll check them
17  in.  If they're already in the computer
18  system, we can see what they are and are able
19  to do and then process them accordingly.  If
20  someone hasn't been to the facility before,
21  the first thing we'll do is fill out waivers.
22  We'll find out if they have children with
23  them.  We'll find out if all the kids are

Page 16

1  there or if they have friends along.  If they
2  have friends along, you know, we'll contact
3  the parents or they'll contact the parents to
4  fill out a waiver online form.
5         Once they fill out the waivers,
6  they'll be brought into the system, and then
7  from that point, we find out who is going to
8  be climbing.  They'll pay accordingly, and
9  then we'll get them their rental gear they
10  need, show them how to put it on, and at that
11  point, they'll go on an orientation to show
12  them what they can and can't use in the gym.
13  And at that point, they're able to use the
14  facility based on what they're qualified for.
15    Q.   Okay.  You mentioned -- and just
16  to kind of back up a minute.  You mentioned
17  the first thing you do is find out if they've
18  been there before.
19         Does that change other than just
20  having to input them into your computer
21  system?  Does that change anything about the
22  safety orientation or anything like that?
23         MR. HAZELTON:  Object to form.

Page 17

1    A.   If someone has been to the gym
2  before, they will have already gone through an
3  orientation.  So, if they haven't been there
4  in a long time, we'll ask them if they
5  remember everything.  If they don't, then
6  we'll refresh them on all the information they
7  need to know.  If they remember everything and
8  they say they're fine and been in within a few
9  months, then they're free to go use the
10  facility.
11    Q.   So it's only the new clients or
12  new guests that have to do the orientation
13  typically?
14    A.   Correct.  First visitors all go
15  through orientation.
16    Q.   Okay.  And you mentioned waivers.
17  Kinsley Kornegay never signed a waiver
18  herself, correct?
19    A.   No.  She's a minor.  So it would
20  have had to have been filled out by a parent.
21         (Plaintiff's Exhibit Number 2 was
22         marked for identification.)
23    Q.   Mr. Watson, I'm handing a document

5 (Pages 14 - 17)

Page 18

1  marked Plaintiff's Exhibit 2.  If you'll take
2  a look at that, review it, and tell us what
3  that document is.
4      A.   This is the orientation form that
5  we use to log who has been on orientation and
6  who did it.
7      Q.   And this specific orientation
8  form, is this the one that was filled out by
9  Kinsley Kornegay's group that she arrived
10  with?
11      A.   If her name is on it, then yes.
12  Yeah, this would be the one.
13      Q.   It does appear on this first page
14  that she's the fist name listed there.
15         Does that appear like Kinsley's
16  name to you?
17      A.   It does, yeah.  It was obviously
18  filled out by an adult, but...
19      Q.   Okay.  So, all of these folks
20  listed down at the bottom of the first and
21  second page of this document, would they have
22  all been in the group that Kinsley arrived
23  with, or are the groups combined sometimes?

Page 19

1      A.   They wouldn't necessarily have
2  been in the same group.  These are running
3  documents, so as people come in, they fill up
4  the empty spaces.  So this form could have
5  been used for multiple groups that went on
6  orientation.
7      Q.   So, just for example, on this
8  first page, Sam Wright and Donna Brown were
9  not necessarily in the same group as Kinsley?
10      A.   Correct.
11      MR. HAZELTON:  Also, just to
12  clarify, when you say "the same group," are
13  you saying the same orientation group or just
14  came to the gym together?
15      MR. WHITTEN:  Arrived together.
16      MR. HAZELTON:  Okay.
17      Q.   (By Mr. Whitten) It's my
18  understanding that sometimes different groups
19  that arrive together close to the same time
20  can do combined orientation; is that right?
21      A.   Correct.  If people are ready to
22  go, we'll combine groups of people into one
23  orientation.

Page 20

1      Q.   Yeah.  And this first page here,
2  it's got next to Kinsley's name, far right
3  side, it says "staff SG."
4         Do you know who that is?
5      A.   That would have been Steadman.
6      Q.   And so Steadman was the one who
7  did this orientation for this group?
8      A.   Correct.
9      Q.   And am I correct that the initial
10  next to these -- there's six names he
11  initialled next to on these next two pages.
12  Would those have all been minors?
13      A.   No.  They would have been adults
14  as well.
15      Q.   Well, why did he initial next to
16  some of these names and not some of the other
17  ones?
18      MR. HAZELTON:  Object to form.
19      A.   The most likely reason is as soon
20  as this incident happened, they would have
21  started pulling paperwork and digitizing it.
22  So, when they pulled this, the person that had
23  done the other orientations hadn't had a

Page 21

1  chance to mark them off yet that they had done
2  them and entered them into the computer yet.
3  So this was pulled and digitized shortly after
4  the incident happened, so...
5      Q.   (By Mr. Whitten) So it's possible
6  that Steadman did not do the orientation for
7  these other folks?
8      A.   Correct.  Somebody else could have
9  possibly done them, and they just didn't have
10  a chance to initial them because the paperwork
11  had been pulled to go and digitize it and
12  everything.
13      Q.   All right.  So, just because all
14  these folks are on here, these two pages, it
15  doesn't mean they went through the orientation
16  together?
17      A.   Correct.
18      Q.   So I'll represent that Kinsley has
19  stated that her group consisted of three
20  adults and six minors, and the three adults
21  are named Misty Beams, Jennifer Perry, and Kim
22  Burt.
23         Do you see any of those three

6 (Pages 18 - 21)

Page 22

1  names on this orientation form?
2      A.   What are the names again?  Beams?
3      Q.   Yeah.  It's Misty Beams, Jennifer
4  Perry, and Kim Burt.
5      A.   Well, Misty appears to be the one
6  that signed for everyone as far as their
7  names.  In the actual printed names, I didn't
8  see them unless I'm missing one.
9      Q.   Okay.  Why would the three adults
10  not be included on this form?
11      A.   I can't explain it.  They may not
12  have understood that they were supposed to
13  print their names as well.
14      Q.   Is it possible that they didn't go
15  through the orientation?
16      A.   No.  They would have been with the
17  kids.
18      Q.   And, I guess, Mr. Gulley would be
19  the only person who could verify that; is that
20  correct?
21      A.   Physically verify it, yes.
22      Q.   Yeah.  I guess he would be the
23  only employee that was physically there,

Page 23

1  correct?
2      A.   Yes, when the orientation was
3  done.
4      Q.   And you mentioned it a minute ago.
5  It looks like it's Misty Beams that likely
6  signed for the minors.
7           And it appears she signed for all
8  six of the kids, correct?
9      A.   It looks like it, yeah.
10      Q.   Okay.  Is that something High
11  Point is concerned about, one adult is
12  agreeing to supervise six children?
13           MR. HAZELTON:  Object to form.
14      A.   This doesn't necessarily -- I
15  don't take this as meaning that they are
16  responsible -- all the adults present are
17  responsible.  They filled out waivers, and
18  they were given the orientation.  So they're
19  all responsible for monitoring the minors.
20  This document doesn't assume that one of them
21  is going to monitor them and the others
22  aren't.
23      Q.   (By Mr. Whitten) So, if it had

Page 24

1  just been Ms. Beams that had brought all of
2  these kids, would that have been a red flag
3  for High Point?
4           MR. HAZELTON:  Object to form.
5      A.   No.  The adult who is supervising
6  is responsible for determining how they're
7  going to manage the kids, whether that's only
8  allowing one to climb at a time or allow two
9  to climb side by side.  It's up to the
10  supervising adult to determine how they're
11  going to supervise the kids based on the
12  information and the requirements they've been
13  given.
14      Q.   (By Mr. Whitten) Is there any
15  limit to the number of children one adult can
16  bring and supervise?
17      A.   I mean, I suppose there's a -- how
18  would I say that -- a realistic -- a parent
19  couldn't show up with 30 kids and expect to
20  manage them all, but if they show up with a
21  handful of kids, they just have to determine
22  how they're going to manage them and restrict
23  who can climb or how many can climb at one

Page 25

1  time.
2      Q.   Does High Point get involved in
3  that decision-making process as far as how the
4  adult supervises the children they bring?
5      A.   As far as setting rules that they
6  have to follow?  As far as how many can climb?
7  Is that what you're asking?
8      Q.   Do they -- just are they involved
9  in that process, or do they just say, You
10  brought your kids, you're responsible for
11  them?
12           MR. HAZELTON:  Object to form.
13      A.   Yeah.  They have to -- they are
14  told that they are responsible for monitoring
15  the kids at all times, and that's their
16  responsibility to determine how they're going
17  to do that.
18      Q.   (By Mr. Whitten) Back to your
19  hypothetical you mentioned a minute ago, if an
20  adult showed up with 30 children, what would
21  High Point do in that situation?
22      A.   Unfortunately, I can't come up
23  with any -- I can't recall any instances where

7 (Pages 22 - 25)

Page 26

1 that's happened.  Fortunately, most adults are
2 responsible enough to know that they --
3 there's going to be enough chaperons to deal
4 with the group.  And we also -- we know when
5 groups are coming in, so -- they have to make
6 reservations so we know that they're coming
7 and they know what the parameters are as far
8 as chaperons and things like that.
9     Q.   Who has to make reservations?  Is
10 there a minimum --
11     A.   Any group over ten people.
12     Q.   Ten people?
13     A.   Correct.
14     Q.   So, if one adult brings nine
15 children and agrees to supervise them, High
16 Point is fine with that?
17     A.   Correct.
18     Q.   High Point is not going to provide
19 any employees to help supervise the children?
20     A.   If they request them and want to
21 pay for staff supervision, they can.
22     Q.   How much do you have to pay for
23 staff supervision like that?

Page 27

1     A.   Honestly, I don't remember what we
2 charge for that.  It happens rarely.  Most
3 groups come in, they're -- parents are with
4 the kids or it's a small group of kids with a
5 single parent.
6     Q.   Okay.  And does High Point have
7 any policies or procedures for children that
8 come in with adults who are not their parents?
9 Are there any additional safeguards or
10 supervision requirements that High Point has
11 for those children?
12          MR. HAZELTON:  Object to form.
13     A.   I mean, other than the waiver
14 being filled out by the minor's parent, the
15 supervising adults have the same
16 responsibilities as they would with their own
17 kids.
18     Q.   (By Mr. Whitten) In your
19 experience -- I mean, what's -- you mentioned
20 that it hasn't ever happened where one adult
21 brought 30 kids, but do you recall the maximum
22 number of kids that one adult has brought
23 before?

Page 28

1     A.   No, I don't.
2     Q.   Would it be unusual for one adult
3 to bring nine kids?
4     A.   Yes.  I mean, it's typically what
5 they can fit in their vehicle.  So it's rare
6 there's going to be that large of a number.
7     Q.   Yeah.  Are there ever any church
8 groups or field trips or anything like that,
9 you know, I guess, that don't make
10 reservations or hire additional High Point
11 supervisors?
12     A.   No.  Our groups will make
13 reservations.  We rarely have a large group
14 show up like that.  If they are a large group,
15 they have a sufficient number of chaperons to
16 monitor the kids.
17     Q.   And Ms. Staubach mentioned that
18 during birthday parties High Point will
19 provide an employee to help supervise.  What
20 are the policies around that?
21     A.   Can you be more specific?
22     Q.   How does that work?
23     A.   If somebody schedules a birthday

Page 29

1 party, we provide a staff person to facilitate
2 games, if they want to do that, help them get
3 things sorted out in the birthday party room,
4 and just to facilitate the climbing with the
5 kids with the help of the parents.  So the
6 parents help watch the kids and monitor them
7 and make sure they're clipping in correctly.
8 We also have a staff person to help do that as
9 well and, like I said, facilitate games if
10 they want to do that, move them around the
11 facility during the party.
12     Q.   Looking back at this orientation
13 form, I'm looking at the first page right
14 after all of these boxes.
15     A.   Uh-huh.
16     Q.   And the first paragraph after the
17 boxes with the bullet points, the last
18 sentence says, "You are responsible for your
19 own safety."
20          Do you see that?
21     A.   Yes.
22     Q.   Does it say anywhere else that,
23 you know, if you sign this, you're also

8 (Pages 26 - 29)

Page 30

1  responsible for the minors that you signed
2  for?
3      A.   I don't believe so.
4      Q.   Okay.  Is that included in High
5  Point's paperwork elsewhere?
6      A.   Could you repeat the question
7  specifically?
8      Q.   I'm just asking if it's included
9  in High Point's paperwork, you know, the --
10 someone signing this document is agreeing that
11 they are responsible for the safety of the
12 minors that they're signing for.
13     A.   I don't think it's -- it's not on
14 this form.  It's in the orientation itself
15 that adults are responsible for the minors
16 they're with.  It's also in the waiver that
17 they're responsible for their -- any minors
18 they're with, I believe.
19     Q.   Okay.  In looking at a few of
20 these bullet points on this first page of
21 Plaintiff's Exhibit 1, under --
22         MR. HAZELTON:  Plaintiff's
23 Exhibit 2.

Page 31

1          MR. WHITTEN:  Oh, this is
2  Plaintiff's Exhibit 2, yeah.
3      Q.   (By Mr. Whitten) I'm looking at
4  the auto belay orientation bullet points.
5          Are these all of the topics that
6  the High Point employee goes over when they're
7  giving the orientation for an auto belay
8  group?
9      A.   These are talking points.  These
10 are, I guess, called markers so that when they
11 reach a certain point they know they need to
12 expound on this subject and cover it.  These
13 are not all the details that are involved in
14 an auto belay orientation.  These are just
15 talking points to keep your place as you move
16 through the orientation.
17     Q.   And it's my understanding from
18 Ms. Staubach that Kinsley's group was
19 restricted to auto belay climbing; is that
20 right?
21     A.   They would have been able use the
22 auto belays and bouldering wall in the kids'
23 area, and there's also auto belays in other

Page 32

1  parts of the gym they could have used too.
2      Q.   But any auto belays in the gym
3  they would have been able to use?
4      A.   Correct.
5      Q.   One of these points here says, "13
6  and under must be supervised by an adult."
7          What does that mean?
8      A.   It just means that an adult has to
9  supervise anyone 13 and under at all times.
10     Q.   Okay.  And what's the purpose of
11 that?
12     A.   To make sure they do everything
13 correctly.  They're young.  So, at that age,
14 they are not allowed to be in the gym by
15 themselves, so they have to be with an adult
16 at all times.
17     Q.   How many High Point employees were
18 working at the Birmingham facility when
19 Kinsley's group arrived?
20     A.   There would have been three.
21     Q.   Who were those employees?
22     A.   Steadman Gulley, Hannah Staubach,
23 and then Ashlyn Brown.

Page 33

1      Q.   And Ms. Staubach testified that
2  Ashlyn Brown was in the back office at the
3  time Kinsley's group was there.
4          Is that your understanding?
5      A.   That's my understanding.
6      Q.   So it would have been Hannah and
7  Steadman responsible for overseeing the
8  operations during that time period?
9      A.   Correct.  Unless they needed help,
10 and then they would have asked her to come
11 out.
12     Q.   Are those three employees you just
13 mentioned still employees at High Point?
14     A.   No.
15     Q.   And do you know how old each of
16 those employees were at that time?
17     A.   No.
18     Q.   If Ms. Staubach said that she was
19 20 and Steadman was 22, round about, would you
20 have any basis to dispute that?
21     A.   No.
22     Q.   Okay.  And are two employees able
23 to see all of the climbing rooms at one time

9 (Pages 30 - 33)

Page 34

1 at the High Point Birmingham facility?
2    A.  No.
3    Q.  How many climbing rooms are there
4 at that facility?
5    A.  Actual climbing rooms, there's
6 three.
7    Q.  Are there any other rooms?
8    A.  There's weight room, cardio, yoga,
9 the party rooms.  So there's, you know,
10 several other rooms in the facility.
11    Q.  And those two employees would have
12 been responsible for monitoring those rooms as
13 well?
14       MR. HAZELTON:  Object to the form.
15    A.  We don't directly monitor the
16 rooms.  When someone goes through an
17 orientation, they are qualified to use certain
18 parts of the facility.  It's their
19 responsibility to use those appropriately.
20 The employees are simply there to facilitate
21 the orientation, classes, testing, things like
22 that.  We don't directly supervise every
23 single room in the facility.

Page 35

1    Q.  (By Mr. Whitten) But do they
2 monitor those rooms for issues, problems?
3       MR. HAZELTON:  Object to the form.
4    A.  As we're moving about the
5 facility, yes, we check to see if there's
6 anything that needs to be corrected.
7    Q.  (By Mr. Whitten) Is there a
8 routine schedule or anything like that for
9 doing safety checks?
10    A.  No.
11    Q.  So, if something is reported or if
12 an employee happens to see something, it's
13 corrected; is that correct?
14    A.  Correct.
15    Q.  So, after this orientation, what
16 would Kinsley's group have done at that point?
17    A.  Did you say after the orientation?
18    Q.  Yeah.
19    A.  After the orientation, if they
20 didn't have any questions about anything, they
21 would have been free to climb at that point.
22    Q.  And free to climb with the caveat
23 of they were supposed to be supervised by an

Page 36

1 adult, correct?
2    A.  Correct.
3    Q.  And you mentioned earlier that you
4 asked who is climbing and who is not when the
5 folks get to the facility.
6       Why is that important?
7    A.  Well, if somebody is not going to
8 climb, they don't have to pay the entry fee.
9 So, in this case, if the parents weren't
10 climbing, they wouldn't pay for climbing, but
11 they are still responsible for filling out
12 waivers and they still have a job to do in
13 monitoring any minors that are with them.
14    Q.  And they wouldn't have -- assuming
15 that the parents were not climbing, they would
16 not have received any climbing gear, correct?
17    A.  Correct.
18    Q.  Does it affect High Point's
19 procedures if the parents who bring minors are
20 climbing?
21    A.  No.
22    Q.  Okay.  So the parents, even if
23 they are not climbing, they are supposed to go

Page 37

1 through the orientation, correct?
2    A.  Correct.
3    Q.  Is there any way for High Point to
4 actually know if the supervising adults are
5 actually supervising the children or not?
6       MR. HAZELTON:  Object to the form.
7    A.  Only when we're walking around the
8 gym and if we see it.
9    Q.  (By Mr. Whitten) What happens if
10 an employee sees that occurring?
11    A.  We would correct it and let them
12 know that they need to be keeping an eye on
13 their kids.
14    Q.  Is it possible for -- well, let me
15 back up.  Do you know which room this incident
16 with Kinsley Kornegay occurred in?
17    A.  It was in the area we call the
18 "Kid Zone."
19    Q.  Is it possible for a person to see
20 all of the climbing walls in the Kid Zone at
21 one time?
22    A.  It would depend on where you're
23 standing.

Veritext Legal Solutions
877-373-3660                    800.808.4958
EXHIBIT 1 - 000011

Page 38

1    Q.   Okay.  So are there times if you
2  were sitting, you know, in one corner of the
3  Kid Zone that you wouldn't be able to see
4  certain walls on the other side of the Kid
5  Zone?
6    A.   Correct.  Yes.
7    Q.   And why would that be?
8    A.   I don't understand what you're
9  asking.
10    Q.   So, I guess, I'm just trying to
11  understand the layout of the Kid Zone to get
12  an idea of, you know, vantage points.
13    A.   There are elements in the middle
14  of the room that might obstruct your view, but
15  if you were standing anywhere near the
16  climbing walls, you would be able to see all
17  of them.
18    Q.   Even if they are on the opposite
19  side of the room -- or let me rephrase.
20      Are there climbing walls on all
21  four sides of the room?
22    A.   No.  There's climbing walls on two
23  sides.  So, if you're standing on the wall

Page 39

1  that doesn't have any climbing walls, you
2  probably wouldn't be able to see all of the
3  elements, but if you were in the middle of the
4  room or closer to the climbing walls, you
5  would be able to see everything.
6    Q.   Okay.  So are there corners of the
7  rooms that, if you sat in, you wouldn't be
8  able to see all of the climbing walls at a
9  given time?
10    A.   Yes.
11    Q.   And just last question about this
12  orientation.  Is it done in the Kid Zone for
13  this type of group?
14    A.   No.  They walk throughout the gym.
15  So they would walk into the rope area, explain
16  that area to them.  Depending on the age, if
17  they're too young to use the bouldering room,
18  then we would do that portion of the
19  orientation in the Kid Zone because there's
20  also a bouldering wall in there.  And then
21  depending on how busy it is for the day, we
22  may do the auto belay part in the Kid Zone or
23  maybe in the rope area depending on how busy

Page 40

1  it is.
2    Q.   Are there auto belay devices in
3  the ropes area as well?
4    A.   Yes.
5    Q.   So you would do the orientation on
6  the auto belays just not in the Kid Zone?
7    A.   It would just depend on how busy
8  it is, yes.
9    Q.   And so with the orientation, does
10  the -- does each person do it themselves as
11  far as clipping into the auto belay device?
12  Do they practice that?
13      MR. HAZELTON:  Object to form.
14    A.   Yeah.  They verbally tell us, and
15  they can practice it as well.
16    Q.   (By Mr. Whitten) But does the
17  employee supervise them practicing clipping
18  into the belay?
19    A.   It's our policy, yes.
20    Q.   All right.  I'm going to attempt
21  to play this video for you.
22      MR. WHITTEN:  And I'm going to
23  introduce it as Plaintiff's Exhibit 3.

