FILED
2023 Feb-21  AM 10:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 1

1

2              IN THE UNITED STATES DISTRICT COURT

3

                   NORTHERN DISTRICT OF ALABAMA

4

5

   - - - - - - - - - - - - - - - - - - -

6   KINSLEY KORNEGAY, a minor, by and

    through her parent and guardian,

7   MATTHEW KORNEGAY,

8                  Plaintiff,

9   -vs-                           CASE NO.:

                                   2:21-cv-00505-SGC

10  HIGH POINT BIRMINGHAM, LLC and

    HIGH POINT CLIMBING, LLC,

11

                   Defendants.

12  - - - - - - - - - - - - - - - - - - -

13

14           Complete Transcript of the deposition of

15  DANIEL M. HAGUE, taken by the Defendant, before

16  Lisa M. Hooker, RPR, a court reporter and Notary

17  Public for the Commonwealth of Virginia at Large,

18  on February 16, 2022 commencing at 10:05 a.m. at

19  Sleep Inn Lynchburg, 3620 Candlers Mountain Road,

20  Lynchburg, Virginia 24502.

21

22

23

24

25

EXHIBIT 3 - 000001

Page 2

1  APPEARANCES:
2
3
4
5    MR. AUSTIN B. WHITTEN, ESQ.
6    Pittman, Dutton & Hellums, P.C.
7    2001 Park Place North
8    Suite 1100
9    Birmingham, Alabama 35203
10   Austinw@pittmandutton.com
11
12      on behalf of Plaintiff;
13
14
15   MR. JEREMY S. HAZELTON, ESQ.
16   505 North 20th Street
17   Suite 1800
18   Birmingham, AL 35203
19   jshazelton@csattorneys.com
20
21      on behalf of Defendant
22
23
24
25

Page 3

1            I N D E X
2
3   EXAMINATION BY                    PAGE
4   Jeremy S. Hazelton, Esq.          4
5
6
7
8
            E X H I B I T S
9
10  NUMBER        DESCRIPTION        PAGE
11  Exhibit 1    Curriculum Vitae     29
     Exhibit 2    Defendant's Deposition
12               Notice of Dan Hague  53
13  Exhibit 3    Two Invoices         67
     Exhibit 4    Consulting Agreement 68
14
     Exhibit 5    Dan Hague - Partial Case
15               History              76
     Exhibit 6    Mr. Hague's Report dated
16               1-7-22              125
17  Exhibit 7    Instruction List    145
     Exhibit 8    Photographs         159
18
     Exhibit 9    Letter dated 4-9-21  173
19  Exhibit 10   Waiver Document     187
20  Exhibit 11   Photographs         201
21
22           * * * * *
23
24
25

Page 4

1       MR. HAZELTON:  I will enter the usual
2  stipulation that we use in Alabama, okay with you,
3  for depositions?
4       MR. WHITTEN:  That is fine.
5           DANIEL M. HAGUE
6  having been sworn by the notary public and
7  Registered Professional Reporter, Lisa M. Hooker,
8  to tell the truth, the whole truth, and nothing but
9  the truth, testified as follows:
10          EXAMINATION
11 BY MR. HAZELTON:
12   Q   Mr. Hague, my name is Jeremy Hazelton; I
13 introduced myself earlier.  I represent High Point
14 Climbing in the lawsuit that we're here about
15 today.  I know that this is not your first rodeo
16 and you've done this several times and that you've
17 met with Austin prior to this and you have an idea
18 of how this is going to go, so I'm not going to run
19 through this part with you.
20      What I will do is just ask if you don't
21 understand a question that I ask or if it is
22 confusing to you in any way, that you let me know
23 and I would be happy to rephrase it for you.  I
24 want to make sure that all of my questions that you
25 answer, that you fully understand them, okay?

Page 5

1   A   Yes.
2   Q   And if I do ask a question and you do
3  answer the question, I'm going to assume that means
4  you understood it; is that fair?
5   A   Yes.
6   Q   Let's go and get started.  Why don't you
7  just for the Record state your full name, please?
8   A   Dan Hague.
9   Q   And what is your current address, Dan?
10  A   1220 Main Street, Suite C, Lynchburg,
11 Virginia 24504.
12  Q   Is that your home address or business
13 address?
14  A   It is both.
15  Q   Both, okay; that is fair.  How long have
16 you been there?
17  A   At that address?
18  Q   At that address, yes.
19  A   I would say two years.
20  Q   How long have you been in Lynchburg?
21  A   Seventeen years.
22  Q   About how many different places have you
23 lived in Lynchburg?
24  A   Three.
25  Q   Are you married?

2 (Pages 2 - 5)

Page 6

1    A    No.
2    Q    Have you ever been married?
3    A    Yes.
4    Q    How many times?
5    A    Twice.
6    Q    What are their names?
7    A    Deidre, D-E-I-D-R-E, Presswood, although
8    she goes by Buhler now, B-U-H-L-E-R, and Leslie,
9    with an I-E, real, R-I-E-H-L.
10   Q    When did you and Deidre get divorced?
11   A    1996.
12   Q    Was that in Virginia?
13   A    No.
14   Q    What state was that in?
15   A    Maryland.
16   Q    What about Leslie?
17   A    Leslie, the divorce date?
18   Q    Yes, yes.
19   A    2019.
20   Q    In Virginia?
21   A    No.
22   Q    Where was that?
23   A    Maryland.
24   Q    Was that because you were married in
25   Maryland and the divorce was filed there, or --

Page 7

1    A    Which one are we talking about?
2    Q    I'm talking about Leslie.
3    A    That is because you -- that is where she
4    filed.
5    Q    Okay, I got you.  Do you and Deidre or
6    Leslie have any children together?
7    A    Yes.
8    Q    How many kids do you have?
9    A    One surviving.
10   Q    And is he or she over 19?
11   A    Yes.
12   Q    How old is he?
13   A    Thirty-two.
14   Q    And do they live in Virginia?
15   A    Yes.
16   Q    Do you have any relatives by blood or
17   marriage that live in Alabama?
18   A    Not that I am aware of.
19   Q    Well, tell me a little bit about your
20   background.  Where are you from?
21   A    I'm from central Ohio.  I grew up there
22   through high school, college in Virginia, and Ohio,
23   grad school.
24   Q    Where did you go to college in Virginia?
25   A    Virginia Tech.

Page 8

1    Q    And what year did you graduate?
2    A    1979.
3    Q    1979.
4    Q    Did you go immediately to grad school in
5    Ohio or work for a period of time?
6    A    I went directly to grad school.
7    Q    What was your degree at Virginia Tech in?
8    A    Industrial forestry.
9    Q    And what about the graduate practice
10   program; what was that for?
11   A    MBA.
12   Q    And what university in Ohio?
13   A    Ohio State University.
14   Q    And what year did you receive your MBA,
15   or did you?
16   A    1981.
17   Q    And after you got your MBA, did you then
18   start your career, join the work force, or tell me
19   what you did then.
20   A    Yes, I took a job.
21   Q    And with who?
22   A    International Paper Company.
23   Q    Doing what?
24   A    Market analysis.
25   Q    Can you just briefly explain to me what

Page 9

1    that means?
2    A    The division I worked for was tasked with
3    supplying their mills with raw material, and so my
4    job was assisting with that in any way they wanted
5    at a staff headquarters.
6    Q    To determine the need?
7    A    Determine the need, determine the quality
8    and volume of the supply, determine the cost of
9    various sources.
10   Q    How long did you work for IP?
11   A    About five years.
12   Q    All right.  Tell me what you did then.
13   A    I moved to Washington, DC to work for
14   IBM.
15   Q    Okay, and as -- in what capacity?
16   A    Same, market analysis.
17   Q    How long were you with IBM?
18   A    About a year and a-half.
19   Q    Were -- what was your job title at IBM?
20   A    I think it was market analyst.
21   Q    Did you just not like it there, not like
22   DC, or --
23   A    I did not like the job at IBM; they let
24   me go, so that is when I started my next career.
25   Q    Is that when we get into the climbing

3 (Pages 6 - 9)

Page 10

1  industry?
2      A   No.
3      Q   Okay.  What was your next career?
4      A   I sold real estate.
5      Q   In the DC area?
6      A   Yes.
7      Q   For how many years?
8      A   So beginning in -- about seven or eight
9  years.
10     Q   Did you have your own brokerage or were
11 you an agent working under someone else's license?
12     A   I was an agent.
13     Q   What was the name of that?  It's probably
14 on your CV, but just for the Record if you could
15 tell me.
16     A   What was the name of what?
17     Q   The real estate brokerage?
18     A   Shannon & Luchs, and so Luchs is
19 L-U-C-H-S.
20     Q   And you were there selling real estate
21 for about eight years?
22     A   I think that it was about eight years.
23     Q   Okay, and what did you do after that?
24     A   That is when I entered the climbing
25 business, 1993.

Page 11

1      Q   Well, how did you get into the climbing
2  business?  Have you always been a climbing
3  enthusiast, or when did that start?
4      A   Since I was 13, yes.
5      Q   And tell me how you got into it when you
6  were a kid.
7      A   I tagged along with friends who were
8  going one day and fell in love with it.
9      Q   To an indoor facility or outside?
10     A   In 1973, there weren't any indoor
11 facilities.
12     Q   Okay.
13     A   So it was outdoors.
14     Q   So you all went and found a rock and
15 said, I want to climb that?
16     A   Well, I think that it is a little bit
17 more sophisticated than that, but as far as I knew
18 at the time, that is what they did.
19     Q   So did you just rely on your friends to
20 kind of teach you how to do it?
21     A   Yes.
22     Q   And did you continuously, whether for
23 fitness or recreation, continue to climb from the
24 age of 13 all the way up through your adult life?
25     A   More or less.  There were breaks in there

Page 12

1  up to the late '80s, and after the late '80s, it
2  became something that I did on a very regular
3  basis.
4      Q   Okay.  When did the indoor climbing
5  industry sort of take off; when did that become a
6  thing?
7      A   The first gyms, indoor facilities, were
8  built in Europe in the '80s, the first one in this
9  country was mid to late '80s, but when you -- when
10 you say, "take off," what does that mean?
11     Q   That is fair.  That is -- that wasn't a
12 great question.  When would you say that the indoor
13 climbing gyms became sort of readily available
14 in -- within driving distance to most communities?
15     A   Let's narrow it more to when were gyms
16 generally available to people in major metropolitan
17 markets.
18     Q   That is a better way to put it, yes.
19     A   I would -- by the mid to late '90s, you
20 could -- in most major Metropolitan areas, you
21 could find an indoor climbing gym.
22     Q   Why did you decide to leave the real
23 estate business, selling real estate, to get into
24 the climbing business?
25     A   I saw an opportunity.

Page 13

1      Q   And who was that with?
2      A   No; I mean, I saw that there was an
3  opportunity to open a gym near Washington, DC which
4  had none at the time.
5      Q   So you saw a potential market for it that
6  you could turn into a business because there was a
7  demand for people that wanted to do that activity?
8      A   I felt like there was enough demand
9  around Washington to do that, yes.
10     Q   And what was the name of the gym that you
11 started?
12     A   That is Sportrock.
13     Q   All right.
14     A   One word.
15     Q   And it looks like that was in Alexandria?
16     A   The first one was in Rockville,
17 Maryland.
18     Q   All right.
19     A   It might say Alexandria; that is where I
20 built another gym in Alexandria, and that is where
21 my office was located.
22     Q   So the first gym that you opened,
23 Sportrock, was in -- I'm sorry, you just mentioned
24 it.
25     A   Rockville, Maryland.

4 (Pages 10 - 13)

1    Q   Was in Rockville, and then how long
2  before you opened the second gym in Alexandria?
3    A   Two years.
4    Q   And in 1993, were there sort of
5  operational standards for the indoor climbing
6  industry?  How did you know how to implement those
7  when you opened the gym?
8    A   There were none, and at that time, the
9  industry was really in its infant stages.  It was
10  an industry that, you know, we were inventing at
11  the time, so there were no standards available.
12    Q   Did you visit gyms in Europe or other
13  gyms that opened in the U.S. to try to get an idea,
14  maybe, of how they were doing it, how they were
15  operating in order to allow you not only to, you
16  know, provide a reasonably safe climbing
17  environment but also to make money doing it, every
18  aspect of running the business; did you do any sort
19  of field research like that before opening?
20    A   Yes, domestically.
21    Q   So tell me what you did.
22    A   We visited -- me and my partner at the
23  time, we visited a number of facilities in this
24  country.
25    Q   What was his or her name, your partner at

1  the time?
2    A   Doug Cosby.
3    Q   Were you and Doug partners throughout the
4  Sportrock?
5    A   No.
6    Q   Okay.  How long were you and Doug
7  partners?
8    A   Until 1998, I believe.
9    Q   And at that point there were two
10  Sportrocks?
11    A   Yes.
12    Q   So you visited several domestic gyms to
13  try to get an idea of how they were operating, what
14  you needed to do, and then decided, I can make this
15  work, and you and Doug opened Sportrock; is that a
16  crude but brief sort of summary of how that
17  happened?
18    A   Yes.
19    Q   Okay.  Do you know about how many gyms,
20  indoor climbing gyms, there were at the time in the
21  U.S. when you opened Sportrock?
22    A   I would be guessing.
23    Q   That is fine.
24    A   Do you want me to guess?
25    Q   Yes, sure.

1    A   I would say that there were fewer than
2  200.
3    Q   Do you have an estimation about how many
4  of those you visited to scope out the operations
5  process before opening Sportrock?
6    A   Fewer than 20.
7    Q   All right.
8    A   But you have to remember that the vast
9  majority of those 200 were in somebody's garage or,
10  you know, they were very minimal and not really
11  worth looking at, as, you know, a commercial
12  enterprise.
13    Q   The first Sportrock that you opened in
14  Rockville, how many square feet was it?
15    A   Of what?
16    Q   Of the actual facility?
17    A   The footprint?
18    Q   Yes.
19    A   Of the space?
20    Q   Well, I will back up.  Let me ask you
21  this.  Was the entire facility dedicated to indoor
22  rock climbing?
23    A   You will have to clarify, I think, what
24  you mean by "the entire facility."
25    Q   Sure.  Was the facility also used for

1  anything other than indoor rock climbing?
2    A   Well, no, other than there is bathrooms
3  and an office and --
4    Q   Of course, of course; I mean, were there
5  any other -- did any paying customers pay to do
6  anything there other than to rock climb?
7    A   No.
8    Q   Okay, and so how many square feet of gym
9  space, we'll say, was there in that initial
10  facility?
11    A   As a footprint?
12    Q   Yes.
13    A   I believe that it was around 5,000 square
14  feet.
15    Q   And do you recall about how many climbing
16  walls there were, and I won't -- I will limit it to
17  actual climbing walls, not bouldering?
18    A   I don't know how to answer that
19  question.  When you say, "how many," since they are
20  contiguous, I would say one.
21    Q   How many customers would it have been
22  able to support at a time for everyone to be
23  climbing?
24    A   For everyone to be climbing?
25    Q   Without anyone having to wait?

1    A    Gosh, let's see.  I would estimate 50.
2    Q    Okay.  What about when you and Doug --
3    well, I assume did you and Doug also open up the
4    Alexandria gym together?
5    A    Yes.
6    Q    Was that about the same size?
7    A    No.
8    Q    Was it bigger?
9    A    Yes.
10    Q    About how much bigger?
11    A    Square footage of the floor was about
12    8,000 square feet there.
13    Q    Okay, and at the Rockville facility,
14    about how many staff worked there, and I don't mean
15    over the course of it because I understand that
16    there is turnover and people come and go, but at
17    any given time?
18    A    Are you talking -- it would vary probably
19    between ten and 20.
20    Q    Okay.  Would that be ten and 20 staff
21    members working at a time or just total?
22    A    Total.
23    Q    How many shift members would there be
24    working?
25    A    It would depend on the day and the time.

1    Q    As an average?
2    A    Two.
3    Q    What about at the Alexandria location?
4    A    What?
5    Q    Same question, about average shift
6    members?
7    A    Same.
8    Q    Okay.  Was there ever a third location of
9    Sportrock open?
10    A    Yes.
11    Q    Where was that?
12    A    Sterling, Virginia.
13    Q    Was that approximately the same size,
14    bigger, smaller, than the Alexandria gym?
15    A    It's a bigger footprint.  I think that
16    it's 10,000 square feet.
17    Q    And as you were opening larger capacity
18    gyms, was it adding more options of different types
19    of climbing opportunities, or were you adding other
20    either fitness or recreational activities for
21    people as well?
22    A    More climbing.
23    Q    Okay, so same question, then, with the
24    third gym; what was the average shift?
25    A    Two.

1    Q    Two?
2    A    Yes.
3    Q    When was the -- I forgot the name of the
4    town in Virginia, the third?
5    A    Sterling.
6    Q    When was the Sterling gym open is; do you
7    remember?
8    A    Yes, very clearly, August of 2001.
9    Q    Okay, and why did you say, "very
10    clearly"?  Was this a disagreement between you and
11    Doug?
12    A    No, because of what happened in September
13    of 2001.
14    Q    Okay, okay, what happened?
15    A    911, so this is in Washington, DC,
16    everybody stayed home and we just opened a
17    brand-new facility.  I remember it very clearly.
18    Q    I got you.  Were you and Doug still
19    together at that time?
20    A    No.
21    Q    You said that was '98 or so?
22    A    Yes.
23    Q    What precipitated either his departure or
24    how you ceased to be business partners?
25    A    He -- we disagreed on policy, and he left

1    to open a gym in Charlotte.
2    Q    What was the policy that you disagreed
3    on?
4    A    It was actually a disagreement over
5    policy related to significant others and their
6    position in the hierarchy of the organization.
7    Q    Of the company?
8    A    Right.
9    Q    Somebody wanted there to be nepotism and
10    someone didn't?
11    A    Crudely, yes.
12    Q    Well, I think that you figured out by now
13    a lot of my questions are crude, so, well, I will
14    just ask you.  Did Doug want his wife to come work
15    there and you disagreed with that and he said, I'm
16    out?
17    A    I think at the time she was his fiancee.
18    I can't remember clearly if they had married or not
19    at that time, but she was working there, and she
20    wasn't -- she wasn't working out.  She wasn't -- my
21    opinion, as president of the company, she was
22    disruptive and I needed to let her go.  He, of
23    course, didn't want to let her go, so --
24    Q    So he took his ball and went home?
25    A    Yes, he took it to Charlotte.

6 (Pages 18 - 21)

Page 22

1    Q   He took his ball to Charlotte and opened
2  the gym in Charlotte.  What is the name of the gym
3  that he opened?
4    A   It's been there -- he's been successful
5  at climbing gyms in Charlotte.  I can't -- I can't
6  remember it.
7    Q   That is okay.
8    A   As far as I know, it is the only one.
9  His facilities are the only ones in Charlotte.
10   Q   Did you take on another partner at that
11 time?
12   A   No.
13   Q   So the gym that you opened in August of
14 2001, you opened on your own as the president and
15 sole owner of Sportrock?
16   A   No, I wasn't the sole owner.  I was
17 president --
18   Q   Okay.
19   A   -- of the corporation.
20   Q   Who else owned it with you?
21   A   There were a lot of investors.
22   Q   A group of people, okay, I understand,
23 and as president were you also the director of
24 operations?  Did you have a say in how the entire
25 operational aspect of the business was run?

Page 23

1    A   Yes.
2    Q   Okay, and did anyone else have input as
3  to that, and when I say, "input," I mean had any
4  decision making power, or was that solely your
5  decision in terms of how the gyms operated?
6    A   Well, if I wanted to, I could dictate,
7  but I didn't.  We collaborated; I had managers who
8  were skilled who had plenty of input in how policy
9  and procedure was formed.
10   Q   When did the Climbing Wall Association
11 become formed and come into existence?
12   A   I don't recall the year.  It was -- the
13 Climbing Wall Association was the second iteration
14 of a trade organization.  The first one I think was
15 called Climbing Wall Industry Group, but it was
16 formed under the umbrella of some larger trade
17 organization who then jettisoned it because of
18 potential liability problems with climbing so the
19 people who had formed CWIG then formed the Climbing
20 Wall Association, and I want to say that happened
21 sometime in the '90s, but I would be purely
22 guessing at this point.
23   Q   Do you remember when the first sort of
24 operational standard recommendations were published
25 by the CWA?

Page 24

1    A   By the CWA?
2    Q   Yes.
3    A   There was a first edition of those
4  published -- I don't recall.  I don't recall the
5  date.
6    Q   Would it have been the '90s?
7    A   Probably, or very early 2000s.
8    Q   Did you have any input into the drafting
9  of those?
10   A   The first.
11   Q   The first edition of the operating
12 standards --
13   A   No.
14   Q   -- published by the CWA?
15   A   No.
16   Q   When did you become a member of the CWA?
17   A   When it was formed.
18   Q   Okay.  When did you become part of the
19 Board?
20   A   When did I become part of the Board?  I
21 don't know.  That is on my CV, but I don't remember
22 the year.
23   Q   All right.
24   A   2009, 2010, something like that.
25   Q   That is fair.  I will do it that way, so

Page 25

1  it looks like in December of 2004 you discontinued
2  operating Sportrock; does that sound about right?
3    A   Yes.
4    Q   Did you sell your ownership interest in
5  it?
6    A   Yes.
7    Q   And resigned as president?
8    A   Yes.
9    Q   Why did you do that?
10   A   There was disagreement between me and the
11 other owners on the direction of ownership of the
12 company.  I wanted to own the company; they didn't
13 want me to.
14   Q   When you say you wanted to own the
15 company, you wanted 51 percent of it?
16   A   Yes.
17   Q   And what was your ownership percentage at
18 the time?
19   A   I think in the 30s.
20   Q   What was the reason other than just, you
21 know, good old-fashioned capitalist greed as to why
22 they wouldn't want you to own more than 50 percent
23 of it?
24   A   I don't know.
25   Q   Was it a control thing; do you know?  Did

7 (Pages 22 - 25)

EXHIBIT 3 - 000007

Page 26

1  they express that to you?
2    A    They did not.
3    Q    Did you sell your ownership percentage to
4  other outside investors, or did the current group
5  just purchase it from you?
6    A    I sold it to somebody that I didn't know
7  and was -- I don't know if he had bought other
8  shares from other members, but I didn't know him.
9    Q    Were any of the others investigators in
10  Sportrock also involved in daily operations of the
11  gym?
12    A    No.
13    Q    That was just you?
14    A    Yes.
15    Q    Did Sportrock have a policies and
16  procedures manual concerning best practices of how
17  to operate their gyms?
18    A    Yes.
19    Q    And who was responsible for drafting and
20  coming up with those?
21    A    The managers and me.
22    Q    So it was a collaborative effort by
23  management at Sportrock?
24    A    Yes.
25    Q    Was the -- did -- at that time, did the

Page 27

1  CWA, had they published their recommended operation
2  standards?
3    A    At what time?
4    Q    At the time that you first collaborated
5  with management at Sportrock to come up with your
6  policies and procedures.
7    A    I don't think so.
8    Q    When the CWA did publish their
9  recommended industry standards for operations of
10  indoor climbing gyms, were those adopted by
11  management of Sportrock?
12    A    I don't recall specifically, but I would
13  think that what -- if there were differences
14  between the CWA's operating standards and
15  Sportrock's, we would have adjusted ours to meet
16  those CWA standards.
17    Q    So it wasn't a situation where you
18  necessarily disagreed with what the CWA came up
19  with because you thought that you had a better
20  mousetrap, so to speak; you would have agreed that
21  it would have been important to adhere to those CWA
22  standards if they were in conflict with your own?
23    A    I don't recall there being really any
24  conflict between the two.  It would have been I
25  think relatively minor adjustments.  The CWA

Page 28

1  standards are not very difficult to adhere to.
2    Q    But if there was something that was a
3  heightened standard, say, by the CWA, higher than
4  the ones that Sportrock was implementing, you would
5  agree that you all would have gotten together to
6  change your policies to make sure that they
7  complied with what the CWA was suggesting?
8    A    Who is "you all"?
9    Q    The management of Sportrock.
10    A    We likely would have conferred and
11  adopted a new standard to meet those requirements
12  from CWA.
13    Q    As you sit here today, and I know that
14  this was 18 years ago when the last time was you
15  were involved in SportRock, but as you sit here
16  today, do you recall a time when that was ever
17  done?
18    A    No.
19    Q    Okay.  After you sold your interest in
20  Sportrock, it looks like January of 2005 to the
21  present on your CV, Climbing Wall Management, LLC
22  out of Silver Spring, Maryland is the next thing on
23  your CV.
24    A    Okay.
25    Q    Does that sound right?

Page 29

1    A    Yes.
2    Q    Okay.  I'm just making sure that you
3  didn't leave anything out accidentally in the CV,
4  so I was just assuming.  Tell me what Climbing Wall
5  Management, LLC is.
6    A    The original idea behind Climbing Wall
7  Management was as a consulting firm to the indoor
8  climbing wall industry.  I had a partner initially
9  who was a skilled -- skilled in a certain part
10  of -- of the -- of climbing wall operations, and so
11  we did instructional and risk management consulting
12  with whoever might have an indoor climbing wall and
13  wanted that expertise.
14    Q    What was the name of your initial partner
15  at -- at Climbing Wall Management?
16    A    Mike Helt, H-E-L-T.
17    Q    How long were you guys partners?
18    A    Oh, a couple of years, maybe.
19      MR. HAZELTON:  And since we are referring
20  to it, I will mark the CV that was produced to me
21  as Defendant's Exhibit Number 1.
22      (The document was marked as Hague
23      Defendant's Deposition Exhibit Number 1.)
24  BY MR. HAZELTON:
25    Q    Well, how many partners -- oh, I need a

Page 30

1  new pen.  How many partners total have you had in
2  Climbing Wall Management?
3      A   One.
4      Q   Is that who we just talked about?
5      A   Yes.
6      Q   So since then, since then it's just been
7  you?
8      A   Yes.
9      Q   Your -- you are the sole member of the
10  LLC?
11      A   Yes.
12      Q   And why was it that -- well, what was his
13  name?  I forgot.
14      A   Mike.
15      Q   Why was it that Mike sold his interest to
16  you and left after a couple of years?
17      A   Mike left to -- he moved to Portland,
18  Oregon and got married and then decided to pursue
19  other opportunities.  He was no longer interested
20  in doing consulting work.
21      Q   Pursue other opportunities in the
22  climbing industry or something completely
23  different?
24      A   Yes, in climbing.
25      Q   And did he end up opening a gym?

Page 31

1      A   Years later, yes.
2      Q   All right.  When you first started
3  Climbing Wall Management, was that the sole source
4  of your income, the consulting work that you did,
5  or were you also an investor or have ownership
6  interest in gyms as well?
7      A   No, that was it.
8      Q   Okay.  The next thing on your CV lists
9  Operations Standards Committee at the Climbing Wall
10  Association, July of 2006 to 2012.  Is that a paid
11  gig?
12      A   No.
13      Q   Okay.  How often would -- well, let me
14  ask you it this way.  How much of your time did
15  that take up monthly?
16      A   It depended on what was going on with the
17  committee.  It could be as little as none; it could
18  be upwards of 20 hours.
19      Q   All right.  Under the Climbing Wall
20  Management section of your CV, "Responsibilities:
21  Create programming for training artificial climbing
22  wall operators."  I take that to mean indoor
23  climbing gyms; is that fair?
24      A   Typically, yes, but it could have been
25  anybody with an indoor artificial climbing wall.

Page 32

1      Q   That used it for commercial purposes?
2      A   So how would you define a university that
3  has a climbing wall?
4      Q   I would define that for commercial
5  purposes --
6      A   Okay.
7      Q   -- if he had a 12,000 square foot house
8  with a 5,000 square foot basement and I just wanted
9  to put a climbing wall in there for myself and my
10  friends, would you be somebody that I would retain
11  to consult to do something like that?
12      A   Yes, I would have.
13      Q   Okay.  Did you ever do that for just
14  private people that wanted to do it for themselves
15  and not commercially to where they invited whether
16  students or customers in?
17      A   I don't recall having ever done that, but
18  it doesn't mean that I didn't.
19      Q   When you say, "training artificial
20  climbing wall operators," tell me what that means;
21  train them in what?
22      A   Typically, a new operator needed to
23  understand how to process new customers, manage
24  existing customers, what kind of safety process to
25  put in place to manage the risks of having a

Page 33

1  facility like this, so they would sometimes bring
2  me in to teach their staff how to -- how to go
3  about those activities.  Sometimes they would
4  employ me to help them write their procedure
5  manuals.
6      Q   What was it that you were doing as a
7  consultant for Climbing Wall Management that wasn't
8  readily available to these operators through the
9  CWA?
10      A   The CWA does not do any training.
11      Q   I understand, but in terms of writing
12  standards, policies, and procedures that you
13  mentioned?
14      A   the CWA wouldn't write policies and
15  procedures for a gym, for anybody.
16      Q   The CWA does have recommendations for --
17  I mean, I understand certain business operations
18  they don't, but in terms of the training of staff
19  and the training of climbers, they do, correct?
20      A   They have a set of minimum practices that
21  is published but that doesn't come anywhere close
22  to being an operations manual.
23      Q   When you say, "operations manual," you
24  mean an operations manual for the entire business?
25      A   Well, sure.

9 (Pages 30 - 33)

Page 34

1    Q   Would that include the marketing of it;
2  would that include not just the nuts and bolts of a
3  customer comes in, you sign them up, you have this
4  checklist, you teach them in, and then when they
5  climb, this is the responsibilities, etc. etc., but
6  also how to actually run the business aspect of it?
7    A   The bulk of those operations manuals
8  consists of the first part of what you were talking
9  about.
10    Q   And that is what I wanted to clarify.
11  When I say, "operations," that is what I'm talking
12  about.
13    A   Right; I've never seen marketing in an
14  operations manual.
15    Q   Okay. How did you become involved in
16  July of 2006 with the CWA's Standards Committee?
17    A   I don't recall if I contacted them or if
18  they contacted me about being part of the committee
19  that was being formed at the time to revise the
20  existing industry practices.
21    Q   Do you recall what year the existing
22  industry practices were revised at the CWA?
23    A   You are talking about the edition that I
24  worked on?
25    Q   Correct.

Page 35

1    A   I believe that it is 2007 is when they
2  were published.
3    Q   As we sit here today in 2022, are
4  those -- is the edition that exists today the same
5  one that was written in 2007 when you and the nine
6  others revised them?
7    A   Yes.
8    Q   So they haven't been revised since 2007?
9    A   No.
10    Q   The industry practices that exist today
11  are the same ones that you helped to write in 2007?
12    A   Yes.
13    Q   And it says, "2006 to 2012," so was your
14  capacity at the CWA, your role at the CWA the same
15  throughout that entire six years?
16    A   On -- for that committee?
17    Q   Yes, it says, "Chairman."
18    A   Right.
19    Q   Yes. Anything other than that that you
20  did in that organization during that time period?
21    A   Again, I would have to look at the dates
22  on my CV to see when they were, there was another
23  committee that I was on and then I was a Board
24  member for a while, to see if there was any
25  overlap.

Page 36

1    Q   Yes, I got you, so 2006 to 2012, you were
2  the chairman of the Operations Standards
3  Committee.  January of 2009 to 2012, you were the
4  chairman of the Climbing Wall Instructor
5  Certification Committee; does that sound correct?
6    A   Yes.
7    Q   And then July of 2010 to August of 2012,
8  it just says "Director."
9    A   Board member, yes.
10    Q   So you were a Board member?
11    A   Yes.
12    Q   But throughout that time, you were the
13  chair of the Operations Standards Committee?
14    A   Yes.
15    Q   Throughout your entire time of the CWA?
16    A   Yes.
17    Q   What was your role as a Board member?
18  What additional duties did you have?
19    A   The Board at CWA forms policy for the
20  organization, provides oversight for the executive
21  director.
22    Q   And as the chair of the climbing wall and
23  instructor certification committee, to me, that
24  part of speaks for itself, but if you could,
25  elaborate a little on what those duties entailed.

Page 37

1    A   That committee was formed to develop a
2  program to certify indoor climbing instructors,
3  that they had to -- what standards they had to meet
4  in order to be certified as a Climbing Wall
5  Association indoor instructor.
6    Q   Did you know whether those standards have
7  been revised since they were written?
8    A   I don't know.
9    Q   Okay.  In your capacity in any of these
10  roles with the CWA, were you ever compensated by
11  the CWA?
12    A   No.  I might have been reimbursed for
13  travel as a Board member, but not compensated for
14  my time.
15    Q   And then it looks like in 2008, you got
16  back into the gym business at Rise Up; is that
17  correct?
18    A   Yes.
19    Q   So from 2005 to 2008, as far as what you
20  did for a living income wise, it was just Climbing
21  Wall Management, LLC?
22    A   Yes.
23    Q   Okay, and then in 2008, tell me how you
24  came to become involved at Rise Up Climbing.
25    A   Well, I had moved here to Lynchburg.

Veritext Legal Solutions
877-373-3660                                                                      800.808.4958
EXHIBIT 3 - 000010

Page 38

1  There was no indoor facility here, and I saw
2  opportunity to build a gym here.
3      Q   Were you the sole owner of that?
4      A   No.
5      Q   How many investors were there?
6      A   Two.
7      Q   Including yourselves?
8      A   Yes.
9      Q   Who was the other one?
10     A   Leslie Riehl.
11     Q   Leslie Riehl?
12     A   Mmm-hmm.
13     Q   Is Leslie a he or she?
14     A   A she; this is my second wife.
15     Q   So you and your wife decided to open Rise
16  Up Climbing in 2008. How many gyms are there or
17  were there that you opened?
18     A   One.
19     Q   Is Rise Up Climbing still operating?
20     A   Yes.
21     Q   Still just one gym?
22     A   Yes.
23     Q   You and Leslie were the 50/50 members of
24  the LLC at the time?
25     A   I believe that we were 50/50.

Page 39

1      Q   Okay. Were your duties -- were each of
2  your duties delineated? Did you handle one aspect
3  of the operation and she handled a different one,
4  or did you both do the same thing?
5      A   She didn't handle any of it.
6      Q   Okay. Did she work there?
7      A   No.
8      Q   She was just an owner of it?
9      A   Yes.
10     Q   So you needed some money and she had some
11  money and you all opened it together and you ran
12  the deal?
13     A   I don't understand your question.
14     Q   Okay, so why did you give Leslie 50
15  percent of the business if she wasn't involved in
16  it?
17     A   Give her? I mean, we were married, so it
18  was going to be -- we were married. I mean, I
19  still don't understand your question, really. Why
20  did I give her 50 percent?
21     Q   Well, when you said that you were 50/50,
22  I just assumed that meant that you all ran it
23  together. It sounds like you ran the gym; you did
24  everything in the gym but she had 50 percent of it,
25  and I was just wondering if it was solely because

Page 40

1  of the relationship that you had, because you were
2  married, or if it was because she contributed 50
3  percent, whether it was financially or in other
4  ways.
5      A   I don't recall if she contributed
6  anything of -- you know, any of her personal
7  assets. We were married; we had joint assets.
8      Q   And were you married before you started
9  Rise Up?
10     A   Yes.
11     Q   When you opened the gym -- well, how big
12  in comparison to Sportrock, the first Sportrock,
13  was Rise Up?
14     A   The first Sportrock gym?
15     Q   Yes.
16     A   I think that it was slightly larger.
17     Q   Would Rise Up have been comparable in
18  size and scope of the business to any of the three
19  Sportrock gyms?
20     A   It was a little bigger than the Rockville
21  gym, smaller than the Alexandria gym and the
22  Sterling gym.
23     Q   In terms of management operations, was it
24  pretty similar to the Sportrock facilities in how
25  Rise Up was managed and staffed and operated?

Page 41

1      A   Managed, it was different, but the
2  operations ran in a very similar way.
3      Q   Including the staffing of the gym at the
4  time it was open, the number of staff members,
5  things like that, pretty similar?
6      A   Less staffing was required in Lynchburg
7  because the gym didn't have the -- near the traffic
8  of the DC gyms.
9      Q   Well, how much less would you say on
10  average?
11     A   On many occasions, there was just one
12  staff person there.
13     Q   And sometimes it would have been you?
14     A   Sometimes it was me.
15     Q   And what led to you divesting of your
16  interest in Rise Up in 2019? Would that have been
17  the divorce between you and Leslie or was it for
18  some other reason?
19     A   I had a serious illness in 2015 and I had
20  turned over the management of the company to my
21  son-in-law who then became kind of disinterested in
22  being part of the business, so we sold it to some
23  other individuals.
24     Q   Have you been to Rise Up since you sold
25  it?

11 (Pages 38 - 41)

Page 42

1    A   Yes.
2    Q   Just as a customer?
3    A   Yes.
4    Q   Is it operating any differently today
5  than it was when you sold it in 2019?
6    A   I --
7    Q   From the outside looking in?
8    A   To some extent, yes.
9    Q   And in what way?
10    A   It is different.  Gosh, we're going to go
11  into some nuance here.
12    Q   That is okay.
13    A   But the way that they manage their route
14  setting activities is different from the way that I
15  would do it.  There is some differences in how they
16  are investing in the facility, what they put money
17  into, what they choose not to put money into.  The
18  quality of training of the staff is different.
19    Q   In what way?
20    A   It seems to be less -- the staff seems to
21  be less attentive to safety issues than what I
22  would have tolerated.
23    Q   What makes you say that?
24    A   Observation.  I'm there quite a bit.
25    Q   Okay, and tell me something specifically

Page 43

1  that you've noticed at Rise Up.
2    A   They -- I see belaying errors occur all
3  the time from people who were taught at the
4  facility to belay.
5    Q   How do you know that they were taught at
6  the facility to belay, just out of curiosity?
7    A   It's not a well trafficked gym; the
8  people that come and go, you know, it's -- it's not
9  a gym where, you know, there is hundreds of new
10  faces every week.  It's kind of easy to keep track
11  of who has been there, and the teaching portion of
12  the gym is right in the middle of the floor, so you
13  can see who is being taught and how they are being
14  taught.
15    Q   And is the way that they are being taught
16  different?
17    A   I don't know.
18    Q   All right.
19    A   I haven't paid that close attention to
20  the instruction.
21    Q   So you haven't gone through a training
22  orientation as a customer?  I mean, obviously, I
23  understand that you are an experienced climber and
24  you don't need it, but when you say that the
25  training is different and they are not being taught

Page 44

1  as well, I didn't know maybe if you went through
2  one just to see what those differences were.
3    A   No, I think that would be kind of
4  intrusive on my part to do that.
5    Q   So what you are basing your opinion on
6  that it is -- that they are not being trained as
7  well is just from what you've seen from the
8  belayers not properly being -- I guess performing
9  their belaying responsibilities.
10    A   Yes.
11    Q   And that is top rope climbing?
12    A   Both top rope and lead, yes.
13    Q   And any other specifics that you've
14  noticed in terms of the difference in the training
15  standards than when you left versus today.
16    A   Not that come to mind.
17    Q   So the only thing that comes to mind is
18  belaying with the top rope and the lead climber,
19  training differences that you specifically see?
20    A   That is the one that I can see.  Whatever
21  other training they are doing is behind the scenes,
22  and I have no -- I haven't been able to observe any
23  of that.
24    Q   Are you aware of any policy and procedure
25  differences --

Page 45

1    A   No.
2    Q   -- at Rise Up?
3    A   No.
4    Q   Okay.  Whether it's for minors, for
5  adults who are novices, or for the responsibilities
6  of adults to supervise minor climbers, are there
7  any differences?
8    A   There might be, but I don't -- but I
9  haven't recognized any.
10    Q   Okay.  How often do you go to Rise Up?
11    A   I would say I average three times a week.
12    Q   Do you have a membership there, I take
13  it?
14    A   I have a -- they allow me to climb there
15  without a membership.
16    Q   Okay.
17    A   If I -- if I give them some assistance
18  every once in a while, if they have a question
19  about something.
20    Q   So you still get along with everybody
21  there?
22    A   Oh, sure, yes.
23    Q   Do they ever retain your consulting
24  services?
25    A   No.

12 (Pages 42 - 45)

Page 46

1    Q    They have not?
2    A    No, they have not.
3    Q    As a regular climber at Rise Up and from
4  what you've observed, would it be your opinion that
5  they could use some consulting services such as the
6  type that you offer in order to operate their gym?
7    A    I think it would be helpful, yes.
8    Q    Okay, and in what aspects would it be
9  helpful to them?
10    A    I think that I could provide some rigor
11  to their training program and the safety process
12  that they use.
13    Q    And specifically, in what ways; what are
14  the safety processes that could use more rigor?
15    A    I think the way they supervise the
16  climbing wall could be a little bit more rigorous,
17  supervise the climbers that are there.
18    Q    How do they currently do it?
19    A    Sporadically.
20    Q    When you say, "sporadically" --
21    A    I mean, the supervision is intermittent
22  and not all that rigorous.
23    Q    When you say, "supervision," you mean
24  supervision of the climbers by the staff?
25    A    Yes.

Page 47

1    Q    Was it more rigorous prior to when you
2  sold the gym in 2019?
3    A    I think so, yes.
4    Q    And in what way?
5    A    I think my staff was much more willing to
6  intervene when there were -- when, say, belay
7  issues were observed.  I'm not sure those belay
8  issues are even -- don't even register sometime
9  with the current staff.
10    Q    So it sounds like to me that you see
11  things that they don't?
12    A    Yes.
13    Q    Either that or they see them and ignore
14  them?
15    A    I don't think that they would ignore
16  them.  I think that the people working there are
17  conscientious people, but I don't think they
18  recognize some of the things that I see.
19    Q    When you see some of these things that
20  they don't recognize, do you talk to management
21  about it or talk to the staff that is there about
22  it?
23    A    It depends.  If it is -- if it is like an
24  imminent danger, I just fix it myself.  If it's
25  something that might be not so imminently

Page 48

1  dangerous, I will point it out to the staff person
2  that is there and let them deal with it.
3    Q    When you were the owner of Rise Up, were
4  these, whether it is a belay issues or any other
5  issues, were these something that just were not
6  existent at Rise Up when you were there, these
7  issues?
8    A    No, they come up at every gym in the
9  country, maybe more at some gyms than others, but
10  yes.
11    Q    So these issues existed even during your
12  time at Rise Up?
13    A    Yes.
14    Q    Okay, and so are you saying that they
15  just exist more now at Rise Up?
16    A    My observation is that they observe more
17  and that they are not corrected in as rigorous a
18  way.
19    Q    You will have to explain that to me; when
20  you say, "not corrected in a more rigorous way,"
21  what does that mean?
22    A    I rarely see the staff intervene in a
23  situation where they should on their own.  They
24  will if I point something out to them, but...
25    Q    And is the staffing situation at Rise Up

Page 49

1  in terms of the number of staff basically the same
2  as it was when you were there?
3    A    It appears to be, yes.
4    Q    So one staff member at the facility?
5    A    Yes.
6    Q    And is the staff member responsible for
7  checking the people in, providing the orientations,
8  getting the waivers signed, making sure that
9  everything is clean, checking on the bathroom,
10  checking on the -- on all the facilities, and
11  supervising the climbers all the at the same time?
12    A    Yes, they do all of those things.
13    Q    So you are not critical of the number of
14  staffing; you are just critical of the ability of
15  whoever the staff person is there to recognize when
16  something might be an issue?
17    A    Yes.
18    Q    And that is something that you think
19  could be corrected with more rigorous training of
20  the staff member; is that --
21    A    And supervision of the staff members,
22  yes.
23    Q    All right.
24    A    Both.
25    Q    Supervision by whom of the staff member?

13 (Pages 46 - 49)

Page 50

1    A    The management of the company.
2    Q    So there should be management on site
3  there at the same time?
4    A    I'm not saying it has to be at the same
5  time; I'm saying that the management, if management
6  made it more of a priority, that the staff would
7  probably follow along and be more rigorous about
8  their supervision.
9    Q    But how could they be more rigorous?  I
10  guess that is what I'm getting at; that is my
11  question.
12    A    I thought you've asked that and I've
13  answered it.
14    Q    Well, from my understanding, what you've
15  answered is they could be more rigorous by
16  identifying an issue when it exists, and then I
17  asked you, is it something they are identifying
18  that they are ignoring or they just don't know that
19  it is an issue, and the understanding that I had
20  from your answer was that it's not that they are
21  ignoring it; they just don't understand that it is
22  an issue.
23    A    Or it's not -- there is not a strong
24  enough direction from the management on what -- on
25  how rigorous their response to that should be.

Page 51

1    Q    Are any of the staff members that are
2  there at Rise Up currently the same staff members
3  that worked for you in 2019?
4    A    I don't think, no.  I don't -- well, no,
5  I don't think that there is any left.
6    Q    Okay, so I guess it would be fair to say,
7  then, that all of the staff that is there now have
8  been there for less than three years?
9    A    I think that would be accurate, yes.
10    Q    What about management; are those all
11  different?
12    A    Yes.
13    Q    Is there anyone still at Rise Up that was
14  associated or affiliated with it whether as
15  management, staff, owner, or whatever, that is the
16  same as now?
17    A    Correct.  I don't think there is anyone
18  who has survived over those years.
19    Q    From when you were -- whenever it was
20  that you sold in 2019, everyone that is associated
21  with it now is a new person?
22    A    I believe so.
23    Q    Okay.  Who owns it now; who did you sell
24  it to, Rise Up?
25    A    The names of the people or --

Page 52

1    Q    Yes, if -- if it is a group of people, I
2  don't need the names, if it is the name of a group,
3  but if it's just one or two people, what are their
4  names?
5    A    I sold to two individuals.  I don't
6  know what their ownership agreement is, but there
7  were two of them, one named Stephen Baker, and I
8  think that it's P-H, and the other, he goes by his
9  initials, J.B. Askew, A-S-K-E-W.
10    Q    And are they purely just business
11  investors or are they climbing enthusiasts
12  themselves involved in the operations and
13  management, if you know?
14    A    Stephen is a climber.  I don't really
15  know about J.B.  I don't think I've ever seen him
16  climb, but I don't have any idea what his interest
17  is other than owning the gym.
18    Q    Do you know whether one or both of them
19  actively manage the gym or if they have people that
20  do that?
21    A    No, they are pretty much every day; I see
22  them regularly.
23    Q    Okay, and when you see one or both of
24  them there, is there also additional staff there or
25  are they acting as the staff?

Page 53

1    A    It can be either.
2    Q    Did you know -- did you know personally
3  Stephen or J.B. prior to selling the gym to them?
4    A    I knew Stephen since he was a climber.
5    Q    And was Stephen involved in the CWA?
6    A    I don't know.
7    Q    Okay, so you just knew him as a climber,
8  not in the business; is that correct?
9    A    Yes.
10    MR. HAZELTON:  All right.  I will mark
11  this as Defendant's Exhibit Number 2.
12    (The document was marked as Hague
13    Defendant's Deposition Exhibit Number 2.)
14  BY MR. HAZELTON:
15    Q    This is the Deposition Notice that we're
16  here about today.  I assume you've seen that
17  document, Dan?
18    A    If this is the one that Mr. Whitten sent
19  me, yes.  It looks the same.
20    Q    Okay, did you have a chance to read over
21  the eleven document requests that were a part of
22  this Deposition Notice?
23    A    Yes.
24    Q    Okay, and you've produced your CV.
25  You've produced Number 2, a complete copy of your

14 (Pages 50 - 53)

1 file; Number 3, it is my understanding you have
2 produced a list of all cases.  The case list that
3 uou produced is relatively lengthy.  Is that --
4 does that encompass the entire course of your
5 expert witness consulting business, or does it just
6 about go back a certain number of years?
7     A   No, it goes back to when I began doing
8 this work.
9     Q   So that is all of it?
10    A   Yes.
11    Q   Number 4, photos, videotape, testimony,
12 records, etc. etc.  I didn't get any photos.  I
13 assume you haven't performed any sort of
14 independent investigation where you took photos or
15 videos as a part of formulating the opinions that
16 we're here about to talk -- that we're here to talk
17 about today?
18    A   I did not.
19    Q   The report that you produced, does that
20 constitute a full and complete copy of your report
21 and your opinions in this case --
22    A   Yes.
23    Q   -- since the time that you drafted it?
24    A   Yes.
25    Q   Nothing has changed since the time you

1 drafted it?
2     A   No.
3     Q   Copies of any books, treatises, manuals,
4 rule books, etc. etc., that is Number 6, and this
5 morning you produced a copy of the book that you
6 wrote that you relied on.  I think that this is the
7 first time that I've had an expert produce a book
8 as part of materials they relied on that they
9 themselves wrote, because usually, you know, they
10 rely on their own experience and knowledge.
11    A   Isn't that what that is?
12    Q   Yes, I thought it was -- no, I appreciate
13 it.
14        MR. WHITTEN:  He just put it in writing
15 for you.
16 BY MR. HAZELTON:
17    Q   Yes, this is in writing form; this is
18 Artificial Climbing Wall Operation and Risk
19 Management:  Operational Standards, Principles, and
20 Best Practices by Dan Hague and it's copyrighted in
21 2019, and just for the Record, this is the only
22 version of this book?
23    A   Yes.
24    Q   It hasn't been updated?
25    A   No.

1     Q   Okay.  What did you use as resources when
2 you wrote this book?
3     A   Mostly my experience in running climbing
4 gyms.
5     Q   Okay, and I notice when I was flipping
6 through it when it was produced this morning, there
7 is several photos in it.  Are all of these
8 photographs photos from Rise Up the gym in
9 Lynchburg?
10    A   It's been a while since I've read through
11 that entire book, so I don't know if all of them
12 are from Rise Up.
13    Q   Well, some of them definitely are because
14 you can see the Rise Up logo.  Would there have
15 been photos of other gyms that you would have used
16 in this book?
17    A   It's possible.
18    Q   Okay.  What other gyms would they be?
19    A   I don't know.
20    Q   Okay.
21    A   You would have to show me a picture.
22    Q   Well, I don't want to show you every
23 picture and ask, but did you get stock photos, if
24 you remember, to use?
25    A   I don't remember.

1     Q   Okay.
2     A   I think I probably took most of those
3 pictures, but I can't be sure that every single
4 picture in there is something that I took.
5     Q   I'm not asking whether you took it; I'm
6 asking whether they are pictures from Rise Up.
7     A   If I took the picture, it would be in --
8 it would be at Rise Up.
9     Q   Okay, and do you remember whether you had
10 any photos that you had taken at Sportrock that you
11 used in this book?
12    A   That is possible.
13    Q   Okay.
14    A   Yes.
15    Q   I will just ask you this and then we'll
16 take a break.  For example, Pages 28 and 29, and we
17 can go to 30 and 31, so I will ask you to look
18 through Pages 28 through 31.  Are those photos from
19 Rise Up?
20    A   28 and 29 are not.
21    Q   Where are they from?
22    A   I don't know.  They look stock to me.
23    Q   All right.
24    A   I'm not sure where those are from.  30 is
25 at Rise Up, and 31 is not.  31 is the front

Page 58

1 climbing gym in Salt Lake City. I don't know if I
2 took that picture or not. I doubt it. I've never
3 been in that gym when there has only been two
4 people in it.
5     Q   To publish that book, did you have to get
6 permission to use all of the photos that are not
7 from Rise Up, if you remember?
8     A   I don't remember.
9     Q   All right.
10    A   I don't remember if I purchased them or
11 got permission or what. I don't remember.
12        MR. HAZELTON: Okay. All right, we can
13 take a break. Let's take five minutes.
14        (The Court Reporter read back the
15    preceding question and answer.)
16 BY MR. HAZELTON:
17    Q   All right, Dan, we just took a break, but
18 you realize that you are still under Oath, right?
19    A   Yes.
20    Q   When we broke, we were sort of going
21 through the list of document requests in
22 Defendant's Exhibit Number 2, and you had produced
23 a copy of the book that you had written. I will
24 show you, on Page 52 of your book, and we could
25 assume that this was taken at Rise Up because it

Page 59

1 says that is Rise Up?
2     A   Yes.
3     Q   Okay, so this looks like it is a photo of
4 their gym rules?
5     A   Yes.
6     Q   And this was when you owned it, I assume,
7 when you owned Rise Up?
8     A   Yes.
9     Q   Had these rules changed at all since you
10 left?
11    A   I honestly haven't read any of the
12 postings that are there now, so I don't know.
13    Q   Is this something that is posted in the
14 gym?
15    A   That was posted in the gym, yes.
16    Q   And on Pages 50 and 51, are these posted
17 at Rise Up as well?
18    A   Currently?
19    Q   Well, at the time that you owned it.
20    A   Yes.
21    Q   This is from Rise Up?
22    A   Yes.
23    Q   Okay. Do you know whether they are
24 currently posted?
25    A   There are posters up. I can't say

Page 60

1 whether they are exactly those posters.
2     Q   Is it best practices to have things like
3 this posted in an indoor climbing gym?
4     A   Yes.
5     Q   Why?
6     A   Well, one of the -- one of the I think
7 things that a climbing gym needs to do is to inform
8 their customers about the risks that are involved
9 in the activity and how to minimize those risks,
10 and placing posters in prominent places where
11 customers can read them is one way to inform them
12 of those.
13    Q   And what are the other ways?
14    A   One of the ways is with the -- the
15 liability waiver that typically everyone who is
16 going to use one of these facilities in this
17 country has to sign, so in -- so in many cases,
18 some of those risks are listed within that
19 liability waiver. They are also presented in an
20 orientation. That orientation can be video format
21 or in person, so they could get the warnings and
22 cautions verbally from the staff, either by video
23 or again in person.
24    Q   Okay. Are there any other ways of
25 informing the customers of the inherent risks and

Page 61

1 sort of the best safety practices, other than what
2 we've talked about?
3     A   There might be, but those are the
4 predominant ways that it's done.
5     Q   Those are the accepted ways in the
6 industry?
7     A   Yes.
8     Q   Okay, and an orientation, whether video
9 or in person, postings around the gym such as the
10 ones we see on Pages 50, 51 and 52 of your book,
11 the liability waivers that essentially say the same
12 thing, make sure that the customers know what is
13 involved, the risks and the safety, and anything
14 else?
15    A   Well, I said the orientation.
16    Q   Right. I mentioned that, yes.
17    A   Okay.
18    Q   Anything -- other than the postings, the
19 waiver, and the orientation to serve as adequate
20 information to the customers about how to safely
21 climb and whose responsibility it is to make sure?
22    A   If you are doing all of those things, I
23 would think that you are informing the customer.
24    Q   Because obviously, you would agree, it
25 says it right here, Intro, big bold, very first

16 (Pages 58 - 61)

Page 62

1   page, "Climbing is dangerous!" with an exclamation
2   mark.  Climbing is an inherently dangerous
3   activity, correct?
4       A    There is certainly the risk of being
5   seriously injured.
6       Q    So it is an inherently dangerous
7   activity?
8       A    I don't know if I would call it
9   inherently dangerous, but there are certainly risks
10  involved.
11      Q    Well, Dan, the first sentence under
12  Climbing is Dangerous says, "Climbing is inherently
13  dangerous indoors or out;" that is your book?
14      A    Okay.
15      Q    Okay, so you could agree with me that
16  climbing is inherently dangerous, and it is
17  important that the customers or the climbers, they
18  know and understand that, especially first timers?
19      A    It's not only important that they
20  understand that there is risk involved but what
21  those risks are.
22      Q    Okay, right, which is the purpose of the
23  postings, the orientation, and the waiver, correct?
24      A    Correct.
25      Q    All right.  Going back to Defendant's

Page 63

1   Exhibit Number 2, Number 7 on the document request,
2   "Please produce a copy of any and all
3   correspondence, emails or other communication to
4   and from the deponent and Plaintiffs' counsel
5   and/or the Plaintiff."  Have there been any of
6   that?
7       MR. WHITTEN:  I will put on the Record, I
8   think I mentioned it before, but most of this is
9   protected.
10      MR. HAZELTON:  I agree, but if it was
11  used in formulating his opinion, then that is
12  discoverable.
13      MR. WHITTEN:  Sure.
14  BY MR. HAZELTON:
15      Q    Has there been any correspondence between
16  you, whether telephone conversations, written
17  correspondence, or information that was provided to
18  you that you used in formulating your opinions that
19  you are here about in this case?
20      A    From Mr. Whitten?
21      Q    Or the Plaintiff or anyone associated
22  with the Plaintiff.
23      A    No.
24      Q    Okay.  Have you spoken to the Plaintiff?
25      A    No.

Page 64

1       Q    You never met Kinsley?
2       A    No.
3       Q    Got on the phone with her?
4       A    No.
5       Q    Did you think that it was important to
6   ask her what happened?
7       A    Not necessarily, no.
8       Q    You didn't want to know whether she did
9   in fact know how to hook into the auto belay?
10      A    Well, she might have known but that may
11  not be the issue here.
12      Q    Well, we will get to what your actual
13  opinions are later, but for these purposes, I'm
14  just curious as to, you know, all of the
15  information that you obtained and gathered in order
16  to come up with your opinions and your conclusions
17  and formulating them, so -- and I know that you've
18  been retained or testified in 60-plus matters in
19  litigation, correct, something like that?
20      A    I've been retained.  I haven't testified
21  in 60.
22      Q    I thought that I said and/or, so you've
23  been retained in 60, give or take, matters, as an
24  expert witness for litigation?
25      A    Yes.

Page 65

1       Q    And in any of those cases, did you ever
2   speak directly to the Plaintiff to ask, or the
3   Defendant, if it was on behalf of the Defendant, to
4   sort of find out what precipitated the incident,
5   how the incident happened, to try to determine what
6   the cause was from that person's perspective?
7       A    Sometimes, but mostly not.
8       Q    And when you say "sometimes" --
9       A    Out of those 60, there were a few where
10  I've spoken to the client, but in the vast majority
11  of cases, no, I never talk to them.
12      Q    Well, can you give me a for instance of
13  one of the times that you did speak to, and I'm
14  going to assume that it was an injured party, about
15  what happened?
16      A    I will not be able to recall the case,
17  but I did -- in the last couple of years, I spoke
18  to a woman who -- and I can't even remember what
19  the particulars were in that case, but I did speak
20  to her and her then boyfriend who witnessed her
21  injury, but that was at the behest of the attorney,
22  their attorney, that I did that.
23      Q    I understand; you are not going to just
24  take it upon yourself.  Did Mr. Whitten or anyone
25  at his law firm ask whether you wanted to speak to

17 (Pages 62 - 65)

Page 66

1  the minor Plaintiff in this case or her parents or
2  any friend that witnessed it or any of the parents
3  that were there?
4     A    They did not.
5     Q    And did you ever ask them if you could?
6     A    No.
7     Q    Number 8, "Copy of any and all
8  reports/opinions," I assume we've talked about
9  that; the report that you produced is the only
10 report in this matter and it is your final report?
11    A    Yes.
12    Q    Number 9, "Please produce each and every
13 piece or item of documentary evidence that the
14 deponent intends to use at the trial of the case."
15 Is anything that the -- the production that I did
16 receive, is there anything that is not within that
17 production that you plan on using as an item of
18 documentary evidence to support your opinions in
19 this case?
20    A    No.
21    Q    Number 10, "A list of all cases," and I
22 have that.  In 11, "A copy of the deponent's fee
23 schedule for providing services and/or testimony."
24 I believe that I received two invoices and a
25 Consulting Agreement.  The invoices that I

Page 67

1  received, and I will mark these collectively as
2  Defendant's Exhibit Number 3; it's two invoices.
3  Do you have a paper clip?  It looks like one is
4  dated 2-1-22 and one is dated 1-1-22.
5        (The document were marked as Hague
6     Defendant's Deposition Exhibit Number 3.)
7  BY MR. HAZELTON:
8     Q    Are -- the dates on these invoices, are
9  these just the date of the invoice or is that the
10 date of the work performed?
11    A    It's the date of the invoice.
12    Q    Okay.  There is no dates for the entries
13 on the work performed.  Would you have an idea of
14 about when that would have been if I showed it to
15 you?
16    A    So the invoices are for the entire
17 previous month.
18    Q    Right, but, for example, the 1-1-22
19 invoice would have been for the month of December
20 when the actual work was done?
21    A    Correct.
22    Q    And there is one, two, three, four, five
23 entries.  Would you know about when that -- the
24 dates of when those entries -- that work was
25 performed?

Page 68

1     A    Not -- no.
2     Q    Based on what it was, what the task was?
3     A    These invoices are generated by
4  QuickBooks and I'm sure that the dates are in
5  QuickBooks, but off the top of my head, I can't --
6  I wouldn't be able to do that.
7     Q    Well, the Consulting Agreement that you
8  produced is dated December 15th, 2021; that was
9  signed by Mr. Whitten, but there is no signature on
10 behalf of Climbing Wall Management.  I will mark
11 this as Defendant's Exhibit Number 4.
12       (The document was marked as Hague
13    Defendant's Deposition Exhibit Number 4.)
14 BY MR. HAZELTON:
15    Q    Does Defendant's Exhibit Number 4
16 constitute the agreement as you understand it
17 between yourself and Plaintiff's counsel?
18    A    Yes.
19    Q    And if it's dated December 15th, would it
20 be fair to assume that the work that was performed
21 and reflected on these invoices in Defendant's
22 Exhibit Number 3 took place on or after December
23 15th?
24    A    Yes.
25    Q    And so no work was performed before this

Page 69

1  was signed?
2     A    I don't believe so.
3     Q    And was there a retainer paid?
4     A    No.
5     Q    And it looks like the first entry that
6  you have for work done in this case, it just says,
7  .7333, so about 45 minutes, "Reviewed documents."
8  Any idea what that would have been?
9     A    Whatever Mr. Whitten sent me at that
10 time.
11    Q    Do you remember what the first batch of
12 documents was that he sent you?
13    A    No, I don't.
14    Q    The next entry is about half an hour; it
15 just says, "Phone call."  Any idea what that would
16 have been?
17    A    Phone call with Mr. Whitten, but I don't
18 recall what we discussed.
19    Q    And had you spoken on the phone with
20 anyone about this case other than Mr. Whitten?
21    A    It would have -- nobody outside of his
22 office.  I can't recall whether I have spoken to
23 anybody else in that firm, but --
24    Q    Well, there is a 30-minute phone call;
25 would that have been with Mr. Whitten?

18 (Pages 66 - 69)

Page 70

1    A   Yes.
2    Q   You wouldn't have had a-half hour phone
3   call with anyone else at that office?
4    A   Occasionally, though, they are conference
5   calls, and I can't remember if there was anyone
6   else who was on the call or not.
7    Q   That is fair.  Any phone calls where
8   Mr. Whitten wasn't a party to the conversation?
9    A   I don't believe so, no.
10    Q   And the next entry is 1.13 hours, "Review
11   depo and training doc." Since this is in December,
12   I will assume that depo was the depo of Hannah
13   Staubach; would that be fair?
14    A   I think that is the first one that I
15   received, yes.
16    Q   And "training doc," any idea what
17   training doc that would have been that you
18   reviewed?
19    A   Yes, there is a training document that I
20   received, a training document for High Point.
21    Q   Okay.
22    A   It was a training outline, I think,
23   something like that.
24    Q   And then the next entry is just shy of
25   two hours, and it just says, "Begin report."  I'm

Page 71

1   assuming that is the draft of the final report that
2   was eventually submitted?
3    A   Well, yes, I was beginning to write the
4   report, yes, exactly what it says.
5    Q   And that was when you had reviewed a
6   training doc, you had reviewed Ms. Staubach's depo,
7   you had a phone call, you reviewed some initial
8   documents, and you began your report after
9   reviewing those things?
10    A   Yes.
11    Q   Okay.
12       MR. WHITTEN:  And I will clarify, too,
13   Jeremy, that Staubach's deposition, that file also
14   includes the Exhibits, so there was a bunch of
15   other documents that he reviewed in conjunction
16   with Ms. Staubach's transcript.
17   BY MR. HAZELTON:
18    Q   Okay, and I assume that is what that
19   training doc was in the same entry as the depo, but
20   that is fair, so if you want to include the
21   Exhibits, so there was the phone call, the initial
22   documents, the Exhibits, and you began writing your
23   report after those three things?
24    A   Right.  There was a Complaint, there was
25   a set of Interrogatories, deposition, the training

Page 72

1   outline, and there was a -- there was some kind of
2   orientation form with signatures on it.
3    Q   (Indicating)?
4    A   That looks like it, yes.
5    Q   Was the Complaint the first thing that
6   you read; do you remember?
7    A   I don't remember.
8    Q   Okay.  Is there --
9    A   There was an Incident Report, too, by the
10   way.
11    Q   Okay.  Is there anything that stood out
12   to you about the claims in the Complaint when you
13   read it, or did it seem pretty standard?
14       MR. WHITTEN:  Object to form.
15   BY MR. HAZELTON:
16    Q   I know you've done this a lot, so that is
17   why I'm asking.
18    A   Nothing stood out as abnormal or
19   irregular.
20    Q   In terms of the type of things that Ms.
21   Kornegay is alleging and what the actual legal
22   allegations are, is there anything that you noticed
23   in this Complaint that you don't usually notice in
24   these cases?
25    A   No.

Page 73

1    Q   Okay, and then the last entry on the --
2   on the 1-1-22 invoice was for about 40 minutes, a
3   "phone conversation."  This was after you had
4   begun the report.  Any idea what that phone
5   conversation was?
6    A   No.
7    Q   I assume it would have been with Mr.
8   Whitten?
9    A   I assume it would have been, yes.
10    Q   Because you just told me that you had no
11   other phone conversations with anyone about this
12   case in which Mr. Whitten was not involved?
13    A   I believe that is correct, yes.
14    Q   All right, and then the 2-1 invoice would
15   have been for work performed in January which was
16   last month; is that correct?
17    A   Yes.
18    Q   And there are three entries, one for 1.23
19   hours, "Review Watson depo," and that speaks for
20   itself.  Did that include the Exhibits?
21    A   Yes.
22    Q   And then the next entry was about 45
23   minutes, and it just says, "Report," so you
24   continued to draft your report?
25    A   Yes.

19 (Pages 70 - 73)

Page 74

1   Q   Is that what the -- just the word
2   "report" means?
3   A   Yes.
4   Q   Is that the completion of the report; do
5   you know?
6   A   I don't remember when I completed the
7   report, whether I completed it in January or not.
8   Q   Do you have an invoice with you today
9   that reflects all the work that you've done since
10  this last invoice?
11  A   No, I haven't produced any more
12  invoices.  I would not produce another invoice
13  until March 1st.
14  Q   Well, I understand that, but there has
15  been work -- other than today and the prep time
16  that you spent with Austin yesterday, has about
17  been other work done in February on this case?
18  A   I don't recall.
19  Q   All right.  Well, I will represent to you
20  that the report that you did submit is dated
21  January 7, 2022.  Would that have been when it was
22  completed?
23  A   Yes.
24  Q   Okay, so this .716 hours entry we just
25  talked about where it just says, "Report," that

Page 75

1   would have been when you finished drafting the
2   report that ended up being produced?
3   A   Probably.
4   Q   Because there is no other entries after
5   that that talk about a report.
6   A   In January, right.
7   Q   Yes, and this is dated January 7th?
8   A   Yes.
9   Q   And then there is one final entry of
10  "phone call" for -- it looks like 20 minutes or
11  so, and again, it just says, "phone call," and as
12  we've established, I think, that would have been
13  something that at least involved a conversation
14  with Mr. Whitten?
15  A   Yes.
16  Q   Were any -- did you receive any
17  information, whether written, whether over the
18  phone, after you wrote your report, that you in any
19  way considered whether it confirmed your opinions
20  in the report or whether it made you question the
21  opinions in your report?
22  A   I don't think I received any additional
23  information that changed -- would have changed my
24  opinion about anything.
25  Q   As we sit here today, nothing that you

Page 76

1   received or found out would change any of the
2   opinions that are contained in your final report
3   dated January 7th?
4   A   Yes.
5   Q   Okay.  It looks like you charged $270 an
6   hour for today, you are charging $335 an hour for
7   your testimony, and then if you testify at trial,
8   that is $350 an hour; does that sound right?
9   A   That sounds right.
10  Q   Is this your standard rate or does it
11  depend on the market in which you are testifying or
12  offering testimony?
13  A   No, that is what I offer to everyone.
14  Q   Everyone, okay.  Can I have that back,
15  please --
16  A   Sure.
17  Q   -- to make sure that I don't lose
18  anything.  We're just going to spend a little bit
19  of time on your case history; I promised you that I
20  would not go through all of them.  Let me start by
21  asking you this way, and I will mark this as
22  Defendant's Exhibit Number 5.  I think it's
23  Defendant's Exhibit Number 5, yes.
24      (The document was marked as Hague
25      Defendant's Deposition Exhibit Number 5.)

Page 77

1   BY MR. HAZELTON:
2   Q   Out of this list of cases, approximately
3   how many dealt with an injury due to a failure to
4   clip into an auto belay?
5   A   So somewhere between 30 and 40 percent.
6   Q   So a lot?
7   A   Yes.
8   Q   You would agree failing to clip in an
9   auto belay, at least in the industry, would be
10  considered a common occurrence?
11  A   All too common, yes.
12  Q   An all too common occurrence, all right.
13  Out of that 30 to 40 percent of cases listed in
14  Defendant's Exhibit Number 5 that involve failing
15  to clip into an auto belay, how many of those were
16  failure of a child under the age of 14 to clip into
17  the auto belay?
18  A   I don't know, somewhere -- somewhere
19  fewer than ten, probably fewer than -- probably
20  five or fewer.
21  Q   Do you know -- and would that include the
22  one we're here about today --
23  A   Yes.
24  Q   -- when you are giving the number?
25  A   Yes.

Page 78

1    Q    Other than this one, what is the most
2  recent one?
3    A    I don't remember.  I don't recall.
4    Q    Do you recall any of them?
5    A    Yes, I definitely recall a young man that
6  was killed in North Carolina as a result of not
7  clipping in.
8    Q    Well, tell me about that case.  What was
9  the name of it?
10    A    Wu; I believe Wu is his last name, W-U.
11    Q    Wu versus Altitude Trampoline?
12    A    Yes.
13    Q    In North Carolina, retained by Scott
14  Roberts?
15    A    Yes.
16    Q    Okay.  Tell me what happened in that
17  case.
18    A    So I think his name was Matthew who was
19  attending his own birthday party at this
20  recreational facility, and if I remember correctly,
21  these children were allowed to -- I can't remember
22  how old he was.  I think that he was -- I think
23  that he was eleven, twelve years old.  They were
24  allowed to clip themselves in and use the climbing
25  wall with auto belays.  He, in a rush to get

Page 79

1  started, he was I believe racing a friend of his,
2  neglected to clip into the lanyard.  He climbed to
3  the top and fell off and land on his neck and he
4  subsequently died.
5    Q    And judging by the style of the case,
6  Altitude Trampoline Park, not a climbing gym?
7    A    It is not a climbing gym.
8    Q    It sounds like it is a trampoline park
9  and they happened to have a climbing wall there?
10    A    Yes, very similar, actually, to what Ms.
11  Kornegay was climbing, yes.
12    Q    When you --
13    A    Lights and auto belays yes.
14    Q    And are you saying that High Point
15  Climbing & Fitness is very similar to Altitude
16  Trampoline Park?
17    A    I'm saying that there are similarities in
18  the cases, yes, and similarity in the portions of
19  the facilities that the participants were using.
20    Q    And did -- does altitude trampoline have
21  staff that takes the kids who don't want to jump on
22  the trampolines but want to climb up their climbing
23  wall through an orientation, an auto belay
24  orientation?
25    A    I don't recall.  It's been -- this case

Page 80

1  has been ongoing for a number of years, and it's
2  been a long time since I reviewed any of the
3  documents for that so I don't remember what they do
4  with their participants.
5    Q    Okay.  Do you know if they have the --
6  the things that we established earlier that are
7  adequate in mitigating controls that climbing
8  facilities have, the postings, the orientation, the
9  liability waiver; did altitude trampoline have
10  those?
11    A    I can -- I can almost guarantee that they
12  have a waiver.  I believe that there were posters
13  up, but I can't recall what was on them.  As far as
14  orientation, I don't remember --
15    Q    Okay.
16    A    -- if they do anything with the
17  participants.
18    Q    Did they have certified climbing
19  instructors on staff at altitude trampoline?
20    A    Certified by -- what do you mean when you
21  say, "certified"?
22    Q    The CWI, or the climbing -- the
23  certification -- I'm sorry, the acronym is escaping
24  me.
25    A    They would not have anybody certified by

Page 81

1  Climbing Wall Association.
2    Q    Did they have any staff there at all
3  familiar with training climbers?
4    A    I don't know.
5    Q    Have you been deposed in that case?
6    A    No.
7    Q    Is the case still ongoing?
8    A    As far as I know, yes.
9    Q    So when was the last time you spoke with
10  the attorney who retained you in that case, if you
11  remember?
12    A    At the beginning of each year I send out
13  an email asking if cases are still ongoing if I
14  haven't heard anything, so I would have heard from
15  them in early January.
16    Q    And do you recall whether you completed a
17  report in that case?
18    A    I don't remember.
19    Q    Okay.  Well, do you remember anything
20  else about the circumstances that surround that
21  case?
22    A    No.
23    Q    But you are comfortable in saying that it
24  was similar to this situation that we're here about
25  today?

21 (Pages 78 - 81)

Page 82

1   A   Yes, the -- the safety apparatus, the
2   climbing wall, the level of supervision, it's all
3   very similar.
4       Q   Did you consider recreational trampoline
5   parks that happen to have a rock climbing wall
6   similar or the same in terms of industry and
7   operating standard as an indoor climbing fitness
8   facility?
9           MR. WHITTEN:  Object to form.
10          THE WITNESS:  It depends on what part of
11  those indoor climbing facilities we're referring
12  to.
13  BY MR. HAZELTON:
14      Q   Well, you just -- you just referred to
15  altitude as being a recreational facility.  Did you
16  consider High Point Climbing & Fitness to be a
17  recreational facility?
18      A   The portion of the gym that was being
19  used by Ms. Kornegay is closer to being an
20  amusement than it is to being -- training for
21  climbers which is what climbing gyms originally
22  were.
23      Q   I assume that means --
24      A   So that means that that portion of their
25  climbing wall that she was using is closer to being

Page 83

1   what the trampoline park has than it is to being
2   part of a, you know, training facility for
3   recreational climbers.
4       Q   Did Sportrock or Rise Up have a climbing
5   room for kids?
6       A   A climbing room?
7       Q   Yes, designed for kids or climbing walls
8   designed for kids?
9       A   Did they have climbing walls designed for
10  kids specifically and only, really?  I mean, is
11  that what you are saying?
12      Q   I'm just asking.
13      A   Yes, but I don't -- I'm not sure that I
14  can answer your question in the way that it was
15  asked.
16      Q   Were there any walls or areas of
17  Sportrock or Rise Up that were designed
18  specifically for younger climbers, i.e., children,
19  in order to make it fun for them that an otherwise
20  serious adult or competitive climbers wouldn't
21  necessarily find appealing?
22          MR. WHITTEN:  Object to form.
23          THE WITNESS:  There weren't any walls
24  that were exclusively set up that way.  There were
25  a combination -- accommodations made for younger

Page 84

1   and less experienced climbers, in other words,
2   making easier routes or paths up the climbing wall
3   for them, but there was nothing -- there was
4   nothing that was designated as a kid zone.  There
5   were no lights; there is no bells or anything like
6   that, just an accommodation for those that weren't
7   experienced climbers, meaning easier terrain for
8   them to climb on.
9   BY MR. HAZELTON:
10      Q   Is it your understanding that there were
11  bells on the climbing walls?
12      A   No, I was just saying that that is a
13  common amusement apparatus.
14      Q   That doesn't exist at High Point?
15      A   As far as I know, they --
16      Q   Okay.
17      A   Well, I don't know what they have, other
18  than that one wall that Ms. Kornegay was climbing
19  on.
20      Q   Okay.  Well, in comparing High Point
21  Climbing & Fitness to the Altitude Trampoline Park,
22  and I would assume that you've been to a High Point
23  facility?
24      A   No.
25      Q   No?

Page 85

1   A   No.
2       Q   Never been to the gym where this
3   occurred?
4       A   No.
5       Q   Have you been to any of their other gyms?
6       A   No.
7       Q   Have you seen anything other than the
8   surveillance video in terms of the insides of any
9   of these facilities?
10      A   I've looked at their website.
11      Q   Other than -- well, okay.  Was there
12  anything on their website that you used in
13  formulating any of the opinions that you have
14  today?
15      A   There was nothing on the website that
16  added anything to my opinion.
17      Q   Well, that -- that specifically wasn't my
18  question.  My question was, was there anything on
19  their website that you viewed that assisted in
20  formulating the opinions that you have in this
21  case?
22      A   I don't recall.  I don't recall there
23  being anything.
24      Q   Okay.
25      A   But I would have look at the website.

22 (Pages 82 - 85)

1  You asked that question.
2      Q   Well, sure, but if there was anything
3  that you looked at that assisted you in coming up
4  with one of the opinions that you have, I want to
5  know what that was that you looked at, and it
6  sounds to me like, as you sit here today, there
7  wasn't anything?
8      A   Not that I recall.
9      Q   Okay.  Do you plan on visiting the gym,
10 High Point's gym?
11     A   It is not my call.
12     Q   Would it be -- would you agree that it
13 would be helpful for you in formulating these types
14 of opinions when being critical of how a gym
15 operates and being critical of how staff is
16 trained, would it be crucial of how a staff trains
17 and orients children and first-time climbers to
18 actually go to the gym and see how it operates, see
19 how it's laid out, see the particulars of the
20 entire place before coming up with that opinion?
21         MR. WHITTEN:  Object to form.
22         THE WITNESS:  Not necessarily.
23 BY MR. HAZELTON:
24     Q   You don't think that that would be
25 helpful at all?

1      A   Not necessarily, no.
2      Q   Okay.  Do you ever visit the gyms in the
3  cases that you are retained where these incidents
4  occur?
5      A   If I'm requested to do a site visit, yes.
6      Q   How often would you say you are requested
7  to do a site visit?
8      A   I would say maybe one out of ten cases.
9      Q   Okay, so ten percent of the time,
10 roughly?
11     A   Roughly.
12     Q   And do you recall what the last site
13 visit you did was in one of these consulting
14 retentions?
15     A   I think the last -- the last ones that I
16 recall is I went to Salt Lake City to visit a
17 facility there, and I also went to one in -- near
18 Philadelphia, yes, and Delaware.  That one was not
19 too long ago, too.
20     Q   And did you visit the Altitude Trampoline
21 Park in North Carolina?
22     A   No, I have not been asked to do that.
23     Q   Okay.  Have you spoken with anyone --
24     A   Wait, I take that back.
25     Q   Sorry.

1      A   I did go to -- I did go go Gastonia and
2  meet with those attorneys.  This has been several
3  years.
4      Q   It looks like your retention was in 2019,
5  according to your case list.
6      A   I don't think I would have gone there if
7  I wasn't going to visit the site, so in that case,
8  I probably did visit.
9      Q   But you can't remember anything about the
10 visit?
11     A   Not off the top of my head.
12     Q   you don't remember what the gym looks
13 like, or, excuse me, the trampoline park looks like
14 or what the --
15     A   I've been to a bunch of trampoline parks
16 now, so I don't remember that one specifically.
17     Q   Do you consider trampoline parks that
18 have an indoor climbing wall to be -- to have the
19 same operations, procedures, as dedicated indoor
20 climbing gyms?
21     A   It depends on -- it depends on whether or
22 not there is overlap between what the climbing gym
23 does and what the amusement park does, but there
24 are enough similarities between the two that the
25 way that trampoline parks should operate their

1  climbing walls should still meet those minimum kind
2  of standards that exist in the climbing wall
3  industry.
4      Q   That are promulgated by the CWA?
5      A   Yes.
6      Q   Okay.  Do you recall what -- who the
7  manufacturer was of the auto belay in the Wu case?
8      A   I don't.
9      Q   Have you spoken with anyone other than
10 the attorneys in that case about that particular
11 incident?
12     A   Not that I recall.
13     Q   What is another one?  You said that there
14 were maybe five or six.
15     A   We're talking about kids that have been
16 hurt?
17     Q   Specifically from a failure to clip in a
18 the auto belay?
19     A   I can't come up with one off the top of
20 my head, no one.
21     Q   So the only one that you can think of is
22 that Wu case versus the trampoline park in North
23 Carolina?
24     A   There are definitely others, but I can't
25 remember them.

1    Q   I understand.  My question was the only
2  thing that you can remember here today is the Wu
3  case?
4    A   Yes.
5    Q   And I understand that it is an
6  estimation, but you estimate that there is about
7  five or six, including the case that we're here
8  about?
9    A   I think I said that it's fewer than ten
10  and probably five or fewer.
11    Q   Fewer than ten and probably five or
12  fewer?
13    A   Probably five.
14    Q   Including this case?
15    A   Yes.
16    Q   And that would be out of 60, it looks
17  like, that are listed here?
18    A   Yes.
19    Q   Okay.  This last case that is listed,
20  Marks versus Da Swamp in Louisiana where you were
21  retained on behalf of the defendant, what happened
22  in that case?
23    A   I don't remember.  Oh, wait, Marks.
24    Q   It's 2021.
25    A   oh, okay, yes.  That is a bouldering

1  injury.
2    Q   And is it at a climbing gym?
3    A   No.
4    Q   Where -- what is Da Swamp?
5    A   It is -- for lack of a better term, it is
6  a trampoline park.
7    Q   A trampoline park that has a climbing
8  boulder?
9    A   Yes.
10    Q   What are the claims in that case?  What
11  does the plaintiff say the defendant did wrong?
12    A   I don't know that I ever -- well, I don't
13  recall if I saw the Complaint on that one or not.
14  I don't think that I wrote a report.  They told me
15  that they settled that case, I believe, when I
16  asked about it at the end of the year.  I'm not
17  sure I did a whole lot with that one.
18    Q   You don't remember what the plaintiff
19  said that Da Swamp did wrong?
20    A   So the circumstances were -- it was a
21  grandmother and her granddaughter who were -- went
22  to this park, and the granddaughter encouraged her
23  grandmother to climb on this boulder.  Bouldering
24  is climbing not very far off the ground but without
25  any kind of rope or harness or anything, so if you

1  fall off, you land on a pad, a mat, and the woman
2  climbed up to the top of this bouldering wall and
3  slipped and fell off it and hurt herself somehow; I
4  don't remember, so I don't recall if they were
5  contesting, you know, how thick the padding was or
6  that they didn't inform this woman of the risks.  I
7  don't remember what exactly they were claiming.
8    Q   Well, you were retained on behalf of the
9  defendant?
10    A   Yes.
11    Q   After review of it, did you -- was it
12  your opinion that the defendant did or did not do
13  anything inadequate or inappropriate to cause the
14  circumstances that led to that fall?
15    A   Yes, I believe that it was my opinion
16  that they did not.
17    Q   Do you remember what specifically -- in
18  terms of how the claims related to the defendant's
19  actions, what specifically they did that was
20  adequate to make sure that something like a
21  grandmother climbing to the top of a bouldering
22  wall and falling off did not get hurt?
23        MR. WHITTEN:  I will object to the form.
24        THE WITNESS:  Well, you can't -- you
25  can't guarantee that somebody is not going to be

1  hurt.
2  BY MR. HAZELTON:
3    Q   In any case?
4        MR. WHITTEN:  Object to form.
5        THE WITNESS:  In any case, yes.  You can
6  do things to minimize the risk, but in this case, I
7  really don't remember what the -- what the
8  specifics were.
9  BY MR. HAZELTON:
10    Q   Other than the grandmother climbing to
11  the top of the wall?
12    A   Yes.
13    Q   And falling off?
14    A   Yes, mmm-hmm.
15    Q   Do you recall how bad she was hurt?
16    A   I don't -- I don't know.
17    Q   Do you recall whether the people at the
18  trampoline park had adequately trained staff to
19  teach something as dangerous as free climbing
20  boulders?
21        MR. WHITTEN:  Object to form.
22        THE WITNESS:  Well, first of all,
23  everything that we've talked about today is free
24  climbing, all of it, whether you are protected or
25  not, so I don't --

24 (Pages 90 - 93)

BY MR. HAZELTON:

1  Q   Well, when I use the term "free
2  climbing," I just mean not being attached to
3  anything.
4  A   Okay, well, that is incorrect, so if you
5  are going to ask me those questions, so I'm not
6  being -- I'm not trying to be a jerk about this,
7  but just like if you want to say that somebody is
8  climbing without treking, just say free solo, free
9  climbing just means that you are using only the
10 wall to climb.  You are not grabbing the equipment
11 to help yourself up a wall.
12 Q   Well, that was my understanding of what
13 you said happened to this grandmother.  She was not
14 using anything; she was just climbing it without
15 being attached to anything.
16 A   And free soloing has a different
17 connotation than bouldering which is typically
18 under a certain number of feet and height, and so
19 let's say under 12 or 14 feet of height, so free
20 soloing would imply that you are climbing to some
21 height greater than that.  Anyway, she was
22 bouldering, she had no safety equipment on, and
23 that was the -- there was no safety equipment
24 available because it was a bouldering wall so there

*(line numbering continues)*

1  weren't any -- there aren't any auto belay
2  mechanisms, there is no harnesses, there is none of
3  that.  There is a big pad underneath the wall that
4  you -- that if you fall off, you land on, so...
5  Q   Back to my question, though, did they --
6  did the people at the Da Swamp trampoline park have
7  staff adequately trained to give, whether it is an
8  orientation or training, to someone who had never
9  done that before when this happened?
10     MR. WHITTEN:  Object to form.
11     THE WITNESS:  I don't recall.
12 BY MR. HAZELTON:
13 Q   Would it have been your opinion that,
14 hey, this is dangerous, there's got to be a level
15 of personal responsibility here, you are
16 responsible for your own actions, not the
17 trampoline park?
18     MR. WHITTEN:  Object to form.
19     THE WITNESS:  And that is always my
20 position up to a certain point.
21 BY MR. HAZELTON:
22 Q   Up to what point?
23 A   Well, people who are new to climbing
24 don't understand the risks, so if you don't inform
25 them of the risks and provide certain levels of

1  safety protocol and equipment, then the facility is
2  not meeting their obligation on the -- to that
3  customer.
4  Q   What was the -- Da Swamp's obligation to
5  that grandmother for bouldering at the trampoline
6  park?
7      MR. WHITTEN:  Object to form.
8  BY MR. HAZELTON:
9  Q   What would it have been?
10 A   What is their obligation?
11 Q   What would their obligation to the
12 grandmother have been?
13 A   To provide an adequate impact attenuation
14 surface, to inform her of the risks involved in
15 bouldering it, to provide her some instruction in
16 how to get off of the -- off of the bouldering wall
17 in a less risky way, although in this case, she
18 fell so it wasn't like she had the opportunity to
19 climb back down; she slipped and fell off.  There
20 is a video of that, if I recall.
21 Q   And so I take it, then, it was your
22 opinion that they did all of those things?
23 A   That is what I recall, yes.
24 Q   Okay.
25 A   Again, I haven't -- it's been a while

1  since I reviewed this one.
2  Q   I understand.  Did they do anything other
3  than have her sign a waiver in terms of informing
4  her of the risks?
5  A   I don't remember.
6  Q   All right.  In 2020, there is a case,
7  Gregory versus Shelby Board of Education in
8  Tennessee; do you remember that?
9  A   I remember taking the case.
10 Q   You were retained by the Shelby Board of
11 Education?
12 A   Yes.
13 Q   Can you tell me as best as you can
14 remember what the claims were, what happened in
15 that case?
16 A   This one I don't recall at all.  I did
17 very little work on this.
18 Q   Did you ever get to the point where you
19 formulated an opinion?
20 A   I never -- I don't believe I ever wrote a
21 report for them.  I think I just consulted with the
22 county attorney once, maybe twice, and then they
23 settled it.
24 Q   Okay.  What about this case in
25 Pennsylvania, Mason versus Urban Air in 2020?  You

Page 98

1  were retained by a lawyer by the name of David
2  Shannon on behalf of Urban Air.
3      A   There is no address on that, either, just
4  for --
5      Q   It says Pennsylvania.
6      A   Right.
7      Q   And a contact phone number and his name
8  is David Shannon.
9      A   No, I don't recall that one.
10     Q   Do you recall 2017 in California, Carter
11  versus Nationwide Insurance and Lee versus
12  Nationwide Insurance, where you were retained by a
13  lawyer by the name of Craig Holtz on behalf of
14  Nationwide Insurance?
15     A   No.
16     Q   Cochran versus Slidell Rocks in 2017 in
17  Louisiana where you were retained by Eric
18  Vollenweider or "wider," depending on how you want
19  to pronounce it.  Do you recall that case?
20     A   None of the specifics, no.  I recall the
21  name.
22     Q   What do you recall generally?
23     A   Just his name.
24     Q   Okay.
25     A   An unusual name.

Page 99

1      Q   McConnell versus St. Johns Church in Iowa
2  in 2016 where you were retained by Daniel Polsby.
3  Do you remember that?
4      A   Yes.
5      Q   Tell me what you remember about that
6  case.
7      A   That is an auto belay case where the
8  Plaintiff put his harness on backwards and he
9  clipped the auto belay lanyard into a non-weight
10  bearing portion of the harness, climbed to the top
11  of the wall, let go, and the harness broke and he
12  fell to the floor.
13     Q   And injured himself?
14     A   Yes.
15     Q   And what was your opinion in that case?
16     A   We have -- the defendant is a church; the
17  defendant was a church, and this is like
18  recreational little facility that they had with
19  billiards and ping-pong and they invited troubled
20  teens there.  The plaintiff was an instructor or
21  counselor who had taught one previous session, I
22  believe that it was, a while before he showed up
23  for this session, waived having any supervision
24  there, waved off the -- the supervisor of the
25  facility who then wasn't present, and he put on his

Page 100

1  harness backwards.
2      There was a kid there who, if I remember
3  right, kind of warned him about that, asked if it
4  was on right, and there was also movable padding
5  that they failed to put out under the climbing wall
6  before anybody climbed as well, so he essentially
7  fell, I don't know, 20 feet to a concrete floor.
8  My -- I think my opinion for the -- for the defense
9  was that I don't -- I don't remember the specifics,
10  but there were some problems with, obviously, some
11  problems with their defense in this case, that
12  maybe the instruction wasn't adequate.
13     They didn't -- the church didn't provide
14  any supervision when they should have, so I -- I
15  think that case got settled pretty quickly, but I
16  don't think -- I'm not sure I even wrote a report
17  in that one.
18     Q   So was it your opinion -- did you convey
19  to St. Johns Church when you were retained -- did
20  you convey to them that all those things that they
21  did were inadequate, and yes, it was in fact their
22  fault that this happened?
23     A   No, I think that is too strong.  There
24  were some things they should have been better, but
25  it wasn't completely their fault, and I don't

Page 101

1  remember if Iowa is, and you all can correct me,
2  but, you know, a state where there is -- where you
3  can be partially responsible for your own
4  injuries.  I don't remember how that worked out
5  there, but there were some things that they should
6  have done better, but it wasn't completely their
7  fault that this guy was injured.
8      Q   So it would have been the plaintiff's
9  fault?
10     MR. WHITTEN:  Object to form.
11     THE WITNESS:  To some extent, yes.
12  BY MR. HAZELTON:
13     Q   Okay, so your opinion, had you been asked
14  to give one, whether in a deposition or trial,
15  would have been that it was both of their faults?
16     A   Yes.
17     Q   And you did or did not write a report in
18  that case?
19     A   I don't remember, but I don't -- I don't
20  think so.
21     Q   Were you deposed?
22     A   No, not in that one.
23     Q   Have you ever given testimony, whether
24  deposition, trial, or otherwise, where as a result
25  of failing to clip in and an injury, it was your

26 (Pages 98 - 101)

1 opinion that it was the plaintiff's fault for --
2 the injuries were the plaintiff's fault; they
3 contributed to their own injuries because they are
4 the ones ultimately responsible for making sure
5 they use the equipment correctly?
6        MR. WHITTEN: Object to form.
7        THE WITNESS: You will need to repeat the
8 first part of that question.
9 BY MR. HAZELTON:
10    Q   Sure. Have you ever given an opinion
11 whether in deposition testimony or trial testimony
12 where it was your opinion that a Plaintiff's
13 injuries were the result of their own failure to
14 clip in and to use the equipment correctly?
15    A   No.
16    Q   Okay. Have you ever given the opinion
17 that it is the plaintiff's -- that it was the
18 plaintiff's responsibility to make sure they were
19 safely clipped in when using the facility, and
20 because they did not safely use the facility, they
21 were injured?
22    A   Repeat that for me, please.
23    Q   Have you ever given the opinion that it
24 is the plaintiff's responsibility to safely use the
25 equipment and the facility, and because they did

1 not, they were injured?
2    A   I don't believe so.
3        MR. WHITTEN: Objection.
4 BY MR. HAZELTON:
5    Q   Have you ever in any form had the opinion
6 that the user of the equipment was ultimately
7 responsible for their own injuries?
8        MR. WHITTEN: Object to form.
9        THE WITNESS: In a case that I've worked
10 on?
11 BY MR. HAZELTON:
12    Q   Yes.
13    A   I don't believe so, but I don't know for
14 sure.
15    Q   What about in the Louisiana case that we
16 talked about earlier with the grandmother, and that
17 was bouldering, was it not your opinion that it was
18 her responsibility to have climbed the boulder
19 safely, and because she slipped, it is not the
20 responsibility of the trampoline park?
21        MR. WHITTEN: Object to form.
22        THE WITNESS: Well, I thought your
23 question before was so in that -- in that case,
24 given that she was provided the right information
25 about the risks involved, then it is her

1 responsibility to use the facility in a way
2 appropriate for her.
3 BY MR. HAZELTON:
4    Q   So, i.e., don't hurt yourself?
5    A   Well, if she wants to hurt herself, that
6 is on her, right?
7    Q   But if she does get hurt, like you said,
8 it's on her?
9    A   As long as -- in that particular case --
10    Q   As long as she knew it was dangerous and
11 that was a potential outcome?
12    A   There is a little bit more to it than
13 that, but in that particular case, in that specific
14 case where I think that I looked at what kind of
15 padding was available and maybe how she was treated
16 before being allowed to get on the climbing wall,
17 then yes, but in many of these cases, that is
18 not -- that is not what -- that is not the case.
19 People aren't informed or the safety equipment is
20 inadequate.
21    Q   No, I understand why there is -- in many
22 of these cases, it seems like out of 60, there is
23 maybe four that you've been retained on behalf of
24 the defendant and the rest plaintiffs; does that
25 sound right?

1    A   I don't have a count, but it is more
2 plaintiffs than defendants for certain.
3    Q   And my question was, wasn't the majority
4 of them -- my question was have you ever had that
5 opinion and testified that it was the
6 responsibility of the climber to use the equipment
7 safely and adequately, and if they become hurt,
8 it's because of their own user error or because
9 they did not use it responsibly?
10        MR. WHITTEN: Object to form.
11        THE WITNESS: And I think my answer was
12 I've not testified to that.
13 BY MR. HAZELTON:
14    Q   Have you ever held that opinion?
15        MR. WHITTEN: Object to form.
16        THE WITNESS: In a case?
17 BY MR. HAZELTON:
18    Q   Yes.
19    A   Yes, we just talked about one.
20    Q   Okay.
21    A   We just talked about two.
22    Q   We did, we talked about two, and it is my
23 understanding that you did not provide testimony,
24 deposition, affidavit, trial or otherwise, to that
25 effect?

27 (Pages 102 - 105)

Page 106

1    A   Correct.
2    Q   Have you ever written a report regardless
3  of whether testimony has been given that held that
4  opinion?
5    A   I don't believe so, but I don't know for
6  sure.  If those -- if those couple that we talked
7  about, whether or not I -- I'm not sure if I wrote
8  a report for either one of those.
9    Q   Do you remember in 2015 Bean versus State
10  of Iowa where you were retained by someone named
11  Ms. Updegraff?
12    A   No.
13    Q   The case that we're here about today, is
14  this the first case that you've been retained in
15  Alabama?
16    A   I believe that it is.
17    Q   And have you ever been disqualified as an
18  expert by any of these courts in any of these
19  cases?
20    A   No.
21    Q   Have you ever had your opinion
22  challenged, if you know?
23    A   What does that mean?
24    Q   It means has anyone, an opposing side,
25  challenged the reliability or sufficiency of your

Page 107

1  opinion, that it wasn't based on accepted
2  scientific method or reliability or sufficient
3  facts and data in order to allow it to be presented
4  to a jury?
5    A   Not that I --
6    Q   If you know.
7    A   I don't think so.
8    Q   What we had talked about earlier with the
9  basically three sort of main things that you
10  contend are adequate measures by facilities to
11  inform and provide as safe as possible -- or as
12  risk mitigating as possible for the climbers, i.e.,
13  the waiver, the postings, the orientation, whether
14  live or by video, assuming that a climbing facility
15  does all of those things and does all of those
16  thing adequately and a person still gets hurt, can
17  it ever be the fault of, if anyone, of anyone other
18  than the facility?
19        MR. WHITTEN:  Object to form.
20  BY MR. HAZELTON:
21    Q   Is there ever a case of climber error
22  that causes an injury?
23    A   Yes.
24        MR. WHITTEN:  Object to form.
25  BY MR. HAZELTON:

Page 108

1    Q   Is there ever a case of inadequate
2  supervision by an adult of a child that causes an
3  injury?
4        MR. WHITTEN:  Object to form.
5        THE WITNESS:  I suppose; I don't -- yes,
6  I suppose there could be.
7  BY MR. HAZELTON:
8    Q   Well, I mean, you wrote a book about
9  operation and risk management for artificial
10  climbing wall facilities, and in it, you talk a lot
11  about steps that are needed, whether it's
12  supervisory, whether it's training, whether it's an
13  orientation, whether it's some sort of informed
14  consent, because we can all agree that this
15  activity not only can be but is dangerous, and the
16  idea is it mitigate that risk as much as possible
17  by implementing certain procedures; is that fair?
18        MR. WHITTEN:  Object to form.
19        THE WITNESS:  And equipment.
20  BY MR. HAZELTON:
21    Q   And equipment, sure, and so what I'm
22  wondering is, given the risks that are involved,
23  the inherent risks that are involved, surely you
24  would agree that there are situations where a
25  facility can do everything right and someone can

Page 109

1  still unfortunately become hurt?
2    A   Yes, that is certainly possible.
3    Q   Okay.  Have you ever held an opinion in a
4  case where you have been retained?
5        MR. WHITTEN:  Object to form.
6        THE WITNESS:  Possibly when I have been
7  retained by the defense.
8  BY MR. HAZELTON:
9    Q   Have you ever been -- well, let me ask
10  you this way.  Have you ever been retained by the
11  defense and you told them, you don't want my
12  opinion, you all messed this up?
13    A   If that was the case, then I wouldn't
14  take the case.  I've turned down cases where I
15  couldn't -- where I would not have been of any help
16  to them because my opinion was counter to what
17  their claim was.
18    Q   Have you turned down cases on the
19  plaintiff's side?
20    A   Yes, absolutely.
21    Q   And have you turned down those cases on
22  the defense side?
23    A   I don't -- I don't recall if I've --
24  because obviously, I get more calls from
25  plaintiffs' attorneys than defense, so I don't

28 (Pages 106 - 109)

1  remember if I've turned anybody down on the defense
2  side.
3      Q   Why is it obvious that you get more calls
4  from plaintiffs?
5      A   No, I'm saying that it is obvious based
6  on my case list that I get more.  It's obvious that
7  the case list shows that I have more plaintiffs
8  than defendants, not that it's obvious that
9  plaintiffs -- that I would -- that I would attract
10  more plaintiffs' calls.
11      Q   Well, it's definitely obvious that you
12  do, it looks like, 90 percent or maybe 85 percent
13  of the work for plaintiffs, but the case list is
14  not obvious to me that you get way more calls from
15  plaintiffs; those just happen to be the cases that
16  you take, and that was the -- I just wanted to
17  clarify that, which was why I asked the question of
18  whether you got calls from the defense side ever
19  and said no, I can't take this because you did X,
20  Y, and Z wrong?
21      A   No, I think that the proportion of cases
22  that you see there reflects the proportion of calls
23  that I receive.
24      Q   All right.
25      A   It's not like I get a lot of calls from

1  defense attorneys and turn them all down.
2      Q   Okay, I understand.  Does personal
3  responsibility play a factor in indoor climbing?
4          MR. WHITTEN:  Object to form.
5          THE WITNESS:  Yes.
6  BY MR. HAZELTON:
7      Q   And recently, it looks like you were
8  retained by an attorney, John Parese, in
9  Connecticut, and you don't know the name of the
10  defendant, but the plaintiff's name is Maloney.  Do
11  you know what that case is about?  It has a
12  question mark by it, and the reason that I ask is
13  because I want to know who the defendant was, and
14  it was fairly -- it was, you know, this past year,
15  so I thought that maybe you would remember.
16      A   I don't.  It's -- sometimes an attorney
17  will retain me and then I don't hear from them for
18  months, maybe never hear from them again, so I
19  don't recall what that is about.  They are on the
20  case list if I get a consulting -- a signed
21  Consulting Agreement from them.
22      Q   And this isn't color coded.  I mean at
23  some point it was, but the bottom it says, "Blue
24  equals deposition testimony, red equals trial
25  testimony"?

1      A   Right.
2      Q   And obviously, I can't tell from this
3  what is red or blue?
4      A   The digital file is color.
5      Q   What portion of these were either red or
6  blue or were they all either red or blue?
7      A   No, the vast majority of them are not
8  either red or blue.
9          MR. WHITTEN:  Jeremy, we did send.
10          MR. HAZELTON:  I'm sure I saw it.
11          MR. WHITTEN:  The electronic version does
12  have the red or blue.
13  BY MR. HAZELTON:
14      Q   I think that maybe I can tell by the
15  grayed out parts that some of these are red or
16  blue, and I apologize.  This can go a lot quicker.
17  This looks like a testimonial case in 2020, Hogan
18  versus Illinois Wesleyan, where you were retained
19  by Larry Smith; do you recall that case?
20      A   Yes.
21      Q   If you could briefly tell me about the
22  facts of that?
23      A   It was a college student, Hogan, who was
24  attending a series of classes, climbing classes for
25  credit taught by the local climbing gym.  What is

1  the name of the climbing gym?  Is it on there.
2      Q   It just says Illinois.
3      A   Oh, that is the school, right.  That is
4  the school.  I can't remember the name of the
5  facility, but anyway, he was in the class, his
6  belayer failed to lower him properly, dropped him
7  to the ground and he was injured.
8      Q   And were you critical of the university
9  for failing to train his belayer appropriately?
10      A   Really, the lawsuit focused on the
11  facility, and I can't remember the name of the
12  facility, but they --
13      Q   Okay.  Well, the facility failing to
14  adequately train the belayer --
15      A   Yes.
16      Q   -- is that what this was?
17      A   That is what it hinged on mostly, yes.
18      Q   Do you know what the outcome of that was?
19      A   I do.  The -- the attorney, Mr. Smith,
20  said that -- because that went to trial; I did
21  testify in a trial in Bloomington, Illinois, and
22  the -- the defendant won the case.  The attorney
23  said based on the waiver form, mostly.
24      Q   You testified live at trial in that case?
25      A   Yes.

Veritext Legal Solutions
877-373-3660                                                    800.808.4958
EXHIBIT 3 - 000029

Page 114

1    Q   Okay.  What about Vandivere versus
2  Vertical World in Washington?  Andrew Ulmer was the
3  lawyer.
4    A   Is that grayed out on there?
5        MR. WHITTEN:  I will add that it's blue
6  in the pdf.
7  BY MR. HAZELTON:
8    Q   Okay.  I wish that I had caught that
9  because I would have -- you know, and for the
10  Record, my understanding of the Federal Rule 26 is
11  that it's only a case list of deposition or trial
12  testimony, so that is why I assumed that these were
13  all cases that you had given testimony in, but
14  anyway, Vandivere versus Vertical World?
15    A   That is a deposition.
16    Q   Okay.  Do you recall the facts of that
17  one or the gist of the claim?
18    A   That is an auto belay where the -- where
19  it -- the case mostly hinges on the lack of
20  training in the use of auto belay that Mr.
21  Vandivere received.
22    Q   Was it a failure to clip in?
23    A   Yes -- well, let me think about this just
24  a second.  I think that in that case, he attempted
25  to clip in but came unclipped at the top of the

Page 115

1  route and didn't realize it, so he never -- in all
2  likelihood never got completely clipped and that
3  the carabiner attaching him to the lanyard wasn't
4  fully closed and somehow came off his harness.
5    Q   And he let go and fell?
6    A   Correct.
7    Q   Do you know the outcome of that case?
8    A   I think that one is still ongoing.  I
9  haven't heard that it's concluded.
10    Q   And is that one where you were critical
11  of Vertical World for a training failure or was it
12  an equipment failure or was it multiple?
13        MR. WHITTEN:  Object to form.
14        THE WITNESS:  I think that one is mostly
15  to do with training.
16  BY MR. HAZELTON:
17    Q   Okay.  Do you recall what aspect of the
18  training you were critical of?
19    A   That he didn't receive any.
20    Q   He received none?
21    A   None.
22    Q   Okay.  No orientation of any kind?
23    A   I don't remember if he -- no, there was
24  an orientation, but -- yes, the strange thing about
25  Vertical World is unless you pass their standard

Page 116

1  belay test, you don't get the instruction on the
2  auto belay.  It is kind of a weird sequence.
3    Q   So he received no instruction on the auto
4  belay?
5    A   My recollection is that he received none,
6  yes.
7    Q   Okay.  Harvey versus Glowzone in
8  California hired by Dan Johnson?
9    A   Harvey versus Glowzone...yes, I remember
10  that one.
11    Q   Okay.  Tell me what you can remember
12  about that.
13    A   That is a group of adults that went for
14  one of the -- one of the adults, and I don't
15  remember if it was Harvey or not, but one of the
16  adults was having a birthday party at an indoor
17  recreation facility, and they had an auto belay
18  climbing wall.  He failed to clip in, went up the
19  wall, and dropped off.
20    Q   And what aspect of Glowzone were you
21  critical of in that case?
22        MR. WHITTEN:  Object to form.
23        THE WITNESS:  I don't remember.  I think
24  that -- I don't remember.
25

Page 117

1  BY MR. HAZELTON:
2    Q   Okay.
3    A   That one has been a while.
4    Q   So you don't remember whether it was
5  training or equipment or information about the risk
6  or anything like that?
7    A   I don't.  I don't remember.
8    Q   Healy versus Santa Fe Climbing Center.
9  Steve Marshall is the lawyer in New Mexico.  Do you
10  recall that?
11    A   Say the name of the facility.
12    Q   Santa Fe Climbing Center.
13    A   No, I don't remember that one.
14    Q   Where you gave testimony?
15    A   It would have been a deposition, but I
16  don't remember that.
17    Q   How many trials have you testified in?
18    A   Three.
19    Q   Okay.  Well, we talked about one of them
20  which was the Illinois?
21    A   Hogan, right.
22    Q   Wesleyan.  Tell me the other ones and
23  then I will be done with this, because those seem
24  to be the ones, understandably so, that you
25  remember the best.

30 (Pages 114 - 117)

Page 118

1    A   Well, let's see.  There was one in
2  Buffalo, New York.  The accident occurred in New
3  Mexico, but the lawsuit was in New York.  That
4  is --
5    Q   Do you recall about what year?
6    A   It goes back.  I don't remember the name
7  of it.  I think that it was -- the defendant might
8  have been Marriott.
9    Q   Sansone versus Marriott?
10   A   Yes.
11   Q   This is in Phoenix, Arizona?
12   A   Right.
13   Q   But it was in New York?
14   A   The trial was in Buffalo, yes.
15   Q   Okay.
16   A   Because I think that is where --
17   Q   Where the plaintiff lived?
18   A   Yes.
19   Q   Okay, and so then tell me, if you would,
20  sort of quickly the gist of the claims and what
21  your opinions were.
22   A   Yes, that was -- Marriott had a
23  bouldering wall in there as a part of their fitness
24  room.  It was only, I don't know, eight feet tall
25  or something and on a vertical wall, and if I

Page 119

1  remember right, Sansone was an older woman and
2  she -- and she was encouraged by staff to do the
3  bouldering.  They had -- they barely had any
4  padding on the floor and they didn't give her
5  really any training; they just told her to try it,
6  and she went up and fell off and hurt herself.
7    Q   In what way is that different than the
8  older lady in Louisiana who had no training and
9  climbed up the bouldering wall and fell?
10       MR. WHITTEN:  Object to form.
11  BY MR. HAZELTON:
12   Q   Was it because the staff encouraged the
13  lady in Sansone?
14   A   Yes, and --
15   Q   Was that the main difference?
16   A   And the fact that they had I think half
17  an inch or an inch of padding is all they had on
18  the floor at the Marriott.  Da Swamp, if I remember
19  correctly, had adequate padding.
20   Q   Okay.  Well, what was the other trial?
21   A   That is -- that is --
22       MR. WHITTEN:  I can short-circuit if you
23  want to.  I've got it pulled up, 2008, Keeter
24  versus Alpine Towers on the next page.
25       THE WITNESS:  Right.

Page 120

1       MR. WHITTEN:  That is the only other
2  one.
3       THE WITNESS:  South Carolina?
4  BY MR. HAZELTON:
5    Q   Yes.  Tell me what the circumstances were
6  of that claim.
7    A   This was a high school in South Carolina
8  where Alpine Towers had constructed a ropes course
9  with a climbing wall on one side.  The junior ROTC
10  at the high school used this and they were having
11  like a spring outing day, something like that,
12  where kids in the junior ROTC can try the climbing
13  wall belayed by kids that were part of junior ROTC,
14  and the plaintiff was climbing and he either fell
15  off or let go to be lowered to the ground.  The
16  belayer dropped him to the dirt.  There was no
17  padding; it was an outdoor ropes course, and he was
18  paralyzed.
19   Q   And Alpine Towers was the manufacturer of
20  the course or --
21   A   Alpine Towers had erected the course and
22  also provided the training to the high school, to
23  the junior ROTC supervisors.  They had provided all
24  of the equipment, and the case hinged on the use of
25  a particular belay device that Alpine Towers had

Page 121

1  provided to the high school and not told them about
2  a -- a more advanced belay device that would have
3  prevented this accident.
4    Q   Out of the handful of minor auto belay
5  clip-in failures that you have been retained in, is
6  the one we're here about today the only one so far
7  that you've given any testimony?
8    A   I don't know.  Have we been through all
9  of the blue?
10   Q   You said that there was three, and I'm
11  taking your word for it.
12       MR. WHITTEN:  No, three reds which is
13  trial testimony.
14       THE WITNESS:  No, three reds for trial.
15  The blue ones are --
16  BY MR. HAZELTON:
17   Q   That is really what I want to know, Dan.
18  I want to know about the testimony in cases where
19  at least some of it in terms of how it happened is
20  similar to what we're here about today.  All of
21  this other stuff, you know, we can short-circuit
22  this, and I understand that you've been doing this
23  a lot and for a long time, and there is a ton of
24  them here and it's not easy to remember as we sit
25  here today.  Do you see any more blue ones?

31 (Pages 118 - 121)

1        MR. WHITTEN:  I'm counting; there are
2   eight total blue ones.
3   BY MR. HAZELTON:
4        Q   How about Ellis versus Lifetime Fitness
5   in Texas in 2011; do you recall that?  You were
6   retained by Andrew Sommerman.
7        A   No, I don't remember that one.
8        Q   Pichardo versus The Cornerstone of
9   Recovery in Tennessee; Joseph Ballard was the
10  lawyer?
11       A   No.
12       Q   Langoni versus Climb-Max, Inc. in
13  Louisiana; Thomas Buck was the lawyer?
14       A   No.
15       Q   And that looks like it is a blue one, or
16  a red or blue one, where you were retained by
17  Climb-Max on behalf of the defendant.  That doesn't
18  ring a bell?
19       A   No.  Where was that again?
20       Q   Louisiana?
21       A   No.
22       Q   It is a 504 Area Code which I'm guessing
23  is New Orleans?  I think that it is New Orleans.
24  Not ringing a bell?
25       A   No.

1        Q   As we sit here today, are there any bells
2   ringing where you have been retained by a defendant
3   and given deposition or trial testimony on behalf
4   of a defendant?
5        A   I don't believe I have.
6        MR. HAZELTON:  What color, Austin, is
7   that?
8        MR. WHITTEN:  If it doesn't say
9   otherwise, it's 2007 Peterson versus Ibex Gym where
10  he gave deposition testimony.
11       THE WITNESS:  Oh, that goes back a ways.
12       MR. WHITTEN:  Yes, and then also the 2010
13  Langoni versus Climb-Max was deposition testimony
14  as well.
15       THE WITNESS:  Okay.
16       MR. HAZELTON:  On behalf of a defendant?
17       MR. WHITTEN:  On behalf of a defendant.
18  BY MR. HAZELTON:
19       Q   Do you recall that case at all?
20       A   I recall the Ibex case but not the
21  Langoni case.
22       Q   Okay, tell me about the Ibex case, then,
23  Peterson versus Ibex Gym in Kansas City.
24       A   Wait, am I remembering the -- yes, I
25  think that is right.  If it's the one that I

1   remember, then it was a belay failure.  This is not
2   an auto belay; it is a failure of a belayer,
3   dropped the climber.
4        MR. HAZELTON:  All right.  Let's take a
5   break and then we'll get into your report and then
6   we will be done.
7        (Off the Record.)
8   BY MR. HAZELTON:
9        Q   Dan, we just took a break, and you
10  realize that you are still under Oath, correct?
11       A   Yes.
12       Q   I wanted to talk now about the report
13  that you issued in this case that delineates the
14  scope of your opinions, and I will -- and do you
15  have notes without scribbles?  Do you have a clean
16  copy of this report --
17       MR. WHITTEN:  I do.  Let me make sure
18  that it is a clean copy.
19       MR. HAZELTON:  -- that I can use as an
20  Exhibit.  Yes?
21       MR. WHITTEN:  Yes.
22       MR. HAZELTON:  Thank you.
23       MR. WHITTEN:  Sure.
24       MR. HAZELTON:  Dan, I will mark this as
25  Number 6, your report, as Defendant's Exhibit

1   Number 6.
2        (The document was marked as Hague
3        Defendant's Deposition Exhibit Number 6.)
4   BY MR. HAZELTON:
5        Q   And I will ask you to take a look at it
6   just to make sure that you can confirm that that is
7   the report that you drafted and issued in this case
8   that contains the entirety of your opinions.
9        A   Yes, that is it.
10       Q   All right, and on the very first page
11  when you say, "In formulating my opinion, I
12  reviewed and/or relied on the following documents
13  provided by your office," and "The opinions
14  provided in this report are to a reasonable degree
15  of rock-climbing professional evaluation certainty,
16  incorporating the accepted standards of care for
17  operations similar to that of the Defendants."
18  Those standards of care noted in that paragraph
19  that I just read, would those be the standards
20  delineated by the CWA?
21       A   Partially.
22       Q   And what would the other ones be?
23       A   Common use.
24       Q   Well, I don't know what that means.
25       A   That means that there are policies and

32 (Pages 122 - 125)

Page 126

1  procedures and safety equipment used commonly in
2  the climbing wall industry that are not referenced
3  in the CWA standards.
4      Q   Give me a "for example."
5      A   CWA does not specify the type, density,
6  or thickness of any impact attenuation surface, so
7  according to their standards, it would be adequate
8  to have -- it would meet their standard to have an
9  inch of -- an inch of padding, a tumbling mat,
10  underneath a bouldering wall.  That is not
11  adequate.
12      Q   That makes sense.  Let me make it
13  easier.  I think that it will be helpful.  As far
14  as your opinions in this case, are there any things
15  defined by the standard of care in that paragraph
16  that fall outside of the CWA standard?
17      A   Yes.
18      Q   Okay.  What are those?
19      A   CWA does not reference in their -- in the
20  2007 industry practices, they don't reference
21  anything about auto belay gates as an example.
22  There is nothing in there about securing the bottom
23  of the route against, you know, unprotected
24  climbers.  It doesn't refer to anything like that.
25      Q   Securing the bottom of the route?

Page 127

1      A   And those belay gates are used almost
2  universally.
3      Q   Maybe -- I mean, let me narrow it down
4  even further, if I could.  The accepted standard of
5  care for operations that is referred to in this
6  paragraph on the first page, is there anything that
7  you are critical of that my client did that fell
8  outside of the CWA accepted standard of care?
9      MR. WHITTEN:  Object to form.
10      THE WITNESS:  You are asking if I think
11  that they violated any of the standards?
12  BY MR. HAZELTON:
13      Q   No, no, you are right.  I'm glad you said
14  that, because that was -- that is not what I meant,
15  so I'm glad that you pointed that out.  What I mean
16  is the standards of care that encompass what you
17  are critical of in this case, are those the
18  standards of care promulgated by the CWA or are
19  there other standards of care not addressed by CWA
20  directly related to what you are critical of what
21  my client did in this case?
22      A   So you are -- so you are asking, did I --
23  do I see something they -- that I think that they
24  did wrong that is not addressed by the CWA?
25      Q   Because my understanding is you are not

Page 128

1  critical of any mats or anything like that, and you
2  gave that as an example of something that the CWA
3  does not address.  What I want to know is what you
4  are critical of if they all fall within the CWA
5  standard of care or if there are other ones.
6      A   Well, Item Number 3 is -- is outside of
7  what the CWA specifics, also Item 4.  It doesn't
8  address -- like the CWA standards don't address
9  distractions.
10      Q   Maybe it would be better, as we go
11  through those items, we can just do it that way.
12      A   Okay.
13      Q   And then below that, you list everything
14  that you reviewed and/or relied on in formulating
15  your opinion.  Is there anything not within this
16  list of one, two, three, four, five, six, seven,
17  eight, nine items provided to you by Plaintiff's
18  counsel and then the two other outside periodicals
19  that you have reviewed that is not listed here; is
20  there anything not listed here that you reviewed
21  and/or relied on in formulating your opinion?
22      A   Well, the only other thing that I
23  reviewed but didn't really have an impact on my
24  opinion are -- well, I will just say no, no, there
25  is not.

Page 129

1      Q   Okay.
2      A   There is not.
3      Q   But you did review other -- it sounds
4  like you did review other materials, but it didn't
5  have an effect one way or the other on your
6  opinion?
7      A   I was thinking of the website, but it
8  doesn't really -- I saw plenty of pictures within
9  the Exhibits that are included in this anyway,
10  so...
11      Q   All right, so I won't go through your
12  history.  Are these photos contained within your
13  report, are these taken directly out of your book,
14  if you know?
15      A   I don't know.
16      Q   What about on Page 5 the bottom photo
17  depicting someone auto belay climbing; do you know
18  what that is from, what gym?
19      A   No. That looks like an add for TruBlue,
20  though.
21      Q   And the next page talks about bouldering;
22  the next page talks about belay devices.  Can we
23  agree that the information about bouldering, belay
24  devices, top road climbing, lead climbing doesn't
25  have any bearing one way or the other on what we're

33 (Pages 126 - 129)

Page 130

1 here about to discuss in this case?
2    A   Yes, we can agree on that.
3    Q   Okay.  That way I can skip and we don't
4 have to talk about that or the padding; you are not
5 critical of any of the padding at my client's
6 facility, are you?
7    A   No.
8    Q   All right, in your Brief Summary of Facts
9 in the Case at the top of Page 9, did you write
10 that yourself?
11   A   Yes.
12   Q   Based on the information provided to you
13 by Mr. Whitten?
14   A   Yes, that, and -- mostly, but whatever
15 documents and information he sent me; is that what
16 you are saying?
17   Q   That is what I'm asking.
18   A   Yes, the information in whatever form
19 would have come from Mr. Whitten.
20   Q   And when you say, "Ms. Kornegay had never
21 visited an HPC facility or participated in any form
22 of rock climbing prior to this date," where would
23 you have gotten that information?
24   A   Somehow from Mr. Whitten.
25   Q   Or from the Complaint, maybe?

Page 131

1    A   Quite possibly.  It would have come from
2 Mr. Whitten.
3    Q   Okay, sure.  About a little bit more than
4 halfway down the second paragraph in the Brief
5 Summary of Facts in this Case, this sentence begins
6 "The safety guard in place known as a belay gate
7 was inadequate to prevent her accessing the
8 climbing wall."  In what way was it inadequate and
9 how did you come to that particular opinion?
10   A   I would think that would be self
11 explanatory, but okay.  If you can access the holds
12 and get on the climbing wall, then it's inadequate
13 to prevent you from getting on the climbing wall.
14   Q   Okay, so it is your opinion, then, that
15 the only adequate belay gates would be large enough
16 to prevent anyone from accessing any of the holds
17 on the wall?
18       MR. WHITTEN:  Object to form.
19       THE WITNESS:  So there is two ways that
20 you could go about this.  One is you produce a
21 belay gate that covers all of those starting holds,
22 or Two, you set your route so that the starting
23 holds fall under whatever belay gate you are using,
24 so HPC did neither of those things.
25 BY MR. HAZELTON:

Page 132

1    Q   So in order to have an adequate belay
2 gate, it either has to be large enough to cover
3 every hold that you could possibly start on, or the
4 only holds available to start are the ones behind
5 the belay gate?
6    A   Yes, that is my opinion.
7    Q   Okay, so any other belay gates configured
8 in any other way are inadequate in your opinion?
9    A   If you can climb around the belay gate,
10 then yes, they are inadequate.
11   Q   Were the belay gates -- was it your
12 opinion that the belay gates at -- whether it
13 was -- I forgot the name of your first facility,
14 Sportrock -- was it Sportrock?  Was that the name
15 of it, your first gym?
16   A   Yes.
17   Q   Was it your opinion that the belay gates,
18 whether it is at Sportrock or Rise Up, the gyms
19 that you owned, were all adequate?
20   A   Your assumption is that we had auto belay
21 devices at those gyms.
22   Q   Okay, assuming that you had auto belay
23 devices at those gyms, did the belay gates that you
24 had meet those criteria that in your opinion would
25 be the two criteria to make it an adequate belay

Page 133

1 gate?
2       MR. WHITTEN:  Object to form.
3       THE WITNESS:  Well, there weren't any in
4 my tenure at Rise Up; there were not auto belay
5 devices.  At Sportrock, the -- we had auto belay
6 devices for a short period of time but there was no
7 such thing as a belay gate when these were
8 installed, and they were removed prior to those
9 devices being invented.
10 BY MR. HAZELTON:
11   Q   There are no auto belay devices at Rise
12 Up?
13   A   There are currently, not when I ran the
14 gym, no.
15   Q   When were those installed?
16   A   I think within the last couple of years.
17   Q   Would there be -- well, let me ask you
18 this.  Would there be -- sorry, I'm trying to think
19 of a less confusing question here.  I think I know
20 what I want to do.  All right, I'm going to refer
21 to your book where there are some photos.
22 Specifically on Page 48, there is a photo where you
23 discuss auto belays, and on the photo, you say,
24 "auto belay barrier."  Do you know what gym this
25 photo is from?

34 (Pages 130 - 133)

Page 134

1    A   It looks like -- it looks like Rise Up.
2    Q   Okay.  Does that look like an auto belay
3  gate on Page 48 of your book at Rise Up?
4    A   After I stopped managing the gym.
5    Q   Well, this book was written prior to
6  2019, correct?
7    A   I don't know when the pictures were
8  taken, though.  They might have been taken very
9  late in the process of putting the book together.
10   Q   The copyright on this book is 2019.
11   A   Yes.
12   Q   Copyright 2019, Dan Hague.  You were at
13  Rise Up through 2019, correct?
14   A   I was -- I should probably clarify the
15  Rise Up sale, so the actual -- so the -- the
16  operation of the gym, the business entity of Rise
17  Up Climbing as opposed to the ownership of the
18  facility was -- I guess that you could call it
19  sold; when I became ill, I turned that over to my
20  son-in-law, and I think that I mentioned that he
21  was managing the gym.  It was his -- his to do with
22  what he wanted at that point, so the -- so the --
23  we -- we did paperwork providing him ownership of
24  the business entity and I retained ownership of the
25  facility, meaning that I owned the building, but it

Page 135

1  was his operation.
2    Q   Well, Dan, when we were talking about
3  that earlier, you had said that you were in your
4  capacity as president and that you managed it all
5  the way up until the time that you sold it.
6    A   I had input.
7        MR. WHITTEN:  Object to form.
8  BY MR. HAZELTON:
9    Q   Can we agree that there was an auto belay
10  gate at Rise Up in 2019?
11   A   Yes.
12   Q   And can we agree that this to photo of
13  this auto belay gate at Rise Up on Page 48 of your
14  book is right next to the section discussing best
15  practices of auto belays?
16   A   Yes.
17   Q   And can we agree that this auto belay
18  gate that is at Rise Up, a gym that you owned, on
19  Page 48 of your book where it discusses best
20  practices of auto belays does not cover up the
21  holds to prevent someone from climbing that wall
22  without attaching to the auto belay?
23       MR. WHITTEN:  Object to form.
24       THE WITNESS:  On the contrary, I think
25  that belay gate actually does make it difficult to

Page 136

1  start those climbs.
2  BY MR. HAZELTON:
3    Q   Then we can agree, Dan, that your
4  testimony earlier was that, in order to be
5  adequate, it had to completely cover up any
6  available holds or the only holds that were
7  available had to be behind the gate?
8        MR. WHITTEN:  Object to form.
9        THE WITNESS:  Well --
10  BY MR. HAZELTON:
11   Q   Was that your testimony?
12   A   Then let me clarify.  The belay gate has
13  to cover enough of the holds to prevent somebody
14  from getting onto the climbing wall.  I think that
15  that belay gate shows that it basically does.  It's
16  covering the hold at the base of the climb.
17   Q   All right.
18   A   It would be very hard to start that climb
19  without -- without lowering that belay gate.
20   Q   And just so we're clear, we're referring
21  to Page 48, the picture of the auto belay gate, and
22  it is your testimony that that auto belay gate
23  represents an adequate auto belay gate under the
24  circumstances that you described earlier?
25   A   It's hard to tell from that picture which

Page 137

1  is so zoomed in, but it appears that it covers the
2  starting foot holds for these climbs.
3    Q   Well, I think the jury will be able to
4  see for themselves; I don't have to point out the
5  number of foot holds that it doesn't cover up, the
6  number of holds all the way and above it that does
7  not cover them up, but let me ask you this.  If
8  High Point's auto belays gates were set up similar
9  to that, would you consider that to be adequate or
10  inadequate?
11   A   Yes, if they were -- if the High Point
12  was set up like that where you can't see really,
13  there aren't any -- it would be very hard to start
14  those climbs without lowering that gate, then yes,
15  but I didn't see any way, in looking at that, that
16  a twelve-year-old who has no previous experience
17  with climbing would be able to -- would be able to
18  start those routes.
19   Q   You can't see how maybe a twelve-year-old
20  could put their foot right there?
21   A   And then where?
22   Q   Put a hand right there, reach across with
23  their leg over there, and then grab another hand
24  hold over there, put their foot on anyone of these
25  three exposed foot holds and climb up that wall;

35 (Pages 134 - 137)

Page 138

1  you can't see how that is possible?
2      A   No.
3          MR. WHITTEN:  Object to form.
4          THE WITNESS:  No, no, that is -- I mean,
5  you can point out, hold on there all day long, but
6  in my experience as a long-time climbing
7  instructor, coach, and operator, a twelve-year-old
8  is not going to be able to use the hold that you
9  were pointing to.
10 BY MR. HAZELTON:
11     Q   All right, so earlier when you told me
12 that there are only two circumstances that make a
13 delay gate inadequate, that wasn't -- that wasn't
14 completely correct, or it sounds like you are
15 revising that testimony?
16         MR. WHITTEN:  Object to form.
17         THE WITNESS:  You will have to give me
18 those two things again, then.
19 BY MR. HAZELTON:
20     Q   Okay, so the two things that you
21 testified to that constitute an adequate belay gate
22 was, One, all the holds were covered up completely;
23 the belay gate was large enough to cover up all
24 holds, or Two, the starting holds were covered up
25 completely by the belay gate, correct?

Page 139

1          MR. WHITTEN:  Object to form.
2          THE WITNESS:  I think that I said that
3  the -- that the holds needed to be -- the hold
4  needed to be covered.  The intent of that is to
5  prevent somebody from accessing the climbing wall,
6  from being able to climb around or over the belay
7  gate, to be able to continue to climb up the wall.
8  If you can't get on the wall because the starting
9  holds are covered, then you have no choice, if you
10 want to climb on that wall, but to lower the belay
11 gate in order to access these holds.
12     Q   Again, earlier, we talked about how you
13 had never been to any of High Point's gyms,
14 correct?
15     A   I have not, but I've seen the video and
16 I've seen the pictures, and the video clearly shows
17 Ms. Kornegay climbing right around the edge of
18 the -- without any difficulty whatsoever, climbing
19 right around the side of the belay gate that they
20 had in place.
21     Q   Okay, and so is the standard it makes it
22 difficult or it makes it impossible for an adequate
23 belay gate?
24     A   Did you say the standard?
25     Q   Yes, the standard of what you -- what

Page 140

1  your opinion of an adequate belay gate is that it
2  makes it difficult to get around it or makes it
3  impossible to get around it?
4      A   Well, I would -- well, it makes it very
5  difficult.  There will always be some enterprising
6  individual who can -- will figure out how to defeat
7  anything, but it has to be made very difficult, and
8  in this case, we're talking about a
9  twelve-year-old, how difficult do you have to make
10 it to prevent a first-time novice twelve-year-old
11 from getting on a climbing wall.
12     Q   Well, just so we're clear, I want to be
13 sure, you consider Page 48, the picture of that
14 belay gate to be adequate, correct?
15         MR. WHITTEN:  Object to form.
16         THE WITNESS:  I think that it is -- that
17 for the routes that are depicted and for what we
18 can see, that it appears to be adequate, yes.
19 BY MR. HAZELTON:
20     Q   You wouldn't have included an inadequate
21 belay gate in your operation and risk management
22 book in the section that talks about best practices
23 for auto belays, would you have?
24     A   I don't know.  I don't know if I would
25 have thought about that particular aspect and not

Page 141

1  just taking a picture of a belay gate.
2      Q   Of whether it was adequate or inadequate?
3      A   Well, I don't know if I would have
4  thought about it.
5      Q   Well, part of your opinion in this case
6  is that Ms. Kornegay became hurt because of an
7  inadequate belay gate; isn't that right?
8      A   Yes.
9      Q   Okay, and so when you are talking about
10 best practices and risk management, you wouldn't
11 consider one way or the other whether it's
12 important to put a photo of what does constitute an
13 adequate belay gate?
14     A   I probably wouldn't have thought about it
15 at that time that I was writing -- that I was
16 taking pictures, and this book is listed in what
17 you refer to in part formulating what your
18 opinions are regarding the standard for indoor
19 climbing gym operations?
20     A   It was one of the manuals I consulted,
21 yes.
22     Q   Below where you called the belay gate
23 inadequate in your brief summary of the facts, we
24 get to the cause of the accident.  "Although the
25 immediate cause of Ms. Kornegay's fall was failing

Page 142

1 to connect to the auto belay, there are multiple
2 proximate causes for the injury sustained." What
3 do you take the phrase "proximate cause" to mean?
4     A   These are the underlying immediate
5 causes, meaning these are the reasons that the
6 accident occurred.
7     Q   The reasons other than the fact that she
8 failed to clip into the auto belays?
9     A   These are the reasons that she failed to
10 clip in.
11    Q   So another way of saying that would be
12 but for these particular things, her injury would
13 not have happened; is that what you are saying?
14        MR. WHITTEN:  Object to form.
15        THE WITNESS:  I think that we can safely
16 say that if -- if High Point had addressed these
17 five issues, that it -- that the accident becomes
18 very unlikely.  No one can say that an accident
19 would never take place, but again, you said
20 earlier, one of our jobs is to reduce the -- reduce
21 the risk, minimize the risks.
22 BY MR. HAZELTON:
23    Q   Minimize the risk of participating in an
24 inherently dangerous activity, absolutely, because
25 sometimes accidents do happen and it's no one's

Page 143

1 fault?
2     A   Right, but these risks are not inherent
3 parts of climbing.  These are not the inherent
4 risks of rock climbing.
5     Q   Okay, well, underneath what you say is a
6 cause of Ms. Kornegay failing to clip in, "lack of
7 proper orientation to the auto belay system," is
8 another way of saying that is she was not taught
9 properly how to clip into the auto belay system?
10        MR. WHITTEN:  Object to form.
11        THE WITNESS:  No, I'm not contending that
12 she wasn't taught how to clip in or not clip in.
13 BY MR. HAZELTON:
14    Q   What about the orientation wasn't proper
15 that caused her to not clip in?  You just said that
16 these were things that caused her not to clip in.
17 How did the lack of proper orientation cause her
18 not to clip in?
19    A   I don't -- I don't think, based on the
20 information that I had about how the orientation is
21 conducted, that she was actually taught and
22 evaluated on her ability to clip in.
23    Q   Is that another way of saying that she
24 was not taught how to adequately clip in?
25    A   I think that the orientation probably --

Page 144

1 well, I think the orientation taught the -- whoever
2 was involved in the orientation how to clip in.  I
3 don't think that they then went far enough in
4 making sure that everyone who was participating in
5 that orientation understood and had acquired all of
6 the information and abilities that they were being
7 taught.
8     Q   In other words, the orientation did not
9 adequately teach her how to clip into the belay
10 system?
11        MR. WHITTEN:  Object to form.
12        THE WITNESS:  Ultimately, I think that is
13 what I'm saying by the fact -- by the combined
14 opinion of Number 1 and Number 2, that part of the
15 instruction process is assessing whether or not the
16 participant had acquired the skills that you were
17 teaching them.
18 BY MR. HAZELTON:
19    Q   So it is your opinion that after this
20 orientation, Kinsley Kornegay did not adequately
21 acquire the skills of how to properly clip into the
22 auto belay?
23    A   She didn't demonstrate that to the
24 orienter, the staff person.
25    Q   Based on what; what evidence do you have?

Page 145

1     A   That she didn't demonstrate it?
2     Q   Yes.
3     A   It's not called for within their
4 procedures that you do that.  There is no
5 assessment test that is written into any of their
6 procedures.
7        MR. HAZELTON:  I will mark this as
8 Defendant's Exhibit Number 7.
9        (The document was marked as Hague
10        Defendant's Deposition Exhibit Number 7.)
11 BY MR. HAZELTON:
12    Q   I've marked as Defendant's Exhibit Number
13 7 something that you reviewed in formulating your
14 opinions, and it's the outline of the orientation
15 that the High Point employees gave.  There is a --
16 the last section deals specifically with auto belay
17 instruction, and the last bullet point says,
18 "Immediately perform any necessary belay tests" --
19    A   This is not --
20    Q   -- "in the orientation"?
21    A   This is not a belay.  I don't know what
22 that refers to.
23    Q   This is under the auto belay section.
24    A   No; I read it, and I --
25    Q   Auto belay instruction, the last bullet

37 (Pages 142 - 145)

Page 146

1  point, so the last thing that they do is they give
2  them auto belay tests to make sure that they know
3  --
4      A   No, that is not what that says.
5      Q   Well, you understand that this is a
6  bullet pointed outline, right?
7      A   It says, "belay test." Belay test is
8  different from an auto belay test. Look under
9  their top section and see if it didn't say
10  "belay."
11     Q   There is a Top Rope/Lead Room Description
12  that talks about that particular type of climb, and
13  then there is a heading, Auto Belay Instruction
14  with several bullet points, the last one being
15  "Immediately perform any belay tests" under the
16  auto belay instruction section of the orientation,
17  the very last thing, so essentially, what their
18  orientation is, is it goes step by step through
19  exactly what it is you say and every other
20  publication and everything that you have reviewed,
21  that constitutes an adequate belay orientation?
22     A   No, I don't believe that that particular
23  reference TO a belay test is actually referring to
24  the auto belay. It's either a mistake that it is
25  in there --

Page 147

1      Q   The lack of the word "auto" in front of
2  "belay"?
3      A   Let me explain, so if you will -- if you
4  will pull the other Exhibit, the orientation form
5  with the signatures on it.
6      Q   Sure.
7      A   Show me on there where it says anything
8  about an auto belay test. Why isn't it on that
9  form but it is on the first form?
10     Q   This is on the training orientation that
11  they give.
12     A   I understand, but why isn't it on the
13  other form saying, these are the things that you
14  have to cover.
15     Q   This isn't saying, these are the things
16  you have to cover?
17     A   Oh, yes, it is. What are you talking
18  about? It absolutely is.
19     Q   Dan, I'm not going to argue with you
20  about this. This form right here is not what the
21  staff goes by when giving the orientation.
22     A   Then why is it on there? That is the
23  form they have in front of them. That is their
24  checklist --
25     Q   I understand that part.

Page 148

1      A   -- when they are doing that orientation.
2      Q   Dan, I understand that --
3      A   Why doesn't it say "test" on there?
4      Q   I understand that part of your opinion is
5  that they didn't give belay tests, and I just
6  showed you where their orientation outline
7  specifically says that they do, and so you are
8  trying to somehow say that because it is not on the
9  sheet that the parents and children fill out and
10  sign, that that means that they didn't do it. If
11  you go -- if you had gone to the gym, would you be
12  in a better position to see what they actually do
13  when they give the orientation?
14         MR. WHITTEN: Object to form.
15         THE WITNESS: Not necessarily.
16  BY MR. HAZELTON:
17     Q   It wouldn't be more helpful or give you a
18  better idea of the actual substance of the
19  orientation if you actually were there and saw it
20  given
21         MR. WHITTEN: Object to form.
22         THE WITNESS: No, because they would know
23  that I was coming and they would probably alter
24  what they do based on my being there.
25  BY MR. HAZELTON:

Page 149

1      Q   You could go any time you want, Dan.
2  They wouldn't know when you were -- when you were
3  going. Could you have gone before you were even
4  disclosed?
5      A   They --
6         MR. WHITTEN: Is that a question,
7  Jeremy?
8         MR. HAZELTON: Well, I think it's clear
9  what is going on, but this is Defendant's Exhibit
10  Number 7.
11  BY MR. HAZELTON:
12     Q   So as we've just discussed, Number 1 and
13  Number 2 combined, you say, is a cause of why Ms.
14  Kornegay was not adequately or did not adequately
15  acquire the skills to be able to clip into the auto
16  belay system, correct?
17     A   Yes.
18     Q   And in fact, in Number 2, you point out
19  that the CWA industry practices, Section 4.1,
20  specifies that "If the facility employs auto belay
21  devices, the staff administers an auto belay
22  orientation and proficiency test," which I will
23  again point out in Defendant Exhibit Number 7,
24  their orientation outline specifically says that,
25  would you -- assume for me that this is what they

1  go by.  Assume for me that the bullet points on
2  this is exactly what their presentation is, would
3  you then agree that the orientation that was given
4  was adequate?
5      MR. WHITTEN:  Object to form.
6  BY MR. HAZELTON:
7      Q   I'm asking you to make an assumption.
8      A   You are asking me to make a big
9  assumption.
10     Q   Fair enough, but I'm allowed to ask you
11 to assume facts.
12     A   Given that belay tests -- by calling this
13 a belay test and not an auto belay test, they mean
14 auto belay test, and that that test actually
15 involves the participant clipping and lowering off
16 of the wall and they are assessing again verbally
17 this mention of, which they do in red on one of
18 those lines, about the bigger risk involved in
19 these things of not clipping in, then if they do
20 all of those things, then I don't have an issue
21 with their orientation.  I don't think they did.
22     Q   And that is based on your reading of the
23 documents that the Plaintiff's counsel has sent you
24 and conversations that you've had with Plaintiff's
25 counsel?

1      A   And also looking over the documents as
2  well, and the document that is -- that is in the
3  hands of the orienter, the staff person, has no
4  reference to any kind of assessment test.
5      Q   What gives you the impression that this
6  document, the one that is signed by the
7  participants, is in the hands of the staff member?
8      A   Well, it has to.  How else does it get
9  signed by the participants?  The staff person has
10 to trot that out for them to sign it.
11     Q   I understand, but what gives you the
12 impression that this is in their hands as they are
13 giving it and referencing these bullet points?
14     A   Well, it might not be in their hand when
15 they are actually giving it, but they have to bring
16 it out, and it says there these are the things this
17 are to be covered, and so there is no testing
18 covered there.
19     Q   Except for the training that they are
20 given that outlines exactly what they are to
21 cover?
22     MR. WHITTEN:  Object to form.
23     THE WITNESS:  Well, my experience with
24 training manuals and what is actually taught can be
25 two completely different things.

1  BY MR. HAZELTON:
2      Q   Something you would be aware of had you
3  visited the gym and --
4      A   Again, not necessarily.
5      MR. WHITTEN:  Object to form.
6  BY MR. HAZELTON:
7      Q   You are also critical of the length of
8  time taken during the orientation at High Point,
9  correct?
10     A   Yes.
11     Q   "The HPC orientation takes," in your
12 words, "approximately 15 minutes and includes
13 descriptions of and warnings for all three types of
14 climbing available at HPC leaving perhaps five
15 minutes for the auto belay orientation
16 instruction."  Is that just a guesstimation on your
17 part, that you are assuming that it takes five
18 minutes to go over the auto belay orientation?
19     A   Well, again, based on my experience, if
20 they are describing all three parts, all three
21 activities in the gym in a 15-minute orientation,
22 that might leave five minutes to do the auto
23 belay portion.
24     Q   Again, I will refer you to Defendant's
25 Exhibit Number 7 which is the High Point employees'

1  orientation outline that they are trained on and
2  that they go by, where at the top and in bold, it
3  says, "Orientations should take a minimum of 15
4  minutes."  Would you agree that "a minimum of 15
5  minutes" is not the same as "approximately 15
6  minutes"?
7      A   And I would suggest to you that in -- in
8  my experience, if you say to your staff, a minimum
9  of 15 minutes, it becomes 15 minutes because nobody
10 really wants to do those things.  There are other
11 things going on in the gym that require their
12 attention, and in a busy facility, they need to get
13 back to doing those other tasks, so if it says a
14 minimum, that is probably what you are going to
15 get.
16     Q   Based on complete and total speculation
17 and assumption on your part, correct?
18     MR. WHITTEN:  Object to form.
19     THE WITNESS:  No, it is based on my
20 experience observing what happens in these
21 facilities.
22 BY MR. HAZELTON:
23     Q   In facilities other than High Point
24 Climbing?
25     A   Well, sure, but it is another climbing

39 (Pages 150 - 153)

Page 154

1  facility, operated in a similar manner to most
2  others.
3      Q   Including your gyms that you've owned?
4      A   In a broad sense, yes, operated in a
5  similar way.
6      Q   But again, my question was, can we agree
7  that a minimum of 15 minutes does not mean the same
8  thing as approximately 15 minutes as you allege in
9  Paragraph 1 of your opinion?
10         MR. WHITTEN:  Object to form.
11         THE WITNESS:  Well, if you -- if you are
12  going to I think just rely on the words, then you
13  are correct, but if you are going to rely on
14  experience and say what is the effective -- what is
15  the effect of either one of those statements, it is
16  15 minutes.
17     Q   Based on nothing other than your
18  assumptions about how this particular gym operates,
19  correct?
20         MR. WHITTEN:  Object to form.
21         THE WITNESS:  No.  You already asked me
22  that, and I said based on my experience observing
23  what happens in these facilities.
24  BY MR. HAZELTON:
25     Q   I am not asking you about your experience

Page 155

1  and what happens in any other facility other than
2  High Point Climbing, so what goes on there is
3  completely an assumption and speculation on your
4  part?
5      A   Again, I want to say the same thing that
6  I've said three times now which is that based on my
7  experience, what will happen is that the staff will
8  gravitate to 15 minutes.
9      Q   How long were the orientations that were
10  given at Rise Up?
11         MR. WHITTEN:  Object to form.
12         THE WITNESS:  Rise Up does orientations
13  differently than High Point.  It is done with a
14  video.  That video takes --
15  BY MR. HAZELTON:
16     Q   How long is the video?
17     A   It's done with a video, and if somebody
18  is going to be either bouldering or using the auto
19  belay, then there is a hands-on portion.  The video
20  itself runs -- ran, because they've revised it
21  since I was there, seven minutes, I think, but then
22  the auto belay would take another five to ten
23  minutes depending on the number and --
24     Q   So 12 to 17 minutes at Rise Up?
25     A   But that does not include -- that does

Page 156

1  not include the orientation to lead climbing and
2  top rope climbing and all the other things that
3  High Point is doing.
4      Q   So the seven-minute video is just an auto
5  belay video; is that your testimony?
6      A   No, it provides a general overview of
7  what happens in the gym.
8      Q   And then another five to ten minutes on
9  the auto belay test?
10     A   Yes.  Again, let me back up, because I'm
11  only -- I'm basing that on just kind of out of the
12  corner of my eye watching them do auto belay
13  instruction, and I haven't actually watched their
14  video to know how long it is or what it includes,
15  but when I was there, there were no auto belays, so
16  at least when I was running the gym, there were no
17  auto belays so that was in the part of the
18  orientation, so now they have auto belays; they've
19  added that in.
20     Q   And I just want to be clear because you
21  keep coming back to this, the picture that you
22  provided from Rise Up in your 2019 book that shows
23  an auto belay, is it your testimony that that was
24  not there when you were still at Rise Up?
25         MR. WHITTEN:  Object to form.

Page 157

1          THE WITNESS:  I was not managing the
2  facility or -- nor did I actually own the business
3  operation, Rise Up Climbing, at the time that
4  picture was taken.
5  BY MR. HAZELTON:
6      Q   Were you not aware, even though you were
7  an owner of the gym, that auto belay devices were
8  installed?
9      A   I owned the building.
10     Q   Okay.  Were you not aware that as the
11  owner of the building, you could potentially be
12  liable for premises accidents if auto belay devices
13  were installed?
14     A   Say that again.
15     Q   Yes; were you not aware as the owner of
16  the premises that auto belay devices were installed
17  on the premises?
18     A   Sure, I was aware of.
19     Q   Okay, and so when you -- when you owned
20  this company, there were auto belay devices at Rise
21  Up?
22     A   No.
23     Q   You had sold all your interest in Rise Up
24  before they installed auto belay devices?
25     A   The operation was -- had been --

40 (Pages 154 - 157)

Page 158

1  ownership of the operation had been transferred to
2  my then son-in-law.
3      Q    Earlier, you told me management of the
4  operation had been transferred to your son-in-law?
5      A    No, I think that I said that we had --
6  that we had signed agreements moving the ownership
7  to him.
8      Q    What were the dates of those?
9      A    I don't remember.  It goes back to -- it
10  was -- I was ill, so it must have been 2016, 2017,
11  somewhere in there.
12      Q    Okay.  Well, but as far as you know,
13  the -- well, let me ask you this.  The way that
14  Rise Up is operated now, do you consider the
15  orientations with auto belays adequate?
16      A    I haven't watched the video and I haven't
17  paid close attention how they are orienting people
18  at the climbing wall so I don't know.
19      Q    Earlier, you told me this video is
20  approximately seven minutes.  How do you know how
21  long it is?
22      A    That is when I ran the gym.  My video was
23  about that long.  I don't know how long it is now
24  because I haven't sat and watched it.  They've
25  revised it.

Page 159

1      Q    But you've been there and seen the
2  hands-on auto belay orientation after the video,
3  correct?
4      A    I've been there when they've given those
5  orientations, but I haven't put my full attention
6  to watching it.
7      Q    Understood, but earlier, you said that is
8  about five to ten minutes, correct?
9      A    I really couldn't say at this point how
10  long they are taking to do those because I don't
11  really pay attention.  They haven't asked me for
12  input on it.
13          MR. HAZELTON:  All right.  We will mark
14  this as Defendant's Exhibit Number 8.
15          (The document was marked as Hague
16      Defendant's Deposition Exhibit Number 8.)
17  BY MR. HAZELTON:
18      Q    I will ask you to take a look at that,
19  specifically the fourth page of it, and I will
20  represent to you, this is a printout from Rise Up
21  Climbing, and under the heading Auto Belay, this is
22  their marking, "Don't have a partner to belay you?
23  No Problem!  A day pass and a short 10-15 minute
24  orientation is all you need in order to route climb
25  solo."  Do you believe that that is adequate?

Page 160

1      A    I don't know what is in that, so...
2      Q    Well, Dan, you are very critical of the
3  length of time which we've established is a minimum
4  of 15 minutes by High Point.  When Rise Up markets
5  that we'll get you climbing in 10-15 minutes
6  after -- or after a ten to 15-minute auto belay
7  orientation --
8          MR. WHITTEN:  Object to form.
9          THE WITNESS:  So I don't know if they are
10  exaggerating; I don't know if it actually takes
11  them that long.  I don't know what is in their
12  orientation anymore.  I don't know if this is ten
13  to 15 minutes after they watch the video, you know,
14  so are you asking me to now speculate on this?
15  BY MR. HAZELTON:
16      Q    "A day pass and a short 10-15 minute
17  orientation is all you need in order to route climb
18  solo," so sign up and then in ten to 15 minutes,
19  you are route climbing solo with an auto belay
20  device.
21          MR. WHITTEN:  Is there a question?
22  BY MR. HAZELTON:
23      Q    The question is, is that adequate in your
24  opinion, Rise Up's standard?
25      A    I think I answered that question

Page 161

1  already.  I don't know, because I don't know what
2  is in it.
3      Q    So it depends on the substance of the
4  orientation, not the length of time?
5          MR. WHITTEN:  Object to form.
6          THE WITNESS:  It's both.  I don't think
7  that you can cover the substance in an adequate
8  amount of time.
9  BY MR. HAZELTON:
10      Q    Do you have an opinion as to what an
11  adequate orientation substantively -- how long that
12  would take to be adequate?
13      A    It depends on the facility and what they
14  have to offer.
15      Q    But let's just specifically talk about
16  orientation on these auto belay devices.
17      A    Just the auto belay, we're talking
18  orientation of the gym or orientation of just the
19  training for the auto belay?
20      Q    Let's talk orientation to the gym and the
21  use of the auto belay.  How much time does that
22  take to adequately train?
23      A    I don't know; it's going to be -- it --
24  again, it depends on the facility, it depends on
25  how they conduct the orientation, and I think that

41 (Pages 158 - 161)

Page 162

1  it's more efficient if they have a video.  High
2  Point does not, so, you know, I think that in the
3  case of -- in the case of Rise Up, if they have a
4  video that lasts for five, ten minutes and then
5  they provide auto belay instruction which they
6  should on top of that along with some bouldering, I
7  think that they could -- I think that they could
8  probably accomplish that in, I don't know, 20
9  minutes.
10     Q    Well, they themselves, Dan, say ten to 15
11 minutes?
12     A    Again, I don't know what is in their
13 orientation.  I don't have any part of it; I wasn't
14 consulted to put it together, so that is what they
15 say.
16     Q    There could be an all encompassing ten to
17 15 minute orientation that is adequate in your
18 opinion depending on the substance of it?
19     A    Depending on the substance, depending on
20 the facility, depending on, yes, what is involved
21 in that orientation, so if you -- if you would have
22 walked in a Rise Up prior to there being auto
23 belays, sure, 15 minutes is plenty of time.
24     Q    And just to be clear, you don't know how
25 long the orientation with the group that

Page 163

1  Ms. Kornegay was in lasted?
2     A    I'm sorry, could you repeat that?
3     Q    Yes, so the -- so the orientation that
4  was given on August the 2nd of 2019 to the group
5  that Kinsley Kornegay was a part of, you have no
6  idea how long that lasted?
7     A    I don't think I saw any testimony saying
8  how long it was.
9     Q    Okay, so it could have been adequate?
10    A    I mean, it could -- it's possible.
11    Q    Okay.
12    A    Well, I should say it's possible in that
13 it could have lasted long enough.  Since it is my
14 opinion that they didn't do any testing, then the
15 whole thing is inadequate.
16    Q    I understand that it is your opinion that
17 they didn't do the testing, regardless of what the
18 facts are, but as you sit here today, you have no
19 idea not only how long that orientation lasted, but
20 what was involved in it, correct?
21       MR. WHITTEN:  Object to form.
22       THE WITNESS:  I think that we have every
23 indication of what was involved in it because there
24 is an outline and there is a signature form.
25 BY MR. HAZELTON:

Page 164

1     Q    But in terms of how long that process
2  took to allow the climbers to adequately acquire
3  the ability to clip in, you have no idea?
4     A    Well, I have a reasonably good idea it
5  didn't take them an hour, so --
6     Q    We know it took a minimum of 15 minutes,
7  correct?
8       MR. WHITTEN:  Object to form.
9       THE WITNESS:  Not necessarily.  We don't
10 know -- that is what their outline says.  It
11 doesn't necessarily mean that the staff people
12 conformed to that.
13 BY MR. HAZELTON:
14    Q    What have you reviewed that would suggest
15 that they did not conform to the way that they were
16 trained?  What evidence do you have?
17       MR. WHITTEN:  Object to form.
18       THE WITNESS:  Other than the fact that
19 Ms. Kornegay failed to clip in and she got hurt?
20       MR. WHITTEN:  Object to form.
21       THE WITNESS:  There is -- I'm just
22 saying, you are asking me to speculate on any
23 number of things here.  I didn't have any direct
24 evidence that says that their orientation took more
25 or less than 15 minutes, but based on my experience

Page 165

1  and based on the documents that I was provided, it
2  appears that they would take 15 minutes or so to do
3  their orientation.
4  BY MR. HAZELTON:
5     Q    Okay.  I'm not asking you to speculate,
6  Dan; I'm asking why you did speculate because
7  what -- what evidence is there that the orientation
8  that they gave was either 15 minutes or inadequate
9  in any way?
10       MR. WHITTEN:  Object to form.
11       THE WITNESS:  I think that I've answered
12 that.  In the -- I think that in terms of what was
13 inadequate, I don't see any evidence that they
14 actually gave a test.
15 BY MR. HAZELTON:
16    Q    Other than Defendant's Exhibit Number 7?
17       MR. WHITTEN:  Object to form.
18       THE WITNESS:  Other than Defendant's
19 Exhibit Number 7 which is which one?
20 BY MR. HAZELTON:
21    Q    Which is the outline that the staff
22 adheres to during the orientation process which the
23 last thing they do is give the auto belay test?
24       MR. WHITTEN:  Object to form.
25       THE WITNESS:  But that is not what it

42 (Pages 162 - 165)

Page 166

1  says; it says, "belay test," and in any facility in
2  the country, belay test is a completely different
3  thing from auto belay test, completely different.
4  BY MR. HAZELTON:
5      Q   Other than Defendant's Exhibit Number 7,
6  assuming the same belay test as a bullet under the
7  heading of auto belay orientation means auto belay
8  test, there is nothing to suggest that High Point
9  did anything inadequate in their orientation and
10  training, is there?
11         MR. WHITTEN:  Object to form.
12         THE WITNESS:  Well, the test is a big
13  issue, so if they didn't do a test, then it's
14  definitely an inadequate orientation.
15  BY MR. HAZELTON:
16      Q   But what if they did do it?
17      A   And I think that it is a big jump just
18  because it says, "belay test" at the end of that
19  form that they actually provided an auto belay
20  test, since it's not referenced in any other of
21  their materials, since that is -- since that is a
22  significant part of the orientation, why isn't it
23  referenced in their other material.
24      Q   You are referring to the page that was
25  signed by the participants and adults?

Page 167

1      A   Well, it looks like it's signed by one of
2  the group.
3      Q   Well, this has several signatures.
4      A   Yes, but only -- there is only one
5  signature for about six people.
6      Q   I understand, and I'm not advocating; I
7  know that you are, but I'm talking everybody that
8  was a part of that group, not just Kinsley's group
9  but part of that orientation.  I mean, look, I
10  don't want to belabor this; I think the point has
11  been made.
12         Obviously, a large portion of your
13  opinion, I think that we can agree, at least with
14  Numbers 1 and 2, where you say, "Those together
15  caused Ms. Kornegay to not have adequate training
16  to know how to clip in," I think that we can agree,
17  those are based in large part on your opinion that
18  a test wasn't performed as a part of orientation;
19  is that fair?
20         MR. WHITTEN:  Object to form.
21         THE WITNESS:  Yes, that is fair.
22  BY MR. HAZELTON:
23      Q   Okay.  Number 3, "Failure to provide
24  adequate supervision," and this is where you talk
25  about the Perfect Descent Operations Manual for the

Page 168

1  220 series where it says, "Climbers should be under
2  constant supervision by a trained operator.  Before
3  ascending the wall, operators should check to
4  verify that each climber has:  Properly fit and
5  secured climbing harness.  Properly clipped their
6  harness onto the Perfect Descent Climbing System
7  carabiner."  Is it your opinion that -- well, first
8  of all, where in the list of documents or manuals
9  that you relied on, the first page of your report,
10  is the Perfect Descent manual listed?
11      A   That is something that I referred to.
12         MR. WHITTEN:  I will point out, I
13  mentioned earlier, the Exhibits to the depositions
14  were included in that, and that is one of the
15  documents that he received.
16         MR. HAZELTON:  Okay, fair enough, fair
17  enough.  I mean, I know what it is; it's not like
18  it is a surprise, but I was curious why that was
19  left out when it was specifically referred to.
20  BY MR. HAZELTON:
21      Q   So is it your opinion, then, Dan, that
22  climbers at indoor climbing gyms should be
23  supervised at all times by a staff member?
24      A   Boy, that is a really broad question.
25  You don't want to be any more specific than that?

Page 169

1      Q   Well, you are quoting a portion of the
2  Perfect Descent Operations Manual that says,
3  "Climbers should be under constant supervision by
4  a trained operator," so is it your opinion, then,
5  that a staff member of a climbing gym should be
6  constantly supervising every climber in the gym?
7      A   That is not my opinion; that is what
8  Perfect Descent specifies.
9      Q   Do you think that is a reasonable
10  industry standard?
11      A   I think that the industry standard from
12  the Climbing Wall Association says that for
13  personal protected equipment, the gym will follow
14  the manufacturer's operating procedures.  That is
15  in the industry practices.
16      Q   When you -- sorry.  Go ahead.  I'm
17  sorry.
18      A   This is -- this thing from Perfect
19  Descent that is in their manual is how they have it
20  written.
21      Q   Okay.
22      A   So if you are going to have a Perfect
23  Descent auto belay device in your facility, and
24  their manual says that you have to have a trained
25  operator next to -- you have to have a trained

Page 170

1  operator clipping every climber in and making sure
2  that they are clipped in, then that is what you
3  should be doing.
4      Q   Is it your opinion, and again, that that
5  is a reasonable standard for climbing gyms using
6  Perfect Descent manuals -- or Perfect Descent
7  equipment?
8      A   I think that that is irrelevant whether
9  it is my opinion or not.  It is what it is.
10     Q   Well, if the Perfect Descent manual said
11 you have to have eight foot tall, blond haired,
12 blue eyed Norwegians supervising every single
13 climber in your facility, would you think that that
14 is a reasonable standard to have because it said it
15 in the manual?
16     A   I think if they want to have that as part
17 of their operating manual, then -- well, I won't
18 even say that they have a reason for doing it, but
19 if it is in their manual and you are going to
20 follow the CWA standards which, by the way, if you
21 want liability insurance for your facility,
22 almost -- you typically have to sign something that
23 says that you will follow their standard, then you
24 better only allow blond haired, blue eyed whatevers
25 at your facility.

Page 171

1      Q   My question was, do you think that would
2  be reasonable, a reasonable standard?
3      A   Again, I think that it's irrelevant.  It
4  doesn't matter what my opinion is.  If the Perfect
5  Descent has that in their manual, it is what it is.
6      Q   Do you know any gym in the entire country
7  or world, for that matter, that uses Perfect
8  Descent auto belays that has a trained staff member
9  constantly supervising every climber in the gym?
10     A   Repeat the question.
11     Q   Do you know of any gym in the United
12 States, or even in the world, for that matter, any
13 indoor climbing gym that uses Perfect Descent auto
14 belay systems and has a trained staff member
15 constantly supervising every climber in the gym at
16 all times?
17     MR. WHITTEN:  Object to form.
18 BY MR. HAZELTON:
19     Q   Do you know of any?
20     A   You are specifically asking about
21 climbing gyms?
22     Q   I am.
23     A   Because there are plenty of --
24     Q   I'm specifically asking about climbing
25 gyms.  I know that Perfect Descent auto belays are

Page 172

1  used for all kind of different things.
2      A   Right, and for a lot of uses, there is a
3  trained operator --
4      Q   I'm asking about climbing gyms.  Do you
5  know of one in the world?
6      A   And there are circumstances in climbing
7  gyms where there is a trained operator with every
8  auto belay participant.
9      Q   Give me a data point.
10     A   Birthday parties.
11     Q   Pardon me?
12     A   Birthday parties.  There would be a staff
13 person with a birthday party who is clipping every
14 kid in and making sure that they are adequately
15 secured.
16     Q   Okay, other than birthday parties?
17     A   I mean, there may be other kind of group
18 activities where that happens.
19     Q   That you know of, have you ever been in a
20 gym -- earlier you mentioned that you had been in
21 hundred of gyms all over the world.  Have you ever
22 been in one that use the Perfect Descent auto belay
23 system that has a trained operator constantly
24 supervising every climber?
25     A   No.

Page 173

1      MR. HAZELTON:  Now, I will mark this as
2  Defendant's Exhibit Number 9.
3      (The document was marked as Hague
4      Defendant's Deposition Exhibit Number 9.)
5  BY MR. HAZELTON:
6      Q   This is a correspondence from the
7  president of Perfect Descent April 9, 2021 that I
8  marked as Defendant's Exhibit Number 9 where,
9  amongst other things, it talks about the Perfect
10 Descent manuals, and in the last paragraph, it
11 states, "We are currently reviewing the training
12 and usage section of the 220 and 230 manuals and
13 will be publishing an addendum in the coming weeks
14 regarding supervision standards in settings that
15 include an auto belay device orientation and skills
16 verification.  Until the addendum is published,
17 Perfect Descent recommends that climbing gym
18 operators follow established Climbing Wall
19 Association practices and guidelines for the
20 operation of recreational auto delays."  Have you
21 ever seen Defendant's Exhibit Number 9?
22     A   Yes.
23     Q   And would you not agree that what they
24 are saying is, is that if there is something in
25 their manual that conflicts with the CWA operating

44 (Pages 170 - 173)

Page 174

1  standards, the gym should follow the CWA operating
2  standard?
3      MR. WHITTEN:  Object to form.
4      THE WITNESS:  Well, there are a couple of
5  problems with that.  First of all, this is dated
6  way after this particular accident occurred.
7  BY MR. HAZELTON:
8      Q   Understood.
9      A   At the time of the accident, this opinion
10  from Perfect Descent didn't exist.  All that you
11  had was their manual that said that there needed to
12  be a trained operator.  It also says -- it also
13  says in their manual that their manual supersedes
14  anybody else, any other standards.
15      Q   Except for Sections 220 and 230?
16      A   No, no.  Read their manual; it says --
17      Q   That is what the president of the company
18  said.
19      A   This isn't -- this is in 2021, and by the
20  way, they've not changed anything in their manual
21  to date, so -- I don't know why, but they are still
22  equivocating on changing that particular
23  instruction to their users, but what I'm saying is
24  in their manual, it says, regardless of what it
25  says in the CWA standard or anybody else's, our

Page 175

1  instructions for use of this device supersedes any
2  of that, so it is contradictory.
3      Q   Have you ever met or spoken with anybody
4  from Perfect Descent?
5      A   I don't think so.
6      Q   Okay, and you never talked to an
7  executive there or anyone responsible for making
8  decisions regarding the best practices in the
9  manufacturing of these systems that has told you
10  exactly what they mean in Sections 220 and 230?
11      A   We can't rely on our owner's manual to
12  tell us exactly what they mean.
13      Q   I'm just asking if you --
14      A   That is a ridiculous assertion, that you
15  have to actually go to the company and find
16  somebody with authority to clarify what is in their
17  manual when the manual is very specific and direct;
18  why would you ever have to do that?
19      Q   My question to you, Dan, is whether
20  you've ever spoken to anyone that works for Perfect
21  Descent about the operations of their auto belays
22  in recreational climbing gyms.
23      A   And the answer is no, because why would I
24  have to?  They've already spelled it out for me in
25  their manual.

Page 176

1      Q   Does Rise Up, with their auto belay
2  systems, do you know whether they use Perfect
3  Descent?
4      A   They do.
5      Q   Okay.  Does Rise Up comply with the
6  Perfect Descent manual language that you've quoted
7  in Paragraph 3 of your report?
8      A   They sadly do not, but I've pointed out
9  to them that they should.
10      Q   And what was their response to you?  Did
11  they show you that letter from the president of
12  Perfect Descent?
13      A   No, they were unaware of this letter.  I
14  told them that they should get their own letter
15  specifically addressed to them, but even then --
16      Q   Why would you tell them that?
17      A   Because I thought that they needed to --
18  they needed to --
19      Q   They need clarifying of what that means?
20      A   No, they needed to I guess prove to
21  themselves that, you know, what we had discussed.
22  They didn't necessarily believe that they had to
23  follow the manual.  In fact, I don't think that
24  they even read the manual but I pointed it out to
25  them, their decision, so it's not my gym anymore,

Page 177

1  so they don't provide an operator for every
2  climber, but that is not me; that is them.
3      Q   So would it be your opinion, then, that
4  every person that gets hurt because of either a no
5  clip-in injury or some sort of malfunction with a
6  carabiner or the lanyard, that if there wasn't a
7  staff member constantly supervising that climber,
8  that Rise Up would be liable and at fault and have
9  to pay that person for their damages?
10      MR. WHITTEN:  Object to form.
11      THE WITNESS:  The same as what we're
12  talking about here for High Point, sure.  I mean,
13  it is same thing.
14  BY MR. HAZELTON:
15      Q   So the standard is for every climbing gym
16  using the Perfect Descent auto belay system, a
17  trained staff member has to constantly supervise
18  every single user, climber, in their gyms at all
19  times?
20      MR. WHITTEN:  Object to form.
21      THE WITNESS:  Again, this is not my
22  opinion; this is Perfect Descent's instruction.
23  BY MR. HAZELTON:
24      Q   All right, and to you, it's very clear
25  and specific; it's -- from when I take, the

45 (Pages 174 - 177)

Page 178

1 president of the company disagrees with you, but I
2 just want to be sure that what your opinion is and
3 what you are stating is that it's crystal clear,
4 that is what that section means?
5        MR. WHITTEN: Object to form.
6 BY MR. HAZELTON:
7    Q   The president of the company says that is
8 not what that section means, but you say -- you
9 are -- you are telling us that is what that section
10 means?
11   A   Yes. I don't see how you can interpret
12 it in any other way.
13   Q   Let's move onto the next one. Number 4,
14 Distractions. "The button Ms. Kornegay pressed just
15 prior to her beginning to climb started a series of
16 lights that lit progressively up the wall. The
17 climber is intended to race those lights to the top
18 of the wall and press another button. This type of
19 amusement is a distraction the more important
20 safety aspects of using the auto belay system and
21 the excitement to beat those lights to the top can
22 cause a climber to forget to clip in, especially if
23 that climber is a minor. HPC knowingly created
24 this easily foreseeable risk without providing any
25 added safety measures."

Page 179

1        That is saying a lot to me which
2 basically seems that your opinion is that -- is
3 your opinion is a child of a certain age is going
4 to forgo any safety training or warnings because
5 they become distracted and excited; is that
6 basically what your opinion is?
7        MR. WHITTEN: Object to form.
8        THE WITNESS: My opinion is that the --
9 that the distraction of the lights and the
10 anticipation of racing them to the top takes
11 attention away from the safety procedures that they
12 were hopefully taught.
13 BY MR. HAZELTON:
14   Q   What data are you basing this on?
15   A   What data?
16   Q   Yes. What are you basing that opinion
17 on, just your assumption?
18   A   My assumption of what? That --
19   Q   That they must get distracted and
20 therefore forget to clip in; what actual facts and
21 data are you basing that on?
22   A   I've seen this happen in at least two
23 other cases, so you can actually see in the video,
24 you can see Ms. Kornegay press the button, the
25 lights start, and the lights take attention. They

Page 180

1 require her attention immediately, and so she
2 starts up the wall to try to beat them.
3    Q   Have you seen any studies that say --
4    A   That kids are easily distracted, sure.
5    Q   That --
6    A   I'm sorry, finish your question.
7    Q   Let me finish my question. Have you seen
8 any studies that say that recreational gyms such as
9 this that have, whether it's timers or lights that
10 go up the wall, somehow make it unsafe and are
11 easily distracting to children of a certain age to
12 the point that they forget to clip in or otherwise
13 exercise safety precautions that they would have
14 but for the distraction; have you seen any studies
15 about that?
16   A   That is a very specific kind of study.
17 There are -- let me just say this. There are
18 virtually no studies whatsoever of anything that
19 happens in climbing gyms, so no, I haven't seen
20 this specific study. I will point out to you,
21 though, that High Point's own guy, Shawn Watson --
22 is that his name? In his deposition, he readily
23 admits that it's distracting.
24   Q   Well, I don't know what specific
25 testimony you are referring to, but --

Page 181

1    A   I just told you, it is in Shawn Watson's
2 deposition.
3    Q   Well, I understand that you generally
4 told me, but I don't know specifically in what
5 context he said that, and we've been running long;
6 I will not take the time to go and read through it
7 to find it, but because it says what it says, it is
8 what it is, but my question to you is, though, what
9 facts, data, studies, anything at all, have you
10 either participated in, read, or are aware of that
11 she -- that these types of distractions cause
12 children to ignore safety; to where can you render
13 that sort of opinion?
14   A   Like I said, there aren't any studies of
15 any kind.
16   Q   All right, what data, though, what facts?
17   A   There is no data collected, so there's
18 none of this. I have seen three different videos
19 of this happening in cases I've worked on, that
20 is -- Wu is one of them; he was racing a timer, and
21 the other one I can't -- I can't remember the high
22 school kid that was also racing a timer, but the
23 same idea, you have the external device that is
24 taking your attention away from safety, so I don't
25 have any studies.

46 (Pages 178 - 181)

Page 182

1    Q   That is your personal opinion, is what it
2  sounds like to me.
3    A   Based on my observations and experience
4  in these cases, yes.
5    Q   Based on your -- and experience in two
6  other instances where you likewise assume that
7  those were a factor in those cases as well?
8    A   Yes, they are a factor in those cases.
9    Q   Based on your assumption?
10   A   They are a factor in those cases.
11   Q   Based on no studies, facts, data of any
12  kind that has been collected to try to determine
13  whether there is some sort of, you know, behavioral
14  effect in that context that affects a child's
15  decision making; you've seen nothing like that?
16   A   Well, you are -- well, not for climbing
17  gyms and, yes, I have not seen anything.
18   Q   All right.  Number 5 --
19   A   You are referring to other than what I
20  personally have observed?
21   Q   Number 5, we talked about a little bit
22  already, the Inadequate Belay Gates.  I think that
23  that point was made.  "Ms. Kornegay, a twelve year
24  old first timer climber, was easily able to climb
25  around HPC's belay gate defeating its purpose of

Page 183

1  blocking access to the access starting holds." Is
2  it your opinion that that is the only purpose of a
3  belay gate?
4    A   They also provide a warning.
5    Q   Okay.  Do you have a problem with High
6  Point's warnings on their belay gates?
7    A   No.
8    Q   "An adequately sized belay gate would
9  prevent a climber access to the beginning holds
10  until the climber had detached the safety lanyard
11  from the gate.  HPC's belay gates are clearly
12  inadequate at preventing a climber access to the
13  climbing wall."
14       I mean, we've gone through this.  We've
15  talked about Page 48 of your own book that talks
16  about adequate standards for auto belay devices and
17  shows a picture of a belay gate that doesn't block
18  access to the wall.  I understand that there is
19  some disagreement on that point.
20       MR. WHITTEN:  Object to form.
21  BY MR. HAZELTON:
22   Q   But having seen that particular picture
23  or that photo, do you want to or would you be
24  willing to revise Number 5 at all?
25       MR. WHITTEN:  Object to form.

Page 184

1       THE WITNESS:  No.
2  BY MR. HAZELTON:
3    Q   Okay, and it is your opinion that an
4  inadequate belay gate was the cause of Ms. Kornegay
5  to fail to clip into the gate?
6       MR. WHITTEN:  Object to form.
7       THE WITNESS:  One of five.
8  BY MR. HAZELTON:
9    Q   Okay, so you have read -- we obviously
10  have established, you read both depositions in this
11  case so far, correct?
12   A   We're talking Watson and Staubach?
13   Q   Correct.
14   A   Yes.
15   Q   And did you read the part where Ms.
16  Kornegay had been climbing for almost an hour prior
17  to this?
18   A   Yes.
19   Q   Okay, and can we agree that Kinsley knew
20  how to clip into the --
21   A   I don't think I read any testimony that
22  said how she had -- how she was clipped in on those
23  previous climbs, meaning, was there an adult there,
24  was there staff nearby, did she do it by herself.
25  There is nothing like that in any of the testimony.

Page 185

1    Q   Would you agree with me that after she
2  was at the top of the wall, she would not just have
3  let go unless she thought that she was clipped in?
4  Can we assume that?  I think that is pretty
5  reasonable, don't you?
6       MR. WHITTEN:  Object to form.
7       THE WITNESS:  I think she assumed she was
8  clipped in, yes.
9  BY MR. HAZELTON:
10   Q   And can we agree that she probably
11  assumed she was clipped in because she had been
12  doing it for the prior hour?
13       MR. WHITTEN:  Object to form.
14       THE WITNESS:  I don't know what was in
15  her head, so I can't really say.
16  BY MR. HAZELTON:
17   Q   You can't say whether she was distracted
18  either, right, because you don't know what was in
19  her head?
20       MR. WHITTEN:  Object to form.
21       THE WITNESS:  I think that she was
22  distracted by the way that she behaved at the base
23  of the climb relative to pushing the button and
24  seeing the lights, and I have to turn this off,
25  sorry.

47 (Pages 182 - 185)

Page 186

1    Q   Again, at the beginning of your one, two,
2  three, four, five numbered paragraphs, you said
3  that there are multiple proximate causes for the
4  injuries sustained, and we talked about how these
5  were causes of why she failed to clip in when to
6  me, at least it's clear, she knew how to clip in
7  because this wasn't her first time up the wall; can
8  we agree to that?
9        MR. WHITTEN:  Object to form.
10        THE WITNESS:  Again, I don't know how she
11  was clipped in prior to this, but yes, so I
12  don't -- so I don't -- there is nothing in any of
13  the depositions or other documents that says what
14  the process of her getting clipped in prior to this
15  event was.  You know, I don't know.
16  BY MR. HAZELTON:
17    Q   Is it common or standard practice for
18  adults who bring children under the age of 14 to
19  climbing gyms to be responsible for the supervision
20  of those children under 14 after they have been
21  instructed on the orientation, instructed on the
22  use of the auto belay, and instructed and informed
23  about their responsibility to supervise those
24  children; is that a common practice in climbing
25  gyms?

Page 187

1        MR. WHITTEN:  Object to form.
2        THE WITNESS:  I would say that yes, that
3  is -- that commonly occurs.
4  BY MR. HAZELTON:
5    Q   Is that a standard practice?
6    A   I wouldn't call it a standard practice.
7    Q   The CWA does an outline that children of
8  a certain age must be under the direct supervision
9  of an adult?
10    A   No.
11    Q   Okay.  Back to Paragraph 1, and I
12  apologize, I didn't touch on the very last part.
13  It says, "In addition there is no evidence that any
14  of the three adults in Ms. Kornegay's group were
15  provided an orientation.  Only the minors in the
16  group are listed on the Facility and auto belay
17  orientation form," and that is what we've been
18  talking about, right, this?
19    A   Yes.
20        MR. HAZELTON:  And since I am referring
21  to it, I'm marking this as Defendant's Exhibit 10.
22  It's something that we've been talking about a
23  lot.
24        (The document was marked as Hague
25        Defendant's Deposition Exhibit Number 10.)

Page 188

1  BY MR. HAZELTON:
2    Q   This is the facility and auto belay
3  orientation info that is signed and dated by the
4  participants stating that they participated in and
5  understand the orientation.  It's also attached to
6  the waiver signed by Kinsley'S father prior to her
7  climbing that day.
8        The third paragraph right above where the
9  signatures are, it says, "My signature indicates
10  that I, or if I am a member of a group, that I and
11  those listed here and on the other side of this
12  document, if any, have witnessed and understand the
13  information above and that High Point's staff has
14  presented all of the above material to me/us," so
15  you would agree that that sentence is wrong in your
16  report?
17        MR. WHITTEN:  Can you let him see the
18  document?
19        MR. HAZELTON:  Sorry, I thought that you
20  had one over there.
21        MR. WHITTEN:  No.
22  BY MR. HAZELTON:
23    Q   So where in your report you say, "No
24  evidence that any of the three adults and Ms.
25  Kornegay's group were provided an orientation," we

Page 189

1  can agree that that is not correct, right?
2    A   Which of the three are -- which of the
3  three are the adults?
4    Q   The person that signed on behalf of
5  Kinsley and the other children.
6    A   That is one.
7    Q   Okay.
8    A   Where --
9    Q   Again --
10    A   Where are the adults listed?
11    Q   Again, in addition, there is no evidence
12  that any of three adults is what you say --
13    A   Oh, well, did she sign --
14    Q   We know at least one.
15    A   I don't think that she signed for
16  herself, though, did she?  She signed off for six
17  kids, but she didn't sign for herself.
18    Q   It says, "My signature indicates that I,
19  or if I'm a member of a group, that I and those
20  listed here and on the other side have witnessed
21  and understand."  The signature indicates that.
22    A   Okay, so we have one -- one of the
23  adults.
24    Q   Okay, so at least there is evidence that
25  at least one of them --

48 (Pages 186 - 189)

Page 190

1    MR. WHITTEN: Object to form.
2 BY MR. HAZELTON:
3    Q    -- you know, attended the orientation?
4    A    Based on what it says there, yes; it
5 looks like that is what she signed, anyway. I say
6 "she;" I don't know if it is a "she" who had,
7 actually.
8    Q    And in your conclusions, "HPC estimated
9 it has experienced a dozen similar accidents
10 involving climbers failing to clip into the auto
11 belay in the last three years but, according to
12 Shawn Watson in his deposition, has done nothing to
13 change their policies, procedures or equipment to
14 stem the tide of resulting injuries. Policy
15 changes providing additional supervision and
16 technology such as the Nicros Auto Belay Safety
17 System or larger belay gates would prevent the vast
18 majority of these incidents." Is it your opinion
19 that had they had this auto belay safety system in
20 place, it would have prevented this?
21    A    Likely, yes.
22    Q    Okay. Do you know of any gyms that use
23 that system?
24    A    No.
25    Q    Okay. Have you ever been into a gym that

Page 191

1 has used it --
2    A    No.
3    Q    -- and says, this doesn't work, we're not
4 using it anymore?
5    A    No.
6    Q    You just know that it existed, but you've
7 never seen it actually used?
8    A    Correct.
9    Q    But it is your opinion that would have
10 prevented this accident?
11    A    Yes.
12    Q    And again, larger belay gates such as the
13 one that is used at Rise Up, that would have
14 prevented this?
15    A    Well, it is a combination of things with
16 that belay gate. It is a bigger belay gate, and it
17 also covers the starting holds.
18    Q    Well, all I have to go by is this report
19 that you filed, and where in the report does it say
20 anything about a larger belay gate? This is --
21 this is what your opinion is, so "A larger belay
22 gate would prevent the vast majority of these
23 instances." What data do you have to support this
24 at all?
25    A    Well, you asked that question before

Page 192

1 about data, and I told you that there isn't any
2 data about anything in climbing gyms.
3    Q    So what sufficient facts or -- I use the
4 word "data" again, do you have that would -- that
5 would support the opinion that larger belay gates
6 or this Nicros system would prevent accidents like
7 these?
8    A    I don't know what to say, other than --
9    Q    Other than your personal opinion?
10    A    Other than the common sense of if you
11 can't touch, stand on, grab, any of the holds, how
12 are you going to get on the climbing wall?
13    Q    What about the Nicros system; what --
14    A    What about it?
15    Q    What facts, evidence, data do you have
16 that suggests that that would prevent similar
17 incidents from happening?
18    A    I have Nicros; I have the company who has
19 tested their product.
20    Q    That no climbing gyms use?
21    A    Well, none that I've seen.
22    Q    None that you've seen, okay, and you say,
23 "These deviations from best practices were the
24 proximate causes of Ms. Kornegay's accident and
25 resulting severe injuries." Do you think that

Page 193

1 Kinsley was responsible at all for failing to clip
2 in?
3    MR. WHITTEN: Object to form.
4 BY MR. HAZELTON:
5    Q    Do you think it was her responsibility at
6 all?
7    A    I think a twelve-year-old, I don't.
8    Q    Okay. What about the parents that
9 brought her there and agreed that they were
10 responsible for supervising her, do you think that
11 they bear any responsibility?
12    MR. WHITTEN: Object to form.
13    THE WITNESS: I think they probably could
14 have done a better job of supervising the kids that
15 they were charged with.
16 BY MR. HAZELTON:
17    Q    And what do you base that on?
18    A    What do you mean, what do I base that
19 on?
20    Q    What do you base that opinion on that
21 they could have done a better job?
22    A    Well, I mean --
23    Q    Just the documents that you've seen, the
24 testimony that you've read, the evidence? You have
25 to understand I'm not asking for your personal

Veritext Legal Solutions

877-373-3660                    EXHIBIT 3 - 000049                    800.808.4958

1 opinion on any of this stuff, Dan.
2     A   You are not?
3     Q   I'm asking for your opinion as a
4 purported expert in this, and there are standards
5 that have to be met in order for you to offer those
6 and for a court to accept them and allow a jury to
7 hear them.  It can't be just your personal
8 opinion.  We can find anybody to come in there and
9 give their personal opinion.  These things have to
10 be based on things which is why courts either allow
11 expert opinion or they don't, so I'm asking you,
12 what are you basing these opinions on?
13         MR. WHITTEN:  Jeremy, his expert opinions
14 are in this report.  You are asking him about his
15 opinions on things that are not included in this.
16         MR. HAZELTON:  I'm asking -- he's making
17 causation opinions in his report and in his
18 testimony, and I'm asking him about other causes of
19 the accident.
20         MR. WHITTEN:  You specifically asked his
21 opinion on the parents that are there, and the
22 parents are not mentioned anywhere in this report.
23         MR. HAZELTON:  The supervising is
24 absolutely mentioned in this report.
25

1 BY MR. HAZELTON:
2     Q   And my question is whether -- well, you
3 just said they probably bear some or they
4 could have supervised them better, and so I'm
5 asking you, what is that based on, if it's based on
6 anything other than just the fact that it happened?
7     A   So supervision is mentioned in this
8 report but it's mentioned -- it's not mentioned in
9 relation to the parents; it's mentioned in relation
10 to what Perfect Descent requires their users to do
11 about supervision, and Perfect Descent does not say
12 -- it does not say, "parents;" it says, "trained
13 operators," and a trained operator is somebody who
14 has been trained as staff at the facility.  It's
15 not -- it's not a parent, so as far as supervision
16 goes, the gym's basically washing their hands of
17 responsibility once they tell the parent that they
18 are responsible to supervise is not adequate based
19 on the fact that Perfect Descent requires there to
20 be a trained operator standing there clipping
21 people in.
22     Q   Do you know one indoor climbing gym, and
23 I might have asked you this, in the whole country
24 or perhaps the world that uses the Perfect Descent
25 auto belay system that is in compliance with that

1 section of their operator's manual?  Name one.
2     A   I don't.
3         MR. WHITTEN:  Object to form.
4 BY MR. HAZELTON:
5     Q   Okay.
6     A   But it is irrelevant; it is in their
7 manual.
8     Q   I understand; I was just wondering if
9 you, of the hundred of gyms that I've been in, that
10 you could name one that in your opinion is
11 compliant with the section of that manual, if there
12 is.
13     A   Well, first of all, I haven't been in
14 hundreds of gyms.  Second, there are two
15 manufacturers of these devices, and so Perfect
16 Descent does not have a monopoly, so of auto belays
17 that I've observed, only a proportion have been
18 Perfect Descent.
19     Q   Sure.
20     A   But I still have not seen anybody this
21 actually complies with their manual.
22     Q   All right.  Let me ask you this.
23     A   Except for -- except for non-climbing
24 gyms who do typically.
25     Q   Let me ask you this.  What is the

1 difference, other than it being a different
2 company, different marketing, if any, in the
3 manufacture or the operation of a TruBlue system
4 versus a Perfect Descent system?  It's basically
5 two sides of the same coin; they do the same thing?
6     A   Can you ask that question again?
7     Q   I'm wondering what the differences are
8 other than one is a Nike; one is Adidas.
9     A   I'm not an engineer so I can't answer
10 that question.
11     Q   Okay, but in terms of when you've either
12 used them yourself or seen them get used, do you
13 notice any difference in the TruBlue versus the
14 Perfect Descent?
15     A   Again, I don't know why Perfect Descent
16 has that in their manual but it is in their manual,
17 so if it is in their manual, it has to be -- and
18 you are going to follow the Climbing Wall
19 Association standard, you are going to follow the
20 manual.
21     Q   Understood, but that wasn't my question.
22 My question was what is the difference that you've
23 noticed in the operation of the TruBlue system
24 versus the Perfect Descent system?
25     A   And what I've responded with is I don't

Page 198

1  know why that particular thing is in their manual.
2  Maybe there is something about the engineering of
3  their product that they want somebody standing
4  there; I don't know.
5      Q   But that is not my question, Dan.
6      A   I understand your question, but I can't
7  answer the question about whether or not,
8  operationally, they should be used in the same
9  way.  I don't know that.
10     Q   I'm just wondering what the difference is
11 when you used them.  Are they used differently or
12 are they operated differently or are the systems
13 essentially the same but they are just like I said
14 before, you know, one brand; some people prefer one
15 brand over another?
16     A   And so I will answer the question the
17 same way again.  I don't know what the differences
18 are between the two mechanical devices and why
19 Perfect Descent might have the -- difference in
20 procedure from TruBlue.  I don't know.
21     Q   I don't know what is in the TruBlue
22 manual; I've never seen it.  I'm just asking you
23 what the differences are when you use it; is it
24 used the same way --
25     A   The --

Page 199

1      Q   -- in climbing gyms?
2      A   So the answer is that if you follow their
3  manuals, they are not used in the same way.  If you
4  follow their directions, they are not.  TruBlue
5  does not call for a trained operator to be -- to
6  clip every climber in; Perfect Descent does.  I
7  don't know why they are different, but they are.
8      Q   I mean, practically speaking, when you go
9  into a gym with TruBlue, do you -- the climb that
10 you do, does it all work the same way in terms of
11 there is a lanyard and then you clip the carabiner
12 in on one and then the other one and then it slowly
13 lowers you down after you reach the top; it has the
14 same type of system?  That is my question; is it
15 used the same way?
16     A   It's -- it's used in the same way as long
17 as you leave out that supervision part of how they
18 are directed to be used.  If you describe the
19 device as you clip it to your harness, you clip it
20 to a climber's harness, they climb up the wall, and
21 if they fall off or let go, it slowly lowers them
22 back to the ground.  That is what they do.
23     Q   They both do this?
24     A   Yes.
25     Q   Okay.  That is all I was trying to ask.

Page 200

1      A   But if you ask me the same question
2  about, you know, how is a Mack truck operated
3  versus an Audi, I would say, well, they both go
4  down the road in the same way but they are operated
5  differently, right, so it's kind of --
6      Q   Is that your understanding, the
7  difference between those two would be analogous to
8  the difference between a Mack truck and an Audi;
9  that is how different they are?  I don't know; I've
10 never used it.
11     A   I don't know, either, because I'm not an
12 engineer; I don't know what is inside of them.
13     Q   Well, you obviously know that the TruBlue
14 operation manual does not contain that section that
15 was in the Perfect Descent; I didn't know that.
16     A   Well, I've read the manual.
17     Q   Why did you read the manual?
18     A   Earlier in this deposition, we talked
19 about how many cases I've been involved in where an
20 auto belay is involved in the accident, and some of
21 those are TruBlue.
22     Q   Have any of the TruBlue cases that you've
23 been involved in been failure to clip-in cases?
24     A   Yes.
25     Q   Okay, and was it a supervision issue; was

Page 201

1  it an orientation issue in the TruBlue cases?
2      A   I don't remember, and typically, I
3  don't -- I wouldn't remember which is TruBlue and
4  which is Perfect Descent.
5      Q   No, well, that is fair.  Honestly, I
6  wasn't trying to be difficult; I was literally
7  wondering if there was differences between the
8  two.  To me, it sounds like they really are not
9  different; they operate the same way, but anyway,
10 give me just a couple of minutes and let's take a
11 break, and I think that I'm done.
12     (Off the Record.)
13     MR. HAZELTON:  I don't have any more
14 questions, but for the Record, I wanted to mark as
15 a collective Exhibit 11 Page 48, 50, 51, and 52
16 that I referred to several times in the deposition,
17 and I have taken photos of these pages and will
18 email the court reporter those photos of those
19 pages to be attached as Exhibit 11 to the
20 deposition.
21     (The documents/photographs were marked as
22 Hague Defendant's Deposition Exhibit Number
23 11.)
24     MR. HAZELTON:  That is all that I have.
25     MR. WHITTEN:  I don't have anything.

51 (Pages 198 - 201)

Page 202

1  Would you like to read and sign your transcript?
2         THE WITNESS:  Yes, please.
3
4         (The deposition concluded at 3:09 p.m.)
5
6
7
8
9
10
11
12              * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 204

1  To: AUSTIN B. WHITTEN, ESQ.
2  Re: Signature of Deponent Daniel Hague
3  Date Errata due back at our offices: 30 days
4
5  Greetings:
6  This deposition has been requested for read and sign by
   the deponent.  It is the deponent's responsibility to
7  review the transcript, noting any changes or corrections
   on the attached PDF Errata.  The deponent may fill
8  out the Errata electronically or print and fill out
   manually.
9
10  Once the Errata is signed by the deponent and notarized,
    please mail it to the offices of Veritext (below).
11
12  When the signed Errata is returned to us, we will seal
    and forward to the taking attorney to file with the
13  original transcript.  We will also send copies of the
    Errata to all ordering parties.
14
15  If the signed Errata is not returned within the time
    above, the original transcript may be filed with the
16  court without the signature of the deponent.
17
18  Please Email the completed errata/witness cert page
    to readandsign@veritext.com
19  or mail to
20  Veritext Production Facility
21  2031 Shady Crest Drive
22  Hoover, AL 35216
23  205-397-2397
24
25

Page 203

1              C E R T I F I C A T E
2  COMMONWEALTH OF VIRGINIA
3  COUNTY OF ROANOKE
4       I, Lisa M. Hooker, Notary Public in and
5  for the Commonwealth of Virginia, at Large, do
6  hereby certify that the Deposition of DANIEL M.
7  HAGUE was by me reduced to machine shorthand in the
8  presence of the witness, afterwards transcribed
9  under my direction by means of Computer, and that
10 to the best of my ability the foregoing is a true
11 and correct transcript of the Deposition as
12 aforesaid.
13      I further certify that this Deposition
14 was taken at the time and place in the foregoing
15 caption specified.
16      I further certify that I am not a
17 relative, counsel or attorney for either party or
18 otherwise interested in the outcome of this action.
19      IN WITNESS WHEREOF, I have hereunto set
20 my hand at Roanoke, Virginia, on this the 28th day
21 of February, 2022.
22
                    *Lisa M. Hooker*
23                  Lisa M. Hooker
                    Notary Public
24
   My commission expires October 31, 2023.
25 Notary Registration Number:  165043

Page 205

1  ERRATA for ASSIGNMENT #5071069
2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that
3
4  ___ There are no changes noted.
5  ___ The following changes are noted:
6
   Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
7  (2017). Rule 30(e) states any changes in form or
   substance which you desire to make to your testimony shall
8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any
9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.
10
11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____
24
25

52 (Pages 202 - 205)

Page 206

1  Page _____ Line _____ Change _____

2  _____

3  Reason for change _____

4  Page _____ Line _____ Change _____

5  _____

6  Reason for change _____

7  Page _____ Line _____ Change _____

8  _____

9  Reason for change _____

10 Page _____ Line _____ Change _____

11 _____

12 Reason for change _____

13 Page _____ Line _____ Change _____

14 _____

15 Reason for change _____

16

17

18        _____

         DEPONENT'S SIGNATURE

19

   Sworn to and subscribed before me this ____ day of

20

        _____, _____.

21

22 _____

23 NOTARY PUBLIC / My Commission Expires:_____

24

25

Veritext Legal Solutions
877-373-3660                                                        800.808.4958
EXHIBIT 3 - 000053

**&**

**&**   2:6 10:18 79:15
82:16 84:21

**0**

**00505**   1:9

**1**

**1**   3:11 29:21,23
144:14 149:12
154:9 167:14
187:11
**1-1-22**   67:4,18 73:2
**1-7-22**   3:16
**1.13**   70:10
**1.23**   73:18
**10**   3:19 66:21
187:21,25
**10,000**   19:16
**10-15**   159:23 160:5
160:16
**10:05**   1:18
**11**   3:20 66:22
201:15,19,23
**1100**   2:8
**12**   94:20 155:24
**12,000**   32:7
**1220**   5:10
**125**   3:16
**13**   11:4,24
**14**   77:16 94:20
186:18,20
**145**   3:17
**15**   152:12,21 153:3
153:4,5,9,9 154:7,8
154:16 155:8 160:4
160:6,13,18 162:10
162:17,23 164:6,25
165:2,8
**159**   3:17
**15th**   68:8,19,23

**16**   1:18
**165043**   203:25
**17**   155:24
**173**   3:18
**18**   28:14
**1800**   2:17
**187**   3:19
**19**   7:10
**1973**   11:10
**1979**   8:2,3
**1981**   8:16
**1993**   10:25 14:4
**1996**   6:11
**1998**   15:8
**1st**   74:13

**2**

**2**   3:11 53:11,13,25
58:22 63:1 144:14
149:13,18 167:14
**2-1**   73:14
**2-1-22**   67:4
**20**   16:6 18:19,20
31:18 75:10 100:7
162:8
**200**   16:2,9
**2000s**   24:7
**2001**   2:7 20:8,13
22:14
**2004**   25:1
**2005**   28:20 37:19
**2006**   31:10 34:16
35:13 36:1
**2007**   35:1,5,8,11
123:9 126:20
**2008**   37:15,19,23
38:16 119:23
**2009**   24:24 36:3
**201**   3:20
**2010**   24:24 36:7
123:12

**2011**   122:5
**2012**   31:10 35:13
36:1,3,7
**2015**   41:19 106:9
**2016**   99:2 158:10
**2017**   98:10,16
158:10 205:7
**2019**   6:19 41:16
42:5 47:2 51:3,20
55:21 88:4 134:6
134:10,12,13
135:10 156:22
163:4
**2020**   97:6,25
112:17
**2021**   68:8 90:24
173:7 174:19
**2022**   1:18 35:3
74:21 203:21
**2023**   203:24
**2031**   204:21
**205-397-2397**
204:23
**20th**   2:16
**220**   168:1 173:12
174:15 175:10
**230**   173:12 174:15
175:10
**24502**   1:20
**24504**   5:11
**26**   114:10
**270**   76:5
**271**   203:22
**28**   57:16,18,20
**28th**   203:20
**29**   3:11 57:16,20
**2:21**   1:9
**2nd**   163:4

**3**

**3**   3:13 54:1 67:2,6
68:22 128:6 167:23
176:7
**30**   57:17,24 69:24
77:5,13 204:3
205:6,7
**30s**   25:19
**31**   57:17,18,25,25
203:24
**335**   76:6
**350**   76:8
**35203**   2:9,18
**35216**   204:22
**3620**   1:19
**3:09**   202:4

**4**

**4**   3:4,13 54:11
68:11,13,15 128:7
178:13
**4-9-21**   3:18
**4.1**   149:19
**40**   73:2 77:5,13
**45**   69:7 73:22
**48**   133:22 134:3
135:13,19 136:21
140:13 183:15
201:15

**5**

**5**   3:14 76:22,23,25
77:14 129:16
182:18,21 183:24
**5,000**   17:13 32:8
**5-30**   205:6
**50**   18:1 25:22 39:14
39:20,24 40:2
59:16 61:10 201:15
**50/50**   38:23,25
39:21

EXHIBIT 3 - 000054

**504** 122:22
**505** 2:16
**5071069** 205:1
**51** 25:15 59:16
61:10 201:15
**52** 58:24 61:10
201:15
**53** 3:12

**6**

**6** 3:15 55:4 124:25
125:1,3
**60** 64:18,21,23 65:9
90:16 104:22
**67** 3:13
**68** 3:13

**7**

**7** 3:17 63:1 74:21
145:8,10,13 149:10
149:23 152:25
165:16,19 166:5
**716** 74:24
**7333** 69:7
**76** 3:15
**7th** 75:7 76:3

**8**

**8** 3:17 66:7 159:14
159:16
**8,000** 18:12
**80s** 12:1,1,8,9
**85** 110:12

**9**

**9** 3:18 66:12 130:9
173:2,4,7,8,21
**90** 110:12
**90s** 12:19 23:21
24:6
**911** 20:15
**98** 20:21

**a**

**a.m.** 1:18
**abilities** 144:6
**ability** 49:14
143:22 164:3
203:10
**able** 17:22 44:22
65:16 68:6 137:3
137:17,17 138:8
139:6,7 149:15
182:24
**abnormal** 72:18
**absolutely** 109:20
142:24 147:18
194:24
**accept** 194:6
**accepted** 61:5
107:1 125:16 127:4
127:8
**access** 131:11
139:11 183:1,1,9
183:12,18
**accessing** 131:7,16
139:5
**accident** 118:2
121:3 141:24 142:6
142:17,18 174:6,9
191:10 192:24
194:19 200:20
**accidentally** 29:3
**accidents** 142:25
157:12 190:9 192:6
**accommodation**
84:6
**accommodations**
83:25
**accomplish** 162:8
**accurate** 51:9
**acquire** 144:21
149:15 164:2

**acquired** 144:5,16
**acronym** 80:23
**acting** 52:25
**action** 203:18
**actions** 92:19 95:16
**actively** 52:19
**activities** 19:20
33:3 42:14 152:21
172:18
**activity** 13:7 60:9
62:3,7 108:15
142:24
**actual** 16:16 17:17
64:12 67:20 72:21
134:15 148:18
179:20
**add** 114:5 129:19
**added** 85:16
156:19 178:25
**addendum** 173:13
173:16
**adding** 19:18,19
**addition** 187:13
189:11
**additional** 36:18
52:24 75:22 190:15
205:9
**address** 5:9,12,13
5:17,18 98:3 128:3
128:8,8
**addressed** 127:19
127:24 142:16
176:15
**adequate** 61:19
80:7 92:20 96:13
100:12 107:10
119:19 126:7,11
131:15 132:1,19,25
136:5,23 137:9
138:21 139:22
140:1,14,18 141:2

141:13 146:21
150:4 158:15
159:25 160:23
161:7,11,12 162:17
163:9 167:15,24
183:16 195:18
**adequately** 93:18
95:7 105:7 107:16
113:14 143:24
144:9,20 149:14,14
161:22 164:2
172:14 183:8
**adhere** 27:21 28:1
**adheres** 165:22
**adidas** 197:8
**adjusted** 27:15
**adjustments** 27:25
**administers** 149:21
**admits** 180:23
**adopted** 27:10
28:11
**adult** 11:24 83:20
108:2 184:23 187:9
**adults** 45:5,6
116:13,14,16
166:25 186:18
187:14 188:24
189:3,10,12,23
**advanced** 121:2
**advocating** 167:6
**affidavit** 105:24
**affiliated** 51:14
**aforesaid** 203:12
**age** 11:24 77:16
179:3 180:11
186:18 187:8
**agent** 10:11,12
**ago** 28:14 87:19
**agree** 28:5 61:24
62:15 63:10 77:8
86:12 108:14,24

EXHIBIT 3 - 000055

129:23 130:2 135:9
135:12,17 136:3
150:3 153:4 154:6
167:13,16 173:23
184:19 185:1,10
186:8 188:15 189:1
**agreed** 27:20 193:9
**agreement** 3:13
52:6 66:25 68:7,16
111:21
**agreements** 158:6
**ahead** 169:16
**air** 97:25 98:2
**al** 2:18 204:22
**ala** 205:6
**alabama** 1:3 2:9
4:2 7:17 106:15
**alexandria** 13:15
13:19,20 14:2 18:4
19:3,14 40:21
**allegations** 72:22
**allege** 154:8
**alleging** 72:21
**allow** 14:15 45:14
107:3 164:2 170:24
194:6,10
**allowed** 78:21,24
104:16 150:10
**alpine** 119:24
120:8,19,21,25
**alter** 148:23
**altitude** 78:11 79:6
79:15,20 80:9,19
82:15 84:21 87:20
**amount** 161:8
**amusement** 82:20
84:13 88:23 178:19
**analogous** 200:7
**analysis** 8:24 9:16
**analyst** 9:20

**andrew** 114:2
122:6
**answer** 4:25 5:3
17:18 50:20 58:15
83:14 105:11
175:23 197:9 198:7
198:16 199:2
**answered** 50:13,15
160:25 165:11
**anticipation** 179:10
**anybody** 31:25
33:15 69:23 80:25
100:6 110:1 174:14
174:25 175:3 194:8
196:20
**anymore** 160:12
176:25 191:4
**anyway** 94:22
113:5 114:14 129:9
190:5 201:9
**apologize** 112:16
187:12
**apparatus** 82:1
84:13
**appealing** 83:21
**appearances** 2:1
**appears** 49:3 137:1
140:18 165:2
**appreciate** 55:12
**appropriate** 104:2
**appropriately**
113:9
**approximately**
19:13 77:2 152:12
153:5 154:8 158:20
**april** 173:7
**area** 10:5 122:22
**areas** 12:20 83:16
**argue** 147:19
**arizona** 118:11

**artificial** 31:21,25
32:19 55:18 108:9
**ascending** 168:3
**asked** 50:12,17
83:15 86:1 87:22
91:16 100:3 101:13
110:17 154:21
159:11 191:25
194:20 195:23
**askew** 52:9
**asking** 57:5,6 72:17
76:21 81:13 83:12
127:10,22 130:17
150:7,8 154:25
160:14 164:22
165:5,6 171:20,24
172:4 175:13
193:25 194:3,11,14
194:16,18 195:5
198:22
**aspect** 14:18 22:25
34:6 39:2 115:17
116:20 140:25
**aspects** 46:8 178:20
**assertion** 175:14
**assessing** 144:15
150:16
**assessment** 145:5
151:4
**assets** 40:7,7
**assignment** 205:1
**assist** 205:8
**assistance** 45:17
**assisted** 85:19 86:3
**assisting** 9:4
**associated** 51:14,20
63:21
**association** 23:10
23:13,20 31:10
37:5 81:1 169:12
173:19 197:19

**assume** 5:3 18:3
53:16 54:13 58:25
59:6 65:14 66:8
68:20 70:12 71:18
73:7,9 82:23 84:22
149:25 150:1,11
182:6 185:4
**assumed** 39:22
114:12 185:7,11
**assuming** 29:4 71:1
107:14 132:22
152:17 166:6
**assumption** 132:20
150:7,9 153:17
155:3 179:17,18
182:9
**assumptions**
154:18
**attach** 205:9
**attached** 94:3,16
188:5 201:19 204:7
**attaching** 115:3
135:22
**attempted** 114:24
**attended** 190:3
**attending** 78:19
112:24
**attention** 43:19
153:12 158:17
159:5,11 179:11,25
180:1 181:24
**attentive** 42:21
**attenuation** 96:13
126:6
**attorney** 65:21,22
81:10 97:22 111:8
111:16 113:19,22
203:17 204:12
**attorneys** 88:2
89:10 109:25 111:1

EXHIBIT 3 - 000056

**attract** 110:9
**audi** 200:3,8
**august** 20:8 22:13
36:7 163:4
**austin** 2:5 4:17
74:16 123:6 204:1
**austinw** 2:10
**authority** 175:16
**auto** 64:9 77:4,9,15
77:17 78:25 79:13
79:23 89:7,18 95:1
99:7,9 114:18,20
116:2,3,17 121:4
124:2 126:21
129:17 132:20,22
133:4,5,11,23,24
134:2 135:9,13,15
135:17,20,22
136:21,22,23 137:8
140:23 142:1,8
143:7,9 144:22
145:16,23,25 146:2
146:8,13,16,24
147:1,8 149:15,20
149:21 150:13,14
152:15,18,22
155:18,22 156:4,9
156:12,15,17,18,23
157:7,12,16,20,24
158:15 159:2,21
160:6,19 161:16,17
161:19,21 162:5,22
165:23 166:3,7,7
166:19 169:23
171:8,13,25 172:8
172:22 173:15,20
175:21 176:1
177:16 178:20
183:16 186:22
187:16 188:2
190:10,16,19

195:25 196:16
200:20
**available** 12:13,16
14:11 33:8 94:25
104:15 132:4 136:6
136:7 152:14
**average** 19:1,5,24
41:10 45:11
**aware** 7:18 44:24
152:2 157:6,10,15
157:18 181:10

**b**

**b** 2:5 3:8 6:8 204:1
**back** 16:20 37:16
54:6,7 58:14 62:25
76:14 87:24 95:5
96:19 118:6 123:11
153:13 156:10,21
158:9 187:11
199:22 204:3
**background** 7:20
**backwards** 99:8
100:1
**bad** 93:15
**baker** 52:7
**ball** 21:24 22:1
**ballard** 122:9
**barely** 119:3
**barrier** 133:24
**base** 136:16 185:22
193:17,18,20
**based** 68:2 107:1
110:5 113:23
130:12 143:19
144:25 148:24
150:22 152:19
153:16,19 154:17
154:22 155:6
164:25 165:1
167:17 182:3,5,9
182:11 190:4

194:10 195:5,5,18
**basement** 32:8
**basically** 49:1
107:9 136:15 179:2
179:6 195:16 197:4
**basing** 44:5 156:11
179:14,16,21
194:12
**basis** 12:3
**batch** 69:11
**bathroom** 49:9
**bathrooms** 17:2
**bean** 106:9
**bear** 193:11 195:3
**bearing** 99:10
129:25
**beat** 178:21 180:2
**began** 54:7 71:8,22
**beginning** 10:8
71:3 81:12 178:15
183:9 186:1
**begins** 131:5
**begun** 73:4
**behalf** 2:12,21 65:3
68:10 90:21 92:8
98:2,13 104:23
122:17 123:3,16,17
189:4
**behaved** 185:22
**behavioral** 182:13
**behest** 65:21
**belabor** 167:10
**belay** 43:4,6 47:6,7
48:4 64:9 77:4,9,15
77:17 79:23 89:7
89:18 95:1 99:7,9
114:18,20 116:1,2
116:4,17 120:25
121:2,4 124:1,2
126:21 127:1
129:17,22,23 131:6

131:15,21,23 132:1
132:5,7,9,11,12,17
132:20,22,23,25
133:4,5,7,11,24
134:2 135:9,13,17
135:22,25 136:12
136:15,19,21,22,23
138:21,23,25 139:6
139:10,19,23 140:1
140:14,21 141:1,7
141:13,22 142:1
143:7,9 144:9,22
145:16,18,21,23,25
146:2,7,7,8,10,13
146:15,16,21,23,24
147:2,8 148:5
149:16,20,21
150:12,13,13,14
152:15,18,23
155:19,22 156:5,9
156:12,23 157:7,12
157:16,20,24 159:2
159:21,22 160:6,19
161:16,17,19,21
162:5 165:23 166:1
166:2,3,6,7,7,18,19
169:23 171:14
172:8,22 173:15
176:1 177:16
178:20 182:22,25
183:3,6,8,11,16,17
184:4 186:22
187:16 188:2
190:11,16,17,19
191:12,16,16,20,21
192:5 195:25
200:20
**belayed** 120:13
**belayer** 113:6,9,14
120:16 124:2

**belayers**  44:8
**belaying**  43:2 44:9
  44:18
**belays**  78:25 79:13
  133:23 135:15,20
  137:8 140:23 142:8
  156:15,17,18
  158:15 162:23
  171:8,25 175:21
  196:16
**believe**  15:8 17:13
  35:1 38:25 51:22
  66:24 69:2 70:9
  73:13 78:10 79:1
  80:12 91:15 92:15
  97:20 99:22 103:2
  103:13 106:5,16
  123:5 146:22
  159:25 176:22
**bell**  122:18,24
**bells**  84:5,11 123:1
**best**  26:16 55:20
  60:2 61:1 97:13
  117:25 135:14,19
  140:22 141:10
  175:8 192:23
  203:10
**better**  12:18 27:19
  91:5 100:24 101:6
  128:10 148:12,18
  170:24 193:14,21
  195:4
**big**  40:11 61:25
  95:3 150:8 166:12
  166:17
**bigger**  18:8,10
  19:14,15 40:20
  150:18 191:16
**billiards**  99:19
**birmingham**  1:10
  2:9,18

**birthday**  78:19
  116:16 172:10,12
  172:13,16
**bit**  7:19 11:16
  42:24 46:16 76:18
  104:12 131:3
  182:21
**block**  183:17
**blocking**  183:1
**blond**  170:11,24
**blood**  7:16
**bloomington**
  113:21
**blue**  111:23 112:3,6
  112:6,8,12,16
  114:5 121:9,15,25
  122:2,15,16 170:12
  170:24
**board**  24:19,20
  35:23 36:9,10,17
  36:19 37:13 97:7
  97:10
**bold**  61:25 153:2
**bolts**  34:2
**book**  55:5,7,22
  56:2,11,16 57:11
  58:5,23,24 61:10
  62:13 108:8 129:13
  133:21 134:3,5,9
  134:10 135:14,19
  140:22 141:16
  156:22 183:15
**books**  55:3,4
**bottom**  111:23
  126:22,25 129:16
**bought**  26:7
**boulder**  91:8,23
  103:18
**bouldering**  17:17
  90:25 91:23 92:2
  92:21 94:18,23,25

  96:5,15,16 103:17
  118:23 119:3,9
  126:10 129:21,23
  155:18 162:6
**boulders**  93:20
**boy**  168:24
**boyfriend**  65:20
**brand**  20:17
  198:14,15
**break**  57:16 58:13
  58:17 124:5,9
  201:11
**breaks**  11:25
**brief**  15:16 130:8
  131:4 141:23
**briefly**  8:25 112:21
**bring**  33:1 151:15
  186:18
**broad**  154:4 168:24
**broke**  58:20 99:11
**brokerage**  10:10
  10:17
**brought**  193:9
**buck**  122:13
**buffalo**  118:2,14
**buhler**  6:8
**build**  38:2
**building**  134:25
  157:9,11
**built**  12:8 13:20
**bulk**  34:7
**bullet**  145:17,25
  146:6,14 150:1
  151:13 166:6
**bunch**  71:14 88:15
**business**  5:12 10:25
  11:2 12:23,24 13:6
  14:18 20:24 22:25
  33:17,24 34:6
  37:16 39:15 40:18
  41:22 52:10 53:8

  54:5 134:16,24
  157:2
**busy**  153:12
**button**  178:14,18
  179:24 185:23

**c**

**c**  5:10 10:19 203:1
  203:1
**california**  98:10
  116:8
**call**  62:8 69:15,17
  69:24 70:3,6 71:7
  71:21 75:10,11
  86:11 134:18 187:6
  199:5
**called**  23:15 141:22
  145:3
**calling**  150:12
**calls**  70:5,7 109:24
  110:3,10,14,18,22
  110:25
**candlers**  1:19
**capacity**  9:15 19:17
  35:14 37:9 135:4
**capitalist**  25:21
**caption**  203:15
**carabiner**  115:3
  168:7 177:6 199:11
**care**  125:16,18
  126:15 127:5,8,16
  127:18,19 128:5
**career**  8:18 9:24
  10:3
**carolina**  78:6,13
  87:21 89:23 120:3
  120:7
**carter**  98:10
**case**  1:9 3:14 54:2
  54:21 63:19 65:16
  65:19 66:1,14,19
  69:6,20 73:12

EXHIBIT 3 - 000058

74:17 76:19 78:8
78:17 79:5,25 81:5
81:7,10,17,21
85:21 88:5,7 89:7
89:10,22 90:3,7,14
90:19,22 91:10,15
93:3,5,6 96:17 97:6
97:9,15,24 98:19
99:6,7,15 100:11
100:15 101:18
103:9,15,23 104:9
104:13,14,18
105:16 106:13,14
107:21 108:1 109:4
109:13,14 110:6,7
110:13 111:11,20
112:17,19 113:22
113:24 114:11,19
114:24 115:7
116:21 120:24
123:19,20,21,22
124:13 125:7
126:14 127:17,21
130:1,9 131:5
140:8 141:5 162:3
162:3 184:11
**cases** 54:2 60:17
65:1,11 66:21
72:24 77:2,13
79:18 81:13 87:3,8
104:17,22 106:19
109:14,18,21
110:15,21 114:13
121:18 179:23
181:19 182:4,7,8
182:10 200:19,22
200:23 201:1
**caught** 114:8
**causation** 194:17
**cause** 65:6 92:13
141:24,25 142:3

143:6,17 149:13
178:22 181:11
184:4
**caused** 143:15,16
167:15
**causes** 107:22
108:2 142:2,5
186:3,5 192:24
194:18
**cautions** 60:22
**ceased** 20:24
**center** 117:8,12
**central** 7:21
**cert** 204:18
**certain** 29:9 33:17
54:6 94:19 95:20
95:25 105:2 108:17
179:3 180:11 187:8
**certainly** 62:4,9
109:2
**certainty** 125:15
**certification** 36:5
36:23 80:23
**certified** 37:4 80:18
80:20,21,25
**certify** 37:2 203:6
203:13,16 205:2
**chair** 36:13,22
**chairman** 35:17
36:2,4
**challenged** 106:22
106:25
**chance** 53:20
**change** 28:6 76:1
190:13 205:11,13
205:14,16,17,19,20
205:22,23 206:1,3
206:4,6,7,9,10,12
206:13,15
**changed** 54:25 59:9
75:23,23 174:20

**changes** 190:15
204:7 205:4,5,7
**changing** 174:22
**charged** 76:5
193:15
**charging** 76:6
**charlotte** 21:1,25
22:1,2,5,9
**check** 168:3
**checking** 49:7,9,10
**checklist** 34:4
147:24
**child** 77:16 108:2
179:3
**child's** 182:14
**children** 7:6 78:21
83:18 86:17 148:9
180:11 181:12
186:18,20,24 187:7
189:5
**choice** 139:9
**choose** 42:17
**church** 99:1,16,17
100:13,19
**circuit** 119:22
121:21
**circumstances**
81:20 91:20 92:14
120:5 136:24
138:12 172:6
**city** 58:1 87:16
123:23
**civil** 205:6
**claim** 109:17
114:17 120:6
**claiming** 92:7
**claims** 72:12 91:10
92:18 97:14 118:20
**clarify** 16:23 34:10
71:12 110:17
134:14 136:12

175:16
**clarifying** 176:19
**class** 113:5
**classes** 112:24,24
**clean** 49:9 124:15
124:18
**clear** 136:20
140:12 149:8
156:20 162:24
177:24 178:3 186:6
**clearly** 20:8,10,17
21:18 139:16
183:11
**client** 65:10 127:7
127:21
**client's** 130:5
**climb** 11:15,23
17:6 34:5 45:14
52:16 61:21 79:22
84:8 91:23 94:11
96:19 122:12,17
123:13 132:9
136:16,18 137:25
139:6,7,10 146:12
159:24 160:17
178:15 182:24
185:23 199:9,20
**climbed** 79:2 92:2
99:10 100:6 103:18
119:9
**climber** 43:23
44:18 46:3 52:14
53:4,7 105:6
107:21 124:3 168:4
169:6 170:1,13
171:9,15 172:24
177:2,7,18 178:17
178:22,23 182:24
183:9,10,12 199:6
**climber's** 199:20

EXHIBIT 3 - 000059

**climbers** 33:19
45:6 46:17,24
49:11 62:17 81:3
82:21 83:3,18,20
84:1,7 86:17
107:12 126:24
164:2 168:1,22
169:3 190:10
**climbing** 1:10 4:14
9:25 10:24 11:1,2
12:4,13,21,24 14:5
14:16 15:20 16:22
17:1,15,17,23,24
19:19,22 22:5
23:10,13,15,18,19
27:10 28:21 29:4,6
29:8,10,12,15 30:2
30:22,24 31:3,9,19
31:21,23,25 32:3,9
32:20 33:7 36:4,22
37:2,4,20,24 38:16
38:19 44:11 46:16
52:11 55:18 56:3
58:1 60:3,7 62:1,2
62:12,12,16 68:10
78:24 79:6,7,9,11
79:15,22 80:7,18
80:22 81:1 82:2,5,7
82:11,16,21,25
83:4,6,7,9 84:2,11
84:18,21 88:18,20
88:22 89:1,2 91:2,7
91:24 92:21 93:10
93:19,24 94:3,9,10
94:15,21 95:23
100:5 104:16
107:14 108:10
111:3 112:24,25
113:1 116:18 117:8
117:12 120:9,12,14
125:15 126:2

129:17,24,24
130:22 131:8,12,13
134:17 135:21
136:14 137:17
138:6 139:5,17,18
140:11 141:19
143:3,4 152:14
153:24,25 155:2
156:1,2 157:3
158:18 159:21
160:5,19 168:5,6
168:22 169:5,12
170:5 171:13,21,24
172:4,6 173:17,18
175:22 177:15
180:19 182:16
183:13 184:16
186:19,24 188:7
192:2,12,20 195:22
196:23 197:18
199:1
**climbs** 136:1 137:2
137:14 184:23
**clip** 67:3 77:4,8,15
77:16 78:24 79:2
89:17 101:25
102:14 114:22,25
116:18 121:5 142:8
142:10 143:6,9,12
143:12,15,16,18,22
143:24 144:2,9,21
149:15 164:3,19
167:16 177:5
178:22 179:20
180:12 184:5,20
186:5,6 190:10
193:1 199:6,11,19
199:19 200:23
**clipped** 99:9
102:19 115:2 168:5
170:2 184:22 185:3

185:8,11 186:11,14
**clipping** 78:7
150:15,19 170:1
172:13 195:20
**close** 33:21 43:19
158:17
**closed** 115:4
**closer** 82:19,25
**coach** 138:7
**cochran** 98:16
**code** 122:22 205:6
**coded** 111:22
**coin** 197:5
**collaborated** 23:7
27:4
**collaborative** 26:22
**collected** 181:17
182:12
**collective** 201:15
**collectively** 67:1
**college** 7:22,24
112:23
**color** 111:22 112:4
123:6
**combination** 83:25
191:15
**combined** 144:13
149:13
**come** 18:16 21:14
23:11 27:5 33:21
43:8 44:16 48:8
64:16 89:19 130:19
131:1,9 194:8
**comes** 34:3 44:17
**comfortable** 81:23
**coming** 26:20 86:3
86:20 148:23
156:21 173:13
**commencing** 1:18
**commercial** 16:11
32:1,4

**commercially**
32:15
**commission** 203:24
206:23
**committee** 31:9,17
34:16,18 35:16,23
36:3,5,13,23 37:1
**common** 77:10,11
77:12 84:13 125:23
186:17,24 192:10
**commonly** 126:1
187:3
**commonwealth**
1:17 203:2,5
**communication**
63:3
**communities** 12:14
**company** 8:22 21:7
21:21 25:12,12,15
41:20 50:1 157:20
174:17 175:15
178:1,7 192:18
197:2
**comparable** 40:17
**comparing** 84:20
**comparison** 40:12
**compensated** 37:10
37:13
**competitive** 83:20
**complaint** 71:24
72:5,12,23 91:13
130:25
**complete** 1:14
53:25 54:20 153:16
**completed** 74:6,7
74:22 81:16 204:18
**completely** 30:22
100:25 101:6 115:2
136:5 138:14,22,25
151:25 155:3 166:2
166:3

completion 74:4
compliance 195:25
compliant 196:11
complied 28:7
complies 196:21
comply 176:5
computer 203:9
concerning 26:16
concluded 115:9
  202:4
conclusions 64:16
  190:8
concrete 100:7
conduct 161:25
conducted 143:21
conference 70:4
conferred 28:10
configured 132:7
confirm 125:6
confirmed 75:19
conflict 27:22,24
conflicts 173:25
conform 164:15
conformed 164:12
confusing 4:22
  133:19
conjunction 71:15
connect 142:1
connecticut 111:9
connotation 94:18
conscientious
  47:17
consent 108:14
consider 82:4,16
  88:17 137:9 140:13
  141:11 158:14
considered 75:19
  77:10
consists 34:8
constant 168:2
  169:3

constantly 169:6
171:9,15 172:23
  177:7,17
constitute 54:20
  68:16 138:21
  141:12
constitutes 146:21
constructed 120:8
consult 32:11
consultant 33:7
consulted 97:21
  141:20 162:14
consulting 3:13
  29:7,11 30:20 31:4
  45:23 46:5 54:5
  66:25 68:7 87:13
  111:20,21
contact 98:7
contacted 34:17,18
contain 200:14
contained 76:2
  129:12
contains 125:8
contend 107:10
contending 143:11
contesting 92:5
context 181:5
  182:14
contiguous 17:20
continue 11:23
  139:7
continued 73:24
continuously 11:22
contradictory
  175:2
contrary 135:24
contributed 40:2,5
  102:3
control 25:25
controls 80:7

conversation 70:8
73:3,5 75:13
conversations
  63:16 73:11 150:24
convey 100:18,20
copies 55:3 204:13
copy 53:25 54:20
  55:5 58:23 63:2
  66:7,22 124:16,18
copyright 134:10
  134:12
copyrighted 55:20
corner 156:12
cornerstone 122:8
corporation 22:19
correct 33:19 34:25
  36:5 37:17 51:17
  53:8 62:3,23,24
  64:19 67:21 73:13
  73:16 101:1 106:1
  115:6 124:10 134:6
  134:13 138:14,25
  139:14 140:14
  149:16 152:9
  153:17 154:13,19
  159:3,8 163:20
  164:7 184:11,13
  189:1 191:8 203:11
corrected 48:17,20
  49:19
corrections 204:7
  205:9
correctly 78:20
  102:5,14 119:19
correspondence
  63:3,15,17 173:6
cosby 15:2
cost 9:8
counsel 63:4 68:17
  128:18 150:23,25
  203:17

counselor 99:21
count 105:1
counter 109:16
counting 122:1
country 12:9 14:24
  48:9 60:17 166:2
  171:6 195:23
county 97:22 203:3
couple 29:18 30:16
  65:17 106:6 133:16
  174:4 201:10
course 17:4,4 18:15
  21:23 54:4 120:8
  120:17,20,21
court 1:2,16 58:14
  194:6 201:18
  204:16
courts 106:18
  194:10
cover 132:2 135:20
  136:5,13 137:5,7
  138:23 147:14,16
  151:21 161:7
covered 138:22,24
  139:4,9 151:17,18
covering 136:16
covers 131:21
  137:1 191:17
craig 98:13
create 31:21
created 178:23
credit 112:25
crest 204:21
criteria 132:24,25
critical 49:13,14
  86:14,15 113:8
  115:10,18 116:21
  127:7,17,20 128:1
  128:4 130:5 152:7
  160:2

EXHIBIT 3 - 000061

**crucial** 86:16
**crude** 15:16 21:13
**crudely** 21:11
**crystal** 178:3
**csattorneys.com**
  2:19
**curiosity** 43:6
**curious** 64:14
  168:18
**current** 5:9 26:4
  47:9
**currently** 46:18
  51:2 59:18,24
  133:13 173:11
**curriculum** 3:11
**customer** 34:3 42:2
  43:22 61:23 96:3
**customers** 17:5,21
  32:16,23,24 60:8
  60:11,25 61:12,20
  62:17
**cv** 1:9 10:14 24:21
  28:21,23 29:3,20
  31:8,20 35:22
  53:24
**cwa** 23:25 24:1,14
  24:16 27:1,8,16,18
  27:21,25 28:3,7,12
  33:9,10,14,16
  34:22 35:14,14
  36:15,19 37:10,11
  53:5 89:4 125:20
  126:3,5,16,19
  127:8,18,19,24
  128:2,4,7,8 149:19
  170:20 173:25
  174:1,25 187:7
**cwa's** 27:14 34:16
**cwi** 80:22
**cwig** 23:19

**d**

**d** 3:1 6:7,7
**da** 90:20 91:4,19
  95:6 96:4 119:18
**daily** 26:10
**damages** 177:9
**dan** 3:12,14 5:8,9
  53:17 55:20 58:17
  62:11 116:8 121:17
  124:9,24 134:12
  135:2 136:3 147:19
  148:2 149:1 160:2
  162:10 165:6
  168:21 175:19
  194:1 198:5
**danger** 47:24
**dangerous** 48:1
  62:1,2,6,9,12,13,16
  93:19 95:14 104:10
  108:15 142:24
**daniel** 1:15 4:5
  99:2 203:6 204:2
**data** 107:3 172:9
  179:14,15,21 181:9
  181:16,17 182:11
  191:23 192:1,2,4
  192:15
**date** 6:17 24:5 67:9
  67:10,11 130:22
  174:21 204:3
**dated** 3:15,18 67:4
  67:4 68:8,19 74:20
  75:7 76:3 174:5
  188:3
**dates** 35:21 67:8,12
  67:24 68:4 158:8
**david** 98:1,8
**day** 11:8 18:25
  52:21 120:11 138:5
  159:23 160:16
  188:7 203:20

206:19
**days** 204:3
**dc** 9:13,22 10:5
  13:3 20:15 41:8
**deal** 39:12 48:2
**deals** 145:16
**dealt** 77:3
**december** 25:1
  67:19 68:8,19,22
  70:11
**decide** 12:22
**decided** 15:14
  30:18 38:15
**decision** 23:4,5
  176:25 182:15
**decisions** 175:8
**dedicated** 16:21
  88:19
**defeat** 140:6
**defeating** 182:25
**defendant** 1:15
  2:21 65:3,3 90:21
  91:11 92:9,12
  99:16,17 104:24
  111:10,13 113:22
  118:7 122:17 123:2
  123:4,16,17 149:23
**defendant's** 3:11
  29:21,23 53:11,13
  58:22 62:25 67:2,6
  68:11,13,15,21
  76:22,23,25 77:14
  92:18 124:25 125:3
  145:8,10,12 149:9
  152:24 159:14,16
  165:16,18 166:5
  173:2,4,8,21
  187:21,25 201:22
**defendants** 1:11
  105:2 110:8 125:17

**defense** 100:8,11
  109:7,11,22,25
  110:1,18 111:1
**define** 32:2,4
**defined** 126:15
**definitely** 56:13
  78:5 89:24 110:11
  166:14
**degree** 8:7 125:14
**deidre** 6:7,10 7:5
**delaware** 87:18
**delay** 138:13
**delays** 173:20
**delineated** 39:2
  125:20
**delineates** 124:13
**demand** 13:7,8
**demonstrate**
  144:23 145:1
**density** 126:5
**departure** 20:23
**depend** 18:25
  76:11
**depended** 31:16
**depending** 98:18
  155:23 162:18,19
  162:19,20
**depends** 47:23
  82:10 88:21,21
  161:3,13,24,24
**depicted** 140:17
**depicting** 129:17
**depo** 70:11,12,12
  71:6,19 73:19
**deponent** 63:4
  66:14 204:2,6,7,10
  204:16
**deponent's** 66:22
  204:6 206:18
**deposed** 81:5
  101:21

EXHIBIT 3 - 000062

deposition 1:14
3:11 29:23 53:13
53:15,22 67:6
68:13 71:13,25
76:25 101:14,24
102:11 105:24
111:24 114:11,15
117:15 123:3,10,13
125:3 145:10
159:16 173:4
180:22 181:2
187:25 190:12
200:18 201:16,20
201:22 202:4 203:6
203:11,13 204:6
205:8

depositions 4:3
168:13 184:10
186:13

descent 167:25
168:6,10 169:2,8
169:19,23 170:6,6
170:10 171:5,8,13
171:25 172:22
173:7,10,17 174:10
175:4,21 176:3,6
176:12 177:16
195:10,11,19,24
196:16,18 197:4,14
197:15,24 198:19
199:6 200:15 201:4

descent's 177:22

describe 199:18

described 136:24

describing 152:20

description 3:10
146:11

descriptions
152:13

designated 84:4

designed 83:7,8,9
83:17

desire 205:7

detached 183:10

determine 9:6,7,7,8
65:5 182:12

develop 37:1

deviations 192:23

device 120:25
121:2 160:20
169:23 173:15
175:1 181:23
199:19

devices 129:22,24
132:21,23 133:5,6
133:9,11 149:21
157:7,12,16,20,24
161:16 183:16
196:15 198:18

dictate 23:6

died 79:4

difference 44:14
119:15 197:1,13,22
198:10,19 200:7,8

differences 27:13
42:15 44:2,19,25
45:7 197:7 198:17
198:23 201:7

different 5:22
19:18 30:23 39:3
41:1 42:10,14,18
43:16,25 51:11
94:17 119:7 146:8
151:25 166:2,3
172:1 181:18 197:1
197:2 199:7 200:9
201:9

differently 42:4
155:13 198:11,12
200:5

difficult 28:1
135:25 139:22
140:2,5,7,9 201:6

difficulty 139:18

digital 112:4

direct 164:23
175:17 187:8

directed 199:18

direction 25:11
50:24 203:9

directions 199:4

directly 8:6 65:2
127:20 129:13

director 22:23 36:8
36:21

dirt 120:16

disagreed 20:25
21:2,15 27:18

disagreement
20:10 21:4 25:10
183:19

disagrees 178:1

disclosed 149:4

discontinued 25:1

discoverable 63:12

discuss 130:1
133:23

discussed 69:18
149:12 176:21

discusses 135:19

discussing 135:14

disinterested 41:21

disqualified 106:17

disruptive 21:22

distance 12:14

distracted 179:5,19
180:4 185:17,22

distracting 180:11
180:23

distraction 178:19
179:9 180:14

distractions 128:9
178:14 181:11

district 1:2,3

divesting 41:15

division 9:2

divorce 6:17,25
41:17

divorced 6:10

doc 70:11,16,17
71:6,19

document 3:19
29:22 53:12,17,21
58:21 63:1 67:5
68:12 70:19,20
76:24 125:2 145:9
151:2,6 159:15
173:3 187:24
188:12,18

documentary
66:13,18

documents 69:7,12
71:8,15,22 80:3
125:12 130:15
150:23 151:1 165:1
168:8,15 186:13
193:23 201:21

doing 8:23 14:14
14:17 30:20 33:6
44:21 54:7 61:22
121:22 148:1
153:13 156:3 170:3
170:18 185:12

domestic 15:12

domestically 14:20

doubt 58:2

doug 15:2,3,6,15
18:2,3 20:11,18
21:14

dozen 190:9

draft 71:1 73:24

EXHIBIT 3 - 000063

**drafted**  54:23 55:1
  125:7
**drafting**  24:8 26:19
  75:1
**drive**  204:21
**driving**  12:14
**dropped**  113:6
  116:19 120:16
  124:3
**due**  77:3 204:3
**duties**  36:18,25
  39:1,2
**dutton**  2:6

**e**

**e**  3:1,8 6:7,7,8,9,9
  29:16 52:9 203:1,1
  205:6,7
**earlier**  4:13 80:6
  103:16 107:8 135:3
  136:4,24 138:11
  139:12 142:20
  158:3,19 159:7
  168:13 172:20
  200:18
**early**  24:7 81:15
**easier**  84:2,7
  126:13
**easily**  178:24 180:4
  180:11 182:24
**easy**  43:10 121:24
**edge**  139:17
**edition**  24:3,11
  34:23 35:4
**education**  97:7,11
**effect**  105:25 129:5
  154:15 182:14
**effective**  154:14
**efficient**  162:1
**effort**  26:22
**eight**  10:8,21,22
  118:24 122:2

**128:17** 170:11
**either**  19:20 20:23
  47:13 53:1 60:22
  98:3 106:8 112:5,6
  112:8 120:14 132:2
  146:24 154:15
  155:18 165:8 177:4
  181:10 185:18
  194:10 197:11
  200:11 203:17
**elaborate**  36:25
**electronic**  112:11
**electronically**
  204:8
**eleven**  53:21 78:23
**ellis**  122:4
**else's**  10:11 174:25
**email**  81:13 201:18
  204:18
**emails**  63:3
**employ**  33:4
**employees**  145:15
  152:25
**employs**  149:20
**encompass**  54:4
  127:16
**encompassing**
  162:16
**encouraged**  91:22
  119:2,12
**ended**  75:2
**engineer**  197:9
  200:12
**engineering**  198:2
**entailed**  36:25
**enter**  4:1
**entered**  10:24
  205:8
**enterprise**  16:12
**enterprising**  140:5

**enthusiast**  11:3
**enthusiasts**  52:11
**entire**  16:21,24
  22:24 33:24 35:15
  36:15 54:4 56:11
  67:16 86:20 171:6
**entirety**  125:8
**entity**  134:16,24
**entries**  67:12,23,24
  73:18 75:4
**entry**  69:5,14 70:10
  70:24 71:19 73:1
  73:22 74:24 75:9
**environment**  14:17
**equals**  111:24,24
**equipment**  94:11
  94:23,24 96:1
  102:5,14,25 103:6
  104:19 105:6
  108:19,21 115:12
  117:5 120:24 126:1
  169:13 170:7
  190:13
**equivocating**
  174:22
**erected**  120:21
**eric**  98:17
**errata**  204:3,7,8,10
  204:12,13,15,18
  205:1
**error**  105:8 107:21
**errors**  43:2
**escaping**  80:23
**especially**  62:18
  178:22
**esq**  2:5,15 3:4
  204:1
**essentially**  61:11
  100:6 146:17
  198:13

**established**  75:12
  80:6 160:3 173:18
  184:10
**estate**  10:4,17,20
  12:23,23
**estimate**  18:1 90:6
**estimated**  190:8
**estimation**  16:3
  90:6
**europe**  12:8 14:12
**evaluated**  143:22
**evaluation**  125:15
**event**  186:15
**eventually**  71:2
**everybody**  20:16
  45:20 167:7
**evidence**  66:13,18
  144:25 164:16,24
  165:7,13 187:13
  188:24 189:11,24
  192:15 193:24
**exactly**  60:1 71:4
  92:7 146:19 150:2
  151:20 175:10,12
**exaggerating**
  160:10
**examination**  3:3
  4:10
**example**  57:16
  67:18 126:4,21
  128:2
**excited**  179:5
**excitement**  178:21
**exclamation**  62:1
**exclusively**  83:24
**excuse**  88:13
**executive**  36:20
  175:7
**exercise**  180:13
**exhibit**  3:11,11,13
  3:13,14,15,17,17

3:18,19,20 29:21
29:23 53:11,13
58:22 63:1 67:2,6
68:11,13,15,22
76:22,23,25 77:14
124:20,25 125:3
145:8,10,12 147:4
149:9,23 152:25
159:14,16 165:16
165:19 166:5 173:2
173:4,8,21 187:21
187:25 201:15,19
201:22
**exhibits** 71:14,21
71:22 73:20 129:9
168:13
**exist** 35:10 48:15
84:14 89:2 174:10
**existed** 48:11 191:6
**existence** 23:11
**existent** 48:6
**existing** 32:24
34:20,21
**exists** 35:4 50:16
**experience** 55:10
56:3 137:16 138:6
151:23 152:19
153:8,20 154:14,22
154:25 155:7
164:25 182:3,5
**experienced** 43:23
84:1,7 190:9
**expert** 54:5 55:7
64:24 106:18 194:4
194:11,13
**expertise** 29:13
**expires** 203:24
206:23
**explain** 8:25 48:19
147:3

**explanatory** 131:11
**exposed** 137:25
**express** 26:1
**extent** 42:8 101:11
**external** 181:23
**eye** 156:12
**eyed** 170:12,24

**f**

**f** 203:1
**faces** 43:10
**facilities** 11:11 12:7
14:23 22:9 40:24
49:10 60:16 79:19
80:8 82:11 85:9
107:10 108:10
153:21,23 154:23
**facility** 11:9 16:16
16:21,24,25 17:10
18:13 20:17 33:1
38:1 42:16 43:4,6
49:4 78:20 82:8,15
82:17 83:2 84:23
87:17 96:1 99:18
99:25 102:19,20,25
104:1 107:14,18
108:25 113:5,11,12
113:13 116:17
117:11 130:6,21
132:13 134:18,25
149:20 153:12
154:1 155:1 157:2
161:13,24 162:20
166:1 169:23
170:13,21,25
187:16 188:2
195:14 204:20
**fact** 64:9 100:21
119:16 142:7
144:13 149:18
164:18 176:23
195:6,19

**factor** 111:3 182:7
182:8,10
**facts** 107:3 112:22
114:16 130:8 131:5
141:23 150:11
163:18 179:20
181:9,16 182:11
192:3,15
**fail** 184:5
**failed** 100:5 113:6
116:18 142:8,9
164:19 186:5
**failing** 77:8,14
101:25 113:9,13
141:25 143:6
190:10 193:1
**failure** 77:3,16
89:17 102:13
114:22 115:11,12
124:1,2 167:23
200:23
**failures** 121:5
**fair** 5:4,15 12:11
24:25 31:23 51:6
68:20 70:7,13
71:20 108:17
150:10 167:19,21
168:16,16 201:5
**fairly** 111:14
**fall** 92:1,14 95:4
126:16 128:4
131:23 141:25
199:21
**falling** 92:22 93:13
**familiar** 81:3
**far** 11:17 22:8
37:19 80:13 81:8
84:15 91:24 121:6
126:13 144:3
158:12 184:11
195:15

**fashioned** 25:21
**father** 188:6
**fault** 100:22,25
101:7,9 102:1,2
107:17 143:1 177:8
**faults** 101:15
**fe** 117:8,12
**february** 1:18
74:17 203:21
**federal** 114:10
**fee** 66:22
**feet** 16:14 17:8,14
18:12 19:16 94:19
94:20 100:7 118:24
**fell** 11:8 79:3 92:3
96:18,19 99:12
100:7 115:5 119:6
119:9 120:14 127:7
**felt** 13:8
**fewer** 16:1,6 77:19
77:19,20 90:9,10
90:11,12
**fiancee** 21:17
**field** 14:19
**figure** 140:6
**figured** 21:12
**file** 54:1 71:13
112:4 204:12
**filed** 6:25 7:4
191:19 204:15
**fill** 148:9 204:7,8
**final** 66:10 71:1
75:9 76:2
**financially** 40:3
**find** 12:21 65:4
83:21 175:15 181:7
194:8
**fine** 4:4 15:23
**finish** 180:6,7
**finished** 75:1

**firm** 29:7 65:25
69:23
**first** 4:15 12:7,8
13:16,22 16:13
23:14,23 24:3,10
24:11 27:4 31:2
34:8 40:12,14 55:7
61:25 62:11,18
69:5,11 70:14 72:5
86:17 93:22 102:8
106:14 125:10
127:6 132:13,15
140:10 147:9 168:7
168:9 174:5 182:24
186:7 196:13
**fit** 168:4
**fitness** 11:23 19:20
79:15 82:7,16
84:21 118:23 122:4
**five** 9:11 58:13
67:22 77:20 89:14
90:7,10,11,13
128:16 142:17
152:14,17,22
155:22 156:8 159:8
162:4 184:7 186:2
**fix** 47:24
**flipping** 56:5
**floor** 18:11 43:12
99:12 100:7 119:4
119:18
**focused** 113:10
**follow** 50:7 169:13
170:20,23 173:18
174:1 176:23
197:18,19 199:2,4
**following** 125:12
205:5
**follows** 4:9
**foot** 32:7,8 137:2,5
137:20,24,25

170:11
**footage** 18:11
**footprint** 16:17
17:11 19:15
**force** 8:18
**foregoing** 203:10
203:14
**foreseeable** 178:24
**forestry** 8:8
**forget** 178:22
179:20 180:12
**forgo** 179:4
**forgot** 20:3 30:13
132:13
**form** 55:17 72:2,14
82:9 83:22 86:21
92:23 93:4,21
95:10,18 96:7
101:10 102:6 103:5
103:8,21 105:10,15
107:19,24 108:4,18
109:5 111:4 113:23
115:13 116:22
119:10 127:9
130:18,21 131:18
133:2 135:7,23
136:8 138:3,16
139:1 140:15
142:14 143:10
144:11 147:4,9,9
147:13,20,23
148:14,21 150:5
151:22 152:5
153:18 154:10,20
155:11 156:25
160:8 161:5 163:21
163:24 164:8,17,20
165:10,17,24
166:11,19 167:20
171:17 174:3
177:10,20 178:5

179:7 183:20,25
184:6 185:6,13,20
186:9 187:1,17
190:1 193:3,12
196:3 205:7,9
**format** 60:20
**formed** 23:9,11,16
23:19,19 24:17
34:19 37:1
**forms** 36:19 150:18
**formulated** 97:19
**formulating** 54:15
63:11,18 64:17
85:13,20 86:13
125:11 128:14,21
141:17 145:13
**forward** 204:12
**found** 11:14 76:1
**four** 67:22 104:23
128:16 186:2
**fourth** 159:19
**free** 93:19,23 94:2
94:9,9,17,20
**friend** 66:2 79:1
**friends** 11:7,19
32:10
**front** 57:25 147:1
147:23
**full** 5:7 54:20 159:5
**fully** 4:25 115:4
**fun** 83:19
**furnish** 205:9
**further** 127:4
203:13,16

**g**

**garage** 16:9
**gastonia** 88:1
**gate** 131:6,21,23
132:2,5,9 133:1,7
134:3 135:10,13,18
135:25 136:7,12,15

136:19,21,22,23
137:14 138:13,21
138:23,25 139:7,11
139:19,23 140:1,14
140:21 141:1,7,13
141:22 182:25
183:3,8,11,17
184:4,5 191:16,16
191:20,22
**gates** 126:21 127:1
131:15 132:7,11,12
132:17,23 137:8
182:22 183:6,11
190:17 191:12
192:5
**gathered** 64:15
**general** 156:6
**generally** 12:16
98:22 181:3
**generated** 68:3
**getting** 49:8 50:10
131:13 136:14
140:11 186:14
**gig** 31:11
**gist** 114:17 118:20
**give** 39:14,17,20
45:17 64:23 65:12
95:7 101:14 119:4
126:4 138:17 146:1
147:11 148:5,13,17
165:23 172:9 194:9
201:10
**given** 18:17 101:23
102:10,16,23
103:24 106:3
108:22 114:13
121:7 123:3 148:20
150:3,12 151:20
155:10 159:4 163:4
205:8

EXHIBIT 3 - 000066

gives 151:5,11
giving 77:24
  147:21 151:13,15
glad 127:13,15
glowzone 116:7,9
  116:20
go 4:18 5:6 7:24 8:4
  9:24 18:16 21:22
  21:23 33:2 42:10
  43:8 45:10 54:6
  57:17 76:20 86:18
  88:1,1,1 99:11
  112:16 115:5
  120:15 128:10
  129:11 131:20
  148:11 149:1 150:1
  152:18 153:2
  169:16 175:15
  180:10 181:6 185:3
  191:18 199:8,21
  200:3
goes 6:8 52:8 54:7
  118:6 123:11
  146:18 147:21
  155:2 158:9 195:16
going 4:18,18 5:3
  11:8 31:16 39:18
  42:10 58:20 60:16
  62:25 65:14,23
  76:18 88:7 92:25
  94:6 133:20 138:8
  147:19 149:3,9
  153:11,14 154:12
  154:13 155:18
  161:23 169:22
  170:19 179:3
  192:12 197:18,19
good 25:21 164:4
gosh 18:1 42:10
gotten 28:5 130:23

grab 137:23 192:11
grabbing 94:11
grad 7:23 8:4,6
graduate 8:1,9
granddaughter
  91:21,22
grandmother
  91:21,23 92:21
  93:10 94:14 96:5
  96:12 103:16
gravitate 155:8
grayed 112:15
  114:4
great 12:12
greater 94:22
greed 25:21
greetings 204:5
gregory 97:7
grew 7:21
ground 91:24
  113:7 120:15
  199:22
group 22:22 23:15
  26:4 52:1,2 116:13
  162:25 163:4 167:2
  167:8,8 172:17
  187:14,16 188:10
  188:25 189:19
guarantee 80:11
  92:25
guard 131:6
guardian 1:6
guess 15:24 44:8
  50:10 51:6 134:18
  176:20
guessing 15:22
  23:22 122:22
guesstimation
  152:16
guidelines 173:19

guy 101:7 180:21
guys 29:17
gym 12:21 13:3,10
  13:20,22 14:2,7
  17:8 18:4 19:14,24
  20:6 21:1 22:2,2,13
  26:11 30:25 33:15
  37:16 38:2,21
  39:23,24 40:11,14
  40:21,21,22 41:3,7
  43:7,9,12 46:6 47:2
  48:8 52:17,19 53:3
  56:8 58:1,3 59:4,14
  59:15 60:3,7 61:9
  79:6,7 82:18 85:2
  86:9,10,14,18
  88:12,22 91:2
  112:25 113:1 123:9
  123:23 129:18
  132:15 133:14,24
  134:4,16,21 135:18
  141:19 148:11
  152:3,21 153:11
  154:18 156:7,16
  157:7 158:22
  161:18,20 169:5,6
  169:13 171:6,9,11
  171:13,15 172:20
  173:17 174:1
  176:25 177:15
  190:25 195:22
  199:9
gym's 195:16
gyms 12:7,13,15
  14:12,13 15:12,19
  15:20 19:18 22:5
  23:5 26:17 27:10
  31:6,23 38:16
  40:19 41:8 48:9
  56:4,15,18 82:21
  85:5 87:2 88:20

132:18,21,23
139:13 154:3
168:22 170:5
171:21,25 172:4,7
172:21 175:22
177:18 180:8,19
182:17 186:19,25
190:22 192:2,20
196:9,14,24 199:1

h

h 3:8 6:8,9 10:19
  29:16 52:8
hague 1:15 3:12,14
  4:5,12 5:8 29:22
  53:12 55:20 67:5
  68:12 76:24 125:2
  134:12 145:9
  159:15 173:3
  187:24 201:22
  203:7 204:2
hague's 3:15
haired 170:11,24
half 9:18 69:14
  70:2 119:16
halfway 131:4
hand 137:22,23
  151:14 203:20
handful 121:4
handle 39:2,5
handled 39:3
hands 151:3,7,12
  155:19 159:2
  195:16
hannah 70:12
happen 82:5
  110:15 142:25
  155:7 179:22
happened 15:17
  20:12,14 23:20
  64:6 65:5,15 78:16
  79:9 90:21 94:14

95:9 97:14 100:22
121:19 142:13
195:6
**happening**  181:19
192:17
**happens**  153:20
154:23 155:1 156:7
172:18 180:19
**happy**  4:23
**hard**  136:18,25
137:13
**harness**  91:25 99:8
99:10,11 100:1
115:4 168:5,6
199:19,20
**harnesses**  95:2
**harvey**  116:7,9,15
**hazelton**  2:15 3:4
4:1,11,12 29:19,24
53:10,14 55:16
58:12,16 63:10,14
67:7 68:14 71:17
72:15 77:1 82:13
84:9 86:23 93:2,9
94:1 95:12,21 96:8
101:12 102:9 103:4
103:11 104:3
105:13,17 107:20
107:25 108:7,20
109:8 111:6 112:10
112:13 114:7
115:16 117:1
119:11 120:4
121:16 122:3 123:6
123:16,18 124:4,8
124:19,22,24 125:4
127:12 131:25
133:10 135:8 136:2
136:10 138:10,19
140:19 142:22
143:13 144:18

145:7,11 148:16,25
149:8,11 150:6
152:1,6 153:22
154:24 155:15
157:5 159:13,17
160:15,22 161:9
163:25 164:13
165:4,15,20 166:4
166:15 167:22
168:16,20 171:18
173:1,5 174:7
177:14,23 178:6
179:13 183:21
184:2,8 185:9,16
186:16 187:4,20
188:1,19,22 190:2
193:4,16 194:16,23
195:1 196:4 201:13
201:24
**head**  68:5 88:11
89:20 185:15,19
**heading**  146:13
159:21 166:7
**headquarters**  9:5
**healy**  117:8
**hear**  111:17,18
194:7
**heard**  81:14,14
115:9
**height**  94:19,20,22
**heightened**  28:3
**held**  105:14 106:3
109:3
**hellums**  2:6
**help**  33:4 94:12
109:15
**helped**  35:11
**helpful**  46:7,9
86:13,25 126:13
148:17

**helt**  29:16
**hereunto**  203:19
**hey**  95:14
**hierarchy**  21:6
**high**  1:10,10 4:13
7:22 70:20 79:14
82:16 84:14,20,22
86:10 120:7,10,22
121:1 137:8,11
139:13 142:16
145:15 152:8,25
153:23 155:2,13
156:3 160:4 162:1
166:8 177:12
180:21 181:21
183:5 188:13
**higher**  28:3
**hinged**  113:17
120:24
**hinges**  114:19
**hired**  116:8
**history**  3:15 76:19
129:12
**hmm**  38:12 93:14
**hogan**  112:17,23
117:21
**hold**  132:3 136:16
137:24 138:5,8
139:3
**holds**  131:11,16,21
131:23 132:4
135:21 136:6,6,13
137:2,5,6,25
138:22,24,24 139:3
139:9,11 183:1,9
191:17 192:11
**holtz**  98:13
**home**  5:12 20:16
21:24
**honestly**  59:11
201:5

**hook**  64:9
**hooker**  1:16 4:7
203:4,23
**hoover**  204:22
**hopefully**  179:12
**hour**  69:14 70:2
76:6,6,8 164:5
184:16 185:12
**hours**  31:18 70:10
70:25 73:19 74:24
**house**  32:7
**hpc**  130:21 131:24
152:11,14 178:23
190:8
**hpc's**  182:25
183:11
**hundred**  172:21
196:9
**hundreds**  43:9
196:14
**hurt**  89:16 92:3,22
93:1,15 104:4,5,7
105:7 107:16 109:1
119:6 141:6 164:19
177:4

**i**

**i.e.**  83:18 104:4
107:12
**ibex**  123:9,20,22,23
**ibm**  9:14,17,19,23
**idea**  4:17 14:13
15:13 29:6 52:16
67:13 69:8,15
70:16 73:4 108:16
148:18 163:6,19
164:3,4 181:23
**identifying**  50:16
50:17
**ignore**  47:13,15
181:12

EXHIBIT 3 - 000068

ignoring  50:18,21
illinois  112:18
  113:2,21 117:20
illness  41:19
immediate  141:25
  142:4
immediately  8:4
  145:18 146:15
  180:1
imminent  47:24
imminently  47:25
impact  96:13 126:6
  128:23
implement  14:6
implementing  28:4
  108:17
imply  94:21
important  27:21
  62:17,19 64:5
  141:12 178:19
impossible  139:22
  140:3
impression  151:5
  151:12
inadequate  92:13
  100:21 104:20
  108:1 131:7,8,12
  132:8,10 137:10
  138:13 140:20
  141:2,7,23 163:15
  165:8,13 166:9,14
  182:22 183:12
  184:4
inappropriate
  92:13
inch  119:17,17
  126:9,9
incident  65:4,5
  72:9 89:11
incidents  87:3
  190:18 192:17

include  34:1,2
  71:20 73:20 77:21
  155:25 156:1
  173:15
included  129:9
  140:20 168:14
  194:15
includes  71:14
  152:12 156:14
including  38:7 41:3
  90:7,14 154:3
income  31:4 37:20
incorporating
  125:16
incorrect  94:5
independent  54:14
indicates  188:9
  189:18,21
indicating  72:3
indication  163:23
individual  140:6
individuals  41:23
  52:5
indoor  11:9,10 12:4
  12:7,12,21 14:5
  15:20 16:21 17:1
  27:10 29:7,12
  31:22,25 37:2,5
  38:1 60:3 82:7,11
  88:18,19 111:3
  116:16 141:18
  168:22 171:13
  195:22
indoors  62:13
industrial  8:8
industry  10:1 12:5
  14:6,9,10 23:15
  27:9 29:8 30:22
  34:20,22 35:10
  61:6 77:9 82:6 89:3
  126:2,20 149:19

169:10,11,15
infant  14:9
info  188:3
inform  60:7,11
  92:6 95:24 96:14
  107:11
information  61:20
  63:17 64:15 75:17
  75:23 103:24 117:5
  129:23 130:12,15
  130:18,23 143:20
  144:6 188:13
informed  104:19
  108:13 186:22
informing  60:25
  61:23 97:3
inherent  60:25
  108:23 143:2,3
inherently  62:2,6,9
  62:12,16 142:24
initial  17:9 29:14
  71:7,21
initially  29:8
initials  52:9
injured  62:5 65:14
  99:13 101:7 102:21
  103:1 113:7
injuries  101:4
  102:2,3,13 103:7
  186:4 190:14
  192:25
injury  65:21 77:3
  91:1 101:25 107:22
  108:3 142:2,12
  177:5
inn  1:19
input  23:2,3,8 24:8
  135:6 159:12
inside  200:12
insides  85:8

installed  133:8,15
  157:8,13,16,24
instance  65:12
instances  182:6
  191:23
instructed  186:21
  186:21,22
instruction  3:17
  43:20 96:15 100:12
  116:1,3 144:15
  145:17,25 146:13
  146:16 152:16
  156:13 162:5
  174:23 177:22
instructional  29:11
instructions  175:1
instructor  36:4,23
  37:5 99:20 138:7
instructors  37:2
  80:19
insurance  98:11,12
  98:14 170:21
intended  178:17
intends  66:14
intent  139:4
interest  25:4 28:19
  30:15 31:6 41:16
  52:16 157:23
interested  30:19
  203:18
intermittent  46:21
international  8:22
interpret  178:11
interrogatories
  71:25
intervene  47:6
  48:22
intro  61:25
introduced  4:13
intrusive  44:4

**invented** 133:9
**inventing** 14:10
**investigation** 54:14
**investigators** 26:9
**investing** 42:16
**investor** 31:5
**investors** 22:21
  26:4 38:5 52:11
**invited** 32:15 99:19
**invoice** 67:9,11,19
  73:2,14 74:8,10,12
**invoices** 3:13 66:24
  66:25 67:2,8,16
  68:3,21 74:12
**involve** 77:14
**involved** 26:10
  28:15 34:15 37:24
  39:15 52:12 53:5
  60:8 61:13 62:10
  62:20 73:12 75:13
  96:14 103:25
  108:22,23 144:2
  150:18 162:20
  163:20,23 200:19
  200:20,23
**involves** 150:15
**involving** 190:10
**iowa** 99:1 101:1
  106:10
**ip** 9:10
**irregular** 72:19
**irrelevant** 170:8
  171:3 196:6
**issue** 49:16 50:16
  50:19,22 64:11
  150:20 166:13
  200:25 201:1
**issued** 124:13
  125:7
**issues** 42:21 47:7,8
  48:4,5,7,11 142:17

**item** 66:13,17
  128:6,7
**items** 128:11,17
**iteration** 23:13

**j**

**j.b.** 52:9,15 53:3
**january** 28:20 36:3
  73:15 74:7,21 75:6
  75:7 76:3 81:15
**jeremy** 2:15 3:4
  4:12 71:13 112:9
  149:7 194:13
**jerk** 94:7
**jettisoned** 23:17
**job** 8:20 9:4,19,23
  193:14,21
**jobs** 142:20
**john** 111:8
**johns** 99:1 100:19
**johnson** 116:8
**join** 8:18
**joint** 40:7
**joseph** 122:9
**jshazelton** 2:19
**judging** 79:5
**july** 31:10 34:16
  36:7
**jump** 79:21 166:17
**junior** 120:9,12,13
  120:23
**jury** 107:4 137:3
  194:6

**k**

**k** 52:9
**kansas** 123:23
**keep** 43:10 156:21
**keeter** 119:23
**kid** 11:6 84:4 100:2
  172:14 181:22

**kids** 7:8 79:21 83:5
  83:7,8,10 89:15
  120:12,13 180:4
  189:17 193:14
**killed** 78:6
**kind** 11:20 32:24
  41:21 43:10 44:3
  72:1 89:1 91:25
  100:3 104:14
  115:22 116:2 151:4
  156:11 172:1,17
  180:16 181:15
  182:12 200:5
**kinsley** 1:6 64:1
  144:20 163:5
  184:19 189:5 193:1
**kinsley's** 167:8
  188:6
**knew** 11:17 53:4,7
  104:10 184:19
  186:6
**know** 4:15,22 14:6
  14:10,16 15:19
  16:10,11 17:18
  22:8 24:21 25:21
  25:24,25 26:6,7,8
  28:13 37:6,8 40:6
  43:5,8,9,17 44:1
  50:18 52:6,13,15
  52:18 53:2,2,6 55:9
  56:11,19 57:22
  58:1 59:12,23
  61:12 62:8,18 64:8
  64:9,14,17 67:23
  72:16 74:5 77:18
  77:21 80:5 81:4,8
  83:2 84:15,17 86:5
  91:12 92:5 93:16
  100:7 101:2 103:13
  106:5,22 107:6
  111:9,11,13,14

  113:18 114:9 115:7
  118:24 121:8,17,18
  121:21 125:24
  126:23 128:3
  129:14,15,17
  133:19,24 134:7
  140:24,24 141:3
  145:21 146:2
  148:22 149:2
  156:14 158:12,18
  158:20,23 160:1,9
  160:10,11,12,13
  161:1,1,23 162:2,8
  162:12,24 164:6,10
  167:7,16 168:17
  171:6,11,19,25
  172:5,19 174:21
  176:2,21 180:24
  181:4 182:13
  185:14,18 186:10
  186:15,15 189:14
  190:3,6,22 191:6
  192:8 195:22
  197:15 198:1,4,9
  198:14,17,20,21
  199:7 200:2,9,11
  200:12,13,15
**knowingly** 178:23
**knowledge** 55:10
**known** 64:10 131:6
**kornegay** 1:6,7
  72:21 79:11 82:19
  84:18 130:20
  139:17 141:6 143:6
  144:20 149:14
  163:1,5 164:19
  167:15 178:14
  179:24 182:23
  184:4,16
**kornegay's** 141:25
  187:14 188:25

EXHIBIT 3 - 000070

192:24

**l**

**l**  6:8,9 10:19 29:16
**lack**  91:5 114:19
    143:6,17 147:1
**lady**  119:8,13
**laid**  86:19
**lake**  58:1 87:16
**land**  79:3 92:1 95:4
**langoni**  122:12
    123:13,21
**language**  176:6
**lanyard**  79:2 99:9
    115:3 177:6 183:10
    199:11
**large**  1:17 131:15
    132:2 138:23
    167:12,17 203:5
**larger**  19:17 23:16
    40:16 190:17
    191:12,20,21 192:5
**larry**  112:19
**lasted**  163:1,6,13
    163:19
**lasts**  162:4
**late**  12:1,1,9,19
    134:9
**law**  41:21 65:25
    134:20 158:2,4
**lawsuit**  4:14 113:10
    118:3
**lawyer**  98:1,13
    114:3 117:9 122:10
    122:13
**lead**  44:12,18
    129:24 146:11
    156:1
**leave**  12:22 29:3
    152:22 199:17
**leaving**  152:14

**led**  41:15 92:14
**lee**  98:11
**left**  20:25 30:16,17
    44:15 51:5 59:10
    168:19
**leg**  137:23
**legal**  72:21
**length**  152:7 160:3
    161:4
**lengthy**  54:3
**leslie**  6:8,16,17 7:2
    7:6 38:10,11,13,23
    39:14 41:17
**letter**  3:18 176:11
    176:13,14
**level**  82:2 95:14
**levels**  95:25
**liability**  23:18
    60:15,19 61:11
    80:9 170:21
**liable**  157:12 177:8
**license**  10:11
**life**  11:24
**lifetime**  122:4
**lights**  79:13 84:5
    178:16,17,21 179:9
    179:25,25 180:9
    185:24
**likelihood**  115:2
**likewise**  182:6
**limit**  17:16
**line**  205:11,14,17
    205:20,23 206:1,4
    206:7,10,13
**lisa**  1:16 4:7 203:4
    203:23
**list**  3:17 54:2,2
    58:21 66:21 77:2
    88:5 110:6,7,13
    111:20 114:11
    128:13,16 168:8

**listed**  60:18 77:13
    90:17,19 128:19,20
    141:16 168:10
    187:16 188:11
    189:10,20
**lists**  31:8
**lit**  178:16
**literally**  201:6
**litigation**  64:19,24
**little**  7:19 11:16
    31:17 36:25 40:20
    46:16 76:18 97:17
    99:18 104:12 131:3
    182:21
**live**  7:14,17 107:14
    113:24
**lived**  5:23 118:17
**living**  37:20
**llc**  1:10,10 28:21
    29:5 30:10 37:21
    38:24
**local**  112:25
**located**  13:21
**location**  19:3,8
**logo**  56:14
**long**  5:15,20 9:10
    9:17 14:1 15:6
    29:17 80:2 87:19
    104:9,10 121:23
    138:5,6 155:9,16
    156:14 158:21,23
    158:23 159:10
    160:11 161:11
    162:25 163:6,8,13
    163:19 164:1 181:5
    199:16
**longer**  30:19
**look**  35:21 57:17,22
    85:25 125:5 134:2
    146:8 159:18 167:9

**looked**  85:10 86:3,5
    104:14
**looking**  16:11 42:7
    137:15 151:1
**looks**  13:15 25:1
    28:20 37:15 53:19
    59:3 67:3 69:5 72:4
    75:10 76:5 88:4,12
    88:13 90:16 110:12
    111:7 112:17
    122:15 129:19
    134:1,1 167:1
    190:5
**lose**  76:17
**lot**  21:13 22:21
    72:16 77:6 91:17
    108:10 110:25
    112:16 121:23
    172:2 179:1 187:23
**louisiana**  90:20
    98:17 103:15 119:8
    122:13,20
**love**  11:8
**lower**  113:6 139:10
**lowered**  120:15
**lowering**  136:19
    137:14 150:15
**lowers**  199:13,21
**luchs**  10:18,18
**lynchburg**  1:19,20
    5:10,20,23 37:25
    41:6 56:9

**m**

**m**  1:15,16 4:5,7
    203:4,6,23
**machine**  203:7
**mack**  200:2,8
**mail**  204:10,19
**main**  5:10 107:9
    119:15

**major** 12:16,20
**majority** 16:9
65:10 105:3 112:7
190:18 191:22
**making** 23:4 29:2
49:8 84:2 102:4
144:4 170:1 172:14
175:7 182:15
194:16 205:8,8
**malfunction** 177:5
**maloney** 111:10
**man** 78:5
**manage** 32:23,25
42:13 52:19
**managed** 40:25
41:1 135:4
**management** 26:23
27:5,11 28:9,21
29:5,7,11,15 30:2
31:3,20 33:7 37:21
40:23 41:20 47:20
50:1,2,5,5,24 51:10
51:15 52:13 55:19
68:10 108:9 140:21
141:10 158:3
**managers** 23:7
26:21
**managing** 134:4,21
157:1
**manner** 154:1
**manual** 26:16
33:22,23,24 34:14
167:25 168:10
169:2,19,24 170:10
170:15,17,19 171:5
173:25 174:11,13
174:13,16,20,24
175:11,17,17,25
176:6,23,24 196:1
196:7,11,21 197:16
197:16,17,20 198:1

198:22 200:14,16
200:17
**manually** 204:8
**manuals** 33:5 34:7
55:3 141:20 151:24
168:8 170:6 173:10
173:12 199:3
**manufacture** 197:3
**manufacturer** 89:7
120:19
**manufacturer's**
169:14
**manufacturers**
196:15
**manufacturing**
175:9
**march** 74:13
**mark** 29:20 53:10
62:2 67:1 68:10
76:21 111:12
124:24 145:7
159:13 173:1
201:14
**marked** 29:22
53:12 67:5 68:12
76:24 125:2 145:9
145:12 159:15
173:3,8 187:24
201:21
**market** 8:24 9:16
9:20 13:5 76:11
**marketing** 34:1,13
197:2
**markets** 12:17
160:4
**marking** 159:22
187:21
**marks** 90:20,23
**marriage** 7:17
**married** 5:25 6:2
6:24 21:18 30:18

39:17,18 40:2,7,8
**marriott** 118:8,9
118:22 119:18
**marshall** 117:9
**maryland** 6:15,23
6:25 13:17,25
28:22
**mason** 97:25
**mat** 92:1 126:9
**material** 9:3 166:23
188:14
**materials** 55:8
129:4 166:21
**mats** 128:1
**matter** 66:10 171:4
171:7,12
**matters** 64:18,23
**matthew** 1:7 78:18
**max** 122:12,17
123:13
**mba** 8:11,14,17
**mcconnell** 99:1
**mean** 12:10 13:2
16:24 17:4 18:14
23:3 31:22 32:18
33:17,24 39:17,18
43:22 46:21,23
48:21 80:20 83:10
94:3 106:23 108:8
111:22 127:3,15
138:4 142:3 150:13
154:7 163:10
164:11 167:9
168:17 172:17
175:10,12 177:12
183:14 193:18,22
199:8
**meaning** 84:7
134:25 142:5
184:23

**means** 5:3 9:1
32:20 74:2 82:23
82:24 94:10 106:24
125:24,25 148:10
166:7 176:19 178:4
178:8,10 203:9
**meant** 39:22
127:14
**measures** 107:10
178:25
**mechanical** 198:18
**mechanisms** 95:2
**meet** 27:15 28:11
37:3 88:2 89:1
126:8 132:24
**meeting** 96:2
**member** 24:16 30:9
35:24 36:9,10,17
37:13 49:4,6,20,25
151:7 168:23 169:5
171:8,14 177:7,17
188:10 189:19
**members** 18:21,23
19:6 26:8 38:23
41:4 49:21 51:1,2
**membership** 45:12
45:15
**mention** 150:17
**mentioned** 13:23
33:13 61:16 63:8
134:20 168:13
172:20 194:22,24
195:7,8,8,9
**messed** 109:12
**met** 4:17 64:1
175:3 194:5
**method** 107:2
**metropolitan** 12:16
12:20
**mexico** 117:9 118:3

EXHIBIT 3 - 000072

**mid**  12:9,19
**middle**  43:12
**mike**  29:16 30:14
  30:15,17
**mills**  9:3
**mind**  44:16,17
**minimal**  16:10
**minimize**  60:9 93:6
  142:21,23
**minimum**  33:20
  89:1 153:3,4,8,14
  154:7 160:3 164:6
**minor**  1:6 27:25
  45:6 66:1 121:4
  178:23
**minors**  45:4 187:15
**minute**  69:24
  152:21 156:4
  159:23 160:6,16
  162:17
**minutes**  58:13 69:7
  73:2,23 75:10
  152:12,15,18,22
  153:4,5,6,9,9 154:7
  154:8,16 155:8,21
  155:23,24 156:8
  158:20 159:8 160:4
  160:5,13,18 162:4
  162:9,11,23 164:6
  164:25 165:2,8
  201:10
**mistake**  146:24
**mitigate**  108:16
**mitigating**  80:7
  107:12
**mmm**  38:12 93:14
**money**  14:17 39:10
  39:11 42:16,17
**monopoly**  196:16
**month**  67:17,19
  73:16

**monthly**  31:15
**months**  111:18
**morning**  55:5 56:6
**mountain**  1:19
**mousetrap**  27:20
**movable**  100:4
**move**  178:13
**moved**  9:13 30:17
  37:25
**moving**  158:6
**multiple**  115:12
  142:1 186:3

**n**

**n**  3:1
**name**  4:12 5:7
  10:13,16 13:10
  14:25 20:3 22:2
  29:14 30:13 52:2
  78:9,10,18 98:1,7
  98:13,21,23,25
  111:9,10 113:1,4
  113:11 117:11
  118:6 132:13,14
  180:22 196:1,10
**named**  52:7 106:10
**names**  6:6 51:25
  52:2,4
**narrow**  12:15
  127:3
**nationwide**  98:11
  98:12,14
**near**  13:3 41:7
  87:17
**nearby**  184:24
**necessarily**  27:18
  64:7 83:21 86:22
  87:1 148:15 152:4
  164:9,11 176:22
**necessary**  145:18
  205:9

**neck**  79:3
**need**  9:6,7 29:25
  43:24 52:2 102:7
  153:12 159:24
  160:17 176:19
**needed**  15:14 21:22
  32:22 39:10 108:11
  139:3,4 174:11
  176:17,18,20
**needs**  60:7
**neglected**  79:2
**neither**  131:24
**nepotism**  21:9
**never**  34:13 58:2
  64:1 65:11 85:2
  95:8 97:20 111:18
  115:1,2 130:20
  139:13 142:19
  175:6 191:7 198:22
  200:10
**new**  20:17 28:11
  30:1 32:22,23 43:9
  51:21 95:23 117:9
  118:2,2,3,13
  122:23,23
**nicros**  190:16
  192:6,13,18
**nike**  197:8
**nine**  35:5 128:17
**non**  99:9 196:23
**north**  2:7,16 78:6
  78:13 87:21 89:22
**northern**  1:3
**norwegians**  170:12
**notarized**  204:10
**notary**  1:16 4:6
  203:4,23,25 206:23
**noted**  125:18 205:4
  205:5
**notes**  124:15

**notice**  3:12 53:15
  53:22 56:5 72:23
  197:13
**noticed**  43:1 44:14
  72:22 197:23
**noting**  204:7
**novice**  140:10
**novices**  45:5
**nuance**  42:11
**number**  3:10 14:23
  29:21,23 41:4 49:1
  49:13 53:11,13,25
  54:1,6,11 55:4
  58:22 63:1,1 66:7
  66:12,21 67:2,6
  68:11,13,15,22
  76:22,23,25 77:14
  77:24 80:1 94:19
  98:7 124:25 125:1
  125:3 128:6 137:5
  137:6 144:14,14
  145:8,10,12 149:10
  149:12,13,18,23
  152:25 155:23
  159:14,16 164:23
  165:16,19 166:5
  167:23 173:2,4,8
  173:21 178:13
  182:18,21 183:24
  187:25 201:22
  203:25
**numbered**  186:2
**numbers**  167:14
**nuts**  34:2

**o**

**oath**  58:18 124:10
**object**  72:14 82:9
  83:22 86:21 92:23
  93:4,21 95:10,18
  96:7 101:10 102:6
  103:8,21 105:10,15

EXHIBIT 3 - 000073

107:19,24 108:4,18
109:5 111:4 115:13
116:22 119:10
127:9 131:18 133:2
135:7,23 136:8
138:3,16 139:1
140:15 142:14
143:10 144:11
148:14,21 150:5
151:22 152:5
153:18 154:10,20
155:11 156:25
160:8 161:5 163:21
164:8,17,20 165:10
165:17,24 166:11
167:20 171:17
174:3 177:10,20
178:5 179:7 183:20
183:25 184:6 185:6
185:13,20 186:9
187:1 190:1 193:3
193:12 196:3
**objection** 103:3
**obligation** 96:2,4
96:10,11
**observation** 42:24
48:16
**observations** 182:3
**observe** 44:22
48:16
**observed** 46:4 47:7
182:20 196:17
**observing** 153:20
154:22
**obtained** 64:15
**obvious** 110:3,5,6,8
110:11,14
**obviously** 43:22
61:24 100:10
109:24 112:2
167:12 184:9

200:13
**occasionally** 70:4
**occasions** 41:11
**occur** 43:2 87:4
**occurred** 85:3
118:2 142:6 174:6
**occurrence** 77:10
77:12
**occurs** 187:3
**october** 203:24
**offer** 46:6 76:13
161:14 194:5
**offering** 76:12
**office** 13:21 17:3
69:22 70:3 125:13
**offices** 204:3,10
**oh** 29:18,25 45:22
90:23,25 113:3
123:11 147:17
189:13
**ohio** 7:21,22 8:5,12
8:13
**okay** 4:2,25 5:15
7:5 9:15 10:3,23
11:12 12:4 15:6,19
17:8 18:2,13,20
19:8,23 20:9,14,14
22:7,18,22 23:2
24:18 28:19,24
29:2 31:8,13 32:6
32:13 34:15 37:9
37:23 39:1,6,14
42:12,25 45:4,10
45:16 46:8 48:14
51:6,23 52:23 53:7
53:20,24 56:1,5,18
56:20 57:1,9,13
58:12 59:3,23
60:24 61:8,17
62:14,15,22 63:24
67:12 70:21 71:11

71:18 72:8,11 73:1
74:24 76:5,14
78:16 80:5,15
81:19 84:16,20
85:11,24 86:9 87:2
87:9,23 89:6 90:19
90:25 94:5 96:24
97:24 98:24 101:13
102:16 105:20
109:3 111:2 113:13
114:1,8,16 115:17
115:22 116:7,11
117:2,19 118:15,19
119:20 123:15,22
126:18 128:12
129:1 130:3 131:3
131:11,14 132:7,22
134:2 138:20
139:21 141:9 143:5
157:10,19 158:12
163:9,11 165:5
167:23 168:16
169:21 172:16
175:6 176:5 183:5
184:3,9,19 187:11
189:7,22,24 190:22
190:25 192:22
193:8 196:5 197:11
199:25 200:25
**old** 7:12 25:21
78:22,23 137:16,19
138:7 140:9,10
182:24 193:7
**older** 119:1,8
**once** 45:18 97:22
195:17 204:10
**one's** 142:25
**ones** 22:9 28:4
35:11 61:10 87:15
102:4 117:22,24
121:15,25 122:2

125:22 128:5 132:4
**ongoing** 80:1 81:7
81:13 115:8
**open** 13:3 18:3 19:9
20:6 21:1 38:15
41:4
**opened** 13:22 14:2
14:7,13 15:15,21
16:13 20:16 22:1,3
22:13,14 38:17
39:11 40:11
**opening** 14:19 16:5
19:17 30:25
**operate** 26:17 46:6
88:25 201:9
**operated** 23:5
40:25 154:1,4
158:14 198:12
200:2,4
**operates** 86:15,18
154:18
**operating** 14:15
15:13 24:11 25:2
27:14 38:19 42:4
82:7 169:14 170:17
173:25 174:1
**operation** 27:1
39:3 55:18 108:9
134:16 135:1
140:21 157:3,25
158:1,4 173:20
197:3,23 200:14
**operational** 14:5
22:25 23:24 55:19
**operationally**
198:8
**operations** 16:4
22:24 26:10 27:9
29:10 31:9 33:17
33:22,23,24 34:7
34:11,14 36:2,13

[operations - paid]                                                                      Page 228

**40**:23 **41**:2 **52**:12
**88**:19 **125**:17 **127**:5
**141**:19 **167**:25
**169**:2 **175**:21
**operator** **32**:22
**138**:7 **168**:2 **169**:4
**169**:25 **170**:1 **172**:3
**172**:7,23 **174**:12
**177**:1 **195**:13,20
**199**:5
**operator's** **196**:1
**operators** **31**:22
**32**:20 **33**:8 **168**:3
**173**:18 **195**:13
**opinion** **21**:21 **44**:5
**46**:4 **63**:11 **75**:24
**85**:16 **86**:20 **92**:12
**92**:15 **95**:13 **96**:22
**97**:19 **99**:15 **100**:8
**100**:18 **101**:13
**102**:1,10,12,16,23
**103**:5,17 **105**:5,14
**106**:4,21 **107**:1
**109**:3,12,16 **125**:11
**128**:15,21,24 **129**:6
**131**:9,14 **132**:6,8
**132**:12,17,24 **140**:1
**141**:5 **144**:14,19
**148**:4 **154**:9 **160**:24
**161**:10 **162**:18
**163**:14,16 **167**:13
**167**:17 **168**:7,21
**169**:4,7 **170**:4,9
**171**:4 **174**:9 **177**:3
**177**:22 **178**:2 **179**:2
**179**:3,6,8,16
**181**:13 **182**:1 **183**:2
**184**:3 **190**:18 **191**:9
**191**:21 **192**:5,9
**193**:20 **194**:1,3,8,9
**194**:11,21 **196**:10

**opinions** **54**:15,21
**63**:18 **64**:13,16
**66**:8,18 **75**:19,21
**76**:2 **85**:13,20 **86**:4
**86**:14 **118**:21
**124**:14 **125**:8,13
**126**:14 **141**:18
**145**:14 **194**:12,13
**194**:15,17
**opportunities**
**19**:19 **30**:19,21
**opportunity** **12**:25
**13**:3 **38**:2 **96**:18
**opposed** **134**:17
**opposing** **106**:24
**options** **19**:18
**order** **14**:15 **37**:4
**46**:6 **64**:15 **83**:19
**107**:3 **132**:1 **136**:4
**139**:11 **159**:24
**160**:17 **194**:5
**ordering** **204**:13
**oregon** **30**:18
**organization** **21**:6
**23**:14,17 **35**:20
**36**:20
**orientation** **43**:22
**60**:20,20 **61**:8,15
**61**:19 **62**:23 **72**:2
**79**:23,24 **80**:8,14
**95**:8 **107**:13 **108**:13
**115**:22,24 **143**:7,14
**143**:17,20,25 **144**:1
**144**:2,5,8,20
**145**:14,20 **146**:16
**146**:18,21 **147**:4,10
**147**:21 **148**:1,6,13
**148**:19 **149**:22,24
**150**:3,21 **152**:8,11
**152**:15,18,21 **153**:1
**156**:1,18 **159**:2,24

**160**:7,12,17 **161**:4
**161**:11,16,18,18,20
**161**:25 **162**:13,17
**162**:21,25 **163**:3,19
**164**:24 **165**:3,7,22
**166**:7,9,14,22
**167**:9,18 **173**:15
**186**:21 **187**:15,17
**188**:3,5,25 **190**:3
**201**:1
**orientations** **49**:7
**153**:3 **155**:9,12
**158**:15 **159**:5
**orienter** **144**:24
**151**:3
**orienting** **158**:17
**orients** **86**:17
**original** **29**:6
**204**:13,15
**originally** **82**:21
**orleans** **122**:23,23
**outcome** **104**:11
**113**:18 **115**:7
**203**:18
**outdoor** **120**:17
**outdoors** **11**:13
**outing** **120**:11
**outline** **70**:22 **72**:1
**145**:14 **146**:6 **148**:6
**149**:24 **153**:1
**163**:24 **164**:10
**165**:21 **187**:7
**outlines** **151**:20
**outside** **11**:9 **26**:4
**42**:7 **69**:21 **126**:16
**127**:8 **128**:6,18
**overlap** **35**:25
**88**:22
**oversight** **36**:20
**overview** **156**:6

**owned** **22**:20 **59**:6,7
**59**:19 **132**:19
**134**:25 **135**:18
**154**:3 **157**:9,19
**owner** **22**:15,16
**38**:3 **39**:8 **48**:3
**51**:15 **157**:7,11,15
**owner's** **175**:11
**owners** **25**:11
**ownership** **25**:4,11
**25**:17 **26**:3 **31**:5
**52**:6 **134**:17,23,24
**158**:1,6
**owning** **52**:17
**owns** **51**:23

**p**

**p** **52**:8
**p.c.** **2**:6
**p.m.** **202**:4
**pad** **92**:1 **95**:3
**padding** **92**:5 **100**:4
**104**:15 **119**:4,17,19
**120**:17 **126**:9 **130**:4
**130**:5
**page** **3**:3,10 **58**:24
**62**:1 **119**:24 **125**:10
**127**:6 **129**:16,21,25
**130**:9 **133**:22 **134**:3
**135**:13,19 **136**:21
**140**:13 **159**:19
**166**:24 **168**:9
**183**:15 **201**:15
**204**:18 **205**:11,14
**205**:17,20,23 **206**:1
**206**:4,7,10,13
**pages** **57**:16,18
**59**:16 **61**:10 **201**:17
**201**:19 **205**:9
**paid** **31**:10 **43**:19
**69**:3 **158**:17

**paper** 8:22 67:3
**paperwork** 134:23
**paragraph** 125:18
126:15 127:6 131:4
154:9 173:10 176:7
187:11 188:8
**paragraphs** 186:2
**paralyzed** 120:18
**pardon** 172:11
**parent** 1:6 195:15
195:17
**parents** 66:1,2
148:9 193:8 194:21
194:22 195:9,12
**parese** 111:8
**park** 2:7 79:6,8,16
83:1 84:21 87:21
88:13,23 89:22
91:6,7,22 93:18
95:6,17 96:6
103:20
**parks** 82:5 88:15
88:17,25
**part** 4:19 24:18,20
29:9 34:8,18 36:24
41:22 44:4 53:21
54:15 55:8 82:10
83:2 102:8 118:23
120:13 141:5,17
144:14 147:25
148:4 152:17
153:17 155:4
156:17 162:13
163:5 166:22 167:8
167:9,17,18 170:16
184:15 187:12
199:17
**partial** 3:14
**partially** 101:3
125:21

**participant** 144:16
150:15 172:8
**participants** 79:19
80:4,17 151:7,9
166:25 188:4
**participated**
130:21 181:10
188:4
**participating**
142:23 144:4
**particular** 89:10
104:9,13 120:25
131:9 140:25
142:12 146:12,22
154:18 174:6,22
183:22 198:1
**particulars** 65:19
86:19
**parties** 172:10,12
172:16 204:13
**partner** 14:22,25
22:10 29:8,14
159:22
**partners** 15:3,7
20:24 29:17,25
30:1
**parts** 112:15 143:3
152:20
**party** 65:14 70:8
78:19 116:16
172:13 203:17
**pass** 115:25 159:23
160:16
**paths** 84:2
**pay** 17:5 159:11
177:9
**paying** 17:5
**pdf** 114:6 204:7
**pen** 30:1
**pennsylvania** 97:25
98:5

**people** 12:16 13:7
18:16 19:21 22:22
23:19 32:14 43:3,8
47:16,17 49:7
51:25 52:1,3,19
58:4 93:17 95:6,23
104:19 158:17
164:11 167:5
195:21 198:14
**percent** 25:15,22
39:15,20,24 40:3
77:5,13 87:9
110:12,12
**percentage** 25:17
26:3
**perfect** 167:25
168:6,10 169:2,8
169:18,22 170:6,6
170:10 171:4,7,13
171:25 172:22
173:7,9,17 174:10
175:4,20 176:2,6
176:12 177:16,22
195:10,11,19,24
196:15,18 197:4,14
197:15,24 198:19
199:6 200:15 201:4
**perform** 145:18
146:15
**performed** 54:13
67:10,13,25 68:20
68:25 73:15 167:18
**performing** 44:8
**period** 8:5 35:20
133:6
**periodicals** 128:18
**permission** 58:6,11
**person** 41:12 48:1
49:15 51:21 60:21
60:23 61:9 107:16
144:24 151:3,9

172:13 177:4,9
189:4
**person's** 65:6
**personal** 40:6
95:15 111:2 169:13
182:1 192:9 193:25
194:7,9
**personally** 53:2
182:20
**perspective** 65:6
**peterson** 123:9,23
**philadelphia** 87:18
**phoenix** 118:11
**phone** 64:3 69:15
69:17,19,24 70:2,7
71:7,21 73:3,4,11
75:10,11,18 98:7
**photo** 59:3 129:16
133:22,23,25
135:12 141:12
183:23
**photographs** 3:17
3:20 56:8 201:21
**photos** 54:11,12,14
56:7,8,15,23 57:10
57:18 58:6 129:12
133:21 201:17,18
**phrase** 142:3
**pichardo** 122:8
**picture** 56:21,23
57:4,7 58:2 136:21
136:25 140:13
141:1 156:21 157:4
183:17,22
**pictures** 57:3,6
129:8 134:7 139:16
141:16
**piece** 66:13
**ping** 99:19
**pittman** 2:6

EXHIBIT 3 - 000076

pittmandutton.com
2:10
place  2:7 32:25
68:22 86:20 131:6
139:20 142:19
190:20 203:14
places  5:22 60:10
placing  60:10
plaintiff  1:8 2:12
63:5,21,22,24 65:2
66:1 91:11,18 99:8
99:20 118:17
120:14
plaintiff's  68:17
101:8 102:1,2,12
102:17,18,24
109:19 111:10
128:17 150:23,24
plaintiffs  63:4
104:24 105:2
109:25 110:4,7,9
110:10,13,15
plan  66:17 86:9
play  111:3
please  5:7 63:2
66:12 76:15 102:22
202:2 204:10,18
205:9,9
plenty  23:8 129:8
162:23 171:23
plus  64:18
point  1:10,10 4:13
15:9 23:22 48:1,24
70:20 79:14 82:16
84:14,20,22 95:20
95:22 97:18 111:23
134:22 137:4,11
138:5 142:16
145:15,17 146:1
149:18,23 152:8,25
153:23 155:2,13

156:3 159:9 160:4
162:2 166:8 167:10
168:12 172:9
177:12 180:12,20
182:23 183:19
point's  86:10 137:8
139:13 180:21
183:6 188:13
pointed  127:15
146:6 176:8,24
pointing  138:9
points  146:14
150:1 151:13
policies  26:15 27:6
28:6 33:12,14
125:25 190:13
policy  20:25 21:2,5
23:8 36:19 44:24
190:14
polsby  99:2
pong  99:19
portion  43:11
82:18,24 99:10
112:5 152:23
155:19 167:12
169:1
portions  79:18
portland  30:17
position  21:6 95:20
148:12
possible  56:17
57:12 107:11,12
108:16 109:2 138:1
163:10,12
possibly  109:6
131:1 132:3
posted  59:13,15,16
59:24 60:3
posters  59:25 60:1
60:10 80:12

postings  59:12 61:9
61:18 62:23 80:8
107:13
potential  13:5
23:18 104:11
potentially  157:11
power  23:4
practically  199:8
practice  8:9 186:17
186:24 187:5,6
practices  26:16
33:20 34:20,22
35:10 55:20 60:2
61:1 126:20 135:15
135:20 140:22
141:10 149:19
169:15 173:19
175:8 192:23
precautions  180:13
preceding  58:15
precipitated  20:23
65:4
predominant  61:4
prefer  198:14
premises  157:12,16
157:17
prep  74:15
presence  203:8
present  28:21
99:25
presentation  150:2
presented  60:19
107:3 188:14
president  21:21
22:14,17,23 25:7
135:4 173:7 174:17
176:11 178:1,7
press  178:18
179:24
pressed  178:14

presswood  6:7
pretty  40:24 41:5
52:21 72:13 100:15
185:4
prevent  131:7,13
131:16 135:21
136:13 139:5
140:10 183:9
190:17 191:22
192:6,16
prevented  121:3
190:20 191:10,14
preventing  183:12
previous  67:17
99:21 137:16
184:23
principles  55:19
print  204:8
printout  159:20
prior  4:17 47:1
53:3 130:22 133:8
134:5 162:22
178:15 184:16
185:12 186:11,14
188:6
priority  50:6
private  32:14
probably  10:13
18:18 24:7 50:7
57:2 75:3 77:19,19
88:8 90:10,11,13
134:14 141:14
143:25 148:23
153:14 162:8
185:10 193:13
195:3
problem  159:23
183:5
problems  23:18
100:10,11 174:5

EXHIBIT 3 - 000077

**procedure** 23:9
  33:4 44:24 198:20
  205:6
**procedures** 26:16
  27:6 33:12,15
  88:19 108:17 126:1
  145:4,6 169:14
  179:11 190:13
**process** 16:5 32:23
  32:24 46:11 134:9
  144:15 164:1
  165:22 186:14
**processes** 46:14
**produce** 55:7 63:2
  66:12 74:12 131:20
**produced** 29:20
  53:24,25 54:2,3,19
  55:5 56:6 58:22
  66:9 68:8 74:11
  75:2
**product** 192:19
  198:3
**production** 66:15
  66:17 204:20
**professional** 4:7
  125:15
**proficiency** 149:22
**program** 8:10 37:2
  46:11
**programming**
  31:21
**progressively**
  178:16
**prominent** 60:10
**promised** 76:19
**promulgated** 89:4
  127:18
**pronounce** 98:19
**proper** 143:7,14,17
**properly** 44:8
  113:6 143:9 144:21

**168:4,5**
**proportion** 110:21
  110:22 196:17
**protected** 63:9
  93:24 169:13
**protocol** 96:1
**prove** 176:20
**provide** 14:16
  46:10 95:25 96:13
  96:15 100:13
  105:23 107:11
  162:5 167:23 177:1
  183:4
**provided** 63:17
  103:24 120:22,23
  121:1 125:13,14
  128:17 130:12
  156:22 165:1
  166:19 187:15
  188:25
**provides** 36:20
  156:6
**providing** 49:7
  66:23 134:23
  178:24 190:15
**proximate** 142:2,3
  186:3 192:24
**public** 1:17 4:6
  203:4,23 206:23
**publication** 146:20
**publish** 27:8 58:5
**published** 23:24
  24:4,14 27:1 33:21
  35:2 173:16
**publishing** 173:13
**pull** 147:4
**pulled** 119:23
**purchase** 26:5
**purchased** 58:10
**purely** 23:21 52:10

**purported** 194:4
**purpose** 62:22
  182:25 183:2
**purposes** 32:1,5
  64:13
**pursuant** 205:6
**pursue** 30:18,21
**pushing** 185:23
**put** 12:18 32:9,25
  42:16,17 55:14
  63:7 99:8,25 100:5
  137:20,22,24
  141:12 159:5
  162:14
**putting** 134:9

**q**

**quality** 9:7 42:18
**question** 4:21 5:2,3
  12:12 17:19 19:5
  19:23 39:13,19
  45:18 50:11 58:15
  75:20 83:14 85:18
  85:18 86:1 90:1
  95:5 102:8 103:23
  105:3,4 110:17
  111:12 133:19
  149:6 154:6 160:21
  160:23,25 168:24
  171:1,10 175:19
  180:6,7 181:8
  191:25 195:2 197:6
  197:10,21,22 198:5
  198:6,7,16 199:14
  200:1
**questions** 4:24
  21:13 94:6 201:14
**quickbooks** 68:4,5
**quicker** 112:16
**quickly** 100:15
  118:20

**quite** 42:24 131:1
**quoted** 176:6
**quoting** 169:1

**r**

**r** 6:7,8,9 203:1
**race** 178:17
**racing** 79:1 179:10
  181:20,22
**ran** 39:11,22,23
  41:2 133:13 155:20
  158:22
**rarely** 48:22
**rate** 76:10
**raw** 9:3
**reach** 137:22
  199:13
**read** 53:20 56:10
  58:14 59:11 60:11
  72:6,13 125:19
  145:24 174:16
  176:24 181:6,10
  184:9,10,15,21
  193:24 200:16,17
  202:1 204:6 205:2
**readandsign**
  204:18
**readily** 12:13 33:8
  180:22
**reading** 150:22
**real** 6:9 10:4,17,20
  12:22,23
**realize** 58:18 115:1
  124:10
**really** 14:9 16:10
  27:23 39:19 52:14
  83:10 93:7 113:10
  119:5 121:17
  128:23 129:8
  137:12 153:10
  159:9,11 168:24
  185:15 201:8

EXHIBIT 3 - 000078

**reason** 25:20 41:18
  111:12 170:18
  205:13,16,19,22
  206:3,6,9,12,15
**reasonable** 125:14
  169:9 170:5,14
  171:2,2 185:5
**reasonably** 14:16
  164:4
**reasons** 142:5,7,9
  205:8
**recall** 17:15 23:12
  24:4,4 27:12,23
  28:16 32:17 34:17
  34:21 40:5 65:16
  69:18,22 74:18
  78:3,4,5 79:25
  80:13 81:16 85:22
  85:22 86:8 87:12
  87:16 89:6,12
  91:13 92:4 93:15
  93:17 95:11 96:20
  96:23 97:16 98:9
  98:10,19,20,22
  109:23 111:19
  112:19 114:16
  115:17 117:10
  118:5 122:5 123:19
  123:20
**receive** 8:14 66:16
  75:16 110:23
  115:19
**received** 66:24 67:1
  70:15,20 75:22
  76:1 114:21 115:20
  116:3,5 168:15
**recognize** 47:18,20
  49:15
**recognized** 45:9
**recollection** 116:5

**recommendations**
  23:24 33:16
**recommended** 27:1
  27:9
**recommends**
  173:17
**record** 5:7 10:14
  55:21 63:7 114:10
  124:7 201:12,14
**records** 54:12
**recovery** 122:9
**recreation** 11:23
  116:17
**recreational** 19:20
  78:20 82:4,15,17
  83:3 99:18 173:20
  175:22 180:8
**red** 111:24 112:3,5
  112:6,8,12,15
  122:16 150:17
**reds** 121:12,14
**reduce** 142:20,20
**reduced** 203:7
**refer** 126:24
  133:20 141:17
  152:24
**reference** 126:19
  126:20 146:23
  151:4
**referenced** 126:2
  166:20,23
**referencing** 151:13
**referred** 82:14
  127:5 168:11,19
  201:16
**referring** 29:19
  82:11 136:20
  146:23 166:24
  180:25 182:19
  187:20

**refers** 145:22
**reflected** 68:21
**reflects** 74:9
  110:22
**regarding** 141:18
  173:14 175:8
**regardless** 106:2
  163:17 174:24
**register** 47:8
**registered** 4:7
**registration** 203:25
**regular** 12:2 46:3
**regularly** 52:22
**reimbursed** 37:12
**related** 21:5 92:18
  127:20
**relation** 195:9,9
**relationship** 40:1
**relative** 185:23
  203:17
**relatively** 27:25
  54:3
**relatives** 7:16
**reliability** 106:25
  107:2
**relied** 55:6,8
  125:12 128:14,21
  168:9
**rely** 11:19 55:10
  154:12,13 175:11
**remember** 16:8
  20:7,17 21:18 22:6
  23:23 24:21 56:24
  56:25 57:9 58:7,8
  58:10,11 65:18
  69:11 70:5 72:6,7
  74:6 78:3,20,21
  80:3,14 81:11,18
  81:19 88:9,12,16
  89:25 90:2,23
  91:18 92:4,7,17

93:7 97:5,8,9,14
  99:3,5 100:2,9
  101:1,4,19 106:9
  110:1 111:15 113:4
  113:11 115:23
  116:9,11,15,23,24
  117:4,7,13,16,25
  118:6 119:1,18
  121:24 122:7 124:1
  158:9 181:21 201:2
  201:3
**remembering**
  123:24
**removed** 133:8
**render** 181:12
**repeat** 102:7,22
  163:2 171:10
**rephrase** 4:23
**report** 3:15 54:19
  54:20 66:9,10,10
  70:25 71:1,4,8,23
  72:9 73:4,23,24
  74:2,4,7,20,25 75:2
  75:5,18,20,21 76:2
  81:17 91:14 97:21
  100:16 101:17
  106:2,8 124:5,12
  124:16,25 125:7,14
  129:13 168:9 176:7
  188:16,23 191:18
  191:19 194:14,17
  194:22,24 195:8
**reporter** 1:16 4:7
  58:14 201:18
**reports** 66:8
**represent** 4:13
  74:19 159:20
**represents** 136:23
**request** 63:1
**requested** 87:5,6
  204:6

EXHIBIT 3 - 000079

**requests** 53:21
58:21
**require** 153:11
180:1
**required** 41:6
**requirements**
28:11
**requires** 195:10,19
**research** 14:19
**resigned** 25:7
**resources** 56:1
**responded** 197:25
**response** 50:25
176:10
**responsibilities**
31:20 34:5 44:9
45:5
**responsibility**
61:21 95:15 102:18
102:24 103:18,20
104:1 105:6 111:3
186:23 193:5,11
195:17 204:6
**responsible** 26:19
49:6 95:16 101:3
102:4 103:7 175:7
186:19 193:1,10
195:18
**responsibly** 105:9
**rest** 104:24
**result** 78:6 101:24
102:13
**resulting** 190:14
192:25
**retain** 32:10 45:23
111:17
**retained** 64:18,20
64:23 78:13 81:10
87:3 90:21 92:8
97:10 98:1,12,17
99:2 100:19 104:23

106:10,14 109:4,7
109:10 111:8
112:18 121:5 122:6
122:16 123:2
134:24
**retainer** 69:3
**retention** 88:4
**retentions** 87:14
**returned** 204:12,15
**review** 70:10 73:19
92:11 129:3,4
204:7
**reviewed** 69:7
70:18 71:5,6,7,15
80:2 97:1 125:12
128:14,19,20,23
145:13 146:20
164:14
**reviewing** 71:9
173:11
**revise** 34:19 183:24
**revised** 34:22 35:6
35:8 37:7 155:20
158:25
**revising** 138:15
**ridiculous** 175:14
**riehl** 38:10,11
**right** 9:12 13:13,18
16:7 21:8 24:23
25:2 28:25 31:2,19
34:13 35:18 43:12
43:18 49:23 53:10
57:23 58:9,12,17
58:18 61:16,25
62:22,25 67:18
71:24 73:14 74:19
75:6 76:8,9 77:12
97:6 98:6 100:3,4
103:24 104:6,25
108:25 110:24
112:1 113:3 117:21

118:12 119:1,25
123:25 124:4
125:10 127:13
129:11 130:8
133:20 135:14
136:17 137:20,22
138:11 139:17,19
141:7 143:2 146:6
147:20 159:13
172:2 177:24
181:16 182:18
185:18 187:18
188:8 189:1 196:22
200:5
**rigor** 46:10,14
**rigorous** 46:16,22
47:1 48:17,20
49:19 50:7,9,15,25
**ring** 122:18
**ringing** 122:24
123:2
**rise** 37:16,24 38:15
38:19 40:9,13,17
40:25 41:16,24
43:1 45:2,10 46:3
48:3,6,12,15,25
51:2,13,24 56:8,12
56:14 57:6,8,19,25
58:7,25 59:1,7,17
59:21 83:4,17
132:18 133:4,11
134:1,3,13,15,16
135:10,13,18
155:10,12,24
156:22,24 157:3,20
157:23 158:14
159:20 160:4,24
162:3,22 176:1,5
177:8 191:13
**risk** 29:11 55:18
62:4,20 93:6

107:12 108:9,16
117:5 140:21
141:10 142:21,23
150:18 178:24
**risks** 32:25 60:8,9
60:18,25 61:13
62:9,21 92:6 95:24
95:25 96:14 97:4
103:25 108:22,23
142:21 143:2,4
**risky** 96:17
**road** 1:19 129:24
200:4
**roanoke** 203:3,20
**roberts** 78:14
**rock** 11:14 16:22
17:1,6 82:5 125:15
130:22 143:4
**rocks** 98:16
**rockville** 13:16,25
14:1 16:14 18:13
40:20
**rodeo** 4:15
**role** 35:14 36:17
**roles** 37:10
**room** 83:5,6 118:24
146:11
**rope** 44:11,12,18
91:25 146:11 156:2
**ropes** 120:8,17
**rotc** 120:9,12,13,23
**roughly** 87:10,11
**route** 42:13 115:1
126:23,25 131:22
159:24 160:17,19
**routes** 84:2 137:18
140:17
**rpr** 1:16
**rule** 55:4 114:10
205:6,7

EXHIBIT 3 - 000080

**rules** 59:4,9
**run** 4:18 22:25 34:6
**running** 14:18 56:3
  156:16 181:5
**runs** 155:20
**rush** 78:25

**s**

**s** 2:15 3:4,8 10:19
  52:9
**sadly** 176:8
**safe** 14:16 107:11
**safely** 61:20 102:19
  102:20,24 103:19
  105:7 142:15
**safety** 32:24 42:21
  46:11,14 61:1,13
  82:1 94:23,24 96:1
  104:19 126:1 131:6
  178:20,25 179:4,11
  180:13 181:12,24
  183:10 190:16,19
**sale** 134:15
**salt** 58:1 87:16
**sansone** 118:9
  119:1,13
**santa** 117:8,12
**sat** 158:24
**saw** 12:25 13:2,5
  38:1 91:13 112:10
  129:8 148:19 163:7
**saying** 48:14 50:4,5
  79:14,17 81:23
  83:11 84:12 110:5
  130:16 142:11,13
  143:8,23 144:13
  147:13,15 163:7
  164:22 173:24
  174:23 179:1
**says** 35:13,17 36:8
  59:1 61:25 62:12
  69:6,15 70:25 71:4

73:23 74:25 75:11
  98:5 111:23 113:2
  145:17 146:4,7
  147:7 148:7 149:24
  151:16 153:3,13
  164:10,24 166:1,1
  166:18 168:1 169:2
  169:12,24 170:23
  174:12,13,16,24,25
  178:7 181:7,7
  186:13 187:13
  188:9 189:18 190:4
  191:3 195:12
**scenes** 44:21
**schedule** 66:23
**school** 7:22,23 8:4
  8:6 113:3,4 120:7
  120:10,22 121:1
  181:22
**scientific** 107:2
**scope** 16:4 40:18
  124:14
**scott** 78:13
**scribbles** 124:15
**seal** 204:12
**second** 14:2 23:13
  38:14 114:24 131:4
  196:14
**section** 31:20
  135:14 140:22
  145:16,23 146:9,16
  149:19 173:12
  178:4,8,9 196:1,11
  200:14
**sections** 174:15
  175:10
**secured** 168:5
  172:15
**securing** 126:22,25
**see** 18:1 35:22,24
  43:2,13 44:2,19,20

47:10,13,18,19
  48:22 52:21,23
  56:14 61:10 86:18
  86:18,19 110:22
  118:1 121:25
  127:23 137:4,12,15
  137:19 138:1
  140:18 146:9
  148:12 165:13
  178:11 179:23,24
  188:17
**seeing** 185:24
**seen** 34:13 44:7
  52:15 53:16 85:7
  139:15,16 159:1
  173:21 179:22
  180:3,7,14,19
  181:18 182:15,17
  183:22 191:7
  192:21,22 193:23
  196:20 197:12
  198:22
**self** 131:10
**sell** 25:4 26:3 51:23
**selling** 10:20 12:23
  53:3
**send** 81:12 112:9
  204:13
**sense** 126:12 154:4
  192:10
**sent** 53:18 69:9,12
  130:15 150:23
**sentence** 62:11
  131:5 188:15
**september** 20:12
**sequence** 116:2
**series** 112:24 168:1
  178:15
**serious** 41:19 83:20
**seriously** 62:5

**serve** 61:19
**services** 45:24 46:5
  66:23
**session** 99:21,23
**set** 33:20 71:25
  83:24 131:22 137:8
  137:12 203:19
**setting** 42:14
**settings** 173:14
**settled** 91:15 97:23
  100:15
**seven** 10:8 128:16
  155:21 156:4
  158:20
**seventeen** 5:21
**severe** 192:25
**sgc** 1:9
**shady** 204:21
**shannon** 10:18
  98:2,8
**shares** 26:8
**shawn** 180:21
  181:1 190:12
**sheet** 148:9
**shelby** 97:7,10
**shift** 18:23 19:5,24
**short** 119:22
  121:21 133:6
  159:23 160:16
**shorthand** 203:7
**show** 56:21,22
  58:24 147:7 176:11
**showed** 67:14
  99:22 148:6
**shows** 110:7 136:15
  139:16 156:22
  183:17
**shy** 70:24
**side** 106:24 109:19
  109:22 110:2,18
  120:9 139:19

EXHIBIT 3 - 000081

188:11 189:20
**sides** 197:5
**sign** 34:3 60:17
  97:3 148:10 151:10
  160:18 170:22
  189:13,17 202:1
  204:6
**signature** 68:9
  163:24 167:5 188:9
  189:18,21 203:22
  204:2,16 206:18
**signatures** 72:2
  147:5 167:3 188:9
**signed** 49:8 68:9
  69:1 111:20 151:6
  151:9 158:6 166:25
  167:1 188:3,6
  189:4,15,16 190:5
  204:10,12,15
**significant** 21:5
  166:22
**silver** 28:22
**similar** 40:24 41:2
  41:5 79:10,15
  81:24 82:3,6
  121:20 125:17
  137:8 154:1,5
  190:9 192:16
**similarities** 79:17
  88:24
**similarity** 79:18
**single** 57:3 170:12
  177:18
**sit** 28:13,15 35:3
  75:25 86:6 121:24
  123:1 163:18
**site** 50:2 87:5,7,12
  88:7
**situation** 27:17
  48:23,25 81:24

**situations** 108:24
**six** 35:15 89:14
  90:7 128:16 167:5
  189:16
**size** 18:6 19:13
  40:18
**sized** 183:8
**skilled** 23:8 29:9,9
**skills** 144:16,21
  149:15 173:15
**skip** 130:3
**sleep** 1:19
**slidell** 98:16
**slightly** 40:16
**slipped** 92:3 96:19
  103:19
**slowly** 199:12,21
**smaller** 19:14
  40:21
**smith** 112:19
  113:19
**sold** 10:4 26:6
  28:19 30:15 41:22
  41:24 42:5 47:2
  51:20 52:5 134:19
  135:5 157:23
**sole** 22:15,16 30:9
  31:3 38:3
**solely** 23:4 39:25
**solo** 94:9 159:25
  160:18,19
**soloing** 94:17,21
**somebody** 21:9
  26:6 32:10 92:25
  94:8 136:13 139:5
  155:17 175:16
  195:13 198:3
**somebody's** 16:9
**sommerman** 122:6
**son** 41:21 134:20
  158:2,4

**sophisticated** 11:17
**sorry** 13:23 80:23
  87:25 133:18 163:2
  169:16,17 180:6
  185:25 188:19
**sort** 12:5,13 14:4
  14:18 15:16 23:23
  54:13 58:20 61:1
  65:4 107:9 108:13
  118:20 177:5
  181:13 182:13
**sound** 25:2 28:25
  36:5 76:8 104:25
**sounds** 39:23 47:10
  76:9 79:8 86:6
  129:3 138:14 182:2
  201:8
**source** 31:3
**sources** 9:9
**south** 120:3,7
**space** 16:19 17:9
**speak** 27:20 65:2
  65:13,19,25
**speaking** 199:8
**speaks** 36:24 73:19
**specific** 104:13
  168:25 175:17
  177:25 180:16,20
  180:24
**specifically** 27:12
  42:25 44:19 46:13
  83:10,18 85:17
  88:16 89:17 92:17
  92:19 133:22
  145:16 148:7
  149:24 159:19
  161:15 168:19
  171:20,24 176:15
  181:4 194:20
**specifics** 44:13 93:8
  98:20 100:9 128:7

**specified** 203:15
**specifies** 149:20
  169:8
**specify** 126:5
**speculate** 160:14
  164:22 165:5,6
**speculation** 153:16
  155:3
**spelled** 175:24
**spend** 76:18
**spent** 74:16
**spoke** 65:17 81:9
**spoken** 63:24 65:10
  69:19,22 87:23
  89:9 175:3,20
**sporadically** 46:19
  46:20
**sportrock** 13:12,23
  15:4,15,21 16:5,13
  19:9 22:15 25:2
  26:10,15,23 27:5
  27:11 28:4,9,15,20
  40:12,12,14,19,24
  57:10 83:4,17
  132:14,14,18 133:5
**sportrock's** 27:15
**sportrocks** 15:10
**spring** 28:22
  120:11
**square** 16:14 17:8
  17:13 18:11,12
  19:16 32:7,8
**st** 99:1 100:19
**staff** 9:5 18:14,20
  33:2,18 41:4,12
  42:18,20 46:24
  47:5,9,21 48:1,22
  49:1,4,6,15,20,21
  49:25 50:6 51:1,2,7
  51:15 52:24,25
  60:22 79:21 80:19

EXHIBIT 3 - 000082

81:2 86:15,16
93:18 95:7 119:2
119:12 144:24
147:21 149:21
151:3,7,9 153:8
155:7 164:11
165:21 168:23
169:5 171:8,14
172:12 177:7,17
184:24 188:13
195:14
**staffed** 40:25
**staffing** 41:3,6
48:25 49:14
**stages** 14:9
**stand** 192:11
**standard** 23:24
28:3,11 72:13
76:10 82:7 115:25
126:8,15,16 127:4
127:8 128:5 139:21
139:24,25 141:18
160:24 169:10,11
170:5,14,23 171:2
174:2,25 177:15
186:17 187:5,6
197:19
**standards** 14:5,11
24:12 27:2,9,14,16
27:22 28:1 31:9
33:12 34:16 36:2
36:13 37:3,6 44:15
55:19 89:2 125:16
125:18,19 126:3,7
127:11,16,18,19
128:8 170:20
173:14 174:1,14
183:16 194:4
**standing** 195:20
198:3

**start** 8:18 11:3
76:20 132:3,4
136:1,18 137:13,18
179:25
**started** 5:6 9:24
13:11 31:2 40:8
79:1 178:15
**starting** 131:21,22
137:2 138:24 139:8
183:1 191:17
**starts** 180:2
**state** 5:7 6:14 8:13
101:2 106:9
**statement** 205:8
**statements** 154:15
**states** 1:2 171:12
173:11 205:7
**stating** 178:3 188:4
**staubach** 70:13
184:12
**staubach's** 71:6,13
71:16
**stayed** 20:16
**stem** 190:14
**step** 146:18,18
**stephen** 52:7,14
53:3,4,5
**steps** 108:11
**sterling** 19:12 20:5
20:6 40:22
**steve** 117:9
**stipulation** 4:2
**stock** 56:23 57:22
**stood** 72:11,18
**stopped** 134:4
**strange** 115:24
**street** 2:16 5:10
**strong** 50:23
100:23
**student** 112:23

**students** 32:16
**studies** 180:3,8,14
180:18 181:9,14,25
182:11
**study** 180:16,20
**stuff** 121:21 194:1
**style** 79:5
**submit** 74:20
**submitted** 71:2
**subscribed** 206:19
**subsequently** 79:4
**substance** 148:18
161:3,7 162:18,19
205:7
**substantively**
161:11
**successful** 22:4
**sufficiency** 106:25
**sufficient** 107:2
192:3
**suggest** 153:7
164:14 166:8
**suggesting** 28:7
**suggests** 192:16
**suite** 2:8,17 5:10
**summary** 15:16
130:8 131:5 141:23
**supersedes** 174:13
175:1
**supervise** 45:6
46:15,17 177:17
186:23 195:18
**supervised** 168:23
195:4
**supervising** 49:11
169:6 170:12 171:9
171:15 172:24
177:7 193:10,14
194:23
**supervision** 46:21
46:23,24 49:21,25

50:8 82:2 99:23
100:14 108:2
167:24 168:2 169:3
173:14 186:19
187:8 190:15 195:7
195:11,15 199:17
200:25
**supervisor** 99:24
**supervisors** 120:23
**supervisory** 108:12
**supply** 9:8
**supplying** 9:3
**support** 17:22
66:18 191:23 192:5
**suppose** 108:5,6
**sure** 4:24 15:25
16:25 28:6 29:2
33:25 45:22 47:7
49:8 57:3,24 61:12
61:21 63:13 68:4
76:16,17 83:13
86:2 91:17 92:20
100:16 102:4,10,18
103:14 106:6,7
108:21 112:10
124:17,23 125:6
131:3 140:13 144:2
146:2 147:6 153:25
157:18 162:23
170:1 172:14
177:12 178:2 180:4
196:19
**surely** 108:23
**surface** 96:14
126:6
**surprise** 168:18
**surround** 81:20
**surveillance** 85:8
**survived** 51:18
**surviving** 7:9

EXHIBIT 3 - 000083

**sustained** 142:2
  186:4
**swamp** 90:20 91:4
  91:19 95:6 119:18
**swamp's** 96:4
**sworn** 4:6 206:19
**system** 143:7,9
  144:10 149:16
  168:6 172:23
  177:16 178:20
  190:17,19,23 192:6
  192:13 195:25
  197:3,4,23,24
  199:14
**systems** 171:14
  175:9 176:2 198:12

**t**

**t** 3:8 29:16 203:1,1
**tagged** 11:7
**take** 12:5,10 22:10
  31:15,22 45:12
  57:16 58:13,13
  64:23 65:24 87:24
  96:21 109:14
  110:16,19 124:4
  125:5 142:3,19
  153:3 155:22
  159:18 161:12,22
  164:5 165:2 177:25
  179:25 181:6
  201:10
**taken** 1:15 57:10
  58:25 129:13 134:8
  134:8 152:8 157:4
  201:17 203:14
**takes** 79:21 152:11
  152:17 155:14
  160:10 179:10
**talk** 47:20,21 54:16
  54:16 65:11 75:5
  108:10 124:12

130:4 161:15,20
  167:24
**talked** 30:4 61:2
  66:8 74:25 93:23
  103:16 105:19,21
  105:22 106:6 107:8
  117:19 139:12
  175:6 182:21
  183:15 186:4
  200:18
**talking** 7:1,2 18:18
  34:8,11,23 89:15
  135:2 140:8 141:9
  147:17 161:17
  167:7 177:12
  184:12 187:18,22
**talks** 129:21,22
  140:22 146:12
  173:9 183:15
**tall** 118:24 170:11
**task** 68:2
**tasked** 9:2
**tasks** 153:13
**taught** 43:3,5,13,14
  43:15,25 99:21
  112:25 143:8,12,21
  143:24 144:1,7
  151:24 179:12
**teach** 11:20 33:2
  34:4 93:19 144:9
**teaching** 43:11
  144:17
**tech** 7:25 8:7
**technology** 190:16
**teens** 99:20
**telephone** 63:16
**tell** 4:8 7:19 8:18
  9:12 10:15 11:5
  14:21 29:4 32:20
  37:23 42:25 78:8
  78:16 97:13 99:5

112:2,14,21 116:11
  117:22 118:19
  120:5 123:22
  136:25 175:12
  176:16 195:17
**telling** 178:9
**ten** 18:19,20 77:19
  87:8,9 90:9,11
  155:22 156:8 159:8
  160:6,12,18 162:4
  162:10,16
**tennessee** 97:8
  122:9
**tenure** 133:4
**term** 91:5 94:2
**terms** 23:5 33:11
  33:18 40:23 44:14
  49:1 72:20 82:6
  85:8 92:18 97:3
  121:19 164:1
  165:12 197:11
  199:10
**terrain** 84:7
**test** 116:1 145:5
  146:7,7,8,23 147:8
  148:3 149:22
  150:13,13,14,14
  151:4 156:9 165:14
  165:23 166:1,2,3,6
  166:8,12,13,18,20
  167:18
**tested** 192:19
**testified** 4:9 64:18
  64:20 105:5,12
  113:24 117:17
  138:21
**testify** 76:7 113:21
**testifying** 76:11
**testimonial** 112:17
**testimony** 54:11
  66:23 76:7,12

101:23 102:11,11
  105:23 106:3
  111:24,25 114:12
  114:13 117:14
  121:7,13,18 123:3
  123:10,13 136:4,11
  136:22 138:15
  156:5,23 163:7
  180:25 184:21,25
  193:24 194:18
  205:2,7
**testing** 151:17
  163:14,17
**tests** 145:18 146:2
  146:15 148:5
  150:12
**texas** 122:5
**thank** 124:22
**thick** 92:5
**thickness** 126:6
**thing** 12:6 25:25
  28:22 31:8 39:4
  44:17 61:12 72:5
  90:2 107:16 115:24
  128:22 133:7 146:1
  146:17 154:8 155:5
  163:15 165:23
  166:3 169:18
  177:13 197:5 198:1
**things** 41:5 47:11
  47:18,19 49:12
  60:2,7 61:22 71:9
  71:23 72:20 80:6
  93:6 96:22 100:20
  100:24 101:5 107:9
  107:15 126:14
  131:24 138:18,20
  142:12 143:16
  147:13,15 150:19
  150:20 151:16,25
  153:10,11 156:2

EXHIBIT 3 - 000084

**[things - trampoline]**

164:23 172:1 173:9
191:15 194:9,10,15
**think**   9:20 10:22
11:16 16:23 19:15
21:12,17 23:14
25:19 27:7,13,25
40:16 44:3 46:7,10
46:15 47:3,5,15,16
47:17 49:18 51:4,5
51:9,17 52:8,15
55:6 57:2 60:6
61:23 63:8 64:5
70:14,22 75:12,22
76:22 78:18,22,22
86:24 87:15 88:6
89:21 90:9 91:14
97:21 100:8,15,16
100:23 101:20
104:14 105:11
107:7 110:21
112:14 114:23,24
115:8,14 116:23
118:7,16 119:16
122:23 123:25
126:13 127:10,23
131:10 133:16,18
133:19 134:20
135:24 136:14
137:3 139:2 140:16
142:15 143:19,25
144:1,3,12 149:8
150:21 154:12
155:21 158:5
160:25 161:6,25
162:2,7,7 163:7,22
165:11,12 166:17
167:10,13,16 169:9
169:11 170:8,13,16
171:1,3 175:5
176:23 182:22
184:21 185:4,7,21

189:15 192:25
193:5,7,10,13
201:11
**thinking**   129:7
**third**   19:8,24 20:4
188:8
**thirty**   7:13
**thomas**   122:13
**thought**   27:19
50:12 55:12 64:22
103:22 111:15
140:25 141:4,14
176:17 185:3
188:19
**three**   5:24 40:18
45:11 51:8 67:22
71:23 73:18 107:9
117:18 121:10,12
121:14 128:16
137:25 152:13,20
152:20 155:6
181:18 186:2
187:14 188:24
189:2,3,12 190:11
**tide**   190:14
**time**   8:5 11:18 13:4
14:8,11,23 15:1,20
17:22 18:17,21,25
20:19 21:17,19
22:11 25:18 26:25
27:3,4 28:14,16
31:14 34:19 35:20
36:12,15 37:14
38:24 41:4 43:3
48:12 49:11 50:3,5
54:23,25 55:7
59:19 69:10 74:15
76:19 80:2 81:9
86:17 87:9 121:23
133:6 135:5 138:6
140:10 141:15

149:1 152:8 157:3
160:3 161:4,8,21
162:23 174:9 181:6
186:7 203:14
204:15
**timer**   181:20,22
182:24
**timers**   62:18 180:9
**times**   4:16 6:4
45:11 65:13 155:6
168:23 171:16
177:19 201:16
**title**   9:19
**today**   4:15 28:13
28:16 35:3,4,10
42:4 44:15 53:16
54:17 74:8,15
75:25 76:6 77:22
81:25 85:14 86:6
90:2 93:23 106:13
121:6,20,25 123:1
163:18
**told**   73:10 91:14
109:11 119:5 121:1
138:11 158:3,19
175:9 176:14 181:1
181:4 192:1
**tolerated**   42:22
**ton**   121:23
**top**   44:11,12,18
68:5 79:3 88:11
89:19 92:2,21
93:11 99:10 114:25
129:24 130:9 146:9
146:11 153:2 156:2
162:6 178:17,21
179:10 185:2
199:13
**total**   18:21,22 30:1
122:2 153:16

**touch**   187:12
192:11
**towers**   119:24
120:8,19,21,25
**town**   20:4
**track**   43:10
**trade**   23:14,16
**traffic**   41:7
**trafficked**   43:7
**train**   32:21 113:9
113:14 161:22
**trained**   44:6 86:16
93:18 95:7 153:1
164:16 168:2 169:4
169:24,25 171:8,14
172:3,7,23 174:12
177:17 195:12,13
195:14,20 199:5
**training**   31:21
32:19 33:10,18,19
42:18 43:21,25
44:14,19,21 46:11
49:19 70:11,16,17
70:19,20,22 71:6
71:19,25 81:3
82:20 83:2 95:8
108:12 114:20
115:11,15,18 117:5
119:5,8 120:22
147:10 151:19,24
161:19 166:10
167:15 173:11
179:4
**trains**   86:16
**trampoline**   78:11
79:6,8,16,20 80:9
80:19 82:4 83:1
84:21 87:20 88:13
88:15,17,25 89:22
91:6,7 93:18 95:6
95:17 96:5 103:20

EXHIBIT 3 - 000085

**trampolines** 79:22
**transcribed** 203:8
**transcript** 1:14
  71:16 202:1 203:11
  204:7,13,15 205:2
**transferred** 158:1
  158:4
**travel** 37:13
**treated** 104:15
**treatises** 55:3
**treking** 94:9
**trial** 66:14 76:7
  101:14,24 102:11
  105:24 111:24
  113:20,21,24
  114:11 118:14
  119:20 121:13,14
  123:3
**trials** 117:17
**trot** 151:10
**troubled** 99:19
**trublue** 129:19
  197:3,13,23 198:20
  198:21 199:4,9
  200:13,21,22 201:1
  201:3
**truck** 200:2,8
**true** 203:10
**truth** 4:8,8,9
**try** 14:13 15:13
  65:5 119:5 120:12
  180:2 182:12
**trying** 94:7 133:18
  148:8 199:25 201:6
**tumbling** 126:9
**turn** 13:6 111:1
  185:24
**turned** 41:20
  109:14,18,21 110:1
  134:19

**turnover** 18:16
**twelve** 78:23
  137:16,19 138:7
  140:9,10 182:23
  193:7
**twice** 6:5 97:22
**two** 3:13 5:19 7:13
  14:3 15:9 19:2,25
  20:1 27:24 38:6
  52:3,5,7 58:3 66:24
  67:2,22 70:25
  88:24 105:21,22
  128:16,18 131:19
  131:22 132:25
  138:12,18,20,24
  151:25 179:22
  182:5 186:1 196:14
  197:5 198:18 200:7
  201:8
**type** 46:6 72:20
  126:5 146:12
  178:18 199:14
**types** 19:18 86:13
  152:13 181:11
**typically** 31:24
  32:22 60:15 94:18
  170:22 196:24
  201:2

**u**

**u** 6:8 10:19 78:10
**u.s.** 14:13 15:21
**ulmer** 114:2
**ultimately** 102:4
  103:6 144:12
**umbrella** 23:16
**unaware** 176:13
**unclipped** 114:25
**underlying** 142:4
**underneath** 95:3
  126:10 143:5

**undersigned** 205:2
**understand** 4:21
  4:25 18:15 22:22
  32:23 33:11,17
  39:13,19 43:23
  50:21 62:18,20
  65:23 68:16 74:14
  90:1,5 95:24 97:2
  104:21 111:2
  121:22 146:5
  147:12,25 148:2,4
  151:11 163:16
  167:6 181:3 183:18
  188:5,12 189:21
  193:25 196:8 198:6
**understandably**
  117:24
**understanding**
  50:14,19 54:1
  84:10 94:13 105:23
  114:10 127:25
  200:6
**understood** 5:4
  144:5 159:7 174:8
  197:21
**unfortunately**
  109:1
**united** 1:2 171:11
**universally** 127:2
**university** 8:12,13
  32:2 113:8
**unprotected**
  126:23
**unsafe** 180:10
**unusual** 98:25
**uou** 54:3
**up's** 160:24
**updated** 55:24
**updegraff** 106:11
**upwards** 31:18

**urban** 97:25 98:2
**usage** 173:12
**use** 4:2 46:5,12,14
  56:1,24 58:6 60:16
  66:14 78:24 94:2
  102:5,14,20,24
  104:1 105:6,9
  114:20 120:24
  124:19 125:23
  138:8 161:21
  172:22 175:1 176:2
  186:22 190:22
  192:3,20 198:23
  205:9
**user** 103:6 105:8
  177:18
**users** 174:23
  195:10
**uses** 171:7,13 172:2
  195:24
**usual** 4:1
**usually** 55:9 72:23

**v**

**vandivere** 114:1,14
  114:21
**various** 9:9
**vary** 18:18
**vast** 16:8 65:10
  112:7 190:17
  191:22
**verbally** 60:22
  150:16
**verification** 173:16
**verify** 168:4
**veritext** 204:10,20
**veritext.com**
  204:18
**version** 55:22
  112:11
**versus** 44:15 78:11
  89:22 90:20 97:7

EXHIBIT 3 - 000086

97:25 98:11,11,16
99:1 106:9 112:18
114:1,14 116:7,9
117:8 118:9 119:24
122:4,8,12 123:9
123:13,23 197:4,13
197:24 200:3
**vertical** 114:2,14
115:11,25 118:25
**video** 60:20,22 61:8
85:8 96:20 107:14
139:15,16 155:14
155:14,16,17,19
156:4,5,14 158:16
158:19,22 159:2
160:13 162:1,4
179:23
**videos** 54:15
181:18
**videotape** 54:11
**viewed** 85:19
**violated** 127:11
**virginia** 1:17,20
5:11 6:12,20 7:14
7:22,24,25 8:7
19:12 20:4 203:2,5
203:20
**virtually** 180:18
**visit** 14:12 87:2,5,7
87:13,16,20 88:7,8
88:10
**visited** 14:22,23
15:12 16:4 130:21
152:3
**visiting** 86:9
**vitae** 3:11
**vollenweider** 98:18
**volume** 9:8
**vs** 1:9

## w

**w** 52:9 78:10
**wait** 17:25 87:24
90:23 123:24
**waived** 99:23
**waiver** 3:19 60:15
60:19 61:19 62:23
80:9,12 97:3
107:13 113:23
188:6
**waivers** 49:8 61:11
**walked** 162:22
**wall** 23:10,13,15,20
28:21 29:4,6,8,10
29:12,15 30:2 31:3
31:9,19,22,25 32:3
32:9,20 33:7 36:4
36:22 37:4,21
46:16 55:18 68:10
78:25 79:9,23 81:1
82:2,5,25 84:2,18
88:18 89:2 92:2,22
93:11 94:11,12,25
95:3 96:16 99:11
100:5 104:16
108:10 116:18,19
118:23,25 119:9
120:9,13 126:2,10
131:8,12,13,17
135:21 136:14
137:25 139:5,7,8
139:10 140:11
150:16 158:18
168:3 169:12
173:18 178:16,18
180:2,10 183:13,18
185:2 186:7 192:12
197:18 199:20
**walls** 17:16,17 83:7
83:9,16,23 84:11
89:1

**want** 4:24 11:15
15:24 21:14,23
23:20 25:13,22
56:22 64:8 71:20
79:21,22 86:4 94:8
98:18 109:11
111:13 119:23
121:17,18 128:3
133:20 139:10
140:12 149:1 155:5
156:20 167:10
168:25 170:16,21
178:2 183:23 198:3
**wanted** 9:4 13:7
21:9 23:6 25:12,14
25:15 29:13 32:8
32:14 34:10 65:25
110:16 124:12
134:22 201:14
**wants** 104:5 153:10
**warned** 100:3
**warning** 183:4
**warnings** 60:21
152:13 179:4 183:6
**washing** 195:16
**washington** 9:13
13:3,9 20:15 114:2
**watch** 160:13
**watched** 156:13
158:16,24
**watching** 156:12
159:6
**watson** 73:19
180:21 184:12
190:12
**watson's** 181:1
**waved** 99:24
**way** 4:22 9:4 11:24
12:18 24:25 31:14
41:2 42:9,13,14,19
43:15 46:15 47:4

48:18,20 60:11
72:10 75:19 76:21
83:14,24 88:25
96:17 104:1 109:10
110:14 119:7
128:11 129:5,25
130:3 131:8 132:8
135:5 137:6,15
141:11 142:11
143:8,23 154:5
158:13 164:15
165:9 170:20 174:6
174:20 178:12
185:22 198:9,17,24
199:3,10,15,16
200:4 201:9
**ways** 40:4 46:13
60:13,14,24 61:4,5
123:11 131:19
**we've** 61:2 66:8
75:12 93:23 149:12
160:3 181:5 183:14
183:14 187:17,22
**website** 85:10,12
85:15,19,25 129:7
**week** 43:10 45:11
**weeks** 173:13
**weight** 99:9
**weird** 116:2
**went** 8:6 11:14
21:24 44:1 87:16
87:17 91:21 113:20
116:13,18 119:6
144:3
**wesleyan** 112:18
117:22
**whatevers** 170:24
**whatsoever** 139:18
180:18
**whereof** 203:19

EXHIBIT 3 - 000087

| | | | |
|---|---|---|---|
| **whitten** 2:5 4:4 | **wider** 98:18 | **word** 13:14 74:1 | **x** |
| 53:18 55:14 63:7 | **wife** 21:14 38:14,15 | 121:11 147:1 192:4 | **x** 3:1,8 110:19 |
| 63:13,20 65:24 | **willing** 47:5 183:24 | **words** 84:1 144:8 | **y** |
| 68:9 69:9,17,20,25 | **wise** 37:20 | 152:12 154:12 | |
| 70:8 71:12 72:14 | **wish** 114:8 | **work** 8:5,18 9:10 | **y** 110:20 |
| 73:8,12 75:14 82:9 | **witness** 54:5 64:24 | 9:13 15:15 21:14 | **year** 8:1,14 9:18 |
| 83:22 86:21 92:23 | 82:10 83:23 86:22 | 30:20 31:4 39:6 | 23:12 24:22 34:21 |
| 93:4,21 95:10,18 | 92:24 93:5,22 | 54:8 67:10,13,20 | 81:12 91:16 111:14 |
| 96:7 101:10 102:6 | 95:11,19 101:11 | 67:24 68:20,25 | 118:5 137:16,19 |
| 103:3,8,21 105:10 | 102:7 103:9,22 | 69:6 73:15 74:9,15 | 138:7 140:9,10 |
| 105:15 107:19,24 | 105:11,16 108:5,19 | 74:17 97:17 110:13 | 182:23 193:7 |
| 108:4,18 109:5 | 109:6 111:5 115:14 | 191:3 199:10 | **years** 5:19,21 9:11 |
| 111:4 112:9,11 | 116:23 119:25 | **worked** 9:2 18:14 | 10:7,9,21,22 14:3 |
| 114:5 115:13 | 120:3 121:14 | 34:24 51:3 101:4 | 28:14 29:18 30:16 |
| 116:22 119:10,22 | 123:11,15 127:10 | 103:9 181:19 | 31:1 35:15 51:8,18 |
| 120:1 121:12 122:1 | 131:19 133:3 | **working** 10:11 | 54:6 65:17 78:23 |
| 123:8,12,17 124:17 | 135:24 136:9 138:4 | 18:21,24 21:19,20 | 80:1 88:3 133:16 |
| 124:21,23 127:9 | 138:17 139:2 | 47:16 | 190:11 |
| 130:13,19,24 131:2 | 140:16 142:15 | **works** 175:20 | **yesterday** 74:16 |
| 131:18 133:2 135:7 | 143:11 144:12 | **world** 114:2,14 | **york** 118:2,3,13 |
| 135:23 136:8 138:3 | 148:15,22 151:23 | 115:11,25 171:7,12 | **young** 78:5 |
| 138:16 139:1 | 153:19 154:11,21 | 172:5,21 195:24 | **younger** 83:18,25 |
| 140:15 142:14 | 155:12 157:1 160:9 | **worth** 16:11 | **z** |
| 143:10 144:11 | 161:6 163:22 164:9 | **write** 33:4,14 35:11 | |
| 148:14,21 149:6 | 164:18,21 165:11 | 71:3 101:17 130:9 | **z** 110:20 |
| 150:5 151:22 152:5 | 165:18,25 166:12 | **writing** 33:11 | **zone** 84:4 |
| 153:18 154:10,20 | 167:21 174:4 | 55:14,17 71:22 | **zoomed** 137:1 |
| 155:11 156:25 | 177:11,21 179:8 | 141:15 | |
| 160:8,21 161:5 | 184:1,7 185:7,14 | **written** 35:5 37:7 | |
| 163:21 164:8,17,20 | 185:21 186:10 | 58:23 63:16 75:17 | |
| 165:10,17,24 | 187:2 193:13 202:2 | 106:2 134:5 145:5 | |
| 166:11 167:20 | 203:8,19 204:18 | 169:20 | |
| 168:12 171:17 | **witnessed** 65:20 | **wrong** 91:11,19 | |
| 174:3 177:10,20 | 66:2 188:12 189:20 | 110:20 127:24 | |
| 178:5 179:7 183:20 | **woman** 65:18 92:1 | 188:15 | |
| 183:25 184:6 185:6 | 92:6 119:1 | **wrote** 55:6,9 56:2 | |
| 185:13,20 186:9 | **won** 113:22 | 75:18 91:14 97:20 | |
| 187:1 188:17,21 | **wondering** 39:25 | 100:16 106:7 108:8 | |
| 190:1 193:3,12 | 108:22 196:8 197:7 | **wu** 78:10,10,11 | |
| 194:13,20 196:3 | 198:10 201:7 | 89:7,22 90:2 | |
| 201:25 204:1 | | 181:20 | |

EXHIBIT 3 - 000088

Rules of Supreme Court of Virginia

Part Four - Pretrial Procedures

Depositions and Production at Trial

Rule 4.5

(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed, the
deposition shall be submitted to the witness for
examination and shall be read to or by him, unless
such examination and reading are waived by the
witness and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within 21 days of its
submission to him, the officer shall sign it and
state on the record the fact of the waiver or of
the illness or absence of the witness or the fact
of the refusal to sign together with the reason, if
any, given therefor; and the deposition may then be
used as fully as though signed unless on a motion

EXHIBIT 3 - 000089

to suppress under Rule 4:7(d)(4) the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 3 - 000090

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

EXHIBIT 3 - 000091