FILED
2023 Feb-21 AM 10:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

VERITEXT
LEGAL SOLUTIONS

Deposition of:

**Hannah Staubach**

*December 10, 2021*

In the Matter of:

**Kornegay, Kinsley Vs. High Point Birmingham, LLC, Et Al**

Veritext Legal Solutions
877.373.3660 | calendar-al@veritext.com | 800.808.4958

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:21-cv-00505-NAD

KINSLEY KORNEGAY, a minor by and Through her parent and guardian, MATTHEW KORNEGAY,

Plaintiffs,

vs.

HIGH POINT BIRMINGHAM, LLC, And HIGH POINT CLIMBING, LLC,

Defendants.

DEPOSITION
OF
HANNAH STAUBACH
December 10, 2021

REPORTED BY:

Kimberly B. Dowdy, CSR, RPR
Veritext Legal Solutions
2031 Shady Crest Drive
Hoover, Alabama 35216

STIPULATIONS

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of HANNAH STAUBACH may be taken before Kimberly B. Dowdy, Commissioner at 1122 Edenton Street, Birmingham, Alabama on the 10th day of December, 2021.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is specifically waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

STIPULATIONS
(Continued)

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition by the Commissioner is waived.

APPEARANCES

APPEARING ON BEHALF OF THE PLAINTIFFS:
PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN, P.C.
BY: Mr. Austin Whitten
2001 Park Place North, Suite 1100
Birmingham, Alabama 35203

APPEARING ON BEHALF OF THE DEFENDANTS:
MOORE, YOUNG, FOSTER & HAZELTON, LLP
BY: Mr. Jeremy S. Hazelton
1122 Edenton Street
Birmingham, Alabama 35242

INDEX

EXAMINATION PAGE:
By Mr. Whitten 6

EXHIBITS

Plaintiff's Exhibit 1..........................8
(Amended Notice of Deposition)
Plaintiff's Exhibit 2..........................17
(Facility and Auto Belay Orientation)
Plaintiff's Exhibit 3..........................34
(Video)
Plaintiff's Exhibit 4..........................51
(Gym Incident Report)
Plaintiff's Exhibit 5..........................61
(New Staff Hiring and Training)
Plaintiff's Exhibit 6..........................69
(Orientation Evaluation)
Plaintiff's Exhibit 7..........................76
(Operations Manual for Perfect Descent Climbing)

CERTIFICATE OF REPORTER 91

I, Kimberly B. Dowdy, CSR, RPR, a Court Reporter and Notary Public of the State of Alabama, acting as Commissioner, do certify that on this date, as provided by the Alabama Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me at 1122 Edenton Street, Birmingham, Alabama on December 10th, 2021, beginning at 9:08 a.m., HANNAH STAUBACH, witness in the above cause for oral examination, whereupon the following proceedings were had:

HANNAH STAUBACH,

after having been first duly sworn under oath, was examined and testified as follows:

EXAMINATION BY MR. WHITTEN:

Q. Good morning, my name is Austin Whitten; I'm one of the Plaintiffs' attorneys representing the Plaintiffs in this matter. Can you state your full name for the record.

A. Hannah Staubach.

Q. Thank you. And have you ever given deposition testimony before?

A. I have not.

Q. Well, I'll just kind of explain how it

works, give you some ground rules just to make sure you understand the process, but I'm going to ask you some questions and you have to answer them truthfully unless your attorney tells you clearly and directly not to answer them. And although no judge is present, this is a formal legal proceeding just like you're testifying in court and you're under the same legal obligation to tell the truth; do you understand?

A. I do.

Q. And a few ground rules before we start. It's important that only one of us speak at a time so that the court reporter here can record everything we are saying clearly. So I just ask that you let me finish my questions before you start answering and I'll try to make sure I let you finish whatever you're saying before I move on.

And the court reporter can only record words, so all of your responses need to be verbal. She can't record head nods or huh-uh's or uh-huh's or things like that. And if you don't hear or understand a question, please ask me to repeat it or rephrase it. If you don't ask me to do that

then I'm going to assume that you understood the question; is that fair?

A. Yes.

Q. And this is not a marathon or any sort of torture situation, if you need a break please just ask for one. The only caveat I'll say to that is if I've asked you a question I just ask that you answer that question before we take a break; is that okay?

A. Yes.

Q. Are you taking any medications this morning that could affect your memory or impair your ability to truthfully answer my questions?

A. No.

Q. I'm going to hand you a document, and I'll mark it as Plaintiffs' Exhibit Number 1.

MR. HAZELTON: Is that what you sent yesterday?

MR. WHITTEN: Yes.

(Whereupon, Plaintiffs' Exhibit Number 1 was marked for identification.)

Q. And, Hannah, have you seen this document before today?

A. I have not.

Q. Okay. Have you seen a deposition notice directed to you before now I should say?

A. I have not.

Q. Okay. Take a minute just to read over that.

A. Okay.

Q. Can you confirm that you're here to testify today in response to this deposition notice?

A. Yes, I am.

Q. Now, what did you do to prepare for this deposition today?

MR. HAZELTON: I'll just speak up, anything that you and I have discussed, you know, don't talk about any of that. Outside of that you can answer his question.

A. Okay. We did a practice --

MR. HAZELTON: No, not anything that you and I discussed in that. He's asking you what you did to prepare outside of you and I --

A. Oh, outside of us?

MR. HAZELTON: Yeah. Yeah.

A. Oh. I've done nothing to prepare.
Q. Your only preparation was meeting with Mr. Hazelton?
A. Yes.
Q. How long did you spend with Mr. Hazelton?
MR. HAZELTON: Again, Austin, I think that gets a little bit into, you know, the privilege territory. Do you need to know how long we met for?
MR. WHITTEN: That's all right.
MR. HAZELTON: Okay.
Q. Did you look at any documents to prepare for the deposition?
A. No. I think I looked at one and that was the -- sorry, my brain just blanked. It was the -- her -- oh, my God; I'm so sorry. The first one that you had on top of there.
Q. The orientation?
A. Yes. Sorry. I don't know why my brain could not come up with that word. The orientation sheet that the parents signed for her.

Q. Okay. And that's the only document that you reviewed for the deposition?
A. Yes.
Q. Okay. Did you speak with anyone at High Point --
A. No.
Q. -- prior to this deposition?
A. No.
Q. Hannah, what is your home address?
A. 1781 Indian Hills Road.
Q. Is that Birmingham?
A. Pelham, Alabama.
Q. Okay. What's the Zip code?
A. 35124.
Q. Okay. What is your date of birth?
A. 8/13/98.
Q. And what is your educational background?
A. I finished high school and then went to real estate school, now I'm a realtor.
Q. Okay. Great. That's going to lead me to my next question which is, where do you work now?

A. White House Real Estate.
Q. Is that the group that Steven Jacks is part of?
A. It is.
Q. Just curious. How long have you been working with White House?
A. Five or six months.
Q. Okay. When did you finish the real estate school?
A. I finished it this year, I believe, in June or July. I can't remember which one exactly but I finished the test in July.
Q. And then started shortly with White House after that?
A. Yes.
Q. Do you have any college education?
A. Some but I didn't finish.
Q. Where did you go to college?
A. I went to UAB for three semesters and then Jeff State for one semester.
Q. Okay. How long did you work at High Point Birmingham?
A. Three years.

Q. What were the, roughly, start and stop dates for that time period?
A. 2016 to, I think, 2020 or 2021. I quit this year, I'm sorry.
Q. Do you know like roughly what month it was?
A. I think July.
Q. So after you finished real estate school?
A. Yes.
Q. And what were your job titles while you were at High Point?
A. Supervisor, coach, and head camp counselor.
Q. What did you start as?
A. Just general staff.
Q. So you started as general staff, and then what was your next position there?
A. I think I was coach before I was a supervisor. Or, no. I was a camp counselor first, then supervisor, and then I started coaching.
Q. So general staff, camp counselor --

Page 14

A. Uh-huh (in the affirmative).
Q. -- supervisor, coach? Okay. Other than the general manager is that all of the positions at High Point Birmingham?
A. No. There's route setters, a marketing coordinator, events coordinator, and spin head route setter. Sometimes we'll have an assistant GM.
Q. And I believe on June 1st, 2018, you were a supervisor; is that correct? In 2019, I'm sorry, the date this incident occurred?
A. Yes, I was.
Q. What were your job responsibilities as a supervisor?
A. It was a lot. I had to make sure that people were filling out waivers; that orientations were getting done; that cleaning was getting down; that pretty much all of like the daily things that needed to be done got done.
Q. When you were working as supervisor did you have employees working underneath you?
A. I did, yes.
Q. How many employees typically working

Page 15

underneath you?
A. Like in one day or altogether?
Q. Just both.
A. Altogether, it was probably anywhere between like ten to 15, just depending on the time of year, and then daily, depending on the day, it was one to five.
Q. And those employees underneath, would they have been the general staff and camp counselors that you talked about?
A. Yes.
Q. What about the other, the positions that you had mentioned, are they -- would they have been underneath you or outside of your supervision?
A. Outside of my supervision.
Q. When you were a supervisor in -- I said June 1st. It was August 2, 2019 is the date that we are here to talk about, I believe. So I'm sorry for misstating that earlier. But on August 2, 2019, when you were a supervisor who was your direct report?
A. Like I was reporting to them or they were reporting to me?

Page 16

Q. Who were you reporting to at that time?
A. Ashlyn Brown.
Q. And what was her job title?
A. She was general manager.
Q. Okay. So I think we established that -- I'm just going to refer to my client as Kinsley; are you familiar with Kinsley Kornegay at this point?
A. Yes.
Q. We established her and her friends arrived at High Point Birmingham August 2, 2019; is that right?
A. Yes.
Q. Okay. And what happened when they arrived?
A. When they arrived I believe not all of them had waivers, so the parents that were there with their kids, they filled out theirs and then we called -- or the parents that were there called the other kids' parents that weren't there to fill out the waivers. Once we received those we checked them in, got them into gear, and took

Page 17

them through an orientation.
Q. Okay. Were you personally involved in that process?
A. I think I helped them get into gear but I didn't take them through the orientation.
Q. Do you remember exactly how many people were in their group?
A. Including the parents?
Q. Yeah.
MR. HAZELTON: Only if you remember.
A. I think it was seven.
Q. I'll go ahead and share this so we can reference it. I'll mark it as Plaintiffs' Exhibit Number 2.
(Whereupon, Plaintiffs' Exhibit Number 2 was marked for identification.)
Q. And, Hannah, have you seen this document that I just handed you before?
A. I have.
Q. Okay. What is this document?
A. This is the orientation form.
Q. And does every client that comes into High Point have to fill one of these out?

A. Yes.
Q. And I think I was asking about the group that Kinsley came in with. Can you look at this document, both pages, and tell me if you know whether or not all of the folks listed on these two pages were in Kinsley's group.
A. I do not remember their names.
Q. Can you tell me, I guess, how this document would have gotten filled out.
A. Yes. So after the waivers and right before we take them on the orientation, we get everyone in the group to print their names and then sign -- if they're younger than 14 the parents that are there for them print out the names and sign for them, and then put in the date.
Q. Okay. So the way this is filled out, it looks like there are 11 names on these two pages total.
A. Yes.
Q. Do you think all of these folks were in the group that Kinsley was with?
A. I do not know.

Q. Okay. Do you combine -- does High Point combine groups that come in?
A. If people come in like at the same time and are ready at the same time, then we will combine, but if they are a couple steps apart from each other then we'll just continue with the people that are ready.
Q. But you can't say if all of these folks were with Kinsley's group or not just based on this document?
A. Correct.
Q. Okay. I think you said you thought there may have been seven folks in her group. Do you remember how many adults were in their group?
A. I think it was three adults and four kids.
Q. But do you remember that for sure?
A. I do not.
Q. I have a few questions about Plaintiffs' Exhibit 2. So Kinsley's name is down here on the first page, do you see that at the top entry there?
A. I do.

Q. Okay. And then to the right of that it says "Staff SG".
A. Yes.
Q. I believe. Who would SG have been?
A. Steadman Gulley.
Q. Okay. Does Steadman also go by Tim?
A. He does.
Q. That was confusing me because there's some references to Tim in the responses and some reference to Steadman, I didn't know if they were the same person, but that's helpful.
And then also next to SG, CO is circled. What is the CO?
A. Climb only.
Q. What does that mean?
A. That means they can only use the auto belays, and if they're old enough they can go into the boulder room, but they don't have the ability to top rope or lead climb.
Q. How old do you have to be to get in the boulder room?
A. Fourteen.
Q. So Kinsley who was 12 at the time would have only had permission to go into the climbing room?
A. Yes. The Kids Zone and the auto belays, and the top rope room is what she was allowed access to.
Q. How many rooms does High Point have with those types of auto belays option?
A. Two.
Q. Why would Mr. Gulley, why does he have to initial by some of these and not others?
MR. HAZELTON: Object to the form. You can answer.
A. The initial is like who did the orientation. All these other ones should have been initialed as well as by who did them but these ones were not.
Q. And it appears that there's a similar signature on -- next to Kinsley's name and then the one under that, and then four more on the next page. Do you see that?
A. I do.
Q. Okay. Do you know who would have signed all of those?

Page 22

MR. HAZELTON: Object to the form. You can answer. Only if I say don't answer, otherwise you answer. I'm just preserving the record. Okay.
THE WITNESS: Okay. Thank you.
A. One of the mom's that were there would have signed it.
Q. So that would have been an adult signature?
A. Yes.
Q. Okay. So is it -- would it be safe to say that all of those people who have the, you know, similar signature next to them would have been children?
A. Yes.
MR. HAZELTON: Object to the form.
Q. Okay. And a few questions about this section here in the middle of the page. It says Auto Belay Orientation; do you see that?
A. I do.
Q. And that's on the first page for the record. It says 13 and under must be supervised by an adult. What does that mean?

Page 23

A. That means that if they're 13 and under they must be directly supervised by their adult at all times.
Q. And is there an adult assigned to each kid?
A. The adults that bring them in are responsible for watching them at all times.
Q. And this section here is -- backing up. Could you describe generally what this auto belay orientation section is for.
MR. HAZELTON: Object to the form. You can answer if you understand.
A. So the auto belay portion of it is when we're directly showing them how to do it and explain the good and the bad things of the auto belay.
Q. So the High Point employee who's doing the orientation is supposed to go through each of these points; is that right?
A. Yes.
Q. How many High Point employees were working when Kinsley and her group arrived?
A. Including route setters?

