FILED

2023 Feb-21  PM 01:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **KINSLEY KORNEGAY, a minor, by and through her parent and guardian, MATTHEW KORNEGAY,** | ) ) ) ) ) | |
| **Plaintiff,** | ) | **Case No.: 2:21-cv-00505-SGC** |
| **v.** | ) ) | |
| **HIGH POINT BIRMINGHAM, LLC and HIGH POINT CLIMBING, LLC,** | ) ) ) ) | |
| **Defendants.** | ) | |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

COME NOW Defendants, High Point Birmingham, LLC and High Point Climbing, LLC (sometimes hereinafter collectively referred to as "Defendants" or "High Point") and file their Motion for Summary Judgment, as to Plaintiff's claims of Negligence and Wantonness against them. In support thereof, Defendants state as follows:

### <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

This is a premises liability case arising from Kinsley Kornegay's untethered jump from a rock-climbing wall at High Point Climbing and Fitness in Birmingham, Alabama. Kinsley (sometimes hereinafter referred to as "Minor Plaintiff") was twelve years old at the time. She broke both her ankles when she jumped. Her parents

were not with her, though her father, Matthew Kornegay (sometimes hereinafter referred to as "Adult Plaintiff" or "Plaintiff") had received and signed the written warnings and disclosures provided by High Point to the guardians of all minor climbers. Though it is natural to feel sympathy for any injured adolescent, the law requires a dispassionate review of the facts and the facts show Kinsley was not hurt because of anything High Point did or failed to do.

Kinsley jumped from the top of the rock-climbing wall because she thought she had secured herself to an auto-belay system. The system, when used, will prevent a climber from falling to the ground if she loses her grip, and will automatically lower a climber who releases from the top of the wall, as Kinsley did.  Kinsley will admit High Point taught her to use the auto-belay system and that she had been using it successfully all day. Though young, Kinsley will tell the Court she was subjectively aware of the dangers of climbing, particularly after the orientation by High Point, and her unusually mature disposition encouraged her parents to let her participate in activities generally reserved for adults.

Kinsley, through her father, accuses High Point of failing her in three ways. First, it is alleged High Point failed to train her to use the equipment, but the undisputed testimony is Kinsley watched two demonstrations of it, understood how to use it, understood why to use it, and had been using it correctly her entire visit.

Second, High Point allegedly failed in its duty to supervise Kinsley.  However, this duty does not exist and was never undertaken by High Point. In the written disclosures provided to and signed by her father (it is unclear how closely he read them) High Point advised it could not supervise or observe climbers after the orientation.

Lastly, Minor Plaintiff claims she was not provided working safety equipment. High Point believes this claim will be abandoned, though it is still in the Complaint, because the record clearly shows the safety equipment was fully functional. The clips worked. The auto-belay system worked. Kinsley simply forgot to use them.

Because of these truths, Plaintiff retained an expert to criticize the policies and procedures of the gym. This expert never spoke to Kinsley, so her subjective understanding of the equipment does not inform his opinions. As such, Plaintiff's expert's opinions, assuming they are true and admissible, do little more than create additional reading without adding to an understanding of the issues.

Put simply, there is an inherent risk when climbing. Kinsley already knew that, just like the rest of us, but was nonetheless taught repeatedly how to avoid it during orientation. The lesson stuck – Kinsley used her equipment correctly all day. On the final climb, she made a mistake. But it cannot be fairly argued she was not trained when (as you will read) she perfectly understood how to use the safety line. And it cannot be fairly argued High Point assumed a duty to walk around with her

and supervise her climbs when it explicitly advised it could not. And it cannot be seriously contended that her equipment failed when it simply was not used. Kinsley had a scary accident, but it is not an accident that creates liability for the property owner under Alabama law.

## <u>NARRATIVE STATEMENT OF UNDISPUTED FACTS</u>

### High Point Background

1.     High Point is a rock climbing gym that provides an indoor rock climbing experience to patrons. ECF 7, 3 at 7.

2.     There are six High Point locations currently operating in Tennessee and Alabama. See Exhibit 1, Deposition Transcript of Shawn Watson, ECF 33-1, 5 at p.11, ll.20-23; p.12, ll.1-4.

3.     The Birmingham location of High Point is owned by High Point Birmingham, LLC. ECF 33-1, 5 at p.12, ll.21-23.

### Kinsley Background

4.     On August 2, 2019, Kinsley Kornegay, the Minor Plaintiff in this case, decided to go to the Birmingham location of High Point as a back to school trip along with her group of friends. See Exhibit 2, Deposition Transcript of Kinsley Kornegay, ECF 33-2, 6 at p.23, ll.1-7.

