FILED

2023 Mar-10  PM 01:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 5
# Dr. W. Krauss Deposition
# (Kinsley's Surgeon)

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF ALABAMA

3    SOUTHERN DIVISION

4  KINSLEY KORNEGAY, a minor,

5  by and through her parent and

6  guardian, MATTHEW KORNEGAY,

7    Plaintiff,

8  Vs.            NO: 2:21-CV-00505-NAD

9  HIGH POINT BIRMINGHAM, LLC

10  and HIGH POINT CLIMBING, LLC,

11    Defendants.

12

13    DEPOSITION OF WILLIAM KRAUSS, M.D.

14    FEBRUARY 6, 2023

15    STIPULATION

16    IT IS STIPULATED AND AGREED, by and

17  between the parties through their respective

18  counsel, that the deposition of WILLIAM

19  KRAUSS, M.D.,taken before Susan Masters

20  Goldman, Alabama Certified Court Reporter,

21  License Number 83, and Notary Public, at

22  Southlake Orthopedics, 3686 Grandview

23  Parkway, Birmingham, Alabama 35243 on the 6th

Page 2

1 day of February, 2023 at or about 10:07 a.m.
2     IT IS FURTHER STIPULATED AND AGREED
3 that the signature to and the reading of the
4 deposition by the witness is waived, the
5 deposition to have the same force and effect
6 as if full compliance had been had with all
7 laws and rules of Court relating to the
8 taking of deposition.
9     IT IS FURTHER STIPULATED AND AGREED
10 that it shall not be necessary for any
11 objections to be made by counsel as to any
12 questions, except as to form or leading
13 questions, and that counsel for the parties
14 may make objections and assign grounds at the
15 time of the trial, or at the time said
16 deposition is offered in evidence, or prior
17 thereto.
18     IT IS FURTHER STIPULATED AND AGREED
19 that notice of the filing of the deposition
20 by the Commissioner is waived.
21
22
23

Page 4

1     APPEARANCES
2 BEFORE:
3   Susan Masters Goldman, Alabama Certified
4   Court Reporter, License Number 83, and
5   Notary Public.
6 APPEARING ON BEHALF OF THE PLAINTIFF:
7   Austin Whitten, Esq,
8   Pittman Dutton & Hellums
9   Bradley & Mann PC
10   2001 Park Place North, Suite 1100
11   Birmingham, Alabama 35203
12 APPEARING OF BEHALF OF THE DEFENDANT:
13   Jeremy S. Hazelton, Esq.
14   Christian & Small, LLP
15   The Financial Center
16   505 North 20th Street, Suite 1800
17   Birmingham, Alabama 35203
18
19 Also present:  Peyton Clark
20
21
22
23

Page 3

1     INDEX
2 EXAMINATION BY       PAGE NO.
3 Mr. Whitten     7
4 Mr. Hazelton     49
5     EXHIBITS
6 PLAINTIFF'S EXHIBIT NO:
7 Exhibit 1  CV     7
8 Exhibit 2  ER Documentation   12
9 Exhibit 3  Notes & Treatment   15
10 Exhibit 4  Office Records   19
11 Exhibit 5  History & Physical   20
12 Exhibit 6  Operative Report   23
13 Exhibit 7  Foot & Ankle Depiction   26
14 Exhibit 8  Photo   29
15 Exhibit 9  Operative Report   30
16 Exhibit 10 YouTube Video (retained)   32
17 Exhibit 11 Progress Notes   37
18 Exhibit 12 Billing Records   43
19 Exhibit 13 Surgery Billing Records   45
20 Exhibit 14 PT Billing Records   45
21 Exhibit 15 UAB West ER Billing Records  46
22 Exhibit 16 PSM&O Billing Records   46
23 Exhibit 17 Medirest Billing Records   47

Page 5

1     I, Susan Masters Goldman, Alabama
2 Certified Court Reporter, License Number
3 83, acting as Notary Public, certify that
4 on this date as provided by Federal Rules
5 of the Civil Procedure, and the foregoing
6 stipulations of counsel, there came before
7 me at Southlake Orthopedics, 3686 Grandview
8 Parkway, Birmingham, Alabama 35243 on the 6th
9 day of February, 2023 at or about 10:07 a.m.,
10 WILLIAM KRAUSS, M.D., witness in the above
11 cause, for oral examination, whereupon, the
12 following proceedings were had:
13     VIDEOGRAPHER:  Good morning.  We're
14 going on the record at 10:07 a.m. on February
15 6th, 2023.  This is Media Unit 1 in the
16 video-recorded deposition of Dr. William B.
17 Krauss taken by counsel for the plaintiff in
18 the matter of Kinsley Kornegay, a minor,
19 by and through her parent and guardian,
20 Matthew Kornegay, versus High Point
21 Birmingham, LLC, et al., filed in the United
22 States District Court for the Northern
23 District of Alabama Southern Division, Case

Veritext Legal Solutions
877-373-3660         800.808.4958

Page 6

1 No. 2:21-CV-00505-NAD.  The location of the
2 deposition is 3686 Grandview Parkway,
3 Birmingham, Alabama.
4     My name is Ted Yost representing
5 Veritext, I'm the videographer.  The court
6 reporter is Susan Goldman from the firm
7 Veritext.
8     At this time, counsel and all present
9 in the room will now state their appearance
10 and affiliations for the record.
11     MR. WHITTEN:  Austin Whitten
12 representing Kinsley Kornegay.  Peyton Clark
13 from my office is here as well.
14     MR. HAZELTON:  Jeremy Hazelton on
15 behalf of High Point Birmingham.
16     VIDEOGRAPHER:  Would the reporter
17 please swear in the witness?
18
19     WILLIAM KRAUSS, M.D.,
20 after having been first duly sworn, testified
21 as follows:
22     THE REPORTER:  Usual stipulations?
23     MR. WHITTEN:  Yes.

Page 7

1     MR. HAZELTON:  That's fine.
2 EXAMINATION BY MR. WHITTEN:
3     Q.  Good morning, Doctor.  Can you please
4 state your name and address for us?
5     A.  Dr. William Krauss, 4517 Southlake
6 Parkway, Birmingham, Alabama.
7     Q.  You just referenced a document.  Is
8 that a document you brought with you this
9 morning?
10     A.  It is, my CV.
11     Q.  That's your current CV?
12     A.  Yes, sir.
13     MR. WHITTEN:  I'd like to mark that as
14 Plaintiff's Exhibit 1 to the deposition.
15     (Plaintiff's Exhibit 1 was marked and
16 attached.)
17     Q.  (BY MR. WHITTEN) Are you a doctor?
18     A.  I am.
19     Q.  In what states are you licensed to
20 practice?
21     A.  Alabama.
22     Q.  Did you complete a residency?
23     A.  I did.

Page 8

1     Q.  Did you complete a fellowship?
2     A.  I did.
3     Q.  What is your specialty?
4     A.  Foot and ankle surgery -- orthopedics,
5 foot and ankle surgery.
6     Q.  Okay.  And what type of medicine does
7 that specialty deal with?
8     A.  Basically, anything below the knee.
9     Q.  Did you receive special training in
10 preparation for practicing that field of
11 medicine?
12     A.  I did an orthopedic surgery residency
13 and I did a one-year foot and ankle
14 fellowship.
15     Q.  Are you Board certified?
16     A.  I am.
17     Q.  In what fields are you Board certified
18 in?
19     A.  Orthopedic surgery.
20     Q.  What does that mean to be Board
21 certified?
22     A.  It means that you've met requirements
23 to be certified by a Board of your peers

Page 9

1 essentially.
2     Q.  How long have you been Board certified
3 in that field?
4     A.  I think since 1997.
5     Q.  And with what hospitals are you
6 associated?
7     A.  Grandview Medical Center and Brookwood
8 Medical Center.
9     Q.  Do you have admitting privileges at
10 those hospitals?
11     A.  I do.
12     Q.  Are you member of a practice group?
13     A.  Southlake Orthopedics.
14     Q.  And how long have you been with that
15 group?
16     A.  Since 2006.
17     Q.  In your practice, have you had the
18 occasion to render medical treatment to
19 Kinsley Kornegay in connection with your
20 practice?
21     A.  Yes.
22     Q.  Okay.  When did you first see Kinsley
23 as a patient?

3 (Pages 6 - 9)

1    A.  I first saw her December 14th, 2021.

2    Q.  And where did you see Kinsley at that

3 time?

4    A.  At our Southlake Grandview office.

5    Q.  Is that in this building we're in now?

6    A.  It is, fourth floor.

7    Q.  What was the occasion for you seeing

8 her at that time?

9    A.  She came in with ankle pain -- both

10 ankles, actually.

11   Q.  Did you take a history from Kinsley or

12 was one made available to you at that visit?

13   A.  One was made available and I took my

14 own.

15   Q.  In laymen's terms, what is a history

16 for a patient?

17   A.  It helps to describe how an injury

18 occurred if they had an injury or how long

19 they've had issues.

20   Q.  What did you learn from the history you

21 got from Kinsley?

22   A.  In 2019, she fell off rocks twenty-five

23 feet injuring both ankles.  She was diagnosed

1 with bilateral ankle fractures, bilateral

2 means both, fractures means obviously breaks.

3 They were treated non-operably, that means

4 without surgery, in a cast.

5    Q.  Okay.  Did the histories you obtained

6 aid you in your care and treatment of

7 Kinsley?

8    A.  It pointed me in the right direction.

9    Q.  Did you physically examine Kinsley at

10 the time you saw her?

11   A.  I did.

12   Q.  Can you describe your examination of

13 Kinsley at that time?

14   A.  She was walking normally.  She had a

15 positive drawer test, which is a test to

16 evaluate excess motion in the ankle, her left

17 was worse than the right.  She was tender of

18 the anterior talofibular ligament, which is

19 an ankle -- which is the typical ankle

20 ligament that you sprain.

21      She had fusion, which means swelling in

22 her ankle joint.  She was not painful in mid

23 foot or the forefoot or the rest of her leg.

1    Q.  Okay.  At or before your initial

2 examination of Kinsley, did you review any

3 records from Kinsley's prior treatment of her

4 injuries after she fell from the rock wall?

5    A.  She had MRIs from an outside source.

6    Q.  Have you reviewed any records from

7 Kinsley's treatment at UAB Medical West?

8    A.  I think I did read those, yes.

9    Q.  Doctor, I'm going to hand you what I'm

10 marking as Plaintiff's Exhibit 2.

11      (Plaintiff's Exhibit 2 was marked and

12 attached.)

13   Q.  (BY MR. WHITTEN) Does this appear to be

14 a copy of the emergency department's

15 physician's documentation from Kinsley's

16 treatment at UAB West on August 2nd, 2019?

