

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **KINSLEY KORNEGAY, a minor, by and through her parent and guardian, MATTHEW KORNEGAY** ) ) ) | **CASE NO.: 2:21-cv-00505-NAD** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **HIGH POINT BIRMINGHAM, LLC and HIGH POINT CLIMBING LLC** ) ) ) | |
| ) | |
| **Defendants.** ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## HIGH POINT'S MOTION FOR SUMMARY JUDGMENT

---

Austin B. Whitten
Michael C. Bradley
PITTMAN, DUTTON, HELLUMS,
BRADLEY & MANN, P.C.
2001 Park Place North
Suite 1100
Birmingham, Alabama 35203
Tel: (205) 322-8880
Fax: (205) 328-2711

*Attorneys for Plaintiff*

i

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

I. INTRODUCTION ............................................................................1

II. ADDITIONAL MATERIAL FACTS ................................................2

III. STANDARD OF REVIEW .............................................................5

IV. ARGUMENTS ...............................................................................6

    A.  High Point's conduct towards Kinsley was negligent under the theories of both premises liability and general negligence. ................................6

      i.  High Point was negligent towards Kinsley under the premises liability doctrine ..........7

          a.  The unnecessary and distracting games built into High Point's "Kid Zone" climbing walls constitute an unreasonably dangerous condition on its premises ...............................................................7

          b.  The dangerous condition was not "open and obvious".......................................10

      ii. High Point was negligent under general negligence principles because its owners and employees affirmatively failed to take the actions necessary to prevent Kinsley from getting injured. .......................................................13

          a.  High Point negligently failed to implement reasonable safety equipment to prevent Kinsley from accessing its climbing wall while unclipped. .................14

          b.  High Point negligently failed to supervise Kinsley in violation of the auto-belay device manufacturer's own operator manual. ...................................16

          c.  High Point negligently failed to train or test Kinsley on her equipment usage or safety hazards. ...................................18

    B. High Point's conduct towards Kinsley was wanton under Alabama law .........................20

IV. CONCLUSION ............................................................................23

**<u>TABLE OF AUTHORITIES</u>**

**<u>Cases</u>**

*Alabama Power Co. v. Taylor*, 306 So. 2d 236 (Ala. 1975)……………………………….....…2
*Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306 (11th Cir. 2007)…………………….6
*Armstrong v. Georgia Marble Co.*, 575 So. 2d 1051 (Ala. 1991)…………………………....10
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………………………...…6
*City of Birmingham v. Whitfield*, 197 So. 666 (Ala. 1940)…………………………………..7, 9
*Collier v. Necaise*, 522 So.2d 275 (Ala. 1988)……………………………………………..…7
*DiBiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454 (Ala. 2008)…………………14
*Etheridge v. Belk, Inc.*, No. 2:21-CV-00413-NAD, 2023 WL 2026532
(N.D. Ala. Feb. 15, 2023)……………………………………………………………..……7, 10
*Hodges v. Wal-Mart Stores, Inc.*, No. 2:17-CV-00459-SGC, 2019 WL 3779903
(N.D. Ala. Aug. 12, 2019)…………………………………………………………………...…10
*Hutto v. Gold's Gym, Inc.*, 703 So.2d 974 (Ala. Civ. App. 1996)……………….....…………...6
*Jones Food Co. v. Shipman*, 981 So. 2d 355 (Ala. 2006)……………………………………7, 10
*J.T. ex rel. Thode v. Monster Mountain*, LLC, 754 F.Supp.2d 1323 (M.D. Ala. 2010)…………..2
*Kilcrease v. Harris*, 259 So.2d 797 (1972)……………………………………………………23
*Lands v. Ward*, 349 So. 3d 219 (Ala. 2021)…………………………………………………20
*Lilya v. Greater Gulf State Fair, Inc.*, 855 So.2d 1049 (Ala. 2003)…………………………...6
*McClurg v. Birmingham Realty Co.*, 300 So. 3d 1115 (Ala. 2020)…………………………10
*Powell v. Piggly Wiggly Ala. Distrib. Co.*, 60 So. 3d 921 (Ala. Civ. App. 2010)…………..……14
*Shelley v. White,* 782 F. Supp. 2d 1295 (M.D. Ala. 2010)……………………………….…….14
*Tillman by & through Tillman v. Starbucks Corp.*, No. 2:21-CV-682-GMB,
2021 WL 5280940 (N.D. Ala. 2021)…………………………………………… …..……....13
*Tolbert v. Gulsby*, 333 So.2d 129 (Ala. 1976)……………………………………………21, 23
*Tutor v. Sines*, No. 1210037, 2023 WL 2054060 (Ala. Feb. 17, 2023)………………….……20

**<u>Statute</u>**

Ala. Code § 6-11-20(b)(3) ...........................................................................................20

# I.    <u>INTRODUCTION</u>

Rock climbing can be an "inherently dangerous activity"—everyone agrees on that point. As such, businesses that build and maintain rock climbing walls in their facilities, then invite the public (the business's customers) to climb their walls, have duties to those customers to take reasonable precautions and install safety measures to <u>decrease</u> the risks of injury to their customers. High Point has done just the opposite. Instead, High Point has monetized this dangerous activity by creating a Chuck E. Cheese-like climbing facility—installing flashing lights, buttons, and race timers—and marketing it to children like Plaintiff Kinsley Kornegay ("Kinsley"), and their parents for birthday parties and other group events. In doing so, it has actually <u>increased</u> the risk of injury or death to the climbers who use its facilities.

