IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| **KINSLEY KORNEGAY, a minor, by and through her parent and guardian, MATTHEW KORNEGAY,** ) ) ) ) ) ) | |
| Plaintiff, ) | Case No.: 2:21-cv-00505-SGC |
| v. ) ) | |
| **HIGH POINT BIRMINGHAM, LLC and HIGH POINT CLIMBING, LLC,** ) ) ) ) | |
| Defendants. | |

### REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants, High Point Birmingham, LLC and High Point Climbing, LLC (sometimes hereinafter collectively referred to as "Defendants" or "High Point") and file this reply in support of their Motion for Summary Judgment, as to Plaintiff's claims of Negligence and Wantonness against them. In support thereof, Defendants state as follows:

### I. INTRODUCTION

As a preliminary matter, Plaintiff begins his Response by finally conceding the obvious fact that "climbing is an inherently dangerous activity" and "everyone agrees on that point". ECF 37, p. 4. This is a welcome departure from the previous stance of Plaintiff's expert, Daniel Hague, who had denied as much in his deposition,

1

despite the fact that Mr. Hague's own book begins with the sentence: "Climbing is inherently dangerous indoors or out…" ECF 33-3, 17 at p.62, ll.2-14. Given that Plaintiff now admits that everyone (including Plaintiff) agrees that climbing is an inherently dangerous activity, Defendants may now turn to address the other issues raised in Plaintiff's Response.

## II. ARGUMENT

### A. Plaintiff's alleged "additional material facts" are mischaracterizations of the record.

Near the beginning of Plaintiff's Response, Plaintiff lists a series of statements which Plaintiff identifies as "additional material facts." Plaintiff claims that these supposed facts are both "important" and "undisputed". ECF 37, 5. However, Plaintiff has adopted a liberal interpretation of what constitutes the "undisputed facts" of this case. Several of Plaintiff's "additional material facts" are either mischaracterizations of the record, speculative, or simply irrelevant to resolving the issues of this case.

First, in paragraphs 2 and 5 on page 6 of his Response, Plaintiff refers to climbing "proficiency tests" identified in a manual from the auto-belay manufacturer and materials from the Climbing Wall Association. ECF 37, 6. Plaintiff claims these proficiency tests are industry standards and, as such, Defendants were "required" to administer such tests to Kinsley and other patrons at its facility. ECF 37, 6 at paragraph 2. However, this duty does not exist in fact or law. Plaintiff cannot point to any statute or case law evidencing such a "requirement" because no such statute

or case law exists. Nor is the manual for an auto-belay considered an industry standard, or else Plaintiff's expert, Daniel Hague, would have cheerfully said so. He did not, because he knows he personally follows no such standard and does not want to be on the record within his own industry as adopting it. ("Q. My question was, do you think that would be reasonable, a reasonable standard? A. Again, I think that it's irrelevant. It doesn't matter what my opinion is. If the Perfect Descent has that in their manual, it is what it is.") ECF 34-3, p.171, ll.1-5. When an expert calls his own opinion irrelevant, the game is up. The "undisputed" requirement of a proficiency test is non-existent.

Lost on Plaintiff is the <u>point</u> of any necessary proficiency testing, no matter how described, how long it lasts, or how often it is done. The point of the tests is not simply to do them; the point is to be sure the climber can use the system correctly. No matter the imaginary standards Plaintiff wishes to impose, nor any existing standards High Point adopted, if Kinsley was trained sufficiently to use the clips and climbing system, then the training succeeded. And we know it did. Kinsley testified that, following the demonstration by High Point staff, she understood how to operate the clip on the auto belay system. ECF 33-2, 8 at p.30, ll.13-21. Plaintiff cannot establish either that "proficiency tests" are required in any meaningful sense, or that High Point did not adequately train Kinsley.

