FILED

2023 Aug-23  AM 11:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| KINSLEY KORNEGAY, a minor, | ) | |
| by and through her parent and | ) | |
| guardian, MATTHEW KORNEGAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-00505-NAD |
| | ) | |
| HIGH POINT BIRMINGHAM, | ) | |
| LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For the reasons stated below and on the record in the June 7, 2023 motion hearing, the court **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment (Doc. 34) filed by Defendants High Point Birmingham, LLC and High Point Climbing, LLC (collectively, "High Point").

## INTRODUCTION

Plaintiff Kinsley Kornegay, a minor, by and through her parent and guardian, Plaintiff Matthew Kornegay (collectively, the Kornegays), filed a complaint alleging that Kinsley was injured when she fell from an indoor rock climbing wall while visiting a climbing gym owned and operated by High Point.  Doc. 1.  The Kornegays alleged negligence and wantonness claims against High Point in

1

connection with Kinsley's fall.  Doc. 1.  It is undisputed that Kinsley fell from High Point's "lava wall" after she did not clip into the wall's auto-belay system, climbed to the top of the wall, and then pushed off (expecting to be safely lowered to the floor by the auto-belay device).  *See infra*.

In light of the record evidence and controlling law, there is no triable issue on the Kornegays' wantonness claim, or on their negligence claim based on an alleged failure to train Kinsley.  But there are triable issues of fact for a jury on the Kornegays' negligence claim based on a theory of premises liability.

## BACKGROUND

### A.   Procedural background

On April 9, 2021, the Kornegays filed a complaint against High Point, alleging negligence and wantonness.  Doc. 1.  The parties consented to magistrate judge jurisdiction.  Doc. 17; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

On February 21, 2023, after the close of discovery, High Point filed this summary judgment motion with supporting evidentiary material.  Doc. 34; *see* Doc. 33.  The parties fully briefed the motion (Doc. 37; Doc. 39), and the Kornegays also submitted evidentiary material in opposition to the motion (Doc. 35; Doc. 36).  On June 7, 2023, the court held a motion hearing.  *See* Doc. 40; Minute Entry (Entered: 06/07/2023).

2

**B.     Legal background**

Under Alabama law, a plaintiff who alleges a negligence claim must prove the following elements, regardless whether the claim relates to premises liability: "duty, breach of duty, cause in fact, proximate or legal cause, and damages." *Ex parte Harold L. Martin Distrib. Co.*, 769 So. 2d 313, 314 (Ala. 2000) ("In [a] premises-liability case, the elements of negligence are the same as those in any tort litigation:   duty, breach of duty, cause in fact, proximate or legal cause, and damages." (citations and quotation marks omitted)).[1]

The difference between a generic negligence claim and a negligence claim based on a theory of premises liability is "whether the injury was caused by some affirmative conduct of the landowner or by a condition of the premises."   *Lilya v. Greater Gulf State Fair, Inc.*, 855 So. 2d 1049, 1053 (Ala. 2003) (citing *Baldwin v. Gartman*, 604 So. 2d 347 (Ala. 1992)).

Where the plaintiff alleges a negligence claim based on a theory of premises liability, "the duty owed an injured person in a premises-liability case depends on the legal status of the person when the injury occurred, i.e., whether the person injured was a trespasser, a licensee, or an invitee."   *Unger v. Wal-Mart Stores, East L.P.*, 279 So. 3d 546 (Ala. 2018) (citation omitted).

---

[1] *See, e.g.*, *Lilya v. Greater Gulf State Fair, Inc.*, 855 So. 2d 1049, 1054 (Ala. 2003) (applying premises liability principles to the duty element of the plaintiff's negligence claim).