Page 41

1      (Plaintiff's Exhibit Number 3 was
2      marked for identification.)
3    Q.   (By Mr. Whitten) And I'll
4  represent that this was produced to us by High
5  Point.  So I'll ask you if you've seen it
6  before, and I'll just go ahead and play it to
7  make sure you're familiar with it.
8      MR. WHITTEN:  And I'll add for the
9  record that there's no sound to this video.
10      (A video was played.)
11      MR. WHITTEN:  And I'll stop it at
12  30 seconds in.
13    Q.   (By Mr. Whitten) Mr. Watson, is
14  this a video you have seen before?
15    A.   Yes.
16    Q.   Okay.  What does this video appear
17  to be?
18    A.   It just shows the incident where
19  she didn't clip in, climbed up, and fell.
20    Q.   Okay.  And it appears that the
21  video starts when she's at the bottom of the
22  wall; is that right?
23    A.   Correct.

11 (Pages 38 - 41)

Page 42

1    Q.   And was there any video footage
2  from before this video started?
3    A.   No.  Well, it was not saved.
4    Q.   It was not saved?
5    A.   Correct.
6    Q.   Okay.  And was this video pulled
7  or saved on the day of the incident?
8    A.   It should have been, yes.
9    Q.   Who would have done that?
10    A.   The general manager.
11    Q.   That's Ashlyn?
12    A.   Correct.
13         MR. WHITTEN:  Now I'm playing it
14  again.
15         (A video was played.)
16         MR. HAZELTON:  Are you just going
17  to play the whole thing, or...  I mean, he's
18  representing he's seen it before, so if you
19  want to ask him questions about it.
20         MR. WHITTEN:  I'll pause at the
21  two minute mark.  We may play some more later.
22    Q.   (By Mr. Whitten) But, yeah.  You
23  represent that you've seen the entirety of

Page 43

1  this video?
2    A.   Yes.
3    Q.   Can you confirm that no High Point
4  employees ever appear in this video during the
5  five minutes?
6    A.   No.  I can't tell who is who in
7  that video.
8    Q.   If Ms. Staubach testified that no
9  High Point employees are depicted in this
10  video, would you have any basis to dispute
11  that?
12    A.   No, if she doesn't recognize
13  anyone.
14    Q.   The only High Point employees who
15  could have potentially been in this video
16  would have been Ms. Staubach, Mr. Gulley, and
17  Ms. Brown, correct?
18    A.   Correct, unless there was someone
19  else climbing on their own time.
20    Q.   But you're not aware of anyone?
21    A.   No.
22    Q.   And Ms. Staubach had testified
23  that Kinsley and her group had been climbing

Page 44

1  for approximately 45 minutes before the start
2  of this video.
3         Do you have any basis to dispute
4  that?
5    A.   No.
6    Q.   And after watching the first few
7  minutes, do you agree that Kinsley was
8  climbing on the wall for roughly a minute and
9  20 seconds unattached to the belay device
10  before she fell?
11    A.   I wasn't watching the time stamps.
12    Q.   Okay.  We can double-check it just
13  to be safe.  I'll rewind it.
14         So she starts climbing, it looks
15  like, about three seconds in -- well, excuse
16  me -- ten seconds in; is that correct?  Sorry.
17  It's small.  It appears she gets on the wall
18  at about ten seconds; is that right?
19    A.   Correct.
20    Q.   Okay.  And I'll fast-forward to
21  where she releases from the top of the wall,
22  and the time stamp there says about a
23  minute 30?

Page 45

1    A.   Correct.
2    Q.   So it would have been about a
3  minute and 20 seconds that she was climbing on
4  the wall without any safety equipment,
5  correct?
6         MR. HAZELTON:  Object to form.
7    A.   With being -- she had her safety
8  equipment.  She failed to attach the auto
9  belay.
10    Q.   (By Mr. Whitten) Okay.  If a High
11  Point employee had seen her climbing
12  unattached to the auto belay during that
13  minute and 20 seconds, what would that
14  employee have done?
15    A.   It would just depend on how high
16  they were.  If they were close to the ground,
17  we could assist them getting down, but in this
18  case, if they're close to the top, we try to
19  get them to stay calm and then we have a
20  rescue rope in the room that we can use to
21  attach the auto belay and send it up to them
22  so they can clip into it and then lower down.
23    Q.   And, typically, climbers don't get

Veritext Legal Solutions
877-373-3660                                                          800.808.4958
EXHIBIT 1 - 000013

Page 46

1 injured if that occurs?
2         MR. HAZELTON: Object to the form.
3     A.   That's pretty subjective. I mean,
4 if we can get to them in time and send the
5 rope up to them and they can clip in, then,
6 yes, they come down fine.
7     Q.   (By Mr. Whitten) Okay.
8 Ms. Staubach testified that there were no High
9 Point employees in the Kid Zone when Kinsley
10 fell.
11         Do you have any basis to dispute
12 that?
13     A.   No.
14     Q.   She testified that she was at the
15 front desk. Is that your understanding?
16     A.   I believe so.
17     Q.   Do you know where Mr. Gulley was
18 when Kinsley fell?
19     A.   No.
20     Q.   And we just watched this video of
21 Kinsley climbing from the bottom to the top.
22 It appears that she hits a button, and the
23 wall lights up at the beginning when she

Page 47

1 starts climbing.
2         What is that?
3     A.   It's the LED lights that travel up
4 the wall. As you climb you push the buttons,
5 and that allows the lights to progress up the
6 wall further.
7     Q.   Okay. So you're continually
8 pushing buttons on the wall as you climb?
9         MR. HAZELTON: Object to the form.
10     A.   That one, there's maybe four on
11 the wall off the top of my head.
12     Q.   (By Mr. Whitten) Does it appear
13 that Kinsley pushed all the buttons on the way
14 up when she was climbing?
15     A.   I wasn't paying attention to
16 whether she was pushing the buttons or not. I
17 don't even remember their exact positions.
18     Q.   Well, I won't play the whole thing
19 again, but I will rewind it because I think
20 you can see the lights at some point. So this
21 is at 50 seconds in.
22         There appears to be lights at the
23 top; is that correct?

Page 48

1     A.   Correct.
2     Q.   I should say it's lighted up all
3 the way to the top, and then it appears -- and
4 this is at 54 seconds -- that she pushes a
5 button at the very top right of the screen.
6         Did you see that?
7     A.   Yes.
8     Q.   Okay. Is that the final button on
9 the wall?
10     A.   It should be.
11     Q.   And what does that do when you
12 press that button?
13     A.   It just allows the lights at the
14 very top to light up.
15     Q.   And you can push these buttons and
16 the wall functions normally even if you're not
17 clipped into the auto belay; is that right?
18     A.   Correct.
19     Q.   And what's the purpose of LED
20 lights on the wall?
21     A.   It just gives the wall a different
22 look than a traditional climbing wall. It
23 just keeps kids interested.

Page 49

1     Q.   Okay. Do you think the light-up
2 function could be considered a distraction for
3 kids?
4         MR. HAZELTON: Object to form.
5     A.   No.
6     Q.   (By Mr. Whitten) So it's supposed
7 to keep them interested but not distract them
8 from using the safety equipment; is that
9 right?
10     A.   Correct.
11     Q.   Do you know how many other guests
12 were at High Point when Kinsley fell?
13     A.   No.
14     Q.   And I won't ask you to count all
15 the guests in this video, but it does appear
16 that there were other guests in that room at
17 the time when Kinsley was climbing the wall,
18 correct?
19     A.   Correct.
20     Q.   Does High Point have any policies
21 about bringing extra staff in if it's an
22 especially busy time?
23         MR. HAZELTON: Object to the form.

13 (Pages 46 - 49)

Page 50

1    A.   No.  We know pretty much to the
2  week how busy we're going to be.  Our business
3  is very typical, so we know exactly how busy
4  we're going to be and we staff accordingly.
5    Q.   (By Mr. Whitten) So I think you've
6  agreed that there were three staff members at
7  the facility at this time when Kinsley was
8  climbing.
9         Is that standard for that time of
10 year for that day of the year?
11   A.   That time of day, yes.
12   Q.   And what time of day was it?
13   A.   It was in the afternoon.
14   Q.   Have you -- did anyone look to see
15 how many other guests were at High Point when
16 Kinsley fell?
17       MR. HAZELTON:  Object to form.
18   A.   There's no way to track that.  We
19 don't check people out as they leave.  We only
20 check people in.  They're free to come and go
21 throughout the day.
22   Q.   (By Mr. Whitten) Okay.  So you
23 could -- your records would show how many

Page 51

1  people checked in on a given day?
2    A.   Correct.
3    Q.   Did anyone look to see how many
4  people checked in that day?
5    A.   No.
6    Q.   Do you know -- have any idea how
7  many people checked in that day?
8    A.   No.
9    Q.   Do you think it would have been
10 more than a hundred or less than a hundred?
11   A.   Are you asking the entire day or
12 up to this point?
13   Q.   I'll say up to this point when
14 Kinsley fell.
15   A.   Oh, it would be less than a
16 hundred.  Far less than a hundred.
17   Q.   Was it normal for kids to be
18 climbing in the Kid Zone without any High
19 Point employees supervising?
20       MR. HAZELTON:  Object to the form.
21   A.   Not supervising in the room, yes.
22   Q.   (By Mr. Whitten) Are there any
23 safety features in place to prevent people

Page 52

1  from climbing without clipping in?
2    A.   The banners at the base of the
3  wall that say "stop" with the clip in
4  instructions that block the bottom of the wall
5  and then just the adult supervision,
6  monitoring the kids to make sure they don't do
7  something like that.
8    Q.   Why do you think that the safety
9  features that are in place did not work in
10 this incident?
11       MR. HAZELTON:  Object to the form.
12   A.   It's an accident.  It was an
13 oversight.  She wasn't paying attention to
14 what she was doing.  That's only an
15 assumption, I guess.  She wasn't paying
16 attention and didn't clip in.
17       (Plaintiff's Exhibit Number 4 was
18       marked for identification.)
19   Q.   (By Mr. Whitten) I'm going to hand
20 you a document marked Plaintiff's Exhibit 4.
21       Mr. Watson, have you seen this
22 document before?
23   A.   Yes.

Page 53

1    Q.   What is this document?
2    A.   It's an incident report.
3    Q.   Okay.  And what's the purpose of
4  these reports?
5    A.   Just to log what happened and who
6  was involved, and, then, depending on the
7  severity, it gets submitted to the insurance
8  companies so they have a record of it.
9    Q.   Does High Point Climbing keep a
10 record of all of these incident reports
11 itself?
12   A.   Yes.
13   Q.   Okay.  Where do they keep those
14 records?
15   A.   At the facility.
16   Q.   At the local facilities or at the
17 corporate?
18   A.   Local facilities.
19   Q.   Okay.  So all of the gym incident
20 report forms from incidents that have happened
21 at the Birmingham facility would be stored at
22 the Birmingham facility?
23   A.   Correct.

14 (Pages 50 - 53)

Page 54

1    Q.   Would corporate also have a copy
2 of all of those?
3    A.   No.
4    Q.   Does corporate get a copy if they
5 are submitted to the insurer?
6       MR. HAZELTON:  Object to the form.
7    A.   I pull it off of their server and
8 submit it to the insurance company.
9    Q.   (By Mr. Whitten) So you have
10 access to the servers for all of the local
11 facilities?
12    A.   Correct.
13    Q.   Is this a complete and accurate
14 copy of the incident report form for this
15 incident involving Kinsley?
16    A.   This is what was filled out, so...
17    Q.   And there's -- the third page is,
18 I believe, a statement from Ms. Staubach, and
19 the fourth page is a statement from a witness,
20 Nick Medlen.
21       Is that your understanding?
22    A.   Correct.
23    Q.   Do you know if there were any

Page 55

1 other witness statements that were --
2    A.   These are the only ones that were
3 involved.
4    Q.   Did High Point do any additional
5 investigation into this incident other than
6 what's reflected in this incident report form?
7       MR. HAZELTON:  Object to the form.
8    A.   No.
9    Q.   (By Mr. Whitten) So there's no
10 other reports that High Point did related to
11 this incident?
12    A.   No.
13    Q.   And I'll represent that
14 Ms. Staubach testified that both her and
15 Ms. Brown were involved in filling this
16 incident report out; is that correct?
17    A.   As far as I know.  I don't know
18 who actually filled all the different portions
19 out.
20    Q.   Did they follow -- did Ashlyn and
21 Hannah follow High Point's protocols correctly
22 after this fall?
23    A.   Can you be more specific?

Page 56

1    Q.   Did they do everything they were
2 supposed to do when responding to a fall of
3 this nature?
4       MR. HAZELTON:  Object to the form.
5    A.   I believe so, yes.
6    Q.   (By Mr. Whitten) On the second
7 page of this incident report, about halfway
8 down, there's a question that says, "Was this
9 the participant's first time at the gym or
10 activity?"
11       Why is that included on this
12 report, that question?
13    A.   This is straight from our
14 insurance company, so that would be -- it's
15 just something they added in.  This is a
16 patent form that's given to all insured.
17    Q.   So High Point did not create this
18 form?
19    A.   No.
20    Q.   Okay.  Why do you think they ask
21 that question if this was the participant's
22 first time at the gym?
23       MR. HAZELTON:  Object to the form.

Page 57

1    A.   That would be a question for the
2 insurance company.
3    Q.   (By Mr. Whitten) Mr. Watson, what
4 training does High Point Birmingham provide an
5 employee when an employee starts working with
6 them?
7       MR. HAZELTON:  Object to the form.
8 High Point Birmingham doesn't provide
9 training.
10    Q.   (By Mr. Whitten) What training
11 does High Point provide to its employees when
12 an employee starts working at the Birmingham
13 facility?
14    A.   Is there a specific training you
15 want to know about, or do you want to know
16 everything that they're trained on?
17    Q.   Just what's the process generally
18 for training?
19    A.   They're trained on everything from
20 how to -- well, our policies and procedures,
21 how we expect them to act, what we expect from
22 them, how to operate the computer system, the
23 procedures for checking people in, cleaning,

15 (Pages 54 - 57)

Page 58

1 monitoring the gym as they are walking around
2 the gym, how to do orientations, and then from
3 there, they learn how to do belay tests.  And
4 then as they progress, they learn how to teach
5 classes and things like that, in very broad
6 strokes.
7        (Plaintiff's Exhibit Number 5 was
8        marked for identification.)
9    Q.   I am handing you a document marked
10 Plaintiff's Exhibit 5.
11        Can you look at that document and
12 tell us what it is?
13    A.   This is a basic checklist of
14 things that staff are going over as they're
15 doing their training.
16    Q.   And it's titled at the top of the
17 first page "New Staff Hiring and Training,"
18 correct?
19    A.   Correct.
20    Q.   Have you seen this specific
21 document before?
22    A.   Yes.
23    Q.   Who created this document?

Page 59

1    A.   The original document was
2 created -- well, it was a collaboration
3 amongst a number of people, but the general
4 managers then make alterations to fit their
5 training schedules and things like that.  So
6 there's a number of people that are involved
7 in making these.
8    Q.   When was this created, this
9 document?
10    A.   I couldn't even begin to guess
11 when we started using these.  It was years and
12 years ago, and it's evolved over the years and
13 changed.
14    Q.   What was it originally based on?
15        MR. HAZELTON:  Object to the form.
16    A.   I don't understand what you're
17 asking.
18    Q.   (By Mr. Whitten) Did High Point
19 use any sort of outside industry standards or
20 guidelines or anything of that nature to
21 create this document?
22    A.   No.
23    Q.   So it was just created based on

Page 60

1 the knowledge of High Point's staff?
2    A.   Correct.
3    Q.   Were all employees trained with
4 this document at High Point's Birmingham
5 facility?
6    A.   Yes.
7    Q.   Are there any other training
8 documents in use at that facility?
9        MR. HAZELTON:  Object to the form.
10    A.   There's training -- there's
11 orientation checklists.  There's class and
12 belay test checklists.  As far as checklists,
13 that should be it.
14    Q.   (By Mr. Whitten) Okay.
15    A.   Oh, there's actually -- there's a
16 Rock Gym Pro Database knowledge test.
17    Q.   And this is not -- this document
18 does not have page numbers, but I've flipped
19 to, I guess, the third to last page.  It shows
20 a section titled "Day Four."  If you flip to
21 that.
22    A.   Uh-huh, yes.
23    Q.   And the subsection down there

Page 61

1 under Day Four, it says, "Subsection 1:
2 Walkthrough of facility."  Right under that,
3 it says, "Safety sweep (what to look for.)"
4 Under that, it says, "Kidzone-auto belay use,
5 boulder zone, parents (are they watching or
6 helping?)"
7        Do you see all that?
8    A.   Yes.
9    Q.   What are High Point's employees
10 trained to do as far as the safety sweeps go?
11    A.   As they're walking around the
12 facility doing other things, looking for
13 things like that, where if parents aren't
14 monitoring the kids, if they see kids running
15 around the facility.  Just anything that would
16 be a safety issue.
17    Q.   And I think we had discussed it
18 earlier, but there's no set schedule for
19 employees doing safety sweeps, correct?
20    A.   Correct.
21    Q.   So are there any records of when
22 these safety sweeps are done?
23    A.   No.

16 (Pages 58 - 61)

Page 62

1    Q.   So there's no way to know when an
2  employee has done a safety sweep last?
3    A.   Correct.
4    Q.   Or if there were any safety sweeps
5  done on a given day, there's no documentation
6  of that?
7    A.   Correct.
8    Q.   Do you know if there were any
9  safety sweeps done while Kinsley and her group
10 were at the facility?
11   A.   I would have to assume at some
12 point, but I can't say when they were done
13 during the day.
14   Q.   And who would have done those?
15   A.   The staff that were on duty at the
16 time.
17   Q.   Hannah and Steadman?
18   A.   It could be any staff person who
19 is on duty.  Just as they walk about the
20 facility, that's one of the things they look
21 for as they're moving around.
22   Q.   Does High Point provide any other
23 training to an employee when that employee is

Page 63

1  promoted to supervisor?
2    A.   By the time they reach supervisor,
3  they have received all of the, I guess,
4  technical training as far as teaching and
5  things like that go.  So, at that point, it's
6  familiarizing them with closing procedures
7  opening procedures, accident procedures such
8  as filling out an accident form, how to pull
9  video, things like that.
10   Q.   Is there a minimum amount of, I
11 guess, experience an employee has to have to
12 be promoted to supervisor?
13   A.   A minimum, no.  It just depends on
14 the person.  Some people just have that
15 ability, and they can step straight into a
16 position like that.  They would receive the
17 instruction or training necessary to make sure
18 they can do the job.
19        (Plaintiff's Exhibit Number 6 was
20        marked for identification.)
21   Q.   I'm handing you a document marked
22 Plaintiff's Exhibit 6.
23        Can you look at that document and

Page 64

1  tell us what it is?
2    A.   This is an orientation evaluation
3  form.
4    Q.   And what is the purpose of this
5  document?
6    A.   As employees start doing
7  orientations on their own or doing practice
8  orientations, this is used to let them know
9  what they're doing correctly and what they
10 need to work on.
11   Q.   So am I correct that a High Point
12 employee uses this form to evaluate another
13 High Point employee to allow the second
14 employee to do orientations on their own?
15   A.   Correct.
16   Q.   So they have to pass this
17 orientation evaluation to be able to do
18 orientations on their own?
19   A.   Yes.
20   Q.   So Mr. Gulley would have had to
21 pass this orientation evaluation, correct?
22   A.   Yes.
23   Q.   Who created this document?