Page 24

Q. Is a route setter involved in anything that Kinsley and her group would have been doing?
A. No.
Q. Then we can exclude them.
A. Okay. Three.
Q. Okay. Do you know who those employees would have been?
A. Me, Steadman and Ashlyn.
Q. So I think you had mentioned Ashlyn was the general manager --
A. Yes.
Q. -- at that time? Do you know how long she had been working at High Point prior to that?
A. Four years.
Q. Is she still employed at High Point?
A. No.
Q. As general manager would she have been involved in the day-to-day operation with you guys?
A. Sometimes, yes. If it's really busy she'll come out and help us. If it's kind of slow she'll be in the back office doing her like things that she needs to do.
Q. Do you recall if she was -- where she

Page 25

was when Kinsley's group was there that date?
A. When they first came in she was in her office.
Q. So she wasn't involved in signing them in or orientation or anything like that?
A. No.
Q. Okay. And so I'm going to call him Steadman, but I know I might interchange Tim at some point.
A. Okay.
Q. But what was Steadman's position at High Point at that time?
A. Just general staff.
Q. Okay. Do you know how long he had been working there at that time?
A. I do not remember.
Q. Okay. Do you know if he's still working there?
A. He does not.
Q. Do you know how long it's been since he's worked there?
A. I do not. He quit, like right before Corona hit.

Q. And I have to ask but does Ashlyn still work there?
A. She does not.
Q. When did she quit?
A. In 2021, but I don't remember the month.
Q. When Kinsley and her group got there Ashlyn was in the back office, and you and Steadman helped them check in, and Steadman did the orientation --
A. Yes.
Q. -- is that all correct?
A. Yes.
Q. Okay. How old were you in August 2019?
A. I know I was 20.
Q. How long had you been working at High Point at that time?
A. Two years.
Q. How old was Steadman; do you know?
A. He was 22.
Q. Do you know how old Ashlyn was at that time?

A. I do not.
Q. Fair enough. You don't ask your boss how old they are. Okay.
So they go through the orientation with Steadman, and they sign this facility and auto belay orientation form. What did they -- what happens after that?
A. After they sign this or after the orientation?
Q. They sign the form after the orientation, right?
A. They sign it right before they go on it.
Q. Okay. So they sign this before the orientation, and then the orientation occurs with Steadman, and then what happens?
A. After the orientation we make sure that all questions are answered, and then it's kind of like go have fun, climb; we are at the front desk if you need anything.
Q. Were you present when Steadman gave the orientation presentation?
A. I was not.

Q. Do you know if he covered all of these points during his orientation?
A. He did.
Q. How do you know that?
A. Because orientations are done the exact same way every single time, and you don't get checked off to go on orientations by yourself until you can do it verbatim every single time.
Q. Is there a script that is used while you are doing it or is it all from memory?
A. There is -- we use this like a reference point if we happen to forget something and need to jog our memory, but it's mostly done from memory.
Q. Okay. Is it asked at any time before the guests start climbing whether they have been there before?
A. Yes.
Q. What happens if a guest has not been there before, what's different?
A. If they have not been there before then waivers get signed, orientations happen. If they have been there before we just make sure that they remember everything. And if they don't they'll go through the orientation.

Q. So they can skip orientation if they have gone through it before?
A. Yes.
Q. I see. Do you know if any of -- well, I guess I should ask. Is it safe to assume that everyone on this list on the facility and auto belay orientation form, it was their first time there?
MR. HAZELTON: Object to the form.
A. Yes, it would have been their first time.
Q. Do you recall if anyone that was in Kinsley's group had been there before?
A. Not that I can recall.
Q. Okay. So none of the parents had been there?
A. No.
Q. Okay. All right. So after the orientation is done is there any sort of, I guess, hands-on training, or is there hands-on training during the orientation as far as clipping into the

belays, things like that?
A. Yes. We'll either quiz them to see if they remember the order of clipping in or we'll watch them clip it in.
Q. Okay. So that has to be done before the orientation is over --
A. Yes.
Q. -- complete? How many different rooms does the High Point Birmingham facility have for climbing?
A. For climbing is three.
Q. What are the three different rooms?
A. There is a top rope room, a kids zone, and the boulder room.
Q. If you were in any one of those rooms would you see the whole room or are they arranged where you have to walk around to be able to see all the walls?
A. They are arranged to where we have to walk around to see all of the walls.
Q. So when adults bring a group of kids in, you know, like a birthday party, is there anything special about the orientation? Are there

any additional training that you give the parents; I mean, if you have two parents and ten kids, you know, what do you tell them?
MR. HAZELTON: Object to the form.
A. Birthday parties are special because they are paying an additional price so they get one to two staff members with them the whole time.
Q. Okay. Was this a birthday party, Kinsley's group?
A. It was not.
Q. So they did not have staff members assigned to their group?
A. They did not.
Q. Why did they do that for the birthday parties?
A. Birthday parties you have a lot more kids and the parents are usually focused on like the birthday kid, or parents drop their kids off and leave, so we have those extra staff people to kind of help out and make sure that the party goes smoothly.
Q. Okay. If it wasn't a birthday party

but it was still, you know, a group of two adults and ten kids, would there be any special sort of supervision by High Point at that point?
MR. HAZELTON: Object to the form.
A. There would not be unless the parents asked and paid additional price for us to be there with them.
Q. Okay. So are the parents that bring the kids to climb at High Point, are they trained during the orientation process?
A. What do you mean by trained?
Q. Are they instructed on, you know, their responsibilities to supervise the kids and what they should be looking for --
A. Yes.
Q. -- that type of thing?
A. They are.
Q. And that's included in this list of stuff here on Plaintiffs' Exhibit 2; is that right?
A. I don't think it specifically says it in here, but the same rules apply to adults that they do kids.
Q. So when there were adults that were

supposed to be supervising kids at High Point how do you know if, you know, the adults are actually doing that?
A. Sometimes we don't know. We do sometimes walk around the facility to make sure that people are doing what they are supposed to be doing, so when we see that they are not then we make sure we tell them and remind them.
Q. So you mentioned earlier that, you know, after the kids start climbing the employees -- you say you are at the front desk?
A. Sometimes we are at the front desk, sometimes we're cleaning something or helping other people out with something, it kind of just depends on what happens in that moment.
Q. Okay. Is there an employee who's assigned to do safety sweeps?
MR. HAZELTON: Object to the form.
A. There's not.
Q. It's just kind of whoever is walking around is supposed to be watching; is that right?
A. Yes.
Q. Hannah, I'm going to try to play this

Page 34

video, I know that you have seen it in the past. And I'll represent this video is four minutes and 58 seconds, and it was produced to us by High Point. I'll mark it as Plaintiffs' Exhibit 3?

(Whereupon, Plaintiffs' Exhibit Number 3 was marked for identification.)

Q. I'm just going to let this play so you can watch it. Can you confirm that you have seen this video before?

A. I have.

MR. HAZELTON: Well, do you want to wait until you've watched it and confirm because technically you don't know what he's going to play.

Q. And that's why I'm going to show it to you to make sure this is the video that you have seen previously. (Video playing). I have started the video.

I'm going to pause it and how about I ask you questions to try to speed this up. Can you see that okay?

A. I can.

Q. I'll also represent there was no sound provided with this video.

Page 35

MR. HAZELTON: Object to the form which suggests that there was sound but they just weren't provided it. There was never any sound on it.

MR. WHITTEN: All I know, we didn't get a video with sound. That's the point I'm putting on the record.

Q. So, Hannah, we are at 19 seconds into the video, can you identify which person in the video is Kinsley Kornegay?

A. She's the one on the volcano wall.

Q. Is that the wall on the right --

A. Yes.

Q. -- side of the screen, the red background?

A. Yes.

Q. Okay. I'm going to pause it again at 36 seconds in. I have a question. What is this lighting up here while Kinsley's climbing?

A. That one you want to beat the volcano before it erupts, so there's buttons on the wall that you can press. So it's like the lava catches up to you, you have time to beat it,

Page 36

it catches up to you, you have time to beat it. And when you get to the top it like explodes.

Q. So Kinsley pressed a button on this to get that started?

A. Yes.

Q. And this is not tracking her progress as the light goes up, it's essentially racing against it?

A. Correct.

Q. Is there anything to keep that from functioning when a person is not clipped in?

A. No.

Q. Is there a timer on the volcano wall?

A. Not that I know of.

Q. But some of the other walls do have timers, correct?

A. Yes.

Q. And what's the purpose of those timers?

A. The timer one is a speed wall. So there's two that are exactly the same and if you and someone else want to race and see who did it the fastest, you can press the timer to start it

Page 37

and the one at the very top to end it.

Q. Okay. Does the volcano wall have anything at the top to press?

A. It has one button that I think makes it erupt, but that's it.

Q. What happens when it erupts?

A. The lights flash.

Q. Okay. All right. So it appears that Kinsley is racing against this volcano light here; is that right?

A. Yes.

MR. HAZELTON: Object to the form.

Q. Okay. I'll go ahead and continue playing. And can you identify who's climbing next to Kinsley in this video?

MR. HAZELTON: Object to the form.

A. I know it's one of her friends but I don't know which ones.

Q. I'll pause it again here at the one minute mark. Do you know who is climbing, I guess it's the three walls down from Kinsley in this video?

A. I don't know their names but I know


it was a dad with a little girl.
Q. I know there is a witness identified in some of the paperwork, I think his name is Nick Medlin, do you know if that was the witness?
A. I think it was.
Q. And it appears that he's there supervising his own child; is that right?
A. Yes.
Q. And he was not with Kinsley's group?
A. No, he was not.
Q. And I'll pause it again at 1:24. There's another person over here supervising with who we believe is Nick Medlin, do you know who that is?
A. I do not.
Q. Do you know if they were with Kinsley's group?
A. I don't think she was.
Q. I'll pause it here at the one minute 57 second mark. It appears as Kinsley has fallen and injured herself by this point; is that right?
A. Yes.
Q. Do you know who these people are that

have gathered around her?
A. I do not.
Q. Do you know if you spoke with them after the injury occurred?
MR. HAZELTON: Object to the form.
A. I don't know who those two people are so I don't know if I talked to them specifically.
Q. I'll keep going. Can you let me know if you recognize anyone that comes on to the video. And I'll pause it at the 2:44 mark just to confirm that there's one, two, three -- I can't tell if that's a person, at least five, maybe six people around Kinsley; do you know who any of those people are?
A. I do not, but --
Q. But do you know if any of them are High Point employees?
A. They are not.
Q. Just to confirm, nobody in the video at this point is -- and I'll pause it -- is a High Point employee?
A. No, they're not.

Q. And we're at the 4:27 mark. Okay. I think that's the end of the video. Were there any High Point employees shown in this video?
A. No.
Q. Okay. We'll get to it in your incident report, but I believe you were the one who first went and looked at the video footage; is that right?
A. Yes.
Q. And did you --
A. Sorry. Ashlyn and I did that together, it wasn't just me.
Q. Okay. Did you watch any video footage of Kinsley prior to the start of this video?
A. I did not, but I'm pretty sure Ashlyn did.
Q. Do you know how long she had been climbing before the start of this video?
A. Roughly 45 minutes.
Q. Do you know how many, just roughly, how many walls she had climbed at that point?
A. I do not know how many.
Q. All right. Forty five minutes?

A. Uh-huh (in the affirmative).
Q. And I'll rewind the video back a little bit. So it appears at the very start of the video is when she first starts climbing on the wall, correct. Let's see. So she hits the start button for the volcano around ten seconds; is that right --
A. Yes.
Q. -- ten seconds into the video? Then she immediately gets on the wall without clipping in; is that right?
A. Correct.
Q. And then I'm going to skip the video ahead because you have already seen this. So I've paused it at a minute and 30 second mark. When we spoke about the volcano eruption button earlier did it appear that she hit that button when she got to the top?
MR. HAZELTON: Are you asking her based on that still frame right there --
Q. Well --
MR. HAZELTON: -- or just asking her if she did?

Page 42

Q. Just generally, can you tell if she did?
A. Do you mind rewinding it a little bit.
Q. Sure. Where would the button be located?
MR. HAZELTON: She hit it. I saw it earlier, but if you want to play it.
Q. Yeah, I just want to confirm the timing of it. So where is the button at the top located, just generally speaking?
A. It's somewhere in the exploding part. I don't know exactly where though. I don't remember.
Q. Okay. But it's on the front face of the wall, not on top?
A. No, it's not.
MR. HAZELTON: No, it's not on top.
A. It's not on top.
Q. Okay. So somewhere in this area; is that right?
A. Yes.
Q. Have you climbed that wall yourself

Page 43

before?
A. I have.
Q. So just to confirm the timing on it, on this video, it appears Kinsley pushes off of the wall right around the one minute and 32 second mark; is that correct?
A. Yes.
Q. Okay. And then she falls after that, correct?
A. Correct.
Q. Okay. So she's -- we established she started climbing ten seconds into this video and then pushed off the wall at a minute 32 seconds; is that right?
A. Yes.
Q. So if my math is correct, she was on the wall unattached for about a minute and twenty-two; is that right?
A. Correct.
Q. Were there any High Point employees in the kids zone room when she fell?
A. There was not.
Q. Where was each employee at that time?

Page 44

MR. HAZELTON: If you remember.
A. I don't remember.
Q. Okay.
A. I was at the front desk because a girl came and grabbed me, but I don't remember where Steadman was.
Q. And Ashlyn would have been in the back office somewhere?
A. Yes.
Q. Would it have been just you and Steadman in charge of all the supervising all of the climbing rooms?
MR. HAZELTON: Object to the form.
A. Say that again.
Q. Were you and Steadman the only two employees that would have been, I guess, watching over the kids zone at that time?
MR. HAZELTON: Same objection.
A. No. We had other tasks to do as well, so we are not always in the kids zone at all times.
Q. But if there was a problem in the kid zone you and Steadman were responsible for

Page 45

resolving the issue; is that right?
A. Yes.
Q. Would that be the same for the other two rooms that you had mentioned?
A. Yes.
Q. Were there any additional employees that would have been helping with the other two rooms?
A. No.
Q. So you and Steadman were responsible for all three of the climbing rooms at that time?
MR. HAZELTON: Object to the form.
A. Correct.
Q. Do you know how many other guests were at High Point when Kinsley fell?
A. I do not.
Q. Can you do any sort of rough ballpark?
A. What day did this happen on?
Q. August 2, 2019 was a Friday.
A. Friday.
MR. HAZELTON: Don't guess. If you don't know, then you don't know.
A. I really don't know.