5.     At that time, Kinsley was twelve years old. ECF 33-2, 9 at p.35, ll.16-18.

6.      Kinsley was an active twelve year old and she participated in several sports and physical activities, including softball and cheerleading. ECF 33-2, 20 at p.77, ll.20-23.

7.      Through these physical activities, and her cheerleading experience in particular, Kinsley had firsthand knowledge of the dangers of falling. ECF 33-2, 20 at p.78, ll.7-23.

8.      Consequently, Kinsley understood that going to the High Point climbing gym, a place where falling is a risk, was potentially dangerous. ECF 33-2, 20 at p.79, ll.1-12.

9.      In addition to being an active twelve year old, Kinsley was also very bright for her age. In her own words, Kinsley Kornegay described herself "pretty mature for my age and was told that by many parents. And like they were telling me how I was good at handling situations and how I was pretty responsible for being a 12 year old…" ECF 33-2, 9 at p.35, ll.18-23.

10.     Kinsley testified that she had the ability to understand if something was dangerous and what measures she needed to take to be safe. ECF 33-2, 9 at p.37, ll.1-10).

11.     Given her maturity level and life experience from cheer and other physical activities, Kinsley appreciated that it was important to be safe while rock climbing. ECF 33-2, 20 at p.79, ll.13-16.

**Liability Waiver**

12.     Indeed, as Plaintiff's own expert on rock climbing safety, Daniel Hague, acknowledged in his book: "Climbing is an inherently dangerous activity." See Exhibit 3, Deposition Transcript of Daniel Hague, ECF 33-3, 17 at p.62, ll.11-21.

13.     Because rock climbing is a dangerous activity, High Point requires the parents of minor rock climbing participants to fill out waivers before their children can participate in rock climbing activities at High Point facilities. ECF 33-1, 6 at p.17, ll.14-15.

14.     Plaintiff's expert, Mr. Hague, testified that liability waivers are a "predominant" method of informing customers of the risks of rock climbing, and acknowledged that the use of liability waivers is accepted in the industry. ECF 33-3, 16 at p.61, ll.3-7.

15.     Kinsley's father, Mr. Kornegay, received and signed a liability waiver for his daughter to participate in rock climbing at High Point Birmingham. See Exhibit 4, Deposition Transcript of Matt Kornegay, ECF 33-4, 4 at p.14, ll.2-14.

16.     When asked if he read the liability waiver he signed, Mr. Kornegay replied: "Of course, I glanced over just the high points or the big block letters and went on about my business, so not great." ECF 33-4, 4 at p.14, ll.7-12.

17.     Notably, the liability waiver which Mr. Kornegay admittedly "glanced over" states in relevant part that: "I understand that High Point Staff have no responsibility

to assist, supervise or even observe Visitors in their activities or movement about the facility, except while instructing or testing…" See Exhibit 5, Liability Waiver, ECF 33-5, 2.

18.   The liability waiver that Mr. Kornegay signed also explicitly states that: "I understand that climbing and the Activities are inherently dangerous and that Visitors will be exposed to risks including, among others: trips and falls and other accidents that may occur in moving about the facility… failing to properly secure themselves to belay devices or ropes; falls from walls…" ECF 33-5, 2.

19.   These disclosures notwithstanding, Mr. Kornegay testified that he was not concerned by anything in the waiver that he signed. ECF 33-4, 4 at p. 14, ll.13-16.

20.   Mr. Kornegay, knowing that his daughter would be climbing outside of his supervision, chose to sign the waiver. ECF 33-4, 4 at p. 14, ll.17-23.

21.   After Mr. Kornegay signed the liability waiver and "went about his business", his daughter Kinsley went to the High Point location in Birmingham with her friends on August 2, 2019. ECF 33-2, 7 at p.27, ll.21-23.

### Orientation

22.   All first time visitors to High Point facilities, including Kinsley, go through a safety orientation prior to any participation in rock climbing activities. ECF 33-1, 6 at p.17, ll.14-15.

23.     Plaintiff's rock climbing safety expert, Mr. Hague, testified that safety orientations, like liability waivers, are a "predominant" method of informing customers of the risks of rock climbing and Mr. Hague acknowledged that the use of safety orientations is accepted in the industry. ECF 33-3, 16 at p.61, ll.3-7.

24.     As noted in its liability waivers, High Point does not provide staff supervision except upon special request and subject to separate and additional payment. ECF 33-1, 9 at p.26, ll.18-23.

25.     Minor Plaintiff went through a safety orientation prior to any participation in rock climbing activities. ECF 33-2, 8 at p.30, ll.1-21.