17   A.  Yes.

18   Q.  Was Kinsley received at UAB West via

19 the emergency room?

20   A.  Yes.

21   Q.  Was she treated by the physicians on

22 staff there?

23   A.  Yes.

1    Q.  Did they obtain a history from her at

2 that time?

3    A.  Yes.

4    Q.  Did they note in the history that her

5 symptoms began earlier that day after fell

6 twenty-five feet at a rock climbing gym?

7    A.  Yes.

8    Q.  And the staff there, they ordered

9 x-rays but did not order any CTs or MRIs; is

10 that correct?

11   A.  Correct.

12   Q.  What was her diagnosis at the emergency

13 room?

14   A.  Salter-Harris II fractures of both

15 tibias.

16   Q.  What does that mean in laymen's terms?

17   A.  Salter-Harris II is a grading system

18 for pediatrics or children when their growth

19 plates are still own.  Four would be the

20 worst, one would be the best.

21   Q.  Is there typically pain associated with

22 those types of injuries?

23   A.  Yes.  Broken ankles hurt.

1   Q.  Can it be severe?

2   A.  Yes.

3       MR. HAZELTON:  Object to the form.

4   Q.  (BY MR. WHITTEN) Would it be

5   appropriate to prescribe narcotics or other

6   medications to relieve a patient's pain in

7   that situation?

8   A.  Yes.

9   Q.  Was Kinsley treated with splints on

10  both of her legs and ankles at the emergency

11  room?

12  A.  Yes.

13  Q.  Is it your opinion that all of

14  Kinsley's emergency treatment at UAB West was

15  medically necessary to treat the injury that

16  she was diagnosed with?

17  A.  Yes.

18  Q.  Was Kinsley then referred to physician

19  specializing in orthopedic injuries for

20  additional treatment?

21  A.  Yes, follow up with an orthopedist as

22  discussed.

23  Q.  And it says that in Plaintiff's Exhibit

1   2?

2   A.  Yes.

3   Q.  Doctor, have you reviewed any records

4   from Kinsley's treatment with Dr. Michael

5   Patterson at Precision Sports Medicine and

6   Orthopedics?

7   A.  I have not.

8   Q.  I'm going to hand you what I'm marking

9   as Plaintiff's Exhibit 3.

10      (Plaintiff's Exhibit 3 was marked and

11  attached.)

12  Q.  (BY MR. WHITTEN) Does this appear to be

13  a copy of Dr. Patterson's physician notes of

14  his treatment of Kinsley from October 5th,

15  2019 to December 8th, 2021?

16  A.  Yes.

17  Q.  Doctor, are you familiar with Dr.

18  Patterson professionally?

19  A.  Yes.

20  Q.  Is he considered knowledgeable and well

21  respected as a physician in the medical

22  community here?

23  A.  Yes.

1   Q.  At his initial examination of Kinsley,

2   did Dr. Patterson confirm her previous

3   diagnosis of bilateral tibial fractures?

4   A.  Yes.

5   Q.  Does the history from Dr. Patterson's

6   initial examination note that her tibial

7   fractures were sustained when she fell at the

8   rock climbing park?

9   A.  Yes.

10  Q.  Doctor, within a reasonable degree of

11  medical probability based on your treatment

12  of Kinsley, your knowledge of her condition,

13  and your knowledge of her history, do you

14  have an opinion as to the cause of her

15  bilateral tibial fractures for which she was

16  treated?

17      MR. HAZELTON:  Object to the form.

18  A.  A fall of twenty-five would be

19  sufficient to cause this type of fracture.

20  Q.  (BY MR. WHITTEN) So is it your opinion

21  as a medical doctor that Kinsley's fall from

22  a climbing wall probably caused her bilateral

23  tibial fractures?

1       MR. HAZELTON:  Object to the form.

2   A.  Yes.

3   Q.  (BY MR. WHITTEN) That initial exam with

4   Dr. Patterson, did he place her in a

5   short-leg cast as treatment for her injuries?

6   A.  Yes.

7   Q.  And in his treatment, did Dr. Patterson

8   then transition her to walking boots and

9   crutches?

10  A.  Yes.

11  Q.  And then did he transition her to

12  Figure 8 ankle braces?

13  A.  Yes.

14  Q.  Did Dr. Patterson clear Kinsley to

15  return to normal activity on October 18th,

16  2019?

17  A.  Yes.

18  Q.  Did Kinsley then return to Dr.

19  Patterson's office on May 1st of 2020 with

20  complaints of continuing pain and swelling

21  over the anterior tibiotalar joints?

22  A.  Yes.

23  Q.  And did Dr. Patterson note in his

1 history at that exam that Kinsley had not
2 suffered any new trauma or injury since his
3 last examination?
4   A. Yes.
5   Q. Did Dr. Patterson then refer Kinsley to
6 physical therapy and order an MRI?
7   A. Yes.
8   Q. Are you aware that Kinsley attended
9 eight physical therapy sessions from May 6th,
10 2020 to June 17th, 2020?
11   A. Yes.
12   Q. Are you aware that Kinsley underwent an
13 MRI on February 3rd, 2021?
14   A. Yes.
15   Q. Do these records indicate that Kinsley
16 then returned to Dr. Patterson's office again
17 on December 8th, 2021 with complaints of
18 continuing pain, swelling, and soreness in
19 her ankles?
20   A. Yes.
21   Q. Is it your opinion that all of Dr.
22 Patterson's treatment of Kinsley, including
23 referring her to physical therapy and

1 ordering an MRI, was medically necessary to
2 treat Kinsley's injuries at that time?
3     MR. HAZELTON: Object to the form.
4   A. Yes.
5   Q. (BY MR. WHITTEN) Did Dr. Patterson then
6 refer Kinsley to you as a foot and ankle
7 specialist for a second opinion?
8   A. Yes.
9   Q. Doctor, I'm handing you what I'm
10 marking as Plaintiff's Exhibit 4.
11     (Plaintiff's Exhibit 4 was marked and
12 attached.)
13   Q. (BY MR. WHITTEN) If you would take a
14 minute to flip through those.
15   A. (Witness complies.)
16   Q. And, Doctor, now that you have looked
17 at those, does that document appear to be a
18 copy of your office records related to your
19 treatment of Kinsley?
20   A. Yes.
21   Q. Do those records appear to go from
22 December 14th, 2021 to July 21st, 2021?
23     MR. HAZELTON: Do you mean July 1st of

1 2022?
2   A. I have got July 18th, '22 for me.
3     MR. HAZELTON: You said '21.
4   A. You said '21.
5   Q. (BY MR. WHITTEN) Oh, I apologize. Yes,
6 I do mean July 2021.
7   A. Yes.
8   Q. Do those records for that time period
9 appear to be complete and accurate?
10   A. Yes.
11   Q. Are the originals of those records kept
12 in the usual and ordinary course of business
13 here at Southlake Orthopedics?
14   A. Yes.
15   Q. You previously testified for us that
16 your initial examination of Kinsley took
17 place on December 14th, 2021; correct?
18   A. Yes.
19     (Plaintiff's Exhibit 5 was marked and
20 attached.)
21   Q. (BY MR. WHITTEN) Doctor, I'm handing
22 you what I've marked as Plaintiff's Exhibit
23 5. Does this appear to be a copy of your

1 history and physical records from your
2 initial examination of Kinsley?
3   A. Yes.
4   Q. Did she present to you with ongoing
5 pain, swelling, and soreness in both of her
6 ankles?
7   A. Yes.
8   Q. And you and your staff obtained a
9 history from Kinsley at that time; correct?
10   A. Yes.
11   Q. And did she report to you her ongoing
12 pain and other ankle injuries began when she
13 fell while rock climbing?
14   A. Yes.
15   Q. How did you conduct your initial exam
16 of Kinsley?
17   A. I watched her walk and then I examined
18 both of her ankles.
19   Q. Ultimately, you assessed her as having
20 bilateral ankle instability; correct?
21   A. Correct.
22   Q. What was that assessment based on?
23   A. Physical examination and history.

Page 22

1 Q. Can you explain bilateral ankle
2 instability in laymen's terms for us?
3 A. When you have a severe ankle sprain,
4 you by definition tear the ligaments. The
5 ligaments are what hold the joint together.
6 Thirty percent of the time, the ligaments do
7 not heal properly and you wind up with too
8 much motion in your ankle which people
9 experience as giving out or feeling weak or
10 they just can't trust it.
11 Q. After that assessment, you then
12 recommended surgical repair of both ankles
13 beginning with the right side; correct?
14 A. Correct.
15 Q. What surgical procedure did you
16 recommend for Kin?
17 A. I recommended a right ankle arthroscopy
18 with a Brostram-Gould lateral ligament
19 reconstruction.
20 Q. And why did you believe those surgeries
21 were necessary for Kinsley?
22 A. Because that would be the typical
23 treatment for ankle instability in someone

Page 23

1 that has failed conservative measures.
2 Q. I think you have already confirmed for
3 us, but Kinsley had failed conservative
4 measures at that point; correct?
5 A. Correct, she had already been through
6 physical therapy and bracing.
7 Q. And you performed an arthroscopy with
8 debridement and a Brostrom-Gould lateral
9 reconstruction on Kinsley's ankle on January
10 14th, 2022; correct?
11 A. Yes, correct.
12 (Plaintiff's Exhibit 6 was marked and
13 attached.)
14 Q. (BY MR. WHITTEN) I'll hand you a
15 document marked Plaintiff's Exhibit 6. Does
16 this appear to be the operative report from
17 that surgery?
18 A. Yes.
19 Q. And in laymen's terms, can you explain
20 to the jury what you did to Kinsley's right
21 ankle during that surgery?
22 A. I made two small incisions on the front
23 part of the ankle and placed a small

Page 24

1 arthroscope, which is like a small telescope
2 and a small shaver, into the ankle joint and
3 cleaned out scar tissue and then made a
4 three-centimeter, inch and a half incision,
5 over the outside of the ankle close to the
6 fibula and repaired the ligament.
7 Q. Did you use any hardware in the
8 ligament repair surgery?
9 A. Yes, I put a Smith and Nephew suture
10 anchor which is a metallic anchor.
11 Q. Did you have to drill into her bone to
12 affix the suture anchor?
13 A. Yes.
14 Q. What tools do you use to drill into her
15 bone?
16 A. An electrical drill and a drill bit.
17 Q. And the hardware you mentioned -- well,
18 I guess let me ask first, what does hardware
19 mean in context of surgery?
20 A. It's metallic, it's a form of -- in
21 this case it's not form of fixation, but a
22 form of anchoring sutures to the bone.
23 Q. Okay. The hardware you mentioned, the

Page 25

1 suture anchor, is that supposed to stay in
2 Kinsley's ankle for the rest of her life?
3 A. Yes.
4 Q. Does this type of hardware ever break
5 or otherwise fail prematurely?
6 A. Exceptionally rarely.
7 Q. But it does happen occasionally?
8 A. Yes, I have seen it happen a couple of
9 times.
10 Q. You have seen it happen personally?
11 A. (Witness nodding head.)
12 Q. What happens if that occurs?
13 A. Sometimes, the hardware will come out.
14 Actually, pull itself out, that's typically
15 what happens.
16 Q. Does that require another surgery to
17 repair?
18 A. (Witness nodding head.)
19 Q. During Kinsley's first surgery, you
20 observed that there was a complete tear of
21 the anterior talofibular ligament in
22 Kinsley's right ankle; is that correct?
23 A. Correct.