The video footage clearly shows that Kinsley did not attach to the auto-belay device because she became distracted by a game installed on High Point's "lava wall" in the "Kid Zone."[1] High Point admitted that these types of games are designed and installed to keep kids like Kinsley (a twelve-year-old child at that time) "interested." The video then clearly shows that Kinsley was able to begin climbing the wall despite not being attached to auto-belay device, which was only possible due to High Point's inadequate safety gates.

Kinsley would not have suffered this horrifying fall that resulted in her catastrophic injuries but for (1) High Point's negligence in creating additional dangers (above and beyond the inherent dangers) for customers like Kinsley by installing arcade-like games and features that distract climbers from focusing on their safety, (2) High Point's failure to implement reasonable safety equipment (effective safety gates), (3) High Point's failure to supervise Kinsley while climbing, and (4) High Point's employee's failure to provide her with adequate training. The evidence

---

[1] The video footage of the fall is attached as Exhibit 1.

undoubtedly confirms that High Point failed to satisfy its duties and was negligent towards Kinsley under Alabama law. This is supported by the opinions and testimony of climbing wall safety expert Dan Hague as well.

High Point tries to paint Kinsley's 20-foot free fall as an unavoidable, tragic accident that just happens sometimes in the climbing gym world, but this is not an isolated incident for High Point. In the three years before Kinsley fell, High Point admitted at least <u>twelve</u> (12) other climbers suffered similar falls in its gyms that resulted in injuries. Incredibly, High Point admitted it did absolutely nothing to try to make its facilities safer in response to those incidents before Kinsley's fall, and that it has done nothing since Kinsley's fall to prevent additional, similar falls (of which there have been at least three at its Birmingham facility alone).

High Point's decisions to take <u>no</u> corrective action in response to so many of its climbers becoming injured is evidence that should be submitted to a jury to determine whether High Point's conduct amounts to reckless indifference for Kinsley's safety and, therefore, whether High Point's conduct was wanton and warrants the imposition of punitive damages.

## II.    ADDITIONAL MATERIAL FACTS

Kinsley disputes the relevance[2] and characterizations of most of the narrative "facts" in High Point's Motion, and adds the following as important, undisputed facts in this case:

---

[2] For example, High Point includes an entire section entitled "Liability Waiver," despite liability waivers for minors being void and unenforceable under Alabama law. *See J.T. ex rel. Thode v. Monster Mountain*, LLC, 754 F.Supp.2d 1323, 1328 (M.D. Ala. 2010) ("[U]nder Alabama law, a parent may not bind a child to a pre-injury waiver in favor of a for-profit activity sponsor by signing the liability waiver on the child's behalf."). Kinsley—the actual climber using the facilities—never even saw the waiver or the purported safety warnings and limitations it included, making it further irrelevant. To the extent High Point implies that Mr. Kornegay was somehow negligent in allowing Kinsley to use High Point's facilities, under Alabama law, any negligence which might be attributable to the parent cannot be imputed to the child. *See Alabama Power Co. v. Taylor*, 306 So. 2d 236, 250 (Ala. 1975) ("It is axiomatic that any negligence which may be attributable to the [parent] cannot be imputed to the child.").

1.      Kinsley had never been to High Point's facility before the day that she became injured.[3]

2.      As such, both the auto-belay device's manufacturer and the Climbing Wall Association, Inc. ("CWA") required High Point to provide her with in-depth, hands-on training on how to safely use the climbing equipment, as well as warning her about the many dangers associated with the use of the equipment. Then, High Point was required to perform a "proficiency test" that called for Kinsley to demonstrate her new knowledge.[4]

3.      Even though Kinsley was a twelve-year-old minor who had no prior experience with indoor climbing gyms, the <u>only</u> instruction High Point provided to her was two brief demonstrations of how to clip in and out of the auto-belay devices.[5]

4.      High Point did not train, instruct, or warn Kinsley of any of the dangers involved in using the auto-belay devices or indoor rock climbing in general.[6]

5.      High Point did not administer any proficiency tests to Kinsley.[7]

6.      After climbing for a few minutes, Kinsley decided to climb the "lava" (or "volcano") wall located in High Point's "Kid Zone."[8]

---

[3] *See* Doc. 33-7 at 29:6-13.
[4] *See* Doc. 33-3 at 144:19-145:6; Exhibit 2 (Perfect Descent Operations Manual) at 15 (Specifically, see Section 5.1 entitled USER INSTRUCTIONS); Exhibit 3 (Climbing Wall Association's Industry Practices) at 5 (Specifically, see Section 2.02).
[5] *See* Doc. 33-2 at 24:5-20; 30:2-18; 31:17-32:12.
[6] *Id.*
[7] *Id.*
[8] *See* Ex. 1; A representative photo of High Point's Kid Zone is attached as Exhibit 4.

7.      The lava wall is a 25-foot-tall artificial climbing wall that has a game built into it with multiple interactive buttons and flashing LED lights, and the climber's goal is to climb up the wall fast enough "to beat the volcano before it erupts."[9]

8.      The purpose of the game built into the lava wall is to keep children "interested," but High Point has admitted that they have the potential to distract children climbers from focusing on their safety.[10]

9.      High Point employees only supervise children climbing in the Kid Zone if their parents pay an extra fee.[11]

10.     As Kinsley approached the lava wall, she pressed the button to start her race against the volcano.[12] She then became distracted by the game, which caused her to begin climbing the wall without being attached to the auto-belay safety device.[13]

11.     Kinsley easily reached the bottom "holds" on the lava wall and accessed the climbing wall without even touching the "safety gate" (or "belay gate" or "banner")[14] that High Point fabricated and installed on the lava wall.[15]

---

[9] *See* Doc. 33-7 (Deposition Transcript of High Point employee H. Staubach) at 35:20-36:2. The lava wall is depicted on the very far-right side of Ex. 4 as well as in Ex. 1.