To this point, Plaintiff next argues "the <u>only</u> instruction High Point provided to [Kinsley Kornegay] was two brief demonstrations of how to clip in and out of the auto-belay devices." ECF 37, p.6. (emphasis original). First, this statement misrepresents the nature of Defendants' orientation training, which, as Kinsley noted *infra*, successfully conveyed how to use the auto belay device to all the gym patrons in attendance, including Kinsley. While Plaintiff means to imply that the "brief demonstrations" were somehow insufficient, it should be noted that the 15 minutes which High Point typically allots for its orientations is consistent with the "10-15 minute" orientations advertised by the former gym of Plaintiff's expert, Daniel Hague. ECF 34-3, 41 at p.160, ll.2-7. Mr. Hague later conceded that 15 minutes is "plenty of time" for a customer to go from walking in the door of a gym to climbing. ECF 34-3, 42 at p.162, ll.16-23. Therefore, Plaintiff's suggestion that Defendants' orientation was somehow too short is both misplaced based on the established record and at odds with the opinion of his own retained expert.

Lastly, and remaining on the subject of time, Plaintiff mischaracterizes how long Kinsley had been climbing prior to the accident, describing her multiple successful rock climbs as lasting "a few minutes". ECF 37, 6 at paragraph 6. In fact, Kinsley's deposition testimony is that, prior to the accident, she "had done a bunch of the walls already" and had been climbing for about 30 to 40 minutes. ECF 34-2, 8 at p.34, ll.2-12. Former High Point employee Hannah Staubach, who was working

at High Point on the date of the accident, corroborates Kinsley's account, noting that Kinsley had been climbing for "roughly 45 minutes" before the accident. ECF 33-7, 12 at p.40, ll.17-19. Setting aside the semantic issue of whether 45 minutes is "a few" minutes, it is clear that, here again, Plaintiff is attempting to portray a narrative of the incident that is contrary to the established record.

### B. Plaintiff's premises liability argument that the "Lava Wall" constituted an "unreasonably dangerous condition" is a novel argument absent from prior pleadings and furthermore does not comport with established facts.

Plaintiff improperly includes new allegations in his Response. The "Lava Wall" theory is entirely absent from Plaintiff's claims, and unavailing regardless. Nowhere in either the Original Complaint or the Amended Complaint is there any allegation that Defendants made the climbing walls *more dangerous*, as Plaintiff now alleges for the first time in his Response to Defendants' Motion for Summary Judgment.

Instead, Plaintiff makes three claims against High Point in support of negligence and wantonness: the alleged failures to properly: 1. train Minor Plaintiff; 2. supervise Minor Plaintiff; and 3. provide working safety equipment to Minor Plaintiff. ECF 7,6 at paragraphs 29-31. Plaintiff's new allegation that High Point was responsible for creating an "unreasonably dangerous condition" by means of an "arcade-like game" does not plausibly fall under anything Plaintiff has alleged so far. Nor is this merely a throw-away argument. Plaintiff now claims that the

5

"proximate cause of Kinsley's fall and resulting injuries was the interactive, light-up racing game that High Point installed and maintained on its climbing wall." ECF 37, p.10. Why Plaintiff has not heretofore pled the "proximate cause" of the fall in either complaint over the last two years is never explained. However, Plaintiff's newfound concern that Defendants "unnecessarily added" alleged dangers to its climbing walls is entirely distinct from the claims in the Amended Complaint, which are the only claims that Defendants could address in their Motion for Summary Judgment. This unpled idea is not properly before this Honorable Court. The Amended Complaint is.

      To the extent that Defendants should respond to these novel arguments for the first time in their Reply brief, Defendants simply note that Plaintiff mischaracterizes (again) the nature of the so-called "lava game". The game does not begin until the climbing wall participant hits the start button. ECF 34-2, 16 at p.61, ll.1-3. Thus, there is no rush to get clipped in and climb before the "lava" flows. In fact, one does not have to hit the button at all. It is an optional part of the climb that "starts" only if the climber elects. There is no artificial pressure to start climbing and, whether the timer is used or not, the climber must clip in first.

      Kinsley acknowledged in her deposition that the climber is to press the button only after first using the auto-belay clip. ECF 34-2, 16 at p.61, ll.10-13. Therefore, as revealed by Kinsley's own testimony, the climber determines when the lava game

begins, and Kinsley understood that the climber should not press the button until after clipping in. Plaintiff's new claim that the lava game was the "proximate cause" of Kinsley's fall not only evidences a new and dubious theory of causation, but reverses cause and effect. The essential fact remains that Kinsley forgot to clip in, and this alone resulted in her fall. (Q. "At any point prior to -- and I think we can all agree that that last wall that you climbed you just forgot to clip in; is that fair?" A. "Yes, sir.") ECF 33-2, 10 at p.37, ll.11-15.