As explained below (*see infra*), it is undisputed that Kinsley was an invitee at High Point's climbing gym.   A property owner "owes an invitee the duty to keep the premises in a reasonably safe condition and, if the premises are unsafe, to warn of hidden defects and dangers that are known to the landowner but that are hidden or unknown to the invitee."  *Galaxy Cable, Inc. v. Davis*, 58 So. 3d 93, 98 (Ala. 2010); *see also Jones Food Co. v. Shipman*, 981 So. 2d 355, 361 (Ala. 2006) ("The duty owed by the invitor to an invitee is to exercise ordinary and reasonable care to keep the premises in a reasonably safe condition." (citing *Winn-Dixie v. Godwin*, 349 So. 2d 37 (Ala. 1977))); *Cornutt v. Bolin*, 404 So. 2d 38, 40 (Ala. 1981) ("Alabama law is well settled that a landowner owes an invitee a duty to maintain the premises in a reasonably safe condition, or in the event that the premises are not safe because of a defect or danger, to warn the invitee of any danger or defective condition.").

Generally speaking, if the defendant owed the plaintiff a duty, "then the questions of breach of that duty, proximate causation, and damages are normally resolved by the jury."  *Jones Food*, 981 So. 2d at 361.

However, "[t]he owner of a premises has no duty to warn an invitee of open and obvious [dangers] which the invitee is aware of, or should be aware of, in the exercise of reasonable care on the invitee's part."  *Dolgencorp, Inc. v. Taylor*, 28 So. 3d 737, 742 (Ala. 2009) (quotation marks omitted).   "'A condition is "open and

obvious" when it is known to the [plaintiff] or should have been observed by the plaintiff in the exercise of reasonable care.'" *Daniels v. Wiley*, 314 So. 3d 1213, 1225 (Ala. 2020) (quoting *Denmark v. Mercantile Stores Co.*, 844 So. 2d 1189, 1194 (Ala. 2002)).

Whether an alleged unreasonably dangerous condition was open and obvious also is normally a question for the jury. *See, e.g.*, *Cuevas v. W.E. Walker, Inc.*, 565 So. 2d 176, 178 (Ala. 1990) (stating that "questions of . . . whether the plaintiff should have been aware of the defect[] are normally questions for the jury" (quoting *Bogue v. R. & M. Grocery*, 553 So. 2d 545 (Ala. 1989))); *Marquis v. Marquis*, 480 So. 2d 1213, 1215–16 (Ala. 1985) (reasoning that the Alabama Supreme Court has "long been committed to the proposition that the plaintiff's appreciation of the danger is, almost always, a question of fact for the determination of the jury" (quoting *Kingsberry Homes Corp. v. Ralston*, 285 Ala. 600, 607 (1970))); *see also Wallace v. Tri-State Motor Transit Co.*, 741 F.2d 375, 378 (11th Cir. 1984) ("Of course, disputed issues of fact going to the obviousness of the danger or the adequacy of the landowner's warning would be questions for the jury in determining the scope of the duty." (applying Alabama law)).

Separately, to prove wantonness, a plaintiff must show both the defendant's "conscious doing of some act or the omission of some duty while knowing of the existing conditions," and that the defendant was "conscious that, from doing or

omitting to do an act, *injury will likely or probably result*." *Ex parte Essary*, 992

So. 2d 5, 9 (Ala. 2007) (emphasis added); *see Bozeman v. Central Bank of the South*,

646 So. 2d 601, 603 (Ala. 1994); *see also* Ala. Code § 6-11-20(b)(3) (defining

wantonness as "[c]onduct which is carried on with a reckless and conscious

disregard of the rights or safety of others").

### C.   Factual background

Unless stated otherwise, the following facts are undisputed.

High Point's climbing gym provides an indoor rock climbing experience to

its patrons.   Doc. 35 at 4.   On August 2, 2019, Kinsley Kornegay went with friends

to High Point's climbing gym in Birmingham, Alabama.   Doc. 7 at 3; Doc. 34 at 4.

As a patron of High Point's climbing gym, Kinsley was an invitee.   Doc. 7 at 3;

Doc. 34 at 15–20.   At the time of her visit to High Point's climbing gym, Kinsley

was 12 years old.   Doc. at 3; Doc. 35 at 4.