Page 65

1    A.   This, again, was a collaboration
2  of a number of managers.
3    Q.   Okay.  Was there any outside
4  guidelines or forms or anything like that
5  used?
6    A.   No.
7    Q.   And how long has this form been
8  used by High Point?
9    A.   If not -- I can't remember if we
10 started using this as soon as we opened or if
11 it was shortly thereafter, but it's been used
12 almost throughout the company's history, I
13 believe.
14   Q.   Okay.  Do you know how long
15 Mr. Gulley had been working at High Point
16 before Kinsley's fall occurred?
17   A.   No.
18   Q.   Is there any way to know whether
19 he covered all of these topics on this form at
20 the orientation for Kinsley's group?
21   A.   Can I personally speak for that?
22 No.
23   Q.   Is there any documentation that

17 (Pages 62 - 65)

Page 66

1 would show that?
2         MR. HAZELTON:  Object to the form.
3     A.   No documentation, no.
4     Q.   (By Mr. Whitten) I'm looking at
5 page 2 of this document, Plaintiff's
6 Exhibit 6.  I had a few questions about a
7 number of topics.
8         About halfway down it says,
9 "Children 6 and under, 13 and under."  What
10 does that topic entail?
11     A.   Children 6 and under must be
12 clipped in by an adult when they're using auto
13 belays.  They're not allowed to do it on their
14 own.  And then 13 and under must be supervised
15 by an adult at all times.
16     Q.   13 and under are allowed to clip
17 into the auto belay by themselves?
18     A.   Correct, up until 6 years old,
19 yes.
20     Q.   And then towards the bottom there,
21 there's another topic.  It says, "If you climb
22 up without clipping in."
23         What does that topic entail?

Page 67

1     A.   Essentially, we discuss what to do
2 if it isn't taking up slack and the
3 procedures.  So stop climbing.  Down climb if
4 you can.  Otherwise, yell for help.  The
5 procedures for if you realize if you haven't
6 clipped in are the same, stop climbing.  If
7 you're comfortable, climb back down.
8 Otherwise, yell for help.  And we follow that
9 up with if you don't clip into the device, you
10 climb up and fall, you will leave in an
11 ambulance to let the minors and the parents
12 know how serious it is to pay attention to
13 what they're doing.
14     Q.   So that would be covered in the
15 following topic that says "Danger of not
16 checking system or not clipping in"?
17     A.   Correct.  Yes.
18     Q.   And are these two topics included
19 in this list because it's a common problem?
20         MR. HAZELTON:  Object to form.
21     A.   It's not a common problem, but
22 it's the reality of not doing something
23 correctly.  It's to prevent it from happening.

Page 68

1     Q.   (By Mr. Whitten) Are there any
2 topics on this list that specifically address
3 instructing the adults to supervise the minors
4 that are with them?
5     A.   I'm sorry.  Could you say that
6 again?
7     Q.   Do any of these topics
8 specifically address parents -- instructing
9 parents to supervise the minors that are with
10 them?
11     A.   Yes.  We talk about that at the
12 beginning of the orientation and then also
13 during the auto belay section when we're
14 talking about 13 and under.  We're directly
15 speaking to the parents at that point.
16     Q.   High Point uses Perfect Descent
17 auto belay devices at its Birmingham facility,
18 correct?
19     A.   Correct.
20         (Plaintiff's Exhibit Number 7 was
21         marked for identification.)
22     Q.   Mr. Watson, I'm handing you a
23 document marked Plaintiff's Exhibit 7.

Page 69

1         Have you seen this document
2 before?
3     A.   Yes.
4     Q.   What is this document?
5     A.   It's the operator's manual for
6 auto belays.
7     Q.   Specifically, is it for the
8 devices that are used at High Point
9 Birmingham, High Point's facility in
10 Birmingham?
11     A.   Yes.
12     Q.   Are these devices used at all of
13 High Point's facilities?
14     A.   Not all.  Some don't have high
15 walls, and some have different models involved
16 as well.
17     Q.   But all of the auto belay devices
18 at Birmingham -- in the Birmingham facility
19 use the Perfect Descent Climbing System?
20     A.   Yes.  I -- yeah, I'm pretty sure
21 all are Perfect Descent.
22     Q.   When did they start using these
23 devices?

18 (Pages 66 - 69)

Page 70

1   A.   When we opened.  They were
2   installed when we opened.
3   Q.   And what year was that?
4   A.   2016.
5   Q.   So these devices that are in use
6   now, they were the same devices that the gym
7   opened with in 2016?
8        MR. HAZELTON:  Object to the form.
9   A.   Correct.  The shells are the same,
10  but they get recertified every two years.
11  Q.   (By Mr. Whitten) Have you read
12  this document?
13  A.   Yes.
14  Q.   Who else at High Point has read
15  this document?
16       MR. HAZELTON:  Object to form.
17  A.   Probably no one.
18  Q.   (By Mr. Whitten) Do you know if
19  Ashlyn, Hannah, or Steadman ever read it?
20  A.   No.
21  Q.   No, you don't know or --
22  A.   I don't know if they read it or
23  not.

Page 71

1   Q.   Are employees expected to read
2   this manual?
3   A.   No.  The information they need to
4   operate and inspect the auto belays -- we
5   provide that to them on different forms.
6   Q.   And Ms. Staubach testified that
7   she had not read it, and she didn't think
8   Steadman had ever read it.
9        Do you have any basis to dispute
10  that?
11  A.   No.
12  Q.   Are employees expected to go over
13  the manual's contents with climbers or
14  parents?
15       MR. HAZELTON:  Object to the form.
16  A.   Not the entirety of the contents.
17  We go over the contents relevant to them and
18  their usage of the device.
19  Q.   (By Mr. Whitten) Okay.  Are
20  climbers or parents provided a copy of this
21  manual?
22  A.   No.
23  Q.   I've flipped to page 2 of this

Page 72

1   exhibit.  If you could turn over there.
2   A.   (Witness complies.)
3   Q.   And the first sentence on this
4   page says, "Facilities using the Perfect
5   Descent Climbing System should refer to and
6   abide by the Climbing Wall Association
7   Operations Standards, which provides
8   guidelines for the indoor climbing industry
9   including age restriction, waiver forms, belay
10  checks, and climbing facility operating
11  procedures."
12       Did I read that correctly?
13  A.   Yes.
14  Q.   Have you read the Climbing Wall
15  Association Industry Practices Sourcebook?
16  A.   Yes.
17  Q.   Who else at High Point would have
18  read that?
19  A.   I can't say that they would have
20  read it.  Our operating procedures meet or
21  exceed the climbing wall industry standards,
22  so our internal training documents and
23  policies meet or exceed those standards.

Page 73

1   Q.   Would Hannah, Ashlyn, or Steadman
2   have ever read the Climbing Wall Association
3   Industry Practices Sourcebook?
4        MR. HAZELTON:  Object to the form.
5   A.   I can't answer that.
6   Q.   (By Mr. Whitten) They're not
7   expected to have read it?
8   A.   No, they're not expected to have
9   read it.  Like I said, our policies and
10  procedures meet or exceed those standards.
11  Q.   And then the next to last sentence
12  in this paragraph says, "The instructions
13  contained herein supersede any information in
14  the aforementioned publications."
15       Do you know what that means?
16  A.   I'm sorry.  Where are you?
17  Q.   The next to last sentence in this
18  paragraph.
19  A.   Okay.
20  Q.   Do you know what that sentence
21  means?
22  A.   It means that they overrule the
23  other documents.

19 (Pages 70 - 73)

Page 74

1    Q.   Essentially, if there's
2  conflicting information between this
3  operations manual and the Climbing Wall
4  Association Operations Standards, then the
5  operations manual for the device controls,
6  correct?
7        MR. HAZELTON:  Object to the form.
8    A.   In this instance, it does, but
9  Perfect Descent has acknowledged that is
10  incorrect and that the Climbing Wall Standards
11  do apply and do take precedence.
12    Q.   (By Mr. Whitten) Where do they
13  acknowledge that?
14    A.   In a -- I guess it was a letter
15  that they had written to the users of the
16  devices.
17    Q.   Okay.  Do you have a copy of that
18  letter?
19    A.   I don't.  It's available on their
20  website.
21    Q.   On their website?
22    A.   Correct.
23    Q.   Okay.  All right.  Do you know

Page 75

1  when that letter was sent out?
2    A.   It was earlier this year, but I
3  can't -- yeah, earlier this year, but I can't
4  remember exactly when.
5    Q.   So it had not been sent out at the
6  time when Kinsley fell; is that correct?
7    A.   Correct.
8    Q.   Okay.  I've flipped to page 3 of
9  this document.  The warning box at the top
10  starts -- it says, "Climbing is an inherently
11  dangerous activity."
12        Do you agree with that?
13    A.   Yes.
14    Q.   It says, "Operators of the Perfect
15  Descent Climbing System are responsible for
16  the safety and supervision of climbers using
17  this equipment."
18        Did I read that correctly?
19    A.   Yes.
20    Q.   Is High Point the operator that
21  it's referring to in this sentence?
22        MR. HAZELTON:  Object to the form.
23    A.   There is -- I believe there's two

Page 76

1  different meanings for "operator" in the sense
2  that operator of the company or the business,
3  yes, but there's also confusion, I believe,
4  later on in the document as to what an
5  operator is, operator being the person using
6  it.  So I believe there's double meaning in
7  the document, but in this instance, it is the
8  operator, I believe, who is operating the
9  business, yes.
10        Can I correct that after reading
11  it again?
12    Q.   (By Mr. Whitten) Sure.  Go on.
13    A.   It's -- well -- "the operators of
14  the Perfect Descent system are responsible for
15  the safety and supervision of climbers using
16  this equipment."
17        In that instance, I believe, it's
18  referring to the person using it.
19    Q.   So who would be --
20    A.   Once someone has gone through an
21  orientation, they would then become an
22  operator.
23    Q.   Okay.  But it uses the words

Page 77

1  "operator" and "climbers" separately.  So --
2    A.   Exactly.
3    Q.   It appears to me that the climber
4  is not the operator in my mind at least.
5        Do you disagree?
6        MR. HAZELTON:  Object to the form.
7    A.   It's not exactly clear because the
8  operator at that point could be the parent of
9  the child who is then supervising the climber.
10  The term is not clear in its relation to the
11  climbing gym industry.
12    Q.   (By Mr. Whitten) So, I guess, two
13  sentences past that, it says, "These
14  instructions must be provided to operators
15  before the use of the Perfect Descent Climbing
16  System and retained for reference by
17  operators."
18        So are you saying that parents
19  must be provided a copy of this manual before
20  they're allowing children to climb?
21        MR. HAZELTON:  Object to the form.
22    A.   According to this document, yes,
23  but it doesn't pertain to the climbing

20 (Pages 74 - 77)

Page 78

1  industry.
2      Q.   (By Mr. Whitten) How does it not
3  pertain to the climbing industry?
4      A.   Perfect Descent has acknowledged
5  that climbing gyms operate differently than
6  amusements and carnivals which also use these
7  devices.  This document is written with them
8  in mind specifically, not how climbing gyms
9  operate.  That's why the letter and addendum
10  was made to acknowledge the fact that this is
11  not -- this document does not clearly reflect
12  how climbing gyms operate.
13      Q.   Okay.  But High Point did not
14  provide -- does not provide parents with a
15  copy of this before their children use it to
16  climb, right?
17          MR. HAZELTON:  Object to the form.
18      A.   Correct.
19          MR. HAZELTON:  Just for the
20  record, I'd like to point out it says the
21  instructions must be provided to operators,
22  not the actual manual itself, from the portion
23  that was just being referenced.  Just to clear

Page 79

1  it up.
2          MR. WHITTEN:  Sure.
3      Q.   (By Mr. Whitten) I've flipped to
4  page 15 of this exhibit.  If you could, turn
5  over there.
6      A.   (Witness complies.)
7      Q.   This page, "Section 5.0 Training"
8  at the top, and it says, "It is the
9  responsibility of the purchaser of the Perfect
10  Descent Climbing System to assure that
11  operators read and understand these operator
12  instructions and are trained in" -- and it
13  goes on to list a number of -- six bullet
14  points.
15          In this sentence I just read,
16  would High Point be the purchaser of the
17  Perfect Descent Climbing System?
18      A.   Correct.
19      Q.   And in this sentence, who do you
20  think the operators are?
21          MR. HAZELTON:  Object to the form.
22      A.   In this case, it would be -- this
23  has nothing to do with a customer using the

Page 80

1  device.  This is all in its set up and
2  anchoring and things like that.  So that would
3  be High Point, which those -- that information
4  is all included in our training.
5      Q.   (By Mr. Whitten) But High Point is
6  the purchaser that's being referenced?
7      A.   Correct.
8      Q.   And who would the operators be?
9      A.   Operators would be our staff who
10  will be teaching customers how to use the
11  device.
12      Q.   Okay.  So it's saying assure that
13  High Point's staff read and understand these
14  operator instructions and are trained in all
15  these bullet points, correct?
16      A.   That's what it says.  We have all
17  of that information in other training
18  documents.
19      Q.   So it's the "operators are trained
20  in how to instruct climbers on the proper use
21  of the Perfect Descent Climbing System,"
22  correct?
23      A.   Correct.

Page 81

1      Q.   And also on "how to supervise
2  climbers using the Perfect Descent Climbing
3  System," correct?
4      A.   How to supervise climbers based on
5  the Climbing Wall Association's guidelines.
6      Q.   And the next sentence says, "It is
7  the responsibility of all operators of the
8  Perfect Descent Climbing System to ensure that
9  all users" -- parentheses -- "(climbers)
10  are" -- and it's got a list of four bullet
11  points, correct?
12      A.   Yes.
13      Q.   And then in that sentence there
14  that I just read, is High Point's staff -- are
15  they the operators again?
16          MR. HAZELTON:  Object to the form.
17      A.   These are all things that would be
18  taught to the users, whether it be kids or
19  adults, so they would then become the
20  operators of the device.
21      Q.   (By Mr. Whitten) So it's High
22  Point's position, then, it's staff is required
23  to train the adults to be operators of the

21 (Pages 78 - 81)

EXHIBIT 1 - 000022

Page 82

1 device?
2         MR. HAZELTON:  Object to the form.
3     A.   We train all users that come in
4 the gym how to use the device properly,
5 whether it's an adult or a child, so they --
6 after the orientation, they have the knowledge
7 necessary to use the device correctly and make
8 decisions accordingly.
9     Q.   (By Mr. Whitten) So, again, just
10 to be clear, is it High Point's position that
11 the supervising adults become the operators
12 instead of High Point's staff?
13        MR. HAZELTON:  Object to the form.
14     A.   According to the way this document
15 is written, yes.
16     Q.   (By Mr. Whitten) So, again, it
17 says, "It is the responsibility of all
18 operators of the Perfect Descent Climbing
19 System to ensure that all users" --
20 parenthesis -- "(climbers are" -- and the
21 second bullet point says, "Properly attached
22 by the Perfect Descent Climbing System
23 carabiner to their climbing harness."

Page 83

1         Did I read that correctly?
2     A.   Yes.
3     Q.   Okay.  So, according to this
4 operator's manual, whose responsibility is it
5 to ensure that the climbers are properly
6 attached to the climbing system?
7         MR. HAZELTON:  Object to the form.
8     A.   Once someone has completed an
9 orientation, it's their responsibility to make
10 sure that they or the minors that are with
11 them are attached properly.
12     Q.   (By Mr. Whitten) That's your
13 understanding of this operations manual?
14        MR. HAZELTON:  Object to the form.
15     A.   That's based on the climbing wall
16 industry standards that we abide by.
17     Q.   (By Mr. Whitten) Is that what this
18 operations manual actually says?
19        MR. HAZELTON:  Object to the form.
20     A.   I believe that could be argued
21 either way.
22     Q.   (By Mr. Whitten) Okay.  But you
23 train -- High Point trains its staff to train

Page 84

1 the supervising adults to be the operators of
2 the climbing system; is that right?
3         MR. HAZELTON:  Object to the form.
4     A.   Correct.
5     Q.   (By Mr. Whitten) So High Point
6 doesn't believe that it's High Point's
7 responsibility to ensure that all climbers are
8 properly attached to the climbing system?
9         MR. HAZELTON:  Object to the form.
10     A.   Correct.  That's the
11 responsibility of the individual after they've
12 been trained.
13     Q.   (By Mr. Whitten) Did any High
14 Point employees ensure that Kinsley was
15 properly attached to the climbing system
16 before she climbed the volcano wall, fell off,
17 and got hurt?
18        MR. HAZELTON:  Object to the form.
19     A.   No.
20     Q.   (By Mr. Whitten) All right.  I'm
21 flipping to page 17 of this exhibit, and at
22 the top it says "8.0 Supervision During Use."
23         Do you see that?

Page 85

1     A.   Yes.
2     Q.   The second bullet point says,
3 "Climbers should be under constant supervision
4 by a trained operator.  Before ascending, the
5 wall operator should check to verify that each
6 climber has properly fit and secured climbing
7 harness and properly clipped their harness
8 onto the Perfect Descent Climbing System
9 carabiner."
10         Did I read that correctly?
11     A.   Yes.
12     Q.   Okay.  So, from this first
13 sentence here, do you agree that the climber
14 is not the trained operator?
15        MR. HAZELTON:  Object to the form.
16     A.   There, again, it's -- based on the
17 way climbing gyms operate, this is not an
18 accurate depiction of what has or what
19 happens.  Ultimately, the operator is the
20 customer after they've been trained.
21     Q.   (By Mr. Whitten) Even if the
22 customer is a 12-year-old?
23     A.   At that point, they're relying on

Veritext Legal Solutions
877-373-3660                    EXHIBIT 1 - 000023                    800.808.4958

Page 86

1 the adults that are with them.
2    Q.   So is it your position that this
3 part of the operations manual doesn't apply to
4 High Point?
5        MR. HAZELTON:  Object to the form.
6    A.   It applies in that these are all
7 things that customers were taught so that they
8 can become operators, but the words do not
9 accurately depict who is doing what and is
10 responsible for what.  The terms "operator"
11 and "user" do not accurately depict who is
12 responsible for what.
13    Q.   (By Mr. Whitten) So do you
14 disagree that climbers should be under
15 constant supervision by a trained operator?
16        MR. HAZELTON:  Object to the form.
17    A.   If they're a minor, they should be
18 under constant supervision by the person they
19 came up with or the adult they came with.
20    Q.   (By Mr. Whitten) So it's your
21 position that the adult that they came with is
22 a trained operator?
23        MR. HAZELTON:  Object to the form.