Page 46

Q. Was it fewer than 50 people?
A. Probably, yes.
Q. Do you know how many of the guests were in the kids zone when Kinsley fell?
A. I do not know how many.
Q. Is there a maximum capacity for the kids zone?
A. I do not know. I know that there's one more for the whole building but I don't know if we have one for each specific room.
Q. How many auto belay walls are in the kids zone?
A. Twenty three'ish. Sometimes we have less, sometimes we have more.
Q. Okay. Is it ever -- was it ever the case that all 23ish of those walls were being used at the same time?
A. Say that again.
Q. Did you ever see all 23ish of the climbing walls in use at the same time?
A. On this day or just in general?
Q. In general.
A. Yes.

Page 47

Q. Okay. But obviously the video shows on this date they were not all --
A. Correct.
Q. Did you watch any other angles of video footage from this incident?
A. I did not.
Q. Okay. Do you know if Ashlyn did?
A. Not that I know of.
Q. Okay. And is there a camera over each wall or is it just select few number of cameras in the room?
A. I think it's a select few. And where they are positioned you can see all of them with all the cameras.
Q. Okay. Was it typical for kids to be climbing in the kids zone without any High Point employees supervising?
A. Yes.
Q. When would High Point employees supervise children climbing the kids zone?
MR. HAZELTON: Object to the form.
A. During birthday parties or during coaching teams.

Page 48

Q. Okay. But on just a normal day without birthday parties or coaching teams there would not be a High Point employee supervising?
A. Correct.
Q. Okay. Is that true even in the situations like we were discussing earlier were all 23 walls were being used at the same time?
MR. HAZELTON: Object to the form.
A. It just depends on how much staffing we have and if we can have somebody in a room for that period of time.
Q. Okay. Was there ever any occasions where you called in additional staff if you were really busy?
A. No.
Q. Are there any safety features in place on the volcano wall that would prevent people from climbing without clipping in?
MR. HAZELTON: Object to the form.
A. The yellow triangle that says stop on it, that's one of your safety features. And then the double clicking in.
Q. What is a double clicking?

Page 49

A. There's two carabiners that are attached, one is attached directly to the top of the yellow triangle, and one is attached to the banner itself and hangs down, so you clip in one first and then you clip in the other one.
Q. Okay. Both of those are normally attached to the yellow triangle?
A. The big green one is, there is a red one that hangs down.
Q. Okay. What are the dimensions of those yellow triangles?
MR. HAZELTON: Object to the form.
A. I don't know the dimensions but I know the point goes up to my hip.
Q. Okay. Would you say that's roughly three feet tall?
A. Probably.
Q. And having not been there before can you explain what a climber is supposed to do when they go up to the wall to clip in?
A. Uh-huh (in the affirmative). They first need to check it, so they pull down on the lanyard and make sure that it goes up again. If

Page 50

it goes back up then they'll clip on their red carabiner first and then they can take the green one off the triangle and put that one onto their harness as well.

Q. Okay. Then after that it's safe to climb?

A. Yes.

Q. I did want to confirm that the lava-racing feature on this volcano wall, it will -- it starts without clipping in, correct?

A. Correct.

Q. Okay. Do you think that if a High Point employee had seen Kinsley climbing unclipped that they would have noticed?

MR. HAZELTON: Object to the form.

A. Yes.

Q. What would you have done if you had noticed that?

A. I would have asked her to stop climbing and to remain holding on; if she can down-climb do so, if not there's a rope inside of the canister that we have in each room that has two carabiners on it. I would have attached one

Page 51

carabiner to the auto belay, sent it up to her and then she could clip in on the wall,

Q. I have another document to show you that I'll mark this as Plaintiffs' Exhibit 4. If you could just look through that document for a moment and let us know what it is.

(Whereupon, Plaintiffs' Exhibit Number 4 was marked for identification.)

A. This is the incident report form.

Q. Okay. And there are four pages in that document, correct?

A. Yes.

Q. Can you identify each page for us?

A. The first two are the incident report forms that we fill out. The third one is my statement of what happened, and the last one is -- did you say his name was Nick Medlin was his last name?

Q. I believe. And I'm getting my information from your reports so I believe it said Medlin.

A. Medlin.

Q. Yeah, on the first page, Section 3

Page 52

there.

A. So he -- his statement is the very last page.

Q. And can you confirm that this is a complete and accurate copy of your Gym Incident Report form and the witness statements?

A. Yes, it is.

Q. Were there any additional witness statements that you're aware of?

A. No, not that I'm aware of.

Q. Okay. I think we already -- I already asked this but Nick Medlin was not with Kinsley's group, correct?

A. Correct.

Q. Did he have any responsibilities to supervise Kinsley while he was climbing?

A. No.

Q. If you turn to the second page of Plaintiffs' Exhibit 4, there is a question towards the top, it says, "Please provide a brief description of surroundings, facility conditions, et cetera." And I think you wrote, "Kids zone partially crowd, mats underneath."

Page 53

Can you explain what all those things mean?

A. Yeah. So kid zone had some people climbing in it but it wasn't super crowded. And then the mats were underneath auto belays on the floor.

Q. So am I reading correctly it reads, "Kid zone partially crowded", and separately, "Mats underneath"?

A. Yes.

Q. I'm just making sure that I understand it. Why did you describe it as partially crowded?

A. There wasn't a whole lot of people in there, but there was enough I guess.

Q. Okay. And mats underneath. Are mats normally underneath the climbing walls?

A. Yes. Those don't move.

Q. Okay. You were just confirming that here?

A. Correct.

Q. Okay. What are the mats made out of?

A. I do not know.

Q. Are they soft or hard?

Page 54

A. Yes, they are soft.
Q. Do you know if Kinsley landed on the mat when she fell?
A. Yes, she did.
Q. And a few lines down from there, "Was this participant's first time at gym or activity?" You marked, "Yes". Why is that included in this report?
A. I don't know.
Q. Do you think it's important whether this was the participant's first time at the gym?
MR. HAZELTON: Object to the form.
A. Like me personally or --
Q. Yeah. I mean, from your experience do people who have not been there before need more help?
A. No.
Q. All right. And then Section 6, which is right under that you wrote, "Supervising adults were not watching." How did you know that?
A. Ashlyn wrote this part. And after one of her friends came and grabbed me, when I walked into the kids zone the parents were

Page 55

sitting in a corner of the building.
Q. I'm sorry. Can you just repeat that. I'm sorry.
A. Yeah. No problem. Ashlyn wrote this part and we said that because when one of her friends came and grabbed me and said that her friend fell, when I walked into the kid zone I saw the parents sitting in the corner.
Q. Okay. Do you know -- and we just watched the video. Do you know if it was the parents that Kinsley had came with that were surrounding her after she fell?
A. I don't remember what they look like, so I don't know if that was her parents or not.
Q. Do you know how many minutes it was between when she fell and when you came into the kid zone room?
A. I do not.
Q. Okay. But we have a number of minutes, I think it's -- and looking at the video we established she fell around one minute and thirty two seconds into the video. And then the

Page 56

video is a total of five minutes and one second. And I think you had testified that there was no High Point employees in the room for that roughly three and a half minutes after she fell to the end of this video.
So do you know how much longer it was before you got into the room?
A. I do not.
Q. Okay. Did you watch any video that goes past the end of this video?
A. A long time ago, yes.
Q. But we know for sure that it was a, roughly three and a half minutes at least before any High Point employees got there?
A. Correct.
Q. So do you know what the parents that Kinsley came with were doing during that three and a half minutes?
A. I do not.
Q. Okay. But you're saying that when you got into the room eventually they were sitting in a corner?
A. Yes.

Page 57

Q. Do you recall which corner it was?
A. When you walk into the kid zone -- well, there is a wall that goes along that whole side and they were in this very far like back corner --
Q. Okay.
A. -- parallel to the hallway that enters it.
Q. Had they moved Kinsley back there?
A. Not at that point, no.
Q. So they were not near Kinsley when you came in?
A. Correct.
Q. Were they aware that Kinsley had fallen?
A. I don't know if they knew that she had fallen. I asked them first what they -- if they saw anything or if anything happened, and they told me that she was just having a panic attack and she was fine.
Q. Okay. Did they tell you that they did not see her fall?
A. I don't remember if they directly

Page 58

said that or not.

Q. And you're not sure what they were doing between the times when she fell and when you got to the kid zone, correct?

A. Correct.

Q. Okay. And we watched the whole video with Kinsley on the wall. Do you have any idea where the parents were while Kinsley was climbing the wall?

A. If they were in the same spot that they were in when I walked in, from the volcano wall there's this big thing of towers that you can climb right in front of that and then benches right behind it, and they were on those benches.

Q. So when you first saw the parents would they have been able to see the volcano wall from where they were?

A. No.

Q. Okay. But you don't know where they were prior to when you first saw them?

A. Correct.

Q. And why did Ashlyn fill in part of this report form?

Page 59

A. I don't know why she did part of it. We kind of did it together. Because this was the first time I had to fill out an incident report and just wanted to make sure I was doing it correctly.

Q. Had she filled them out before?

A. I believe so, yes.

Q. So do you know if -- did Ashlyn speak to the parents directly or did you?

A. We both did.

Q. A little further down it says, "Checklist before submitting." It's the fourth line down from there. It says, "Belay orientation/testing (attached)." Do you see that?

A. I do.

Q. And it doesn't appear that there -- anything was marked next to that. There's "Yes", "No", "NA". And they all appear blank to me; is that what you see?

A. Yes.

Q. The belay orientation/testing that they are talking about, is that this document we looked at that's marked Plaintiffs' Exhibit 2?

Page 60

A. Yes, it is.

Q. Why would that not have been marked here?

A. I'm not sure. If I remember correctly, after we filled out this top part Ashlyn did the checklist before submitting.

Q. Okay. And the line under that says "Photos". And looks like both "Yes" and "NA" are checked. Do you know why that is?

A. Yeah. I think she got confused and thought that was the video because we have a video but we don't have anything that takes pictures.

Q. So nobody took any photos, no employees took any photos that you're aware of?

A. Correct.

Q. And that's your signature down at the bottom?

A. Yes.

Q. And I turn to the third page which I believe is your written statement. The first line says one of Kinsley's friends grabbed me. And just to confirm, you were at the front desk when she

Page 61

found you?

A. I was, yes.

Q. Was there -- were there any other employees at the front desk with you at that time?

A. I do not remember where Steadman was at this time.

Q. Okay. And the last page is Nick Medlin's statement. Did you talk to Mr. Medlin directly or did Ashlyn talk to him?

A. I don't remember.

Q. Okay. Do you want to take a five-minute break?

MR. HAZELTON: Sure.

(Whereupon, a discussion was held off the record and a break was taken at 10:18 a.m.)

Q. Hannah, what training did High Point provide you when you started working there?

A. When I started there's like a four-day onboarding training, so we did that.

Q. I'm marking this document as Plaintiffs' Exhibit 5. And can you look over that document and tell us what it is.

Page 62

(Whereupon, Plaintiffs' Exhibit Number 5 was marked for identification.)

A. So this is the new staff training and hiring sheets.

Q. Have you seen this document before?

A. It's been awhile, but yes.

Q. Was this document used when you were training -- being trained?

A. Yes, it was.

Q. And who trained you?

A. Tony. I don't remember his last name, but he was our general manager at that time.

Q. Was he general manager just before Ashlyn?

A. Yes.

Q. Have you trained other employees with this document?

A. I have helped with parts of training but I haven't been solely responsible for one of these.

Q. Okay. Is it the general manager who's responsible for training new staff?

Page 63

A. Yes.

Q. Are those -- is this document actually initialed by a trainee and trainer as it's been completed?

A. Yes, it is.

Q. Are these documents stored anywhere after they are completed?

MR. HAZELTON: Object to the form.

A. I do not know.

Q. Okay. Would Ashlyn know that?

A. Yes.

Q. Do you know if Steadman was trained with this document?

A. He was.

Q. Do the summer camp staff employees get the same training?

A. Yes. They get this plus additional training.

Q. What additional training do they have?

A. It's a lot of the same training as when they are going to become a coach, so there's like videos and Power Points that we go over with our programs coordinator, and then we have -- I

Page 64

think it's like two or three days before camp starts where we do mock summer camps with each other.

Q. What's the summer camp program like there?

A. It's Monday through Friday, eight o'clock to one, and it's a big mix of climbing games, non-climbing games, depending on how old they are they will get to rappel or learn to belay. There's a bunch of activities that we get to do with the kids.

Q. Do any of those take place in the kids zone?

A. Yes, they do.

Q. Do you know if the summer camp was in session when Kinsley and her friends were climbing?

A. It was not.

Q. Okay. How do you know that?

A. Because I would have been with summer camp instead of behind the front desk.

Q. So had summer camp ended or was this after 1 p.m.?

A. I think at that time we stopped

Page 65

summer camps in July.

Q. Okay.

A. So it would have been over, no camps in the books.

Q. Okay. So would there have been any summer camp employees at the High Point on August 2nd?

A. No.

Q. I have a few questions about this document. If you could flip towards the back, it's the third page from the back, unfortunately there's no page numbers, but I'm looking at the page that has day four toward the bottom.

A. Okay.

Q. Do you see that?

A. I do.

Q. Okay. And a couple of subheadings down, it says walk-through of facility. Under that it says safety sweep, what to look for. And then it says kid zone, auto belay use, boulder zone. Parents, are they watching or helping.

What does all of that mean to you?

A. So safety sweeps get done daily but

kind of happens whenever we have the time to do them or whenever we are walking around giving orientation or cleaning, we are keeping our eyes out for these things as well. So we are just trying to like check each person is doing what they are supposed to be doing.

Q. Is there a schedule that you're supposed to keep as far as routine safety sweeps?

A. There is not.

Q. So you said earlier I believe that you thought Kinsley had been climbing for about 45 minutes in the kid zone prior to her fall.