### Training and Equipment

26.     The High Point location in Birmingham uses the Perfect Descent Climbing System auto belay devices as climbing gear for patrons. ECF 33-1, 19 at p.69, ll. 17-21.

27.     A High Point employee performed the safety orientation for the group, including Kinsley, showing them how to safely and properly use the auto belay system. ECF 33-2, 8 at p.29, ll.23; p.30, ll.1-11.

28.     Minor Plaintiff testified that she understood the demonstration of how to operate the clip on the auto belay system. ECF 33-2, 8 at p.30, ll.13-21.

29.      In fact, Kinsley received not one, but two demonstrations of how to properly use the auto belay equipment. ECF 33-2, 8 at p.30 -p. 32.

30.    After the demonstrations, Kinsley told one of the adult chaperones that she knew how to operate the equipment. (A. "They asked us -- they were like do y'all know how to clip y'all's self's in, and we were like yes, ma'am, he showed us.") ECF 33-2, 8 at p.32, ll.16-19.

31.    The auto belay system includes a yellow triangle with a stop sign below the clip that serves as a safety feature. ECF 33-2, 9 at p.33, ll.1-6.  A photograph of this safety feature is included as an exhibit to this motion. See Exhibit 6, Photograph, ECF 33-6.

32.    Minor Plaintiff now claims that High Point staff ought to have spent "more time explaining" at the safety orientation(s). ECF 33-2, 15 at p.59, ll.6-7.

33.    At her deposition more than three years later, Kinsley recalled the details of the orientation, stating: "We were supposed to take it, and he said just like kind of push down with your thumb and then take it off of that and then clip it … around your waist." ECF 33-2, 18 at p.69, ll.17-21.

34.    Kinsley testified that she understood the purpose and operation of the clipping mechanism. (A. "…[T]he machine was supposed to like slow you down and catch you when you were repelling off the wall ECF 33-2, 9 at p.33, ll.13-16.

35.     Kinsley understood that it was not ok to climb without the harness clipped in. ECF 33-2, 16 at p.63, ll.3-6.

**Accident**

36.     Minor Plaintiff testified that she did not have any problems with the clips or other equipment while rock climbing prior to the climbing the last wall.  ECF 33-2, 15 at p.60, ll.3-10.

37.     Minor Plaintiff had been climbing for approximately 45 minutes before climbing the last wall. See Exhibit 7, Deposition Transcript of Hannah Staubach, ECF 33-7, 12 at p.40, ll.17-19.

38.     Kinsley had in fact properly used the climbing equipment multiple times that day. (Q. "And you had, I assumed, had clipped in, climbed the wall, and been lowered down a bunch –" A. "Every single -- yes, sir. I had done a bunch of the walls already.") ECF 33-2, 9 at p.34, ll.8-12.

39.     Minor Plaintiff admitted that she just forgot to clip in on the last wall she climbed that day. (Q. "At any point prior to -- and I think we can all agree that that last wall that you climbed you just forgot to clip in; is that fair?" A. "Yes, sir.") ECF 33-2, 10 at p.37, ll.11-15.

40.     There is undisputed video evidence that Minor Plaintiff did not clip in prior to climbing the last wall. ECF 33-1, 12 at p.41, ll.16-19.

41.     Minor Plaintiff testified that, had she realized that she was not clipped in, she would not have let go of the wall in the manner she did on the day of the accident. ECF 33-2, 10 at p.38, ll.18-23.

**Lawsuit**

42.     Some time after Kinsley's fall, on April 9, 2021, Kinsley and her father filed suit against High Point Climbing, LLC and High Point Birmingham, LLC. ECF 1. The Kornegays later filed an amended complaint on May 4, 2021. ECF 7.

43.     In Plaintiff's Amended Complaint (hereinafter simply "the Complaint" except as otherwise noted) Plaintiff claims that Defendants did three things wrong: 1. Defendants failed to adequately train Kinsley; 2. Defendants failed to adequately supervise Kinsley, and 3. Defendants failed to provide Kinsley with working safety equipment. ECF 7, 5 at 26-28.

**Plaintiff's Expert**

44.     Plaintiff's expert on rock climbing safety, Daniel Hague, testified that Kinsley's injuries were the result of High Point's policies and procedures. ECF 33-3, 49 at p.190, ll.13-21.

45.     Mr. Hague did not speak to Kinsley in preparing his opinion. ECF 33-3, 17 at p.64, ll.1-7.

46.     Mr. Hague did not visit the Birmingham High Point location or any other High Point location in preparing his opinion. ECF 33-3, 22 at p.84, ll. 20-25; p.85, ll.1-6.