Page 26

1   Q.  I'm handing you what I'm marking as
2  Plaintiff's Exhibit 7.
3       (Plaintiff's Exhibit 7 was marked and
4  attached.)
5   Q.  (BY MR. WHITTEN) Doctor, Plaintiff's
6  Exhibit 7, is that generally an accurate
7  depiction of a human foot and ankle?
8   A.  The lateral outside half of it, yes.
9   Q.  And you can see a label for the
10 anterior talofibular ligament towards the top
11 right of the page; correct?
12  A.  Correct.
13  Q.  Is the arrow coming from that label
14 accurately identifying the location of the
15 anterior talofibular ligament in a normal
16 ankle?
17  A.  Yes.
18  Q.  Do the other labels in this exhibit
19 appear to be accurate as well?
20  A.  Yes.
21  Q.  And is the anterior talofibular
22 ligament the only ligament you operated on in
23 Kinsley's ankle?

Page 27

1   A.  Yes, but it's really -- the anterior
2  talofibular ligament is a -- more of a
3  thickening of the capsule of the ankle, it's
4  not usually the discreet ligament.
5   Q.  And in laymen's terms, what is the role
6  of the anterior talofibular ligament in a
7  person's ankle?
8   A.  It keeps your talus, which is the
9  bottom ankle and the ankle joint from sliding
10 too far forward or backwards or -- too far
11 forwards, I guess.
12  Q.  So from a functional standpoint, how
13 does a tear of the ligament affect someone?
14  A.  As we talked about, they will feel like
15 their ankle is loose or giving out or hurt or
16 swelling.
17  Q.  Can it cause significant pain, that
18 type of injury?
19  A.  Uh-huh.  When you have a severe ankle
20 sprain, that's what you're tearing, so it
21 hurts when you do it.  And then that will
22 heal, but then sometimes you have residual or
23 leftover looseness in the ankle.

Page 28

1   Q.  Is it fair to stay that Kinsley would
2  have felt like she had a severe ankle sprain
3  with this injury?
4       MR. HAZELTON:  Object to the form.
5   A.  Initially, yes, but not after that.
6  She was not complaining of the ankle sprain
7  symptoms when I saw her.
8   Q.  (BY MR. WHITTEN) Were Kinsley's
9  ligament tears that you observed consistent
10 with her history of chronic ankle pain,
11 swelling, and soreness?
12  A.  Yes.
13  Q.  After the surgery, is it expected that
14 patients like Kinsley who undergo this
15 procedure will be in pain following the
16 surgery?
17  A.  There is postoperative pain for the
18 first day or two.
19  Q.  Okay.  Are pain medications typically
20 prescribed for these patients?
21  A.  Yes.
22  Q.  Was Kinsley prescribed pain medication?
23  A.  Yes.

Page 29

1   Q.  Was Kinsley then required to be in a
2  hard cast for a period of time?
3   A.  Yes, for six weeks.
4   Q.  I'm handing you a document I'm marking
5  as Plaintiff's Exhibit 8, and I'll represent
6  this is a photo of Kinsley's ankle shortly
7  after her cast was removed after the first
8  surgery.
9       (Plaintiff's Exhibit 8 was marked and
10 attached.)
11  Q.  (BY MR. WHITTEN) Does this photo
12 accurately depict the areas of Kinsley's
13 ankle where you made incisions in order to
14 perform these operations?
15  A.  Yes.
16  Q.  Did you refer Kinsley to physical
17 therapy after her cast was removed?
18  A.  Yes.
19  Q.  And why was that medically necessary?
20      MR. HAZELTON:  Object to the form.
21  A.  Because people get stiff after six
22 weeks of immobilization in a cast.
23  Q.  (BY MR. WHITTEN) Did Kinsley, in fact,

1 attend physical therapy at Renew Physical
2 Therapy at that time?
3    A.  Yes.
4    Q.  And you saw her several times after the
5 first surgery; correct?
6    A.  Yes.
7    Q.  Did she progress as you expected?
8    A.  Yes, she did very well.
9    Q.  And then you performed the arthroscopy
10 and Brostrom-Gould lateral reconstruction on
11 Kinsley's left ankle on May 13th, 2022;
12 correct?
13    A.  Yes.
14    Q.  I'll hand you what I'm marking as
15 Plaintiff's Exhibit 9.
16       (Plaintiff's Exhibit 9 was marked and
17 attached.)
18    Q.  (BY MR. WHITTEN) Does this appear to be
19 the operative report from that surgery?
20    A.  Yes.
21    Q.  And did you perform this second surgery
22 in a similar manner to how you performed the
23 first surgery?

1    A.  Yes.
2    Q.  Was there anything materially different
3 about the surgery that you remember?
4    A.  No.
5    Q.  You used the same tools to drill into
6 her bone and you implanted the same hardware?
7    A.  Correct.
8    Q.  Doctor, did you or anyone else video
9 either of the surgeries you performed on
10 Kinsley?
11    A.  Video, no.  I do take still pictures
12 routinely done during an arthroscopy.
13    Q.  And are those the scope photos that are
14 attached to those that are attached to those
15 exhibits that we looked at?
16    A.  Correct.
17    Q.  Doctor, I would like to show you a
18 video now that I have pulled up on my laptop.
19 It's a video from YouTube entitled
20 Brostrom-Gould Ankle Reconstruction - Dr.
21 Weatherby.
22       I'm going to mark the video Plaintiff's
23 Exhibit 10 to this deposition.

1       (Plaintiff's Exhibit 10 was marked and
2 retained by plaintiff's counsel.)
3    Q.  (BY MR. WHITTEN) I'll represent the
4 video -- it's published by SHCC Video.  It's
5 twelve minutes and three seconds long.  I'm
6 going to start the video thirty seconds in
7 and increase the playback speed to one and a
8 half out of respect for your time.
9       I'm going to play it for you now.  If
10 you could watch and then I'll ask you a few
11 questions about it and how it related to the
12 surgery you performed on Kinsley.
13       MR. HAZELTON:  And just for the record,
14 we will object to the use of this video or
15 any line of questioning that has anything to
16 do with this particular video.
17       (Playing video.)
18    A.  That's not the same incision I would
19 use.
20    Q.  (BY MR. WHITTEN) All right.  Doctor,
21 I'm going to pause the video here.  It ended
22 a few seconds earlier.
23       And, Doctor, as you watched that video,

1 was there anything important that you noticed
2 the surgeon do or not do in the video that
3 you did differently in Kinsley's surgery?
4       MR. HAZELTON:  Object to the form.
5    A.  I use a mini approach, I don't use a
6 large incision that they utilized.
7    Q.  (BY MR. WHITTEN) I think you mentioned
8 that early on in the video that you would
9 have used a different type of incision
10 starting out?
11    A.  Yes.
12    Q.  Okay.  Is that only important or
13 material difference you noticed?
14    A.  I used a suture anchor, they used a
15 primary repair of the soft tissues.
16    Q.  Can you explain the difference for us?
17    A.  We talked about putting the suture
18 anchor in to reattach the tissues.  In this
19 case, they just cut the tissues and sewed
20 them back together without a suture anchor.
21    Q.  So there was not a suture anchor
22 involved in the video we just watched?
23    A.  Correct.

9 (Pages 30 - 33)

Page 34

1   Q.  Okay.  And in Kinsley's surgery, you
2  did install a suture anchor?
3   A.  Correct.
4   Q.  And in this video, it only depicts the
5  ligament repair aspect of the surgery.  You
6  also performed arthroscopies on Kinsley; is
7  that correct?
8   A.  Correct.
9   Q.  Other than the suture anchors you just
10  mentioned, did you use the same type of
11  sutures in Kinsley's surgery that the surgeon
12  used in this video?
13   A.  No.
14   Q.  How are they different?
15   A.  Different brands, different tensile
16  strength.
17   Q.  Are they installed differently?
18   A.  No.
19   Q.  So would it be fair to say that the
20  installation of the sutures that you did in
21  Kinsley's ankles were accurately depicted in
22  this video?
23   A.  No.

Page 35

1   Q.  How would it be different?
2   A.  They put in five, I put in two.
3   Q.  Okay.  But other than the number of
4  sutures, were they installed the same way,
5  the same --
6   A.  Into the same issues, yes.
7   Q.  All right.  In your opinion, does this
8  video fairly illustrate the ligament repair
9  surgeries you performed on Kinsley?
10   A.  No.
11     MR. HAZELTON:  Object to the form.
12   Q.  (BY MR. WHITTEN) And it's because of
13  the differences that we just discussed?
14   A.  Correct.
15   Q.  Are you aware if there are any videos,
16  training videos or otherwise, available
17  videos that would depict the type of surgery
18  and how you performed it on Kinsley?
19   A.  I don't know.
20   Q.  Okay.  And going back to the operative
21  report for Kinsley's second surgery, when you
22  had her ankle opened up, you observed a
23  complete tear of the anterior talofibular

Page 36

1  ligament in that ankle as well; correct?
2   A.  Correct.
3   Q.  So is it correct that Kinsley had
4  complete anterior talofibular ligament tears
5  in both of her ankles prior to the surgeries
6  you performed?
7   A.  Correct.
8   Q.  Were Kinsley's presurgery complaints of
9  pain, swelling and soreness consistent with
10  what you would expect from someone that's
11  trying to live an active life with two torn
12  anterior talofibular ligaments?
13     MR. HAZELTON:  Object to the form.
14   A.  Yes.
15   Q.  (BY MR. WHITTEN) Is it possible to run,
16  exercise, and play sports comfortably with
17  two torn ligaments like this?
18     MR. HAZELTON:  Same objection.
19   A.  Some patients can do that, yes.
20   Q.  (BY MR. WHITTEN) Okay.  Is that common?
21   A.  I would have to assume so, yes.
22   Q.  Okay.  In your opinion, what would have
23  happened if Kinsley had not undergone these

Page 37

1  corrective surgeries on her ankles?
2     MR. HAZELTON:  Object to the form.
3   A.  Her symptoms would have continued.
4   Q.  (BY MR. WHITTEN) After the second
5  surgery, would you have again prescribed
6  Kinsley medication to treat her pain?
7   A.  Yes.
8   Q.  And you saw Kinsley several more times
9  following that second surgery; correct?
10   A.  Yes.
11   Q.  Did she progress as expected?
12   A.  Yes, did very well with the second one
13  as well.
14   Q.  Was she, again, required to be in a
15  hard cast for another six weeks?
16   A.  Yes.
17   Q.  Did you, again, refer Kinsley to
18  physical therapy after she got her cast off?
19   A.  Yes.
20     (Plaintiff's Exhibit 11 was marked and
21  attached.)
22   Q.  (BY MR. WHITTEN) I'm going to hand you
23  what I've marked as Plaintiff's Exhibit 11.