[10] *See* Doc. 33-1 at 102:15-23 ("Q. You don't think these race clocks could distract [climbers] from, you know, safety precautions while they're climbing? A. Potentially, but in order to be distracted enough, they would have to climb around the banner blocking the bottom of the wall.").

[11] *See* Doc. 33-1 at 26:18-21 ("Q. High Point is not going to provide any employees to help supervise the children? A. If they request them and want to pay for staff supervision, they can.").

[12] *See* Ex. 1; Doc. 33-7 at 36:3-5.

[13] *See* Doc. 33-2 at 36:3-5; Ex. 1 (Video evidence supporting Kinsley's testimony).

[14] High Point attached a photo of a safety gate as Exhibit 6 to its Motion (Doc. 33-6), but it should be clarified that the safety gate depicted in the photo is not one from any High Point facility. It is a safety gate from a climbing gym that Expert Hague previously owned. *See* Doc. 33-3 at 134:2-135:1.

[15] *See* Doc. 33-1 at 113:1-8 ("Q. Where do these banners come from? A. How do you mean? Q. Did they come with the device or -- A. No. Those are banners that we make and put at the base of the wall.").

12.     High Point's safety gate on the lava wall failed to prevent Kinsley from climbing up the wall without first attaching to the auto-belay lanyard.[16]

13.     The volcano game was successful at keeping Kinsley "interested," and she climbed the entire lava wall for more than a minute without noticing that she was not attached to anything.[17]

14.     Kinsley pressed the final button of the volcano game at the very top of the lava wall and then, still unaware that she was untethered, released[18] from the wall.[19]

15.     Kinsley free fell to the ground, where she landed feet-first.[20]

16.     Both of Kinsley's tibias were fractured on impact due to the fall.[21]

17.     Kinsley suffered ligament tears in both ankles that, after a year and a half of persistent pain and swelling, required two surgeries to repair.[22]

18.     Kinsley has missed out on years of playing sports with her friends and participating in other activities because of the injuries she sustained at High Point.[23]

19.     More than three and a half years later, she continues to have pain, limitations, and other problems with her ankles.[24]

## III.     STANDARD OF REVIEW

---

[16] *See* Doc. 33-1 at 51:22-52-16.

[17] *See* Ex. 1.

[18] High Point's Motion calls Kinsley's fall an "untethered jump" from the wall, but the Court will see from the video footage that that is a gross mischaracterization. Kinsley properly released from the wall (despite receiving no instruction from High Point's employees on how to do so).

[19] *See* Ex. 1.

[20] *Id*.

[21] *See* Exhibit 5 (Deposition Transcript of Dr. William Krauss) at 16:20-17:2.

[22] *Id*.

[23] *See* Doc. 33-2 at 73:16-23; Doc. 33-4 (Deposition Transcript of Matt Kornegay) at 38:17-23.

[24] *See* Doc. 33-2 at 66:20-67:6 (Q. Well, how are you doing today?  A. I still have a little like -- like if I do a lot of running and like exercise, they'll like swell up some. But I figured like, you know, that's to be expected after every like surgery and every like -- after they broke and everything. But I always wear my ankle braces, and I come home and ice them every night and make sure they are elevated.").

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007). "[S]ummary judgment is rarely appropriate in negligence and personal injury cases." *Hutto v. Gold's Gym, Inc.*, 703 So.2d 974, 977 (Ala. Civ. App. 1996).

## IV.   ARGUMENTS

### A. High Point's conduct towards Kinsley was negligent under the theories of both premises liability and general negligence.

High Point's Motion conflates the legal standards of general negligence with those of premises liability in an attempt to present Kinsley's claims narrowly. However, under Alabama law, the two theories are distinct from each other, with differing standards and affirmative defenses. The Alabama Supreme Court has explained that, to determine "whether the duty owed . . . should be extracted from general principles of negligence or of premises liability," "[t]he key to this question is whether the injury was caused by some affirmative conduct of the landowner or by a condition of the premises." *Lilya v. Greater Gulf State Fair, Inc.*, 855 So.2d 1049, 1053 (Ala. 2003).

As explained below, High Point owed duties towards Kinsley under both theories, and whether High Point breached those duties and caused Kinsley's injuries are questions that must be decided by a jury.

### i.      High Point was negligent towards Kinsley under the premises liability doctrine.

High Point's Motion correctly states that Kinsley was an "invitee" at its facility under Alabama law and, under the premises liability theory of negligence, High Point owed her a duty to "exercise ordinary and reasonable care to keep the premises in a reasonably safe condition." *Etheridge v. Belk, Inc.*, No. 2:21-CV-00413-NAD, 2023 WL 2026532, *2 (N.D. Ala. Feb. 15, 2023) (quoting *Jones Food Co. v. Shipman*, 981 So. 2d 355, 361 (Ala. 2006)). The duty of care High Point owed to Kinsley was heightened by her status as a minor:

> [T]he degree of caution which is necessary to reach the required standard of reasonable care to be exercised may vary according to the capacity of the person with respect to whom such duty exists and . . . those upon whom the duty rests of exercising reasonable care toward children must calculate upon the fact that children are expected to act according to their known characteristics and childish impulses.

*City of Birmingham v. Whitfield*, 197 So. 666, 670 (Ala. 1940). *See also Collier v. Necaise*, 522 So.2d 275, 278 (Ala. 1988) ("[A]n invitee's peculiar status as a child may alter the degree of "reasonable care and diligence" required on the part of the occupier of land.").

### a.      The unnecessary and distracting games built into High Point's "Kid Zone" climbing walls constitute an unreasonably dangerous condition on its premises.