In support of his new theory, Plaintiff colorfully claims "High Point's attempt to characterize Kinsley injuries as being caused simply by 'climbing' here is akin to a grocery store trying to characterize a customer's slip-and-fall injuries as being caused by walking." ECF 37, 14. This analogy cannot obscure the dispositive issue. One is obviously not required to sign a waiver to enter a grocery store. Nor can "walking into a grocery" store be seriously compared to what Plaintiff's own expert has described as an "inherently dangerous activity" – something Plaintiff now concedes "everybody knows."

**C. The waiver form which Plaintiff Matthew Kornegay read and signed is indisputable evidence that Plaintiff had notice and knowledge of the "open and obvious" potentially dangerous conditions of rock climbing at High Point.**

Perhaps reflecting an understanding that the executed liability waiver undermines his premises liability argument, Plaintiff characterizes it as "irrelevant" despite the important information it provides. ECF 37, 14. Plaintiff's position in this

regard is at odds with his own expert, Mr. Hague, who testified liability waivers are a "predominant" method of informing customers of the risks of rock climbing, and acknowledged that the use of liability waivers is accepted in the industry. ECF 33-3, 16 at p.61, ll.3-7. To be clear, Defendants have not, and are not, arguing that the waiver and disclosure form serves as an effective waiver of Kinsley's claims against Defendants. Rather, the wavier and disclosure form served to provide Plaintiff with notice of the risks associated with rock climbing at High Point and High Point's duties in that regard. Plaintiff's concession that the risks are both high and universally understood makes the information in the disclosure more important, not less.

     Kinsley's father, Plaintiff Matthew Kornegay, received, read, and signed the liability waiver for his daughter to participate in rock climbing at High Point Birmingham. ECF 33-4, 4 at p.14, ll.2-14. The plain language of the waiver states High Point will not supervise climbers and is not responsible for supervising climbers ("I understand that High Point staff have no responsibility to assist, supervise or even observe Visitors in their activities or movement about the facility…") ECF 33-5, at 2. Plaintiff acknowledged vaguely reading and signing this waiver. ECF 33-4, 4 at p.14, ll.2-14. Plaintiff further testified that he was not concerned by anything in the waiver that he signed. ECF 33-4, 4 at p. 14, ll.13-16. His decision not to carefully read it, or to understand it, does not mean he gets to

impose nonexistent legal duties on High Point to supervise his child.  The opposite is true.

To Plaintiff, his failure to read the disclosure – or worse – to keep the information a secret from his child - is a feature, not a bug.  Amidst this backdrop of undisputed facts, Plaintiff makes an odd statement in his Response that "disclosing the risks to a family member that didn't tell Kinsey is like disclosing it to the family pet." ECF 37, p.15. Of course, as the father and legal guardian of Kinsley Kornegay, Plaintiff has very real legal obligations, and certainly moral ones, to bother pondering his child's safety. Presumably, Plaintiff did not mean to imply by this statement that he regards this solemn responsibility with a cavalier disregard such that Defendants' clear waiver (which described in unambiguous language the admittedly obvious risks which Kinsley would be potentially subject to at High Point, and the fact High Point would not supervise his daughter) might as well have been given to an unthinking animal, or not at all.

In any event, Plaintiff cannot have his cake and eat it too. On the one hand, Plaintiff insists that the waiver is meaningless to Kinsley because she is a minor. On the other hand, Plaintiff, himself Kinsley's father and a grown man, claims that the waiver was useless to him because he was not climbing. But Plaintiff cannot have it both ways. While it is true that a minor cannot provide consent via waiver, that is precisely why Defendants seek and obtain the written consent of a minor's legal

9

guardian before allowing the minor to participate in any activities at High Point. In this case, it is undisputed that Plaintiff did review and sign the waiver and disclosure form. ECF 33-4, 4 at p.14, ll.2-14. What remains is that Plaintiff knew of the risks and signed off on his daughter's participation at High Point. Plaintiff has already conceded that "everyone knows" that climbing is an inherently dangerous activity, and because Plaintiff signed the waiver advising High Point would not supervise his child, he can hardly argue High Point negligently failed to do so.