Kinsley's parents were not present at High Point's gym on August 2, 2019;

but, before Kinsley began climbing, her father Matthew electronically had signed a

liability waiver.   Doc. 34 at 6; Doc. 33-5 ("High Point Climbing and Fitness Gym

Rules and Waiver").

The waiver required acknowledgment that indoor rock climbing is "inherently

dangerous," and acknowledgment of the risks associated with climbing, including

the risks of "falls from walls" and a climber "failing to properly secure [herself] to

belay devices."   Doc. 33-5 at 2 ("I understand that climbing [is] inherently dangerous and that [climbers] will be exposed to risks including, among others: failing to properly secure themselves to belay devices or ropes; [and] falls from walls . . . .").

The waiver also required acknowledgement that a climber—like Kinsley— would not be supervised while climbing.   Doc. 33-5 at 2 ("I understand that High Point staff have no responsibility to assist, supervise or even observe [climbers] in their activities or movement about the facility . . . .").

After Matthew had signed the waiver, Kinsley and her friends received some training, or a "safety orientation," on how to use High Point's safety harnesses and auto-belay system.   Doc. 7 at 3; Doc. 34 at 7–8.   Specifically, Kinsley received at least "two brief demonstrations of how to [use the safety harness to] clip in and out of the auto-belay devices."   Doc. 37 at 6.

An auto-belay system allows "climbers to climb up the wall by themselves and then the device will slowly release the climber back to the ground."   Doc. 7 at 3.

The "Operations Manual" for the auto-belay system that High Point used at its climbing gym (i.e., the "Perfect Descent Climbing" system) states as follows: "Climbers should be under constant supervision by a trained operator.   Before ascending the wall, operators should check to verify that each climber has . . .

[p]roperly clipped their harness onto the Perfect Descent Climbing System."   Doc. 35-2 at 18.

High Point's auto-belay system also included a safety gate, consisting of a "yellow triangle with a stop sign below the clip."   Doc. 34 at 9; *see* Doc. 35-4. Before clipping her safety harness into the auto-belay system, a climber first must unhook and pull the safety gate out of the way.   Doc. 33-2 at 7–8.

Kinsley testified that, after the training and before she started climbing, she understood how to use the auto-belay system.   Doc. 34 at 8–9; Doc. 33-2 at 8 (Q: "Did you feel like you understood how [the auto-belay system] worked after that?" A: "For the most part, yes, sir.").

While her parents were not present at the climbing gym, Kinsley and her friends told the parents who were present that they understood how to clip their safety harnesses into the auto-belay system.   Doc. 33-2 at 8 (Q. "Did any of the moms that were there with y'all talk to y'all about it . . . ?" A. "They asked us -- they were like do y'all know how to clip y'all's self's in, and we were like yes, ma'am, he showed us.").

After the training, Kinsley climbed for a period of time on different climbing walls, and correctly clipped her safety harness into the auto-belay system each time at each wall.   Doc. 34 at 10; Doc. 33-2 at 9 ("We were there for like 30, 40 minutes before we -- I think.   I'm not like for sure.   That's just kind of what it felt like to

me. . . . I had done a bunch of walls already.").

Kinsley then decided to climb the "lava wall," or "volcano wall," in High Point's "Kids Zone."   Doc. 36 at 6.   A High Point employee—Hannah Staubach—testified that Kinsley had been climbing for approximately 45 minutes before Kinsley climbed the lava wall.   Doc. 33-7 at 12.

The lava wall is a 25-foot wall with "a game built into it with multiple interactive buttons and flashing LED lights, and the climber's goal is to climb up the wall fast enough 'to beat the volcano before it erupts.'"   Doc. 37 at 7 (quoting Doc. 33-7 at 11).