Page 87

1    A.   After they've gone through the
2 orientation, yes.
3    Q.   (By Mr. Whitten) So it's High
4 Point's position that the following sentence
5 applies to the supervising adult of the minor,
6 not to High Point; is that correct?
7        MR. HAZELTON:  Object to the form.
8    A.   Which -- where are you?  Which one
9 are you talking about?
10    Q.   (By Mr. Whitten) The sentence that
11 says "Before ascending the wall, operators
12 should check to verify that each climber is
13 properly clipped into their harness onto the
14 Perfect Descent Climbing System."
15        MR. HAZELTON:  Object to the form.
16    A.   Correct.  That would either be the
17 supervising adult of the minor or the adult
18 themselves.  If they were climbing, they're
19 responsible for checking the system.
20    Q.   (By Mr. Whitten) So it's High
21 Point's position that after the employee
22 provides the orientation, the supervising
23 adult is a trained operator of the Perfect

Page 88

1 Descent Climbing System; is that correct?
2        MR. HAZELTON:  Object to the form.
3    A.   Correct.
4    Q.   (By Mr. Whitten) All right.  And
5 under this Section 8.0, there are 11 bullet
6 points; is that correct?
7    A.   Yes.
8    Q.   And it appears to me that these
9 are all separate instructions on how to
10 supervise a climber while they're using this
11 device.  Is that your understanding?
12    A.   There are instructions on what to
13 do and not to do as you're climbing and how to
14 clip in.
15    Q.   Is it High Point's position that
16 after its orientation, supervising adults are
17 trained to watch for and correct all of the
18 items discussed in these 11 bullet points?
19        MR. HAZELTON:  Object to the form.
20    A.   Yes.  Some of them are irrelevant
21 just because the way the walls are set up.  So
22 some of these can't happen, but yes, they --
23 all of these things are discussed in the

Page 89

1 orientation.
2    Q.   (By Mr. Whitten) And it's High
3 Point's position that after the orientation,
4 parents are qualified to supervise minors
5 using this device?
6    A.   Correct.  After completing
7 orientation, they have the knowledge necessary
8 to use the device according to Perfect Descent
9 and the Climbing Wall Association.
10    Q.   And it's High Point's position
11 that they have -- High Point has no
12 responsibility to do any of these items listed
13 in Section 8 here after orientation?
14        MR. HAZELTON:  Object to the form.
15    A.   Could you say that again?
16    Q.   (By Mr. Whitten) Is it High
17 Point's position that they have no
18 responsibility for any of these items
19 regarding supervision after their clients have
20 gone through orientation?
21        MR. HAZELTON:  Object to the form.
22    A.   Specifically, watching every
23 customer, no, but we do look for these things

23 (Pages 86 - 89)

1  as we're walking around the facility.
2      Q.    (By Mr. Whitten) Okay.  And last
3  thing in this document, I'll have you flip to
4  page 31.
5      A.    (Witness complies.)
6      Q.    What is "factory service log"?
7      A.    Oh, that's just -- they go -- the
8  units get sent back every two years for
9  recertification, changing out internal parts,
10  function tests, things like that.
11     Q.    So there's only two dates listed
12  on this factory service log:  November 2nd,
13  2018; December 16th, 2020.
14        Are those the only times these --
15  this device has been serviced?
16        MR. HAZELTON:  Object to the form.
17     A.    Yeah, possibly.  There's -- if
18  this specific booklet didn't go in with the
19  device, they would provide another one with
20  the appropriate dates.  All the unit serial
21  numbers are logged at the factory.  So they
22  have a running log, but it would make sense if
23  this had only been in twice because they only

1  have to go in every two years.
2        (Plaintiff's Exhibit Number 8 was
3        marked for identification.)
4      Q.    (By Mr. Whitten) All right.
5  Mr. Watson, I'm handing you a document marked
6  Plaintiff's Exhibit 8.
7        If you could, review that and tell
8  us what that is.
9      A.    It's the industry practices book
10  from the Climbing Wall Association.
11     Q.    Have you seen this document
12  before?
13     A.    Yes.
14     Q.    Have you read this document
15  before?
16     A.    Yes.
17     Q.    When was the first time you read
18  this document?
19     A.    I couldn't even begin to say.  It
20  was a very long time ago.  I read the first or
21  second edition.
22     Q.    And what edition are we looking
23  at?

1      A.    The third.
2      Q.    What edition would have been
3  applicable in August of 2019?
4      A.    Probably this one.
5      Q.    Do you know if anyone else at High
6  Point has read this document?
7      A.    Possibly our programs coordinator.
8  It's a requirement of getting a further
9  certification from the CWA, but like I said,
10  our policies and procedures meet or exceed
11  these standards.  So -- our written policies
12  and everything.
13     Q.    Would any of the employees at High
14  Point's Birmingham facility have been expected
15  to read this document?
16     A.    No.
17     Q.    And am I correct that this is the
18  Climbing Wall Association's operations
19  standards that are referenced in the Perfect
20  Descent operations manual?
21        MR. HAZELTON:  Object to the form.
22     A.    Correct.
23     Q.    (By Mr. Whitten) Okay.  So how do

1  these industry practices apply to High Point?
2      A.    Can you be more specific?
3      Q.    What does High Point do with these
4  industry practices?
5        MR. HAZELTON:  Object to the form.
6      A.    Use them as a minimum standard for
7  operating.
8      Q.    (By Mr. Whitten) Are there any
9  other industry standards that apply to High
10  Point?
11     A.    No.
12     Q.    All right.  I'm going to flip to
13  page 24 of this document, and I'm looking at
14  Section 6.10, which is titled "The
15  Organization has a reasonable policy regarding
16  a minimum age limit for climbing and belaying
17  without direct adult supervision."
18        Does this apply to auto belay as
19  well?
20        MR. HAZELTON:  Object to the form.
21     A.    It applies to every aspect of the
22  gym.
23     Q.    (By Mr. Whitten) And did we

EXHIBIT 1 - 000025

Page 94

1   already go over High Point's policy as far as
2   minimum age limits for auto belay?
3       A.   Yes.
4       Q.   I believe it was in one of the
5   earlier documents that you said it was the
6   ages 6 and 13; is that correct?
7       A.   6 and under must be clipped in by
8   an adult.  13 and under must be supervised by
9   an adult at all times.
10      Q.   And as far as High Point's
11  policies related to auto belaying, is that the
12  only policy High Point has regarding minimum
13  age limits?
14      A.   There are age limits for belaying,
15  for bouldering, being in the facility by
16  themselves.
17      Q.   Okay.  The sentence under that
18  says, "Comment: Children in late childhood
19  begin to develop the ability to reason
20  hypothetically and systematically and perform
21  more complex problem solving tasks between the
22  ages of approximately 11 and 15 years of age."
23          Do you agree with that statement?

Page 95

1           MR. HAZELTON:  Object to the form.
2       A.   I'm not the child psychologist, so
3   I'm not going to venture into that realm.
4       Q.   (By Mr. Whitten) Do you have any
5   reason to dispute that?
6       A.   No.
7       Q.   Okay.  Flip to page 31 of this
8   document.
9       A.   (Witness complies.)
10      Q.   At the top, it's entitled
11  "Annex C - Informative, Sample Auto Belay
12  Device Orientation and Test Procedure."
13          Do you see that?
14      A.   Yes.
15      Q.   I believe this also runs onto
16  page 32.
17          Did High Point consult this
18  Annex "C" when it was creating its training
19  procedures?
20      A.   No.  I believe our training
21  procedures were already in place before this
22  even came out.
23      Q.   Okay.  Has High Point consulted

Page 96

1   this Annex "C" to confirm that it's policies
2   are up to industry standards?
3       A.   Yes.
4       Q.   Okay.  So has -- are all of the
5   items on this sample orientation test
6   procedure covered in High Point's orientation?
7       A.   Yes.
8       Q.   And it's High Point's position
9   that parents who bring children and go through
10  orientation are responsible for making sure
11  the climber does all of the things listed on
12  this document?
13          MR. HAZELTON:  Object to the form.
14      A.   Yes.  Despite how long this is,
15  the majority of this is extreme common sense,
16  and some of it isn't relevant just because of
17  the way the devices are set up.
18          MR. HAZELTON:  And just for the
19  record, what's being referred to is
20  orientation procedure for people climbing
21  without assistance or direction.  Unless I'm
22  reading the wrong page.
23          MR. WHITTEN:  Page 31 at the top

Page 97

1   says "suggested as an orientation procedure to
2   an auto belay device for climbers using an
3   auto belay device without assistance or direct
4   supervision."
5           Is that what you're referencing?
6           MR. HAZELTON:  Yeah, yeah.
7       Q.   (By Mr. Whitten) But High Point's
8   policy is that anyone under 13 has to have
9   direct supervision, correct?
10      A.   Correct.
11      Q.   So this would apply to minors
12  climbing, correct?
13      A.   To the adults that are with them
14  including the minor.  As the previous
15  statement said, they do -- they can reason and
16  understand these things.
17      Q.   Okay.
18          (Plaintiff's Exhibit Number 9 was
19          marked for identification.)
20      Q.   Mr. Watson, I'm handing you
21  another document marked Plaintiff's Exhibit 9.
22          Can you look at these three
23  photographs and see if you're familiar with

25 (Pages 94 - 97)

Page 98

1  what they're depicting?
2      A.   Yes.
3      Q.   Are these photographs of High
4  Point's facility in Birmingham?
5      A.   Yes.
6      Q.   Can you confirm that all of these
7  photographs were taken in the Kid Zone at the
8  High Point facility in Birmingham?
9      A.   Yes.
10     Q.   And I'll represent these photos
11 were taken from the facility's Facebook page,
12 but looking at the first page -- and I'll just
13 designate it as Exhibit 9A, and then I'll
14 designate the second page as Exhibit 9B, and
15 the third page as Exhibit 9C just for
16 reference.
17          In the first photograph here,
18 what's occurring in this picture?
19     A.   Kids climbing on the speed walls.
20     Q.   And none of these are the walls
21 that Kinsley was climbing on when she fell,
22 correct?
23     A.   No.

Page 99

1      Q.   And I believe she was on what you
2  call the "volcano wall," correct?
3      A.   Yes.
4      Q.   What are the speed walls?
5      A.   They are two identical walls that
6  have a timing system attached.  Speed climbing
7  is an international sport.  So it's a way for
8  us to get our clubs and the teams practicing,
9  and it's also for other climbers to use as
10 well.
11     Q.   Does it work the same way as the
12 volcano wall in that there's a button at the
13 bottom to start, I guess, the speed clock?
14     A.   Yes.
15     Q.   And I'll rephrase because I know
16 that's not how the volcano wall works exactly.
17          There's no clock, correct?
18     A.   Correct.
19     Q.   The volcano wall, you hit the
20 button, and it starts the LED lights?
21     A.   Yes.
22     Q.   In this first picture, are there
23 High Point employees present?

Page 100

1      A.   I can't tell who -- I can only see
2  the backs of people.  I can't tell who they
3  are.
4      Q.   If you look at the second page, it
5  might be more clear.
6          Are those High Point employees
7  there that are at the base of the walls?
8      A.   One is.  I can see the name tag,
9  but I'm not sure who the other person is.
10     Q.   Does the one with the name tag
11 appear to be Ms. Staubach?
12     A.   Yes.
13     Q.   And you're not familiar with the
14 gentleman in the vest and the backwards hat?
15     A.   No, I can't tell who that is.
16     Q.   Have you met Steadman Gulley
17 before?
18     A.   I know I have.  I just don't
19 remember him.  We have a lot of employees.
20     Q.   Sure.  You don't know if this is
21 Mr. Gulley in this picture?
22     A.   No, I don't.
23     Q.   Why is there at least one High

Page 101

1  Point employee climbing with these kids?
2          MR. HAZELTON:  Object to the form.
3      A.   This most likely would be a camp,
4  a club potentially.
5      Q.   (By Mr. Whitten) Could it also be
6  a birthday party?
7          MR. HAZELTON:  Object to the form.
8      A.   No, because parents would be in
9  the frames as well.
10     Q.   (By Mr. Whitten) All right.  And
11 then on the third page, is this also a High
12 Point employee?
13     A.   With the jacket, I would -- yes.
14     Q.   Can you identify who that is?
15     A.   No.
16     Q.   Was this photo taken in the Kid
17 Zone?
18     A.   Yes.
19     Q.   And we may have covered it
20 already, but what are all of the occasions
21 where a High Point employee would be directly
22 supervising a minor while they're on these
23 climbing walls in the Kid Zone?

26 (Pages 98 - 101)

EXHIBIT 1 - 000027

Page 102

1    A.   During club and team practices,
2   summer camp, and then during a birthday party,
3   we would be assisting the parents in
4   supervising the kids.
5    Q.   Okay.  I think you mentioned you
6   can also hire a supervisor if you're bringing
7   a group in?
8    A.   Correct.
9    Q.   Okay.  On this first page,
10  Exhibit 9A, do you think these race clocks
11  could be a distraction for children while
12  they're climbing?
13       MR. HAZELTON:  Object to the form.
14   A.   Not while they're climbing, no.
15   Q.   (By Mr. Whitten) You don't think
16  these race clocks could distract them from,
17  you know, safety precautions while they're
18  climbing?
19       MR. HAZELTON:  Object to the form.
20   A.   Potentially, but in order to be
21  distracted enough, they would have to climb
22  around the banner blocking the bottom of the
23  wall.

Page 103

1    Q.   (By Mr. Whitten) Does that ever
2   occur at High Point's facilities?
3    A.   Yes, for -- not necessarily just
4   for kids.  Adults as well.
5    Q.   The last document I'll go over
6   with you, I'll mark as Plaintiff's Exhibit 10.
7        (Plaintiff's Exhibit Number 10 was
8        marked for identification.)
9    Q.   Have you seen this document before
10  this morning?
11   A.   This is the -- yes.
12   Q.   Did you assist in responding to
13  the questions in this document?
14   A.   Yes.
15   Q.   And I don't recall, but did you
16  sign these responses on behalf of High Point
17  Birmingham?
18   A.   I don't remember.
19       MR. HAZELTON:  Can we go off the
20  record for a second?
21       (Discussion off the record.)
22   Q.   (By Mr. Whitten) So I would like
23  to ask you to flip to page 2 of this document,

Page 104

1   and the Kornegays asked High Point about
2   similar falls recently.  And High Point
3   responded, "In the past 3 years, there have
4   been 12 such incidents," and for the record
5   I'll clarify that such incidents were falls
6   involving guests that didn't clip in.  It says
7   one in Huntsville, Alabama; one in Memphis,
8   Tennessee; three in Birmingham, Alabama; one
9   in Chattanooga, Tennessee, Riverside location;
10  and seven in the Chattanooga, Tennessee,
11  downtown location.
12       How does High Point keep track of
13  these types of falls?
14   A.   Through incident reports like any
15  other incident.
16   Q.   Okay.  So did somebody at High
17  Point go into the servers for each of these
18  and review the incident reports?
19       MR. HAZELTON:  Object to the form.
20  If you know.
21   A.   Can you be more specific?  What
22  are you asking?
23   Q.   (By Mr. Whitten) I guess, how did

Page 105

1   High Point gather this information?
2    A.   Oh, I had to go through the
3   incident reports by hand.
4    Q.   Okay.  How many incident reports
5   have there been in the last three years?
6    A.   In total?
7    Q.   Yes.
8    A.   I have no idea.
9    Q.   Is it in the hundreds?
10   A.   No, I don't think it would be in
11  the hundreds.
12   Q.   Okay.  Do you know if it's more or
13  less than 100?
14   A.   It could be a hundred, maybe a
15  little over, and that's -- that is not just
16  auto belay incidents.  That's bouldering
17  falls, that's tripped on the edge of the pad,
18  that's every incident that happens in the
19  facility.
20   Q.   Sure.
21       MR. HAZELTON:  Just for the record
22  to be clear, you're not just talking about
23  Birmingham, right?

27 (Pages 102 - 105)

Page 106

1        THE WITNESS:  Correct.
2        Q.    (By Mr. Whitten) Do you know how
3   many specific incident reports have come out
4   of the Birmingham location in the last three
5   years?
6        A.    No.
7        Q.    Okay.  And this response only
8   includes information in the past three years,
9   and I think you said the Birmingham facility
10  opened in 2016, correct?
11       A.    Correct.
12       Q.    Does High Point have all of the
13  incident reports from 2016 to present?
14       A.    They should be available, yes.
15       Q.    And the incidents mentioned in the
16  response to Interrogatory Number 3 here, it
17  says, "There have been 12 such incidents plus
18  Kinsley's."
19       I guess that would be 13, is that
20  correct, or would it be 12?
21       A.    I believe that's included in here,
22  yes.
23       Q.    Okay.  So the three in Birmingham,

Page 107

1   Alabama, is Kinsley plus two others?
2        A.    Correct.
3        Q.    Okay.  Ms. Staubach testified that
4   one of these other incidents that happened in
5   Birmingham involved a guy who is now a High
6   Point employee; is that correct?
7        A.    Correct.
8        Q.    Who is that?
9        A.    I can't remember his name.  I
10  can't remember his name.
11       Q.    Is he a current employee?
12       A.    Yes.
13       Q.    Those other two incidents, what
14  kind of injuries were involved?
15       A.    I don't know the specific injuries
16  they suffered.
17       Q.    But you have those incident
18  reports?
19       A.    They should be available, yes.
20       Q.    Okay.  And it says, "This response
21  is limited to the past three years."
22       Do you know if there were any
23  similar incidents like this at the Birmingham

Page 108

1   facility, I guess, between 2016 and 2018?
2        MR. HAZELTON:  Object to the form.
3        A.    I would have to go back and look.
4   I'm not sure what those numbers would have
5   been.
6        Q.    (By Mr. Whitten) Okay.  So the
7   other two incidents at the Birmingham
8   facility, were they minors or adults?
9        A.    Well, one of them was an adult.
10  The other one I can't remember specifically
11  whether it was a minor or an adult.  Well,
12  overall, out of all these, I believe there
13  were only two of them that were minors.  The
14  rest of them were adults, and the majority
15  were experienced climbers.
16       Q.    You're saying the 12 incidents in
17  the past three years --
18       A.    I believe only 3 total were
19  minors.
20       Q.    Okay.  Did any of these 12
21  incidents you mentioned result in death to the
22  climber?
23       A.    No.

Page 109

1        Q.    Okay.  Did any of them result in,
2   what you would consider, catastrophic
3   injuries?
4        MR. HAZELTON:  Object to the form.
5        A.    Could you define catastrophic?
6        Q.    I guess, hospitalization.
7        MR. HAZELTON:  Object to the form.
8        A.    I can't remember if any of them
9   were hospitalized.  I know more than one of
10  them would have left in an ambulance, but
11  whether they were in the hospital for any
12  length of time, I can't answer that.
13       Q.    (By Mr. Whitten) Do the incident
14  reports typically say if they left in an
15  ambulance?
16       A.    Yes.
17       Q.    Are you familiar with the death of
18  a 12-year-old Matthew Lu?
19       A.    No.
20       Q.    Do you know if anyone at High
21  Point has ever heard about the incident with
22  Matthew Lu?
23       A.    No.

28 (Pages 106 - 109)

Page 110

1    Q.   What has High Point done to try to
2  reduce the number of people getting injured
3  after they forget to clip in?
4    A.   Are you asking after they have
5  forgotten to clip in and are up on the wall?
6    Q.   No.  I guess my question is, has
7  High Point changed any policies or procedures
8  in response to the number of folks who have
9  become injured from failing to clip in?
10       MR. HAZELTON:  Object to the form.
11    A.   No.  The training procedures have
12  remained the same.  Once someone is trained
13  properly, they know what they are supposed to
14  be doing.  It's up to them to do it properly.
15    Q.   (By Mr. Whitten) You mentioned
16  that a number of these other incidents
17  involved experienced climbers.
18       Why do you think they failed to
19  clip in the auto belay?
20       MR. HAZELTON:  Object to the form.
21    A.   New climbers, first time
22  visitors -- I don't mean this quit
23  literally -- but you can scare a new climber

Page 111

1  into understanding how serious it is telling
2  them that if you don't do this properly, you
3  can leave in an ambulance.  So they understand
4  that I need to be paying attention to what I'm
5  doing.  I need to be doing this correctly.  An
6  experienced climber has heard it all before.
7  They've been there, done that.  And they
8  become, I guess, not sort of lax but
9  comfortable, and they forget that they need to
10  be doing this every time.  I guess that would
11  be akin to driving a car.  When you first
12  start driving, you're scared, you're really
13  paying attention, but the more you drive, the
14  more comfortable you get, the more lax you
15  get.  So, typically, if there is an auto belay
16  incident, the majority of the time across the
17  industry it's an adult, and it's an
18  experienced climber.
19    Q.   (By Mr. Whitten) So there's been,
20  according to this response, 12 similar
21  incidents at High Point's facilities in the
22  past three years.
23       Does High Point consider that an

Page 112

1  acceptable rate of incidents for this type
2  of --
3       MR. HAZELTON:  Object to the form.
4    A.   It's not acceptable.  I mean, we
5  would hope that people wouldn't make mistakes,
6  but climbing is inherently dangerous.  You're
7  just as likely to get injured on an auto belay
8  as you are bouldering or using ropes.  If you
9  make a mistake, it has consequences.
10    Q.   (By Mr. Whitten) Are there any
11  products available to High Point that are
12  designed to reduce the number of falls like
13  this?
14       MR. HAZELTON:  Object to the form.
15    A.   I believe there are some alarm
16  systems and things like that on the market.
17  But over the years, there have been a number
18  of those come out, and it has been almost
19  immediately proven that they don't work.
20  People disregard the alarms and the bells and
21  things like that, so...
22    Q.   (By Mr. Whitten) So High Point has
23  not implemented any of those devices?

Page 113

1    A.   No, beyond our banners that block
2  the bottom of the wall.
3    Q.   Where do these banners come from?
4    A.   How do you mean?
5    Q.   Did they come with the device
6  or --
7    A.   No.  Those are banners that we
8  make and put at the base of the wall.
9    Q.   So you fabricate the banners
10  yourself?
11    A.   Correct.  We -- auto belays
12  nowadays ship with a banner similar to that,
13  but they are very generic.  We make our own
14  that say, Stop, you must be properly
15  instructed as to the rules and the weight
16  limits and everything else around the banner.
17  So we actually go above and beyond what is
18  shipped with the device.
19    Q.   Has High Point ever hired a safety
20  consultant to consult at its climbing
21  facilities?
22    A.   No.
23    Q.   Why is that?