A. Yes.

Q. Do you know if any safety sweeps had been done during that time?

A. I don't know if they got done during that time, but I know they happen throughout the day.

Q. But is it possible that there were no safety sweeps during that time?

MR. HAZELTON: Object to the form.

A. It's possible.

Q. When you and the other employees did

safety sweeps did you document that anywhere?

A. We did not.

Q. It wasn't written down, I inspected kid zone at, you know, 12:15 p.m.?

A. No.

Q. Okay. And where it says, "Parents (are they watching or helping)," what does that mean?

A. That's just us making sure that the parents that are supposed to be watching the kids are actually doing so.

Q. Did you do any of these safety sweeps while Kinsley was in and her group were there?

A. I don't remember if I did them while her group was there, but I know I did some that day.

Q. Okay. You don't know if you did any safety sweeps of the kid zone while she was in there?

A. I don't remember if it was when she was in there or not.

Q. Did High Point provide you any additional training when you were promoted to

supervisor?

A. Yes. They taught me how to like use the system for the supervisor because my code would then have more access to things in that.

Q. But was there any additional training as far as your orientation or guests' supervision responsibilities?

A. No.

MR. HAZELTON: Object to the form.

A. No.

Q. Were there any additional hiring or training documents that you were provided while you worked there?

A. Training documents, yes. As you got like higher up or wanted more, like, responsibilities they would train you to teach belay classes, training you to teach lead classes, and then they would provide a CWI course if you wanted to teach those classes.

Q. Other than this document we are looking at, is there any other training that Steadman would have received that you're aware of before August 2, 2019?

A. Not that I'm aware of.

Q. Okay. And what did you say his job title was?

A. General staff.

Q. Okay. And that's -- is that what you get hired into as a new employee?

A. Yes, it is.

Q. Okay. I have another document that I'm going to mark as Plaintiffs' Exhibit 6.

(Whereupon, Plaintiffs' Exhibit Number 6 was marked for identification.)

Q. Hannah, have you seen this document before?

A. It's been awhile, but yes.

Q. Okay. What is this document we are looking at?

A. This is the Orientation Evaluation. So you can't give others orientations by yourself until you get excellent or thorough on all of these.

Q. You mean complete or thorough?

A. This last page that says excellent --

Page 70

Q. Okay. I see -- okay.
MR. HAZELTON: Basically the best of all of them --
Q. Yeah. I was looking at the first page, the categories are omitted, and needs improvement, acceptable, complete, and thorough. So there's three pages in this document. What are the first two pages from?
A. The first two are like the rules that you're going over during the orientation.
Q. Okay. So are those all topics that are supposed to be covered in the orientation?
A. Yes, they are all.
Q. And who fills out this evaluation?
A. I believe the general manager does the final approval of if you can give orientations or not.
Q. Okay. So were you evaluated with this document?
A. I was, yes.
Q. Who evaluated you?
A. Tony.
Q. Okay. And was Steadman evaluated with

Page 71

this document?
A. He was, yes.
Q. Who would have evaluated him?
A. Either Tony or Ashlyn, I can't remember exactly when he started with us.
Q. Okay. But would he have had to get good or excellent on all these categories on the last page to be able to do the orientations by himself?
A. Correct.
Q. Okay. Do you know if these documents are stored anywhere after they are completed?
A. I do not know.
Q. I'm looking at the second page of this document, Plaintiffs' Exhibit 6, maybe a third of the way down it says, "Auto belay description." What would be covered in this topic by someone giving an orientation?
A. Everything that they need to know about the auto belay: How to use it, how to check it, how to clip in and out of it. Things like that.
Q. Two lines down it says, "Children six

Page 72

and under, 13 under." What does that topic entail?
A. So kids six and under have to be directly clipped in by their parents or the supervising adult. Thirteen and under their parents have to be watching them the whole time making sure they are clipping in and out correctly.
Q. Okay. Did it make a difference when parents arrived with other people's children versus their own children?
MR. HAZELTON: Object to the form.
A. Yes and no. The waivers have to be filled out by their legal guardian, but like the orientation form and direct supervision just has to be whoever the adult is that came in with them.
Q. Do the adults that bring other people's children in, are they required to sign anything other than just the waiver?
A. They are also required to sign the orientation form.
Q. Is anything in there parents agreeing to supervise these children?

Page 73

A. The orientation form, yes.
Q. Does High Point make sure that each kid that comes in has a supervising adult?
MR. HAZELTON: Object to the form.
A. Yes.
Q. Under the topic we just looked says, "Clipping in procedure - demonstrating twice", what does that mean?
A. That means that we show the group how to clip in at least twice.
Q. Okay. And with the group like Kinsley's, would the orientation have been limited to the kids zone, the activities?
A. It would have been limited to the rope room and the kid zone. The other rooms they didn't have access to.
Q. So Kinsley could have climbed in the rope room on an auto belay device as well?
A. Correct, yes.
Q. How tall are those?
A. One is 45 feet and the other one is 55.
Q. Okay. Do they have the same setups as

Page 74

the kid zone, auto belay?
A. Yes, they do.
Q. Okay. There's no additional steps to clipping in or anything like that?
A. Not for auto belays.
Q. Does High Point -- do High Point employees supervise that area?
A. When we can, yes.
Q. But there's not always a High Point employee in that room supervising?
A. Yes.
Q. There's not?
A. Correct. Sorry.
Q. A few lines down on the same page it says, "If you climb up without clipping in", do you see that?
A. Yes.
Q. Okay. What do you say in orientation about that?
A. Yeah. We say something along the lines of, if you're climbing and you realize you forgot to clip in, down-climb if you can, if not yell for help.

Page 75

Q. Is that a common problem with people climbing up without clipping in?
MR. HAZELTON: Object to the form.
A. It happens. Sometimes people just forget.
Q. Have you -- as far as what you're talking about people realizing, you know, after they started that they are not clipped in, have you seen that happen yourself?
A. I have, yes.
Q. How many times have you seen it happen?
A. Probably, anywhere between like five and ten times.
Q. That would have been over the course of --
A. Four years.
Q. -- four years? And right underneath that it says, "Danger of not checking system or not clipping in". What's covered in this topic?
A. So we make it clear that auto belays are a machine and machines can fail, so you want to give like a few pulls on the lanyard just to

Page 76

make sure the system is working correctly and it tracks back up, so we'll tell them to do the pull test before they clip in and before they actually jump off the wall to get lowered.
And then we also try to tell them to make sure that they look at their harness and can see that they are clipped in.
Q. And High Point uses Perfect Descent auto belay devices at the gym in Birmingham; is that right?
A. Yes.
Q. I'm marking this as Plaintiffs' Exhibit 7
(Whereupon, Plaintiffs' Exhibit Number 7 was marked for identification.)
Q. Have you seen this document before?
A. I have not.
Q. So you did not see this document when you were trained at High Point?
A. Correct.
Q. Okay. You did not see it at any point after that while you worked at High Point?
A. I did not.

Page 77

Q. Okay. Do you see on the first page it says, "Always read instructions before use"?
A. Yes.
Q. So you're confirming that you have not read this before?
A. I have not.
Q. I'm flipping to page two as marked in the bottom right-hand corner. Number four, do you know -- before I move on do you know if Steadman had read this?
A. Not that I know of.
Q. Do you know if Ashlyn has read this operations manual?
A. I have no idea if she has or not.
Q. Okay. Did you ever discuss it with her?
A. No.
Q. So on page two, the first line says, "Facilities using the Perfect Descent Climbing System should refer to and abide by the Climbing Wall Association Operation Standards.
And it goes on. Do you see that there?

Page 78

A. I do.
Q. Have you read the Climbing Wall Association Industry Practices source book before?
MR. HAZELTON: I'm just going to enter an objection here and just make it clear for the record that Ms. Staubach is not testifying on behalf of High Point. She's here as a fact witness in her individual capacity.
To the extent that you have any knowledge of any of this you can answer, but I just want the record to be clear on all on that particular issue. Go ahead.
A. I have not read the climbing wall association engineering standards.
Q. Or the Climbing Wall Association Industry Practices source book?
A. Correct, I have not read that.
Q. All right. I'm looking at page three, and the second sentence in the big warning box at the top reads, "Operators of the Perfect Descent Climbing System are responsible for the safety and supervision of climbers using this equipment."
Do you know what that means?

Page 79

MR. HAZELTON: Object to the form.
A. I don't.
Q. Do you know who the operator would be in this scenario?
MR. HAZELTON: Object to the form.
A. I would think it's whoever's using it.
MR. HAZELTON: If you know. Don't guess.
A. No.
Q. But you haven't read this warning before, correct?
A. Correct.
Q. And underneath that in the box that's titled Health and Safety, it says, "Owners and operators must abide by all standards, national, federal, state and provincial laws, and any specific health and safety regulations pertaining to the installation and use of this product."
Did I read that correctly?
A. Yes.
Q. Okay. Do you know what standards that this sentence is referring to?

Page 80

MR. HAZELTON: Object to the form.
A. I do not.
Q. Okay. I turned to page 15 of that, if you could flip over there to this document. At the very top it says Section 5.0 Training; do you see that?
A. Yes.
Q. Okay. And the sentence under that says, "It is the responsibility of the purchaser of the Perfect Descent Climbing System to assure that operators read and understand these operator instructions."
Do you know who the purchaser of the Perfect Descent Climbing System is?
MR. HAZELTON: Object to the form.
A. I don't know who like directly in High Point bought them, but it would have been High Point who purchased these climbing systems.
MR. HAZELTON: Object to the form. If you know. You can answer if you know.
A. Oh. Yes, High Point would have been the people that bought it.
Q. Okay. And then it says, "Assure that

Page 81

operators read and understand these operator instructions."
Would you and Ashlyn and Steadman have been the operators on August 2, 2019?
MR. HAZELTON: Object to the form.
A. Can you repeat that.
Q. Yeah. This sentence here says the purchaser of the Perfect Descent Climbing System has to assure the operate -- that operators read and understand these operator instructions.
Did High Point assure that you, Ashlyn and Steadman had read these instructions?
MR. HAZELTON: Object to the form.
A. Not that we read them, but we would have verbally told them based on how High Point told us to tell them how to clip in and out, making sure the checks are done.
Q. Okay. But High Point did not train you by giving you this document, correct?
A. Correct.
Q. Okay. And the next heading down, it says it is the responsibility of all operators of the Perfect Descent Climbing System to ensure that

user (climbers) are -- and the second bullet point says properly attached by the Perfect Descent Climbing System carabiner to their climbing harness.

What does that mean to you?

MR. HAZELTON: Object to the form.

A. So it means that carabiners are on the proper loop on their harness.

Q. But the first part of that sentence where it says it is the responsibility of all operators of the Perfect Descent Climbing System to ensure that the users are attaching the carabiner to the climbing harness.

MR. HAZELTON: Object to the form.

Q. Whose responsibility is it to ensure that climbers are clipped in?

MR. HAZELTON: Object to the form.

A. Because of their age it's their parents.

Q. Okay. So it's your understanding of these instructions that the parents of the climbers would be the operator --

MR. HAZELTON: Object to the form.

Q. -- in that situation?

A. Yes.

Q. Did anyone at High Point ensure that Kinsley was properly attached to the climbing system before she climbed up the wall and fell off and got hurt?

MR. HAZELTON: Object to the form.

A. On the volcano wall when it happened or like previously climbing making sure that she did it correctly?

Q. The last climb.

A. The last climb. To my knowledge, no.

Q. And did High Point train you to instruct the parents that it was their responsibility to ensure that Kinsley was clipped in?

A. Yes.

Q. I turned to page 17, if you could flip over there, and the top of the page it says the topic 8.0, Supervision During Use; do you see that?

A. Yes.

Q. The second bullet point down reads,

"Climbers should be under constant supervision by a trained operator. Before ascending the wall, operators should check to verify that each climber has: Properly fit and secured climbing harness; properly clipped their harness to the Perfect Descent Climbing System carabiner." Did I read that correctly?

A. Yes.

Q. Who do you think -- who do you think the trained operator is that it mentions here in this bullet point?

MR. HAZELTON: Object to the form.

A. The parents that are with her.

Q. And how do they become a trained operator of this system?

MR. HAZELTON: Object to the form.

A. They went through orientation with us and so we told them and the kids how to clip in and out properly.

Q. Okay. And I believe you had testified earlier that Steadman would not have read this document that we are looking at.

A. Correct.

Q. So I assume it's -- is it safe to also assume that the parents were not given copies of this document that we are looking at?

MR. HAZELTON: Object to the form.

A. Correct.

Q. Okay. But the parents that Kinsley arrived with, you would consider them a trained operator of this system?

MR. HAZELTON: Object to the form.

A. Yes.

Q. These bullets points that are following -- let's see. Underneath that there are 1, 2, 3, 4, 5, 6, 7, 8, 9 bullet points on page 17 following the one we just looked at. And if you could, just read through those real quick and let me know when you are done.

A. Okay. I read them.

Q. Okay. Are all of these bullet points and instructions for people who are supervising climbers?

MR. HAZELTON: Object to the form.

A. Yes.

MR. HAZELTON: Only if you know.

A. They are. We go over all of those in orientation.
Q. Okay. So are these copied and pasted into your training materials or --
MR. HAZELTON: Object to the form.
Q. -- or orientation materials?
A. Not copied and pasted.
Q. So you go over all of these bullet points in the orientation, and then the parents are responsible for enforcing these rules that are in the bullet points?
A. Yes.
MR. HAZELTON: Object to the form.
Q. Okay. Are parents ever given any sort of written documents with the rules or things they should be watching out for while their kids are climbing?
A. We'll point out that they can read the top of the orientation form, if they would like to, but we go over all of that in the orientation as well. And then there's printed rules around the facility as well.
Q. I think you had mentioned earlier that

this Gym Incident Report form that you did for Kinsley was the first one that you had done as an employee at High Point?
A. Yes, it was.
Q. How many did you do after that?
A. Two others.
Q. Okay.
A. No, one other. Sorry.
Q. Did either of those involve falls from people who had not clipped in?
A. Yes.
Q. Okay. How many of those?
A. They both were.
Q. Okay. Were they children or adults?
A. Adults.
Q. Were those -- so Kinsley and two others. Were those the only three incidents of falls from people who had not clipped in that you saw yourself?
A. Yes.
Q. And those other two incidents, were they also on auto belay devices?
A. They were.