47.     Regarding Defendants' allegedly inadequate training, Mr. Hague has asserted that High Point's orientation did not provide adequate evaluation of a patron's ability to clip in. ECF 33-3, 37 at p.143, ll.14-22.

48.    Mr. Hague maintains this opinion regardless of whether Kinsley actually knew how to clip into the auto-belay climbing system. (Q. You didn't want to know whether she did in fact know how to hook into the auto belay? A. Well, she might have known but that may not be the issue here.") ECF 33-3, 17 at p.64, ll.1-11.

49.    Mr. Hague conceded that he had no idea how long High Point's orientation lasted. (A. "I don't think I saw any testimony saying how long it was." Q. "Okay, so it could have been adequate?" A. "I mean, it could -- it's possible.") ECF 33-3, 42 at p.163, ll.7-10.

50.    Mr. Hague then admitted that, at his own former rock climbing gym, Rise Up, a customer could walk into the gym and begin rock climbing within 15 minutes. (A. "… [I]f you would have walked in a Rise Up prior to there being auto belays, sure, 15 minutes is plenty of time.") ECF 33-3, 42 at p.162, ll. 21-23.

51.    Regarding Defendants' alleged failure to supervise, Mr. Hague noted that Defendants did not have a trained supervisor observing every climb, as noted in the instructions of the Perfect Descent Auto Belay system manual. Mr. Hague initially insinuated that this evidenced Defendants' alleged failure to supervise. ECF 33-3, 43 at p.168, ll. 1-25; p.169, ll.1-15.

52.    However, when asked if he believed that this was a reasonable standard, Mr. Hague demurred. (Q. "My question was, do you think that would be reasonable, a reasonable standard?" A. "Again, I think that it's irrelevant. It doesn't matter what

my opinion is. If the Perfect Descent has that in their manual, it is what it is.") ECF 33-3, 44 at p.171, ll. 1-5.

53.     Mr. Hague conceded that he did not know of any gym in the world that has a trained operator constantly supervising every climber. ECF 33-3, 44 at p.172, ll. 19-25.

54.     In fact, Mr. Hague testified that he was the sole staff member present in his own rock climbing gym "on many occasions". ECF 33-3, 11 at p.41, ll. 9-14.

55.     On the date of the incident in question, there were at least three full time staffers at High Point, in addition to other High Point personnel. ECF 33-7, 8 at p.23, ll.21-23; p.24, ll. 1-5. Former employee Hannah Staubach also estimated that there were fewer than fifty patrons on the date of the accident. ECF 33-7, 14 at p.46, ll.1-2.

56.     Plaintiff's expert, Mr. Hague, did not offer an opinion regarding Plaintiff's third claim concerning the safety equipment. Mr. Hague did opine that even in situations where a facility, such as High Point, does everything right, someone can still become hurt. ECF 33-3, 28 at p.108, ll.24-25; p.109, ll.1-2. This is because, in Mr. Hague's words "you can't guarantee that somebody is not going to be hurt." ECF 33-3, 24 at p. 92, ll.24-25; p.93, ll.1.

## STANDARD OF REVIEW

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

The Federal Rules also contemplate partial summary judgment. *See* Rule Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."). The Court may, in the alternative, "enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the facts as established in the case." Fed. R. Civ. P. 56(g).

## LEGAL ARGUMENT

## I. Plaintiff's negligence claim fails as a matter of law because there is no evidence that Defendants acted negligently.

In Count One of Plaintiff's Complaint, Plaintiff alleges that Defendants were negligent, and Minor Plaintiff was injured as a result of Defendants' negligence. Defendants' alleged negligence purportedly arises from breaches of the following

duties: 1. A duty to adequately train Minor Plaintiff; 2. A duty to ensure that she was adequately supervised; and 3. A duty to provide Minor Plaintiff with working safety equipment. ECF 7, 5 at 26-28. Plaintiff alleges that Defendants owed these duties to Minor Plaintiff because Minor Plaintiff was a "patron of its business". *Id.* Stated differently, Plaintiff alleges that Defendants violated the duty of care owed to Minor Plaintiff as an "invitee". Irrespective of whether Plaintiff styled his negligence count intending to raise a premises liability issue, the elements of negligence "are the same as those in any tort litigation: duty, breach of duty, cause in fact, proximate cause or legal cause, and damages." *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 969 (Ala. 1985) (citation omitted).

Given that all Defendants' purported duties, as alleged by Plaintiff in his Complaint, are derivative of Minor Plaintiff's status as an invitee or "patron of the business", Defendants shall first address the standard of care owed to invitees under Alabama law, and thereafter will refute each alleged duty breach in turn.