Page 38

1  And, Doctor, does this appear to be the
2  progress note from your examination of
3  Kinsley on July 18th, 2022?
4     A.  Yes.
5     Q.  It appears from this document that you
6  released Kinsley to full activities without
7  restriction and will see her back as needed;
8  is that correct?
9     A.  Yes.
10    Q.  Does that mean she would come back to
11 if she needs you with respect to her ankle
12 injuries?
13    A.  Yes.
14    Q.  Doctor, did you encounter any
15 difficulties or problems in your treatment
16 due to any lack of cooperation from Kinsley?
17    A.  No.
18    Q.  Did you find Kinsley to be cooperative
19 and did she do everything that you instructed
20 her to do?
21    A.  Yes.  She was an excellent patient.
22    Q.  Do you have any reason to believe that
23 Kinsley's complaints and history she provided

Page 39

1  to you and other her medical providers were
2  not truthful or accurate?
3     A.  No.
4     Q.  In your treatment, did you see anything
5  to indicate that Kinsley ever had leg or
6  ankle problems prior to her falling from a
7  climbing wall on August 2nd, 2019?
8     A.  I can't answer that, I don't know.
9     Q.  Was there anything in the records or
10 her treatment -- your treatment of her
11 personally that would indicate that?
12    A.  No.
13    Q.  And, Doctor, within a reasonable degree
14 of medical probability based on your
15 treatment of Kinsley, your knowledge of her
16 condition and your knowledge of her history,
17 do you have an opinion as to the cause of the
18 complete tears of the anterior talofibular
19 ligaments in her ankles for which you treated
20 her?
21        MR. HAZELTON:  Object to the form.
22    A.  It would be consistent with a severe
23 ankle injury which she suffered with the

Page 40

1  Salter-Harris II fractures of the tibia.
2     Q.  So is it your opinion as a medical
3  doctor that Kinsley's fall from the climbing
4  wall probably caused her torn ligaments?
5        MR. HAZELTON:  Object to the form.
6     A.  Yes.
7     Q.  (BY MR. WHITTEN) And did those injuries
8  cause Kinsley to require the two surgeries
9  that you performed?
10    A.  Yes.
11    Q.  Are there any likely residual effects
12 of her injuries and surgical treatment?
13    A.  No.
14    Q.  Okay.  Are you aware if she has any
15 current impairments due to these injuries?
16    A.  No.
17    Q.  It's been just over a year since her
18 first surgery.  Has she reached maximum
19 medical improvement at this time?
20    A.  Maximum medical improvement is
21 typically used for workmen's comp patients.
22 She is not a workmen's comp patient.
23    Q.  Are you aware if she has any ongoing

Page 41

1  issues?
2     A.  I'm not aware of any, no.
3     Q.  What are the most common complications
4  for people who undergo the kind of surgery
5  that Kinsley had long-term?
6     A.  They can re-injure the ankle.  The
7  repair made the ankle as strong as it was
8  before, but it doesn't prevent them from
9  having another injury.  Some people will have
10 pain of the suture knots, that's about it.
11    Q.  Do these types of operations --
12 injuries or operations increase the
13 likelihood that Kinsley might experience
14 arthritis in the future in her ankles?
15        MR. HAZELTON:  Object to the form.
16    A.  Typically, no.  You're decreasing the
17 risk of arthritis in the future.
18    Q.  (BY MR. WHITTEN) Do you have an
19 estimate of the average age of the patients
20 that you've performed the surgery on over the
21 years?
22    A.  Teenagers, young adults.
23    Q.  Is it possible or probable that Kinsley

11 (Pages 38 - 41)

1 will require additional surgery in the future
2 because of these injuries?
3      MR. HAZELTON:  Object to the form.
4    A.  Highly unlikely.
5    Q.  (BY MR. WHITTEN) Can injuries or
6 operations like Kinsley had accelerate
7 degenerative diseases of the bones and joints
8 in the ankles?
9      MR. HAZELTON:  Object to the form.
10    A.  Any time that you have a fracture that
11 goes into a joint, you are at risk for
12 increased arthritis in the future.
13    Q.  (BY MR. WHITTEN) In your treatment of
14 Kinsley generally, do you expect her to have
15 any problems with her ankles at some point in
16 her life due to these fractures or ligament
17 tears?
18    A.  No.
19    Q.  Doctor, did you and your office charge
20 for the medical services you rendered Kinsley
21 from the date you first saw her until your
22 final examination of her?
23    A.  Yes.

1    Q.  I'll hand you what I'm marking as
2 Plaintiff's Exhibit 12.
3      (Plaintiff's Exhibit 12 was marked and
4 attached.)
5    Q.  (BY MR. WHITTEN) Does this appear to be
6 a copy of your office's billing records
7 related to your treatment of Kinsley?
8      MR. HAZELTON:  The page numbers are a
9 little out of whack here.
10      Is this two separate --
11      MR. WHITTEN:  Yes, we had to request
12 these.
13      MR. HAZELTON:  We've 1 through 15 and
14 another one, too?
15      MR. WHITTEN:  Correct.  They are out of
16 order I think chronologically to some degree
17 due to the nature of us having to request
18 them a few times.
19      This should be all of them put
20 together.
21    A.  Yes.
22    Q.  (BY MR. WHITTEN)  Do the records there
23 in that exhibit for the time period indicated

1 appear complete and accurate?
2    A.  From what I can tell, yes.
3    Q.  Are the original of those records kept
4 in the usual and ordinary course of business
5 here at Southlake Orthopedics?
6    A.  Yes.
7    Q.  And would all of your charges for that
8 time period be reflected in these records?
9    A.  Yes.
10    Q.  Were the services associated with these
11 charges medically necessary?
12    A.  Yes.
13    Q.  Were all of your charges for her care
14 reasonable?
15    A.  Yes.
16    Q.  And you performed both of Kinsley's
17 surgeries at Medplex Outpatient Surgery
18 Center; correct?
19    A.  Correct.
20    Q.  I'm going to hand you what I'm marking
21 as Plaintiff's Exhibit 13, and these are the
22 billing records for Kinsley's surgeries at
23 Medplex during your care and treatment of

1 her.
2      (Plaintiff's Exhibit 13 was marked and
3 attached.)
4    Q.  (BY MR. WHITTEN) Were the services
5 associated with those charges medically
6 necessary?
7    A.  Yes.
8    Q.  Do those charges appear reasonable to
9 you?
10    A.  Yes.
11    Q.  And, Doctor, I'll mark Plaintiff's
12 Exhibit 14.
13      (Plaintiff's Exhibit 14 was marked and
14 attached.)
15    Q.  (BY MR. WHITTEN) I'll represent these
16 are the billing records from Kinsley's
17 physical therapy treatment after she fell at
18 the rock climbing gym.  Were these services
19 associated with those charges medically
20 necessary?
21    A.  Yes.
22    Q.  Do those charges appear reasonable to
23 you?

Page 46

1  A.  Yes.
2      (Plaintiff's Exhibit 15 was marked and
3  attached.)
4  Q.  (BY MR. WHITTEN) I'm handing you what I
5  have marked as Plaintiff's Exhibit 15, and
6  I'll represent these are the billing records
7  associated with Kinsley's treatment at UAB
8  West emergency department after the fall.
9      Were the services associated with those
10  charges medically necessary?
11  A.  Yes.
12  Q.  Do the charges in this document appear
13  reasonable to you?
14  A.  Yes.
15  Q.  I'm handing you what I'm marking as
16  Plaintiff's Exhibit 16, and I'll represent
17  that these are the billing records from
18  Kinsley's treatment by Dr. Patterson at
19  Precision Sports Medicine and Orthopedics
20  after her fall.
21      (Plaintiff's Exhibit 16 was marked and
22  attached.)
23  Q.  (BY MR. WHITTEN) Do the services

Page 47

1  associated with those charges appear to be
2  medically necessary?
3  A.  Yes.
4  Q.  And do those charges appear reasonable
5  to you?
6  A.  Yes.
7  Q.  Doctor, I just have one more exhibit to
8  show you, I'll mark it as Plaintiff's Exhibit
9  17.
10      (Plaintiff's Exhibit 17 was marked and
11  attached.)
12  Q.  (BY MR. WHITTEN) I'll represent these
13  are the billing records for Kinsley's medical
14  equipment that she received from Medirest,
15  Incorporated that she was prescribed after
16  her fall.
17      Do the services associated with those
18  charges appear medically necessary?
19  A.  Yes.
20  Q.  Do the charges appear reasonable to
21  you?
22  A.  Yes.
23  Q.  Doctor, thank you so much for your

Page 48

1  time.  Those are all the questions I have
2  prepared for you.
3
4  EXAMINATION BY MR. HAZELTON:
5  Q.  Dr. Krauss, I just have a couple of
6  questions for you.
7      When you first had occasion to see
8  Kinsley, did she describe for you exactly
9  what happened in this fall where she injured
10  her ankles?
11  A.  In my history, I put that she fell
12  twenty-five off of a rock climbing wall.
13  Q.  Is it fair to say that since that is
14  what is in your history that is everything
15  that you were told about sort of how the
16  injury happened --
17  A.  Yes.
18  Q.  -- because your primary concern is not
19  necessarily, you know, what happened versus
20  you just want to treat the patient; is that
21  fair?
22  A.  No.  It's important to talk about
23  mechanism of injury in a history to make sure

Page 49

1  that is consistent with what you are
2  treating.
3  Q.  But in terms of the ultimate cause, who
4  may or may have been at fault for something,
5  you don't concern yourself with that?
6  A.  That's completely irrelevant.
7  Q.  You're not here expressing an opinion
8  on that at all?
9  A.  Correct.
10  Q.  And I noticed when you saw Ms.
11  Kornegay, Kinsley, when she came and saw you,
12  she had the right ankle surgery.  Would it be
13  fair to say that that was a successful
14  surgery?
15      MR. WHITTEN:  Object to form.
16  A.  Yes.
17  Q.  (BY MR. HAZELTON) In fact, I think in
18  one of your follow-up notes she was three
19  weeks status post-procedure, she reported one
20  out of ten pain, and you thought she was
21  doing extremely well?
22  A.  Correct.
23  Q.  And then after the left ankle surgery