High Point wants the Court to believe that Kinsley's fall was caused by the "inherent the dangers of rock climbing," but that is simply not the case. The proximate cause of Kinsley's fall and resulting injuries was the interactive, light-up racing game that High Point installed and maintained on its climbing wall. The video evidence clearly shows that the game caused Kinsley

to become distracted after she approached the lava wall and hit the first button, which caused her to overlook attaching to the auto-belay device before beginning her climb and, ultimately, caused her to fall and become injured. In her deposition, Kinsley testified:

> I think I got like distracted by like everything going on and like pressing the buttons and racing up the wall.  Q. Okay. Were you racing up the wall when this happened?  A. Yes, sir.  Q. Who were you racing?  A. There was like a little thing like the lava. Like you race the lava. . . Q. So you race the lava to get -- but what starts the lava?  A. You press a button. . .  You're supposed to click it when you start climbing up the wall.

Doc. 33-2 at 60:15-61:9.

The substantial dangers that High Point created by adding arcade-style games and stimulations to its Kid Zone climbing walls are not the same as those dangers inherent to rock climbing. "Inherent" is defined by Webster's Dictionary as "involved in the constitution or essential character of something" and "belonging by nature or habit." Games and amusements like those that High Point installed on the lava wall are in no way essential to the character of a rock-climbing wall, even an artificial indoor rock wall. Case in point, there are many other artificial rock walls in High Point's own facility that have no games, buttons, flashing lights, or race timers, and yet customers still pay to climb them. By definition, the games, flashing lights, buttons, and timers that High Point added to its Kid Zone are not "inherent" to rock walls, and the dangers these distractions create for children like Kinsley are not essential to the activity of rock climbing. Indeed, the Climbing Wall Association, Inc.'s Industry Practices specifies that "[t]he Industry Practices are intended to address climbing as a sport and not the climbing activities that are conducted as if they were "amusement rides.""[25]

---

[25] *See* Ex. 3 at vii.

Instead, as Expert Hague opined in his report, "[t]his type of amusement is a distraction from the more important safety aspects of using the auto-belay system, and the excitement to beat those lights to the top can cause a climber to forget to clip in, especially if that climber is a minor."[26]

High Point testified that the purpose of the games on its climbing walls is to keep children like Kinsley "interested"[27] and that the games can distract climbers from focusing on their safety.[28] Certainly, High Point knew that clipping into the auto-belay device when climbing was of paramount importance to Kinsley's safety,[29] which is what makes High Point's decision to add and maintain distractions to its Kid Zone rock walls so unreasonable. As previously quoted, "[t]hose upon whom the duty rests of exercising reasonable care toward children must calculate upon the fact that children are expected to act according to their known characteristics and childish impulses." *Whitfield,* 197 So. at 670. It is universally known that children (especially groups of children) are excitable, easily distracted, and can be susceptible to over-stimulation. Instead of taking this into account and trying to reduce the number of distractions that could divert the attention of minor climbers, such as Kinsley, from focusing on their safety, High Point chose to go the other direction and increase the number of distractions.

---

[26] Exhibit 6 (Expert Report of Dan Hague) at 10; *See also* Doc. 33-3 at 178:18-23.

[27] *See* Doc 33-1 at 48:11-23 ("Q. And what does that do when you press that button?  A. It just allows the lights at the very top to light up.  Q. And you can push these buttons and the wall functions normally even if you're not clipped into the auto belay; is that right?  A. Correct.  Q. And what's the purpose of LED lights on the wall?  A. It just gives the wall a different look than a traditional climbing wall. It just keeps kids interested.").

[28] *Id*. at 102:15-103:3 ("Q. You don't think these race clocks could distract them from, you know, safety precautions while they're climbing? . . . A. Potentially, but in order to be distracted enough, they would have to climb around the banner blocking the bottom of the wall.  Q. Does that ever occur at High Point's facilities?  A. Yes, for -- not necessarily just for kids. Adults as well.").

[29] *See* Exhibit 7 (High Point's "Orientation Outline") at 5 (The Orientation Outline expressly directs employees to warn customers that, "If you don't clip into this device, climb up and fall, you will leave seriously injured in an ambulance. Double check before every single route.").

"[T]he question whether a property owner maintained its premises in a reasonably safe condition is normally a question for a jury," *Etheridge*, 2023 WL 2026532 at *3, and there is ample evidence here for a jury to find the games and amusements High Point unnecessarily added to its Kid Zone climbing wall constituted an unreasonably dangerous condition in violation of the heightened duty of care High Point owed to Kinsley as a minor.[30]

   b.   The dangerous condition was not "open and obvious."

High Point argues that summary judgment is still appropriate because, first, "the 'danger' of rock climbing walls is open and obvious."[31] Doc. 34 at 18. And second, because it warned Kinsley about "the inherent risk associated with rock climbing[.]" *Id*. at 19.

Alabama law requires, when a dangerous condition such as the one here exists, that landowners "[g]ive sufficient warning so that, by the use of ordinary care, the danger can be avoided." *Armstrong v. Georgia Marble Co*., 575 So. 2d 1051, 1053 (Ala. 1991). But the landowner has no duty to warn if the danger is open and obvious, meaning "[w]hether the danger should have been observed [by the plaintiff], not whether in fact it was consciously appreciated [by him or her]." *Jones Food Co.*, 981 So. 2d at 362. As an affirmative defense,[32] the landowner bears the burden of proving that the danger was open and obvious. *Hodges v. Wal-Mart Stores, Inc*., No. 2:17-CV-00459-SGC, 2019 WL 3779903, *3 (N.D. Ala. Aug. 12, 2019).