### C.  High Point's training adequately prepared Kinsley to rock climb.

Plaintiff next returns to a claim that actually is pled: alleged inadequate training. Plaintiff claims that Kinsley's deposition testimony is the only evidence regarding the substance of her training. ECF 37, 14. It is not.  But it is undisputed for purposes of summary judgment, so if her testimony shows she was properly trained, the claim fails.  And her testimony shows she was fully and adequately trained. This is why Plaintiff attacks the training for being too short, or for not including enough tests, or for not demonstrating the equipment often enough.  What Plaintiff missed, and continues to miss, is how any of those alleged failures, assuming them to be true, would have changed anything when Kinsley admits whatever training she received, however it is disparaged, was enough to teach her how to use the equipment and why she needed it.

The purpose of the training was to teach Kinsley, and the other rock climbing participants, how to use the clip system of the auto belay device. It is undisputed that, following the training, Kinsley knew how to use the auto belay device. She testified that she used the clip and did so repeatedly, successfully, and without incident throughout the day until her last climb. ECF 33-2, 9 at p.34, ll.8-12. No matter how Plaintiff attempts to contrive otherwise, it is clear that the goal of the training was clearly met. Kinsley was the only participant to injure herself that day, and her accident occurred at the tail end of Kinsley successfully and safely engaging in a series of climbs. ECF 33-2, 15 at p.60, ll.3-10.

For Plaintiff to now claim that High Point's training was a "sham orientation" requires the logical leap that, by sheer luck or intuition, all other climbers who participated in that "sham orientation" were somehow able to repeatedly climb rock walls without receiving any instruction on how to do so. Plaintiff's own colorful analogy in footnote 48 of their Response, likening Defendants' training to telling a new driver to just "hit the road" only underscores the sheer implausibility of his claim. ECF 37, 21. Under Plaintiff's envisioned scenario, failure to properly instruct new drivers would, as Plaintiff intimates, certainly result in multiple vehicular accidents in short order. If Plaintiff's metaphor holds, one would likewise expect that, if all the participants that day had received *wantonly* inadequate training (as Plaintiff claims) then more than one participant would have fallen from the rock

walls on account of that "sham" training. The fact that only one participant, Minor Plaintiff, injured herself that day, and only did so after repeatedly climbing rock walls without incident following her training, belies Plaintiff's claim that Defendants' training was a "sham" or otherwise inadequate under the law. She never claims she did not use the clip because it bewildered or confused her, and she needed more training to handle it. She just forgot to use it.

Plaintiff makes passing references to other falling incidents in an attempt to portray falling and patron injuries as a recurring concern at High Point. ECF 37, 25. However, with respect to other incidents at High Point locations, Plaintiff's allegations are light on facts. Since High Point Birmingham began operating in November 2016 until the end of 2020, High Point Birmingham had 235,537 visits by 67,056 unique visitors. Out of all those visits, there were only 8 such reported incidents of falls resulting from failure to clip into the auto belay device, including Kinsley's accident on August 2, 2019. The statistics do not include how many different climbs were made during these 235,537 visits, but 8 injuries results in a .000034 occurrence rate. It would be lower if included each climb instead of each climber. Plaintiff's attempt to portray High Point as a location prone to repeated accidents and severe injuries is completely untrue and a gross mischaracterization of High Point's safety record, which is indeed stellar by industry-standards. Attached

as Exhibit A to this reply is the Affidavit of High Point Chief Operating Officer Shawn Watson. which attests to the above-stated facts.

### D. Defendants' auto belay safety gates are industry standard and constitute "working safety equipment".

Lastly, the Response alleges that Defendants' safety gates were somehow defective, and Defendants' negligent failure to provide "working safety equipment" resulted in Kinsley's injuries. ECF 37, 18. Plaintiff's Amended Complaint did not elaborate on what particular safety equipment is at issue or why that equipment was not "working", and neither Plaintiff's expert Daniel Hague, nor Plaintiff's counsel in their discovery requests, have ever identified any defect with Defendants' safety gates. Rather, the thrust of Plaintiffs' safety equipment argument has rested on the operation of the auto-belay device, which Defendants have addressed in their Motion for Summary Judgment.