Before climbing the lava wall, Kinsley did not unhook the safety gate, and did not clip into the auto-belay system; stated simply, she forgot to clip into the auto-belay system.   Doc. 34 at 10 (Q. "At any point prior to -- and I think we can all agree that that last wall that you climbed you just forgot to clip in; is that fair?" A. "Yes, sir."); Doc. 37 at 7.   Kinsley testified that she forgot to "clip in" to the auto-belay system before climbing the lava wall because she was "distracted by like everything going on and like pressing the buttons and racing up the wall."   Doc. 33-2 at 15.   After climbing to the top of the lava wall, Kinsley pushed off from the wall—unaware that she was not clipped into the auto-belay system.   Doc. 37 at 8. Kinsley fell to the ground; she fractured both of her tibias, and tore ligaments in both of her ankles.   Doc. 37 at 8.

No High Point employee was supervising Kinsley when she climbed the lava wall.   Doc. 33-1 at 13; Doc. 33-7 at 14.

The Kornegays retained an expert on indoor rock climbing safety, Daniel Hague.   *See* Doc. 33-3.   Hague testified that the amusement-style aspects of the lava wall (e.g., the climber pressing the button and racing up the wall against the lights that simulate rising lava) can distract a climber from properly using the safety equipment, and that a different belay gate or supervision would have prevented Kinsley's fall and injury.   Doc. 33-3 at 46, 49; *see* Doc. 35-6 at 10–11.

But Hague did concede that, with respect to indoor rock climbing, "you can't guarantee that somebody is not going to be hurt."   Doc. 34 at 13; Doc. 33-3 at 24.

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   A material fact is one that might affect the outcome of the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts creating a genuine dispute for trial.   *Celotex*, 477 U.S. at 324–

25.   The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.   The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant.   *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a), (c).

Finally, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.   "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord, e.g.*, *Edwards v. National Vision, Inc.*, 568 F. App'x 854, 859 (11th Cir. 2014); *Brown v. Alabama DOT*, 597 F.3d 1160, 1179 (11th Cir. 2010).

## DISCUSSION

There is no genuine dispute of material fact on the Kornegays' wantonness claim, or on their negligence claim based on High Point's alleged failure to train Kinsley.   But there are triable issues of fact for a jury on the Kornegays' negligence

claim based on a theory of premises liability with regard to the lava wall.

# I.    On the Kornegays' wantonness claim, there is no genuine dispute of material fact.

On the Kornegays' wantonness claim, there is no genuine dispute of material fact for trial.   On the record evidence, no reasonable jury could find or infer that High Point was conscious that injury would likely or probably result on the lava wall.   *See Celotex*, 477 U.S. at 322–23 (a "failure of proof concerning an essential element of the [plaintiff's] case necessarily renders all other facts immaterial"); *Ex parte Essary*, 992 So. 2d at 9.

On September 7, 2021, in response to the Kornegays' discovery interrogatories, High Point disclosed that, in the past 3 years, there had been 12 "similar instances where patrons did not follow instructions and failed to clip in[to] [the auto-belay system] which resulted in a fall," and that 3 of those incidents had occurred at High Point's Birmingham location, where Kinsley was climbing in August 2019.   Doc. 35-8 at 3; *see* Doc. 37 at 24.

In this regard, High Point provided a sworn affidavit from its Chief Operating Officer, Shawn Watson, along with its reply brief in support of this summary judgment motion.   Doc. 39-1.   In his affidavit, Watson avers that from November 2016 through the end of 2020, High Point's Birmingham location had 253,537 visits by 67,056 unique visitors.   Doc. 39-1 at 3.   Based on a search and review of High Point's records for "all falling incidents . . . that resulted from a failure to clip into

the auto-belay system," Watson avers that from 2016 to 2020 there were 8 "reported incidents at the High Point Birmingham location out of the aforementioned 235,537 visits during that same time period."[2]   Doc. 39-1 at 3.

As High Point argues, "[t]he statistics do not include how many different climbs were made during the 235,537 visits," but—even counting just 1 climb for each of the 235,537 visits—"8 injuries results in a .000034 occurrence rate."   Doc. 39 at 12.

Moreover, there is no evidence regarding how many of those other similar incidents, if any, may have occurred on the lava wall.