29 (Pages 110 - 113)

Page 114

1    A.    We operate by the climbing wall
2  industry standards, so...
3    Q.    Is High Point a member of any
4  indoor climbing associations?
5    A.    The Climbing Wall Association.
6    Q.    Do they ever send out information
7  on safety issues?
8    A.    Can you be more specific?
9    Q.    Do they have publications or
10  newsletters or anything like that?
11    A.    There is a -- how do I say it...
12  There's an informational newsletter that goes
13  out, but it's not necessarily based on "these
14  are things that are happening in the
15  industry." Things like that, they will send
16  out notices of, you know, this happened at
17  this facility, but that's very rare to see
18  something like that.
19        Typically, what will happen is,
20  when we have a conference every year, there
21  will be sessions where we can talk to various
22  people involved in the industry about
23  different lawsuits that have come up and

Page 115

1  things like that, here's what happened, here's
2  what the argument was. But beyond that,
3  there's not normal newsletters because we
4  aren't directly reporting to the CWA that this
5  happened.
6    Q.    But at these conferences, do they
7  ever discuss safety issues like climbers not
8  clipping in?
9    A.    Yes. I mean, the operating
10  standards are a constantly evolving document
11  too, so...
12    Q.    Has the Climbing Wall Association
13  ever sent out any information about addressing
14  this issue of climbers not clipping into auto
15  belays?
16    A.    Not that I'm aware of specific
17  information. The Climbing Wall Association
18  doesn't dictate policy. They are more
19  involved in minimum operating standards. It's
20  up to the facilities, their insurance carrier,
21  their lawyers to determine what those
22  thresholds are going to be.
23    Q.    Who does general safety

Page 116

1  inspections at High Point's facility in
2  Birmingham?
3    A.    General safety in what regard?
4    Q.    Or I guess I should have asked if
5  there are any sort of safety inspections that
6  are routinely done at High Point's facility in
7  Birmingham.
8    A.    Safety regarding what
9  specifically?
10    Q.    Just general safety issues,
11  inspections.
12        MR. HAZELTON: Object to the form.
13    A.    That's very, very broad. Could
14  you be more specific?
15    Q.    (By Mr. Whitten) I don't know the
16  specific industry terms for the types of
17  inspections that are done, but does anyone
18  from the Climbing Wall Association ever
19  inspect the facilities?
20    A.    No, they don't inspect facilities.
21    Q.    Has anyone from your liability
22  insurer ever inspected the facilities?
23    A.    They do a walkthrough about once a

Page 117

1  year when they do an audit just looking for
2  their typical concerns: Trip and fall, things
3  like that, egress and stuff. But climbing
4  wall inspections are done -- the actual walls
5  are inspected twice a year, and as far as
6  equipment, equipment is checked weekly. So we
7  do safety checks, but there's no outside
8  inspectors that come in to inspect the
9  facility.
10    Q.    Who does the internal safety
11  inspections?
12    A.    Our staff.
13    Q.    Is that the local staff, or does
14  corporate --
15    A.    Local staff.
16    Q.    Okay. Does High Point ever
17  consult any books on indoor climbing safety?
18        MR. HAZELTON: Object to the form.
19    A.    Not really because all of -- there
20  really isn't any, and any information comes
21  from the Climbing Wall Association and our
22  conference when we get to talk to other
23  operators.

30 (Pages 114 - 117)

Page 118

1   Q.   (By Mr. Whitten) Are you familiar
2 with the book entitled "Artificial Climbing
3 Wall Operation and Risk Management"?
4   A.   Who is it by?
5   Q.   Written by Dan Hague.
6   A.   I'm not familiar with that one.
7   Q.   Do you know if anybody at High
8 Point would have seen or read that book?
9   A.   Unlikely.
10   Q.   Are you familiar with Mr. Hague?
11   A.   No, I'm not.
12   MR. HAZELTON:  Is that who you
13 hired, Mr. Hague?
14   THE WITNESS:  Can I ask --
15   MR. HAZELTON:  Off the record.
16   (Discussion off the record.)
17   Q.   (By Mr. Whitten) My last question,
18 Mr. Watson, is about the relationship between
19 High Point Birmingham and High Point Climbing.
20 High Point responded that High Point
21 Birmingham is the property owner of the
22 Birmingham, Alabama, facility which it leases
23 to High Point Climbing.

Page 119

1   So is it correct that High Point
2 Climbing is over all the operations at the
3 facility, climbing operations?
4   A.   Correct.  High Point Climbing is
5 the operator of the climbing business.
6   Q.   Does High Point Birmingham have
7 any employees?
8   A.   No.
9   Q.   So everybody -- all the people
10 we've discussed -- employees, staff, owners
11 executives -- they're all associated with High
12 Point Climbing?
13   A.   Correct.
14   MR. HAZELTON:  And, obviously,
15 he's here pursuant to the notice as the -- you
16 know, the notices were identical for both
17 entities, but can we agree that as far as the
18 operations go, he's testifying on behalf of
19 High Point Climbing for -- because, like we
20 said, High Point Birmingham is literally just
21 an entity that collects a rent check.  All
22 policies and procedures, everything we've been
23 talking about, is related to High Point

Page 120

1 Climbing.  Can we agree to that?
2   MR. WHITTEN:  That's what he just
3 confirmed for me.  So we're on the same page.
4   Mr. Watson, that's all the
5 question I have for you.  I don't know if your
6 lawyer has any.
7   MR. HAZELTON:  I don't know that I
8 do.  How about we do this, can we take, like,
9 a five-minute break and then come back?
10   MR. WHITTEN:  Yes.  That's
11 perfectly fine.
12   (A recess was taken.)
13   MR. HAZELTON:  I don't have any
14 questions.  Thanks.
15   (The deposition concluded
16   at 11:07 a.m. EST)
17   * * * * * * * * * * * *
18   FURTHER DEPONENT SAITH NOT
19   * * * * * * * * * * * *
20
21
22
23

Page 121

1   REPORTER'S CERTIFICATE
2 STATE OF ALABAMA
3 ETOWAH COUNTY
4   I, Joseph Jones, Certified Court
5 Reporter and Commissioner for the State of
6 Alabama at Large, hereby certify that on
7 December 16, 2021, I reported the deposition
8 of SHAWN WATSON, who was first duly sworn or
9 affirmed to speak the truth in the matter of
10 the foregoing cause, and that pages 5 through
11 120 contain a true and accurate transcription
12 of the examination of said witness by counsel
13 for the parties set out herein.
14   I further certify that I am
15 neither kin nor of counsel to any of the
16 parties to said cause nor in any manner
17 interested in the results thereof.
18
19
   JOSEPH JONES, CCR
20   Commissioner for the
   State of Alabama at Large
21   CCR # 645, Expires 09/30/22
22   MY COMMISSION EXPIRES: 06/01/25
23

31 (Pages 118 - 121)

| & | | | |
| --- | --- | --- | --- |

**&**  2:4,8 9:14

**0**

**00505**  1:9
**06/01/25**  121:22
**09/30/22**  121:21

**1**

**1**  3:6 7:9,13 30:21
  61:1
**10**  3:15 103:6,7
**100**  105:13
**1000**  1:21
**103**  3:15
**11**  88:5,18 94:22
**1100**  2:5
**11:07**  120:16
**12**  85:22 104:4
  106:17,20 108:16
  108:20 109:18
  111:20
**120**  121:11
**13**  32:5,9 66:9,14
  66:16 68:14 94:6,8
  97:8 106:19
**1400**  2:9
**15**  79:4 94:22
**16**  1:15 121:7
**16th**  90:13
**17**  3:7 84:21
**18453**  121:19

**2**

**2**  3:7 17:21 18:1
  30:23 31:2 66:5
  71:23 103:23
**20**  33:19 44:9 45:3
  45:13
**200**  1:20 2:10
**2001**  2:5
**2013**  10:6,18

**2015**  9:23
**2016**  70:4,7 106:10
  106:13 108:1
**2018**  90:13 108:1
**2019**  14:10 92:3
**2020**  90:13
**2021**  1:15 121:7
**22**  33:19
**24**  93:13
**2:21**  1:9
**2nd**  14:10 90:12

**3**

**3**  3:8 40:23 41:1
  75:8 104:3 106:16
  108:18
**30**  24:19 25:20
  27:21 41:12 44:23
**31**  90:4 95:7 96:23
**32**  95:16
**35203**  2:6
**35242**  2:10

**4**

**4**  3:9 52:17,20
**41**  3:8
**45**  44:1

**5**

**5**  3:3,10 58:7,10
  121:10
**5.0**  79:7
**50**  47:21
**52**  3:9
**54**  48:4
**58**  3:10

**6**

**6**  3:11 63:19,22
  66:6,9,11,18 94:6,7
**6.10**  93:14
**6/8/72**  9:8

**63**  3:11
**645**  121:21
**68**  3:12

**7**

**7**  3:6,12 68:20,23

**8**

**8**  3:13 89:13 91:2,6
**8.0**  84:22 88:5
**8:57**  1:22

**9**

**9**  3:14 97:18,21
**91**  3:13
**95**  10:16
**97**  3:14
**9a**  98:13 102:10
**9b**  98:14
**9c**  98:15

**a**

**a.m.**  1:22 120:16
**abide**  72:6 83:16
**ability**  7:5 63:15
  94:19
**able**  15:18 16:13
  31:21 32:3 33:22
  38:3,16 39:2,5,8
  64:17
**acceptable**  112:1,4
**access**  54:10
**accident**  52:12 63:7
  63:8
**accurate**  54:13
  85:18 121:11
**accurately**  86:9,11
**acknowledge**  74:13
  78:10
**acknowledged**  74:9
  78:4
**act**  57:21

**activity**  56:10
  75:11
**actual**  10:20 22:7
  34:5 78:22 117:4
**add**  41:8
**added**  56:15
**addendum**  78:9
**additional**  27:9
  28:10 55:4
**address**  68:2,8
**addressing**  115:13
**adult**  18:18 23:11
  24:5,10,15 25:4,20
  26:14 27:20,22
  28:2 32:6,8,15 36:1
  52:5 66:12,15 82:5
  86:19,21 87:5,17
  87:17,23 93:17
  94:8,9 108:9,11
  111:17
**adults**  20:13 21:20
  21:20 22:9 23:16
  26:1 27:8,15 30:15
  37:4 68:3 81:19,23
  82:11 84:1 86:1
  88:16 97:13 103:4
  108:8,14
**affect**  7:4 36:18
**affirmed**  5:3 121:9
**aforementioned**
  73:14
**afternoon**  50:13
**age**  32:13 39:16
  72:9 93:16 94:2,13
  94:14,22
**ages**  94:6,22
**ago**  23:4 25:19
  59:12 91:20
**agree**  44:7 75:12
  85:13 94:23 119:17
  120:1

**agreed**  4:2,17 50:6
**agreeing**  23:12
  30:10
**agreement**  1:18
**agrees**  26:15
**ahead**  41:6
**akin**  111:11
**alabama**  1:2,19 2:6
  2:10 4:8 104:7,8
  107:1 118:22 121:2
  121:6,20
**alarm**  112:15
**alarms**  112:20
**allow**  24:8 64:13
**allowed**  32:14
  66:13,16
**allowing**  24:8
  77:20
**allows**  47:5 48:13
**alterations**  59:4
**ambulance**  67:11
  109:10,15 111:3
**amount**  63:10
**amusements**  78:6
**anchoring**  80:2
**annex**  95:11,18
  96:1
**answer**  5:20 6:23
  7:5 73:5 109:12
**answers**  3:15
**anybody**  118:7
**appear**  18:13,15
  41:16 43:4 47:12
  49:15 100:11
**appearances**  2:1
**appears**  22:5 23:7
  41:20 44:17 46:22
  47:22 48:3 77:3
  88:8
**applicable**  92:3

**applies**  86:6 87:5
  93:21
**apply**  74:11 86:3
  93:1,9,18 97:11
**appropriate**  90:20
**appropriately**
  34:19
**approximately**
  1:22 44:1 94:22
**arbitrary**  9:22
**area**  31:23 37:17
  39:15,16,23 40:3
**argued**  83:20
**argument**  115:2
**arrive**  19:19
**arrived**  15:10 18:9
  18:22 19:15 32:19
**artificial**  118:2
**ascending**  85:4
  87:11
**ashlyn**  32:23 33:2
  42:11 55:20 70:19
  73:1
**asked**  33:10 36:4
  104:1 116:4
**asking**  6:15 25:7
  30:8 38:9 51:11
  59:17 104:22 110:4
**aspect**  93:21
**assist**  45:17 103:12
**assistance**  96:21
  97:3
**assistant**  10:9
**assisting**  102:3
**associated**  119:11
**association**  72:6,15
  73:2 74:4 89:9
  91:10 114:5 115:12
  115:17 116:18
  117:21

**association's**  81:5
  92:18
**associations**  114:4
**assume**  6:17 23:20
  62:11
**assuming**  36:14
**assumption**  52:15
**assure**  79:10 80:12
**attach**  45:8,21
**attached**  82:21
  83:6,11 84:8,15
  99:6
**attempt**  40:20
**attention**  47:15
  52:13,16 67:12
  111:4,13
**attorneys**  2:4,9 5:9
**audit**  117:1
**august**  14:10 92:3
**austin**  2:3 5:8
**auto**  31:4,7,14,19
  31:22,23 32:2
  39:22 40:2,6,11
  45:8,12,21 48:17
  61:4 66:12,17
  68:13,17 69:6,17
  71:4 93:18 94:2,11
  95:11 97:2,3
  105:16 110:19
  111:15 112:7
  113:11 115:14
**available**  74:19
  106:14 107:19
  112:11
**aware**  43:20
  115:16

**b**

**b**  2:3
**back**  16:16 25:18
  29:12 33:2 37:15
  67:7 90:8 108:3

120:9
**background**  9:10
  10:14
**backs**  100:2
**backwards**  100:14
**banner**  102:22
  113:12,16
**banners**  52:2 113:1
  113:3,7,9
**base**  52:2 100:7
  113:8
**based**  11:6 16:14
  24:11 59:14,23
  81:4 83:15 85:16
  114:13
**basic**  58:13
**basis**  33:20 43:10
  44:3 46:11 71:9
**beams**  21:21 22:2,3
  23:5 24:1
**beginning**  46:23
  68:12
**behalf**  7:21 103:16
  119:18
**belay**  31:4,7,14,19
  39:22 40:2,11,18
  44:9 45:9,12,21
  48:17 58:3 60:12
  61:4 66:17 68:13
  68:17 69:17 72:9
  93:18 94:2 95:11
  97:2,3 105:16
  110:19 111:15
  112:7
**belaying**  93:16
  94:11,14
**belays**  31:22,23
  32:2 40:6 66:13
  69:6 71:4 113:11
  115:15

EXHIBIT 1 - 000034

**believe** 30:3,18
46:16 54:18 56:5
65:13 75:23 76:3,6
76:8,17 83:20 84:6
94:4 95:15,20 99:1
106:21 108:12,18
112:15
**bells** 112:20
**beyond** 113:1,17
115:2
**birmingham** 1:10
2:6,10 7:22 12:12
12:13 14:9 15:1,5
32:18 34:1 53:21
53:22 57:4,8,12
60:4 68:17 69:9,10
69:18,18 92:14
98:4,8 103:17
104:8 105:23 106:4
106:9,23 107:5,23
108:7 116:2,7
118:19,21,22 119:6
119:20
**birth** 9:7
**birthday** 28:18,23
29:3 101:6 102:2
**block** 52:4 113:1
**blocking** 102:22
**book** 91:9 118:2,8
**booklet** 90:18
**books** 117:17
**bottom** 18:20 41:21
46:21 52:4 66:20
99:13 102:22 113:2
**boulder** 61:5
**bouldering** 31:22
39:17,20 94:15
105:16 112:8
**boulevard** 1:21
**box** 75:9

**boxes** 29:14,17
**bradley** 2:4
**break** 6:21 7:1
120:9
**bring** 24:16 25:4
28:3 36:19 96:9
**bringing** 49:21
102:6
**brings** 26:14
**broad** 58:5 116:13
**brought** 16:6 24:1
25:10 27:21,22
**brown** 19:8 32:23
33:2 43:17 55:15
**bullet** 29:17 30:20
31:4 79:13 80:15
81:10 82:21 85:2
88:5,18
**burt** 21:22 22:4
**business** 9:11 11:18
12:15,19 50:2 76:2
76:9 119:5
**busy** 39:21,23 40:7
49:22 50:2,3
**button** 46:22 48:5,8
48:12 99:12,20
**buttons** 47:4,8,13
47:16 48:15

**c**

**c** 95:11,18 96:1
**call** 37:17 99:2
**called** 31:10
**calm** 45:19
**camp** 101:3 102:2
**car** 111:11
**carabiner** 82:23
85:9
**cardio** 34:8
**carnivals** 78:6
**carrier** 115:20

**case** 1:8 4:19,20
36:9 45:18 79:22
**catastrophic** 109:2
109:5
**cause** 121:10,16
**caveat** 6:22 35:22
**ccr** 1:18 121:19,21
**center** 2:9
**central** 11:7
**certain** 31:11 34:17
38:4
**certificate** 121:1
**certification** 92:9
**certified** 121:4
**certify** 121:6,14
**chance** 21:1,10
**change** 16:19,21
**changed** 59:13
110:7
**changing** 90:9
**chaperons** 26:3,8
28:15
**charge** 27:2
**chattanooga** 1:20
104:9,10
**check** 15:16 35:5
44:12 50:19,20
85:5 87:12 119:21
**checked** 51:1,4,7
117:6
**checking** 57:23
67:16 87:19
**checklist** 3:10
58:13
**checklists** 60:11,12
60:12
**checks** 35:9 72:10
117:7
**chief** 9:16
**child** 77:9 82:5
95:2

**childhood** 94:18
**children** 15:22
23:12 24:15 25:4
25:20 26:15,19
27:7,11 37:5 66:9
66:11 77:20 78:15
94:18 96:9 102:11
**church** 28:7
**civil** 4:5,16,22
**clarify** 19:12 104:5
**class** 60:11
**classes** 34:21 58:5
**cleaning** 57:23
**clear** 77:7,10 78:23
82:10 100:5 105:22
**clearly** 6:11 78:11
**client** 14:8
**clients** 17:11 89:19
**climb** 24:8,9,23,23
25:6 35:21,22 36:8
47:4,8 66:21 67:3,7
67:10 77:20 78:16
102:21
**climbed** 41:19
84:16
**climber** 77:3,9 85:6
85:13 87:12 88:10
96:11 108:22
110:23 111:6,18
**climbers** 45:23
71:13,20 75:16
76:15 77:1 80:20
81:2,4,9 82:20 83:5
84:7 85:3 86:14
97:2 99:9 108:15
110:17,21 115:7,14
**climbing** 1:11 7:21
9:14 10:12,15
11:21 12:2,9,11,14
12:18,22 13:18,19
16:8 29:4 31:19

**[climbing - counsel]**

33:23 34:3,5 36:4
36:10,10,15,16,20
36:23 37:20 38:16
38:20,22 39:1,4,8
43:19,23 44:8,14
45:3,11 46:21 47:1
47:14 48:22 49:17
50:8 51:18 52:1
53:9 67:3,6 69:19
72:5,6,8,10,14,21
73:2 74:3,10 75:10
75:15 77:11,15,23
78:3,5,8,12 79:10
79:17 80:21 81:2,5
81:8 82:18,22,23
83:6,15 84:2,8,15
85:6,8,17 87:14,18
88:1,13 89:9 91:10
92:18 93:16 96:20
97:12 98:19,21
99:6 101:1,23
102:12,14,18 112:6
113:20 114:1,4,5
115:12,17 116:18
117:3,17,21 118:2
118:19,23 119:2,3
119:4,5,12,19
120:1
**clip** 41:19 45:22
46:5 52:3,16 66:16
67:9 88:14 104:6
110:3,5,9,19
**clipped** 48:17
66:12 67:6 85:7
87:13 94:7
**clipping** 29:7 40:11
40:17 52:1 66:22
67:16 115:8,14
**clock** 99:13,17
**clocks** 102:10,16