Q. Were there any High Point employees present when those incidents occurred?
A. Not in the room when it happened, but after the fact, once we were found out, yes.
Q. Are you aware of any similar incidents that happened before Kinsley?
A. Not that I'm aware of.
Q. Okay. Was Kinsley the first of these three incidents?
A. Yes.
Q. Was there any policy changes or additional training after Kinsley got hurt --
MR. HAZELTON: Object to the form.
Q. -- for this issue?
A. No.
Q. Was there any policy change or additional training provided after the other two incidents?
A. No.
Q. How serious were the injuries in the other two incidents?
MR. HAZELTON: Object to the form.
A. The first one I don't know the

extent of his injuries. But the second one, he now works for us so I know his back was pretty badly messed up.
Q. Okay. Are you -- do you have any personal knowledge of any other similar incidents that happened at any other High Point climbing gyms?
A. I know that ones have happened but I don't know the extent of it.
Q. While you were employed there did High Point implement any new policies to try to reduce the number of these types of incidents?
MR. HAZELTON: Object to the form.
A. We were told to maybe like emphasize the importance of the auto belays more because they have been happening, but that's really it.
Q. I don't think I have anymore questions for you. Your lawyer may have some.
MR. HAZELTON: I don't have any questions.
MR. WHITTEN: Thank you so much for your time.
THE WITNESS: Thank you.

Page 90

(Whereupon, the preceding deposition was concluded at 11:00 a.m.)

Page 91

REPORTER'S CERTIFICATE

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing, to the best of my ability and understanding.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

Kimberly B. Dowdy

Kimberly B. Dowdy, CCR, RPR
Alabama CCR #62

My Commission expires:
March 16, 2024

**&**

**&** 4:5,11

**0**

**00505** 1:4

**1**

**1** 5:8 8:16,20 64:22 85:13
**10** 1:17
**10:18** 61:15
**10th** 2:7 6:7
**11** 18:18
**1100** 4:7
**1122** 2:6 4:13 6:6
**11:00** 90:2
**12** 20:23
**12:15** 67:4
**13** 22:22 23:1 72:1
**14** 18:13
**15** 15:5 80:3
**16** 91:20
**17** 5:10 83:19 85:13
**1781** 11:10
**18429** 91:17
**19** 35:8
**1:24** 38:11
**1st** 14:9 15:17

**2**

**2** 5:10 15:17,20 16:12 17:14,15 19:20 32:19 45:19 59:23 68:23 81:4 85:13
**20** 26:16
**2001** 4:7
**2016** 13:3
**2018** 14:9
**2019** 14:10 15:17 15:20 16:12 26:15 45:19 68:23 81:4
**2020** 13:3
**2021** 1:17 2:8 6:7 13:3 26:5
**2024** 91:20
**2031** 1:22
**22** 26:21
**23** 48:7
**23ish** 46:16,19
**2:21** 1:4
**2:44** 39:11
**2nd** 65:7

**3**

**3** 5:11 34:4,5 51:23 85:13
**30** 41:15
**32** 43:5,13
**34** 5:11
**35124** 11:14
**35203** 4:8
**35216** 1:23
**35242** 4:14
**36** 35:18

**4**

**4** 5:13 51:4,7 52:19 85:13
**45** 40:19 66:12 73:21
**4:27** 40:1

**5**

**5** 5:14 61:21 62:1 85:13
**5.0** 80:5
**50** 46:1
**51** 5:13
**55** 73:22
**57** 38:20
**58** 34:3

**6**

**6** 5:4,16 54:18 69:9 69:10 71:15 85:13
**61** 5:14
**62** 91:18
**69** 5:16

**7**

**7** 5:17 76:13,14 85:13
**76** 5:17

**8**

**8** 5:8 85:13
**8.0** 83:21
**8/13/98** 11:16

**9**

**9** 85:13
**91** 5:20
**9:08** 6:8

**a**

**a.m.** 6:8 61:15 90:2
**abide** 77:20 79:16
**ability** 8:13 20:19 91:10
**able** 30:17 58:16 71:8
**acceptable** 70:6
**access** 21:5 68:4 73:16
**accurate** 52:5
**acting** 6:3
**action** 91:13
**activities** 64:10 73:13
**activity** 54:6
**additional** 31:1,6 32:6 45:6 48:13 52:8 63:17,19 67:23 68:5,11 74:3 88:12,17
**address** 11:9
**adult** 22:8,23 23:3 23:4 72:4,15 73:3
**adults** 19:14,15 23:6 30:21 32:1,21 32:23 33:2 54:19 72:17 87:14,15
**affect** 8:12
**affirmative** 14:1 41:1 49:21
**age** 82:18
**ago** 56:11
**agreed** 2:3,10 3:4 3:12
**agreeing** 72:22
**ahead** 17:12 37:13 41:14 78:12
**aided** 91:7
**alabama** 1:2,23 2:7 4:8,14 6:3,4,7 11:12 91:2,18
**allowed** 21:5
**altogether** 15:2,4
**amended** 5:9
**angles** 47:4
**answer** 7:3,5 8:8,13 9:17 21:12 22:2,2,3 23:12 78:10 80:20
**answered** 27:18
**answering** 7:16
**answers** 91:6
**anymore** 89:17
**anywise** 91:14
**apart** 19:5
**appear** 41:17 59:16 59:18
**appearing** 4:3,10
**appears** 21:17 37:8 38:6,20 41:3 43:4
**apply** 32:21

**approval** 70:16
**area** 42:20 74:7
**arranged** 30:16,19
**arrived** 16:12,16 16:17 23:22 72:9 85:7
**ascending** 84:2
**ashlyn** 16:3 24:8,9 26:1,8,22 40:11,16 44:7 47:7 54:21 55:4 58:22 59:8 60:6 61:9 62:15 63:10 71:4 77:12 81:3,11
**asked** 8:7 28:15 32:6 50:19 52:12 57:17
**asking** 9:20 18:2 41:19,22
**assign** 3:7
**assigned** 23:4 31:13 33:17
**assistant** 14:8
**association** 77:21 78:3,14,15
**assume** 8:1 29:7 85:1,2
**assure** 80:10,23 81:9,11
**attached** 49:2,2,3,7 50:23 59:14 82:2 83:4
**attaching** 82:12
**attack** 57:20
**attorney** 7:4
**attorneys** 6:16
**august** 15:17,20 16:12 26:15 45:19 65:7 68:23 81:4
**austin** 4:6 6:15 10:7
**auto** 5:10 20:17 21:3,7 22:19 23:9 23:13,15 27:5 29:8 46:11 51:1 53:5 65:20 71:16,20 73:18 74:1,5 75:21 76:9 87:22 89:15
**aware** 52:9,10 57:14 60:15 68:22 69:1 88:5,7
**awhile** 62:6 69:14

**b**

**b** 1:20 2:6 5:7 6:1 91:18
**back** 24:21 26:8 41:2 44:7 50:1 57:4 57:9 65:10,11 76:2 89:2
**background** 11:18 35:15
**backing** 23:8
**bad** 23:15
**badly** 89:3
**ballpark** 45:17
**banner** 49:4
**based** 19:9 41:20 81:15
**basically** 70:2
**beat** 35:20,23 36:1
**beginning** 6:8
**behalf** 4:3,10 78:7
**belay** 5:10 22:19 23:10,13,16 27:6 29:9 46:11 51:1 59:13,21 64:10 65:20 68:17 71:16 71:20 73:18 74:1 76:9 87:22
**belays** 20:17 21:4,7 30:1 53:5 74:5 75:21 89:15
**believe** 12:10 14:9 15:18 16:17 20:4 38:13 40:6 51:19 51:20 59:7 60:21 66:10 70:15 84:20
**benches** 58:13,14
**best** 70:2 91:10
**big** 49:8 58:12 64:7 78:19
**birmingham** 1:10 2:7 4:8,14 6:7 11:11 12:22 14:4 16:12 30:9 76:9
**birth** 11:15
**birthday** 30:22 31:5,9,15,17,19,23 47:22 48:2
**bit** 10:8 41:3 42:4
**blank** 59:18
**blanked** 10:16
**book** 78:3,16
**books** 65:4
**boss** 27:2
**bottom** 60:18 65:13 77:8
**bought** 80:17,22
**boulder** 20:18,21 30:14 65:20
**box** 78:19 79:14
**bradley** 4:5
**brain** 10:16,21
**break** 8:5,8 61:12 61:15
**brief** 52:20
**bring** 23:6 30:21 32:8 72:17
**brown** 16:3
**building** 46:9 55:1
**bullet** 82:1 83:23 84:11 85:13,18 86:8,11
**bullets** 85:11
**bunch** 64:10
**busy** 24:19 48:14
**button** 36:3 37:4 41:6,16,17 42:5,10
**buttons** 35:21

**c**

**c** 4:1
**call** 25:7
**called** 16:20,21 48:13
**camera** 47:9
**cameras** 47:10,14
**camp** 13:13,20,23 15:9 63:15 64:1,4 64:15,20,21 65:6
**camps** 64:2 65:1,3
**canister** 50:22
**capacity** 46:6 78:8
**carabiner** 50:2 51:1 82:3,12 84:6
**carabiners** 49:1 50:23 82:7
**case** 1:4 46:16
**catches** 35:23 36:1
**categories** 70:5 71:7
**cause** 6:9 91:15
**caveat** 8:6
**ccr** 91:18,18
**certificate** 5:20 91:1
**certify** 6:3 91:4,12
**cetera** 52:22
**change** 88:16
**changes** 88:11
**charge** 44:11
**check** 26:9 49:22 66:5 71:21 84:3
**checked** 16:23 28:7 60:9

**checking** 75:19
**checklist** 59:12
  60:6
**checks** 81:17
**child** 38:7
**children** 22:14
  47:20 71:23 72:9
  72:10,18,23 87:14
**circled** 20:13
**civil** 6:5
**classes** 68:17,18,19
**cleaning** 14:17
  33:13 66:3
**clear** 75:21 78:5,11
**clearly** 7:4,14
**clicking** 48:22,23
**client** 16:7 17:22
**climb** 20:14,19
  27:19 32:9 50:6,21
  58:13 74:15,22
  83:11,12
**climbed** 40:21
  42:23 73:17 83:5
**climber** 49:19 84:3
**climbers** 78:22
  82:1,16,21 84:1
  85:20
**climbing** 1:11 5:18
  21:2 28:16 30:10
  30:11 33:10 35:19
  37:14,20 40:18
  41:4 43:12 44:12
  45:11 46:20 47:16
  47:20 48:18 50:13
  50:20 52:16 53:4
  53:16 58:8 64:7,8
  64:16 66:11 74:21
  75:2 77:19,20 78:2
  78:13,15,21 80:10
  80:14,18 81:8,23
  82:3,3,11,13 83:4,9

84:4,6 86:17 89:6
**clip** 30:4 49:4,5,20
  50:1 51:2 71:21
  73:10 74:22 76:3
  81:16 84:18
**clipped** 36:11 72:3
  75:8 76:7 82:16
  83:16 84:5 87:10
  87:18
**clipping** 29:23 30:3
  41:10 48:18 50:10
  72:6 73:7 74:4,15
  75:2,20
**coach** 13:13,19
  14:2 63:21
**coaching** 13:22
  47:23 48:2
**code** 11:13 68:3
**college** 12:16,18
**combine** 19:1,2,5
**come** 10:21 19:2,3
  24:20
**comes** 17:22 39:10
  73:3
**commission** 91:19
**commissioner** 2:6
  3:14 6:3
**common** 75:1
**complete** 30:8 52:5
  69:21 70:6
**completed** 63:4,7
  71:12
**compliance** 2:14
**computer** 91:7
**concluded** 90:2
**conditions** 52:21
**confirm** 9:8 34:8
  34:12 39:11,20
  42:9 43:3 50:8 52:4
  60:23

**confirming** 53:18
  77:4
**confused** 60:10
**confusing** 20:8
**consider** 85:7
**constant** 84:1
**continue** 19:6
  37:13
**continued** 3:2
**coordinator** 14:6,6
  63:23
**copied** 86:3,7
**copies** 85:2
**copy** 52:5
**corner** 55:1,8 56:22
  57:1,5 77:8
**corona** 25:23
**correct** 14:10 19:11
  26:12 36:9,16 41:5
  41:12 43:6,9,10,16
  43:19 45:13 47:3
  48:4 50:10,11
  51:11 52:13,14
  53:20 56:15 57:13
  58:4,5,21 60:16
  71:10 73:19 74:13
  76:20 78:17 79:12
  79:13 81:19,20
  84:23 85:5 91:8
**correctly** 53:7 59:5
  60:5 72:7 76:1
  79:20 83:10 84:7
**counsel** 2:4 3:6 6:6
  91:13
**counselor** 13:14,20
  13:23
**counselors** 15:10
**county** 91:2
**couple** 19:5 65:17
**course** 68:18 75:15

**court** 1:1 2:15 6:2
  7:7,13,18
**covered** 28:1 70:12
  71:17 75:20
**crest** 1:22
**crowd** 52:23
**crowded** 53:4,8,12
**csr** 1:20 6:1
**curious** 12:5
**cv** 1:4
**cwi** 68:18

**d**

**d** 5:1
**dad** 38:1
**daily** 14:19 15:6
  65:23
**danger** 75:19
**date** 6:4 11:15
  14:11 15:17 18:16
  25:1 47:2
**dates** 13:2
**day** 2:7 15:2,7
  24:18,18 45:18
  46:21 48:1 61:19
  65:13 66:18 67:16
**days** 64:1
**december** 1:17 2:8
  6:7
**defendants** 1:12
  4:10
**demonstrating**
  73:7
**depending** 15:5,6
  64:8
**depends** 33:15 48:9
**deposition** 1:14 2:5
  2:11,13 3:9,13 5:9
  6:21 9:2,9,13 10:14
  11:2,7 90:1 91:5
**depositions** 2:16