**a. Plaintiff cannot establish that Defendants breached the duty owed to a business invitee.**

In Alabama, a landowner owes a duty to maintain their premises in a reasonably safe condition. *Cornutt v. Bolin*, 404 So. 2d 38, 40 (Ala. 1981) ("Alabama law is well settled that a landowner owes an invitee a duty to maintain the premises in a reasonably safe condition, or in the event that the premises are not

safe because of a defect or danger, to warn the invitee of any danger or defective condition.") However, under Alabama law "The owner of a premises ... is not an insurer of the safety of his invitees, and the principle of *res ipsa loquitur* is not applicable. There is no presumption of negligence which arises from the mere fact of an injury to an invitee." *Tice v. Tice*, 361 So.2d 1051, 1052 (Ala.1978).

As a preliminary matter, it is not clear that there is a hazard in this case within the meaning of Alabama law. Minor Plaintiff came to the High Point location for the purpose of engaging in rock climbing activities. It would therefore be dubious for Plaintiff to claim that the rock climbing walls were a hazard that Minor Plaintiff needed to be warned of, when the very purpose of the group's visit was to climb those rock walls. See *Richards v. Henderson*, 589 So. 2d 709, 710 (Ala. 1991) ("There is no duty to warn when the danger is fully known to the party who [may be] injured.") (the Alabama Supreme Court granting summary judgment to the defendant landowner and holding that he had no duty to warn an invitee who came on his property to remove dead tree limbs of the danger of falling tree limbs).

Understandably, Plaintiff returns to Minor Plaintiff's injuries as though her injuries alone suffice as evidence of a dangerous condition. However, Alabama law is clear that the fact of the injury itself cannot be used to show a dangerous condition existed. See *Miller v. Liberty Park Joint Venture, LLC*, 84 So. 3d 88, 92 (Ala. Civ. App. 2011) ("The mere fact that an unfortunate injury occurred, does not give rise

to an inference that a dangerous condition existed.") (quoting *Ex parte Harold L. Martin Distrib. Co.*, 769 So. 2d 313 (Ala. 2000)). Therefore, to prevail on this point, Plaintiff needs to provide evidence that a dangerous condition existed on the property.

To overcome this crucial, and ultimately insurmountable, hurdle, Plaintiff enlisted the services of his expert, Daniel Hague. Mr. Hague's testimony is of dubious import to this case. First, in his deposition Mr. Hague showed no hesitation in contradicting his own book when asked whether he believed that "climbing is an inherently dangerous activity." ECF 33-3, 17 at p.62, ll.2-14. Mr. Hague published this book in 2019 and produced it in discovery as one of the materials he relied on in forming his opinion. ECF 33-3, 15 at p.55, ll.3-11. Despite purportedly relying on his own book, Mr. Hague's deposition testimony proved malleable, and he did not hold fast to his opinions. In yet another instance of backtracking, Mr. Hague referred to the Perfect Descent Operations Manual as the standard in the industry, and admonished Defendants for failing to adhere to it in his report. ECF 33-3, 43 at p.167-169. However, despite using the Perfect Descent Operations Manual as a bludgeon against Defendants, Mr. Hague was unwilling to endorse the central opinion of the Manual, that "Climbers should be under constant supervision by a trained operator." ECF 33-3, 43 at p.169, ll.1-8.

Second, Mr. Hague testified that liability waivers and safety orientations are the "predominant" methods of informing customers of the risks of rock climbing, nothing that such methods are accepted "in the industry." ECF 33-3, 16 at p.61, ll.3-7. Defendants did both in this case: Adult Plaintiff signed a liability waiver and Minor Plaintiff participated in a safety orientation. Lastly, Mr. Hague's opinion, by his own admission, does not consider whether Minor Plaintiff, whom Mr. Hague never met or spoke with, knew how to hook into the auto-belay climbing system. (Q. You didn't want to know whether she did in fact know how to hook into the auto belay? A. Well, she might have known but that may not be the issue here.") ECF 33-3, 17 at p.64, ll.1-11. Mr. Hague's indifference to an essential element of Plaintiff's negligence claim (whether Minor Plaintiff was "adequately trained"), as well as his inconsistent testimony, renders his opinion superfluous to the resolution of the key issues in this case.