13 (Pages 46 - 49)

Page 50

1  in May of that year, after she got her cast
2  off, she came in and saw you, I believe it
3  was in June.  It says patient states her pain
4  is a zero out of ten on a pain scale.
5       So would it be far to say as of June,
6  about a month after the left ankle surgery,
7  in your mind she was progressing well and
8  everything was going according to plan?
9    A.  Yes.
10   Q.  And then the last time you saw her a
11 month later in July, you released her to full
12 activity.  You said if anything acts up or if
13 anything starts giving you any issues, give
14 me a call; right?
15   A.  Correct.
16   Q.  Did she ever call you or her family
17 ever call you after that last visit in July?
18   A.  No.
19   Q.  Thanks, Dr. Krauss.  That's all I have
20 got.
21       MR. WHITTEN:  That's all I've got.
22       VIDEOGRAPHER:  We're going off the
23 record at 10:59 a.m. and this concludes the

Page 51

1  deposition.
2
3       FURTHER DEPONENT SAITH NOT
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 52

1       C E R T I F I C A T E
2
3       I, SUSAN MASTERS GOLDMAN, Alabama
4  Certified Court Reporter, License Number 83,
5  and Notary Public, hereby certify that the
6  above and foregoing deposition was taken down
7  by me on Computerized Stenotype, and the
8  questions and answers thereto were
9  transcribed by me, and that the foregoing
10 represents a true and correct transcript of
11 the deposition given by said witness upon
12 said hearing.
13      I further certify that I am neither
14 attorney or counsel for, nor related to or
15 employed by any of the parties to the action
16 in which this deposition is taken.
17
18
19      _Susan Masters Goldman_
20      CCR #83, Expires 09/30/23
21      Commissioner for the
22      State of Alabama at Large
23      My Commission Expires:  08/30/26

14 (Pages 50 - 52)

**&**

**&**   3:9,11,13 4:8
   4:9,14

**0**

**00505**   1:8 6:1
**08/30/26**   52:23
**09/30/23**   52:20

**1**

**1**   3:7 5:15 7:14
   7:15 43:13
**10**   3:16 31:23
   32:1
**10:07**   2:1 5:9,14
**10:59**   50:23
**11**   3:17 37:20,23
**1100**   4:10
**12**   3:8,18 43:2,3
**13**   3:19 44:21
   45:2
**13th**   30:11
**14**   3:20 45:12,13
**14th**   10:1 19:22
   20:17 23:10
**15**   3:9,21 43:13
   46:2,5
**16**   3:22 46:16,21
**17**   3:23 47:9,10
**17th**   18:10
**1800**   4:16
**18338**   52:19
**18th**   17:15 20:2
   38:3
**19**   3:10

**1997**   9:4
**1st**   17:19 19:23

**2**

**2**   3:8 12:10,11
   15:1
**20**   3:11
**2001**   4:10
**2006**   9:16
**2019**   10:22
   12:16 15:15
   17:16 39:7
**2020**   17:19
   18:10,10
**2021**   10:1 15:15
   18:13,17 19:22
   19:22 20:6,17
**2022**   20:1 23:10
   30:11 38:3
**2023**   1:14 2:1
   5:9,15
**20th**   4:16
**21**   20:3,4
**21st**   19:22
**22**   20:2
**23**   3:12
**26**   3:13
**29**   3:14
**2:21**   1:8 6:1
**2nd**   12:16 39:7

**3**

**3**   3:9 15:9,10
**30**   3:15
**32**   3:16

**35203**   4:11,17
**35243**   1:23 5:8
**3686**   1:22 5:7
   6:2
**37**   3:17
**3rd**   18:13

**4**

**4**   3:10 19:10,11
**43**   3:18
**45**   3:19,20
**4517**   7:5
**46**   3:21,22
**47**   3:23
**49**   3:4

**5**

**5**   3:11 20:19,23
**505**   4:16
**5th**   15:14

**6**

**6**   1:14 3:12
   23:12,15
**6th**   1:23 5:8,15
   18:9

**7**

**7**   3:3,7,13 26:2,3
   26:6

**8**

**8**   3:14 17:12
   29:5,9
**83**   1:21 4:4 5:3
   52:4,20
**8th**   15:15 18:17

**9**

**9**   3:15 30:15,16

**a**

**a.m.**   2:1 5:9,14
   50:23
**above**   5:10 52:6
**accelerate**   42:6
**accurate**   20:9
   26:6,19 39:2
   44:1
**accurately**
   26:14 29:12
   34:21
**acting**   5:3
**action**   52:15
**active**   36:11
**activities**   38:6
**activity**   17:15
   50:12
**acts**   50:12
**actually**   10:10
   25:14
**additional**
   14:20 42:1
**address**   7:4
**admitting**   9:9
**adults**   41:22
**affect**   27:13
**affiliations**   6:10
**affix**   24:12
**age**   41:19
**agreed**   1:16 2:2
   2:9,18
**aid**   11:6

**al** 5:21
**alabama** 1:2,20
  1:23 4:3,11,17
  5:1,8,23 6:3 7:6
  7:21 52:3,22
**anchor** 24:10,10
  24:12 25:1
  33:14,18,20,21
  34:2
**anchoring**
  24:22
**anchors** 34:9
**ankle** 3:13 8:4,5
  8:13 10:9 11:1
  11:16,19,19,22
  17:12 19:6
  21:12,20 22:1,3
  22:8,17,23 23:9
  23:21,23 24:2,5
  25:2,22 26:7,16
  26:23 27:3,7,9,9
  27:15,19,23
  28:2,6,10 29:6
  29:13 30:11
  31:20 35:22
  36:1 38:11 39:6
  39:23 41:6,7
  49:12,23 50:6
**ankles** 10:10,23
  13:23 14:10
  18:19 21:6,18
  22:12 34:21
  36:5 37:1 39:19
  41:14 42:8,15
  48:10

**answer** 39:8
**answers** 52:8
**anterior** 11:18
  17:21 25:21
  26:10,15,21
  27:1,6 35:23
  36:4,12 39:18
**apologize** 20:5
**appear** 12:13
  15:12 19:17,21
  20:9,23 23:16
  26:19 30:18
  38:1 43:5 44:1
  45:8,22 46:12
  47:1,4,18,20
**appearance** 6:9
**appearances** 4:1
**appearing** 4:6
  4:12
**appears** 38:5
**approach** 33:5
**appropriate**
  14:5
**areas** 29:12
**arrow** 26:13
**arthritis** 41:14
  41:17 42:12
**arthroscope**
  24:1
**arthroscopies**
  34:6
**arthroscopy**
  22:17 23:7 30:9
  31:12

**aspect** 34:5
**assessed** 21:19
**assessment**
  21:22 22:11
**assign** 2:14
**associated** 9:6
  13:21 44:10
  45:5,19 46:7,9
  47:1,17
**assume** 36:21
**attached** 7:16
  12:12 15:11
  19:12 20:20
  23:13 26:4
  29:10 30:17
  31:14,14 37:21
  43:4 45:3,14
  46:3,22 47:11
**attend** 30:1
**attended** 18:8
**attorney** 52:14
**august** 12:16
  39:7
**austin** 4:7 6:11
**available** 10:12
  10:13 35:16
**average** 41:19
**aware** 18:8,12
  35:15 40:14,23
  41:2

                **b**

**b** 5:16
**back** 33:20
  35:20 38:7,10

**backwards**
  27:10
**based** 16:11
  21:22 39:14
**basically** 8:8
**began** 13:5
  21:12
**beginning** 22:13
**behalf** 4:6,12
  6:15
**believe** 22:20
  38:22 50:2
**best** 13:20
**bilateral** 11:1,1
  16:3,15,22
  21:20 22:1
**billing** 3:18,19
  3:20,21,22,23
  43:6 44:22
  45:16 46:6,17
  47:13
**birmingham** 1:9
  1:23 4:11,17 5:8
  5:21 6:3,15 7:6
**bit** 24:16
**board** 8:15,17
  8:20,23 9:2
**bone** 24:11,15
  24:22 31:6
**bones** 42:7
**boots** 17:8
**bottom** 27:9
**braces** 17:12
**bracing** 23:6

**bradley**  4:9
**brands**  34:15
**break**  25:4
**breaks**  11:2
**broken**  13:23
**brookwood**  9:7
**brostram**  22:18
**brostrom**  23:8
  30:10 31:20
**brought**  7:8
**building**  10:5
**business**  20:12
  44:4

                    **c**

**c**  52:1,1
**call**  50:14,16,17
**capsule**  27:3
**care**  11:6 44:13
  44:23
**case**  5:23 24:21
  33:19
**cast**  11:4 17:5
  29:2,7,17,22
  37:15,18 50:1
**cause**  5:11
  16:14,19 27:17
  39:17 40:8 49:3
**caused**  16:22
  40:4
**ccr**  52:20
**center**  4:15 9:7
  9:8 44:18
**centimeter**  24:4
**certified**  1:20
  4:3 5:2 8:15,17

8:21,23 9:2 52:4
**certify**  5:3 52:5
  52:13
**charge**  42:19
**charges**  44:7,11
  44:13 45:5,8,19
  45:22 46:10,12
  47:1,4,18,20
**children**  13:18
**christian**  4:14
**chronic**  28:10
**chronologically**
  43:16
**civil**  5:5
**clark**  4:19 6:12
**cleaned**  24:3
**clear**  17:14
**climbing**  1:10
  13:6 16:8,22
  21:13 39:7 40:3
  45:18 48:12
**close**  24:5
**come**  25:13
  38:10
**comfortably**
  36:16
**coming**  26:13
**commission**
  52:23
**commissioner**
  2:20 52:21
**common**  36:20
  41:3
**community**
  15:22

**comp**  40:21,22
**complaining**
  28:6
**complaints**
  17:20 18:17
  36:8 38:23
**complete**  7:22
  8:1 20:9 25:20
  35:23 36:4
  39:18 44:1
**completely**  49:6
**compliance**  2:6
**complications**
  41:3
**complies**  19:15
**computerized**
  52:7
**concern**  48:18
  49:5
**concludes**  50:23
**condition**  16:12
  39:16
**conduct**  21:15
**confirm**  16:2
**confirmed**  23:2
**connection**  9:19
**conservative**
  23:1,3
**considered**
  15:20
**consistent**  28:9
  36:9 39:22 49:1
**context**  24:19
**continued**  37:3