---

[30]As for High Point's notice of the dangerous condition, under Alabama law, "[w]here a business or its employees create the dangerous condition, the business is deemed to have actual notice of it." *Hodges v. Wal-Mart Stores, Inc.,* No. 2:17-CV-00459-SGC, 2019 WL 3779903, *3 (N.D. Ala. Aug. 12, 2019) (citations omitted).

[31] High Point makes this argument despite that the Alabama Supreme Court "[h]as consistently held that questions of openness and obviousness of a defect or danger . . . are generally not to be resolved on a motion for summary judgment." *McClurg v. Birmingham Realty Co.*, 300 So. 3d 1115, 1119 (Ala. 2020) (quotations and citations omitted).

High Point first argues that it had no duty to warn Kinsley at all because "the 'danger' of rock climbing walls is open and obvious." Doc. 34 at 18. But in its argument, High Point's completely misidentifies the hazard that caused Kinsley to become injuries as simply being "rock climbing." As discussed at length above, the hazard that proximately caused Kinsley's injuries was the arcade-style <u>amusement</u> (as Expert Hague calls it) that High Point unnecessarily added to the lava wall that distracted Kinsley.

High Point's attempt to characterize Kinsley injuries as being caused simply by "climbing" here is akin to a grocery store trying to characterize a customer's slip-and-fall injuries as being caused by walking. Of course, the store does need to warn customers about the dangers inherent to walking (i.e., falling), but the store does need to warn customers if they are about to walk over an unexpected puddle of water on the floor. Likewise, Kinsley was absolutely aware that climbing, like walking, has its inherent dangers. But the question that must be answered by the jury is whether Kinsley, as a twelve-year-old child, should have realized that playing the games on High Point's the Kid Zone climbing walls could ultimately be dangerous to her. A reasonable jury will likely agree that Kinsley had no reason to observe or appreciate that the amusements on the lava wall could ultimately cause her to get hurt.

High Point's Motion argues next that the open and obvious defense still applies, because High Point claims it "did in fact warn Kinsley and her father of the inherent risks associated with rock climbing by way of liability waiver and the safety orientation." *Id.* at 19. However, the evidence proves otherwise.

To start, High Point introduced no evidence suggesting that Kinsley ever saw High Point's waiver or even discussed its contents with her father prior to climbing (because she did not), so again, whatever warnings may or may not have been in the waiver are irrelevant, because High

Point's duty was to warn <u>Kinsley</u>—the invitee—about the danger. Warning a family member that was not present has the same legal effect as warning her family pet. So, High Point must rely on its "safety orientation" as the sole grounds for its claim that it warned Kinsley about the danger of becoming distracted by the amusements on its Kid Zone climbing walls.

The only evidence High Point submits in support of its Motion relating to what warnings were or were not provided is Kinsley's own testimony. This is because none of the other witnesses who have testified in this case were present at her orientation. Kinsley's undisputed testimony is that the participants of the orientation were her, the other children, and a male employee from High Point; that the employee led them to the main climbing room and briefly showed them how to clip into one of the auto-belay systems, and then took them to the Kid's Zone and simply did the same brief demonstration again.[33] The following undisputed testimony is the <u>only</u> evidence of what High Point's employee said to Kinsley during the orientation:

- "And then a man took us into the room, and he was like you clip this." *Id.* At 24:8-10.

- "Like basically all he said was make sure you clip this, and then he just like moved on." *Id.* at 32:1-3.

- "[A]nd he was like this one like you just got to do the same thing. Make sure you clip it." *Id.* at 24:15-17.

- "[H]e said like you got to make sure you clip this one." *Id.* at 30:5-6.

- "He was like y'all got to make sure this is clipped, and then he just clipped it like just like unclipped it again." *Id.* at 30:15-18.

- "And he just said y'all can go back in the like whichever room y'all want and climb." *Id.* at 32:9-10.

---

[33] *See* Doc. 33-2 at 24:5-20; 30:2-18; 31:17-32:12.

- "[N]o one really talked about anything other than when he took us to show -- like clip it in. That's basically any -- everything that was said to me before they walked back out of the room." *Id.* at 25:20-26:2.

As you can see, Kinsley was repeatedly questioned during her deposition about what information High Point conveyed in her "safety orientation", and she consistently testified that the only item covered was how to clip and unclip into the auto-belay devices. She testified that their group was originally told they were going to get an "in-depth demonstration," but that <u>it never happened</u>. *Id.* at 31:17-32:3.

Because High Point has submitted no evidence that its employees ever warned Kinsley of <u>any</u> dangers, much less about the specific danger that was the proximate cause of Kinsley's injuries, High Point has failed to meet its burden of proving that it is entitled to summary judgment on Kinsley's premises liability claim based on the open and obvious defense.

Kinsley herself nicely summarized High Point's negligence under the premises liability theory when she testified, "I feel like if [rock climbing is] going to be targeted towards like such young age people, there shouldn't be distractions like that could even like even slightly distract you from being able to like have your all focus on clipping in and making sure you're safe." *Id. at* 61:19-62:2. A jury must decide whether she is right.

> ii. **High Point was negligent under general negligence principles because its owners and employees affirmatively failed to take the actions necessary to prevent Kinsley from getting injured.**

"[W]here a defendant's or its employees' actions cause an injury on the defendant's property, courts applying Alabama law find that the defendant's duty is grounded in traditional negligence principles, not premises liability, regardless of the plaintiff's status." *Tillman by & through Tillman v. Starbucks Corp.*, No. 2:21-CV-682-GMB, 2021 WL 5280940, *2 (N.D. Ala.

2021) (citing to *Powell v. Piggly Wiggly Ala. Distrib. Co.*, 60 So. 3d 921, 925–26 (Ala. Civ. App. 2010); *Shelley v. White,* 782 F. Supp. 2d 1295, 1296 (M.D. Ala. 2010)).