With respect to the safety gates, Plaintiff does not argue it is broken or inoperable. Plaintiff argues it is not big enough and thus is "defective." To that end, again please consider Plaintiff's expert, Daniel Hague, who testified that auto belay safety gates are used "almost universally". ECF 34-3, 33 at p.127, ll.1-2. Despite this, Mr. Hague did not have <u>any</u> auto belay safety gates at either of his former gyms, Sportrock or Rise Up, during his tenure as owner. ECF 34-3, 34 at p.132, ll.22-25; p.133, ll.3-9. Unworried by his own hypocrisy, Mr. Hague testified, without any supporting evidence, that "[a]n adequately sized belay gate would prevent a climber

13

access to the beginning holds until the climber had detached the safety lanyard from the gate". ECF 34-3, 47 at p.183, ll. 8-11.  Perhaps this is true, perhaps not.  Either way, it falls short of showing High Point's system was dangerous or defective, simply because Plaintiff's expert can imagine a better device.

And to be sure, it is Plaintiff's expert's imagination.  In his book, Hague features an auto-belay safety gate at his former gym, Rise Up (installed after he left) which did <u>not</u> cover up the holds to prevent someone from climbing the wall. ECF 34-3, 47 at p.183, ll. 14-18. Plaintiff correctly points out that a photograph of this gate is used by Defendant and Mr. Hague as a literal textbook <u>example</u> of a safety gate. ECF 37, 7; ECF 33-6.  In his deposition, Mr. Hague ignores his own habits and book to assert, again without any evidence, that a "larger belay gate" would "likely have prevented the accident made the basis of this suit. ECF 34-3, 49 at p.190, ll. 17-21. When asked if he is aware of any climbing gyms that use larger belay gates, Hague confessed: "none that I've seen." ECF 34-3, 49 at p.192, ll. 15-21. Plaintiff's claim that Defendants somehow negligently utilized standard safety gates is a claim based on pure conjecture. Neither Plaintiff nor his expert can point to any authority that Defendants had a legal duty to use gates larger than those used by others in the industry. Hague's testimony that a larger gate – one he has not seen anybody else use, and one that is not featured in his textbook on climbing – would have prevented

an accident occurring at a .000034 rate does not make High Point's existing equipment defective, nor its conduct negligent or wanton.

### III. CONCLUSION

Kinsley Kornegay is a smart and capable young lady. She knew the inherent risks of climbing – namely, falling – and therefore paid attention to her orientation. No matter how Plaintiff now belittles the training she received, it is simply undisputed that Kinsley and her entire climbing party were instructed at least twice how to use the auto-belay system. She understood how and why to use it and, in fact, spent her time at the gym using it specifically to avoid falling when she repelled from the wall. On this one occasion she was not clipped in. Not because she wasn't trained to do so – we know that is false. Not because the clip broke or malfunctioned. We also know this is false. And not because she went there expecting to be supervised. She had already been climbing without supervision, so she knew personally this was not the case, even if her father opted not to tell her what he read in the disclosure. She simply forgot, because people of all ages and experience make mistakes. Plaintiff has failed to prove either negligence or wantonness against the Defendants and summary judgment is due to be granted.

Dated this the 28th day of March, 2023.

*s/ Neal D. Moore, III*
Neal D. Moore, III (ASB-3971-M73N)
Jeremy S. Hazelton (ASB-1481-M76H)
Robert Andrew Yarbro (ASB-2053-F21Q)
*Attorneys for Defendants*

**OF COUNSEL:**
**Christian & Small, LLP**
**505 North 20th Street**
**Suite 1800**
**Birmingham, AL 35203**
**Email: ndmoore@csattorneys.com / jshazelton@csattorneys.com**

## CERTIFICATE OF SERVICE

I hereby certify that I have this date, using the CM/ECF filing system which will send notification of such filing, served a copy of the foregoing pleading upon all counsel of record on this the 28th day of March, 2023:

Austin B. Whitten
Michael C. Bradley
**Pittman, Dutton & Hellums, P.C.**
2001 Park Place North, Suite 1100
Birmingham, Alabama 35203
austinw@pittmandutton.com

*s/ Neal D. Moore, III*
OF COUNSEL