Thus, without more (e.g., evidence about prior occurrences on the lava wall), the undisputed "occurrence rate" (*see* Doc. 39 at 12) is too low for a reasonable jury to find or infer that High Point was "conscious that . . . injury w[ould] likely or probably result" on the lava wall.   *Ex parte Essary*, 992 So. 2d at 9; *see Wal-Mart Stores, Inc. v. Thompson*, 726 So. 2d 651, 654 (Ala. 1998) ("[T]he management of

---

[2] Hannah Staubach—a High Point employee—testified that she had seen climbers at the High Point Birmingham location who "realiz[ed] . . . after they started [climbing] that they [we]re not clipped in . . . anywhere between five and ten times" over the "course" of "four years."   Doc. 33-7 at 21.   Staubach also testified that she had worked at the High Point Birmingham location for "[t]hree years" from 2016 to 2021.   Doc. 33-7 at 5.   Staubach testified further that she completed three "Gym Incident Report[s]" for "falls from people who had not clipped in"—one for Kinsley, and the other two for adults who fell *after* Kinsley's fall.   Doc. 33-7 at 24. Staubach was not "aware of any similar incidents that happened before Kinsley['s] fall."   Doc. 33-7 at 24.

that store had no information from which they could have known that an accident of the kind which occurred in this case was likely to happen.").

## II. On the Kornegays' negligence claim based on High Point's alleged failure to train Kinsley, there is no genuine dispute of material fact.

On the Kornegays' negligence claim based on High Point's alleged failure to train Kinsley, there is no genuine dispute of material fact for trial. On the record evidence, no reasonable jury could find or infer that any alleged deficiency in High Point's training caused Kinsley's fall from the lava wall. *See Celotex*, 477 U.S. at 322–23 (a "failure of proof concerning an essential element of the [plaintiff's] case necessarily renders all other facts immaterial").

In his deposition, the Kornegays' expert (Hague) testified that safety orientations and liability waivers are the "predominant" and "accepted" means of informing patron climbers about the risks of indoor rock climbing. Doc. 34 at 8; Doc. 33-3 at 16. In this respect, the Kornegays argue that "High Point negligently failed to train or test Kinsley on her equipment usage or safety hazards" (Doc. 37 at 21); the Kornegays base this argument on the auto-belay system's "Operations Manual," the "Industry Practices" of the "Climbing Wall Association" (a trade association), High Point's own written policies (which require "employees to administer 'proficiency tests' to new climbers"), and Hague's expert opinions. Doc. 37 at 21–22.

But the undisputed evidence shows that Kinsley did receive some training—

14

a "safety orientation."   Doc. 7 at 3; Doc. 34 at 7–8.   It is undisputed that Kinsley received at least "two brief demonstrations of how to clip in and out of the auto-belay devices."   Doc. 37 at 6.

Furthermore, it is undisputed that after the training Kinsley understood how to use the auto-belay system.   Doc. 33-2 at 8.   Kinsley and her friends told the parents who were with them at the climbing gym that they understood how to clip their safety harnesses into the auto-belay system.   Doc. 33-2 at 8; *see also* Doc. 33-3 at 17 (Hague depo.) (Q. "You didn't want to know whether [Kinsley] did in fact know how to hook into the auto belay?" A. "Well, she might have known but that may not be the issue here.").

Indeed, it is undisputed that Kinsley climbed several walls, and correctly used the auto-belay system for approximately 30 to 45 minutes, before then climbing the lava wall.   Doc. 34 at 10; Doc. 33-7 at 12; Doc. 33-2 at 9 ("I had done a bunch of walls already.").

And, it is undisputed that Kinsley fell from the lava wall because she "forgot" to clip into the auto-belay system.   Doc. 33-2 at 10, 15.