**close** 19:19 45:16
45:18
**closer** 39:4
**closing** 63:6
**club** 101:4 102:1
**clubs** 99:8
**collaboration** 59:2
65:1
**collects** 119:21
**combine** 19:22
**combined** 18:23
19:20
**come** 19:3 25:22
27:3,8 33:10 46:6
50:20 82:3 106:3
112:18 113:3,5
114:23 117:8 120:9
**comes** 15:14 117:20
**comfortable** 67:7
111:9,14
**coming** 26:5,6
**commencing** 1:21
**comment** 94:18
**commission** 4:9
121:22
**commissioner** 1:19
4:8 121:5,20
**common** 67:19,21
96:15
**companies** 53:8
**company** 10:5,8,18
10:19 11:4 54:8
56:14 57:2 76:2
**company's** 65:12
**complete** 54:13
**completed** 83:8
**completing** 89:6
**complex** 94:21
**complies** 72:2 79:6
90:5 95:9

**computer** 15:17
16:20 21:2 57:22
**concerned** 23:11
**concerns** 117:2
**concluded** 120:15
**conference** 114:20
117:22
**conferences** 115:6
**confirm** 7:18 43:3
96:1 98:6
**confirmed** 120:3
**conflicting** 74:2
**confusion** 76:3
**conner** 14:4
**consequences**
112:9
**consider** 109:2
111:23
**considered** 49:2
**consisted** 21:19
**constant** 85:3
86:15,18
**constantly** 115:10
**construction** 11:17
**consult** 95:17
113:20 117:17
**consultant** 113:20
**consulted** 95:23
**contact** 16:2,3
**contain** 121:11
**contained** 73:13
**contents** 71:13,16
71:17
**continually** 47:7
**controls** 74:5
**coo** 11:10
**coordinator** 92:7
**copy** 54:1,4,14
71:20 74:17 77:19
78:15

**corner** 38:2
**corners** 39:6
**corporate** 15:4
53:17 54:1,4
117:14
**correct** 12:10,13,14
17:14,18 19:10,21
20:8,9 21:8,17
22:20 23:1,8 26:13
26:17 32:4 33:9
35:13,14 36:1,2,16
36:17 37:1,2,11
38:6 41:23 42:5,12
43:17,18 44:16,19
45:1,5 47:23 48:1
48:18 49:10,18,19
51:2 53:23 54:12
54:22 55:16 58:18
58:19 60:2 61:19
61:20 62:3,7 64:11
64:15,21 66:18
67:17 68:18,19
70:9 74:6,22 75:6,7
76:10 78:18 79:18
80:7,15,22,23 81:3
81:11 84:4,10 87:6
87:16 88:1,3,6,17
89:6 92:17,22 94:6
97:9,10,12 98:22
99:2,17,18 102:8
106:1,10,11,20
107:2,6,7 113:11
119:1,4,13
**corrected** 35:6,13
**correctly** 29:7
32:13 55:21 64:9
67:23 72:12 75:18
82:7 83:1 85:10
111:5
**counsel** 4:3,18
121:12,15

877-373-3660                                                    800.808.4958

EXHIBIT 1 - 000036

**count** 49:14
**county** 121:3
**court** 1:1 4:7 5:19
  5:22 6:4 121:4
**cover** 31:12
**covered** 65:19
  67:14 96:6 101:19
**create** 56:17 59:21
**created** 58:23 59:2
  59:8,23 64:23
**creating** 95:18
**current** 107:11
**currently** 11:22
**customer** 79:23
  85:20,22 89:23
**customers** 80:10
  86:7
**cv** 1:9
**cwa** 92:9 115:4

**d**

**dan** 118:5
**danger** 67:15
**dangerous** 75:11
  112:6
**database** 60:16
**date** 9:7
**dates** 90:11,20
**day** 11:16,16 39:21
  42:7 50:10,11,12
  50:21 51:1,4,7,11
  60:20 61:1 62:5,13
**deal** 26:3
**death** 108:21
  109:17
**december** 1:15
  90:13 121:7
**decision** 25:3
**decisions** 82:8
**defendant** 2:7
**defendants** 1:12

**define** 109:5
**degree** 9:11
**depend** 37:22 40:7
  45:15
**depending** 39:16
  39:21,23 53:6
**depends** 12:6 63:13
**depict** 86:9,11
**depicted** 43:9
**depicting** 98:1
**depiction** 85:18
**deponent** 120:18
**deposition** 1:14 3:6
  4:4,6,14,19 5:15
  7:20 8:2,6,8 9:4
  120:15 121:7
**descent** 68:16
  69:19,21 72:5 74:9
  75:15 76:14 77:15
  78:4 79:10,17
  80:21 81:2,8 82:18
  82:22 85:8 87:14
  88:1 89:8 92:20
**designate** 98:13,14
**designed** 112:12
**desk** 46:15
**despite** 96:14
**details** 31:13
**determine** 24:10,21
  25:16 115:21
**determining** 24:6
**develop** 94:19
**device** 40:11 44:9
  67:9 71:18 74:5
  80:1,11 81:20 82:1
  82:4,7 88:11 89:5,8
  90:15,19 95:12
  97:2,3 113:5,18
**devices** 40:2 68:17
  69:8,12,17,23 70:5
  70:6 74:16 78:7

96:17 112:23
**dictate** 115:18
**different** 19:18
  48:21 55:18 69:15
  71:5 76:1 114:23
**differently** 78:5
**digitize** 21:11
**digitized** 21:3
**digitizing** 20:21
**direct** 93:17 97:3,9
**direction** 96:21
**directly** 11:1 34:15
  34:22 68:14 101:21
  115:4
**disagree** 77:5 86:14
**discuss** 67:1 115:7
**discussed** 61:17
  88:18,23 119:10
**discussion** 103:21
  118:16
**dispute** 33:20
  43:10 44:3 46:11
  71:9 95:5
**disregard** 112:20
**distract** 49:7
  102:16
**distracted** 102:21
**distraction** 49:2
  102:11
**district** 1:1
**division** 1:2,3
**document** 7:8
  17:23 18:3,21
  23:20 30:10 52:20
  52:22 53:1 58:9,11
  58:21,23 59:1,9,21
  60:4,17 63:21,23
  64:5,23 66:5 68:23
  69:1,4 70:12,15
  75:9 76:4,7 77:22
  78:7,11 82:14 90:3

91:5,11,14,18 92:6
  92:15 93:13 95:8
  96:12 97:21 103:5
  103:9,13,23 115:10
**documentation**
  62:5 65:23 66:3
**documents** 7:10,15
  8:10,18,22 19:3
  60:8 72:22 73:23
  80:18 94:5
**doing** 35:9 52:14
  58:15 61:12,19
  64:6,7,9 67:13,22
  86:9 110:14 111:5
  111:5,10
**donna** 19:8
**double** 44:12 76:6
**downtown** 104:11
**drive** 2:9 111:13
**driving** 111:11,12
**duly** 5:3 121:8
**dutton** 2:3
**duty** 62:15,19

**e**

**earlier** 36:3 61:18
  75:2,3 94:5
**edge** 105:17
**edition** 3:13 91:21
  91:22 92:2
**educational** 9:9
**egress** 117:3
**either** 4:21 83:21
  87:16
**elements** 38:13
  39:3
**employed** 9:13
**employee** 22:23
  28:19 31:6 35:12
  37:10 40:17 45:11
  45:14 57:5,5,12
  62:2,23,23 63:11

64:12,13,14 87:21
101:1,12,21 107:6
107:11
**employees** 26:19
32:17,21 33:12,13
33:16,22 34:11,20
43:4,9,14 46:9
51:19 57:11 60:3
61:9,19 64:6 71:1
71:12 84:14 92:13
99:23 100:6,19
119:7,10
**empty** 19:4
**ensure** 81:8 82:19
83:5 84:7,14
**entail** 66:10,23
**entered** 21:2
**entire** 51:11
**entirety** 42:23
71:16
**entities** 119:17
**entitled** 95:10
118:2
**entity** 12:6 119:21
**entry** 36:8
**equipment** 45:4,8
49:8 75:17 76:16
117:6,6
**especially** 49:22
**essentially** 67:1
74:1
**est** 1:22 120:16
**etowah** 121:3
**evaluate** 64:12
**evaluation** 3:11
64:2,17,21
**event** 14:17
**everybody** 119:9
**evidence** 4:14
**evolved** 59:12

**evolving** 115:10
**exact** 47:17
**exactly** 8:20 50:3
75:4 77:2,7 99:16
**examination** 3:1
5:6 121:12
**example** 19:7
**exceed** 72:21,23
73:10 92:10
**excuse** 44:15
**executive** 10:21
**executives** 119:11
**exhibit** 3:4,5,6,7,8
3:9,10,11,12,13,14
3:15 7:9,13 17:21
18:1 30:21,23 31:2
40:23 41:1 52:17
52:20 58:7,10
63:19,22 66:6
68:20,23 72:1 79:4
84:21 91:2,6 97:18
97:21 98:13,14,15
102:10 103:6,7
**expect** 24:19 57:21
57:21
**expected** 71:1,12
73:7,8 92:14
**experience** 27:19
63:11
**experienced** 108:15
110:17 111:6,18
**expires** 121:21,22
**explain** 22:11
39:15
**expound** 31:12
**extra** 49:21
**extreme** 96:15
**eye** 37:12

**f**

**fabricate** 113:9
**facebook** 98:11
**facilitate** 29:1,4,9
34:20
**facilities** 11:20 12:3
15:2 53:16,18
54:11 69:13 72:4
103:2 111:21
113:21 115:20
116:19,20,22
**facility** 12:12 14:9
14:20 15:1,6,20
16:14 17:10 29:11
32:18 34:1,4,10,18
34:23 35:5 36:5
50:7 53:15,21,22
57:13 60:5,8 61:2
61:12,15 62:10,20
68:17 69:9,18
72:10 90:1 92:14
94:15 98:4,8
105:19 106:9 108:1
108:8 114:17 116:1
116:6 117:9 118:22
119:3
**facility's** 98:11
**fact** 78:10
**factory** 90:6,12,21
**failed** 45:8 110:18
**failing** 110:9
**fair** 6:18
**fall** 14:8,14 55:22
56:2 65:16 67:10
117:2
**falls** 11:18 104:2,5
104:13 105:17
112:12
**familiar** 14:12 41:7
97:23 100:13
109:17 118:1,6,10

**familiarize** 7:11
**familiarizing** 63:6
**far** 14:15 20:2 22:6
25:3,5,6 26:7 40:11
51:16 55:17 60:12
61:10 63:4 94:1,10
117:5 119:17
**fast** 44:20
**features** 51:23 52:9
**federal** 4:5,16,22
**fee** 36:8
**fell** 41:19 44:10
46:10,18 49:12
50:16 51:14 75:6
84:16 98:21
**field** 28:8
**fill** 15:21 16:4,5
19:3
**filled** 17:20 18:8,18
23:17 27:14 54:16
55:18
**filling** 36:11 55:15
63:8
**final** 48:8
**find** 15:15,22,23
16:7,17
**fine** 17:8 26:16
46:6 120:11
**finish** 6:12,13
**first** 5:2 15:12,15
15:21 16:17 17:14
18:13,20 19:8 20:1
29:13,16 30:20
44:6 56:9,22 58:17
72:3 85:12 91:17
91:20 98:12,17
99:22 102:9 110:21
111:11 121:8
**fist** 18:14
**fit** 28:5 59:4 85:6

EXHIBIT 1 - 000038

**fitness** 9:14
**five** 43:5 120:9
**flag** 24:2
**flip** 7:11 60:20 90:3
  93:12 95:7 103:23
**flipped** 60:18 71:23
  75:8 79:3
**flipping** 84:21
**floor** 10:20,23
**folks** 18:19 21:7,14
  36:5 110:8
**follow** 25:6 55:20
  55:21 67:8
**following** 67:15
  87:4
**follows** 5:5
**footage** 3:8 42:1
**foregoing** 121:10
**forget** 110:3 111:9
**forgotten** 110:5
**form** 3:7,11 4:11
  10:22 12:1 16:4,23
  18:4,8 19:4 20:18
  22:1,10 23:13 24:4
  25:12 27:12 29:13
  30:14 34:14 35:3
  37:6 40:13 45:6
  46:2 47:9 49:4,23
  50:17 51:20 52:11
  54:6,14 55:6,7 56:4
  56:16,18,23 57:7
  59:15 60:9 63:8
  64:3,12 65:7,19
  66:2 67:20 70:8,16
  71:15 73:4 74:7
  75:22 77:6,21
  78:17 79:21 81:16
  82:2,13 83:7,14,19
  84:3,9,18 85:15
  86:5,16,23 87:7,15
  88:2,19 89:14,21

90:16 92:21 93:5
  93:20 95:1 96:13
  101:2,7 102:13,19
  104:19 108:2 109:4
  109:7 110:10,20
  112:3,14 116:12
  117:18
**formal** 5:21
**formality** 4:9
**forms** 53:20 65:4
  71:5 72:9
**fortunately** 26:1
**forward** 44:20
**foster** 2:8
**four** 14:5,6 38:21
  47:10 60:20 61:1
  81:10
**fourth** 54:19
**frames** 101:9
**free** 17:9 35:21,22
  50:20
**friends** 16:1,2
**front** 46:15
**function** 49:2 90:10
**functions** 48:16
**further** 4:17 47:6
  92:8 120:18 121:14

**g**

**games** 29:2,9
**gather** 105:1
**gear** 16:9 36:16
**general** 10:9 11:1
  42:10 59:3 115:23
  116:3,10
**generally** 57:17
**generic** 113:13
**gentleman** 100:14
**getting** 45:17 92:8
  110:2
**given** 5:14 23:18
  24:13 39:9 51:1

56:16 62:5
**gives** 48:21
**giving** 31:7
**go** 5:17,18 14:23
  15:5 16:11 17:9,14
  19:22 21:11 22:14
  36:23 41:6 50:20
  61:10 63:5 71:12
  71:17 76:12 90:7
  90:18 91:1 94:1
  96:9 103:5,19
  104:17 105:2 108:3
  113:17 119:18
**goes** 31:6 34:16
  79:13 114:12
**going** 7:8 16:7
  23:21 24:7,11,22
  25:16 26:3,18 28:6
  36:7 40:20,22
  42:16 50:2,4 52:19
  58:14 93:12 95:3
  115:22
**good** 5:8
**great** 14:2
**ground** 5:17 45:16
**group** 15:10 18:9
  18:22 19:2,9,12,13
  20:7 21:19 26:4,11
  27:4 28:13,14 31:8
  31:18 32:19 33:3
  35:16 39:13 43:23
  62:9 65:20 102:7
**groups** 18:23 19:5
  19:18,22 26:5 27:3
  28:8,12
**guardian** 1:6
**guess** 9:23 10:9,10
  12:7 22:18,22 28:9
  31:10 38:10 52:15
  59:10 60:19 63:3
  63:11 74:14 77:12

99:13 104:23
  106:19 108:1 109:6
  110:6 111:8,10
  116:4
**guests** 17:12 49:11
  49:15,16 50:15
  104:6
**guidelines** 59:20
  65:4 72:8 81:5
**gulley** 22:18 32:22
  43:16 46:17 64:20
  65:15 100:16,21
**guy** 107:5
**guys** 8:23
**gym** 15:14 16:12
  17:1 19:14 32:1,2
  32:14 37:8 39:14
  53:19 56:9,22 58:1
  58:2 60:16 70:6
  77:11 82:4 93:22
**gyms** 78:5,8,12
  85:17

**h**

**hague** 118:5,10,13
**halfway** 56:7 66:8
**hand** 7:8 52:19
  105:3
**handful** 24:21
**handing** 17:23 58:9
  63:21 68:22 91:5
  97:20
**hannah** 32:22 33:6
  55:21 62:17 70:19
  73:1
**hannah's** 8:5,8
**happen** 88:22
  114:19
**happened** 14:13
  15:10 20:20 21:4
  26:1 27:20 53:5,20
  107:4 114:16 115:1

EXHIBIT 1 - 000039

115:5
**happening** 11:2
  67:23 114:14
**happens** 11:18 27:2
  35:12 37:9 85:19
  105:18
**harness** 82:23 85:7
  85:7 87:13
**hat** 100:14
**hazelton** 2:8,8
  10:22 12:1 13:14
  16:23 19:11,16
  20:18 23:13 24:4
  25:12 27:12 30:22
  34:14 35:3 37:6
  40:13 42:16 45:6
  46:2 47:9 49:4,23
  50:17 51:20 52:11
  54:6 55:7 56:4,23
  57:7 59:15 60:9
  66:2 67:20 70:8,16
  71:15 73:4 74:7
  75:22 77:6,21
  78:17,19 79:21
  81:16 82:2,13 83:7
  83:14,19 84:3,9,18
  85:15 86:5,16,23
  87:7,15 88:2,19
  89:14,21 90:16
  92:21 93:5,20 95:1
  96:13,18 97:6
  101:2,7 102:13,19
  103:19 104:19
  105:21 108:2 109:4
  109:7 110:10,20
  112:3,14 116:12
  117:18 118:12,15
  119:14 120:7,13
**head** 6:8 47:11
**hear** 6:14

**heard** 109:21 111:6
**hellums** 2:3
**help** 10:18 26:19
  28:19 29:2,5,6,8
  33:9 67:4,8
**helping** 61:6
**hereto** 4:21
**high** 1:10,11 7:21
  7:21 8:18 9:3,14
  10:3 11:10,20 12:2
  12:8,10,12,14,18
  12:22 13:17,19
  14:9 15:11 23:10
  24:3 25:2,21 26:15
  26:18 27:6,10
  28:10,18 30:4,9
  31:6 32:17 33:13
  34:1 36:18 37:3
  41:4 43:3,9,14
  45:10,15 46:8
  49:12,20 50:15
  51:18 53:9 55:4,10
  55:21 56:17 57:4,8
  57:11 59:18 60:1,4
  61:9 62:22 64:11
  64:13 65:8,15
  68:16 69:8,9,13,14
  70:14 72:17 75:20
  78:13 79:16 80:3,5
  80:13 81:14,21
  82:10,12 83:23
  84:5,6,13 86:4 87:3
  87:6,20 88:15 89:2
  89:10,11,16 92:5
  92:13 93:1,3,9 94:1
  94:10,12 95:17,23
  96:6,8 97:7 98:3,8
  99:23 100:6,23
  101:11,21 103:2,16
  104:1,2,12,16
  105:1 106:12 107:5

109:20 110:1,7
  111:21,23 112:11
  112:22 113:19
  114:3 116:1,6
  117:16 118:7,19,19
  118:20,20,23 119:1
  119:4,6,11,19,20
  119:23
**hire** 28:10 102:6
**hired** 113:19
  118:13
**hiring** 58:17
**history** 65:12
**hit** 99:19
**hits** 46:22
**honestly** 27:1
**hope** 112:5
**hospital** 109:11
**hospitalization**
  109:6
**hospitalized** 109:9
**huh** 11:9 29:15
  60:22
**hundred** 51:10,10
  51:16,16 105:14
**hundreds** 105:9,11
**huntsville** 104:7
**hurt** 84:17
**hypothetical** 25:19
**hypothetically**
  94:20

**i**

**idea** 38:12 51:6
  105:8
**identical** 99:5
  119:16
**identification** 7:14
  17:22 41:2 52:18
  58:8 63:20 68:21
  91:3 97:19 103:8

**identify** 101:14
**illinois** 9:12 11:7,8
**immediately** 14:17
  112:19
**impair** 7:5
**implemented**
  112:23
**important** 6:3,9
  36:6
**incident** 3:9 14:15
  20:20 21:4 37:15
  41:18 42:7 52:10
  53:2,10,19 54:14
  54:15 55:5,6,11,16
  56:7 104:14,15,18
  105:3,4,18 106:3
  106:13 107:17
  109:13,21 111:16
**incidents** 53:20
  104:4,5 105:16
  106:15,17 107:4,13
  107:23 108:7,16,21
  110:16 111:21
  112:1
**included** 22:10
  30:4,8 56:11 67:18
  80:4 106:21
**includes** 106:8
**including** 72:9
  97:14
**incorrect** 74:10
**index** 3:1,4
**individual** 84:11
**indoor** 72:8 114:4
  117:17
**industry** 3:13
  10:12,15 59:19
  72:8,15,21 73:3
  77:11 78:1,3 83:16
  91:9 93:1,4,9 96:2
  111:17 114:2,15,22