**descent** 5:18 76:8 77:19 78:20 80:10 80:14 81:8,23 82:2 82:11 84:6
**describe** 23:9 53:12
**description** 52:21 71:16
**desk** 27:20 33:11 33:12 44:4 60:23 61:4 64:20
**device** 73:18
**devices** 76:9 87:22
**difference** 72:8
**different** 28:20 30:8,12
**dimensions** 49:10 49:13
**direct** 15:21 72:14
**directed** 9:3
**directly** 7:5 23:2,14 49:2 57:23 59:9 61:9 72:3 80:16
**discuss** 77:15
**discussed** 9:15,20
**discussing** 48:6
**discussion** 61:14
**district** 1:1,2
**division** 1:3
**document** 8:15,23 11:1 17:18,20 18:4 18:9 19:10 51:3,5 51:11 59:22 61:20 61:22 62:5,7,18 63:2,13 65:10 67:1 68:20 69:8,12,15 70:7,19 71:1,15 76:16,18 80:4 81:19 84:22 85:3
**documents** 10:13 63:6 68:12,14 71:11 86:15
**doing** 23:17 24:2 24:21 28:10 33:3,6 33:7 56:17 58:3 59:4 66:5,6 67:11
**double** 48:22,23
**dowdy** 1:20 2:6 6:1 91:18
**drive** 1:22
**drop** 31:19
**duly** 6:12
**dutton** 4:4

**e**

**e** 4:1,1 5:1,7
**earlier** 15:19 33:9 41:16 42:8 48:6 66:10 84:21 86:23
**edenton** 2:7 4:13 6:6
**education** 12:16
**educational** 11:17
**effect** 2:13
**eight** 64:6
**either** 30:2 71:4 87:9
**emphasize** 89:14
**employed** 24:15 89:10
**employee** 23:17 33:16 39:22 43:23 48:3 50:13 69:6 74:10 87:3
**employees** 14:21 14:23 15:8 23:21 24:6 33:11 39:18 40:3 43:20 44:16 45:6 47:17,19 56:3 56:14 60:15 61:4 62:17 63:15 65:6 66:23 74:7 88:1
**ended** 64:21
**enforcing** 86:10
**engineering** 78:14
**ensure** 81:23 82:12 82:15 83:3,16
**entail** 72:1
**enter** 78:4
**enters** 57:8
**entry** 19:22
**equipment** 78:22
**erupt** 37:5
**eruption** 41:16
**erupts** 35:21 37:6
**essentially** 36:7
**established** 16:6,11 43:11 55:22
**estate** 11:20 12:1,9 13:8
**et** 52:22
**evaluated** 70:18,21 70:23 71:3
**evaluation** 5:16 69:17 70:14
**events** 14:6
**eventually** 56:21
**evidence** 3:9
**exact** 28:6
**exactly** 12:12 17:6 36:21 42:13 71:5
**examination** 5:3 6:9,14
**examined** 6:13
**excellent** 69:19,23 71:7
**exclude** 24:4
**exhibit** 5:8,10,11 5:13,14,16,17 8:16 8:20 17:13,15 19:20 32:19 34:4,5 51:4,7 52:19 59:23 61:21 62:1 69:9,10 71:15 76:13,14
**experience** 54:14
**expires** 91:19
**explain** 6:23 23:15 49:19 53:1
**explodes** 36:2
**exploding** 42:12
**extent** 78:9 89:1,9
**extra** 31:20
**eyes** 66:3

**f**

**face** 42:15
**facilities** 77:19
**facility** 5:10 27:5 29:8 30:9 33:5 52:21 65:18 86:22
**fact** 78:7 88:4
**fail** 75:22
**fair** 8:2 27:2
**fall** 57:22 66:12
**fallen** 38:20 57:15 57:17
**falls** 43:8 87:9,18
**familiar** 16:8
**far** 29:23 57:4 66:8 68:6 75:6
**fastest** 36:23
**feature** 50:9
**features** 48:16,21
**federal** 79:17
**feet** 49:16 73:21
**fell** 43:21 45:15 46:4 54:3 55:7,12 55:17,22 56:4 58:3 83:5
**fewer** 46:1
**filing** 3:13
**fill** 16:22 17:23 51:15 58:22 59:3
**filled** 16:19 18:9,17 59:6 60:5 72:13

**filling** 14:16
**fills** 70:14
**final** 70:16
**fine** 57:20
**finish** 7:15,17 12:8 12:17
**finished** 11:19 12:10,12 13:8
**first** 6:12 10:18 13:21 19:21 22:21 25:2 29:9,12 40:7 41:4 49:5,22 50:2 51:14,23 54:6,11 57:17 58:15,20 59:3 60:21 70:4,8,9 77:1,18 82:9 87:2 88:8,23
**fit** 84:4
**five** 12:7 15:7 39:13 40:23 56:1 61:12 75:13
**flash** 37:7
**flip** 65:10 80:4 83:19
**flipping** 77:7
**floor** 53:6
**focused** 31:18
**folks** 18:5,21 19:9 19:13
**following** 6:10 85:12,14
**follows** 6:13
**footage** 40:7,13 47:5
**force** 2:13
**foregoing** 6:5 91:4 91:8
**forget** 28:12 75:5
**forgot** 74:22
**form** 3:6 17:21 21:11 22:1,16 23:11 27:6,10 29:9 29:11 31:4 32:4 33:18 35:1 37:12 37:16 39:5 44:13 45:12 47:21 48:8 48:19 49:12 50:15 51:9 52:6 54:12 58:23 63:8 66:21 68:9 72:11,14,21 73:1,4 75:3 79:1,5 80:1,15,19 81:5,13 82:6,14,17,23 83:7 84:12,16 85:4,9,21 86:5,13,19 87:1 88:13,22 89:13
**formal** 7:6
**forms** 51:15
**forty** 40:23
**foster** 4:11
**found** 61:1 88:4
**four** 19:15 21:19 24:14 34:2 51:10 61:19 65:13 75:17 75:18 77:8
**fourteen** 20:22
**fourth** 59:12
**frame** 41:20
**friday** 45:19,20 64:6
**friend** 55:7
**friends** 16:11 37:17 54:22 55:6 60:22 64:16
**front** 27:20 33:11 33:12 42:15 44:4 58:13 60:23 61:4 64:20
**full** 2:14 6:18
**fun** 27:19
**functioning** 36:11
**further** 2:10 3:4,12 59:11 91:12

**g**

**games** 64:8,8
**gathered** 39:1
**gear** 16:23 17:4
**general** 13:16,17 13:23 14:3 15:9 16:5 24:10,17 25:13 46:21,22 62:12,14,22 69:4 70:15
**generally** 23:9 42:1 42:11
**getting** 14:17,18 51:19
**girl** 38:1 44:5
**give** 7:1 31:1 69:18 70:16 75:23
**given** 6:20 85:2 86:14 91:9
**giving** 66:2 71:18 81:19
**gm** 14:8
**go** 12:18 17:12 20:6 20:18 21:1 23:18 27:4,12,19 28:7 29:2 37:13 49:20 63:22 78:12 86:1,8 86:20
**god** 10:17
**goes** 31:22 36:7 49:14,23 50:1 56:10 57:3 77:22
**going** 7:2 8:1,15 11:21 16:7 25:7 33:23 34:7,13,14 34:18 35:17 39:9 41:13 63:21 69:9 70:10 78:4
**good** 6:15 23:15 71:7
**gotten** 18:9
**grabbed** 44:5 54:22 55:6 60:22
**great** 11:21
**green** 49:8 50:2
**ground** 7:1,11
**grounds** 3:8
**group** 12:2 17:7 18:3,6,12,22 19:9 19:13,14 23:22 24:2 25:1 26:7 29:15 30:21 31:10 31:13 32:1 38:9,17 52:13 67:13,15 73:9,11
**groups** 19:2
**guardian** 1:6 72:13
**guess** 18:8 29:7,21 37:20 44:16 45:21 53:14 79:9
**guest** 28:19
**guests** 28:16 45:14 46:3 68:6
**gulley** 20:5 21:9
**guys** 24:18
**gym** 5:13 52:5 54:6 54:11 76:9 87:1
**gyms** 89:7

**h**

**h** 5:7
**half** 56:4,13,18
**hallway** 57:7
**hand** 8:15 77:8
**handed** 17:18
**hands** 29:22,22
**hangs** 49:4,9
**hannah** 1:16 2:5 6:8,11,19 8:22 11:9 17:17 33:23 35:8

61:16 69:12
**happen** 28:12,22 45:18 66:17 75:9 75:12
**happened** 16:15 51:16 57:18 83:8 88:3,6 89:6,8
**happening** 89:16
**happens** 27:7,16 28:19 33:15 37:6 66:1 75:4
**hard** 53:23
**harness** 50:4 76:6 82:4,8,13 84:4,5
**hazelton** 4:11,12 8:17 9:14,19,23 10:3,6,7,12 17:10 21:11 22:1,16 23:11 29:11 31:4 32:4 33:18 34:11 35:1 37:12,16 39:5 41:19,22 42:7,18 44:1,13,18 45:12 45:21 47:21 48:8 48:19 49:12 50:15 54:12 61:13 63:8 66:21 68:9 70:2 72:11 73:4 75:3 78:4 79:1,5,8 80:1 80:15,19 81:5,13 82:6,14,17,23 83:7 84:12,16 85:4,9,21 85:23 86:5,13 88:13,22 89:13,19
**head** 7:20 13:13 14:7
**heading** 81:21
**health** 79:15,18
**hear** 7:21
**hearing** 91:10
**held** 61:14
**hellums** 4:4
**help** 24:20 31:21 54:16 74:23
**helped** 17:4 26:9 62:19
**helpful** 20:11
**helping** 33:13 45:7 65:21 67:7
**high** 1:10,11 11:5 11:19 12:21 13:12 14:4 16:12 17:23 19:1 21:6 23:17,21 24:13,15 25:12 26:17 30:9 32:3,9 33:1 34:3 39:18,21 40:3 43:20 45:15 47:16,19 48:3 50:12 56:3,14 61:16 65:6 67:22 73:2 74:6,6,9 76:8 76:19,22 78:7 80:17,18,21 81:11 81:15,18 83:3,14 87:3 88:1 89:6,10
**higher** 68:15
**hills** 11:10
**hip** 49:14
**hired** 69:6
**hiring** 5:15 62:4 68:11
**hit** 25:23 41:17 42:7
**hits** 41:5
**holding** 50:20
**home** 11:9
**hoover** 1:23
**house** 12:1,6,14
**huh** 7:20 14:1 41:1 49:21
**huh's** 7:20
**hurt** 83:6 88:12

**i**

**idea** 58:7 77:14
**identification** 8:21 17:16 34:6 51:8 62:2 69:11 76:15
**identified** 38:2
**identify** 35:9 37:14 51:13
**immediately** 41:10
**impair** 8:12
**implement** 89:11
**importance** 89:15
**important** 7:12 54:10
**improvement** 70:6
**incident** 5:13 14:11 40:6 47:5 51:9,14 52:5 59:3 87:1
**incidents** 87:17,21 88:2,5,9,18,21 89:5 89:12
**included** 32:18 54:7
**including** 17:8 23:23
**indian** 11:10
**individual** 78:8
**industry** 78:3,16
**information** 51:20
**initial** 21:10,13
**initialed** 21:15 63:3
**injured** 38:21
**injuries** 88:20 89:1
**injury** 39:4
**inside** 50:21
**inspected** 67:3
**installation** 79:19
**instruct** 83:15
**instructed** 32:12
**instructions** 77:2 80:12 81:2,10,12 82:21 85:19
**interchange** 25:8
**interested** 91:14
**involve** 87:9
**involved** 17:2 24:1 24:18 25:4
**issue** 45:1 78:12 88:14

**j**

**jacks** 12:2
**jeff** 12:20
**jefferson** 91:2
**jeremy** 4:12
**job** 13:11 14:13 16:4 69:2
**jog** 28:13
**judge** 7:6
**july** 12:11,12 13:7 65:1
**jump** 76:4
**june** 12:11 14:9 15:17

**k**

**keep** 36:10 39:9 66:8
**keeping** 66:3
**kid** 23:5 31:19 44:22 53:3,8 55:7 55:18 57:2 58:4 65:20 66:12 67:4 67:18 73:3,15 74:1
**kids** 16:19,21 19:16 21:3 30:13,21 31:2 31:18,19 32:2,9,13 32:22 33:1,10 43:21 44:17,20 46:4,7,12 47:15,16

47:20 52:22 54:23 64:11,12 67:10 72:2 73:13 84:18 86:16
**kimberly** 1:20 2:6 6:1 91:18
**kin** 91:13
**kind** 6:23 24:20 27:19 31:21 33:14 33:20 59:2 66:1
**kinsley** 1:5 16:8,8 18:3,22 20:23 23:22 24:2 26:7 35:10 36:3 37:9,15 37:21 38:20 39:14 40:14 43:4 45:15 46:4 50:13 52:16 54:2 55:11 56:17 57:9,11,14 58:7,8 64:16 66:11 67:13 73:17 83:4,16 85:6 87:2,16 88:6,8,12
**kinsley's** 18:6 19:9 19:20 21:18 25:1 29:15 31:10 35:19 38:9,17 52:12 60:22 73:12
**knew** 57:16
**know** 9:15 10:8,9 10:20 13:5 18:4,23 20:10 21:22 22:13 24:6,12 25:8,14,17 25:20 26:16,20,22 28:1,4 29:6 30:22 31:3 32:1,12 33:2,2 33:4,10 34:1,13 35:5 36:14 37:17 37:18,20,23,23 38:2,4,13,16,23 39:3,6,7,9,14,17 40:17,20,22 42:13 45:14,22,22,23 46:3,5,8,8,9 47:7,8 49:13,14 51:6 53:22 54:2,9,20 55:9,10,14,16 56:6 56:12,16 57:16 58:19 59:1,8 60:9 63:9,10,12 64:15 64:18 66:14,16,17 67:4,15,17 71:11 71:13,19 75:7 77:9 77:9,11,12 78:23 79:3,8,22 80:13,16 80:20,20 85:16,23 88:23 89:2,8,9
**knowledge** 78:10 83:12 89:5
**kornegay** 1:5,7 16:8 35:10