Even supposing, *arguendo*, Plaintiff was able to prove a dangerous condition existed, and that Defendants had notice of the dangerous condition, this Court should still grant Defendants' summary judgment because the "danger" of rock climbing walls is open and obvious. Alabama law is clear that there is no duty to warn of hazards that are open and obvious. See *Owens v. Ganga Hosp., LLC*, No. 1200449, 2021 Ala. LEXIS 116, at *5 (Oct. 29, 2021); *Dolgencorp, Inc. v. Taylor*, 28 So. 3d 737, 742 (Ala. 2009). Moreover, Minor Plaintiff testified that she was aware of the

danger posed by rock climbing walls. ECF 33-2, 20 at p.79, ll.8-12.  Minor Plaintiff's recognition of the danger posed by rock climbing walls is fatal to Plaintiff's attempt to blame Minor Plaintiff's injuries on Defendants. "**The entire basis of an invitor's liability rests upon his superior knowledge of the danger which causes the invitee's injuries**." *Edwards v. Intergraph Services Co., Inc.*, 4 So. 3d 495, 500 (Ala. Civ. App. 2008) (quoting *Jones Food Co. v. Shipman*, 981 So. 2d 355, 363 (Ala. 2006)) (emphasis added). This is not an instance of a hidden sinkhole on a residential property or a loose ceiling tile about to give way. Both Adult Plaintiff, Minor Plaintiff, and Defendants all understood and appreciated the potential dangers posed by the rock climbing walls.

Notwithstanding that Defendants had no duty to warn Minor Plaintiff of the obvious risks associated with indoor rock climbing walls, Defendants did in fact warn Kinsley and her father of the inherent risks associated with rock climbing by way of liability waiver and the safety orientation. This warning evidently registered with Minor Plaintiff, as Minor Plaintiff testified that she understood that rock climbing was a dangerous activity. ECF 33-2, 20 at p.79, ll.8-12. Therefore, it is difficult to see how Defendants supposedly breached a duty to Minor Plaintiff, as a "patron of the business" when Minor Plaintiff came to the Birmingham High Point location to climb rock walls, knew that such activity was dangerous, was told that

such activity was dangerous, and willingly participated in such activities following a waiver, a safety orientation, and training on how to rock climb.

**b. There is no failure to train Plaintiff; by her own admission Defendants did train her and she understood how to operate the auto belay system.**

It is unclear what would constitute "adequate" training to the satisfaction of Plaintiff. Moreover, liability in a negligence action does not hinge on a party's subjective view of what would be "adequate" training.  Plaintiff's expert has criticized Defendants' training not for its effectiveness – since Kinsley clearly understood how to use the clips and auto-belay system – but because he thinks the training should have required the participants to demonstrate how to clip in. ECF 33-3, 37 at p. 144, ll.12-24. This opinion is not serious. Initially, there is no evidence such a demonstration would have altered Plaintiff's behavior.  Secondly, the evidence that Kinsley knew how to use the system is found in her own testimony that she had clipped in "every single" time before ECF 33-2, 9 at p.34, ll.8-12.

The fact is, Minor Plaintiff safely and successfully rock climbed throughout the party prior to the last rock wall. ECF 33-2, 15 at p.60, ll.3-10. Perhaps if Minor Plaintiff had injured herself on her first, or even second, rock climbing attempt, Plaintiff could plausibly argue that Minor Plaintiff was not adequately trained by Defendants' staff. However, the facts of this case, and Minor Plaintiff's own testimony, make it clear that Minor Plaintiff was "adequately" trained such that she

had no trouble scaling the rock walls safely on multiple occasions. This fact belies Plaintiff's contention that Minor Plaintiff was somehow "inadequately" trained.

**c. Defendants owed no duty to supervise Minor Plaintiff and expressly disclaimed that Defendants would do so.**

Defendants owed no duty to supervise Minor Plaintiff and expressly conveyed to Adult Plaintiff (in the liability waiver that he read and signed) that High Point staff would not supervise climbers. Furthermore, Adult Plaintiff signed a waiver form acknowledging that High Point staff would not supervise participants, including Minor Plaintiff. ECF 33-4, 4 at p, 14, ll.13-16. Adult Plaintiff received the form, perhaps read it, but undeniably signed it. ECF 33-4, 4 at p, 14, ll.13-16. His decision not to take the liability waiver seriously does not mean the gym now owes duties to his daughter that were specifically disclaimed. It simply means he was uninformed, by his own choice, or the actual gym rules.

Plaintiff avoids this fact by presenting the testimony of Daniel Hague, a rock climbing safety expert. Hague testified the gym should have a trained supervisor watch every climb and descent because the user manual for the auto-belay system said trained supervision was necessary. However, Hague would not personally endorse this "standard" as one for use in the industry, going so far as to say his opinion about the industry (which is what he was hired to do – give his opinion about the industry) was irrelevant. This is an usual tactic for an expert to take, but the

reason he did so is obvious.  There is no gym in the world that operates that way, and if Hague had testified gyms must constantly supervise each climb, he would lose whatever credibility he may have in the industry.  He refused to personally endorse the very standard he asks this court to hold Defendants to, and his refusal is for the most plain reason:  he himself does not follow the language in the auto-belay manual.