**continuing**
  17:20 18:18
**cooperation**
  38:16
**cooperative**
  38:18
**copy**  12:14
  15:13 19:18
  20:23 43:6
**correct**  13:10,11
  20:17 21:9,20
  21:21 22:13,14
  23:4,5,10,11
  25:22,23 26:11
  26:12 30:5,12
  31:7,16 33:23
  34:3,7,8 35:14
  36:1,2,3,7 37:9
  38:8 43:15
  44:18,19 49:9
  49:22 50:15
  52:10
**corrective**  37:1
**counsel**  1:18
  2:11,13 5:6,17
  6:8 32:2 52:14
**couple**  25:8 48:5
**course**  20:12
  44:4
**court**  1:1,20 2:7
  4:4 5:2,22 6:5
  52:4
**crutches**  17:9
**cts**  13:9

**current** 7:11
40:15
**cut** 33:19
**cv** 1:8 3:7 6:1
7:10,11

**d**

**date** 5:4 42:21
**day** 2:1 5:9 13:5
28:18
**deal** 8:7
**debridement**
23:8
**december** 10:1
15:15 18:17
19:22 20:17
**decreasing**
41:16
**defendant** 4:12
**defendants** 1:11
**definition** 22:4
**degenerative**
42:7
**degree** 16:10
39:13 43:16
**department**
46:8
**department's**
12:14
**depict** 29:12
35:17
**depicted** 34:21
**depiction** 3:13
26:7
**depicts** 34:4

**deponent** 51:3
**deposition** 1:13
1:18 2:4,5,8,16
2:19 5:16 6:2
7:14 31:23 51:1
52:6,11,16
**describe** 10:17
11:12 48:8
**diagnosed** 10:23
14:16
**diagnosis** 13:12
16:3
**difference** 33:13
33:16
**differences**
35:13
**different** 31:2
33:9 34:14,15
34:15 35:1
**differently** 33:3
34:17
**difficulties**
38:15
**direction** 11:8
**discreet** 27:4
**discussed** 14:22
35:13
**diseases** 42:7
**district** 1:1,2
5:22,23
**division** 1:3
5:23
**doctor** 7:3,17
12:9 15:3,17
16:10,21 19:9

19:16 20:21
26:5 31:8,17
32:20,23 38:1
38:14 39:13
40:3 42:19
45:11 47:7,23
**document** 7:7,8
19:17 23:15
29:4 38:5 46:12
**documentation**
3:8 12:15
**doing** 49:21
**dr** 5:16 7:5 15:4
15:13,17 16:2,5
17:4,7,14,18,23
18:5,16,21 19:5
31:20 46:18
48:5 50:19
**drawer** 11:15
**drill** 24:11,14
24:16,16 31:5
**due** 38:16 40:15
42:16 43:17
**duly** 6:20
**dutton** 4:8

**e**

**e** 52:1,1
**earlier** 13:5
32:22
**early** 33:8
**effect** 2:5
**effects** 40:11
**eight** 18:9
**either** 31:9

**electrical** 24:16
**emergency**
12:14,19 13:12
14:10,14 46:8
**employed** 52:15
**encounter** 38:14
**ended** 32:21
**entitled** 31:19
**equipment**
47:14
**er** 3:8,21
**esq** 4:7,13
**essentially** 9:1
**estimate** 41:19
**et** 5:21
**evaluate** 11:16
**evidence** 2:16
**exactly** 48:8
**exam** 17:3 18:1
21:15
**examination** 3:2
5:11 7:2 11:12
12:2 16:1,6 18:3
20:16 21:2,23
38:2 42:22 48:4
**examine** 11:9
**examined** 21:17
**excellent** 38:21
**except** 2:12
**exceptionally**
25:6
**excess** 11:16
**exercise** 36:16
**exhibit** 3:6,7,8,9
3:10,11,12,13

3:14,15,16,17
3:18,19,20,21
3:22,23 7:14,15
12:10,11 14:23
15:9,10 19:10
19:11 20:19,22
23:12,15 26:2,3
26:6,18 29:5,9
30:15,16 31:23
32:1 37:20,23
43:2,3,23 44:21
45:2,12,13 46:2
46:5,16,21 47:7
47:8,10
**exhibits**  3:5
31:15
**expect**  36:10
42:14
**expected**  28:13
30:7 37:11
**experience**  22:9
41:13
**expires**  52:20,23
**explain**  22:1
23:19 33:16
**expressing**  49:7
**extremely**  49:21

**f**

**f**  52:1
**fact**  29:23 49:17
**fail**  25:5
**failed**  23:1,3
**fair**  28:1 34:19
48:13,21 49:13

**fairly**  35:8
**fall**  16:18,21
40:3 46:8,20
47:16 48:9
**falling**  39:6
**familiar**  15:17
**family**  50:16
**far**  27:10,10
50:5
**fault**  49:4
**february**  1:14
2:1 5:9,14 18:13
**federal**  5:4
**feel**  27:14
**feeling**  22:9
**feet**  10:23 13:6
**fell**  10:22 12:4
13:5 16:7 21:13
45:17 48:11
**fellowship**  8:1
8:14
**felt**  28:2
**fibula**  24:6
**field**  8:10 9:3
**fields**  8:17
**figure**  17:12
**filed**  5:21
**filing**  2:19
**final**  42:22
**financial**  4:15
**find**  38:18
**fine**  7:1
**firm**  6:6
**first**  6:20 9:22
10:1 24:18

25:19 28:18
29:7 30:5,23
40:18 42:21
48:7
**five**  10:22 13:6
16:18 35:2
48:12
**fixation**  24:21
**flip**  19:14
**floor**  10:6
**follow**  14:21
49:18
**following**  5:12
28:15 37:9
**follows**  6:21
**foot**  3:13 8:4,5
8:13 11:23 19:6
26:7
**force**  2:5
**forefoot**  11:23
**foregoing**  5:5
52:6,9
**form**  2:12 14:3
16:17 17:1 19:3
24:20,21,22
28:4 29:20 33:4
35:11 36:13
37:2 39:21 40:5
41:15 42:3,9
49:15
**forward**  27:10
**forwards**  27:11
**four**  13:19
**fourth**  10:6

**fracture**  16:19
42:10
**fractures**  11:1,2
13:14 16:3,7,15
16:23 40:1
42:16
**front**  23:22
**full**  2:6 38:6
50:11
**functional**
27:12
**further**  2:2,9,18
51:3 52:13
**fusion**  11:21
**future**  41:14,17
42:1,12

**g**

**generally**  26:6
42:14
**give**  50:13
**given**  52:11
**giving**  22:9
27:15 50:13
**go**  19:21
**goes**  42:11
**going**  5:14 12:9
15:8 31:22 32:6
32:9,21 35:20
37:22 44:20
50:8,22
**goldman**  1:20
4:3 5:1 6:6 52:3
**good**  5:13 7:3
**gould**  22:18
23:8 30:10

**[gould - joints]** Page 58

31:20
**grading** 13:17
**grandview** 1:22
  5:7 6:2 9:7 10:4
**grounds** 2:14
**group** 9:12,15
**growth** 13:18
**guardian** 1:6
  5:19
**guess** 24:18
  27:11
**gym** 13:6 45:18

### h

**half** 24:4 26:8
  32:8
**hand** 12:9 15:8
  23:14 30:14
  37:22 43:1
  44:20
**handing** 19:9
  20:21 26:1 29:4
  46:4,15
**happen** 25:7,8
  25:10
**happened** 36:23
  48:9,16,19
**happens** 25:12
  25:15
**hard** 29:2 37:15
**hardware** 24:7
  24:17,18,23
  25:4,13 31:6
**harris** 13:14,17
  40:1

**hazelton** 3:4
  4:13 6:14,14 7:1
  14:3 16:17 17:1
  19:3,23 20:3
  28:4 29:20
  32:13 33:4
  35:11 36:13,18
  37:2 39:21 40:5
  41:15 42:3,9
  43:8,13 48:4
  49:17
**head** 25:11,18
**heal** 22:7 27:22
**hearing** 52:12
**hellums** 4:8
**helps** 10:17
**high** 1:9,10 5:20
  6:15
**highly** 42:4
**histories** 11:5
**history** 3:11
  10:11,15,20
  13:1,4 16:5,13
  18:1 21:1,9,23
  28:10 38:23
  39:16 48:11,14
  48:23
**hold** 22:5
**hospitals** 9:5,10
**huh** 27:19
**human** 26:7
**hurt** 13:23
  27:15
**hurts** 27:21

### i

**identifying**
  26:14
**ii** 13:14,17 40:1
**illustrate** 35:8
**immobilization**
  29:22
**impairments**
  40:15
**implanted** 31:6
**important** 33:1
  33:12 48:22
**improvement**
  40:19,20
**inch** 24:4
**incision** 24:4
  32:18 33:6,9
**incisions** 23:22
  29:13
**including** 18:22
**incorporated**
  47:15
**increase** 32:7
  41:12
**increased** 42:12
**index** 3:1
**indicate** 18:15
  39:5,11
**indicated** 43:23
**initial** 12:1 16:1
  16:6 17:3 20:16
  21:2,15
**initially** 28:5
**injure** 41:6

**injured** 48:9
**injuries** 12:4
  13:22 14:19
  17:5 19:2 21:12
  38:12 40:7,12
  40:15 41:12
  42:2,5
**injuring** 10:23
**injury** 10:17,18
  14:15 18:2
  27:18 28:3
  39:23 41:9
  48:16,23
**instability** 21:20
  22:2,23
**install** 34:2
**installation**
  34:20
**installed** 34:17
  35:4
**instructed**
  38:19
**involved** 33:22
**irrelevant** 49:6
**issues** 10:19
  35:6 41:1 50:13

### j

**january** 23:9
**jeremy** 4:13
  6:14
**joint** 11:22 22:5
  24:2 27:9 42:11
**joints** 17:21
  42:7

**july**   19:22,23
   20:2,6 38:3
   50:11,17
**june**   18:10 50:3
   50:5
**jury**   23:20

### k

**keeps**   27:8
**kept**   20:11 44:3
**kin**   22:16
**kind**   41:4
**kinsley**   1:4 5:18
   6:12 9:19,22
   10:2,11,21 11:7
   11:9,13 12:2,18
   14:9,18 15:14
   16:1,12 17:14
   17:18 18:1,5,8
   18:12,15,22
   19:6,19 20:16
   21:2,9,16 22:21
   23:3 28:1,14,22
   29:1,16,23
   31:10 32:12
   34:6 35:9,18
   36:3,23 37:6,8
   37:17 38:3,6,16
   38:18 39:5,15
   40:8 41:5,13,23
   42:6,14,20 43:7
   48:8 49:11
**kinsley's**   12:3,7
   12:15 14:14
   15:4 16:21 19:2
   23:9,20 25:2,19