Under general negligence principles, a plaintiff must prove "(1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant's breach was the actual and proximate cause of the plaintiff's loss or injury." *DiBiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 460 (Ala. 2008).[34]

Based on the evidence discussed herein, a jury could find that High Point and its employees acted negligently towards Kinsley in at least three different ways: (1) by fabricating, installing, and maintaining an inadequate safety gate on the lava wall, (2) by failing to supervise her, or (3) by failing to adequately train her.

    a.  High Point negligently failed to implement reasonable safety equipment to prevent Kinsley from accessing its climbing wall while unclipped.

High Point was well-aware that climbers becoming distracted and overlooking clipping into the auto-belay devices is a common cause of injuries at its facilities, because there had been twelve (12) of these incidents at High Point in just the three years prior to Kinsley's fall.[35] This knowledge created a duty for High Point to take reasonable precautions to prevent this type of incident from happening to Kinsley. Expert Hague opined that one of the most effective ways for climbing centers to prevent falls like Kinsley's is to install and maintain "safety gates" that will

---

[34] It is also important to note that "[t]he 'open and obvious defect' defense applies to premises-liability claims. . . [T]he defense has not been extended to negligence actions based on affirmative conduct committed by the alleged tortfeasor." *Powell*, 60 So. 3d at 926. "Open and obvious" is the only affirmative defense raised by High Point's Motion.

[35] *See* Exhibit 8 (High Point's Answers to Plaintiff's First Interrogatories) (High Point's Response to Interrogatory No. 3: "[T]here have been similar instances where patrons did not . . . clip in which resulted in a fall. In the past 3 years, there have been 12 such incidents[.]").

prevent climbers from accessing the lowest "holds" on the rock wall.[36] The logic is that, if a climber becomes distracted and overlooks clipping in, the climber cannot get around the safety gates and, thus, they will not be able to get to the top of the wall and free fall back down. This is simply common sense: climbers cannot fall off the wall untethered if they cannot get onto the wall in the first place.

Here, High Point did have a safety gate on the lava wall.[37] Indeed, High Point fabricated and installed the gate itself.[38] However, video footage reveals that its gate was wholly inadequate and ineffective. Kinsley was able to climb the wall without even moving or otherwise touching the gate. Expert Hague testified that High Point's safety gates failed to meet the minimum industry standards.[39] He explained that the entire purpose of the gate (or, really, any gate) is to prevent access to whatever is on the other side of it. Expert Hague opined that the industry standards required High Point to either (1) make its homemade gate larger in size to cover all the bottom holds or (2) place all the bottom holds behind the gate.[40] If High Point implemented either of these reasonable safety precautions, Kinsley would not have even been able to get onto the lava wall without being clipped in, which would have prevented her from getting injured.

There is ample evidence for a jury to find that High Point was negligent when it manufactured, installed, and maintained a safety gate that failed to block Kinsley's access to the lava wall.

---

[36] *See* Doc. 33-3 at 191:12 – 17; *see also* Ex. 4 at 6 ("An adequately sized belay gate would prevent a climber access to the beginning holds until the climber had detached the safety lanyard from the gate.").
[37] *See* Doc. 34 at pg. 9, para. 31.
[38] *See* Doc. 33-1 at 113:9-18.
[39] *See* Doc. 33-3 at 131:6-13.
[40] *See* Doc. 33-3 at 131:14-24.

b. <u>High Point negligently failed to supervise Kinsley in violation of the auto-belay device manufacturer's own operator manual.</u>

High Point uses auto-belay devices that are part of the Perfect Descent Climbing System manufactured by C3 Manufacturing.[41] C3 requires climbing centers who use their devices to be familiar with all the instructions and requirements within its Operations Manual.[42] The second page of the manual contains the following warning:

> **WARNING**
>
> *Climbing is an inherently dangerous activity. Operators of the Perfect Descent Climbing System are responsible for the safety and supervision of climbers using this equipment. C3 Manufacturing requires all operators to be trained before using this product. These instructions must be provided to operators before use of the Perfect Descent Climbing System and retained for reference by operators. Owners and operators must read, understand (or have explained), and heed all instructions, labels, marking, and warnings supplied with this product, and with any associated products intended for use with the Perfect Descent Climbing System. FAILURE TO DO SO MAY RESULT IN SERIOUS INJURY OR DEATH.*

C3 leaves no doubt that it is the <u>operator's</u> responsibility to supervise climbers like Kinsley who are using the Perfect Descent auto-belay systems. C3 is clear that the "operator" in this context is the climbing center and its employees; this is obvious because C3 requires operators to be provided with, read, understand, and heed the Operations Manual and all other safety materials concerning the Perfect Descent System. It would not be practical nor possible for climbing centers to provide every customer with the 30+ page manual upon arrival at the gym and require them to read and understand it before climbing or supervising climbers.

---

[41] *See* Doc. 33-1 at 68:16-19.
[42] *See* Ex.2 at 1 ("ALWAYS READ INSTRUCTIONS BEFORE USE.").