In sum, it is undisputed that Kinsley received training on how to use the auto-belay system, that Kinsley understood how to use the auto-belay system, that Kinsley safely used the auto-belay system for 30–45 minutes without incident, and that Kinsley fell from the lava wall because she forgot to clip into the auto-belay

system—and not because she didn't understand how to properly or safely use the auto-belay device.   Given that undisputed record evidence, no reasonable jury could find or infer that any alleged deficiency with High Point's training caused Kinsley's fall or injury.

### III.   On the Kornegays' negligence claim based on a theory of premises liability, there are triable issues of fact for a jury.

However, on the Kornegays' negligence claim based on a theory of premises liability, there are disputed fact issues for trial.   Those genuine disputes of material fact include the following:   whether the lava wall—with the amusement-style aspects of a race between the climber and the rising lights, the safety gate, and the lack of supervision—was an unreasonably dangerous condition; whether any such unreasonably dangerous condition was open and obvious; and whether High Point adequately had warned of any such unreasonably dangerous condition.   Construing the evidence and reasonable inferences in the Kornegays' favor (*see Centurion Air Cargo*, 420 F.3d at 1149), these are triable fact issues for a jury.[3]

As explained above, a property owner "owes an invitee the duty to keep the

---

[3] For sake of clarity, separate and apart from the alleged unreasonably dangerous condition (i.e., the lava wall), no "freestanding" negligence claim will go to the jury based on either High Point's alleged lack of supervision or safety gates.   Among other things, there is no evidence based on which a reasonable jury could find or infer that Kinsley was injured by any unreasonably dangerous condition or any "affirmative conduct" of High Point or its employees related to an alleged lack of supervision or safety gates, *except* at the lava wall.   *See, e.g.*, *Lilya*, 855 So. 2d at 1053.

premises in a reasonably safe condition." *Galaxy Cable*, 58 So. 3d at 98.

In this case, the lava wall—i.e., the alleged unreasonably dangerous condition—is a 25-foot wall in High Point's "Kids Zone" with "a game built into it with multiple interactive buttons and flashing LED lights, and the climber's goal is to climb up the wall fast enough 'to beat the volcano before it erupts.'"   Doc. 37 at 7 (quoting Doc. 33-7 at 11).

It is undisputed that, before she began climbing the lava wall, Kinsley did not unhook the safety gate, and did not clip into the auto-belay system.   Doc. 34 at 10; Doc. 37 at 7.

Kinsley testified that she was "distracted by like everything going on and like pressing the buttons and racing up the wall," and consequently that she "forgot" to properly "clip in" to the auto-belay system.   Doc. 33-2 at 15.   Kinsley also testified that she would not have pushed off the lava wall (after having climbed to the top), if she had realized that she had not clipped into the auto-belay system.   Doc. 34 at 10; Doc. 33-2 at 10.

Kinsley testified further, "I feel like if [the lava wall's] going to be targeted towards like such young age people, there shouldn't be distractions like that could even like even slightly distract you from being able to like have your all focus on clipping in and making sure you're safe."   Doc. 33-2 at 61 (sic).

In his expert report, Hague opined that the "immediate cause" of Kinsley's

fall was her failure to clip into the auto-belay system.   Doc. 35-6 at 10.

With respect to the amusement-style aspects of the lava wall and distraction, Hague's expert report states that "[t]he button [Kinsley] pressed just prior to her beginning to climb [the lava wall] started a series of lights that lit progressively up the wall.   The climber is intended to race those lights to the top of the wall and press another button."   Doc. 35-6 at 11.

Consistent with Kinsley's testimony, Hague opined that "[t]his type of amusement is a distraction from the more important safety aspects of using the auto-belay system and the excitement to beat those lights to the top can cause a climber to forget to clip in, especially if that climber is a minor."   Doc. 35-6 at 11; Doc. 33-3 at 46 ("My opinion is that . . . the distraction of the lights and the anticipation of racing them to the top takes attention away from the safety procedures that the[] [climbers] were hopefully taught.").   Similarly, the Climbing Wall Association's Industry Practices state that they are "intended to address climbing as a sport and not climbing activities conducted as if they were 'amusement rides.'"   Doc. 35-2 at 10.