116:16
**information** 17:6
24:12 71:3 73:13
74:2 80:3,17 105:1
106:8 114:6 115:13
115:17 117:20
**informational**
114:12
**informative** 95:11
**inherently** 75:10
112:6
**initial** 20:9,15
21:10
**initialled** 20:11
**injured** 46:1 110:2
110:9 112:7
**injuries** 107:14,15
109:3
**input** 16:20
**inspect** 71:4 116:19
116:20 117:8
**inspected** 116:22
117:5
**inspections** 116:1,5
116:11,17 117:4,11
**inspectors** 117:8
**installed** 70:2
**instance** 74:8 76:7
76:17
**instances** 25:23
**instruct** 80:20
**instructed** 113:15
**instructing** 68:3,8
**instruction** 63:17
**instructions** 52:4
73:12 77:14 78:21
79:12 80:14 88:9
88:12
**insurance** 53:7
54:8 56:14 57:2
115:20

**insured** 56:16
**insurer** 54:5
116:22
**interested** 48:23
49:7 121:17
**internal** 72:22 90:9
117:10
**international** 99:7
**interrogatories**
3:15 8:5,16
**interrogatory**
106:16
**introduce** 40:23
**introduced** 4:20
**investigation** 55:5
**involved** 11:1 25:2
25:8 31:13 53:6
55:3,15 59:6 69:15
107:5,14 110:17
114:22 115:19
**involving** 14:8
54:15 104:6
**irrelevant** 88:20
**issue** 61:16 115:14
**issues** 35:2 114:7
115:7 116:10
**items** 88:18 89:12
89:18 96:5

**j**

**jacket** 101:13
**jennifer** 21:21 22:3
**jeremy** 2:8
**job** 9:15 10:7 11:11
36:12 63:18
**john** 13:6 14:3,3
**jones** 1:18 4:7
121:4,19
**joseph** 1:18 4:7
121:4,19

**k**

**keep** 31:15 49:7
53:9,13 104:12
**keeping** 37:12
**keeps** 48:23
**kid** 37:18,20 38:3,4
38:11 39:12,19,22
40:6 46:9 51:18
98:7 101:16,23
**kids** 15:23 22:17
23:8 24:2,7,11,19
24:21 25:10,15
27:4,4,17,21,22
28:3,16 29:5,6
31:22 37:13 48:23
49:3 51:17 52:6
61:14,14 81:18
98:19 101:1 102:4
103:4
**kidzone** 61:4
**kim** 21:21 22:4
**kin** 121:15
**kind** 9:22 16:16
107:14
**king** 1:21
**kinsley** 1:5 8:22
15:10 17:17 18:9
18:22 19:9 21:18
37:16 43:23 44:7
46:9,18,21 47:13
49:12,17 50:7,16
51:14 54:15 62:9
75:6 84:14 98:21
107:1
**kinsley's** 18:15
20:2 31:18 32:19
33:3 35:16 65:16
65:20 106:18
**know** 6:7 12:2
13:10 14:1 16:2
17:7 20:4 26:2,4,6

26:7 28:9 29:23
30:9 31:11 33:15
34:9 37:4,12,15
38:2,12 46:17
49:11 50:1,3 51:6
54:23 55:17,17
57:15,15 62:1,8
64:8 65:14,18
67:12 70:18,21,22
73:15,20 74:23
92:5 99:15 100:18
100:20 102:17
104:20 105:12
106:2 107:15,22
109:9,20 110:13
114:16 116:15
118:7 119:16 120:5
120:7
**knowledge** 60:1,16
82:6 89:7
**kornegay** 1:5,6
8:23 17:17 37:16
**kornegay's** 15:10
18:9
**kornegays** 104:1

**l**

**large** 1:20 4:9 28:6
28:13,14 121:6,20
**late** 94:18
**law** 2:4,9
**lawsuits** 114:23
**lawyer** 120:6
**lawyers** 115:21
**lax** 111:8,14
**layout** 38:11
**learn** 58:3,4
**lease** 12:21
**leases** 12:11,12,20
118:22
**leave** 50:19 67:10
111:3

led   47:3 48:19
  99:20
left   109:10,14
legal   5:21,23
length   109:12
letter   74:14,18 75:1
  78:9
liability   116:21
light   48:14 49:1
lighted   48:2
lights   46:23 47:3,5
  47:20,22 48:13,20
  99:20
limit   24:15 93:16
limited   107:21
limits   11:5 94:2,13
  94:14 113:16
list   67:19 68:2
  79:13 81:10
listed   7:20 18:14,20
  89:12 90:11 96:11
literally   110:23
  119:20
little   105:15
llc   1:11,11 12:15,18
  13:11,19
llp   2:8
local   53:16,18
  54:10 117:13,15
location   104:9,11
  106:4
locations   12:17
log   18:5 53:5 90:6
  90:12,22
logged   90:21
long   9:18 17:4 65:7
  65:14 91:20 96:14
look   8:3,10 18:2
  48:22 50:14 51:3
  58:11 61:3 62:20
  63:23 89:23 97:22

  100:4 108:3
looked   8:14,21
looking   29:12,13
  30:19 31:3 61:12
  66:4 91:22 93:13
  98:12 117:1
looks   23:5,9 44:14
lot   100:19
lower   45:22
lu   109:18,22
luther   1:21

### m

maintenance   11:16
majority   96:15
  108:14 111:16
making   25:3 59:7
  96:10
manage   24:7,20,22
management   11:14
  118:3
manager   10:10
  11:1 42:10
managers   59:4
  65:2
mann   2:4
manner   4:21
  121:16
manual   3:12 69:5
  71:2,21 74:3,5
  77:19 78:22 83:4
  83:13,18 86:3
  92:20
manual's   71:13
marathon   6:20
mark   7:9 21:1
  42:21 103:6
marked   7:14 17:22
  18:1 41:2 52:18,20
  58:8,9 63:20,21
  68:21,23 91:3,5
  97:19,21 103:8

markers   31:10
market   112:16
martin   1:20
matter   5:10 121:9
matthew   1:6
  109:18,22
maximum   27:21
mean   8:13 21:15
  24:17 27:13,19
  28:4 32:7 42:17
  46:3 110:22 112:4
  113:4 115:9
meaning   23:15
  76:6
meanings   76:1
means   32:8 73:15
  73:21,22
medication   7:3
medlen   54:20
meet   72:20,23
  73:10 92:10
member   114:3
members   13:10
  50:6
memory   7:4
memphis   104:7
mentioned   8:12
  16:15,16 17:16
  23:4 25:19 27:19
  28:17 33:13 36:3
  102:5 106:15
  108:21 110:15
met   100:16
middle   38:13 39:3
mind   77:4 78:8
minimum   26:10
  63:10,13 93:6,16
  94:2,12 115:19
minor   1:5 17:19
  86:17 87:5,17
  97:14 101:22

  108:11
minor's   27:14
minors   20:12 21:20
  23:6,19 30:1,12,15
  30:17 36:13,19
  67:11 68:3,9 83:10
  89:4 97:11 108:8
  108:13,19
minute   16:16 23:4
  25:19 42:21 44:8
  44:23 45:3,13
  120:9
minutes   43:5 44:1
  44:7
missing   22:8
mistake   112:9
mistakes   112:5
misty   21:21 22:3,5
  23:5
models   69:15
monitor   23:21
  28:16 29:6 34:15
  35:2
monitoring   23:19
  25:14 34:12 36:13
  52:6 58:1 61:14
month   15:3,8
months   17:9
moore   2:8
morning   5:8 7:4,16
  103:10
move   29:10 31:15
moved   10:17
moving   35:4 62:21
multiple   19:5

### n

nad   1:9
name   5:8,11 11:3
  18:11,14,16 20:2
  100:8,10 107:9,10

EXHIBIT 1 - 000042

**named**  21:21
**names**  13:20 14:1
  20:10,16 22:1,2,7,7
  22:13
**nature**  56:3 59:20
**near**  38:15
**necessarily**  19:1,9
  23:14 103:3 114:13
**necessary**  63:17
  82:7 89:7
**need**  4:12 6:21
  16:10 17:7 31:11
  37:12 64:10 71:3
  111:4,5,9
**needed**  33:9
**needs**  35:6
**neither**  121:15
**never**  17:17
**new**  11:16 17:11,12
  58:17 110:21,23
**newsletter**  114:12
**newsletters**  114:10
  115:3
**nick**  54:20
**nine**  26:14 28:3
**nod**  6:7
**normal**  51:17 115:3
**normally**  48:16
**north**  2:5
**northern**  1:2
**notice**  119:15
**notices**  3:6 7:20
  114:16 119:16
**november**  90:12
**nowadays**  113:12
**number**  3:5 7:13
  13:20 17:21 24:15
  27:22 28:6,15 41:1
  52:17 58:7 59:3,6
  63:19 65:2 66:7
  68:20 79:13 91:2

97:18 103:7 106:16
  110:2,8,16 112:12
  112:17
**numbers**  60:18
  90:21 108:4

**o**

**o'brien**  14:3,4,4
**object**  10:22 12:1
  16:23 20:18 23:13
  24:4 25:12 27:12
  34:14 35:3 37:6
  40:13 45:6 46:2
  47:9 49:4,23 50:17
  51:20 52:11 54:6
  55:7 56:4,23 57:7
  59:15 60:9 66:2
  67:20 70:8,16
  71:15 73:4 74:7
  75:22 77:6,21
  78:17 79:21 81:16
  82:2,13 83:7,14,19
  84:3,9,18 85:15
  86:5,16,23 87:7,15
  88:2,19 89:14,21
  90:16 92:21 93:5
  93:20 95:1 96:13
  101:2,7 102:13,19
  104:19 108:2 109:4
  109:7 110:10,20
  112:3,14 116:12
  117:18
**objections**  4:10,11
**obligation**  5:23
**obstruct**  38:14
**obviously**  18:17
  119:14
**occasions**  101:20
**occur**  103:2
**occurred**  14:9,21
  37:16 65:16

**occurring**  37:10
  98:18
**occurs**  46:1
**offered**  4:14
**office**  33:2
**officer**  9:17
**oh**  12:5 31:1 51:15
  60:15 90:7 105:2
**okay**  7:1 8:7,21 9:6
  10:3,11 13:2 14:1
  15:4 16:15 17:16
  18:19 19:16 22:9
  23:10 27:6 30:4,19
  32:10 33:22 36:22
  38:1 39:6 41:16,20
  42:6 44:12,20
  45:10 46:7 47:7
  48:8 49:1 50:22
  53:3,13,19 56:20
  60:14 65:3,14
  71:19 73:19 74:17
  74:23 75:8 76:23
  78:13 80:12 83:3
  83:22 85:12 90:2
  92:23 94:17 95:7
  95:23 96:4 97:17
  102:5,9 104:16
  105:4,12 106:7,23
  107:3,20 108:6,20
  109:1 117:16
**old**  33:15 66:18
  85:22 109:18
**once**  15:3,8 16:5
  76:20 83:8 110:12
  116:23
**ones**  8:11 20:17
  55:2
**online**  16:4
**opened**  65:10 70:1
  70:2,7 106:10

**opening**  63:7
**operate**  57:22 71:4
  78:5,9,12 85:17
  114:1
**operates**  12:18
**operating**  9:16
  72:10,20 76:8 93:7
  115:9,19
**operation**  118:3
**operations**  11:16
  12:19 33:8 72:7
  74:3,4,5 83:13,18
  86:3 92:18,20
  119:2,3,18
**operator**  12:15
  75:20 76:1,2,5,5,8
  76:22 77:1,4,8
  79:11 80:14 85:4,5
  85:14,19 86:10,15
  86:22 87:23 119:5
**operator's**  3:12
  69:5 83:4
**operators**  75:14
  76:13 77:14,17
  78:21 79:11,20
  80:8,9,19 81:7,15
  81:20,23 82:11,18
  84:1 86:8 87:11
  117:23
**opposite**  38:18
**order**  102:20
**organization**  93:15
**orientation**  3:7,11
  16:11,22 17:3,12
  17:15 18:4,5,7 19:6
  19:13,20,23 20:7
  21:6,15 22:1,15
  23:2,18 29:12
  30:14 31:4,7,14,16
  34:17,21 35:15,17
  35:19 37:1 39:12

EXHIBIT 1 - 000043

39:19 40:5,9 60:11
64:2,17,21 65:20
68:12 76:21 82:6
83:9 87:2,22 88:16
89:1,3,7,13,20
95:12 96:5,6,10,20
97:1
**orientations** 20:23
58:2 64:7,8,14,18
**original** 59:1
**originally** 59:14
**outside** 59:19 65:3
117:7
**overall** 108:12
**overrule** 73:22
**overseeing** 33:7
**oversight** 52:13
**owner** 118:21
**owners** 12:21 15:7
119:10
**owns** 12:3

**p**

**pad** 105:17
**page** 18:13,21 19:8
20:1 29:13 30:20
54:17,19 56:7
58:17 60:18,19
66:5 71:23 72:4
75:8 79:4,7 84:21
90:4 93:13 95:7,16
96:22,23 98:11,12
98:14,15 100:4
101:11 102:9
103:23 120:3
**pages** 20:11 21:14
121:10
**paperwork** 20:21
21:10 30:5,9
**paragraph** 29:16
73:12,18

**parameters** 26:7
**parent** 1:6 17:20
24:18 27:5,14 77:8
**parentheses** 81:9
**parenthesis** 82:20
**parents** 16:3,3 27:3
27:8 29:5,6 36:9,15
36:19,22 61:5,13
67:11 68:8,9,15
71:14,20 77:18
78:14 89:4 96:9
101:8 102:3
**park** 2:5
**part** 12:19 39:22
86:3
**participant's** 56:9
56:21
**parties** 4:3,18
28:18 121:13,16
**parts** 32:1 34:18
90:9
**party** 4:21 29:1,3
29:11 34:9 101:6
102:2
**pass** 64:16,21
**patent** 56:16
**patrick** 14:4
**pause** 42:20
**pay** 16:8 26:21,22
36:8,10 67:12
**paying** 47:15 52:13
52:15 111:4,13
**pc** 2:4
**pending** 6:23
**people** 13:21 19:3
19:21,22 26:11,12
50:19,20 51:1,4,7
51:23 57:23 59:3,6
63:14 96:20 100:2
110:2 112:5,20
114:22 119:9

**perfect** 68:16 69:19
69:21 72:4 74:9
75:14 76:14 77:15
78:4 79:9,17 80:21
81:2,8 82:18,22
85:8 87:14,23 89:8
92:19
**perfectly** 120:11
**perform** 94:20
**period** 33:8
**perry** 21:21 22:4
**person** 20:22 22:19
29:1,8 37:19 40:10
62:18 63:14 76:5
76:18 86:18 100:9
**personally** 65:21
**pertain** 77:23 78:3
**photo** 101:16
**photograph** 98:17
**photographs** 3:14
97:23 98:3,7
**photos** 98:10
**physically** 22:21,23
**picture** 98:18 99:22
100:21
**pittman** 2:3
**place** 2:5 31:15
51:23 52:9 95:21
**plaintiff** 1:7 2:2
8:22
**plaintiff's** 3:5 7:9
7:13 17:21 18:1
30:21,22 31:2
40:23 41:1 52:17
52:20 58:7,10
63:19,22 66:5
68:20,23 91:2,6
97:18,21 103:6,7
**plaintiffs** 5:10
**play** 40:21 41:6
42:17,21 47:18

**played** 41:10 42:15
**playing** 42:13
**please** 6:7,15,21
12:9
**plus** 106:17 107:1
**point** 1:10,11 7:21
7:22 8:18 9:3,14
10:3 11:10,21 12:2
12:8,10,12,14,18
12:22 13:17,19
15:11 16:7,11,13
23:11 24:3 25:2,21
26:16,18 27:6,10
28:10,18 31:6,11
32:17 33:13 34:1
35:16,21 37:3 41:5
43:3,9,14 45:11
46:9 47:20 49:12
49:20 50:15 51:12
51:13,19 53:9 55:4
55:10 56:17 57:4,8
57:11 59:18 62:12
62:22 63:5 64:11
64:13 65:8,15
68:15,16 69:8
70:14 72:17 75:20
77:8 78:13,20
79:16 80:3,5 82:21
83:23 84:5,14 85:2
85:23 86:4 87:6
89:11 92:6 93:1,3
93:10 94:12 95:17
95:23 98:8 99:23
100:6 101:1,12,21
103:16 104:1,2,12
104:17 105:1
106:12 107:6
109:21 110:1,7
111:23 112:11,22
113:19 114:3
117:16 118:8,19,19

EXHIBIT 1 - 000044

118:20,20,23 119:1
119:4,6,12,19,20
119:23
**point's** 14:9 30:5,9
36:18 55:21 60:1,4
61:9 69:9,13 80:13
81:14,22 82:10,12
84:6 87:4,21 88:15
89:3,10,17 92:14
94:1,10 96:6,8 97:7
98:4 103:2 111:21
116:1,6
**points** 29:17 30:20
31:4,9,15 32:5
38:12 79:14 80:15
81:11 88:6,18
**policies** 11:15 27:7
28:20 49:20 57:20
72:23 73:9 92:10
92:11 94:11 96:1
110:7 119:22
**policy** 40:19 93:15
94:1,12 97:8
115:18
**portion** 39:18
78:22
**portions** 55:18
**position** 63:16
81:22 82:10 86:2
86:21 87:4,21
88:15 89:3,10,17
96:8
**positions** 47:17
**possible** 21:5 22:14
37:14,19
**possibly** 21:9 90:17
92:7
**potentially** 43:15
101:4 102:20
**practice** 40:12,15
64:7

**practices** 3:13
72:15 73:3 91:9
93:1,4 102:1
**practicing** 40:17
99:8
**precautions** 102:17
**precedence** 74:11
**prepare** 8:1 9:3
**present** 14:18
23:16 99:23 106:13
**president** 13:4,7
**press** 48:12
**pretty** 11:18 46:3
50:1 69:20
**prevent** 51:23
67:23
**previous** 10:19
97:14
**principal** 11:11
**print** 22:13
**printed** 22:7
**pro** 60:16
**probably** 39:2
70:17 92:4
**problem** 67:19,21
94:21
**problems** 35:2
**procedure** 4:6,16
4:22 95:12 96:6,20
97:1
**procedures** 27:7
36:19 57:20,23
63:6,7,7 67:3,5
72:11,20 73:10
92:10 95:19,21
110:7,11 119:22
**proceeding** 5:21
**process** 15:19 25:3
25:9 57:17
**processes** 11:15

**produced** 41:4
**products** 112:11
**programs** 92:7
**progress** 47:5 58:4
**promoted** 63:1,12
**proper** 80:20
**properly** 82:4,21
83:5,11 84:8,15
85:6,7 87:13
110:13,14 111:2
113:14
**properties** 12:11
**property** 12:20,23
118:21
**protocols** 55:21
**proven** 112:19
**provide** 26:18
28:19 29:1 57:4,8
57:11 62:22 71:5
78:14,14 90:19
**provided** 4:15,21
71:20 77:14,19
78:21
**provides** 72:7
87:22
**psychologist** 95:2
**publications** 73:14
114:9
**pull** 54:7 63:8
**pulled** 20:22 21:3
21:11 42:6
**pulling** 20:21
**purchaser** 79:9,16
80:6
**purpose** 4:15 32:10
48:19 53:3 64:4
**pursuant** 1:17 4:5
119:15
**purview** 11:19
**push** 47:4 48:15

**pushed** 47:13
**pushes** 48:4
**pushing** 47:8,16
**put** 16:10 113:8

**q**

**qualified** 16:14
34:17 89:4
**question** 6:12,15,18
6:22 7:1 30:6 39:11
56:8,12,21 57:1
110:6 118:17 120:5
**questions** 4:10,11
5:20 7:6 35:20
42:19 66:6 103:13
120:14
**quit** 110:22

**r**

**race** 102:10,16
**range** 11:13
**rare** 28:5 114:17
**rarely** 27:2 28:13
**rate** 112:1
**reach** 31:11 63:2
**read** 8:7 70:11,14
70:19,22 71:1,7,8
72:12,14,18,20
73:2,7,9 75:18
79:11,15 80:13
81:14 83:1 85:10
91:14,17,20 92:6
92:15 118:8
**reading** 76:10
96:22
**ready** 19:21
**realistic** 24:18
**reality** 67:22
**realize** 67:5
**really** 111:12
117:19,20

**realm** 95:3
**reason** 20:19 94:19
  95:5 97:15
**reasonable** 93:15
**recall** 25:23 27:21
  103:15
**receive** 63:16
**received** 36:16 63:3
**recertification** 90:9
**recertified** 70:10
**recess** 120:12
**recognize** 43:12
**record** 5:12 12:4
  41:9 53:8,10 78:20
  96:19 103:20,21
  104:4 105:21
  118:15,16
**records** 50:23
  53:14 61:21
**red** 24:2
**reduce** 110:2
  112:12
**refer** 72:5
**reference** 77:16
  98:16
**referenced** 78:23
  80:6 92:19
**referencing** 97:5
**referred** 96:19
**referring** 75:21
  76:18
**reflect** 78:11
**reflected** 55:6
**refresh** 17:6
**regard** 116:3
**regarding** 89:19
  93:15 94:12 116:8
**regularly** 15:6
**regus** 1:20
**related** 55:10 94:11
  119:23

**relation** 77:10
**relationship** 118:18
**releases** 44:21
**relevant** 71:17
  96:16
**relying** 85:23
**remained** 110:12
**remember** 17:5,7
  27:1 47:17 65:9
  75:4 100:19 103:18
  107:9,10 108:10
  109:8
**rent** 119:21
**rental** 16:9
**repeat** 6:16 30:6
**rephrase** 6:16
  38:19 99:15
**report** 3:9 13:2
  14:16 53:2,20
  54:14 55:6,16 56:7
  56:12
**reported** 35:11
  121:7
**reporter** 4:7 5:19
  6:5 121:5
**reporter's** 121:1
**reporting** 115:4
**reports** 53:4,10
  55:10 104:14,18
  105:3,4 106:3,13
  107:18 109:14
**represent** 21:18
  41:4 42:23 55:13
  98:10
**representative** 15:5
**representing** 4:3
  4:18 5:10 42:18
**request** 26:20
**required** 81:22
**requirement** 92:8

**requirements**
  24:12 27:10
**rescue** 45:20
**reservations** 26:6,9
  28:10,13
**reserved** 4:13
**respond** 6:12
**responded** 104:3
  118:20
**responding** 56:2
  103:12
**response** 6:9,13
  106:7,16 107:20
  110:8 111:20
**responses** 103:16
**responsibilities**
  11:11,14 27:16
**responsibility**
  25:16 34:19 79:9
  81:7 82:17 83:4,9
  84:7,11 89:12,18
**responsible** 23:16
  23:17,19 24:6
  25:10,14 26:2
  29:18 30:1,11,15
  30:17 33:7 34:12
  36:11 75:15 76:14
  86:10,12 87:19
  96:10
**rest** 108:14
**restrict** 24:22
**restricted** 31:19
**restriction** 72:9
**result** 108:21 109:1
**results** 121:17
**retained** 77:16
**review** 18:2 91:7
  104:18
**rewind** 44:13 47:19
**right** 9:2 11:10
  19:20 20:2 21:13

  29:13 31:20 40:20
  41:22 44:18 48:5
  48:17 49:9 61:2
  74:23 78:16 84:2
  84:20 88:4 91:4
  93:12 101:10
  105:23
**risk** 11:14 118:3
**riverside** 104:9
**rock** 60:16
**role** 9:19,20 13:3
**room** 29:3 34:8,23
  37:15 38:14,19,21
  39:4,17 45:20
  49:16 51:21
**rooms** 33:23 34:3,5
  34:7,9,10,12,16
  35:2 39:7
**rope** 39:15,23
  45:20 46:5
**ropes** 40:3 112:8
**roughly** 10:1 44:8
**round** 33:19
**routine** 35:8
**routinely** 116:6
**rules** 4:5,16,22
  5:18 25:5 113:15
**ruling** 4:13
**running** 19:2 61:14
  90:22
**runs** 95:15

**s**

**s** 2:8
**safe** 44:13
**safeguards** 27:9
**safety** 16:22 29:19
  30:11 35:9 45:4,7
  49:8 51:23 52:8
  61:3,10,16,19,22
  62:2,4,9 75:16
  76:15 102:17

EXHIBIT 1 - 000046

113:19 114:7 115:7
115:23 116:3,5,8
116:10 117:7,10,17
**saith** 120:18
**sam** 19:8
**sample** 95:11 96:5
**sat** 39:7
**saved** 42:3,4,7
**saw** 8:5
**saying** 6:6 19:13
77:18 80:12 108:16
**says** 20:3 29:18
32:5 44:22 56:8
61:1,3,4 66:8,21
67:15 72:4 73:12
75:10,14 77:13
78:20 79:8 80:16
81:6 82:17,21
83:18 84:22 85:2
87:11 94:18 97:1
104:6 106:17
107:20
**scare** 110:23
**scared** 111:12
**schedule** 35:8
61:18
**schedules** 28:23
59:5
**screen** 48:5
**second** 7:12 18:21
56:6 64:13 82:21
85:2 91:21 98:14
100:4 103:20
**seconds** 41:12 44:9
44:15,16,18 45:3
45:13 47:21 48:4
**section** 60:20 68:13
79:7 88:5 89:13
93:14
**secured** 85:6

**see** 15:18 21:23
22:8 29:20 33:23
35:5,12 37:8,19
38:3,16 39:2,5,8
47:20 48:6 50:14
51:3 61:7,14 84:23
95:13 97:23 100:1
100:8 114:17
**seen** 7:15 9:1 41:5
41:14 42:18,23
45:11 52:21 58:20
69:1 91:11 103:9
118:8
**sees** 37:10
**send** 45:21 46:4
114:6,15
**sense** 76:1 90:22
96:15
**sent** 8:23 75:1,5
90:8 115:13
**sentence** 29:18
72:3 73:11,17,20
75:21 79:15,19
81:6,13 85:13 87:4
87:10 94:17
**sentences** 77:13
**separate** 88:9
**separately** 77:1
**serial** 90:20
**serious** 67:12 111:1
**server** 54:7
**servers** 54:10
104:17
**service** 90:6,12
**serviced** 90:15
**sessions** 114:21
**set** 61:18 80:1
88:21 96:17 121:13
**setting** 25:5
**seven** 104:10

**severity** 53:7
**sg** 20:3
**shawn** 1:14 3:2 4:4
5:1,13 121:8
**shells** 70:9
**ship** 113:12
**shipped** 113:18
**shortly** 21:3 65:11
**show** 16:10,11
24:19,20 28:14
50:23 66:1
**showed** 25:20
**shows** 41:18 60:19
**shrug** 6:7
**side** 20:3 24:9,9
38:4,19
**sides** 38:21,23
**sign** 29:23 103:16
**signature** 121:19
**signed** 17:17 22:6
23:6,7 30:1
**signing** 30:10,12
**similar** 104:2
107:23 111:20
113:12
**simply** 34:20
**single** 27:5 34:23
**sitting** 38:2
**situation** 25:21
**six** 10:1 11:22,23
12:17 20:10 21:20
23:8,12 79:13
**slack** 67:2
**small** 27:4 44:17
**smoothly** 5:18
**solving** 94:21
**somebody** 21:8
28:23 36:7 104:16
**soon** 20:19 65:10
**sorry** 8:16 12:2,5
13:18 44:16 68:5

73:16
**sort** 59:19 111:8
116:5
**sorted** 29:3
**sound** 41:9
**sourcebook** 72:15
73:3
**southern** 1:3
**spaces** 12:21 19:4
**speak** 5:3 6:4,10
9:2 65:21 121:9
**speaking** 14:16
68:15
**specific** 8:11,13
9:20 13:20 18:7
28:21 55:23 57:14
58:20 90:18 93:2
104:21 106:3
107:15 114:8
115:16 116:14,16
**specifically** 30:7
68:2,8 69:7 78:8
89:22 108:10 116:9
**speed** 98:19 99:4,6
99:13
**sport** 99:7
**staff** 20:3 26:21,23
29:1,8 49:21 50:4,6
58:14,17 60:1
62:15,18 80:9,13
81:14,22 82:12
83:23 117:12,13,15
119:10
**stamp** 44:22
**stamps** 44:11
**standard** 50:9 93:6
**standards** 11:15
59:19 72:7,21,23
73:10 74:4,10
83:16 92:11,19
93:9 96:2 114:2

115:10,19
**standing** 37:23
38:15,23
**start** 10:17,18 44:1
64:6 69:22 99:13
111:12
**started** 10:5,8,16
13:8 20:21 42:2
59:11 65:10
**starts** 41:21 44:14
47:1 57:5,12 75:10
99:20
**state** 1:19 4:8 5:11
9:12 121:2,5,20
**stated** 21:19
**statement** 54:18,19
94:23 97:15
**statements** 55:1
**states** 1:1
**staubach** 28:17
31:18 32:22 33:1
33:18 43:8,16,22
46:8 54:18 55:14
71:6 100:11 107:3
**stay** 45:19
**steadman** 20:5,6
21:6 32:22 33:7,19
62:17 70:19 71:8
73:1 100:16
**step** 15:13,15 63:15
**stipulated** 4:2,17
**stipulation** 1:17
**stipulations** 4:1
**stop** 41:11 52:3
67:3,6 113:14
**stored** 53:21
**straight** 56:13
63:15
**strokes** 58:6
**stuff** 117:3

**subject** 31:12
**subjective** 46:3
**submissions** 8:15
8:17
**submit** 54:8
**submittals** 8:4
**submitted** 8:20
53:7 54:5
**subsection** 60:23
61:1
**suffered** 107:16
**sufficient** 28:15
**suggested** 97:1
**suite** 1:21 2:5,10
**summer** 102:2
**supersede** 73:13
**supervise** 23:12
24:11,16 26:15,19
28:19 32:9 34:22
40:17 68:3,9 81:1,4
88:10 89:4
**supervised** 32:6
35:23 66:14 94:8
**supervises** 25:4
**supervising** 24:5
24:10 27:15 37:4,5
51:19,21 77:9
82:11 84:1 87:5,17
87:22 88:16 101:22
102:4
**supervision** 26:21
26:23 27:10 52:5
75:16 76:15 84:22
85:3 86:15,18
89:19 93:17 97:4,9
**supervisor** 63:1,2
63:12 102:6
**supervisors** 28:11
**suppose** 24:17
**supposed** 22:12
35:23 36:23 49:6

56:2 110:13
**sure** 5:18 6:8 29:7
32:12 41:7 52:6
63:17 69:20 76:12
79:2 83:10 96:10
100:9,20 105:20
108:4
**surrounding** 14:13
**sweep** 61:3 62:2
**sweeps** 61:10,19,22
62:4,9
**sworn** 5:3 121:8
**system** 15:18 16:6
16:21 57:22 67:16
69:19 72:5 75:15
76:14 77:16 79:10
79:17 80:21 81:3,8
82:19,22 83:6 84:2
84:8,15 85:8 87:14
87:19 88:1 99:6
**systematically**
94:20
**systems** 112:16

**t**

**tag** 100:8,10
**take** 7:1 18:1 23:15
74:11 120:8
**taken** 1:15,17 4:4,7
98:7,11 101:16
120:12
**talk** 14:8 68:11
114:21 117:22
**talking** 12:7 31:9
31:15 68:14 87:9
105:22 119:23
**tasks** 94:21
**taught** 81:18 86:7
**teach** 58:4
**teaching** 63:4
80:10

**team** 102:1
**teams** 99:8
**technical** 63:4
**technically** 9:16
**tell** 5:23 18:2 40:14
43:6 58:12 64:1
91:7 100:1,2,15
**telling** 111:1
**ten** 26:11,12 44:16
44:18
**tennessee** 104:8,9
104:10
**term** 77:10
**terms** 86:10 116:16
**test** 60:12,16 95:12
96:5
**testified** 5:5 33:1
43:8,22 46:8,14
55:14 71:6 107:3
**testify** 7:19
**testifying** 5:22
119:18
**testing** 34:21
**tests** 58:3 90:10
**thanks** 120:14
**thereof** 121:17
**thing** 15:21 16:17
42:17 47:18 90:3
**things** 5:18 26:8
29:3 34:21 58:5,14
59:5 61:12,13
62:20 63:5,9 80:2
81:17 86:7 88:23
89:23 90:10 96:11
97:16 112:16,21
114:14,15 115:1
117:2
**think** 11:5 30:13
47:19 49:1 50:5
51:9 52:8 56:20
61:17 71:7 79:20

102:5,10,15 105:10
106:9 110:18
**third**  3:13 54:17
60:19 92:1 98:15
101:11
**three**  21:19,20,23
22:9 32:20 33:12
34:6 44:15 50:6
97:22 104:8 105:5
106:4,8,23 107:21
108:17 111:22
**thresholds**  115:22
**time**  4:12,13 6:4,10
17:4 19:19 24:8
25:1 33:3,8,16,23
37:21 39:9 43:19
44:11,22 46:4
49:17,22 50:7,9,11
50:12 56:9,22
62:16 63:2 75:6
91:17,20 109:12
110:21 111:10,16
**times**  25:15 32:9,16
38:1 66:15 90:14
94:9
**timing**  99:6
**title**  9:15 10:7
**titled**  58:16 60:20
93:14
**today**  7:19
**today's**  8:2
**told**  25:14
**top**  44:21 45:18
46:21 47:11,23
48:3,5,14 58:16
75:9 79:8 84:22
95:10 96:23
**topic**  66:10,21,23
67:15
**topics**  7:19 31:5
65:19 66:7 67:18

68:2,7
**total**  14:5,6 105:6
108:18
**track**  50:18 104:12
**traditional**  48:22
**train**  81:23 82:3
83:23,23
**trained**  57:16,19
60:3 61:10 79:12
80:14,19 84:12
85:4,14,20 86:15
86:22 87:23 88:17
110:12
**training**  3:10 11:15
57:4,9,10,14,18
58:15,17 59:5 60:7
60:10 62:23 63:4
63:17 72:22 79:7
80:4,17 95:18,20
110:11
**trains**  83:23
**transcript**  8:7
**transcription**
121:11
**travel**  47:3
**trial**  4:20
**trip**  117:2
**tripped**  105:17
**trips**  28:8
**true**  121:11
**truth**  5:3,4,4,23
121:9
**truthfully**  5:21 7:5
**try**  6:13 45:18
110:1
**trying**  38:10
**turn**  72:1 79:4
**turned**  8:19
**twice**  90:23 117:5
**two**  7:10,20 13:22
20:11 21:14 24:8

33:22 34:11 38:22
42:21 67:18 70:10
75:23 77:12 90:8
90:11 91:1 99:5
107:1,13 108:7,13
**type**  39:13 112:1
**types**  104:13
116:16
**typical**  50:3 117:2
**typically**  17:13
28:4 45:23 109:14
111:15 114:19

---

**u**

**uh**  11:9 29:15
60:22
**ultimately**  85:19
**unattached**  44:9
45:12
**understand**  6:1,14
14:7 38:8,11 59:16
79:11 80:13 97:16
111:3
**understanding**
12:9 19:18 31:17
33:4,5 46:15 54:21
83:13 88:11 111:1
**understood**  6:17
22:12
**unfortunately**
25:22
**unit**  90:20
**united**  1:1
**units**  90:8
**university**  9:12
**unusual**  28:2
**upper**  11:5
**urban**  2:9
**usage**  71:18
**use**  16:12,13 17:9
18:5 31:21 32:3
34:17,19 39:17

45:20 59:19 60:8
61:4 69:19 70:5
77:15 78:6,15
80:10,20 82:4,7
84:22 89:8 93:6
99:9
**user**  86:11
**users**  74:15 81:9,18
82:3,19
**uses**  64:12 68:16
76:23

---

**v**

**vantage**  38:12
**various**  12:20
114:21
**vehicle**  28:5
**venture**  95:3
**verbal**  6:8
**verbally**  40:14
**verify**  22:19,21
85:5 87:12
**vest**  100:14
**video**  3:8 14:16
40:21 41:9,10,14
41:16,21 42:1,2,6
42:15 43:1,4,7,10
43:15 44:2 46:20
49:15 63:9
**view**  38:14
**visitors**  17:14
110:22
**volcano**  84:16 99:2
99:12,16,19
**vs**  1:9

---

**w**

**waiver**  16:4 17:17
27:13 30:16 72:9
**waivers**  15:21 16:5
17:16 23:17 36:12

EXHIBIT 1 - 000049

**walk**   15:9 39:14,15
  62:19
**walking**   37:7 58:1
  61:11 90:1
**walkthrough**   61:2
  116:23
**wall**   31:22 38:23
  39:20 41:22 44:8
  44:17,21 45:4
  46:23 47:4,6,8,11
  48:9,16,20,21,22
  49:17 52:3,4 72:6
  72:14,21 73:2 74:3
  74:10 81:5 83:15
  84:16 85:5 87:11
  89:9 91:10 92:18
  99:2,12,16,19
  102:23 110:5 113:2
  113:8 114:1,5
  115:12,17 116:18
  117:4,21 118:3
**walls**   37:20 38:4,16
  38:20,22 39:1,4,8
  69:15 88:21 98:19
  98:20 99:4,5 100:7
  101:23 117:4
**want**   13:20 26:20
  29:2,10 42:19
  57:15,15
**warning**   75:9
**watch**   29:6 88:17
**watched**   46:20
**watching**   44:6,11
  61:5 89:22
**watson**   1:14 3:2 4:4
  5:1,13 9:6 17:23
  41:13 52:21 57:3
  68:22 91:5 97:20
  118:18 120:4 121:8
**way**   37:3 47:13
  48:3 50:18 62:1

65:18 82:14 83:21
  85:17 88:21 96:17
  99:7,11
**we've**   119:10,22
**website**   74:20,21
**week**   50:2
**weekly**   117:6
**weight**   34:8 113:15
**went**   19:5 21:15
**west**   1:20
**whitten**   2:3 3:3 5:7
  5:9 11:3 12:8 13:17
  19:15,17 21:5
  23:23 24:14 25:18
  27:18 31:1,3 35:1,7
  37:9 40:16,22 41:3
  41:8,11,13 42:13
  42:20,22 45:10
  46:7 47:12 49:6
  50:5,22 51:22
  52:19 54:9 55:9
  56:6 57:3,10 59:18
  60:14 66:4 68:1
  70:11,18 71:19
  73:6 74:12 76:12
  77:12 78:2 79:2,3
  80:5 81:21 82:9,16
  83:12,17,22 84:5
  84:13,20 85:21
  86:13,20 87:3,10
  87:20 88:4 89:2,16
  90:2 91:4 92:23
  93:8,23 95:4 96:23
  97:7 101:5,10
  102:15 103:1,22
  104:23 106:2 108:6
  109:13 110:15
  111:19 112:10,22
  116:15 118:1,17
  120:2,10

**wide**   11:13
**witness**   5:2 12:5
  13:15 54:19 55:1
  72:2 79:6 90:5 95:9
  106:1 118:14
  121:12
**wiygul**   13:6 14:3
**words**   6:6 76:23
  86:8
**work**   10:3,20 28:22
  52:9 64:10 99:11
  112:19
**worked**   10:11 11:8
**working**   32:18 57:5
  57:12 65:15
**works**   99:16
**wright**   19:8
**write**   6:5,6,10
**written**   74:15 78:7
  82:15 92:11 118:5
**wrong**   12:10 96:22

**y**

**yeah**   8:20 9:21 10:2
  10:5 12:8 13:15
  18:12,17 20:1 22:3
  22:22 23:9 25:13
  28:7 31:2 35:18
  40:14 42:22 69:20
  75:3 90:17 97:6,6
**year**   50:10,10 70:3
  75:2,3 85:22
  109:18 114:20
  117:1,5
**years**   10:1 59:11,12
  59:12 66:18 70:10
  90:8 91:1 94:22
  104:3 105:5 106:5
  106:8 107:21
  108:17 111:22
  112:17

**yell**   67:4,8
**yoga**   34:8
**young**   2:8 32:13
  39:17

**z**

**zone**   37:18,20 38:3
  38:5,11 39:12,19
  39:22 40:6 46:9
  51:18 61:5 98:7
  101:17,23

EXHIBIT 1 - 000050

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

EXHIBIT 1 - 000051

court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

(F) Certification and filing by officer; exhibits; copies; notice of filing.

(1) The officer shall certify on the deposition that the witness was duly sworn by the officer and that the deposition is a true record of the testimony given by the witness. Unless otherwise ordered by the court, the officer shall then securely seal the deposition in an envelope indorsed with the title of the action and marked "Deposition of [here insert name of witness]" and shall promptly file it with the court in which the action is pending or send it by registered or certified mail to the clerk thereof for filing.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 1 - 000052

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT 1 - 000053