**l**

**l** 2:1 3:1
**landed** 54:2
**lanyard** 49:23 75:23
**lava** 35:23 50:8
**laws** 2:14 79:17
**lawyer** 89:18
**lead** 11:21 20:19 68:17
**leading** 3:6
**learn** 64:9
**leave** 31:20
**legal** 1:21 7:6,8 72:13
**light** 36:7 37:9
**lighting** 35:19
**lights** 37:7
**limited** 73:12,14
**line** 59:13 60:7,21 77:18
**lines** 54:5 71:23 74:14,21
**list** 29:8 32:18
**listed** 18:5
**little** 10:8 38:1 41:3 42:3 59:11
**llc** 1:10,11
**llp** 4:11
**located** 42:6,11
**long** 10:5,9 12:5,21 24:12 25:14,20 26:17 40:17 56:11
**longer** 56:6
**look** 10:13 18:3 51:5 55:13 61:21 65:19 76:6
**looked** 10:15 40:7 59:23 73:6 85:14
**looking** 32:14 55:21 65:12 68:21 69:16 70:4 71:14 78:18 84:22 85:3
**looks** 18:18 60:8
**loop** 82:8
**lot** 14:15 31:17 53:13 63:20
**lowered** 76:4

**m**

**machine** 75:22
**machines** 75:22
**making** 53:11 67:9 72:6 81:17 83:9
**manager** 14:3 16:5 24:10,17 62:12,14 62:22 70:15
**mann** 4:5
**manual** 5:18 77:13
**marathon** 8:4
**march** 91:20
**mark** 8:16 17:13 34:4 37:20 38:20 39:11 40:1 41:15 43:6 51:4 69:9
**marked** 8:21 17:16 34:6 51:8 54:7 59:17,23 60:2 62:2 69:11 76:15 77:7
**marketing** 14:6
**marking** 61:20 76:12
**mat** 54:3
**materials** 86:4,6
**math** 43:16
**mats** 52:23 53:5,8 53:15,15,21
**matter** 6:17
**matthew** 1:7
**maximum** 46:6
**mean** 20:15 22:23 31:2 32:11 53:2 54:14 65:22 67:8 69:21 73:8 82:5
**means** 20:16 23:1 73:9 78:23 82:7 91:7
**medications** 8:11
**medlin** 38:4,13 51:17,21,22 52:12 61:8
**medlin's** 61:8
**meeting** 10:2
**members** 31:7,12
**memory** 8:12 28:10 28:13,14
**mentioned** 15:13 24:9 33:9 45:4 86:23
**mentions** 84:10
**messed** 89:3
**met** 10:10
**middle** 22:18

**mind** 42:3
**minor** 1:5
**minute** 9:5 37:20 38:19 41:15 43:5 43:13,17 55:22 61:12
**minutes** 34:2 40:19 40:23 55:16,21 56:1,4,13,18 66:12
**misstating** 15:19
**mix** 64:7
**mock** 64:2
**mom's** 22:6
**moment** 33:15 51:6
**monday** 64:6
**month** 13:5 26:6
**months** 12:7
**moore** 4:11
**morning** 6:15 8:12
**move** 7:17 53:17 77:9
**moved** 57:9

**n**

**n** 2:1 3:1 4:1 5:1
**nad** 1:4
**name** 6:15,18 19:20 21:18 38:3 51:17 51:18 62:12
**names** 18:7,12,15 18:18 37:23
**national** 79:16
**near** 57:11
**necessary** 3:5
**need** 7:19 8:5 10:9 27:20 28:13 49:22 54:15 71:19
**needed** 14:19
**needs** 24:22 70:5
**neither** 91:12
**never** 35:3
**new** 5:15 62:3,23 69:6 89:11
**nick** 38:3,13 51:17 52:12 61:7
**nods** 7:20
**non** 64:8
**normal** 48:1
**normally** 49:6 53:16
**north** 4:7
**northern** 1:2
**notary** 6:2
**notice** 3:13 5:9 9:3 9:10
**noticed** 50:14,18
**number** 1:4 8:16 8:20 17:14,15 34:5 47:10 51:7 55:20 62:1 69:10 76:14 77:8 89:12
**numbers** 65:12

**o**

**o** 2:1 3:1
**o'clock** 64:7
**oath** 6:12
**object** 21:11 22:1 22:16 23:11 29:11 31:4 32:4 33:18 35:1 37:12,16 39:5 44:13 45:12 47:21 48:8,19 49:12 50:15 54:12 63:8 66:21 68:9 72:11 73:4 75:3 79:1,5 80:1,15,19 81:5,13 82:6,14,17,23 83:7 84:12,16 85:4,9,21 86:5,13 88:13,22 89:13
**objection** 44:18 78:5
**objections** 3:5,7
**obligation** 7:8
**obviously** 47:1
**occasions** 48:12
**occurred** 14:11 39:4 88:2
**occurs** 27:15
**offered** 3:9
**office** 24:21 25:3 26:8 44:8
**oh** 9:22 10:1,17 80:21
**okay** 8:9 9:2,5,7,18 10:12 11:1,4,13,15 11:21 12:8,21 14:2 16:6,15 17:2,20 18:17 19:1,12 20:1 20:6 21:22 22:4,5 22:11,17 24:5,6 25:7,10,14,17 26:14 27:3,14 28:15 29:17,20 30:5 31:9,23 32:8 33:16 34:20 35:17 37:2,8,13 40:1,5,13 42:15,20 43:8,11 44:3 46:15 47:1,7,9 47:15 48:1,5,12 49:6,10,15 50:5,12 51:10 52:11 53:15 53:18,21 55:9,20 56:9,20 57:6,21 58:6,19 60:7 61:7 61:11 62:22 63:10 64:18 65:2,5,14,17 67:6,17 69:2,5,8,15 70:1,1,11,18,23 71:6,11 72:8 73:11 73:23 74:3,18 76:21 77:1,15 79:22 80:3,8,23 81:18,21 82:20 84:20 85:6,17,18 86:3,14 87:7,12,14 88:8 89:4
**old** 20:17,20 26:14 26:20,22 27:3 64:8
**omitted** 70:5
**onboarding** 61:19
**once** 16:22 88:4
**ones** 21:14,16 37:18 89:8
**operate** 81:9
**operation** 24:18 77:21
**operations** 5:18 77:13
**operator** 79:3 80:11 81:1,10 82:22 84:2,10,15 85:8
**operators** 78:20 79:16 80:11 81:1,4 81:9,22 82:11 84:3
**option** 21:7
**oral** 6:9
**order** 30:3
**orientation** 5:10,16 10:19,22 17:1,5,21 18:11 21:14 22:19 23:10,18 25:5 26:10 27:4,6,9,11 27:15,15,17,22 28:2 29:2,3,9,21,23 30:6,23 32:10 59:14,21 66:3 68:6 69:17 70:10,12 71:18 72:14,21 73:1,12 74:18 84:17 86:2,6,9,19 86:21

**orientations** 14:17 28:5,7,22 69:18 70:17 71:8
**outside** 9:16,21,22 15:14,15
**owners** 79:15

**p**

**p** 2:1 3:1 4:1,1
**p.c.** 4:5
**p.m.** 64:22 67:4
**page** 5:3 19:21 21:20 22:18,21 51:13,23 52:3,18 60:20 61:7 65:11 65:12,12 69:22 70:5 71:8,14 74:14 77:1,7,18 78:18 80:3 83:19,20 85:13
**pages** 18:4,6,18 51:10 70:7,8
**paid** 32:6
**panic** 57:19
**paperwork** 38:3
**parallel** 57:7
**parent** 1:6
**parents** 10:22 16:18,20,21 17:8 18:14 29:17 31:1,2 31:18,19 32:6,8 54:23 55:8,11,14 56:16 58:8,15 59:9 65:21 67:6,10 72:3 72:5,9,22 82:19,21 83:15 84:13 85:2,6 86:9,14
**park** 4:7
**part** 12:3 42:13 54:21 55:5 58:22 59:1 60:5 82:9
**partially** 52:23 53:8,12
**participant's** 54:6 54:11
**particular** 78:12
**parties** 2:4 3:7 31:5 31:16,17 47:22 48:2 91:13
**parts** 62:19
**party** 30:22 31:9,21 31:23
**pasted** 86:3,7
**pause** 34:18 35:17 37:19 38:11,19 39:11,21
**paused** 41:15
**paying** 31:6
**pelham** 11:12
**people** 14:16 17:7 19:3,7 22:12 31:20 33:6,14 38:23 39:6 39:13,14 46:1 48:17 53:3,13 54:15 75:1,4,7 80:22 85:19 87:10 87:18
**people's** 72:9,18
**perfect** 5:18 76:8 77:19 78:20 80:10 80:14 81:8,23 82:2 82:11 84:5
**period** 13:2 48:11
**permission** 21:1
**person** 20:11 35:9 36:11 38:12 39:13 66:5
**personal** 89:5
**personally** 17:2 54:13
**pertaining** 79:18
**photos** 60:8,14,15
**pictures** 60:13
**pittman** 4:4
**place** 4:7 48:16 64:12
**plaintiff's** 5:8,10,11 5:13,14,16,17
**plaintiffs** 1:8 4:3 6:16,17 8:16,20 17:13,15 19:20 32:19 34:4,5 51:4,7 52:19 59:23 61:21 62:1 69:9,10 71:15 76:12,14
**play** 33:23 34:7,13 42:8
**playing** 34:16 37:14
**please** 7:22 8:5 52:20
**plus** 63:17
**point** 1:10,11 11:5 12:22 13:12 14:4 16:9,12 17:23 19:2 21:6 23:17,21 24:13,15 25:9,12 26:18 28:12 30:9 32:3,3,9 33:1 34:4 35:6 38:21 39:18 39:21,22 40:3,21 43:20 45:15 47:16 47:19 48:3 49:14 50:13 56:3,14 57:10 61:16 65:6 67:22 73:2 74:6,6,9 76:8,19,22,22 78:7 80:17,18,21 81:11 81:15,18 82:1 83:3 83:14,23 84:11 86:18 87:3 88:1 89:6,11
**points** 23:19 28:2 63:22 85:11,13,18 86:9,11
**policies** 89:11
**policy** 88:11,16
**portion** 23:13
**position** 13:18 25:11
**positioned** 47:13
**positions** 14:4 15:12
**possible** 66:19,22
**power** 63:22
**practice** 9:18
**practices** 78:3,16
**preceding** 90:1
**preparation** 10:2
**prepare** 9:12,21 10:1,14
**present** 7:6 27:21 88:2
**presentation** 27:22
**preserving** 22:3
**press** 35:22 36:23 37:3
**pressed** 36:3
**pretty** 14:18 40:15 89:2
**prevent** 48:17
**previously** 34:16 83:9
**price** 31:6 32:6
**print** 18:12,14
**printed** 86:21
**prior** 3:9 11:7 24:13 40:14 58:20 66:12
**privilege** 10:9
**probably** 15:4 46:2 49:17 75:13

**problem** 44:22 55:4 75:1
**procedure** 6:5 73:7
**proceeding** 7:6
**proceedings** 6:10
**process** 7:2 17:3 32:10
**produced** 34:3
**product** 79:19
**program** 64:4
**programs** 63:23
**progress** 36:6
**promoted** 67:23
**proper** 82:8
**properly** 82:2 83:4 84:4,5,19
**provide** 52:20 61:17 67:22 68:18
**provided** 6:4 34:23 35:3 68:12 88:17
**provincial** 79:17
**public** 6:2
**pull** 49:22 76:2
**pulls** 75:23
**purchased** 80:18
**purchaser** 80:9,13 81:8
**purpose** 36:18
**pushed** 43:13
**pushes** 43:4
**put** 18:15 50:3
**putting** 35:7

**q**

**question** 7:22 8:2,7 8:8 9:17 11:22 35:18 52:19
**questions** 3:6 7:3 7:15 8:13 19:19 22:17 27:18 34:19 65:9 89:17,20 91:6
**quick** 85:15
**quit** 13:4 25:22 26:4
**quiz** 30:2

**r**

**r** 4:1
**race** 36:22
**racing** 36:7 37:9 50:9
**rappel** 64:9
**read** 9:5 77:2,5,10 77:12 78:2,13,17 79:11,20 80:11 81:1,9,12,14 84:6 84:21 85:15,17 86:18
**reading** 2:11 53:7
**reads** 53:7 78:20 83:23
**ready** 19:4,7
**real** 11:20 12:1,8 13:8 85:15
**realize** 74:21
**realizing** 75:7
**really** 24:19 45:23 48:14 89:16
**realtor** 11:20
**recall** 24:23 29:14 29:16 57:1
**received** 16:22 68:22
**recognize** 39:10
**record** 6:18 7:13,18 7:20 22:4,22 35:7 61:15 78:6,11
**red** 35:14 49:8 50:1
**reduce** 89:11
**refer** 16:7 77:20
**reference** 17:13 20:10 28:12
**references** 20:9
**referring** 79:23
**regulations** 79:18
**relating** 2:15
**remain** 50:20
**remember** 12:11 17:6,10 18:7 19:14 19:17 25:16 26:5 29:1 30:3 42:14 44:1,2,5 55:13 57:23 60:4 61:5,10 62:11 67:14,20 71:5
**remind** 33:8
**repeat** 7:22 55:2 81:6
**rephrase** 7:23
**report** 5:13 15:21 40:6 51:9,15 52:6 54:8 58:23 59:3 87:1
**reported** 1:19
**reporter** 5:20 6:2 7:13,18
**reporter's** 91:1
**reporting** 15:22,23 16:1
**reports** 51:20
**represent** 34:2,22
**representing** 6:17
**represents** 91:8
**required** 72:18,20
**resolving** 45:1
**respective** 2:4
**response** 9:9
**responses** 7:19 20:9
**responsibilities** 14:13 32:13 52:15 68:7,16
**responsibility** 80:9 81:22 82:10,15 83:16
**responsible** 23:7 44:23 45:10 62:20 62:23 78:21 86:10
**result** 91:14
**reviewed** 11:2
**rewind** 41:2
**rewinding** 42:3
**right** 10:11 16:13 18:10 20:1 23:19 25:22 27:11,12 29:20 32:19 33:21 35:12 37:8,10 38:7 38:21 40:8,23 41:7 41:11,20 42:21 43:5,14,18 45:1 54:18,19 58:13,14 75:18 76:10 77:8 78:18
**road** 11:10
**room** 20:18,21 21:2 21:4 30:13,14,16 43:21 46:10 47:11 48:10 50:22 55:18 56:3,7,21 73:15,18 74:10 88:3
**rooms** 21:6 30:8,12 30:15 44:12 45:4,8 45:11 73:15
**rope** 20:19 21:4 30:13 50:21 73:15 73:18
**rough** 45:17
**roughly** 13:1,5 40:19,20 49:15 56:3,13
**route** 14:5,7 23:23 24:1

**routine** 66:8
**rpr** 1:20 6:1 91:18
**rules** 2:15 6:4 7:1
7:11 32:21 70:9
86:10,15,22

**s**

**s** 2:1,1 3:1,1 4:1,12
5:7
**safe** 22:11 29:7
50:5 85:1
**safety** 33:17 48:16
48:21 65:19,23
66:8,14,20 67:1,12
67:18 78:21 79:15
79:18
**saw** 42:7 55:8
57:18 58:15,20
87:19
**saying** 7:14,17
56:20
**says** 20:2 22:18,22
32:20 48:20 52:20
59:11,13 60:7,22
65:18,19,20 67:6
69:22 71:16,23
73:6 74:15 75:19
77:2,18 79:15 80:5
80:9,23 81:7,22
82:2,10 83:20
**scenario** 79:4
**schedule** 66:7
**school** 11:19,20
12:9 13:9
**screen** 35:14
**script** 28:9
**second** 38:20 41:15
43:5 52:18 56:1
71:14 78:19 82:1
83:23 89:1
**seconds** 34:3 35:8
35:18 41:6,9 43:12

43:13 55:23
**section** 22:18 23:8
23:10 51:23 54:18
80:5
**secured** 84:4
**see** 19:21 21:20
22:19 29:6 30:2,16
30:17,20 33:7
34:20 36:22 41:5
46:19 47:13 57:22
58:16 59:14,19
65:15 70:1 74:16
76:7,18,21 77:1,22
80:5 83:21 85:12
**seen** 8:22 9:2 17:17
34:1,8,16 41:14
50:13 62:5 69:12
75:9,11 76:16
**select** 47:10,12
**semester** 12:20
**semesters** 12:19
**sent** 8:17 51:1
**sentence** 78:19
79:23 80:8 81:7
82:9
**separately** 53:8
**serious** 88:20
**session** 64:16
**setter** 14:7 24:1
**setters** 14:5 23:23
**setups** 73:23
**seven** 17:11 19:13
**sg** 20:2,4,12
**shady** 1:22
**share** 17:12
**she'll** 24:20,21
**sheet** 10:22
**sheets** 62:4
**shortly** 12:13
**show** 34:14 51:3
73:9

**showing** 23:14
**shown** 40:3
**shows** 47:1
**side** 35:14 57:4
**sign** 18:13,15 27:5
27:8,10,12,14
72:18,20
**signature** 2:11
21:18 22:9,13
60:17 91:17
**signed** 10:22 21:23
22:7 28:22
**signing** 25:4
**similar** 21:17 22:13
88:5 89:5
**single** 28:6,8
**sitting** 55:1,8 56:21
**situation** 8:5 83:1
**situations** 48:6
**six** 12:7 39:13
71:23 72:2
**skip** 29:3 41:13
**slow** 24:21
**smoothly** 31:22
**soft** 53:23 54:1
**solely** 62:20
**solutions** 1:21
**somebody** 48:10
**sorry** 10:16,17,20
13:4 14:11 15:19
40:11 55:2,3 74:13
87:8
**sort** 8:4 29:21 32:2
45:17 86:14
**sound** 34:22 35:2,3
35:6
**source** 78:3,16
**southern** 1:3
**speak** 7:12 9:14
11:4 59:8

**speaking** 42:11
**special** 30:23 31:5
32:2
**specific** 46:10
79:18
**specifically** 2:12
32:20 39:8
**speed** 34:19 36:20
**spend** 10:5
**spin** 14:7
**spoke** 39:3 41:16
**spot** 58:10
**staff** 5:15 13:16,17
13:23 15:9 20:2
25:13 31:7,12,20
48:13 62:3,23
63:15 69:4
**staffing** 48:9
**standards** 77:21
78:14 79:16,22
**start** 7:12,16 13:1
13:15 28:16 33:10
36:23 40:14,18
41:3,5
**started** 12:13 13:17
13:21 34:16 36:4
43:12 61:17,18
71:5 75:8
**starts** 41:4 50:10
64:2
**state** 6:2,18 12:20
79:17 91:2
**statement** 51:16
52:2 60:21 61:8
**statements** 52:6,9
**states** 1:1
**staubach** 1:16 2:5
6:8,11,19 78:6
**steadman** 20:5,6,10
24:8 25:8 26:8,9,20
27:5,16,21 44:6,11

44:15,23 45:10 61:5 63:12 68:22 70:23 77:9 81:3,12 84:21
**steadman's** 25:11
**stenotype** 91:5
**steps** 19:5 74:3
**steven** 12:2
**stipulated** 2:3,10 3:4,12
**stipulation** 6:5
**stop** 13:1 48:20 50:19
**stopped** 64:23
**stored** 63:6 71:12
**street** 2:7 4:13 6:7
**stuff** 32:19
**subheadings** 65:17
**submitting** 59:12 60:6
**suggests** 35:2
**suite** 4:7
**summer** 63:15 64:2 64:4,15,20,21 65:1 65:6
**super** 53:4
**supervise** 32:13 47:20 52:16 72:23 74:7
**supervised** 22:22 23:2
**supervising** 33:1 38:7,12 44:11 47:17 48:3 54:19 72:4 73:3 74:10 85:19
**supervision** 15:14 15:15 32:3 68:6 72:14 78:22 83:21 84:1
**supervisor** 13:13 13:20,21 14:2,10 14:14,20 15:16,20 68:1,3
**supposed** 23:18 33:1,6,21 49:19 66:6,8 67:10 70:12
**sure** 7:1,16 14:15 19:17 27:17 28:23 31:21 33:5,8 34:15 40:15 42:5 49:23 53:11 56:12 58:2 59:4 60:4 61:13 67:9 72:6 73:2 76:1 76:6 81:17 83:9
**surrounding** 55:12
**surroundings** 52:21
**sweep** 65:19
**sweeps** 33:17 65:23 66:8,14,20 67:1,12 67:18
**sworn** 6:12
**system** 68:3 75:19 76:1 77:20 78:21 80:10,14 81:8,23 82:3,11 83:5 84:6 84:15 85:8
**systems** 80:18

**t**

**t** 2:1,1 3:1,1 5:7
**take** 8:8 9:5 17:5 18:11 50:2 61:11 64:12
**taken** 2:5 61:15 91:5
**takes** 60:12
**talk** 9:16 15:18 61:8,9
**talked** 15:10 39:7
**talking** 59:22 75:7
**tall** 49:16 73:20
**tasks** 44:19
**taught** 68:2
**teach** 68:16,17,19
**teams** 47:23 48:2
**technically** 34:13
**tell** 7:8 18:4,8 31:3 33:8 39:12 42:1 57:21 61:22 76:2,5 81:16
**tells** 7:4
**ten** 15:5 31:2 32:2 41:6,9 43:12 75:14
**territory** 10:9
**test** 12:12 76:3
**testified** 6:13 56:2 84:20
**testify** 9:9
**testifying** 7:7 78:6
**testimony** 6:21 91:9
**testing** 59:14,21
**thank** 6:20 22:5 89:21,23
**theirs** 16:19
**thereto** 3:10 91:6
**thing** 32:16 58:12
**things** 7:21 14:19 23:15 24:22 30:1 53:1 66:4 68:4 71:21 86:15
**think** 10:7,15 13:3 13:7,19 16:6 17:4 17:11 18:2,21 19:12,15 24:9 32:20 37:4 38:3,5 38:18 40:2 47:12 50:12 52:11,22 54:10 55:21 56:2 60:10 64:1,23 79:6 84:9,9 86:23 89:17
**third** 51:15 60:20 65:11 71:15
**thirteen** 72:4
**thirty** 55:23
**thorough** 69:19,21 70:6
**thought** 19:12 60:11 66:11
**three** 12:19,23 19:15 24:5 30:11 30:12 37:21 39:12 45:11 49:16 56:4 56:13,17 64:1 70:7 78:18 87:17 88:9
**three'ish** 46:13
**tim** 20:6,9 25:8
**time** 3:8,8 7:13 13:2 15:6 16:2 19:4 19:4 20:23 24:12 25:12,15 26:18,23 28:6,8,15 29:9,13 31:8 35:23 36:1 43:23 44:17 45:11 46:17,20 48:7,11 54:6,11 56:11 59:3 61:4,6 62:13 64:23 66:1,15,17,20 72:5 89:22
**timer** 36:13,20,23
**timers** 36:16,19
**times** 23:3,7 44:21 58:3 75:11,14
**timing** 42:10 43:3
**title** 16:4 69:3
**titled** 79:15
**titles** 13:11
**today** 8:23 9:9,13
**told** 57:19 81:15,16 84:18 89:14

**tony** 62:11 70:22 71:4

**top** 10:18 19:21 20:19 21:4 30:13 36:2 37:1,3 41:18 42:10,16,18,19 49:2 52:20 60:5 78:20 80:5 83:20 86:19

**topic** 71:17 72:1 73:6 75:20 83:21

**topics** 70:11

**torture** 8:5

**total** 18:19 56:1

**towers** 58:12

**tracking** 36:6

**tracks** 76:2

**train** 68:16 81:18 83:14

**trained** 32:9,11 62:8,10,17 63:12 76:19 84:2,10,14 85:7

**trainee** 63:3

**trainer** 63:3

**training** 5:15 29:22 29:22 31:1 61:16 61:19 62:3,8,19,23 63:16,18,19,20 67:23 68:5,12,14 68:17,21 80:5 86:4 88:12,17

**transcribed** 91:6

**transcript** 91:9

**transcription** 91:7

**trial** 3:8

**triangle** 48:20 49:3 49:7 50:3

**triangles** 49:11

**true** 48:5 91:8

**truth** 7:8

**truthfully** 7:4 8:13

**try** 7:16 33:23 34:19 76:5 89:11

**trying** 66:5

**turn** 52:18 60:20

**turned** 80:3 83:19

**twenty** 43:18 46:13

**twice** 73:7,10

**two** 18:5,18 21:8 26:19 31:2,7 32:1 36:21 39:6,12 43:18 44:15 45:4,7 49:1 50:23 51:14 55:23 64:1 70:8,9 71:23 77:7,18 87:6 87:16,21 88:17,21

**type** 32:16

**types** 21:7 89:12

**typical** 47:15

**typically** 14:23

**u**

**u** 2:1 3:1

**uab** 12:19

**uh** 7:20 14:1 41:1 49:21

**uh's** 7:20

**unattached** 43:17

**unclipped** 50:13

**underneath** 14:21 15:1,8,14 52:23 53:5,9,15,16 75:18 79:14 85:12

**understand** 7:2,9 7:22 23:12 53:11 80:11 81:1,10

**understanding** 82:20 91:11

**understood** 8:1

**unfortunately** 65:11

**united** 1:1

**use** 20:16 28:11 46:20 65:20 68:2 71:20 77:2 79:19 83:21

**user** 82:1

**users** 82:12

**uses** 76:8

**usually** 31:18

**v**

**verbal** 7:19

**verbally** 81:15

**verbatim** 28:8

**verify** 84:3

**veritext** 1:21

**versus** 72:9

**video** 5:12 34:1,2,9 34:15,16,17,23 35:6,9,10 37:15,22 39:10,20 40:2,3,7 40:13,14,18 41:2,4 41:9,13 43:4,12 47:1,5 55:10,21,23 56:1,5,9,10 58:6 60:11,12

**videos** 63:22

**volcano** 35:11,21 36:13 37:2,9 41:6 41:16 48:17 50:9 58:11,16 83:8

**vs** 1:9

**w**

**wait** 34:12

**waived** 2:12 3:14

**waiver** 72:19

**waivers** 14:16 16:18,22 18:10 28:22 72:12

**walk** 30:17,20 33:5 57:2 65:18

**walked** 54:23 55:7 58:11

**walking** 33:20 66:2

**wall** 35:11,12,22 36:13,20 37:2 41:5 41:10 42:16,23 43:5,13,17 47:10 48:17 49:20 50:9 51:2 57:3 58:7,9,12 58:16 76:4 77:21 78:2,13,15 83:5,8 84:2

**walls** 30:18,20 36:15 37:21 40:21 46:11,16,20 48:7 53:16

**want** 34:11 35:20 36:22 42:8,9 50:8 61:11 75:22 78:11

**wanted** 59:4 68:15 68:19

**warning** 78:19 79:11

**watch** 30:4 34:8 40:13 47:4 56:9

**watched** 34:12 55:10 58:6

**watching** 23:7 33:21 44:16 54:20 65:21 67:7,10 72:5 86:16

**way** 18:17 28:6 71:16

**went** 11:19 12:19 40:7 84:17

**white** 12:1,6,13

**whitten** 4:6 5:4 6:14,16 8:19 10:11 35:5 89:21

**whoever's** 79:6

**witness**  2:12 6:8
  22:5 38:2,4 52:6,8
  78:7 89:23 91:9
**word**  10:21
**words**  7:19
**work**  11:22 12:21
  26:2
**worked**  25:21
  68:13 76:22
**working**  12:6 14:20
  14:21,23 23:22
  24:13 25:15,18
  26:17 61:17 76:1
**works**  7:1 89:2
**written**  60:21 67:3
  86:15
**wrote**  52:22 54:19
  54:21 55:4

**x**

**x**  5:1,7

**y**

**yeah**  9:23,23 17:9
  42:9 51:23 53:3
  54:14 55:4 60:10
  70:4 74:20 81:7
**year**  12:10 13:4
  15:6
**years**  12:23 24:14
  26:19 75:17,18
**yell**  74:23
**yellow**  48:20 49:3,7
  49:11
**yesterday**  8:18
**young**  4:11
**younger**  18:13

**z**

**zip**  11:13
**zone**  21:3 30:14
  43:21 44:17,20,23
  46:4,7,12 47:16,20

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by the witness, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within thirty (30) days of its submission to the witness, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; the deposition may then be used as fully as though signed unless on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

(F) Certification and filing by officer; exhibits; copies; notice of filing.

(1) The officer shall certify on the deposition that the witness was duly sworn by the officer and that the deposition is a true record of the testimony given by the witness. Unless otherwise ordered by the court, the officer shall then securely seal the deposition in an envelope indorsed with the title of the action and marked "Deposition of [here insert name of witness]" and shall promptly file it with the court in which the action is pending or send it by registered or certified mail to the clerk thereof for filing.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.