Hague admitted he would be the sole staff member in his rock climbing gym "on many occasions". ECF 33-3, 11 at p.41, ll. 9-14. It would clearly be impossible for him to check folks in, orient new climbers, run the front desk, collect the liability waivers he used, and supervise each climb on the multiple rope stations.  Nor does any industry rule or requirement say he has to do so.  Indeed, Plaintiff's expert later testified that he does not take issue with a single staff member having sole responsibility for "checking the [customers] in, providing the orientations, getting the waivers signed, making sure that everything is clean, checking on …on all the facilities, and supervising the climbers all the at the same time…" ECF 33-3, 13 at p.49, ll. 6-17.

Despite Hague describing his own opinions as immaterial and refusing to endorse the standards he wants this Court to follow, High Point's staffing greatly exceeded the low bar that Plaintiff's expert set for himself and his gym. On the date of the incident in question, there were at least three full time staffers at High Point, in addition to other High Point personnel. ECF 33-7, 8 at p.23, ll.21-23; p.24, ll. 1-

5. Former employee Hannah Staubach also estimated that on the date of the accident there were fewer than fifty patrons at High Point. ECF 33-7, 14 at p.46, ll.1-2. The Alabama Supreme Court, in considering the duty of supervision, stated the following:

> It follows that if a condition is open and obvious rather than latent or obscure, no greater duty is imposed upon a host of a child under parental supervision than would be owed to the parent. *If the parent has either been warned, or if the condition is or should be obvious to the parent, the[parent's failure properly to supervise its child is the proximate cause of a subsequent injury.*

*Williamson v. Tyson Foods*, 626 So. 2d 1261, 1265 (Ala. 1993) (emphasis original).

Of course, Defendants in this case are the owners and managers of an indoor rock climbing gym: High Point Climbing and Fitness. The "condition" of the climbing walls is so obvious that it is in the name of the business. A Louisiana appellate court, considering a factually similar case involving a fourteen year old boy at an indoor rock climbing gym, largely agreed with the sentiment: "The duty on the gym operator, when these types of sports are conducted, is that of providing a sound and secure environment for undertaking  a clearly risky form of recreation and not that of removing every element of danger inherent in rock climbing…" *Ravey v. Rockworks, LLC*, 12-1305 ( La. App. 3 Cir 04/10/13), 111 So. 3d 1187, 1192. Therefore, it is clear from the facts and the law that Plaintiff cannot prevail on his negligent supervision claim.

**d. Plaintiff's allegation that Defendant had a duty to provide "working safety equipment" is a procedurally defective products liability claim that is wholly unsupported by the facts in the record.**

With respect to the alleged third duty breached, the "duty to provide [Minor Plaintiff] with working safety equipment", this can be summarily dismissed on both procedural and factual grounds. Procedurally, the alleged duty described by Plaintiff is properly pled as a products liability cause of action. However, Plaintiff failed to allege a products liability action against Defendants, and Plaintiff's attempt to impose products liability upon Defendants under the guise of a negligence action is procedurally improper.

Furthermore, there is no factual basis to sustain a products liability action. Assuming, *arguendo*, that Plaintiff had properly asserted a products liability action against Defendants in either his initial Complaint or Amended Complaint, the record clearly reflects that the climbing equipment was working properly on the date of the accident. Plaintiff has not presented any evidence to indicate that there was any flaw or defect in the auto belay devices or ropes used by Minor Plaintiff on the date of the accident. Minor Plaintiff testified that her equipment had worked properly on the date of the accident. ECF 33-2, 15 at p.60, ll.3-10. Minor Plaintiff further testified that the accident was the result of her own failure to properly clip in the climbing equipment. ECF 33-2, 10 at p.37, ll.11-15. Therefore, it is clear that the cause-in-

fact for Minor Plaintiff's injuries was her own human error, and Minor Plaintiff's injuries were not the result of any defective or malfunctioning equipment. Accordingly, Plaintiff has no standing, as a matter of law or fact, to assert a products liability action, however styled, against Defendants.

## II. Plaintiff cannot establish his wantonness claim against Defendants.

Having demonstrated that Plaintiff cannot prevail on his negligence claim, the wantonness claim, which by definition involves deliberate conduct, must surely fail as a matter of law. There is simply no evidence that High Point, or its agents and employees, "acted with reckless and conscious disregard of Kinsley's safety" as Plaintiff contends in his Complaint. ECF 7, 7 at 37. Indeed, Plaintiff's wantonness claim essentially states the same grievances alleged in Plaintiff's negligence claim (inadequate training, supervision, and equipment) and is due to fail for the same reason.

Under Alabama law, wantonness is not merely a higher degree of culpability than negligence. *Ex parte Anderson*, 682 So. 2d 467, 470 (Ala. 1996). Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness that "the doing of such act or the omission of [some known] duty, injury will likely or probably result…" *Garrison v. Sam's E., Inc.*, No. 1:17-CV-381-C, 2019 U.S. Dist. LEXIS 57471, at

*19 (S.D. Ala. Apr. 3, 2019). Willful and wanton conduct has a well-defined meaning at law. Wantonness "imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act." *Garrison v. Sam's E., Inc.*, No. 1:17-CV-381-C, 2019 U.S. Dist. LEXIS 57471, at *19 (S.D. Ala. Apr. 3, 2019) (quoting *Alfa Mut. Ins. Co. v. Roush*, 723 So. 2d 1250, 1256 (Ala. 1998)). What constitutes wanton misconduct depends on the facts presented in each particular case. *Central Alabama Electric Cooperative v. Tapley,* 546 So. 2d 371 (Ala. 1989); *Brown v. Turner,* 497 So. 2d 1119 (Ala. 1986); *Trahan v. Cook,* 288 Ala. 704, 265 So. 2d 125 (l 972). The undisputed facts prove Kinsley was shown twice how to use the safety clip, that High Point disclosed the risks of climbing to her father, and the equipment worked as intended – if used. This is the categorical opposite of a deliberate disregard for climber safety.

There is a good reason why willful and wanton conduct should not be confused with negligence. It has been correctly stated that the two concepts are as "unmixable as oil and water." *Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc.*, 510 So. 2d 142, 145-46 (Ala. 1987). Willfulness or wantonness imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act, and strictly speaking, is not within the meaning of the term "negligence," which conveys the idea of inadvertence, as distinguished from premeditation or formed intention. *Ex parte*

*Anderson,* 682 So. 2d 467, 470 (Ala. 1996). Here, Plaintiff is not entitled to relief upon the facts and law provided. There is no evidence to support the material averment of Plaintiff's claim of wantonness against Defendants.

Plaintiff's expert, Mr. Hague, stated the obvious when he opined that "you can't guarantee that somebody is not going to be hurt." ECF 33-3, 24 at p. 92, ll.24-25; p.93, ll.1. It is true even in situations where a facility, such as High Point, does everything right, that someone can still become hurt. ECF 33-3, 28 at p. 108, ll.24-25; p.109, ll.1-2. Certainly, this is one such case and neither Plaintiff, nor his experts, have proffered any evidence to indicate otherwise. Accordingly, Plaintiff's wantonness claim must fail as a matter of law.

## **CONCLUSION**

Plaintiff's sprawling negligence claim against Defendants ultimately fails to hit the mark. Plaintiff has not, and cannot, establish that Defendants breached any duty to Minor Plaintiff, nor can Plaintiff avoid the undisputed testimony of Minor Plaintiff, which reveals that Minor Plaintiff's own actions and inactions were contributing factors to her injuries. Moreover, because there is no evidence that Defendants acted willfully or wantonly, they are not liable for Minor Plaintiff's injuries under either Plaintiff's negligence or wantonness claims. As such, Defendants have presented a prima facie showing that they are entitled to judgment

as a matter of law and therefore their motion for summary judgment is due to be granted.

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request that this Honorable Court grant their Motion for Summary Judgment, as to Plaintiff's claims of Negligence and Wantonness against them.

Dated this the 21st day of February, 2023.

*s/ Neal D. Moore, III*
Neal D. Moore, III (ASB-3971-M73N)
Jeremy S. Hazelton (ASB-1481-M76H)
*Attorneys for Defendants*

**OF COUNSEL:**
**Christian & Small, LLP**
**505 North 20th Street**
**Suite 1800**
**Birmingham, AL 35203**
**Email: ndmoore@csattorneys.com / jshazelton@csattorneys.com**

## CERTIFICATE OF SERVICE

I hereby certify that I have this date, using the CM/ECF filing system which will send notification of such filing, served a copy of the foregoing pleading upon all counsel of record on this the 21st day of February, 2023:

Austin B. Whitten
Michael C. Bradley
**Pittman, Dutton & Hellums, P.C.**
2001 Park Place North, Suite 1100
Birmingham, Alabama 35203
austinw@pittmandutton.com

*s/ Neal D. Moore, III*
OF COUNSEL