25:22 26:23
   28:8 29:6,12
   30:11 33:3 34:1
   34:11,21 35:21
   36:8 38:23 40:3
   44:16,22 45:16
   46:7,18 47:13
**knee**   8:8
**knots**   41:10
**know**   35:19
   39:8 48:19
**knowledge**
   16:12,13 39:15
   39:16
**knowledgeable**
   15:20
**kornegay**   1:4,6
   5:18,20 6:12
   9:19 49:11
**krauss**   1:13,19
   5:10,17 6:19 7:5
   48:5 50:19

### l

**label**   26:9,13
**labels**   26:18
**lack**   38:16
**laptop**   31:18
**large**   33:6 52:22
**lateral**   22:18
   23:8 26:8 30:10
**laws**   2:7
**laymen's**   10:15
   13:16 22:2
   23:19 27:5

**leading**   2:12
**learn**   10:20
**left**   11:16 30:11
   49:23 50:6
**leftover**   27:23
**leg**   11:23 17:5
   39:5
**legs**   14:10
**license**   1:21 4:4
   5:2 52:4
**licensed**   7:19
**life**   25:2 36:11
   42:16
**ligament**   11:18
   11:20 22:18
   24:6,8 25:21
   26:10,15,22,22
   27:2,4,6,13 28:9
   34:5 35:8 36:1,4
   42:16
**ligaments**   22:4
   22:5,6 36:12,17
   39:19 40:4
**likelihood**   41:13
**likely**   40:11
**line**   32:15
**little**   43:9
**live**   36:11
**llc**   1:9,10 5:21
**llp**   4:14
**location**   6:1
   26:14
**long**   9:2,14
   10:18 32:5 41:5

**looked**   19:16
   31:15
**loose**   27:15
**looseness**   27:23

### m

**m.d.**   1:13,19
   5:10 6:19
**made**   2:11
   10:12,13 23:22
   24:3 29:13 41:7
**make**   2:14
   48:23
**mann**   4:9
**manner**   30:22
**mark**   7:13
   31:22 45:11
   47:8
**marked**   7:15
   12:11 15:10
   19:11 20:19,22
   23:12,15 26:3
   29:9 30:16 32:1
   37:20,23 43:3
   45:2,13 46:2,5
   46:21 47:10
**marking**   12:10
   15:8 19:10 26:1
   29:4 30:14 43:1
   44:20 46:15
**masters**   1:19
   4:3 5:1 52:3
**material**   33:13
**materially**   31:2
**matter**   5:18

**matthew** 1:6
5:20
**maximum** 40:18
40:20
**mean** 8:20
13:16 19:23
20:6 24:19
38:10
**means** 8:22 11:2
11:2,3,21
**measures** 23:1,4
**mechanism**
48:23
**media** 5:15
**medical** 9:7,8,18
12:7 15:21
16:11,21 39:1
39:14 40:2,19
40:20 42:20
47:13
**medically** 14:15
19:1 29:19
44:11 45:5,19
46:10 47:2,18
**medication**
28:22 37:6
**medications**
14:6 28:19
**medicine** 8:6,11
15:5 46:19
**medirest** 3:23
47:14
**medplex** 44:17
44:23

**member** 9:12
**mentioned**
24:17,23 33:7
34:10
**met** 8:22
**metallic** 24:10
24:20
**michael** 15:4
**mid** 11:22
**mind** 50:7
**mini** 33:5
**minor** 1:4 5:18
**minute** 19:14
**minutes** 32:5
**month** 50:6,11
**morning** 5:13
7:3,9
**motion** 11:16
22:8
**mri** 18:6,13 19:1
**mris** 12:5 13:9

**n**

**nad** 1:8 6:1
**name** 6:4 7:4
**narcotics** 14:5
**nature** 43:17
**necessarily**
48:19
**necessary** 2:10
14:15 19:1
22:21 29:19
44:11 45:6,20
46:10 47:2,18
**needed** 38:7

**needs** 38:11
**neither** 52:13
**nephew** 24:9
**new** 18:2
**nodding** 25:11
25:18
**non** 11:3
**normal** 17:15
26:15
**normally** 11:14
**north** 4:10,16
**northern** 1:2
5:22
**notary** 1:21 4:5
5:3 52:5
**note** 13:4 16:6
17:23 38:2
**notes** 3:9,17
15:13 49:18
**notice** 2:19
**noticed** 33:1,13
49:10
**number** 1:21
4:4 5:2 35:3
52:4
**numbers** 43:8

**o**

**object** 14:3
16:17 17:1 19:3
28:4 29:20
32:14 33:4
35:11 36:13
37:2 39:21 40:5
41:15 42:3,9
49:15

**objection** 36:18
**objections** 2:11
2:14
**observed** 25:20
28:9 35:22
**obtain** 13:1
**obtained** 11:5
21:8
**obviously** 11:2
**occasion** 9:18
10:7 48:7
**occasionally**
25:7
**occurred** 10:18
**occurs** 25:12
**october** 15:14
17:15
**offered** 2:16
**office** 3:10 6:13
10:4 17:19
18:16 19:18
42:19
**office's** 43:6
**oh** 20:5
**okay** 8:6 9:22
11:5 12:1 24:23
28:19 33:12
34:1 35:3,20
36:20,22 40:14
**ongoing** 21:4,11
40:23
**opened** 35:22
**operably** 11:3
**operated** 26:22

**operations**
29:14 41:11,12
42:6
**operative**  3:12
3:15 23:16
30:19 35:20
**opinion**  14:13
16:14,20 18:21
19:7 35:7 36:22
39:17 40:2 49:7
**oral**  5:11
**order**  13:9 18:6
29:13 43:16
**ordered**  13:8
**ordering**  19:1
**ordinary**  20:12
44:4
**original**  44:3
**originals**  20:11
**orthopedic**  8:12
8:19 14:19
**orthopedics**
1:22 5:7 8:4
9:13 15:6 20:13
44:5 46:19
**orthopedist**
14:21
**outpatient**
44:17
**outside**  12:5
24:5 26:8
**own**  10:14
13:19

**p**

**page**  3:2 26:11
43:8
**pain**  10:9 13:21
14:6 17:20
18:18 21:5,12
27:17 28:10,15
28:17,19,22
36:9 37:6 41:10
49:20 50:3,4
**painful**  11:22
**parent**  1:5 5:19
**park**  4:10 16:8
**parkway**  1:23
5:8 6:2 7:6
**part**  23:23
**particular**
32:16
**parties**  1:17
2:13 52:15
**patient**  9:23
10:16 38:21
40:22 48:20
50:3
**patient's**  14:6
**patients**  28:14
28:20 36:19
40:21 41:19
**patterson**  15:5
15:18 16:2 17:4
17:7,14,23 18:5
19:5 46:18
**patterson's**
15:13 16:5
17:19 18:16,22

**pause**  32:21
**pc**  4:9
**pediatrics**  13:18
**peers**  8:23
**people**  22:8
29:21 41:4,9
**percent**  22:6
**perform**  29:14
30:21
**performed**  23:7
30:9,22 31:9
32:12 34:6 35:9
35:18 36:6 40:9
41:20 44:16
**period**  20:8 29:2
43:23 44:8
**person's**  27:7
**personally**
25:10 39:11
**peyton**  4:19
6:12
**photo**  3:14 29:6
29:11
**photos**  31:13
**physical**  3:11
18:6,9,23 21:1
21:23 23:6
29:16 30:1,1
37:18 45:17
**physically**  11:9
**physician**  14:18
15:13,21
**physician's**
12:15

**physicians**
12:21
**pictures**  31:11
**pittman**  4:8
**place**  4:10 17:4
20:17
**placed**  23:23
**plaintiff**  1:7 4:6
5:17
**plaintiff's**  3:6
7:14,15 12:10
12:11 14:23
15:9,10 19:10
19:11 20:19,22
23:12,15 26:2,3
26:5 29:5,9
30:15,16 31:22
32:1,2 37:20,23
43:2,3 44:21
45:2,11,13 46:2
46:5,16,21 47:8
47:10
**plan**  50:8
**plates**  13:19
**play**  32:9 36:16
**playback**  32:7
**playing**  32:17
**please**  6:17 7:3
**point**  1:9,10
5:20 6:15 23:4
42:15
**pointed**  11:8
**positive**  11:15
**possible**  36:15
41:23

post  49:19
postoperative
  28:17
practice  7:20
  9:12,17,20
practicing  8:10
precision  15:5
  46:19
prematurely
  25:5
preparation
  8:10
prepared  48:2
prescribe  14:5
prescribed
  28:20,22 37:5
  47:15
present  4:19 6:8
  21:4
presurgery  36:8
prevent  41:8
previous  16:2
previously
  20:15
primary  33:15
  48:18
prior  2:16 12:3
  36:5 39:6
privileges  9:9
probability
  16:11 39:14
probable  41:23
probably  16:22
  40:4

problems  38:15
  39:6 42:15
procedure  5:5
  22:15 28:15
  49:19
proceedings
  5:12
professionally
  15:18
progress  3:17
  30:7 37:11 38:2
progressing
  50:7
properly  22:7
provided  5:4
  38:23
providers  39:1
psm&o  3:22
pt  3:20
public  1:21 4:5
  5:3 52:5
published  32:4
pull  25:14
pulled  31:18
put  24:9 35:2,2
  43:19 48:11
putting  33:17

**q**

questioning
  32:15
questions  2:12
  2:13 32:11 48:1
  48:6 52:8

**r**

r  52:1
rarely  25:6
rays  13:9
reached  40:18
read  12:8
reading  2:3
really  27:1
reason  38:22
reasonable
  16:10 39:13
  44:14 45:8,22
  46:13 47:4,20
reattach  33:18
receive  8:9
received  12:18
  47:14
recommend
  22:16
recommended
  22:12,17
reconstruction
  22:19 23:9
  30:10 31:20
record  5:14
  6:10 32:13
  50:23
recorded  5:16
records  3:10,18
  3:19,20,21,22
  3:23 12:3,6 15:3
  18:15 19:18,21
  20:8,11 21:1
  39:9 43:6,22
  44:3,8,22 45:16

46:6,17 47:13
refer  18:5 19:6
  29:16 37:17
referenced  7:7
referred  14:18
referring  18:23
reflected  44:8
related  19:18
  32:11 43:7
  52:14
relating  2:7
released  38:6
  50:11
relieve  14:6
remember  31:3
removed  29:7
  29:17
render  9:18
rendered  42:20
renew  30:1
repair  22:12
  24:8 25:17
  33:15 34:5 35:8
  41:7
repaired  24:6
report  3:12,15
  21:11 23:16
  30:19 35:21
reported  49:19
reporter  1:20
  4:4 5:2 6:6,16
  6:22 52:4
represent  29:5
  32:3 45:15 46:6
  46:16 47:12

**[representing - stipulated]**

**representing** 6:4,12

**represents** 52:10

**request** 43:11 43:17

**require** 25:16 40:8 42:1

**required** 29:1 37:14

**requirements** 8:22

**residency** 7:22 8:12

**residual** 27:22 40:11

**respect** 32:8 38:11

**respected** 15:21

**respective** 1:17

**rest** 11:23 25:2

**restriction** 38:7

**retained** 3:16 32:2

**return** 17:15,18

**returned** 18:16

**review** 12:2

**reviewed** 12:6 15:3

**right** 11:8,17 22:13,17 23:20 25:22 26:11 32:20 35:7 49:12 50:14

**risk** 41:17 42:11

**rock** 12:4 13:6 16:8 21:13 45:18 48:12

**rocks** 10:22

**role** 27:5

**room** 6:9 12:19 13:13 14:11

**routinely** 31:12

**rules** 2:7 5:4

**run** 36:15

**s**

**s** 4:13

**saith** 51:3

**salter** 13:14,17 40:1

**saw** 10:1 11:10 28:7 30:4 37:8 42:21 49:10,11 50:2,10

**says** 14:23 50:3

**scale** 50:4

**scar** 24:3

**scope** 31:13

**second** 19:7 30:21 35:21 37:4,9,12

**seconds** 32:5,6 32:22

**see** 9:22 10:2 26:9 38:7 39:4 48:7

**seeing** 10:7

**seen** 25:8,10

**separate** 43:10

**services** 42:20 44:10 45:4,18 46:9,23 47:17

**sessions** 18:9

**several** 30:4 37:8

**severe** 14:1 22:3 27:19 28:2 39:22

**sewed** 33:19

**shaver** 24:2

**shcc** 32:4

**short** 17:5

**shortly** 29:6

**show** 31:17 47:8

**side** 22:13

**signature** 2:3 52:19

**significant** 27:17

**similar** 30:22

**sir** 7:12

**situation** 14:7

**six** 29:3,21 37:15

**sliding** 27:9

**small** 4:14 23:22 23:23 24:1,2

**smith** 24:9

**soft** 33:15

**soreness** 18:18 21:5 28:11 36:9

**sort** 48:15

**source** 12:5

**southern** 1:3 5:23

**southlake** 1:22 5:7 7:5 9:13 10:4 20:13 44:5

**special** 8:9

**specialist** 19:7

**specializing** 14:19

**specialty** 8:3,7

**speed** 32:7

**splints** 14:9

**sports** 15:5 36:16 46:19

**sprain** 11:20 22:3 27:20 28:2 28:6

**staff** 12:22 13:8 21:8

**standpoint** 27:12

**start** 32:6

**starting** 33:10

**starts** 50:13

**state** 6:9 7:4 52:22

**states** 1:1 5:22 7:19 50:3

**status** 49:19

**stay** 25:1 28:1

**stenotype** 52:7

**stiff** 29:21

**stipulated** 1:16 2:2,9,18

**stipulation**  1:15
**stipulations**  5:6
  6:22
**street**  4:16
**strength**  34:16
**strong**  41:7
**successful**  49:13
**suffered**  18:2
  39:23
**sufficient**  16:19
**suite**  4:10,16
**supposed**  25:1
**sure**  48:23
**surgeon**  33:2
  34:11
**surgeries**  22:20
  31:9 35:9 36:5
  37:1 40:8 44:17
  44:22
**surgery**  3:19 8:4
  8:5,12,19 11:4
  23:17,21 24:8
  24:19 25:16,19
  28:13,16 29:8
  30:5,19,21,23
  31:3 32:12 33:3
  34:1,5,11 35:17
  35:21 37:5,9
  40:18 41:4,20
  42:1 44:17
  49:12,14,23
  50:6
**surgical**  22:12
  22:15 40:12

**susan**  1:19 4:3
  5:1 6:6 52:3
**sustained**  16:7
**suture**  24:9,12
  25:1 33:14,17
  33:20,21 34:2,9
  41:10
**sutures**  24:22
  34:11,20 35:4
**swear**  6:17
**swelling**  11:21
  17:20 18:18
  21:5 27:16
  28:11 36:9
**sworn**  6:20
**symptoms**  13:5
  28:7 37:3
**system**  13:17

**t**

**t**  52:1,1
**take**  10:11
  19:13 31:11
**taken**  1:19 5:17
  52:6,16
**talk**  48:22
**talked**  27:14
  33:17
**talofibular**
  11:18 25:21
  26:10,15,21
  27:2,6 35:23
  36:4,12 39:18
**talus**  27:8
**tear**  22:4 25:20
  27:13 35:23

**tearing**  27:20
**tears**  28:9 36:4
  39:18 42:17
**ted**  6:4
**teenagers**  41:22
**telescope**  24:1
**tell**  44:2
**ten**  49:20 50:4
**tender**  11:17
**tensile**  34:15
**term**  41:5
**terms**  10:15
  13:16 22:2
  23:19 27:5 49:3
**test**  11:15,15
**testified**  6:20
  20:15
**thank**  47:23
**thanks**  50:19
**therapy**  18:6,9
  18:23 23:6
  29:17 30:1,2
  37:18 45:17
**thereto**  2:17
  52:8
**thickening**  27:3
**think**  9:4 12:8
  23:2 33:7 43:16
  49:17
**thirty**  22:6 32:6
**thought**  49:20
**three**  24:4 32:5
  49:18
**tibia**  40:1

**tibial**  16:3,6,15
  16:23
**tibias**  13:15
**tibiotalar**  17:21
**time**  2:15,15 6:8
  10:3,8 11:10,13
  13:2 19:2 20:8
  21:9 22:6 29:2
  30:2 32:8 40:19
  42:10 43:23
  44:8 48:1 50:10
**times**  25:9 30:4
  37:8 43:18
**tissue**  24:3
**tissues**  33:15,18
  33:19
**together**  22:5
  33:20 43:20
**told**  48:15
**took**  10:13
  20:16
**tools**  24:14 31:5
**top**  26:10
**torn**  36:11,17
  40:4
**towards**  26:10
**training**  8:9
  35:16
**transcribed**
  52:9
**transcript**  52:10
**transition**  17:8
  17:11
**trauma**  18:2

| | | | |
|---|---|---|---|
| **treat** 14:15 19:2 37:6 48:20 | **typical** 11:19 22:22 | **video** 3:16 5:16 31:8,11,18,19 | **whack** 43:9 |
| **treated** 11:3 12:21 14:9 16:16 39:19 | **typically** 13:21 25:14 28:19 40:21 41:16 | 31:22 32:4,4,6 32:14,16,17,21 32:23 33:2,8,22 | **whitten** 3:3 4:7 6:11,11,23 7:2 7:13,17 12:13 14:4 15:12 |

**treat** 14:15 19:2 37:6 48:20

**treated** 11:3 12:21 14:9 16:16 39:19

**treating** 49:2

**treatment** 3:9 9:18 11:6 12:3,7 12:16 14:14,20 15:4,14 16:11 17:5,7 18:22 19:19 22:23 38:15 39:4,10 39:10,15 40:12 42:13 43:7 44:23 45:17 46:7,18

**trial** 2:15

**true** 52:10

**trust** 22:10

**truthful** 39:2

**trying** 36:11

**twelve** 32:5

**twenty** 10:22 13:6 16:18 48:12

**two** 23:22 28:18 35:2 36:11,17 40:8 43:10

**type** 8:6 16:19 25:4 27:18 33:9 34:10 35:17

**types** 13:22 41:11

**typical** 11:19 22:22

**typically** 13:21 25:14 28:19 40:21 41:16

**u**

**uab** 3:21 12:7 12:16,18 14:14 46:7

**uh** 27:19

**ultimate** 49:3

**ultimately** 21:19

**undergo** 28:14 41:4

**undergone** 36:23

**underwent** 18:12

**unit** 5:15

**united** 1:1 5:21

**use** 24:7,14 32:14,19 33:5,5 34:10

**used** 31:5 33:9 33:14,14 34:12 40:21

**usual** 6:22 20:12 44:4

**usually** 27:4

**utilized** 33:6

**v**

**veritext** 6:5,7

**versus** 5:20 48:19

**video** 3:16 5:16 31:8,11,18,19 31:22 32:4,4,6 32:14,16,17,21 32:23 33:2,8,22 34:4,12,22 35:8

**videographer** 5:13 6:5,16 50:22

**videos** 35:15,16 35:17

**visit** 10:12 50:17

**vs** 1:8

**w**

**waived** 2:4,20

**walk** 21:17

**walking** 11:14 17:8

**wall** 12:4 16:22 39:7 40:4 48:12

**want** 48:20

**watch** 32:10

**watched** 21:17 32:23 33:22

**way** 35:4

**we've** 43:13

**weak** 22:9

**weatherby** 31:21

**weeks** 29:3,22 37:15 49:19

**west** 3:21 12:7 12:16,18 14:14 46:8

**whack** 43:9

**whitten** 3:3 4:7 6:11,11,23 7:2 7:13,17 12:13 14:4 15:12 16:20 17:3 19:5 19:13 20:5,21 23:14 26:5 28:8 29:11,23 30:18 32:3,20 33:7 35:12 36:15,20 37:4,22 40:7 41:18 42:5,13 43:5,11,15,22 45:4,15 46:4,23 47:12 49:15 50:21

**william** 1:13,18 5:10,16 6:19 7:5

**wind** 22:7

**witness** 2:4 5:10 6:17 19:15 25:11,18 52:11

**workmen's** 40:21,22

**worse** 11:17

**worst** 13:20

**x**

**x** 13:9

**y**

**year** 8:13 40:17 50:1

**years** 41:21

**[yost - zero]**                                      Page 66

**yost**   6:4
**young**   41:22
**youtube**   3:16
   31:19

**z**

**zero**   50:4

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

(F) Certification and filing by officer; exhibits;
copies; notice of filing.
(1) The officer shall certify on the deposition
that the witness was duly sworn by the officer and
that the deposition is a true record of the
testimony given by the witness. Unless otherwise
ordered by the court, the officer shall then
securely seal the deposition in an envelope
indorsed with the title of the action and marked
"Deposition of [here insert name of witness]" and
shall promptly file it with the court in which the
action is pending or send it by registered or
certified mail to the clerk thereof for filing.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.