In his deposition, High Point's corporate representative made a weak attempt to shift its duty to supervise climbers using the Perfect Descent system to the adults that brought Kinsley to High Point.[43] Specifically, he testified that High Point believes that the adults became "operators" as defined in the manual after they (supposedly) received High Point's brief informational orientation upon arrival at the facility. However, High Point never provided copies of the C3 manual to the adults and the adults were otherwise untrained, which means they cannot fall within C3's definition of "operator."[44]

The explicit language in C3's Operations Manual squashes High Point's desperate attempt to deflect responsibility for the safety of its customers. Most notably, it directs:

- "It is the responsibility of all <u>operators</u> of the Perfect Descent Climbing System to ensure that all <u>users (climbers)</u> are . . . [p]roperly attached by the Perfect Descent Climbing System to their climbing harness."[45]

- **"Climbers should be under constant supervision <u>by a trained operator</u>. Before ascending the wall, <u>operators</u> should check to verify that each climber has . . . [p]roperly clipped their harness onto the Perfect Descent Climbing System."[46]

High Point admits that no employees were supervising Kinsley or the other children using the Perfect Descent Climbing System when Kinsley fell.[47] This is a clear dereliction of the duty owed to Kinsley under C3's Operations Manual. Had High Point provided a trained employee to supervise climbers as required by C3, he or she would have ensured that Kinsley clipped into the auto-belay device, and Kinsley would not have fallen and suffered severe injuries.

---

[43] *See* Doc. 33-1 at 75:14-77:11.
[44] High Point has also submitted no evidence that the adults who brought Kinsley actually received any orientation or training.
[45] Ex. 2 at 15 (emphasis added).
[46] *Id*. at 17 (emphasis added).
[47] *See* Doc. 33-1 at 43:3-19; Doc. 33-7 at 43:20-22.

A jury should decide whether High Point was negligent by failing to supervise Kinsley in violation of the auto-belay device manufacturer's Operations Manual.

           c.   <u>High Point negligently failed to train or test Kinsley on her equipment usage or safety hazards.</u>

In its Motion, High Point admits it had a duty to train Kinsley, as a first-time climber, when she arrived at its facility. However, High Point argues that it satisfied its duty by providing Kinsley with the sham "safety orientation" (discussed *supra*) where she was briefly shown how to clip in and out.

High Point is wrong. Not only was High Point required to explain how the Perfect Descent Climbing System equipment works, it was also required to instruct, train and test each climber on properly using the equipment <u>safely</u>.[48] This is confirmed and supported by multiple sources. First, C3's Operations Manual includes multiple lists of warnings and instructions that operators of Perfect Descent Belay System must convey to the climber.[49] Second, the Climbing Wall Association's Industry Practices[50] provides, *inter alia*, that "[i]t is important that clients are informed of the nature of climbing and the inherent risks of climbing in a climbing facility during their initial orientation and at other appropriate times."[51] And specifically, "[c]limbers should be instructed to report any unsafe condition or unauthorized use of the device such as . . . climbers not clipped in properly or not clipped in at all, etc."[52] Third, High Point's own policies and

---

[48] It is like showing someone how to operate a car, but not telling them which lane of traffic to drive in or explaining the rules of intersections, and then telling them to hit the road.

[49] *See* Ex. 2 at 15 (Specifically, see Section 5.1 entitled USER INSTRUCTIONS for a lengthy list of very important warnings that should have been communicated to Kinsley but were not).

[50] High Point has acknowledged that these standards apply to its operations. Doc. 33-1 at 93:3-7 ("Q. What does High Point do with [Climbing Wall Association's Industry Practices]? A. Use them as a minimum standard for operating.").

[51] *See* Ex. 3 at 14.

[52] *Id*. at 17.

procedures include a list of "safety checks" that its employees are required to communicate to new climbers, including: "One of the most common accidents with these is not hooking up to the auto belay before climbing. You must attach to the system. . . This is why we do safety checks and recommend working in pairs" and "If you don't clip into this device, climb up and fall, you will leave seriously injured in an ambulance. Double check before every single route."[53]

Further, all these indoor climbing wall authorities—and High Point's own written policies[54]—place a duty on High Point's employees to administer "proficiency tests" to new climbers to ensure the climber will use the equipment safely.

Again, Kinsley's testimony is the _only_ evidence about what information she received from High Point's employee in the orientation. Without beating the proverbial dead horse any further, her testimony is that the employee simply demonstrated how to clip and unclip into the belay device (twice) and set them loose to climb unsupervised in the Kid Zone. High Point's employee failed to go over any "safety checks." High Point's employee failed to go over _any_ of the numerous warnings and precautions listed in High Point's Orientation Outline that are designed to decrease the risk of injury to climbers.[55] High Point's employee failed to administer any proficiency tests. High Point's employee simply rushed through a sham orientation without providing Kinsley with any of the warnings, instructions, or safety training required by C3, the Climbing Wall Association, and High Point's own policies and procedures.

Based on this evidence, a jury must decide whether High Point was negligent towards Kinsley when its employee failed to provide a proper orientation and instruction in violation of its known duties.

---

[53] Ex. 7 at 5.
[54] _See Id._ ("[A]sk everyone in your orientation to demonstrate the clip in procedure.").
[55] _See Id_. at 4.

**B.  High Point's conduct towards Kinsley was wanton under Alabama law.**

To prove a claim for wantonness, a plaintiff in Alabama must have evidence showing "the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Lands v. Ward*, 349 So. 3d 219, 229 (Ala. 2021) (citation omitted). Wantonness is "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." § 6-11-20(b)(3), Ala. Code 1975.

Here, there is ample evidence to support a jury finding that High Point acted wantonly by (1) choosing not to remove the arcade-style games from its Kid Zone walls before Kinsley became injured, (2) choosing to continue using its ineffective safety gates, (3) choosing not to provide a trained operator/employee to supervise Kinsley in direct violation of the auto-belay device's operations manual, or (4) choosing not to provide her with a real safety orientation and training. There is no need to rehash all the evidence already discussed that proves High Point absolutely did each of these things, but we must look at whether High Point did them with knowledge that they were dangerous and with a reckless or conscious disregard of Kinsley's safety.

First, although direct evidence is not required to prove High Point's knowledge that the amusements on its Kid Zone climbing walls posed a danger to children like Kinsley,[56] there is direct evidence: High Point's corporate representative testified that the purpose of the LED lights for the game on the lava wall was to just keeps kids interested and then, when asked if the racing features on the walls could distract children from focusing on their safety while climbing, he

---

[56]The Alabama Supreme Court has repeatedly said that "the actor's knowledge may be proved by showing circumstances from which the fact of knowledge is a reasonable inference; it need not be proved by direct evidence." *Tutor v. Sines*, No. 1210037, 2023 WL 2054060 (Ala. Feb. 17, 2023) (citations omitted).

responded, "[p]otentially, but in order to be distracted enough, they would have to climb around the banner blocking the bottom of the wall." Then, when asked if children ever do get distracted and climb around the banner without clipping in, he admitted that it does.[57] This evidence also shows that High Point knew that its safety gates (i.e., "banners") were ineffective at preventing children from climbing the walls without clipping in. High Point also knew that choosing not to supervise children climbers using the auto-belay systems was dangerous, because High Point had read and understand the manufacturer's Operations Manual,[58] and the manufacturer specifically warned that "Operators of the Perfect Descent Climbing System are responsible for the safety and supervision of climbers using this equipment. . . FAILURE TO DO SO MAY RESULT IN SERIOUS INJURY OR DEATH."[59] Lastly, High Point's employee responsible for properly training Kinsley knew that Kinsley was about to go climb 25-foot walls covered in flashing lights, buttons, and timers, and he still made the decision not to skip over all the safety warnings or instructions in the orientation.

A jury can reasonably infer that High Point was conscious that each of its four reckless decisions discussed above would likely result in injury to children climbers like Kinsley, because (12) similar falls had already occurred at High Point facilities in the three (3) years <u>prior</u> to Kinsley's fall.[60] These are all incidents involving auto-belay devices. Further, under Alabama law, "[w]antonness may arise after discovery of actual peril, by conscious failure to use preventive means at hand." *Tolbert v. Gulsby,* 333 So.2d 129, 132 (Ala. 1976). When asked if High Point changed any policies or procedures in response to the number of its customers who have become

---

[57] *See* Doc. 33-1 at 103:1-3.
[58] *See Id.* at 70:11-13 (High Point's corporate representative testifying that he had read the operations manual.)
[59] *See* Ex. 2 at 3.
[60] *See* Ex. 8 at 2.

injured patrons from being distracted and not clipping in, High Point answered, "No. The training procedures have remained the same. . ."[61] And when asked if High Point has implemented any devices or products designed to reduce or prevent these incidents, High Point answered, "No, beyond our banners that block the bottom of the wall."[62] High Point admits that it continues to rely on safety gates—which have proven to be ineffective more than a dozen times now—as its key defense against the well-known issue of climbers becoming distracted and failing to clip in before climbing.[63] Further, High Point knows its business revolves around "inherently dangerous activities," and yet it has never even hired a safety consultant to advise on how High Point can reduce the number of these injuries.[64]

In short, High Point knew its climbers were consistently getting hurt in a similar manner to Kinsley during the three years prior to her injuries, and High Point consciously did absolutely nothing in response to prevent it from happening to Kinsley. The evidence shows that High Point continued to do nothing to try to prevent these incidents after Kinsley's injury, and more climbers have gotten hurt because of High Point's conscious disregard for its customers' safety.[65] As discussed, there are numerous "preventive means" available to High Point to prevent these falls, but High Point has chosen instead to continue ignoring the problem entirely.[66]

---

[61] See Doc. 33-1 at 110:6-12.

[62] Id. at 112:10-113:2.

[63] See Doc. 33-7 at 74:20-75:14 (High Point's employee testifying she personally observed this happening between five and ten times at High Point's Birmingham facility).

[64] See Doc. 33-1 at 113:19-22.

[65] See Doc. 33-7 at 74:20-75:14 (High Point's employee testifying that, after Kinsley's fall, she personally filled out incident reports for two other climbers that became injured at High Point's Birmingham facility after not clipping in).

[66] Id. at 88:11-19 ("Q. Was there any policy changes or additional training after Kinsley got hurt . . . for this issue?  A. No.  Q. Was there any policy change or additional training provided after the other two incidents?  A. No."); Id. at. 89:11-19 ("Q. While you were employed there did High Point implement any new policies to try to reduce the number of these types of incidents? . . . A.

"[A] wanton count should go to the jury if there is the least particle of evidence to support a finding of wantonness." *Tolbert*, 333 So.2d at 132 (citing to *Kilcrease v. Harris*, 259 So.2d 797 (1972)). There is overwhelming evidence in this case from which a reasonable jury could find that High Point's conduct towards Kinsley was wanton in each of the four ways described above.

## V.    CONCLUSION

Based on the substantial evidence supporting each of Kinsley's claims and arguments, there are genuine issues of material fact and each cause of action against High Point must be decided by a jury. Kinsley respectfully asks that this Court deny High Point's Motion for Summary Judgment in its entirety.

Dated: March 10, 2023                   Respectfully submitted,

                                        */s/ Austin Whitten*
                                        Michael C. Bradley (BRA094)
                                        Austin B. Whitten (WHI165)
                                        **PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN P.C.**
                                        2001 Park Place North
                                        Suite 1100
                                        Birmingham, AL 35203
                                        Tel: (205) 322-8880
                                        Fax: (205) 328-2711
                                        Email: mikeb@pittmandutton.com
                                        Email: austinw@pittmandutton.com

                                        *Attorneys for Plaintiff*

---

We were told to maybe like emphasize the importance of the auto belays more because they have been happening, but that's really it.").

23

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 10, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide notification to all counsel of record.

*/s/ Austin Whitten*
Of Counsel