Moreover, High Point's 30(b)(6) corporate representative, Shawn Watson, acknowledged that amusement-style aspects of climbing walls "[p]otentially" could be "a distraction for children while they're climbing."   Doc. 33-1 at 28 (discussing "race clocks").   Watson testified that, "in order to be distracted enough, the[] [children] would have to climb around the banner [i.e., the safety gate] blocking the

bottom of the wall."   Doc. 33-1 at 28.

But Watson also recognized that, on other occasions, climbers have climbed around the safety gates at High Point.   Doc. 33-1 at 28.   And it is undisputed that Kinsley was able to climb around the safety gate on the lava wall before she climbed to the top of the wall and then fell.   Doc. 34 at 10; Doc. 37 at 7.

With respect to the safety gate, Hague's expert report opined that "[a]n adequately sized belay gate would prevent a climber access to the beginning holds until the climber had detached the safety lanyard from the gate," and that High Point's "belay gates are clearly inadequate at preventing a climber access to the climbing wall."   Doc. 35-6 at 11.

With respect to the lack of supervision (and as noted above), the manual for the auto-belay system that High Point used states that "[c]limbers should be under constant supervision by a trained operator," and that "operators should check to verify that each climber has . . . [p]roperly clipped their harness onto the [auto-belay system]."   Doc. 35-2 at 18.

It is undisputed that no High Point employee was supervising Kinsley when she climbed the lava wall.   Doc. 33-1 at 13; Doc. 33-7 at 14.   It also is undisputed that the High Point waiver, which Matthew signed, states that High Point would not supervise Kinsley while she was climbing.   Doc. 33-5 at 2.

Construing the evidence and inferences in favor of the Kornegays, Hague's

expert's report states that "[t]here was no direct supervision by a trained operator," and opined that supervision at the lava wall "would have ensured that [Kinsley] was properly secured to the auto-belay system prior to her leaving the ground."  Doc. 35-6 at 11.

Thus, based on the record evidence, a reasonable jury could find that the lava wall was an unreasonably dangerous condition—e.g., based on the amusement-style aspects, the safety gate, and the lack of supervision.  On the other hand, without more, the fact of an injury does not prove negligence, and a reasonable jury could find that the lava wall was *not* an unreasonably dangerous condition.  *See, e.g.*, *Tice v. Tice*, 361 So. 2d 1051, 1052 (Ala. 1978) ("There is no presumption of negligence which arises from the mere fact of an injury to an invitee." (citations omitted)).

Likewise, a reasonable jury could find that any danger was open and obvious (or not), and/or that High Point adequately had warned of any such danger (or not). *See, e.g.*, Doc. 34 at 19 ("Notwithstanding that [High Point] had no duty to warn [Kinsley] of the obvious risks associated with indoor rock climbing walls, [High Point] did in fact warn Kinsley and her father of the inherent risks associated with rock climbing by way of [the] liability waiver and the safety orientation."); Doc. 39 at 8 ("[T]he waiver and disclosure form served to provide [the Kornegays] with notice of the risks associated with rock climbing at High Point and High Point's duties in that regard.").

The point for now is only that, in light of the record evidence in this case, the court cannot decide those disputed issues as a matter of law.

## CONCLUSION

For the reasons stated above, High Point's summary judgment motion (Doc. 34) is **GRANTED IN PART**, with respect to the Kornegays' wantonness claim and negligence claim based on an alleged failure to train Kinsley, and **DENIED IN PART**, with respect to the Kornegays' negligence claim based on a theory of premises liability.

The court **DISMISSES WITH PREJUDICE** the Kornegays' wantonness claim, and their negligence claim based on an alleged failure to train Kinsley.

The court **SETS** this case for a telephone status conference on **Wednesday, September 6, 2023, at 1:00pm**.  Ahead of that status conference, counsel are **ORDERED** to meet and confer regarding potential case resolution and trial scheduling.

**DONE** and **ORDERED** this August 23, 2023.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE